

OFFICE COPY

**JUDGE KAPLAN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

FIREMAN'S FUND INSURANCE
COMPANY, ONE BEACON INSURANCE
COMPANY, NATIONAL LIABILITY AND
FIRE INSURANCE COMPANY and QBE
MARINE & ENERGY SYNDICATE 1036,

ECF Case

10 Civ. (          )

**10 cv 1653**

Plaintiffs,

-against-

GREAT AMERICAN INSURANCE
COMPANY OF NEW YORK, MAX
SPECIALTY INSURANCE COMPANY
and SIGNAL INTERNATIONAL, LLC

Defendants.
-------------------------------------------------------X

**COMPLAINT**



Plaintiffs Fireman's Fund Insurance Company ("FFIC"), One Beacon Insurance

Company ("One Beacon"), National Liability and Fire Insurance Company ("National

Liability") and QBE Marine & Energy Syndicate 1036 ("QBE"), as and for a Complaint against

the Defendants Great American Insurance Company of New York ("Great American"), Max

Specialty Insurance Company ("Max Specialty") and Signal International, LLC ("Signal"),

allege upon information and belief as follows:

<u>**JURISDICTION**</u>

1.      This action is filed under and pursuant to the Federal Declaratory Judgment Act,

28 U.S.C. §2201.

2.      The following issues constitute questions of insurance coverage under several

Admiralty or Maritime contracts of insurance and thereby come within the Admiralty and

Maritime jurisdiction of the United States District Court, pursuant to Title 28 U.S.C. §1333 <u>et</u>

seq., and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and within the Admiralty and Maritime jurisdiction of the United States and of this Honorable Court.

3.      An actual controversy of a justiciable nature exists between plaintiffs and defendants involving the rights and obligations under these several marine contracts of insurance and, depending on the construction of said contracts, the aforesaid controversy can be determined by a judgment of this Court, without further suit.

4.      As outlined below, this Court has personal jurisdiction over defendant Signal pursuant to New York Civil Practice Laws and Rules Section 302.

## PARTIES

5.      At all times relevant, plaintiff FFIC was and is an insurance company duly organized under and existing by virtue of the laws of the State of California with a principal place of business in California and with an office and place of business at One Chase Manhattan Plaza, New York, New York 10005.

6.      At all times relevant, plaintiff One Beacon was and is an insurance company duly organized under and existing by virtue of the laws of the State of Massachusetts with a principal place of business in Massachusetts and with its home office for marine insurance and place of business at 77 Water Street, New York, New York 10005.

7.      At all times relevant, plaintiff National Liability was and is a corporation duly organized under and existing by virtue of the laws of the State of Connecticut with an office and principal place of business in Omaha, Nebraska.

8.      At all times relevant, plaintiff National Liability was and is authorized to issue policies of insurance in the States of New York.

9.     At all times relevant, plaintiff National Liability was represented by an underwriting agent in New York, Starr Marine Agency, Inc. ("Starr").  Starr is not a party in this action.

10.     At all times relevant, Starr had and has its home office underwriting staff in New York, New York.

11.     At all times relevant, plaintiff QBE was and is a Lloyds insurance syndicate duly organized under and existing by virtue of the laws of the country of United Kingdom with an office and place of business in London, United Kingdom.

12.     At all times relevant, defendant Signal was and is a corporation duly organized under and existing by virtue of the laws of the State of Delaware with offices and places of business in the States of Mississippi and Texas.

13.     At all times relevant, defendant Great American was and is an insurance company duly organized under and existing by virtue of the laws of the State of New York with a principal place of business located at 65 Broadway in the County, City and State of New York.

14.     At all times relevant, defendant Max Specialty was and is an insurance company duly organized under and existing by virtue of the laws of one of the states of the United States with a principal place for marine insurance business located in the County, City and State New York.

15.     At all times relevant, Westchester Surplus Lines Insurance Company ("Westchester") was and is an insurance company duly organized under and existing by virtue of the laws of one of the states of the United States with an office and place of business in New York.  Westchester is not a party to this action.

16.     At all times relevant, Willis of Alabama, Inc. ("Willis/AL") was and is a corporation or other business entity duly organized under and existing by virtue of the laws of the State of Alabama with a home office for marine insurance claims c/o Willis of New York, Inc. ("Willis/NY") with an office and place of business in the County, City and State of New York.  Neither Willis/AL nor Willis/NY (hereinafter jointly referred to as "Willis") are parties to this action.

17.     At all times relevant, Willis was and is engaged in the business of brokering marine insurance and was and is the broker for defendant Signal with regard to the insurance policies which are the subject matter of this litigation.

18.     At all times relevant, Willis was and is an agent of Signal.

**OVERVIEW**

19.     This action arises out of the August 20, 2009 sinking of a drydock (drydock AFDB-5) at its berth in Texas (the "loss"); the drydock was owned and operated by defendant Signal.

20.     As fully set forth in the enumerated paragraphs below, Signal had obtained several policies of insurance that had the potential for providing coverage for certain claims attendant upon the sinking of the drydock.

21.     Due to the sinking of the drydock, to date Signal has made demand from insurers for payment of at least $45 million in unsubstantiated claims.

22.     As also set forth fully below, plaintiffs in this action seek declarations from this Court of the duties and obligations of the various insurers and of Signal, the owner of the drydock and claimant under the several policies.

**THE PRIMARY POLICIES**

23.     On or before January 30, 2009, defendant Signal purchased a primary property insurance policy through the New York offices of AMWins Brokerage of New York from Westchester, bearing policy no. D37362220 001 for the period of January 30, 2009 through January 30, 2010 (the "Westchester Policy").

24.     In and by the terms of the Westchester Policy, Westchester insures defendant Signal in the amount of $10 million per occurrence for, *inter alia*, the physical loss of a certain drydock identified as AFDB-5 (hereinafter sometimes referred to as the "drydock"), including the debris removal of the wrecked drydock with a sub-limit of $5 million per occurrence.

25.     Westchester has paid defendant Signal the full policy limit of $10 million, but without allocating the payment under and pursuant to the policy terms.

26.     Defendant Signal has refused to allocate any of the $10 million payment by Westchester for the removal of the debris, which make up the wrecked drydock.

27.     On or before January 30, 2009, defendant Signal made application in New York to purchase a policy of pollution liability insurance from defendant Great American.

28.     On or about January 30, 2009, defendant Great American issued in New York a pollution liability insurance policy to defendant Signal, which bears policy no. OMH 6539337 05 for the policy period of January 30, 2009 through January 30, 2010 (the "Great American Policy").

29.     The Great American Policy insures defendant Signal for pollution liability arising under Oil Pollution Act of 1990 ("OPA"), the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), Federal Water Pollution Control Act, Amendments of 1972 ("FWPCA"), and pursuant to endorsements, the coverage includes the

"on-water removal of materials of a non-OPA and non-CERCLA nature which has been mandated by an authorized public authority" and removal of pollutants under state law.

30.     The Great American Policy contains a clause requiring the application of "Federal Maritime" or, in its absence, New York law.

31.     Notwithstanding that the United States Coast Guard and Texas General Land Management ("Texas GLO") have ordered the removal of the wrecked drydock under OPA and Texas state pollution laws, respectively, defendant Great American has declined coverage for the removal of the drydock in whole and/or in part.

32.     On or about January 30, 2009, the plaintiff FFIC authorized the issuance of a policy of Marine Excess Liability Insurance to defendant Signal, bearing policy no. MGL 09 05 100 (the "FFIC MGL Policy")

33.     The FFIC MGL Policy was for the period of January 30, 2009 through January 30, 2010.

34.     As the FFIC MGL Policy required head marine office approval prior to its issuance, plaintiff FFIC bound the policy, in fact, through the New York home office, subscribing to a 50% participation and with the designation as lead insurer.

35.     The FFIC MGL Policy contains a full following clause with plaintiff FFIC, as the lead insurer, having full claims control over the acceptance and/or declination of claims made thereunder.

36.     The plaintiff One Beacon subscribed to a 50% participation in the FFIC MGL Policy, but only in a following position, thereby ceding claims control to the lead insurer, plaintiff FFIC.

37.    The FFIC MGL Policy provided coverage in the amount of $1 million per occurrence, but subject to a $100,000.00 deductible.

38.    With regards to the claim, which is the subject matter of this Complaint, One Beacon has tendered its full policy limit of $450,000.00 to the lead insurer FFIC to be paid out in accordance with the terms and conditions of the FFIC MGL Policy, but with full recognition that any and all claim payments are solely within the authority of plaintiff FFIC as lead insurer.

## THE EXCESS POLICIES

39.    On or about January 30, 2009, the plaintiff FFIC authorized the issuance of a policy of Marine Excess Liability Insurance to defendant Signal, bearing policy no. MGL 09 05 100 (the "Bumbershoot Policy") with a coverage period of January 30, 2009 through January 30, 2010.

40.    As the Bumbershoot Policy required the head marine office approval prior to its issuance, plaintiff FFIC bound the policy, in fact, through the New York home office, subscribing to a 34% participation and with the designation as lead insurer.

41.    The Bumbershoot Policy contains a full following clause with plaintiff FFIC, as the lead insurer, having full claims control over the acceptance and/or declination of claims made thereunder.

42.    The plaintiff National Liability subscribes to a 34% participation in the Bumbershoot Policy, but only on a following basis.

43.    As the Bumbershoot Policy required home office approval prior to its issuance, plaintiff National Liability bound the policy, in fact, through Starr's marine head office in New York, subscribing to a 33% participation and with the designation as lead insurer.

44.     The plaintiff QBE subscribes to a 32% participation in the Bumbershoot Policy, but only on a following basis.

45.     The Bumbershoot Policy contains a full following clause with plaintiff FFIC, as the lead insurer, having full claims control over the acceptance and/or declination of claims made thereunder.

46.     The policy provides coverage in the amount of $25 million per occurrence, but in excess of the scheduled underlying insurance and other applicable policies.

47.     The Great American Policy and the FFIC MGL Policy are both scheduled as underlying policies to the Bumbershoot Policy.

48.     On or about January 30, 2009, defendant Max Specialty through the New York offices of AMWins Brokerage of New York issued an excess property policy to defendant Signal for the period of January 30, 2009 through January 30, 2010 on a full following form to the primary property policy issued by Westchester with limits of $15 million per any occurrence, but excess of the $10 million primary property policy limit (the "Max Specialty Excess Property Policy").

49.     Notwithstanding that the drydock is 1) wrecked beyond repair, 2) a constructive total loss and 3) without further usefulness and, therefore, constitutes debris under the primary property policy and the Max Specialty Excess Property Policy, Max Specialty has declined coverage in all respects for the removal of the drydock and has also directed defendant Signal not to allocate any of the primary property payments for debris removal of the wrecked drydock.

## FACTUAL BACKGROUND

50.     On or before August 20, 2009, drydock AFDB-5 was in such poor condition that it required daily pumping by its main pumps to prevent it from sinking.

51.     On or about August 20, 2009, drydock AFDB-5 sank at its berth in Texas during a period of calm weather.

52.     By reason of the dydock's poor condition and its sinking, said drydock no longer had the capability of dewatering and refloating itself and thereby constituted a constructive total loss without any further usefulness or value.

53.     Shortly after the sinking of the now worthless drydock, the United States Coast Guard issued an order requiring containment of pollution or potential discharge of pollutants caused by the sinking and/or removal of the wrecked drydock pursuant to OPA.

54.     On or about September 2, 2009, the Texas General Land Office ("Texas GLO") after investigating the sinking of the subject drydock, ordered the removal of the wrecked drydock, citing only to the Oil Spill Prevention and Response Act of 1991 ("OSPRA").

55.     Texas GLO did not order the removal of the drydock on the grounds that it was a navigation hazard.

56.     After the sinking of the drydock, surveys revealed that the internals of the structure, particularly in the machinery spaces, contained both oil products and hazardous materials, such as asbestos, that require removal.

57.     In November 2009, defendant Signal presented a claim to plaintiff FFIC, as the lead insurer under the Bumbershoot Policy, requesting that the Bumbershoot insurers fund the removal of the drydock in full, less any amount paid by the FFIC MGL Policy without any

contribution from the primary and excess property policy and the Great American pollution policy.

58.     Thereafter, plaintiff FFIC, as the lead insurer under the Bumbershoot Policy, issued a reservation of rights letter stating that it was not required to respond for the funding of the removal of the wrecked drydock and/or pollutants until such time as all primary policies were exhausted, including but not limited to the FFIC MGL Policy, if triggered, and the Great American pollution policy; both of which are scheduled as underlying insurance to the Bumbershoot Policy and contribution from the primary and excess property policies issued by Westchester and Max Specialty, respectively.

59.     On or about January 19, 2010, representatives of Signal and Willis attended a meeting in New York for purposes of discussing the Signal claims arising out of the sinking of the wrecked drydock, particularly the funding for the cost of debris and pollution removal.

60.     At the January 19, 2010 meeting in New York, plaintiff FFIC, as lead insurer on behalf of both the MGL insurers and Bumbershoot insurers, declined the demand for payment, but agreed to assist in going forward on soliciting bids for the removal of the debris and pollutants, which make up the wrecked drydock.

61.     In an attempt to move this process forward on a without prejudice basis, on and after January 20, 2010, defendant Signal, with assistance from plaintiff FFIC, solicited bids from various and several salvors for the removal of the debris and pollutants for the wrecked drydock, but without any commitment by plaintiff FFIC, as the lead insurer under the FFIC MGL Policy and Bumbershoot Policy, that payments would be forthcoming.

62.     In conjunction with obtaining bids for removal of debris and pollutants, which make up the wrecked drydock, plaintiff FFIC retained the services of Ken Edgars, as a marine consultant, who is an expert in both drydock operations and removal of sunken structures.

63.     On or about February 11, 2010, several salvors, including Don Jon Marine ("Don Jon") and Weeks Marine, Inc. ("Weeks"), responded to a request for proposal to remove the debris and pollutants, making up the wrecked drydock

64.     On or about February 22, 2010, Ken Edgars advised that the Weeks bid should be accepted by defendant Signal as it represented the most cost effective, although not lowest, of the submitted bids, and that the cost could then be limited to approximately $12.3 million.

65.     On or about February 22, 2010, Ken Edgars also advised that Don Jon's bid, while technically acceptable, was for an amount in excess of $17 million and therefore did not represent the most cost effective manner in which to remove the debris and pollutants, making up the wrecked drydock.

66.     At the January 19, 2010 meeting, defendant Signal advised that it was making claim for additional amounts in a sum then stated to be approximately $1.3 million under FFIC MGL Policy and the Bumbershoot Policy for alleged costs associated with the removal of the debris and pollutants.

67.     In late January/early February 2010, defendant Signal submitted to plaintiff FFIC, as lead insurer on the FFIC MGL Policy and Bumbershoot Policy, a schedule of cost and expenses totaling in amount in excess of $2.25 million, representing the alleged costs incurred to date by defendant Signal to remove the debris and pollutants, which make up the wrecked drydock.

68.     In mid February 2010, the representatives of FFIC, after reviewing the claim schedules submitted by Signal as the additional claims, advised defendant Signal that the amounts claimed did not 1) constitute removal charges, or 2) were not properly identified and/or 3) required submission of additional background material for further consideration.  To date, defendant Signal has not responded to these requests.

69.     On or about February 23, 2010, by letter bearing that date, defendant Signal once again made demand upon plaintiff FFIC, as lead insurer of the FFIC MGL Policy and the Bumbershoot Policy, to pay for all costs of removing the debris and pollutants which make up the wrecked drydock without any contribution from the primary and excess property policies and the primary pollution policy.

70.     By this declaratory judgment action, plaintiff FFIC, as lead insurer on the FFIC MGL Policy and Bumbershoot Policy, hereby declines such demand.

71.     In the February 23, 2010 letter, defendant Signal further demands that the primary MGL policy and Bumbershoot Policy respond for the additional claim amounts in the approximate sum of $2.25 million for alleged charges and other expenses purportedly incurred by defendant Signal for the removal of the debris and pollutants which make up the wrecked drydock without contribution from the primary and excess property policies and/or Great American pollution policy.

72.     By this declaratory judgment action, plaintiff FFIC, as the lead insurer on the FFIC MGL Policy and the Bumbershoot Policy, declines this demand for payment, but is open to a further submission by defendant Signal, but with a full reservation of rights, and plaintiff FFIC demands in return that the primary policies be exhausted in the first instance before the

Bumbershoot underwriters are responsible for any payments which may be covered under the Bumbershoot Policy.

73.     In the February 23, 2010 letter, defendant Signal further advises that it has, without just cause and without explanation, rejected the bid by Weeks for the removal of the debris and pollutants, which make up the wrecked drydock.

74.     By this declaratory judgment action, plaintiff FFIC as the lead insurer on the FFIC MGL Policy and the Bumbershoot Policy objects to defendant Signal's rejection of the Weeks bid for the removal of the debris and pollutants, which make up the wrecked drydock.

75.     In the February 23, 2010 letter, defendant Signal advises that it will award the bid for the removal of the debris and pollutants, which make up the wrecked drydock, to Don Jon, despite the fact that Don Jon's bid is $5 million above that quoted by Weeks.

76.     By this declaratory judgment action, plaintiff FFIC, as the lead insurer of the FFIC MGL Policy and the Bumbershoot Policy, hereby advises defendant Signal that it objects to the award of the bid to Don Jon and that, if defendant Signal proceeds in this manner and awards the bid to Don Jon, these insurers will not pay an amount, if liable, in excess of the Weeks bid in the approximate amount of $12.3 million, less any payments made by defendant Signal as part of its deductible and/or self insured retention and payments made by other insurers.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST SIGNAL BY THE MGL INSURERS

77.     Repeats and incorporates by reference each and every allegation set forth in paragraphs "1" through "76," inclusive of this Complaint as if more fully set forth herein.

78.     Pursuant to the terms and conditions of the FFIC MGL Policy, that policy only responds for the removal of the drydock if "so-ordered" by a governmental authority, subject to the full terms and conditions of the policy.

79.     In and by the terms of the FFIC MGL Policy, FFIC and One Beacon do not respond for any and all losses which arise from pollution.

80.     At present, there exist two (2) governmental orders for the removal of the wrecked drydock, one issued by the United States Coast Guard under OPA and another issued by Texas GLO under OSPRA.

81.     To the extent that the United States Coast Guard and Texas GLO orders arise solely from pollution, the FFIC MGL Policy does not respond for the removal of the debris and pollutants, which make up the wrecked drydock.

82.     Defendant Signal claims, without authority or support, that Texas GLO has ordered the removal of the drydock for reasons other than pollution.

83.     To date, defendant Signal has not submitted anything to support the claims that the Texas GLO order arises from anything but pollution.

84.     By reason of the foregoing, plaintiffs FFIC and One Beacon seek an order declaring that they have no liability under the MGL policy to make payment for the removal of the wrecked drydock or, in the alternative, for an order requiring payment under the MGL only to the extent any of the removal is non-pollution based and that their payments be prorated amongst other responsible insurers.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST SIGNAL BY THE BUMBERSHOOT INSURERS

85.     Repeats and incorporates by reference each and every allegation set forth in paragraphs "1" through "84," inclusive of this Complaint as if more fully set forth herein.

86.     The FFIC MGL Policy, if triggered, and the Great American Pollution Policy are both scheduled as underlying insurance to the Bumbershoot Policy.

87.     The plaintiffs FFIC, National Liability and QBE are not required to make any payments under the Bumbershoot Policy until such time as the primary limits of the FFIC MGL Policy, if triggered, and the Great American Pollution Policy have been exhausted.

88.     By virtue of the foregoing, plaintiffs FFIC, National Liability and QBE seek an order, authorizing them to withhold payment to defendant Signal under the Bumbershoot Policy until such time as the limits of liability under the FFIC MGL Policy, if triggered, and the Great American Pollution Policy have been exhausted.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST SIGNAL BY THE BUMBERSHOOT INSURERS

89.     Repeats and incorporates by reference each and every allegation set forth in paragraphs "1" through "88," inclusive of this Complaint as if more fully set forth herein.

90.     The Bumbershoot Policy contains an "Other Insurance" clause which renders any liability under the Bumbershoot Policy to defendant Signal for the cost of removing debris and pollutants, making up the wrecked drydock, excess to any other insurance, including the primary property policy issued by Westchester.

91.     By reason of the foregoing, the plaintiffs FFIC, National Liability and QBE seek an order, authorizing them to withhold payment to defendant Signal under the Bumbershoot Policy until such time as Signal, the recipient of the $10 million proceeds under the primary property policy, has paid the first $5 million for the removal of debris, making up the wrecked drydock.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST SIGNAL BY THE MGL AND BUMBERSHOOT INSURERS

92.     Repeats and incorporates by reference each and every allegation set forth in paragraphs "1" through "91," inclusive of this Complaint as if more fully set forth herein.

93.     Defendant Signal has presented to plaintiff FFIC, as lead insurer under both the MGL and the Bumbershoot Policy, an additional claim for the alleged removal of the debris and pollutants, making up the wrecked drydock, in the approximate sum of $2.25 million.

94.     The additional claim is comprised of the alleged cost of a lease for property, labor, materials and equipment, all of which defendant Signal claims to have paid for the removal of the debris and pollutants, making up the wrecked drydock.

95.     At present, none of the charges, as submitted, appear to be attributable to removal efforts by defendant Signal and/or as being properly identified as being expended in furtherance of said removal of the debris and pollutants, which make up the wrecked drydock.

96.     By reason of the foregoing, plaintiffs FFIC, One Beacon, National Liability and QBE seek an order affirming their present decision to decline payment for these charges or in the alternative, ordering defendant Signal to produce additional information to support such claim for further consideration by these liability insurers.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST SIGNAL BY THE BUMBERSHOOT INSURERS

97.     Repeats and incorporates by reference each and every allegation set forth in paragraphs "1" through "96," inclusive of this Complaint as if more fully set forth herein.

98.     Under all applicable laws, defendant Signal has an obligation to act in good faith in making claims for payment under the Bumbershoot Policy.

99.     In Signal's February 23, 2010 letter, Signal advises that it is rejecting the Weeks' bid and states that it will award the bid to Don Jon for the removal of the debris and pollutants, making up the wrecked drydock, despite the fact that the Don Jon bid is $5 million higher in cost than that submitted by Weeks.

100.     Defendant Signal has provided no good and valid reason or cause for selecting the higher bid by Don Jon over the lower bid by Weeks.

101.     In the event that defendant Signal selects the Don Jon bid requiring a payment in excess of the Weeks bid, this is a breach of defendant Signal's obligation of good faith under the Bumbershoot Policy.

102.     By reason of the foregoing, plaintiffs FFIC, National Liability and QBE seek an order prohibiting defendant Signal from receiving payment from these Bumbershoot underwriters, if responsible for any payment, in excess in the amount of the Weeks bid (which is in the approximate sum of $12.3 million) less any and all deductibles and/or self insured retentions to be paid by defendant Signal and any amounts payable under all other primary and excess policies, which are subject matters of this action.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST
### GREAT AMERICAN BY THE MGL AND BUMBERSHOOT INSURERS

103.     Repeats and incorporates by reference each and every allegation set forth in paragraphs "1" through "102," inclusive of this Complaint as if more fully set forth herein.

104.     The Great American Pollution Policy must respond for the cost of removing any actual or imminent discharge of pollutants under federal and/or state law.

105.     The removal of the wrecked drydock has been mandated and ordered by Texas GLO under a pollution statute, which by operation of law, renders the drydock itself a pollutant, and the cost of removal is covered under the Great American Pollution Policy.

106.    In addition, the subject drydock contains both oil product derivatives under OPA and hazardous materials, such as asbestos, under CERCLA, which have either been released and/or are in danger of imminent release and therefore, the removal of these pollutants are covered under the Great American Pollution Policy and Great American should respond for the removal of these pollutants under the Great American Pollution Policy.

107.    By reason of the foregoing, plaintiffs FFIC, One Beacon, National Liability and QBE seek an order requiring Great American to pay for the removal of the pollutants under both state and federal law up to the full limits of its policy which is in the sum of $5 million.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### AGAINST MAX SPECIALTY BY THE BUMBERSHOOT INSURERS

108.    Repeats and incorporates by reference each and every allegation set forth in paragraphs "1" through "107," inclusive of this Complaint as if more fully set forth herein.

109.    The drydock in its wrecked condition is debris under the terms and conditions of the primary property policy issued by Westchester.

110.    The Max Specialty Excess Property Policy is written on a following form and provides the same coverage as that provided under the terms and conditions of the primary property policy issued by Westchester.

111.    As the Bumbershoot Policy and the Max Specialty Excess Property Policy both provide coverage for the removal of the wrecked drydock, each policy should be required to pay a prorated share of the costs for removal which exceed the amount paid by the exhaustion of all other primary policy limits which are obligated to pay for the removal of the wrecked drydock.

112.    By virtue of the foregoing, plaintiffs FFIC, National Liability and QBE seek an order that to the extent that these Bumbershoot insurers are required to pay for debris removal

that such payments are to be made only after the exhaustion of the primary policy limits and that such payments be made only on a proportional basis with Max Specialty.

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

A.   in favor of plaintiffs FFIC and One Beacon and against defendant Signal on the First Cause of Action for judgment declaring that plaintiffs FFIC and One Beacon have no liability under the FFIC MGL Policy to make payments for the removal of any pollutants associated with the wrecked drydock, including the drydock, itself, or alternatively, requiring payment under the FFIC MGL Policy only to the extent that any of the removal is non-pollution based and that said payments be prorated amongst other responsible insurers;

B.   in favor of plaintiffs FFIC, National Liability and QBE and against defendant Signal on the Second Cause of Action for judgment declaring that plaintiffs FFIC, National Liability and QBE are not liable to defendant Signal for payment under the Bumbershoot Policy until such time as the limits of liability under the FFIC MGL Policy, if triggered, and the Great American Pollution Policy have been exhausted;

C.   in favor of plaintiffs FFIC, National Liability and QBE and against defendant Signal on the Third Cause of Action for judgment declaring that plaintiffs FFIC, National Liability and QBE are not liable to defendant Signal for any payments for the removal of debris until such time as Signal, as the recipient of the $10 million proceeds under the primary property policy, has paid the first $5 million for removal of debris, making up the wrecked drydock;

D.   in favor of the plaintiffs FFIC and One Beacon under the FFIC MGL Policy and FFIC, National Liability and QBE under the Bumbershoot Policy on the Fourth Cause of Action for judgment declaring that plaintiffs FFIC, One Beacon, National Liability and QBE have no obligation to make payment for the additional claims being presented by defendant Signal as cost incurred for the removal of debris and pollutants, making up the wrecked drydock;

E.   in favor of plaintiffs FFIC, National Liability and QBE and against defendant Signal on the Fifth Cause of Action for judgment declaring that plaintiffs FFIC, National Liability and QBE, if obligated at all, shall not be required to make payment for the removal of debris and pollutants, making up the wrecked drydock to the extent that such payments by defendant Signal exceed the Weeks' bid in the sum of approximately $12.3 million, less any and all deductibles and/or self insured retentions to be paid by defendant Signal and any amounts payable under all other primary and excess policies, which are the subject matters of this action;

F.   in favor of plaintiffs FFIC, One Beacon, National Liability and QBE and against defendant Great American on the Sixth Cause of Action for judgment declaring that defendant Great American is obligated to pay the full $5 million of the limits of liability under its policy for the removal of the pollutants, making up the wrecked drydock under both federal and state law;

G.   in favor of plaintiffs FFIC, National Liability and QBE and against defendant Max Specialty on the Seventh Cause of Action for judgment declaring that any payments to be made by plaintiffs FFIC, National Liability and QBE in excess

of the primary property and/or liability policies, which are the subject matter of

this action be shared on a prorated basis with defendant Max Specialty; and

H.      in favor of plaintiffs for such other and further relief that this Court may deem

just and proper;

together with the disbursements and costs of this action.


Dated:      New York, New York
            March 2, 2010


                        NICOLETTI HORNIG & SWEENEY
                        *Attorneys for Plaintiffs*


            By:     _____
                        John A. V. Nicoletti (JN-7174)
                        Wall Street Plaza
                        88 Pine Street, 7th Floor
                        New York, New York 10005-1801
                        Tel: (212) 220-3830
                        Fax: (212) 220-3780
                        E-mail: jnicoletti@nicolettihornig.com
                        (FILE NO.:  42000055 JAVN/RAN/FK)