UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

FIREMAN'S FUND INSURANCE
COMPANY, ONE BEACON INSURANCE
COMPANY, NATIONAL LIABILITY AND
FIRE INSURANCE COMPANY and QBE
MARINE & ENERGY SYNDICATE 1036,

                              Plaintiffs,

            -against-

GREAT AMERICAN INSURANCE
COMPANY OF NEW YORK, MAX
SPECIALTY INSURANCE COMPANY
and SIGNAL INTERNATIONAL, LLC

                              Defendants.
-------------------------------------------------------X

**ECF Case**

10 Civ. 1653  (JPO)

**PLAINTIFFS' LOCAL
RULE 56.1 STATEMENT**

Plaintiffs Fireman's Fund Insurance Company, One Beacon Insurance Company, National Liability and Fire Insurance Company and QBE Marine & Energy Syndicate 1036, by their attorneys, Nicoletti Hornig & Sweeney, set forth below as and for their Statement pursuant to Local Rule 56.1 the following material facts as to which plaintiffs contend there are no genuine issues to be tried in regard to plaintiffs' motion for summary judgment against defendant Max Specialty Insurance Company:

## THE PARTIES

1.      Plaintiff Fireman's Fund Insurance Company ("Fireman's Fund") was and is an insurance company duly organized under and existing by virtue of the laws of the State of California with a principal place of business in California and with an office and place of business at One Chase Manhattan Plaza, New York, New York 10005.  (Complaint ¶ 5, Exhibit "1"; Answer ¶ 5[1], Exhibit "2").[2]

---

[1] All references to "Answer" herein are references to the "Second Amended Answer of Defendant Max Specialty Insurance Company" (Docket No. 101) unless otherwise specifically stated.

2.     Plaintiff One Beacon Insurance Company ("One Beacon") was and is an insurance company duly organized under and existing by virtue of the laws of the State of Massachusetts with a principal place of business in Massachusetts and with its home office for marine insurance and place of business at 77 Water Street, New York, New York 10005. (Complaint ¶ 6, Exhibit "1"; Answer ¶ 6, Exhibit "2").

3.     Plaintiff National Liability and Fire Insurance Company ("National Liability") was and is a corporation duly organized under and existing by virtue of the laws of the State of Connecticut with an office and principal place of business in Omaha, Nebraska.  (Complaint ¶ 7, Exhibit "1"; Answer ¶ 7, Exhibit "2").

4.     Plaintiff National Liability was and is authorized to issue policies of insurance in the States of New York.  (Complaint ¶ 8, Exhibit "1"; Answer ¶ 8, Exhibit "2").

5.     Plaintiff National Liability was represented by an underwriting agent in New York, Starr Marine Agency, Inc. ("Starr").  Starr is not a party in this action.  (Complaint ¶ 9, Exhibit "1"; Answer ¶ 9, Exhibit "2").

6.     Starr had and has its home office underwriting staff in New York, New York. (Complaint ¶ 10, Exhibit "1"; Answer ¶ 10, Exhibit "2").

7.     Plaintiff QBE Marine & Energy Syndicate 1036 was and is a Lloyds insurance syndicate duly organized under and existing by virtue of the laws of the country of United Kingdom with an office and place of business in London, United Kingdom.  (Complaint ¶ 11, Exhibit "1"; Answer ¶ 11, Exhibit "2").

8.     Defendant Signal International, LLC ("Signal") was and is a corporation duly organized under and existing by virtue of the laws of the State of Delaware with offices and

---

[2] The exhibits referenced herein are annexed to the accompanying Declaration of John A. V. Nicoletti, Esq. in Support of Plaintiffs' Motion for Summary Judgment against Defendant Max Specialty Insurance Company.

places of business in the States of Mississippi and Texas.  (Complaint ¶ 12, Exhibit "1"; Answer ¶ 12, Exhibit "2").

9.      Defendant Great American Insurance Company of New York ("Great American") was and is an insurance company duly organized under and existing by virtue of the laws of the State of New York with a principal place of business located at 65 Broadway in the County, City and State of New York.  (Complaint ¶ 13, Exhibit "1"; Answer ¶ 13, Exhibit "2").

10.      Defendant Max Specialty Insurance Company ("Max Specialty") was and is an insurance company duly organized under and existing by virtue of the laws of one of the states of the United States with a principal place for marine insurance business located in the County, City and State of New York.  (Complaint ¶ 14, Exhibit "1"; Answer ¶ 14, Exhibit "2").

11.      Mr. James "Trip" Morano was and is a property insurance underwriter for Max Specialty (currently known as Alterra Specialty Insurance Company ("Alterra")) and was and is the underwriter of the Max Specialty property policy at issue in this action.  (Morano Tr. 5:11-13, 6:8-9, 7:9-21, 10:15-21, 23:25-24:3, Exhibit "3").

12.      Mr. Morano does not underwrite marine insurance.  (Morano Tr. 19:8-11, Exhibit "3").

13.      Mr. Cody Whittington was and is a claims specialist for Max Specialty (Alterra) and was the adjuster for Max Specialty assigned to Signal's claim regarding drydock AFDB-5.  (Whittington Tr. 7:11-13, 9:1-10:12, 12:17-23, 17:10-13, Exhibit "4").

14.      Westchester Surplus Lines Insurance Company ("Westchester") was and is an insurance company duly organized under and existing by virtue of the laws of one of the states of the United States with an office and place of business in New York.  Westchester is not a party to this action.  (Complaint ¶ 15, Exhibit "1"; Answer ¶ 15, Exhibit "2").

15.     Willis of Alabama, Inc. ("Willis/AL") was and is a corporation or other business entity duly organized under and existing by virtue of the laws of the State of Alabama with a home office for marine insurance claims c/o Willis of New York, Inc. ("Willis/NY") with an office and place of business in the County, City and State of New York.  Neither Willis/AL nor Willis/NY (hereinafter jointly referred to as "Willis") are parties to this action.  (Complaint ¶ 16, Exhibit "1"; Answer ¶ 16, Exhibit "2").

16.     Willis was and is engaged in the business of brokering marine and other insurance and was and is the broker for defendant Signal with regard to the insurance policies which are the subject matter of this litigation.  (Complaint ¶ 17, Exhibit "1"; Answer ¶ 17, Exhibit "2"; Johnson Tr. 13:4-13, 147:7-21, Exhibit "5").

17.     Willis was and is an agent of Signal.  (Complaint ¶ 18, Exhibit "1"; Answer ¶ 18, Exhibit "2").

18.     John Bullock was and is a Producer at Willis whose responsibilities include handling a production team, cultivating new business and serving existing business, and since 2003, Signal has been one of Mr. Bullock's accounts.  (Bullock Tr. 8:1-3 and 11-12, 9:3-10:3, 11:4-20, 75:10-16, 79:15-80:9, Exhibit "6"; Johnson Tr. 146:7-21, Exhibit "5").

19.     Ms. Joyce Johnson was the Client Manager at Willis for the Signal account from 2003 until 2008 and thereafter became the Account Executive and, in such positions, oversaw the placement of the various lines of coverages that Willis placed for Signal, both marine and non-marine.  (Johnson Tr. 12:1-20, 13:1-3 144:14-145:14, 152:13-21, 154:8-14, 174:6-176:7, Exhibit "5").

20.     Vernon Ewing has been the Marine Marketing Manager for Willis since 1989 and, on behalf of Willis, has placed Signal's marine insurance policies since 2003 but had no

involvement with the placement of Signal's property coverages. (Ewing Tr. 9:1–10:11, 15:14-22, 18:6-20:12, 194:17-21, 196:7-12, Exhibit "7"; Johnson Tr. 145:18-146:6, Exhibit "5").

## BACKGROUND

21.    This action arises out of the August 20, 2009 sinking of a drydock (drydock AFDB-5) at its berth in Texas (the "loss"); the drydock was owned and operated by defendant Signal. (Complaint ¶¶ 19 and 51, Exhibit "1"; Answer ¶¶ 19 and 51, Exhibit "2").

22.    As a result of the sinking, Signal's drydock AFDB-5 was 1) wrecked beyond repair, 2) a constructive total loss and 3) without further usefulness. (Complaint ¶¶ 49 and 52, Exhibit "1"; Answer ¶¶ 49 and 52, Exhibit "2").

23.    Signal came into existence in 2003 at which time Signal purchased the offshore repair division of Friede Goldman Halter in bankruptcy, which consisted of six (6) facilities, two (2) in Mississippi and four (4) in Texas, with one (1) of the Texas facilities being the Port Arthur dockyard at which drydock AFDB-5[3], the subject of this litigation, was located. (Haley Tr. 9:13-11:8, 12:19-13:3, Exhibit "8"; Johnson Tr. 300:4-20, Exhibit "5").

24.    Signal's business at its Port Arthur facility consisted principally of repairing, refurbishing and upgrading offshore drilling rigs. (Haley Tr. 19:1-25, Exhibit "8"; Morano Tr. 34:22-35:6, Exhibit "3").

25.    From Signal's inception in 2003, Willis was Signal's insurance broker for various lines of coverages. (Bullock Tr. 79:15-82:12, Exhibit "6"; see also ¶¶ 19 and 20, supra).

26.    The policies placed by Willis on behalf of Signal were for an annual term that commenced on January 30 of the given year, and such policies would either be renewed by the

---

[3] In this litigation, Signal's dry dock at the core of the insurance claims has been referred to as the AFDB-5, Dry Dock No. 1, The Texas Dry Dock and/or the big dry dock.

incumbent insurance carrier or remarketed to other insurance carriers.  (Johnson Tr. 149:2-151:2, Exhibit "5"; Ewing Tr. 144:20-145:13, Exhibit "7").

27.     From its inception in 2003, Signal insured its drydock AFDB-5, as well as its other drydock Dual Carrier located in Pascagoula, Mississippi, under its property insurance program and not under its marine hull insurance program.[4]  (Johnson Tr. 206:5-14, Exhibit "5").

## THE RELEVANT POLICIES

**A.     The Property Program**

28.     In late January of 2009, Signal was forced to remarket (through its broker Willis) its property insurance program on an extremely expedited basis because Signal's incumbent property insurer, Lexington Insurance Company ("Lexington"), which had insured the entire $25 million property program limit for the expiring year and which had indicated that it would renew for the 2009-2010 policy year at the $25 million property program limit for a premium of $1.4 million, at the last minute offered unacceptable terms of only $10 million in coverage for a premium of $1.75 million.  (Johnson Tr. 258:6-262:6, Exhibit "5"; Bullock Tr. 118:15-122:12, Exhibit "6").

29.     For the 2009-2010 policy period, Willis utilized an intermediary broker, AMWINS Brokerage of New York ("AMWINS") to remarket and place Signal's property insurance, and Willis provided AMWINS with a property submission for that purpose. (Johnson Tr. 99:16–101:7, 248:12-15, Exhibit "5"; Morano Tr. 43:24-44:11, 137:15-138:22, Exhibit "3"; Morano Ex. 202, Exhibit "9"; Complaint ¶ 23, Exhibit "1"; Answer ¶ 23, Exhibit "2").

---

[4] Signal insured certain liabilities associated with the operation of its two (2) drydocks under a primary marine general liability policy and bumbershoot liability policies.  (See infra).

30.     The submission provided by Willis to the intermediary broker AMWINS for the 2009-2010 policy period was provided by AMWINS to Westchester and Max Specialty and contained a document entitled "Property Insurance Submission."  (Johnson Tr. 102:9–104:18, 126:8-18, 265:14–267:7, Exhibit "5"; Johnson Ex. 101 at pp. TRIPM0056 – TRIPM0071[5], Exhibit "10"; Morano Tr. 43:24-44:11, 45:2-4, 47:1-24, Exhibit "3"; Morano Ex. 196, Exhibit "11", Morano Ex. 202, Exhibit "9").

31.     The 2009-2010 Property Insurance Submission stated in part:

SUM INSURED:     USD 25,000,000.  Blanket Property Damage and "Time Element" per "occurrence" all coverages combined ONLY TO PAY EXCESS PER OCCURRENCE OF THE DEDUCTIBLE SET FORTH BELOW.

DEDUCTIBLE:     Program Deductible being USD 100,000. in respect of all losses other than the Schedule of Exceptions to Program Deductible (for 100%) as attached.

* * *

CONDITIONS:     Schedule of Program Sub-limits (for 100%) as attached.

* * *

INFORMATION:     As per the Willis Underwriting Submission dated 01/15/2009, including Loss History contained therein.  For premium purposes only, the 100% PD/BI values are USD 211,328,279.

### SCHEDULE OF PROGRAM SUB-LIMITS OF LIABILITY (FOR 100%) AND TIME LIMITS

Application of Program Sub-limits of Liability

1.     The Program Sub-limits of Liability apply per "occurrence" in excess of any applicable Deductible, unless otherwise stated.

---

[5] In Johnson Ex. 101, pages TRIPM0056 – TRIPM0071 come after pages TRIPM0082 – TRIPM0191.

2.      The Program Sub-limits of Liability represent the maximum amount recoverable in respect of the limited coverage over all Underlying, Contributing or Excess Insurance combined.

3.      The Program Sub-limits of Liability shall not increase the Limit of Liability (Sum Insured) of the Policy.

\* \* \*

| | |
|---|---|
| USD 5,000,000 or 25% of the Property Damage and "Time Element" claim payable under the Policy, whichever is greater | Debris Removal and Cost of Cleanup |

\* \* \*

| | |
|---|---|
| USD 25,000,000 | "Earthquake" in the aggregate during any Policy year, Property Damage and "Time Element" combined. |

\* \* \*

| | |
|---|---|
| USD 25,000,000 | "Flood" in the aggregate during any Policy year, Property Damage and "Time Element" combined.  This aggregate does not apply to Flood resulting from a Named Storm. |

\* \* \*

## SCHEDULE OF EXCEPTIONS TO PROGRAM DEDUCTIBLE (FOR 100%)

\* \* \*

| | |
|---|---|
| As respects to dry docks (and any attached equipment) | 2% of the actual cash value of the dry dock involved in the loss or damage, subject to a minimum of USD 250,000. any one occurrence. |

\* \* \*

8

## SCHEDULE OF COVERAGES IN POLICY

Property Damage

* * *

Debris Removal and Cost of Cleanup

* * *

Removal

* * *

Time Element

(Johnson Ex. 101 at pp. TRIPM 0062-63, TRIPM0065-71, Exhibit "10").

32.     The 2009-2010 Property Insurance Submission also contained a "Statement of Values" for the property insurance program (100%) of $211,328,279.00 representing the total value of all of Signal's buildings, structures, contents and drydocks at its six (6) facilities. (Johnson Ex. 101 at pp. TRIPM0072 – 0075, Exhibit "10"; Johnson Tr. 267: 8 – 269: 10, Exhibit "5").

###   i.     **The Westchester Primary Property Policy[6]**

33.     Based on the remarketing submission, Westchester offered to provide the first $10 million of coverage under the property program for the January 30, 2009 to January 30, 2010 policy year at a premium of $1.4 million.  (Johnson Tr. 262:7-263:14; 126:8-18, Exhibit "5").

34.     Westchester bound and issued to Signal property policy no. D37362220 001 for the period January 30, 2009 through January 30, 2010 (the "Westchester Policy").  (Johnson Tr.

---

[6] Westchester is also known as ACE; the names are interchangeable.   (Morano Tr. 37:14-17, Exhibit "3").

126:8– 27:10, 129:5-11, Exhibit "5"; Johnson Ex. 103, Exhibit "12"; Complaint ¶ 23, Exhibit "1"; Answer ¶ 23, Exhibit "2").

35.    In and by the terms of the Westchester Policy, Westchester insured defendant Signal for the first $10 million of exposure under the property insurance program with respect to buildings and property, including the floating drydock AFDB-5.  (Complaint ¶ 24, Exhibit "1"; Answer ¶ 24, Exhibit "2"; Johnson Ex. 103, Exhibit "12").

36.    A true and accurate copy of the Westchester Policy was identified as Exhibit 103 to the deposition of Joyce Johnson.  (Johnson Tr. 126:16-127:10, Exhibit "5"; Johnson Ex. 103, Exhibit "12").

37.    The Westchester Policy contains the following provisions:

### Policy Declarations

| Policy No. D37362220 001 | Renewal of: **NEW** |
|---|---|

| **NAMED INSURED & MAILING ADDRESS**<br>Signal International, LLC.<br>P.O. Box 7007<br>Pascagoula, MS 39568 |
|---|

| **POLICY PERIOD** | | |
|---|---|---|
| When Coverage Begins:<br>Address | 01/30/2009 | 12:01 A.M. Local Time At Named Insured's |
| When Coverage Ends:<br>Address | 01/30/2010 | 12:01 A.M. Local Time At Named Insured's |

| **INSURING COMPANY** | Producer's Name & Address |
|---|---|
| **Westchester Surplus Lines Insurance Company** | AMWINS BROKERAGE OF NEW YORK INC.<br>88 PINE STREET – 6TH FLOOR<br>WALL STREET PLAZA<br>NEW YORK, NY 10005<br><br>Producer No: 249699 |

\* \* \*

## *Commercial Property Declarations*

Company: **Westchester Surplus Lines Insurance Company**
SYM:  FS      Policy ID: D37362220 001

\* \* \*

| Coverages and Limits Provided | Insurance At Described Location Applies Only For Coverages For Which A Limit Of Liability Is Shown | | | | | |
|---|---|---|---|---|---|---|
| | Loc. No. | Bld. No. | Coverage | Covered Causes of Loss Form | Co-Ins-urance % | Limit of Insurance $ |
| | ALL | ALL | See Brokers Manuscript Form | Special | N/A | See Brokers Manuscript Form |

\* \* \*

I.   DECLARATIONS

    A.   THE FIRST NAMED INSURED

       [Signal International LLC] and any owned, controlled, associated or affiliated subsidiary, company, corporation, organization, trust or association as now or may hereinafter be constituted or acquired; the interest of the First Named Insured in any partnership or joint venture, to the extent not otherwise insured; and any entity for which The First Named Insured has agreed to provide insurance, as their respective rights and interests appear and as defined in the Policy wording.

\* \* \*

    B.   BROKER

       Willis Location Name          (Willis of Alabama, Inc.).

\* \* \*

    C.   PREMIUM AND THE POLICY PERIOD

       In consideration of the premium negotiated and agreed, this Policy attaches and insures for a period of one (1) year, from January 30, 2009 to January 30, 2010 beginning and ending at 12:01 AM  at the "location" of the property insured.

\* \* \*

11

D.   LIMITS OF LIABILITY

The Insurer's maximum Limit of Liability in a single "occurrence" regardless of the number of "locations" or coverages involved shall not exceed the Policy Limit of Liability of [USD10,000,000.]

When a Limit of Liability for a "location" or other specified property is shown, such Limit shall be the maximum amount payable for any loss or damage arising from physical loss, damage or destruction of the type insured by this Policy at the "location" or involving such other specified property.

Sub-limits stated in the Sub-limits schedule, or elsewhere in this Policy, shall apply as a part of and not in addition to the Policy Limit of Liability.  Limits and sub-limits do not include the amount of any applicable Deductibles.

Limits of Liability apply per "occurrence" unless otherwise stated.  When a Sub-limit of Liability is shown as applying in the aggregate during any Policy year, the Insurer's maximum Limit of Liability shall not exceed such Limit during any Policy year regardless of the number of "locations" and coverges involved.

**Schedule of 100% Program Sub-limits (all in United States Dollars)**

Property Damage and "Time Element" coverages are subject to the following Sub-limits, unless otherwise stated:

| | |
|---|---|
| USD5,000,000. or 25% of the Property Damage and "Time Element" claim payable under this Policy, whichever is greater. | Debris Removal and Cost of Cleanup |
| * * * | |
| USD25,000,000. | Scheduled Contractors Equipment |

* * *

E.   DEDUCTIBLES

The Insurer shall be liable for each loss separately occurring or for each loss separately occurring or for the sum of all losses arising from the same "occurrence" excess of USD(100,000.) except excess of:

* * *

| | |
|---|---|
| With respect to Dry-docks (and any attached equipment) | 5% of the scheduled value of the dry dock involved in the loss or damage, subject to a minimum of USD250,000. any one occurrence |

\* \* \*

II.   INSURING AGREEMENT

IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS IN THIS POLICY OR ADDED HERETO, AND OF THE PREMIUM SPECIFIED in the Declarations, Attachments or in Endorsements made a part of this Policy, the Insurer, for the term specified in the Declarations from inception date shown in the Declarations to expiration date shown in the Declarations, to an amount not exceeding the Limits of Liability specified in the Declarations, does insure the interest of the Insured named in the Declarations and its legal representatives, to the extent more fully described in this Policy, against 'all risks' of direct physical loss, damage or destruction, occurring during the Policy period, except as hereinafter excluded, of the property described and insured in this Policy.   'All risks' includes "Boiler and Machinery," "Flood" and "Earthquake" as more fully defined in DEFINITIONS.   Physical loss, damage or destruction includes "general average contributions and salvage charges" and other charges and expenses as more fully described in this Policy.   Wherever used in this Policy, 'peril insured' refers to this INSURING AGREEMENT and to EXCLUSIONS in this Policy and 'property insured' refers to PROPERTY INSURED and PROPERTY EXCLUDED in this Policy.

Assignment of this Policy shall not be valid except with the written consent of the Insurer.   This Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this Policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this Policy.

III.   PROPERTY INSURED

Except as hereinafter excluded, this Policy insures:

A.   REAL AND PERSONAL PROPERTY

The insurable interest of the Insured in all real and personal property of every kind and description, at a "location" within 1000 feet thereof, including the "insurable interest of the Insured in property of others in the care, custody, control of the Insured" and at the option of the Insured, business personal property of officers, directors and employees, the Insured while at a "location" or anywhere within the Policy territory when the officer, director or employee is act on behalf of the Insured.

B.   ADDITIONAL COVERAGES

1.   Debris Removal and Cost of Clean Up

Notwithstanding the provisions of any exclusion contained herein or any provision respecting pollution and/or contamination, in the event of physical loss, damage or destruction of property insured by a peril

13

insured by this Policy, this Policy (subject otherwise to its terms, conditions, and limitations, including but not limited to any applicable Deductible) insures:

a.   Expenses necessarily and reasonably incurred in removal of debris of such property from the "location" of the insured physical loss, damage or destruction and/or from other premises when blown by wind or carried by water.

and/or

b.   Cost of clean up at the "location" made necessary as a result of physical loss, damage or destruction of property of the type insured by this Policy by a peril insured by this Policy.

Provided such expenses are reported to the insurer within 365 days of the date of the direct physical loss, damage or destruction.

This provision does not insure against the costs of decontamination or removal of water, soil or any substance not insured by this Policy on or under such "location."

It is a condition precedent to recovery under this provision that the Insurer shall have paid or agreed to pay for physical loss, damage or destruction of property insured unless such payment is precluded solely by the operation of any Deductible.

2.   Contamination Cleanup

Notwithstanding anything in this Policy to the contrary, this Policy insurers costs or expenses incurred to clean up and/or remove polluted or contaminated land and/or water from an insured "location" provided the contamination or pollution results directly from physical loss, damage or destruction of property insured by a peril insured by this Policy, and provided such expenses are reported to the insurer within 365 days of the date of the direct physical loss, damage or destruction.

* * *

IV.   PROPERTY EXCLUDED

This Policy does not insure:

* * *

14

E.    WATERCRAFT

Watercraft while waterborne except as provided in 'Off-Shore Property' below.

* * *

K.    OFF-SHORE PROPERTY

Off-shore property, except structures and their contents extending from land or shore; however, waterborne vessels and their contents and/or floating docks permanently moored to a dock, river bank or shore shall not to be considered as off-shore property.

* * *

V.    TIME ELEMENT

A.    BUSINESS INTERRUPTION

1.    This Policy insures loss resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage or destruction, by a peril insured by this Policy, of property insured.

* * *

**ENDORSEMENT 2 – Valuation Amendment**

It is hereby understood and agreed that, in case of loss, the basis of adjustment shall be on the basis of Actual Cash Value as respects Contractors Equipment (except leased/rented equipment when required by lease agreement) bulk heads and dry docks.

The Actual Cash Value of the property at the time any loss or damage occurs shall be ascertained on the estimated Replacement Value, with proper deduction for physical depreciation, however caused, and shall in no event exceed what it would then cost to repair the same with material of like kind and quality.

**ENDORSEMENT 3 – Policy Wording Amendments**

It is hereby understood and agreed that the following changes are made to the form wording:

**Section IV. Property Excluded E. Watercraft** is amended to reach as follows:

This Policy does not insure watercraft.  This exclusion shall not apply to the coverage on watercraft provided in "Off-Shore Property" below (K).  This exclusion shall not apply to the dry-dock known as Dual Carrier while Dual Carrier is located within 5 miles of the Insured's premises.  This exclusion shall not apply to other dry-docks while located within 1 mile of the insured's premises.

15

**Section IV. Property Excluded K. Offshore Property** is amended to include the following:

This exclusion does not apply to dry docks as per Endorsement 1.

(Johnson Ex. 103, Exhibit "12").

### ii.    The Max Specialty Excess Property Policy

38.    Trip Morano was the only person at Max Specialty involved in underwriting Max Specialty's property policy to Signal.  (Morano Tr. 18:15-24, 21:6-25, 30:1-9, 60:24-61:9, Exhibit "3").

39.    Trip Morano only first heard of Signal in January, 2009, when Tom Cesare of AMWINS presented the submission.  (Morano Tr. 34:12-21, Exhibit "3").

40.    During Mr. Morano's course of underwriting the Signal account, Mr. Morano dealt only with Tom Cesare of AMWINS and never dealt with anyone from Signal, Willis or ACE/Westchester.  (Morano Tr. 35:7-9, 37:5-21, 44:23-45:19, Exhibit "3").

41.    The entire process of Max Specialty's underwriting of the Signal account from the time of receipt of the submission from AMWINS to binding coverage took place within a two (2) calendar day period of which the underwriter spent one afternoon and one morning underwriting the Signal property account.  (Morano 42:8-14, 51:8-52:25, 60:24-61:6, 109:1-10, Exhibit "3").

42.    All of the information received by Trip Morano of Max Specialty in underwriting the Signal property account came from Tom Cesare of AMWINS and consisted of the submission provided by Willis to AMWINS, including the document entitled "Property Insurance Submission."   (Morano Tr. 45:2-4, 47:1-24, 51:25-52:3, 53:1-12, 61:24-62:10, 89:21-90:3, 106:7-13, Exhibit "3"; Morano Ex. 196, Exhibit "11").

16

43.     At the time the Max Specialty coverage respecting Signal's property program was underwritten and bound, Max Specialty did not have a copy of the underlying Westchester policy. (Morano Tr. 214:10-13, Exhibit "3").

44.     Max Specialty did not obtain a copy of the underlying Westchester policy until some time after the loss and after Max Specialty's claims department prepared a "notice to underwriters" (prepared for losses considered to be "significant") and after Max Specialty's claims department prepared the "Large Loss Report" which, among other things, established Max Specialty's reserves. (Whittington Tr. 171:15-176:8, 177:14-178:22, 179:8-17, Exhibit "4").

45.     Max Specialty's assigned claims adjuster, Cody Whittington, had little familiarity with the Westchester policy. (Whittington Tr. 49:20-51:4, Exhibit "4").

46.     Based on the submission provided by Willis through AMWINS, Max Specialty issued a formal quote to bind coverage for the Signal property account. (Morano Tr. 120:4-121:9, Exhibit "3").

47.     Max Specialty's formal quote to bind coverage for the Signal property account expressly referenced coverage for Signal's drydocks. (Morano Tr. 121:10-12, 217:16-218:11, Exhibit "3"; Morano Ex. 201, Exhibit "13").

48.     Based on the 2009-2010, Property Insurance Submission, Max Specialty bound and issued to Signal a non-marine property policy no. MAX2XP0004029 for the period January 30, 2009 through January 30, 2010 (the "Max Specialty Policy"). (Johnson Tr. 129:18–130:19, Exhibit "5"; Johnson Ex. 104, Exhibit "14"; Morano Tr. 139:3-140:17, Exhibit "3").

49.     The Max Specialty policy was on a full following form to the primary property policy issued by Westchester with limits of $15 million per any occurrence, but excess of the

$10 million primary property policy limit (the "Max Specialty Excess Property Policy"). (Complaint ¶ 48, Exhibit "1"; Answer ¶ 48, Exhibit "2").

50.    The Max Specialty Excess Property Policy is written on a following form and provides the same coverage as that provided under the terms and conditions of the primary property policy issued by Westchester including Debris Removal.  (Complaint ¶¶ 48 and 110, Exhibit "1"; Answer ¶¶ 48 and 110, Exhibit "2"; Morano Tr. 121:19-122:1, 216:2-20, Exhibit "3"; Whittington Tr. 176:16-19, Exhibit "4"; Johnson Tr. 229:17-230:2, Exhibit "5").

51.    Signal's AFDB-5 drydock is covered property under the Max Specialty policy. (Morano Tr. 141:6-8, 142:2-8, 218:23-220:19, Exhibit "3").

52.    A true and accurate copy of the Max Specialty Excess Property Policy was identified as Exhibit 104 to the deposition of Joyce Johnson.  (Johnson Tr. 129:18-130:8, Exhibit "5"; Johnson Ex. 104, Exhibit "14").

53.    The Max Specialty Excess Property Policy contains the following provisions:

### Max Specialty Excess Property Policy

### Relevant Clauses

| **Max** Specialty | **MAX SPECIALTY INSURANCE COMPANY**<br>9020 Stony Point Parkway, Suite 325<br>Richmond, VA 23235 USA |
|---|---|

**POLICY DECLARATIONS**        Policy No. MAX2XP0004029

| 12:01 a.m. Standard Time at place of issuance, the Named Insurance Companies shown in the Percentage of participation Endorsement, (hereinafter referred to as the Company), in consideration of the payment of the premium specified in this policy and subject to each company's percent of participation, the limits of insurance, exclusions, conditions and other terms of this policy [or as may be added by form(s) or endorsement(s)] does agree with you to provide the insurance as stated in this policy. | |
|---|---|
| Insured's Name:    Signal International, LLC<br><br>Mailing Address:    P.O. Box 7007 | Policy Period |

| | Pascagoula, MS 39568 | From: | 01/30/2009 |
|---|---|---|---|
| | | To: | 01/30/2010 |

| | | |
|---|---|---|
| 1. | **Coverage Part(s):** | Commercial Property-Excess of Loss |
| 2. | **Participation Layer:** | $15,000,000 per occurrence excess of $10,000,000 per occurrence |
| 3. | **Coverage Form:** | Excess of Loss Agreement MEP003 (07/08) |
| 4. | **Covered Property:** | Building, Contents, and Business Income with Extra Expense as per the schedule of values on file with this company dated 01/30/2009 |
| 5. | **Perils:** | All Risks of Direct Physical Loss or Damage excluding Named Windstorm, Flood, Storm Surge/Ensuing Flood, and Earthquake |
| | | * * * |
| 10. | This premium is based on $211,328,279 in total value of property and interest covered as of 01/30/2009 Reported by the Insured in the application or request of this insurance. | |
| 11. | **Primary/Underlying Carrier(s):** as per the Commercial Property Supplemental Declarations MEP002 (07/08) | |

* * *

## COMMERCIAL PROPERTY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

* * *

13.    Other Insurance:

      A.    The Insured may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If the Insured does, the Company will pay their share of the covered loss or damage. The Company's share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

      B.    If there is other insurance covering the same loss or damage, other than that described in above, the Company will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the Insured can collect on it or not. But the Company will not pay more than the applicable Limit of Insurance.

* * *

# OCCURRENCE LIMIT OF INSURANCE
# ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Excess of Loss Agreement MEP003 (07/08)**

LIMITS OF INSURANCE Sections as found in the above referenced coverage forms are deleted and replaced by the following:

**Occurrence Limit of Insurance $   15,000,000   **

The most we will pay for loss or damage in any occurrence is the Occurrence Limit of Insurance shown above, irrespective of the number of locations involved.

<u>In the event of loss or damage we will not pay more than the **least** of the following:</u>

(1)    The actual amount of the adjusted loss as defined elsewhere throughout the policy, or

(2)    The stated value for each scheduled item of coverage applicable to the lost or damaged property, as shown on the Statement of Values on file with the Company, or on MBM106 if attached to this policy, plus any additional limits of insurance for Property Additional Coverage or Coverage Extensions included in, or that modify the Property Coverage Parts; and any limit(s) of insurance as shown on Coverage Declaration(s) or Schedules of any inland marine coverage forms; or

(3)    The Occurrence Limit of Insurance shown above,

Less applicable deductible(s).

\* \* \*

### Commercial Property Supplemental Declarations
### Primary/Underlying Insurance

| Item No. | |
|---|---|
| 1. Schedule Of Primary / Under-lying Carrier | Primary Carrier:<br><br>Westchester Surplus Lines<br><br>Company:        Signal International, LLC<br><br>Policy Number:   D37362220 001<br><br>Term:            01/30/2009-01/30/2010 |

| 2. Attachment | $15,000,000 | per occurrence excess of $10,000,000 per occurrence |
|---|---|---|
| 3. Participation and Layer Limit(s) | LIMIT<br>Primary: $10,000,000<br>(Subject to Occurrence Limit of Liability) | P/O PER OCCURRENCE<br>100% |
| 4. Perils | All Risks of Direct Physical Loss or Damage including Earthquake and Flood | |
| * * * | | |
| 6. Sublimits: | n/a | |

\* \* \*

## EXCESS PHYSICAL DAMAGE FORM

**1.    INSURING AGREEMENT:**

Subject to the limitations, terms and conditions contained in this Policy or added hereto, the Insurer(s) agree to indemnify the Insured named in the Declarations herein in respect of Direct Physical loss or damage to the property described in Declarations, while located or contained as described in the Declarations, occurring during the period stated in the Declarations and caused by any of such perils as are set forth in Declarations and which are also covered by and defined in the Policy/ies specified in the Declarations and issued by the "Primary Insurer(s)" stated therein.

**2.    APPLICATION OF UNDERLYING PROVISIONS:**

In respect of the perils hereby insured against this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and Limits of Liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the Policy/ies of the Primary Insurer(s) prior to the happening of a loss for which claim is made hereunder and should any alteration be made in the premium for the Policy/ies of the Primary Insurer(s), then the premium hereon may be adjusted accordingly.

**3.    LIMIT OF LIABILITY:**

Provided always that liability attaches to the Insurer(s) only after the Primary and Underlying Excess Insurer(s) have paid or have admitted liability for the full amount of their respective liability as set forth in Declarations and designated Primary and Underlying Excess Limit(s) and then the limits of the Insurer(s) Liability shall be those set forth in Declarations under the designation Excess Limit(s) and the Insurer(s) shall be liable to pay up to the full amount of such Excess Limit(s).

\* \* \*

6.    **DEFINITIONS:**

(a) Loss:

The word "loss" shall mean each and every loss or series of losses arising out of one "loss occurrence."

(b) Loss Occurrence:

The sum of all individual losses directly occasioned by any one disaster, accident, or loss or series of disasters, accidents, or losses arising out of one event. The duration and extent of any one loss occurrence will be limited to all individual losses sustained by the Company occurring during any period of 168 consecutive hours arising out of and directly occasioned by the same event except that the term "loss occurrence" will be further defined as follows:

1.    As regards windstorm, hail, tornado, hurricane, and cyclone, including ensuing collapse and water damage, all individual losses sustained by the Company occurring during any period of 72 consecutive hours arising out of and directly occasioned by the same event.

2.    As regards riot, riot attending a strike, civil commotion, vandalism, and malicious mischief, all individual losses sustained by the Company occurring during any period of 72 consecutive hours.

3.    As regards earthquake and fire following directly occasioned by the earthquake, only those individual fire losses that commence during the period of 168 consecutive hours may be included in the Company's loss occurrence.

(c) Ultimate Net Loss:

The words "ultimate net loss" shall mean the loss sustained by the Insured as a result of each and every loss or series of losses arising out of one occurrence, limited by

(i)

any sub-limits contained within this Policy or the Policy/ies of the Primary and/or Underlying Excess Insurer(s), and

(ii)

making deductions for all salvages, recoveries and other insurance's (other than recoveries under the Policy/ies of the Primary and Underlying Excess Insurer(s).

(d) Policy Year:

The words "policy year" shall be understood to mean the period in Declarations.

\* \* \*

10.    **PRIORITY OF PAYMENTS:**

Notwithstanding anything contained herein to the contrary it is hereby agreed that in the event of a claim hereunder which involves more than one interest and/or coverage and/or peril, it shall be at the sole option of the Insured to apportion recovery under this policy when submitting final proof of loss, subject to the overall amount of claim not exceeding the overall limit of liability contained herein for any one loss.

For the purpose of attachment of coverage for excess layers, it is further agreed that loss involving any interest and/or peril covered in primary or underlying excess layers, but excluded in higher excess layers, shall be recognized by such excess layers as eroding or exhausting the occurrence limits of the primary and/or underlying excess layer(s). Nothing herein, however, shall be deemed to extend coverage in such layer(s) to include loss from the specifically excluded peril in the excess layer(s) itself.

(Johnson Ex. 104, Exhibit "14").

**B.    The MGL and Bumbershoot Policies**

    **i.    The Marine General Liability Policy**

54.    In connection with its solicitation of marine general liability insurance (as well as a policy of marine hull insurance which is not involved in this action) on behalf of Signal, Willis submitted to potential underwriters a joint "Hull and MGL Insurance Submission." (Johnson Tr. 159:14-160:18, Exhibit "5"; Johnson Ex. 108, Exhibit "15").

55.    Plaintiff Fireman's Fund, as lead insurer, issued a policy of Marine General Liability Insurance bearing Policy No. OML 92001349 (the "MGL Policy") to defendant Signal for the period January 30, 2009 through January 30, 2010. (Complaint ¶¶ 32 and 33, Exhibit "1"; Answer ¶¶ 32 and 33, Exhibit "2"; Ewing Tr. 198:19-199:17, Exhibit "7"; Ewing Ex. 139, Exhibit "16").

56.    The Fireman's Fund MGL Policy contains a full following clause with plaintiff Fireman's Fund, as the lead insurer, having full claims control over the acceptance and/or declination of claims made thereunder. (Complaint ¶ 35, Exhibit "1"; Answer ¶ 35, Exhibit "2").

57.     The plaintiff One Beacon subscribed to a 50% participation in the Fireman's Fund MGL Policy, but only in a following position, thereby ceding claims control to the lead insurer, plaintiff Fireman's Fund.  (Complaint ¶ 36, Exhibit "1"; Answer ¶ 36, Exhibit "2").

58.     The Fireman's Fund MGL Policy provided coverage in the amount of $1 million per occurrence, but subject to a $100,000.00 deductible.  (Complaint ¶ 37, Exhibit "1"; Answer ¶ 37, Exhibit "2").

59.     The MGL Policy is scheduled as an underlying policy to the Bumbershoot Policy.  (Complaint ¶ 47, Exhibit "1"; Answer ¶ 47, Exhibit "2").

60.     A true and accurate copy of the MGL Policy was identified as Exhibit 139 to the deposition of Vernon Ewing.  (Ewing Tr. 198:19-199:17, Exhibit "7"; Ewing Ex. 139, Exhibit "16").

### ii.     The Bumbershoot Policy

61.     In connection with its solicitation of excess marine general liability coverage (or Bumbershoot coverage) on behalf of Signal, Willis submitted to potential underwriters a "Bumbershoot Liabilities Insurance Submission." (Johnson Tr. 161:12-19, Exhibit "5"; Johnson Ex. 110, Exhibit "17").

62.     On or about February 6, 2009, plaintiff Fireman's Fund issued a policy of Marine Excess Liability Insurance bearing Policy No. OXL 92001369, with a coverage period of February 6, 2009 through January 30, 2010, to defendant Signal (the "Bumbershoot Policy"), in which Fireman's Fund subscribed to a 34% participation.  (Complaint ¶ 39, Exhibit "1"; Answer ¶ 39, Exhibit "2"; Ewing Tr. 197:19-198:16, Exhibit "7"; Ewing Ex. 138, Exhibit "18").

63.     The Bumbershoot Policy contains a full following clause with plaintiff Fireman's Fund, as the lead insurer, having full claims control over the acceptance and/or

declination of claims made thereunder.  (Complaint ¶ 41, Exhibit "1"; Answer ¶ 41, Exhibit "2").

64.     Plaintiff National Liability subscribes to a 34% participation in the Bumbershoot Policy, but only on a following basis.  (Complaint ¶ 42, Exhibit "1"; Answer ¶ 42, Exhibit "2").

65.     Plaintiff QBE subscribes to a 32% participation in the Bumbershoot Policy, but only on a following basis.  (Complaint ¶ 44, Exhibit "1"; Answer ¶ 44, Exhibit "2").

66.     The Bumbershoot Policy provides coverage in the amount of $25 million per occurrence in excess of the scheduled underlying insurance policies.  (Complaint ¶ 46, Exhibit "1"; Answer ¶ 46, Exhibit "2").

67.     A true and accurate copy of the Bumbershoot Policy was identified as Exhibit 138 to the deposition of Vernon Ewing.  (Ewing Tr. 197:19-198:16, Exhibit "7"; Ewing Ex. 138, Exhibit "18").

## C.     The Great American Policy[7]

68.     Mr. Ewing of Willis also placed Signal's pollution coverage, including the pollution coverage for Signal's AFDB-5 dry dock, since 2003.  (Ewing Tr. 116:16-118:11, Exhibit "7").

69.     Since January 30, 2004, Willis placed Signal's pollution insurance with Great American Insurance Company of New York ("Great American").  (Ewing Tr. 126:16-129:4, Exhibit "7").

70.     In connection with the placement of Signal's pollution insurance for the January 30, 2009 to January 30, 2010 policy year, Willis provided to Great American an insurance submission.  (Ewing Tr. 129:23-130:20, Exhibit "7"; Johnson Ex. 109, Exhibit "19"; Complaint ¶ 27, Exhibit "1"; Answer ¶ 27, Exhibit "2").

---

[7] The Great American Policy is not at issue in the instance motion.

71.     On or about January 30, 2009, defendant Great American issued in New York a pollution liability insurance policy to defendant Signal, which bears policy no. OMH 6539337 05 for the policy period of January 30, 2009 through January 30, 2010 (the "Great American Policy").  (Complaint ¶ 28, Exhibit "1"; Answer ¶ 28, Exhibit "2"; Ewing Tr. 130:21-131:20, Exhibit "7"; Ewing Ex. 130, Exhibit "20").

72.     The Great American Policy is scheduled as an underlying policy to the Bumbershoot Policy.  (Complaint ¶ 47, Exhibit "1"; Answer ¶ 47, Exhibit "2").

## SIGNAL'S CLAIM

73.     Following the sinking of the drydock, Signal made demand upon its insurers for coverage under the respective policies.  (Complaint ¶ 21, Exhibit "1"; Answer ¶ 21, Exhibit "2").

74.     The Texas General Land Office ("Texas GLO") ordered the removal of the wrecked drydock.  (Complaint ¶ 54, Exhibit "1"; Answer ¶ 54, Exhibit "2").

### i.     The Liability Insurers' Position

75.     Plaintiff Fireman's Fund, as lead insurer under the Bumbershoot Policy, issued a reservation of rights in connection with Signal's claims in respect of the drydock.  (Complaint ¶ 58, Exhibit "1"; Answer ¶ 58, Exhibit "2").

76.     Fireman's Fund's reservation of rights letter stated that it was not required to respond for the funding of the removal of the wrecked drydock until such time as all primary policies were exhausted, including but not limited to the FFIC MGL Policy, if triggered, and the Great American pollution policy, both of which are scheduled as underlying insurance to the Bumbershoot Policy, and contribution from the primary and excess property policies issued by Westchester and Max Specialty, respectively. (Complaint ¶ 58, Exhibit "1"; Answer ¶ 58, Exhibit "2").

77.     On or about January 19, 2010, representatives of Signal and Willis attended a meeting in New York for purposes of discussing the Signal claims and particularly the funding for the cost of removal of the wrecked drydock and pollution abatement.  (Complaint ¶ 59, Exhibit "1"; Answer ¶ 59, Exhibit "2"; Piccolo Decl. ¶ 15).

78.     At the January 19, 2010 meeting in New York, plaintiff Fireman's Fund, as lead insurer on behalf of the MGL insurers and the Bumbershoot insurers, declined the demand for payment, but agreed to assist in going forward on soliciting bids for the removal of the wreck. (Complaint ¶ 60, Exhibit "1"; Answer ¶ 60, Exhibit "2").

79.     As a result of continuing negotiations between Fireman's Fund and Signal, Signal entered into a contract with Weeks Marine, Inc. for the removal of the wrecked drydock. (Piccolo Decl. ¶¶ 19-22).

80.     The MGL and Bumbershoot insurers agreed to fund the removal of Signal's wrecked drydock on a without prejudice basis.  (Piccolo Decl. ¶ 18).

81.     The removal of the AFDB-5 and the cleanup of the location where it sank were completed by the end of February, 2012.  (Piccolo Decl. ¶ 31).

82.     Plaintiffs have paid to Weeks Marine, Inc., on behalf of Signal, the amount of $12,395,026.00 in respect of the removal and cleanup of drydock AFDB-5.  (Piccolo Decl. ¶¶ 23-31).

**ii.     The Property Insurers' Position**

83.     Mr. Ken Cruickshank is a field adjuster who works for York Specialized Loss Adjusting ("York") and was the field adjuster designated in the Westchester policy to act as the arm of the insurance company in the field.  (Whittington Tr. 74:20-75:17, 180:12-182:23, Exhibit "4"; Johnson Ex. 103 at p. WILLIS 00742, Exhibit "12").

84.   Mr. Cruickshank and York are agents of both Westchester and Max Specialty. (Whittington Tr. 183:2-20, Exhibit "4").

85.   Mr. Cruickshank was assigned to do an investigation into the damages which were insured under the Westchester and Max Specialty policies and to do so he was provided with copies of the Westchester and Max Specialty policies.   (Whittington Tr. 184:20-185:9, Exhibit "4").

86.   In his very first report dated September 2, 2009, relating to his investigation into the Signal drydock loss, Mr. Cruickshank determined that the property programs' $5 million sub-limit for Debris Removal would be both implicated and exhausted in payment of the claim. (Whittington Tr. 188:3-11, 189:9-192:11, Exhibit "4"; Whittington Ex. 213 at Bates Stamp p. MSI 000313, Exhibit "21").

87.   Mr. Cruickshank similarly included the $5 million sub-limit for Debris Removal as a proper element in the adjustment of Signal's claim under its property program in his Second Report (dated October 16, 2009), Third Report (dated November 3, 2009) and Fourth Report (dated November 19, 2009).   (Whittington Tr. 197:13-199:2, 202:2-12, 204:25-205:8, 209:7-19, 210:19-211:16, Exhibit "4").

88.   Max Specialty's in-house claims adjuster, Cody Whittington, after reviewing each of the first four (4) Cruickshank reports, had no disagreement or objection with Mr. Cruickshank's inclusion of the $5 million Debris Removal and Cost of Cleanup coverage afforded under the property program as a proper element of Signal's adjusted claim. (Whittington Tr. 193:6-22, 206:3-208:5, 209:15-19, 211:17-214:9, 214:19-24, Exhibit "4").

89.   In an e-mail to coverage counsel on November 2, 2009, prior to receipt of the legal opinion regarding Debris Removal, Max Specialty's in-house claims adjuster, Cody Whittington, stated that "[i]n that the Debris coverage may fall to us for settlement, please keep

28

us informed of developments as primary insurer on this matter." (Whittington Tr. 379:20-381:25, Exhibit "4"; Whittington Ex. 237, Exhibit "22").

90.     As a result of a legal opinion forwarded to Max Specialty by Ken Cruickshank, Max Specialty subsequently took the position that it did not have to make any payments or contributions pursuant to the property programs coverage for Debris Removal and Cost of Cleanup for Signal's destroyed drydock AFDB-5 on the basis that Signal's MGL and Bumbershoot policies should pay all costs associated with removal of the destroyed drydock and the cleanup.  (Whittington Tr. 196:2-12; 216:10-15; 217:17-23; 222:2-14, 229:13-23, Exhibit "4").

91.     Max Specialty's in-house claims adjuster, Cody Whittington, admitted that 1) there is nothing contained in the property policies to support the statement in paragraph "12" of his Affidavit [Docket No. 65-1] wherein he states that "The 'debris' removal provision in the primary property insurance policy issued by Westchester is intended to insure Signal for the costs of removing debris if, for example, a building on land is damaged as a result of a storm or other occurrence.  That provision is not intended to insure the costs to remove Signal's wrecked vessels…."; 2) that his Affidavit was drafted by counsel, and 3) that the only basis of the statement was the opinion of counsel.  (Whittington Tr. 253:4-254:2, 254:13-255:22, 256:7-25, 241:4-10, 243:3-25, 246:17-23, 249:14-251:23, Exhibit "4").

92.     In or about early January, 2010, Westchester paid to Signal its full $10 million layer less the property program 100% deductible.  (Bullock Tr. 44:1-7, Exhibit "6"; Whittington Tr. 51:20-52:2, 295:14-296:8, Exhibit "4"; Complaint ¶ 25, Exhibit "1"; Answer ¶ 25, Exhibit "2").

93.     Westchester did not attempt to allocate its $10 million payment (less the property program 100% deductible) to any of the specific coverage afforded to Signal under the property program.  (Whittington Tr. 52:3-20, Exhibit "4").

94.     After Westchester paid to Signal the full layer of property coverage under the Westchester policy in respect of the drydock claim, Willis and Signal continued to make claim against Max Specialty for the balance of Signal's recoverable loss under the property program including the property program's full $5 million sub-limit (100%) for Debris Removal and Cost of Cleanup.  (Bullock Tr. 105:14-116:11, Exhibit "6"; Bullock Ex. 154, Exhibit "23"; Bullock Ex. 155, Exhibit "24"; Bullock Ex. 156, Exhibit "25").

95.     Signal even requested that Max Specialty allocate $5 million of the Westchester payment for Debris Removal.  (Ewing Tr. 251:13-253:11, Exhibit "7"; Ewing Ex. 144, Exhibit "26"; Whittington Tr. 257:18-258:4, 261:5-263:17, Exhibit "4"; Whittington Ex. 221, Exhibit "27").

96.     Max Specialty has outright denied any responsibility for payment and/or contribution towards the removal and/or cleanup of Signal's drydock.  (Whittington Tr. 269:8-12, Exhibit "4"; Whittington Ex. 222, Exhibit "28").

97.     Willis, on behalf of Signal, formally disagreed with Max Specialty's position regarding whether Signal was entitled to Debris Removal coverage under the property program.  (Whittington Tr. 273:10-275:6, Exhibit "4"; Bullock Ex. 155, Exhibit "24").

98.     Based upon Max Specialty's position regarding Debris Removal, Signal sought full recovery for the removal and cleanup of Drydock AFDB-5 from its MGL insurers.  (Whittington Tr. 264:15-20, 265:13-21, Exhibit "4").

99.     Max Specialty's underwriter admitted that the Westchester policy provides Signal with coverage for Debris Removal.  (Morano Tr. 236:25-237:4, Exhibit "3").

100.    Max Specialty's underwriter admitted that the entire property program placement included a $5 million sub-limit for Debris Removal. (Morano Tr. 238:12-18, 247:4-11, Exhibit "3").

101.    Max Specialty's underwriter testified that an example of Debris Removal coverage would be "bulldozing the manufacturing facility out of the way after a fire to rebuild a new one, the actual hard – the hard debris." (Morano Tr. 237:18-238:4, Exhibit "3").

102.    Max Specialty's underwriter testified that the only reason he believes that Max Specialty does not provide Debris Removal coverage, despite following form to the Westchester policy, is because Debris Removal coverage is referenced as a sub-limit in the Westchester policy.   (Morano Tr. 238:19-239:12, 239:22-241:4, 248:17-249:16, 251:6-13, Exhibit "3").

103.    Max Specialty's underwriter admitted that there is nothing in the Max Specialty policy that states that the Max Specialty policy does not provide coverage for those program sub-limits identified in the Westchester policy (Morano Tr. 248:8-13, Exhibit "3").

104.    Max Specialty's underwriter admitted that the insured, Signal, has a right to allocate the Westchester policy payments to the $5 million sub-limit for Debris Removal which would immediately result in Max Specialty owing Signal $5 million more towards the physical loss claim. (Morano Tr. 241:5-243:1, 243:14-244:2, Exhibit "3").

Dated: New York, New York
      August 10, 2012

                                 Yours etc.

                           NICOLETTI HORNIG & SWEENEY
                           *Attorneys for Plaintiffs*

By: _____
         JOHN A. V. NICOLETTI (JN-7174)
         Wall Street Plaza
         88 Pine Street, 7th Floor
         New York, New York 10005-1801
         Tel: (212) 220-3830
         Fax: (212) 220-3780
         OUR FILE:  42000055 JAVN

TO:

George Richard Zacharkow, Esq.
Stephen J. Galati, Esq.
MATTIONI, LTD.
*Attorneys for Defendant*
*Great American Insurance Company of New York*
399 Market Street, 2nd Floor
Philadelphia, Pennsylvania 19106
Ph: (215) 629-1600
Fax: (215) 923-2227
Email: gzachark@mattioni.com;
       sgalati@mattioni.com


Stephen D. Straus, Esq.
TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP
*Attorneys for Defendant*
*Max Specialty Insurance Company*
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York  10532
Ph: (914) 347-2600
Fax: (914) 347-8898
Email: sstraus@traublieberman.com

Stephen Patrick Kyne, Esq.
BURKE & PARSONS
100 Park Avenue, 30th Floor
New York, New York 10036
Ph: (212) 354-3814
Fax: (212) 221-1432
Email: kyne@burkeparsons.com

and

David S. Bland, Esq.
Matthew C. Guy, Esq.
LEBLANC BLAND P.L.L.C.
*Attorneys for Defendant*
*Signal International, LLC*
909 Poydras Street, Suite 1860
New Orleans, LA  70112
Ph: (504) 528-3088, Ext. 208
Fax: (504) 586-3419
Email: dbland@leblancbland.com;
          mguy@leblancbland.com