# EXHIBIT 3

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
 2

 3

 4    FIREMAN'S FUND INSURANCE COMPANY, )
      ONE BEACON INSURANCE COMPANY,     )
 5    NATIONAL LIABILITY AND FIRE       )
      INSURANCE COMPANY and QBE         )
 6    MARINE & ENERGY SYNDICATE 1036,   )
                                        )
 7            Plaintiffs,               )
      v.                                )  10-civ-1653 (LAK)
 8                                      )
      GREAT AMERICAN INSURANCE COMPANY  )
 9    OF NEW YORK, MAX SPECIALTY        )
      INSURANCE COMPANY and SIGNAL      )
10    INTERNATIONAL, L.L.C.             )
                                        )
11            Defendants.               )

12

13            DEPOSITION UPON ORAL EXAMINATION OF

14               JAMES FRANCIS MORANO, III

15     TAKEN ON BEHALF OF DEFENDANT SIGNAL INTERNATIONAL, LLC

16

17                    Richmond, Virginia

18               Wednesday, June 29, 2011

19

20

21

22

23

24

25
```

Page 2

1    Appearances:

2

3            NICOLETTI HORNIG & SWEENEY
             By:   JOHN A. NICOLETTI, ESQUIRE
                   ROBERT A. NOVAK, ESQUIRE
4                  88 Pine Street, 7th Floor
                   New York, New York  10005-1801
5                  jnicoletti@nicolettihornig.com
                   rnovak@nicolettihornig.com
6                  Counsel for the Plaintiffs

7

8            LE BLANC BLAND, P.L.L.C
             By:   DAVID S. BLAND, ESQUIRE
9                  MATTHEW C. GUY, ESQUIRE
                   909 Poydras Street, Suite 1860
10                 New Orleans, Louisiana  70112
                   dbland@leblancbland.com
11                 mguy@leblancbland.com
                   Counsel for the Defendant Signal
12                 International, L.L.C.

13

14

15           NOURSE & BOWLES, LLP
             By:   LAWRENCE J. BOWLES, ESQUIRE
                   55 Broadway, 30th Floor
16                 One Exchange Plaza
                   New York, New York  10006-3030
17                 lbowles@nb-ny.com
                   Counsel for the Defendant Max Specialty
18                 Insurance Company

19

20           MATTIONI, LTD.
             By:   STEPHEN J. GALATI, ESQUIRE
21                 399 Market Street, 2nd Floor
                   Philadelphia, Pennsylvania  19106
22                 sgalati@mattioni.com
                   Counsel for the Defendant Great American
23                 Insurance Company of New York

24   Also Present:

25           Chris Cunningham, Signal International

Page 3

```
 1                    I N D E X

 2

 3   DEPONENT                                    PAGE

 4   JAMES FRANCIS MORANO, III

 5   Examination By Mr. Bland                       5

 6   Examination By Mr. Nicoletti                 208

 7   Examination By Mr. Bowles                    268

 8   Examination By Mr. Bland                     270

 9   Examination By Mr. Bowles                    276

10   Examination By Mr. Bland                     276

11   Examination By Mr. Bowles                    277

12   Examination By Mr. Bland                     277

13   Examination By Mr. Bowles                    278

14

15                  E X H I B I T S

16   NO.   DESCRIPTION                           PAGE

17   196   Grouping of documents headed by email chain  47

18         dated January 28, 2009 from Krause to Daniel

19   197   Email Chain dated January 29, 2009 from    108

20         Cesare to Morano

21   198   Handwritten Notes                          112

22   199   Email dated January 29, 2009 from Cesare   113

23         to Morano

24   200   Email Chain dated January 29, 2009 from    114

25         Morano to Cesare
```

Page 4

1

2                    E X H I B I T S (Continued)

3    NO.    DESCRIPTION                                     PAGE

4    201    Email Chain dated January 30, 2009 from     116

5           Morano to Updike

6    202    Email dated January 27, 2009 from Cesare    137

7           to Pippin

8    203    Max Specialty's Objections and Answers to   205

9           Signal's First Interrogatories

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Deposition upon oral examination of JAMES

2     FRANCIS MORANO, III, taken on behalf of the Defendant

3     Signal International, L.L.C., before Marianne Martini

4     Holmes, RPR, a Notary Public for the Commonwealth of

5     Virginia at large, taken pursuant to Notice, commencing

6     at 8:59 a.m. on Wednesday, June 29, 2011, at the Omni

7     Hotel, 100 South 12th Street, Richmond, Virginia; and

8     this in accordance with the Federal Rules of Civil

9     Procedure.

10

11          JAMES FRANCIS MORANO, III was sworn and

12     deposed on behalf of the Defendant Signal International,

13     L.L.C. as follows:

14

15                    EXAMINATION

16     BY MR. BLAND:

17     Q.    Mr. Morano, I'm Dave Bland.  I represent

18     Signal International in connection with this lawsuit.

19          We're here today to take your deposition

20     regarding the lawsuit, the allegations in the lawsuit,

21     the property insurance policy and other matters.

22          Should I ask you any questions during the

23     deposition that you don't understand, just tell me,

24     okay?

25     A.    Okay.

Page 6

1      Q.   If you answer my question without telling me

2  that you don't understand it, I'll assume from your

3  answer that you understood it, okay?

4      A.   Okay.

5      Q.   If you need to take a break, just tell us,

6  we'll take a break.

7      A.   Um-hum.

8      Q.   Would you state your full name for the record?

9      A.   Full name is James Francis Morano, III.

10          MR. BLAND:  And I take it we're taking the

11      deposition pursuant to the same rules and

12      guidelines we've been taking the other ones in?  Is

13      that okay?

14          MR. NICOLETTI:  Is that the standard

15      stipulations?

16          MR. BLAND:  Yes.

17          MR. NICOLETTI:  All objections except as to

18      form are reserved for trial.  He can sign, read --

19      he can sign before any notary and -- do you want to

20      read?

21          MR. BLAND:  Yes.

22          MR. NICOLETTI:  Larry, does your client want

23      to read the transcript?

24          MR. BOWLES:  Yes.

25          MR. NICOLETTI:  Okay.

 1    BY MR. BLAND:

 2        Q.    You have the right to read and sign your

 3    deposition when it comes back and it's in a transcribed

 4    form.   I'll leave that to you and your counsel as to

 5    that.

 6              Where do you live?

 7        A.    I live at 362 Albemarle Avenue in Richmond,

 8    Virginia.

 9        Q.    And where do you work?

10        A.    I work for Alterra Excess and Surplus

11    Insurance Company.

12        Q.    How long have you worked at Alterra?

13        A.    Alterra, we've been Alterra for just over a

14    year now.

15              Prior to that, it was Max Specialty Insurance

16    Company.   I have been there since October of 2007.

17        Q.    So Max essentially is the same thing as

18    Alterra.   If we say "Alterra," that also means Max

19    Specialty?

20        A.    Correct.   We went through a merger with

21    Harbour Point last year and changed the name to Alterra.

22

23        Q.    Okay.   What is your educational background?

24        A.    I was a political science major at James

25    Madison University.   After that, I started working in

Page 10

1    well?

2        A.    Yes.

3        Q.    Both excess and primary?

4        A.    Yes.

5        Q.    And when you were at Risk Placement Services,

6    what types of policies were you a wholesale broker for?

7        A.    Entirely surplus lines, property.

8        Q.    And what about at McAuley Woods?

9        A.    Property and casualty.

10       Q.    Have you ever been involved in your career in

11   writing a marine insurance policy?

12       A.    Not a true marine policy.  Builder's risks,

13   yes, other excess policies on shipbuilders or ship

14   repair, yes, but that's the extent of it.

15       Q.    And when you joined Max Specialty in October

16   of 2007, what was your job?

17       A.    I was an executive underwriter.

18       Q.    For what types of policies?

19       A.    Property only.

20       Q.    Would that be primary and excess?

21       A.    Yes.

22       Q.    When did Max Specialty become incorporated, if

23   you will?  When did they start?

24       A.    They'd been in business for about a year

25   before I joined them.

1      Q.   Sometime in 2006?

2      A.   I'm not sure the exact date, but they've been

3  writing business for about a year before I joined.

4      Q.   Where is Max Specialty located?

5      A.   Our, our office here is -- the headquarters is

6  in Richmond, Virginia.  Our parent company is in

7  Bermuda.

8      Q.   Who is the parent company?

9      A.   Alterra Capital, Bermuda.

10     Q.   What did you do to prepare for this

11  deposition?

12     A.   I read through the underwriting file,

13  refamiliarized myself with that, and I've had some

14  conversations with Larry.

15     Q.   Mr. Bowles?

16     A.   Mr. Bowles, yes, sir.

17     Q.   All right.  So you reviewed the underwriting

18  file?

19     A.   Yes.

20     Q.   Did that include any emails or correspondence

21  with anyone?

22     A.   Yes, there are emails within the underwriting

23  file.

24     Q.   From you?

25     A.   Yes.

Page 18

```
 1        A.    No.

 2        Q.    Who do you report to?

 3        A.    I report to Jon Hahn.  It's J-o-n.  Last name

 4   is H-a-h-n.

 5        Q.    And what is his job?

 6        A.    He is the vice-president and head of all

 7   brokerage underwriting operations.

 8        Q.    Is he here in Richmond?

 9        A.    He is.

10        Q.    Have you spoken to Mr. Hahn about this

11   lawsuit?

12        A.    Only to inform him of where things stood and

13   to refer him to claims if there was something I couldn't

14   speak to.

15        Q.    When you were placing -- sorry, when you were

16   underwriting this insurance with Signal, did you have to

17   seek any authority from anyone at Max Specialty to agree

18   to write the excess property insurance for Signal?

19        A.    No.

20        Q.    During the course of you agreeing to

21   underwrite the Signal excess property insurance, did you

22   talk to or deal with anyone inside of Max or did you do

23   it all on your own?

24        A.    No, did it on my own.

25        Q.    Max Specialties does not write marine
```

1    insurance, right?

2        A.    We actually have a marine division.

3        Q.    And where is that?

4        A.    We have offices in New York, Atlanta, Dallas

5    and San Francisco.

6        Q.    There's no marine division here in Richmond?

7        A.    That's correct.

8        Q.    So you yourself don't underwrite marine

9    insurance, do you?

10       A.    Correct.   We would refer that generally to our

11   marine division.

12       Q.    I noticed in some correspondence that you were

13   a regional property manager for the Richmond territory;

14   is that correct?

15       A.    That's correct.

16       Q.    What does that mean?

17       A.    I am the regional property manager for a

18   territory that's handled out of Richmond which would

19   encompass the Northeast from Charlotte, North Carolina

20   north, say west to Chicago.

21       Q.    How is it that you as a underwriter came to

22   underwrite a shipyard that is located in Texas and

23   Mississippi?

24       A.    The account came from a broker within our

25   territory, from a New York City broker.   Territory's

Page 20

```
 1   referred to where the business comes from, not where the

 2   risk is located.

 3        Q.    Before Signal, had you ever underwritten a

 4   shipyard on the Gulf Coast of the United States?

 5        A.    Yes.

 6        Q.    Which ones and where?

 7        A.    Bollinger Shipyards, I believe they had

 8   operations in Mobile and Pascagoula and also -- well,

 9   that was it on the Gulf Coast.

10        Q.    You were the underwriter for Bollinger?

11        A.    Correct.

12        Q.    And it's your testimony that they have

13   shipyards in Pascagoula and Mobile?

14        A.    I can't be certain where their shipyards are

15   located.  They were on the Gulf Coast.

16        Q.    Have you ever been to Bollinger?

17        A.    No.

18        Q.    Have you ever been to Signal?

19        A.    No.

20        Q.    Has anyone from Max Specialty ever been to

21   Signal shipyards in Texas or Mississippi?

22        A.    No.

23        Q.    Has anyone from Max Specialty ever requested

24   to inspect or go see Signal's shipyards in Mississippi

25   or Texas?
```

1      A.   No.

2      Q.   Even after the AFDB-5 sank, no one from

3  Max Specialty went to Texas to Signal Shipyard; is that

4  correct?

5      A.   That's correct.

6      Q.   Now, at Max Specialty, you were the only

7  person that dealt with AmWINS in the underwriting of the

8  Signal account?

9      A.   Yes.

10     Q.   Cody Whittington didn't have anything to do

11 with underwriting the Signal account, did he?

12     A.   No, he did not.

13     Q.   And you didn't seek any input from him during

14 the process of you underwriting the Signal account, did

15 you?

16     A.   No, I did not.

17     Q.   What about Mr. Boesen?

18     A.   No.

19     Q.   Is that -- he didn't have any involvement with

20 underwriting the Signal account, did he?

21     A.   No, he did not.

22     Q.   To your knowledge, is the first time Cody

23 Whittington became involved with the Signal account in

24 any way was after the AFDB-5 sank in August of 2009?

25     A.   Yes.

```
 1      Systems involved with?

 2           A.   Marine repair, marine fabrication.

 3           Q.   Vessels?

 4           A.   Yes.

 5           Q.   Not rigs, correct?

 6           A.   Correct.

 7           Q.   Do you know if Bollinger is involved with the

 8      repair or refurbishment of offshore drilling rigs?

 9           A.   I'm not sure.

10           Q.   Prior to underwriting the Signal account in

11      January of 2009, had you personally ever been involved

12      with the underwriting of an account for property

13      insurance that includes drydocks?

14           A.   Yes.

15           Q.   Which ones?

16           A.   I can't give you specific instances, but as an

17      underwriter, I've seen numerous port facilities.  Port

18      of Tampa I've reviewed before, but I can't give you

19      specific instances.

20           Q.   Do you know what a drydock is?

21           A.   Yes.

22           Q.   What is it?

23           A.   It's a floating dock used to lift items up out

24      of the water for repair.

25           Q.   Now, in this case, you at Max agreed to write
```

Page 24

1    an excess property insurance policy for Signal; is that

2    right?

3          A.    That's right.

4          Q.    Now, when you as an underwriter are looking at

5    an excess policy, do you have a different process for

6    underwriting than you do when you're looking at a

7    primary policy?

8          A.    I would say we look at a few additional

9    things.  The same -- the fundamentals are the same, but

10   there are other things you would take into consideration

11   on the excess side.

12         Q.    What where the fundamentals?

13         A.    Construction type, occupancy, protections in

14   place and the exposures.  The loss history.

15         Q.    At Max Specialty, these fundamentals that you

16   just described to me, are these in writing somewhere at

17   Max Specialty?

18         A.    No.

19         Q.    Does Max Specialty have any written

20   underwriting guidelines?

21         A.    No.

22         Q.    These fundamentals that you described, are

23   they your personal fundamentals?

24         A.    They are the fundamentals that most property

25   underwriters learn when they start in the business.

Page 30

1    Q.    Inside of Max, is there any system of checking

2    or approving a risk before it is underwritten?

3    A.    I'm not sure I understand the question.

4    Q.    For example, in the Signal excess property

5    insurance, did anyone check your decision to underwrite

6    the excess policy before it was underwritten?

7    A.    No.

8    Q.    Has anyone ever reviewed it after the fact?

9    A.    No.

10   Q.    Now, these fundamentals that you talked about,

11   are these questions you normally ask a broker when they

12   present a risk to you?

13   A.    If we have any questions that weren't answered

14   by the information provided.

15   Q.    In your career at Max Specialty, have you ever

16   requested to inspect a property before you decided to

17   underwrite it?

18   A.    Never before.

19   Q.    Have you ever requested to interview the

20   prospective insured before you underwrote the risk?

21   A.    No.

22   Q.    Have you ever requested surveys or anything

23   like that of an insured's property before you underwrote

24   the property?

25   A.    I don't recall a time when I have.

Page 34

1       Q.    You could have done that, right?

2       A.    Yes.  We relied upon what we were provided by

3   Signal.

4       Q.    And with values, you want the most current

5   value, right?

6       A.    Correct.

7       Q.    You don't want values that are old or

8   obsolete, do you?

9       A.    No.

10      Q.    Is that right?

11      A.    That's right.

12      Q.    When did you first hear of Signal

13  International?

14      A.    When Tom Cesare presented me with the

15  submission.

16      Q.    In January of 2009?

17      A.    That's correct.

18      Q.    Before January of 2009, had you ever heard of

19  Signal International?

20      A.    If we had received a previous submission on

21  it, I don't recall it.

22      Q.    Do you know what Signal International, do you

23  know what they do?

24      A.    Yes.

25      Q.    What do they do?

1      A.   They do marine fabrication, repair of drilling

2  equipment, rigs, construction and repair, marine

3  fabrication.

4      Q.   And where are they located?

5      A.   They have operations in Pascagoula, Orange,

6  Port Arthur.

7      Q.   Have you ever to this day spoken to anyone

8  from Signal International?

9      A.   No.

10      Q.   When you were, in January of 2009 when you

11  were underwriting the account, did you know how many

12  buildings they had on those respective properties in

13  Texas and Mississippi?

14      A.   We were presented with a spreadsheet, with an

15  Excel spreadsheet that had a breakdown of values on it.

16      Q.   And did you review that?

17      A.   I did.

18      Q.   Do you know who Signal's customers are?

19      A.   Not by name.

20      Q.   Do you know by type?

21      A.   Yes.

22      Q.   What type of customers does Signal have?

23      A.   The oil, the oil industry, I believe some Navy

24  contracts.

25      Q.   When you say "oil industry," what do you mean

```
 1        A.    No.

 2        Q.    Do you know if any of those companies that

 3   I've just listed have anything to do with Signal?

 4        A.    I don't.

 5        Q.    During the course of underwriting the Signal

 6   insurance excess property policy, is the only person

 7   with whom you dealt Tom Cesare?

 8        A.    Yes.

 9        Q.    Did you deal with anyone from Willis?

10        A.    No.

11        Q.    And you didn't speak to anyone from Ace; is

12   that correct?

13        A.    That's correct.

14        Q.    When I say "Ace," is -- we've also seen the

15   name Westchester.

16              Is that the same thing to you?

17        A.    That's the same thing.

18        Q.    And you spoke to no one from Ace or

19   Westchester during the course of you deciding and

20   agreeing to underwrite the excess policy for Signal.

21        A.    That's correct.

22        Q.    Do you know when Signal International came

23   into existence?

24        A.    I do not.

25        Q.    During the course of you deciding to
```

Page 42

1    was provided to us by Signal and gave a favorable

2    overview and listed no recommendations.

3        Q.    Okay.  But what I'm asking is what you did.

4            When you looked at the statement of values in

5    the list of property, did you ask Mr. Cesare about the

6    condition, the value, et cetera of any of the property?

7        A.    No.

8        Q.    When you were deciding -- let me back up a

9    second.

10           The entire process of you being called by

11   Mr. Cesare about Signal, or being emailed by him, until

12   the time you decided to underwrite it was two days,

13   correct?

14       A.    Correct.

15       Q.    And during that two-day period, did you make

16   any attempt to look at Signal's financials?

17       A.    No.

18       Q.    Did you make any attempt to look at their

19   revenue?

20       A.    No.

21       Q.    Did you make any attempt to look at their

22   revenue from the utilization of the drydock?

23       A.    No.  I looked at the business interruption

24   values that were provided in the submission.

25       Q.    Did you make any attempt to ascertain the, on

1    your own, the actual cash value of any of the property

2    listed?

3         A.   No.

4         Q.   Before Mr. Cesare contacted you in January of

5    2009, did you know him?

6         A.   Yes.

7         Q.   How long have you known him?

8         A.   I've probably known Mr. Cesare for 15 years.

9         Q.   15?

10        A.   I can't put an exact, but probably 15.

11        Q.   Is he a broker with whom you've done business

12   before?

13        A.   Yes.

14        Q.   Over those 15 years?

15        A.   Yes.

16        Q.   Is that how you know him?  Professionally?

17        A.   Yes.

18        Q.   Have you met him personally before?

19        A.   Yes.

20        Q.   Is he a social friend of yours?

21        A.   No.

22        Q.   Do you view him as a competent broker?

23        A.   Yes.

24        Q.   What is AmWINS?

25        A.   AmWINS is a wholesale broker.  They are an

Page 44

```
 1    intermediary between retail brokers and surplus lines

 2    carriers.

 3         Q.    In this case here, the retail broker was who?

 4         A.    Willis.

 5         Q.    Which office?

 6         A.    Mobile, I believe.

 7         Q.    Do you know anybody at Willis Mobile?

 8         A.    No.

 9         Q.    At AmWINS, what is Mr. Cesare's job?

10         A.    I believe he's the property manager in the

11    New York office.

12         Q.    And does he typically come to -- has he

13    typically come to you for certain accounts for property

14    insurance?

15         A.    Yes.

16         Q.    Both excess and primary?

17         A.    Yes.

18         Q.    Do you believe that Mr. Cesare is an

19    experienced and reputable broker?

20         A.    Yes.

21         Q.    Do you believe him to be honest?

22         A.    Yes.

23         Q.    Other than Mr. Cesare, did you have any

24    contact with anyone at AmWINS in placing the excess

25    property insurance for Signal?
```

1    A.   No.

2    Q.   All of the information that you received on

3    Signal's account came from AmWINS; is that correct?

4    A.   That's correct.

5    Q.   Did Mr. Cesare make any misrepresentations to

6    you when placing Signal's excess insurance policy?

7    A.   Not that I know of.  It appeared to me he

8    provided all the inform- -- he provided the information

9    that was provided to him by Willis.

10   Q.   And when you were provided that information

11   from Mr. Cesare, did you believe at that time in January

12   of 2009 that the information was complete?

13   A.   It appeared to be a complete submission.

14   Q.   Did you have all the information that you

15   needed to decide to underwrite the Signal excess

16   insurance policy?

17   A.   Yes.

18   Q.   Yes?

19   A.   Yes.

20   Q.   Have you dealt with Willis of Mobile before?

21   A.   No.

22   Q.   Have you dealt with Willis before?

23   A.   No.

24   Q.   Do you know John Bullock?

25   A.   No.

1          (Grouping of documents headed by email chain

2     dated January 28, 2009 from Krause to Daniel was marked

3     Deposition Exhibit Number 196.)

4     BY MR. BLAND:

5          Q.   Exhibit 196, for the record, starts with an

6     email chain Tom Cesare email dated January 28, 2009, and

7     at the top there's a January 28, 2009 email from Tom

8     Krause to John Daniel with a CC to Trip Morano.

9              And then attached to it is Westchester's

10    $10 million quote from the previous year, the Willis

11    2009 property submission, the current 2009 statement of

12    values, an RMS workbook and the Heller inspection report

13    that you referred to earlier; is that correct,

14    Mr. Morano?

15         A.   That's correct.

16         Q.   In front of you, Exhibit 196 is what you

17    received from Mr. Morano in January of 2009; is that

18    correct?

19         A.   It's what we received from Mr. Cesare.

20         Q.   I'm sorry.

21             Make it clear for the record.  Exhibit 196 is

22    what you received from Mr. Cesare on January 28, 2009;

23    is that correct?

24         A.   That's correct.

25             MR. NICOLETTI:  David, just so we can be clear

1          And then there's an unnumbered page RMS

2     Construction Codes & Description and then another

3     series of pages numbering six, and that completes

4     the exhibit, I believe.

5          MR. BLAND:  It does.

6          MR. NICOLETTI:  Okay.

7   BY MR. BLAND:

8     Q.   Now, if you look at the email in front of you,

9   the one that's the first email, January 28, 2009,

10  10:56 a.m.

11         Do you see that?

12    A.   Um-hum.

13         THE COURT REPORTER:  Yes?

14  BY MR. BLAND:

15    Q.   Yes?

16    A.   Yes.

17    Q.   It says from Tom Cesare to Tom Cesare.

18         This is an email you received, isn't it?

19    A.   I'm not sure I received it or was

20  carbon-copied in from Tom Krause, but ultimately it

21  landed in my hands that morning.

22    Q.   All right.  That morning of January 28th,

23  2009?

24    A.   January 28th, 2009.

25    Q.   And Exhibit 196 is the complete information

Page 52

1      that you received from AmWINS for the Signal account; is

2      that correct?

3          A.    That's correct.

4          Q.    Now, the email says from Cesare, it says, "We

5      have a short fuse 1/30/09 account that we have some

6      history on."

7                Do you recall reading this email --

8          A.    Yes.

9          Q.    -- back then?

10         A.    Yes.

11         Q.    So the short fuse meant that the account was

12     expiring in two days; is that right?

13         A.    That's right.

14         Q.    Is that something that's typical in your

15     industry, that you will get an account to quote on at

16     the last minute?

17         A.    That is very common.

18         Q.    This was not an uncommon situation for you to

19     be in, receiving an account with just two days; is that

20     correct?

21         A.    That's correct.

22         Q.    Did you believe that two days was enough time

23     for you to evaluate the risk and place it?

24         A.    Based on the information that Tom provided,

25     yes, it appeared we had enough information.

1      Q.    And this package of materials, Exhibit 196, is

2    a typical package that you would receive in deciding to

3    underwrite an excess insurance property policy, correct?

4      A.    Correct.

5      Q.    The Exhibit 196 was enough for you to go

6    through the fundamentals that you described to me

7    earlier; is that correct?

8      A.    That's correct.

9      Q.    And, in fact, Mr. Cesare's submission to you,

10   Exhibit 196, covered all the fundamentals that you

11   typically look at, correct?

12     A.    That's correct.

13     Q.    And certainly no one coerced or forced you to

14   write the Signal account, right?

15     A.    That's correct.

16     Q.    And then Mr. Cesare in his email gives a

17   history, a short history, of the account back to

18   January 30th, '07; is that right?

19     A.    That's right.

20     Q.    Do you know who Lexington is?

21     A.    Yes.

22     Q.    Who were they?

23     A.    It's Lexington Insurance Company, AIG company.

24     Q.    That's a very large insurance company, isn't

25   it?

Page 60

1      Q.   Does he sit in Richmond?

2      A.   He does.

3      Q.   And is he someone with whom you work?

4      A.   Yes.

5      Q.   Is he senior to you as a regional underwriter?

6      A.   He is senior to me, yes.

7      Q.   You don't report to him, though.  You report

8   to Mr. Hahn?

9      A.   That's correct.

10      Q.   Does Mr. Krause report to Mr. Hahn?

11      A.   Yes.

12      Q.   Who is John Daniel?

13      A.   John Daniel is one of our underwriting

14   assistants.

15      Q.   In Richmond?

16      A.   Yes.

17      Q.   Does Mr. Daniel work with you?

18      A.   Yes, he does.

19      Q.   Does he assist you?

20      A.   Yes.

21      Q.   And then you're CCed on this email; is that

22   right?

23      A.   That's right.

24      Q.   And was it around this time at 11:24 a.m. that

25   you received a package from Mr. Cesare as Exhibit 196?

1      A.   Yes.

2      Q.   From that point forward, from January 28th,

3  2009 at 11:24 a.m., was it you at Max Specialty that

4  handled the underwriting of the Signal excess insurance

5  policy?

6      A.   Yes.

7      Q.   Neither Mr. Krause nor Mr. Daniel had any role

8  in that; is that right?

9      A.   That's right.

10     Q.   Now, can you tell us here today whether you

11  read -- I know you do not use the RMS workbook, but

12  other than that, did you read all of the documents that

13  are a part of Exhibit 196 before you decided to

14  underwrite the policy?

15     A.   Yes.

16     Q.   Every page.

17     A.   I went through it.  I can't say I read every

18  page completely thoroughly, but I went through it and

19  found what I felt was the pertinent information.

20     Q.   Based on your experience, you knew what to

21  look for, and you looked for that and you were

22  satisfied; is that right?

23     A.   That's right.

24     Q.   Now, have a look at the property insurance

25  submission which is -- begins with TRIPM 0056.

1      A.   Yes.

2      Q.   From that point forward, from January 28th,

3   2009 at 11:24 a.m., was it you at Max Specialty that

4   handled the underwriting of the Signal excess insurance

5   policy?

6      A.   Yes.

7      Q.   Neither Mr. Krause nor Mr. Daniel had any role

8   in that; is that right?

9      A.   That's right.

10     Q.   Now, can you tell us here today whether you

11  read -- I know you do not use the RMS workbook, but

12  other than that, did you read all of the documents that

13  are a part of Exhibit 196 before you decided to

14  underwrite the policy?

15     A.   Yes.

16     Q.   Every page.

17     A.   I went through it.  I can't say I read every

18  page completely thoroughly, but I went through it and

19  found what I felt was the pertinent information.

20     Q.   Based on your experience, you knew what to

21  look for, and you looked for that and you were

22  satisfied; is that right?

23     A.   That's right.

24     Q.   Now, have a look at the property insurance

25  submission which is -- begins with TRIPM 0056.

Page 62

1           And this is a document effective January 30th,

2    2009 to January 30, 2010, meaning that's when the policy

3    period would be, right?

4         A.   That's correct.

5         Q.   The issue date on this at the top there is

6    January 14th, 2009; is that correct?

7         A.   That's correct.

8         Q.   And it was presented by Willis of Alabama,

9    Inc., Mobile; is that right?

10        A.   That's right.

11        Q.   If you turn to the Bates stamp page

12   TRIPM 0058.

13        A.   Okay.

14        Q.   There was some general information listed

15   there about Signal International; is that correct?

16        A.   That's correct.

17        Q.   And within that, they -- you were provided

18   with a financial contact Chris Cunningham and his phone

19   number; is that right?

20        A.   That's correct.

21        Q.   Do you know why a financial contact would be

22   listed?

23        A.   I don't.

24        Q.   Then there's an inspection contact, Lisa

25   Spears, and it says "same," meaning the same number,

1        A.    But at the time, no.

2        Q.    All right.   Show me in Exhibit 196 what is

3    inaccurate.

4        A.    Only that the condition of the properties may

5    not have been, you know, as above average as presented

6    in the survey.

7        Q.    Okay.   I'm coming back to my earlier question.

8            Show me in that exhibit, all those

9    attachments, where there's an inaccurate description of

10   the AFDB-5.   Show me.

11       A.    I can't tell you where that is.   I don't, I

12   don't know that it's in there.   I don't recall seeing

13   it.

14           MR. NICOLETTI:   We can take 10 minutes while I

15           get coffee so we can look through each page, and I

16           think we should.

17   BY MR. BLAND:

18       Q.    What I'd like you to do, because it's the

19   basis of your fraud claim against my client, is I want

20   you to look at Exhibit 196 -- let me back up.

21           You say that at the time of the placement of

22   this insurance, Signal International, my client, made

23   misrepresentations, committed fraud and had material

24   nondisclosures, okay?

25           It was -- Exhibit 196 is the only exhibit,

Page 90

1    documents, that you looked at and relied on in

2    underwriting the policy, right?

3         A.   Yes.

4         Q.   All right.  So what I want you to do is tell

5    me where in that submission, Exhibit 196, there is a

6    misrepresentation, a fraudulent statement or a material,

7    underline "material," nondisclosure.  I want you to tell

8    me where that is.

9         A.   I don't know where that is.  I don't know that

10   it's in there.

11        Q.   You don't know whether there was any

12   misrepresentation.

13        A.   All I know is that Signal had other reports in

14   their possession that spoke to the less than

15   seaworthiness, the danger of using that equipment for

16   repair work on large rigs, and we were not presented

17   that material.

18        Q.   I'm going to ask you all about that, believe

19   me.

20        A.   All right.

21        Q.   But what I'm asking you is in 196, that

22   exhibit, the thing that you relied on, where is the

23   misrepresentation by Signal?

24        A.   I don't know.  I don't know that, that there

25   is a misrepresentation in this report.

Page 106

```
 1        Q.    What about with Mr. Heller?  Do you have any
 2   information that Signal concealed or did not disclose
 3   information to Mr. Heller?
 4        A.    No.
 5        Q.    Or Heller & Associates?
 6        A.    No.
 7        Q.    In the underwriting process, the two days or
 8   so that you looked at this before you wrote it, did you
 9   ever speak with Mr. Cesare?
10        A.    I can't recall.  I believe we may have spoken
11   only in terms of, "Hey, Trip, this is Tom.  I need this
12   like now," but we didn't, you know, we did not have any
13   conversations about underwriting or pricing.
14        Q.    Since this lawsuit was filed, have you had any
15   discussions with Ace?
16        A.    No.
17        Q.    Do you know whether or not Ace is a party to
18   this lawsuit?
19        A.    No, I do not.
20        Q.    Do you know that Ace paid its limits as the
21   primary property underwriter?
22        A.    Yes.
23        Q.    Are you aware that they have not sued Signal
24   and allege that Signal committed fraud or had material
25   nondisclosure?
```

1      Q.    All right.  So I'm going to ask you this

2  question.

3            We looked at Exhibit 196, the package you

4  received from AmWINS.

5            Can you give us an estimate of how much time

6  you spent looking at those materials in Exhibit 196?

7      A.    I spent the better part of the afternoon of

8  Wednesday, the 28th and the morning of the 29th looking

9  at it.

10           So probably a day.

11     Q.    And you say, "I'm going to take a pass on the

12  layers outlined below at the current pricing level.

13           What did you mean by that?

14     A.    At the suggested -- at Tom's suggested

15  pricing, the layers just did not make sense.

16     Q.    By "pricing," what do you mean?  The premium

17  paid?

18     A.    The premium available for those layers,

19  correct, just did not make sense, given the loss

20  experience.

21     Q.    And you say, "I'd probably want at least

22  200,000 per mil in any of the low attaching layers

23  (doesn't loss rate or work out well on a payback

24  basis)," exclamation point.

25           What did you mean by that?

1          (Email dated January 29, 2009 from Cesare to

2   Morano was marked Deposition Exhibit Number 199.)

3   BY MR. BLAND:

4          Q.   This is an email from Mr. Cesare to you,

5   Thursday, January 29 at 11:31 a.m.   You see that?

6          A.   Yes.

7          Q.   Do you recall this?

8          A.   Yes.

9          Q.   And they are referencing the -- apparently

10   attached is Westchester's 10 million primary quote; is

11   that right?

12          A.   That's right.

13          Q.   Is that something you took into consideration

14   when writing this policy?

15          A.   Yes.

16          Q.   And then it says, "The Westchester underwriter

17   (who has an engineering degree) has read the whole

18   inspection report that we included in the submission and

19   has pointed out that most of Ike loss was to the

20   electrical equipment at Orange, Texas yards."   Do you

21   see that?

22          A.   Yes.

23          Q.   Do you know who he's referencing there, the

24   Westchester underwriter who has an engineering degree?

25          A.   I know who he is, I know his name, but I don't

Page 114

```
 1    know him.

 2          Q.    What's his name?

 3          A.    Darrell Pippin.

 4          Q.    And in this email, what is Mr. Cesare asking

 5    you to do?

 6          A.    Asking us to take another look at providing

 7    some catastrophe limits based on the fact that -- you

 8    know, he's being a broker -- based on the fact that the

 9    Ace underwriter still likes it, you know, the fact that

10    they've tried to make some improvements to avoid salt

11    water intrusion to their electrical equipment and storm

12    surge.  He's just trying to convince us to have another

13    look at providing catastrophe perils.

14          Q.    This email is mainly about the catastrophe

15    peril?

16          A.    Yes.

17          Q.    And after receiving this email, did you

18    request any further information about Signal or from

19    Signal?

20          A.    No.

21                (Email Chain dated January 29, 2009 from

22    Morano to Cesare was marked Deposition Exhibit

23    Number 200.)

24    BY MR. BLAND:

25          Q.    The next exhibit we've marked as Morano 200 is
```

1    Q.   And Miss Everett on behalf of Arch had this

2   for just an hour or two and decided to go 50 percent on

3   the 15 million?

4    A.   She -- yes.

5    Q.   Is that typical in your business as well?

6    A.   Yes.

7    Q.   So she couldn't have looked at the AmWINS

8   submission in any detail, right?

9    A.   I think she looked at it the night before.

10   After, after dinner, I think she -- she told me she was

11   going to look at it and have me an answer in the

12   morning.

13    Q.   And by the next morning by 8:50 a.m., you had

14   heard from her, and she'd agreed to take on 50 percent

15   of the excess; is that right?

16    A.   That's right, somewhere around 8:30 the next

17   morning she sent me an email saying she was good to go

18   with the capacity and the price.

19    Q.   And then Mr. Cesare in the email chain

20   responded to you five minutes later at 8:56 a.m. and

21   says, "Thanks.  Get me the quote first so that my broker

22   can present it and get a formal okay to bind."  Do you

23   see that?

24    A.   Yes.

25    Q.   What's the quote?

Page 120

1     A.    That is our formal quote document which is a

2     two-page document with all the formal terms and

3     conditions on it.

4     Q.    And then you came back at 9:15 a.m., this is

5     on TRIPM 0027, and you say, "Attached is the formal

6     quote for the 15 million excess 10 million nonCAT layer.

7     Please review and let me know if you see anything that

8     needs attention.  Hope this does the trick.  Hope we can

9     bind this one up," exclamation point.  That's what you

10    wrote?

11    A.    Correct.

12    Q.    And the formal quote that you attached begins

13    in this Exhibit 201 at TRIPM 0031; is that right?

14    A.    That's right.

15    Q.    And it's a two-page quote, as you described

16    it.  It's TRIPM 0031 to 32; is that right?

17    A.    That's right.

18    Q.    And this is an excess proposal dated

19    January 30th, 2009 on Max Specialty paper; is that

20    right?

21    A.    That's right.

22    Q.    And that is sent to Tom Cesare at AmWINS?

23    A.    That's right.

24    Q.    That's the normal course of business, you deal

25    with the wholesale broker?

```
 1          A.   Yes, it is.
 2          Q.   And would Mr. Cesare then turn that down --
 3    send this down to Willis?
 4          A.   That's correct.
 5          Q.   Who would then, in your experience, get
 6    authority from Signal?
 7          A.   That's correct.
 8          Q.   The insured?
 9          A.   Correct.
10          Q.   And this excess proposal as it describes as
11    covered property includes drydocks; is that right?
12          A.   That's right.
13          Q.   And the premium was how much?
14          A.   It was a hundred thousand originally.  At some
15    point Tom did come back to me and we amended it downward
16    at lower commission because Willis worked on a fee.
17               But the net number remained unchanged, I
18    believe.
19          Q.   In the excess proposal at page -- at
20    TRIPM 0031, it says, "Policy form:  Max Specialty excess
21    of loss following form."  What does that mean?
22          A.   That is our excess following form that in a
23    nutshell says we follow the terms and conditions of the
24    underlying policy.
25          Q.   Of the primary policy?
```

Page 122

1        A.    Of the primary policy.

2        Q.    Do you follow the decisions of the primary

3   insurance?

4        A.    We follow the terms and conditions of their

5   policy, not necessarily their decisions.

6        Q.    Is a decision by the primary underwriter under

7   this excess following form, is it binding on you as the

8   excess?

9        A.    No.

10        Q.    Are you sure of that?

11        A.    We, we reserve the right to adjust our own

12   claims.  It simply means we follow the terms and

13   conditions of their policy.

14        Q.    TRIPM 0032, "Standard Conditions."  Do you see

15   that?

16        A.    Yes.

17        Q.    You're familiar -- this is a form of

18   Max Specialty's, correct?

19        A.    Right.  That's standard wording.

20        Q.    And on number 3, it says, "This quote is

21   conditional upon favorable financials, inspection

22   report(s) and compliance with recommendations, if

23   requested."  Is that right?

24        A.    That's right.

25        Q.    And as you've already told me, you didn't

1              MR. NICOLETTI:  David, could you just clarify

2        whether it's quota share or excess of loss?

3   BY MR. BLAND:

4        Q.   Do you know the difference?

5        A.   Yes.  It was quota share.

6              MR. BLAND:  Thank you.

7              MR. GALATI:  Can I take a two-minute break

8        while you're getting documents together?

9              MR. BLAND:  Yeah.  Can we take a little break?

10        Is that okay?

11              THE DEPONENT:  Sure.

12              (A recess was taken from 12:14 p.m. until

13        12:26 p.m.)

14   BY MR. BLAND:

15        Q.   I'm going to show you a document which you may

16   not have seen before.  I'm going to mark it as

17   Exhibit 202.

18              (Email dated January 27, 2009 from Cesare to

19   Pippin was marked Deposition Exhibit Number 202.)

20   BY MR. BLAND:

21        Q.   This is an email, it's dated January 27, 2009

22   from Mr. Cesare to Darrell Pippin, and I take it -- have

23   you ever seen that email before?

24        A.   No, I never have.

25        Q.   Okay.  Do you understand who Mr. Pippin is?

Page 138

1     A.     Yes.

2     Q.     Is he the Ace underwriter?

3     A.     Yes, he was at the time.

4     Q.     And this is, apparently if you just look at

5     it, this is Mr. Cesare broking, if you will, the primary

6     policy, isn't it?

7     A.     Correct.

8     Q.     The renewal?

9     A.     Yes.

10     Q.     And if you just look at it from the

11     submission, in the middle of the page there, it says,

12     "In any event, we are enclosing," and he lists documents

13     A through E, the Westchester 10 million quote, the

14     Willis' 2009 property submission, the current 2009

15     statement of values and RMS workbook, "that should be

16     helpful to your modelers and the most recent inspection

17     report.  Do you see that?

18     A.     Yes.

19     Q.     That's the very same list that was provided to

20     you the very next day on January 2009 -- sorry,

21     January 28th, 2009; is that correct?

22     A.     That's correct.

23     Q.     And do you know whether or not Ace had any

24     other documentation in their possession when they

25     decided to renew the primary insurance policy up to

1    $10 million?

2         A.    I did not.

3         Q.    Have a look now what has previously been

4    marked as Exhibit 104.   This is 104.

5              And just if you could have a quick flip

6    through that and tell me what that is.

7         A.    This is a copy of Max Specialty's 15 over 10

8    excess policy.

9         Q.    This is the policy that you agreed to

10   underwrite on January 30th, 2009; is that correct?

11        A.    That's correct.

12        Q.    And in Exhibit 104 -- and we'll go by Willis

13   Bates stamp number on this -- it's the second page of

14   the exhibit, it's WILLIS 00697 is the Bates stamp, it's

15   the policy declarations.   You see that, Mr. Morano?

16        A.    Yes.

17        Q.    And the coverage is for commercial property

18   excess of loss; is that right?

19        A.    That's correct.

20        Q.    This is not a marine insurance policy, is it?

21        A.    That's correct.

22        Q.    And the total value that the insured -- sorry,

23   start over.

24              At the box number 10, it says, "This premium

25   is based on," and then it says 2,011,328,279; is that

Page 140

1  right?

2      A.   That's correct.

3      Q.   I'm sorry, 200 million; is that right?

4      A.   211 million, yes.

5      Q.   And what does that number reflect, that

6  $211 million number?

7      A.   That's the total insurable value shown on the

8  schedule of values that was submitted to us.

9      Q.   Is it the insured value of all property that

10  you were writing excess for?

11      A.   It would be the insured value.  Were they to

12  buy full limits of 211 million of insurance limits, it

13  would be the full insured value.

14          But it's the total of all the values.

15      Q.   The premium was based on that $211 million

16  value, right?

17      A.   That's correct.

18      Q.   Now, earlier in your testimony, you referenced

19  something about, I think you used the word "seaworthy."

20  Do you remember that?

21      A.   Yes.

22      Q.   What does "seaworthy" mean to you?

23      A.   Capable of staying afloat.

24      Q.   Is the word "seaworthy" in this commercial

25  property excess of loss?

1      A.    No.

2      Q.    There is no warranty in this policy of

3  seaworthiness with respect to any of the scheduled

4  property; is that correct?

5      A.    That's correct.

6      Q.    The AFDB-5 is a covered asset or a scheduled

7  piece of property under this excess policy, Exhibit 104?

8      A.    That's correct.

9      Q.    If the AFDB-5 sank because of operator error,

10 this is an event or an occurrence that this

11 Max Specialty excess policy would cover, right?

12     A.    Yes, yes.

13     Q.    If there's negligence on the part of Signal

14 which causes the drydock to sink, that is what Signal

15 was attempting to insure in this policy, right?

16     A.    I think they were attempting to insure against

17 an accident or event that causes damage to their

18 facilities.

19     Q.    And maybe I didn't --

20     A.    Yeah.

21     Q.    I'm sorry, I asked the question in an improper

22 way.

23          This policy, Exhibit 104, covers the sinking

24 of the drydock which is caused by the negligence of

25 Signal, correct?

Page 142

1        A.    Yes, that's correct.

2        Q.    And it covers the physical loss of the

3    drydock?

4        A.    That's correct.

5        Q.    And it would cover any business interruption

6    that may be attendant to the loss of the drydock,

7    correct?

8        A.    Correct.

9        Q.    And in this case, do you have any information

10   that the drydock, the AFDB-5, sank for any other reason

11   other than operator error?

12       A.    In speaking with Mr. Bowles and our claims

13   staff, there's been discussions concerning the condition

14   of the drydock and the fact that it was in disrepair

15   that led to it sinking, but that's, but that's all --

16       Q.    Trust me on this one.  I know what Mr. Bowles

17   says about it, okay?

18       A.    Okay.

19       Q.    But I'm asking you.

20             Do you have any information that the drydock

21   sank for any other reason other than operator error?

22       A.    I do not have that information.

23       Q.    Does Max Specialty have that?

24       A.    I do not know.  That would be a question

25   better suited for Cody and Steve.

Page 214

1   coverages that were going to be provided.

2       Q.   So when you were writing your excess policy,

3   you had an understanding that the Ace/Westchester policy

4   did have a broader scope of coverage than those areas

5   outlined in Mr. Cesare's email; is that correct?

6       A.   I knew that -- yes, I knew that there were

7   going to be more coverages covered under the Ace policy

8   than were discussed in Tom Cesare's very brief email to

9   me, yes.

10      Q.   Does there ever come a time when you receive a

11  copy of the Westchester primary policy prior to your

12  placement of binding of the coverage?

13      A.   No.

14      Q.   Did there ever come a time when you received a

15  copy of the Westchester primary property policy between

16  the time you bound it up until the time you issued your

17  own policy?

18      A.   That could be.  We typically ask for a copy of

19  the underlying policy so that we can review it and issue

20  our own excess policy.

21      Q.   Would you only issue your excess policy after

22  receiving an actual copy of the Westchester policy?  The

23  primary policy.

24      A.   Not all the time, no.  If it's a carrier that

25  we write excess over all the time, often we will issue

Page 216

1      A.   Yes.

2      Q.   All right.  Are you familiar with the term

3   "following form" in regards to someone who writes excess

4   property insurance?

5      A.   Yes.

6      Q.   What is your understanding of the term

7   "following form"?

8      A.   It would mean that the excess policy would

9   follow the terms and conditions of the underlying

10  policy --

11     Q.   All right.

12     A.   -- with the exception of any mandatory company

13  endorsements that might be attached.

14     Q.   When you use the term "except for the

15  company's mandatory endorsements which may be attached,"

16  are you referring to the primary underwriter or the

17  excess underwriter?

18     A.   The excess underwriter.

19     Q.   Meaning yourself.

20     A.   Correct.

21     Q.   And when you speak in terms of the mandatory

22  endorsements, were they, in fact, attached to the

23  Max Specialty policy which was issued to Signal?

24     A.   Yes.

25     Q.   Let me put before you -- I think you have a

1    copy of Exhibit 104 and Exhibit 120.

2              MR. BOWLES:  Do we have 120?

3              MR. NICOLETTI:  Yes, it was early on.

4              (Discussion held off the record.)

5              MR. NICOLETTI:  I'm sorry.  Maybe you don't.

6         Not 120.  My apologies.  It's Exhibit 201.

7              MR. BLAND:  Is that the Ace primary policy?

8              MR. NICOLETTI:  No.  I don't have the Ace

9         primary policy.

10   BY MR. NICOLETTI:

11        Q.   Do you have 120 -- 201 in front of you, 201

12   and 104?

13        A.   Got it.

14        Q.   Trip, you and I will deal.  Forget everyone

15   else.  They are just confusing the both of us.

16              Let me first direct your attention to

17   Exhibit Morano 201.

18              Turn to the last several pages TRIPM 0031 and

19   32.  Do you have them in front of you?

20        A.   I do.

21        Q.   Can you identify that two-page document for

22   me?

23        A.   That is our original quote for the 15 excess

24   of 10 million layer.

25        Q.   Now, I direct your attention to the middle

Page 218

1    where it says "Excess Proposal."  Do you see that?

2         A.   Yes.

3         Q.   It says "Covered Property."  Do you see that

4    line?

5         A.   Yes.

6         Q.   And after the covered property, there's a

7    colon, then the following words appear, "Buildings,

8    contents, bulkheads, drydocks equipment," comma.

9              Is that the type of physical property that you

10   intended to insure under the excess policy?

11        A.   Yes.

12        Q.   It goes on to also identify business income

13   and extra expense as per schedule of values.

14             Is that the additional or enhanced coverages

15   you intended to provide?

16        A.   Yes.

17        Q.   But they are more fully defined in the policy

18   form itself; is that correct?

19        A.   That's right.

20        Q.   Which form are you referring to, the

21   Max Specialty, primary or both?

22        A.   The body of the Ace/Westchester form.

23        Q.   Let me direct your attention to Exhibit 104,

24   specifically the first page entitled "Declarations."  I

25   think it's a two-page document at WILLIS 00697 and 698.

1        Do you see those two pages?

2    A.   Yes.

3    Q.   And can you identify those two pages for me?

4    A.   That is the declarations page to our policy.

5    Q.   All right.

6         Now, I direct your attention to "Covered

7    Property."  You see that?

8    A.   I do.

9    Q.   And it states after the colon, "Building,

10   contents, and business income."

11        Do you note that the word "drydock" is

12   missing?

13   A.   I do.

14   Q.   Was that an error on your part?

15   A.   I don't think it was error as much as I have

16   been told that our system is incapable of actually

17   pulling it from -- that is the canned wording that comes

18   out of our system.  It is not an error.

19        Our intention is to cover the covered property

20   that was on that quote letter.

21   Q.   Okay.  So the fact that the word "drydock" is

22   missing from the covered property is just a symptom of

23   your system not having the word "drydock" in it.

24   A.   That's correct.

25   Q.   So it was always your intent to have the word

Page 220

1    "drydock" next to "Covered Property."

2         A.    That's correct.

3         Q.    And, again, you have here, "Business income

4    with extra expenses as per schedule of values on file

5    with this company."

6              Did you intend to in any way limit the

7    additional or enhancements of coverages in the

8    Ace/Westchester policy by not specifically quoting the

9    same terms you have in your proposal?

10        A.    No, no.  I believe the policy was issued as --

11   with the same terms that was in our proposal.

12        Q.    Okay.  So if the declaration page has any

13   omissions in it, I should look back at the proposal?

14        A.    Correct.

15        Q.    Okay.

16        A.    Correct.

17        Q.    So there's nothing in this proposal that

18   should not be insured under the policy; is that correct?

19        A.    That's correct.

20        Q.    Now, let's turn to WILLIS 00699.  It says

21   "Forms Endorsement" in the center.

22        A.    Yes.

23        Q.    See that page?

24        A.    I do.

25        Q.    "Forms Endorsement."

Page 236

1    privy to the discussions between our claims unit and

2    Arch Re's claims unit.

3        Q.    So you don't know exactly what conversations

4    were had between the two, between your claims office and

5    the Arch reinsurance claims office; is that correct?

6        A.    That's correct.

7        Q.    Is there a claims control clause in the

8    facultative reinsurance contract?

9        A.    Not that I'm aware of.

10        Q.    Is there a strict following clause which,

11    which demands Arch follow Max Specialty in claims

12    decisions?

13        A.    No, not that I'm aware of.

14        Q.    Are you telling me then Arch had the

15    independent right to assess and pay this claim?

16        A.    I'm not sure.  That's --

17            MR. NICOLETTI:  I think we'll have to call for

18        production of the facultative reinsurance contract.

19            MR. BOWLES:  Has that been produced?

20            THE DEPONENT:  It's been produced.

21            MR. NICOLETTI:  It has?

22            MR. GUY:  Yes.

23            MR. NICOLETTI:  We have it.

24    BY MR. NICOLETTI:

25        Q.    Without going through protracted discussions

1    of the Westchester primary policy, does the Westchester

2    policy provide coverage for Signal for debris removal?

3        A.   Yes, there was a $5 million sublimit for

4    debris removal in the Ace policy.

5        Q.   All right.  Did the Ace primary property

6    policy, the Westchester policy, also provide for

7    cleanup -- also provide coverage for Signal for cleanup

8    costs?

9        A.   I believe, but I can't recall.  I would have

10   to review the policy.  But I believe it did.  I believe

11   there was a sublimit for cleanup costs as well.  I can't

12   remember.

13       Q.   The policy speaks for itself.  I can represent

14   to you it's in, it's in the Westchester policy.

15            And that has its own separate sublimit; isn't

16   that correct?

17       A.   That's correct.

18       Q.   Okay.

19            Now, can you tell me the difference between

20   debris removal and cleanup costs since there are two

21   separate coverages?

22       A.   I associate cleanup costs more with a

23   pollution type of situation where you're cleaning up

24   land or water or something that's been contaminated

25   after a fire.

Page 238

```
 1              The debris removal I associate with bulldozing
 2     the manufacturing facility out of the way after a fire
 3     to rebuild a new one, the actual hard -- the hard
 4     debris.
 5          Q.    Okay.  Let me approach it this way then.
 6              If there is a pollution exclusion in a policy,
 7     what's the purpose of the cleanup cost coverage?  Good
 8     question?
 9          A.    That's a good question.
10          Q.    That's why I'm asking.
11          A.    I don't know the answer to that question.
12          Q.    Now, based upon your Max Specialty following
13     form, the Max Specialty excess policy would also provide
14     Signal with both debris removal and cleanup cost
15     coverages, isn't that correct?
16          A.    My understanding is that the entire property
17     placement included a $5 million sublimit for debris
18     removal.
19          Q.    I didn't ask you about the limit.  I was very
20     careful what I'm asking you.
21              My question to you is very simple.  Did the
22     Max Specialty policy follow form in regards to the
23     Westchester primary property policy and provide Signal
24     with both debris removal and cleanup cost coverages?
25          A.    We followed form to the Ace/Westchester
```

1   policy, but both of those coverages were sublimited

2   within the Ace/Westchester policy.

3       Q.   I'm putting aside the limits for the moment.

4   I'll get to the limits.

5           Putting aside the limits, does the

6   Max Specialty provide coverage for both debris removal

7   and cleanup costs for Signal?

8       A.   I don't think it does based on the fact that

9   the limits are contained within the primary policy.

10      Q.   So what you're telling me then, because it's

11  sublimitted in the primary policy, you don't cover it.

12      A.   Correct.

13      Q.   Okay.  Where do you get that understanding

14  from?

15      A.   I believe we would -- we could -- would

16  recognize it for -- that it could erode the underlying

17  insurance, but it would not be an additional coverage in

18  our excess policy.

19      Q.   What's the basis for your saying that?

20      A.   Just my understanding of the way 100 percent

21  program sublimits work.

22      Q.   Can you direct my attention to anything in the

23  Max Specialty excess property policy which is before you

24  that tells the insured Signal that if it has sublimits

25  in its primary policy, that the Max Specialty policy

Page 240

1    does not provide coverage for that type of insured

2    issue?

3         A.   I cannot direct you to anything in our policy,

4    but the sublimits in the Willis proposal are shown as

5    100 percent program sublimits.

6              MR. NICOLETTI:  Can I have the Westchester

7         policy?

8    BY MR. NICOLETTI:

9         Q.   I'm going to hand you the Westchester policy.

10             Can you direct my attention to the terms and

11   conditions to which you're referring?

12             MR. BOWLES:  What is the exhibit number?  103.

13             THE DEPONENT:  I'm looking on the page

14        numbered WILLIS 00738.

15   BY MR. NICOLETTI:

16        Q.   Okay.

17        A.   I'm looking about a third of the way down, the

18   $5 million -- well, at the top of the page, it's

19   entitled "Schedule of 100 Percent Program Sublimits,"

20   and then about a third of the way down, 5 million for

21   debris removal and cost of cleanup.

22        Q.   Is that the sole basis for your saying that

23   your Max Specialty excess policy does not provide debris

24   removal coverage?

25        A.   Yes.

1      Q.    Okay.  Anything else in that policy that

2  supports your contention?

3      A.    No.  My contention is based upon what is --

4  appears to be a 100 percent program limit 5 million.

5      Q.    Let me, let me understand this correctly then.

6            If you're telling the insured that they have a

7  sublimit in their primary policy, you provide no

8  coverage on the excess policy, if that's what you're

9  telling the insured, does that mean the insured then has

10  the right to allocate the primary limits so that it

11  could access the excess limits in what you call the

12  other covered areas?

13      A.    That's my understanding.

14      Q.    So if Signal would tell you today that it's

15  going to allocate $5 million of the Ace primary policy

16  to debris removal, you would pay them $5 million towards

17  the physical loss of the drydock.

18      A.    I don't know.  I can't answer that question.

19      Q.    You're the underwriter.  You're the only guy

20  that can.

21      A.    That's not something I could answer or have

22  the authority to answer.  That would have to go to --

23      Q.    I'm not asking you whether you can give the

24  authority to do it now.

25            I'm asking you based upon your understanding

Page 242

1    of the policy --

2         A.    Based --

3         Q.    Based on your understanding of the policy and

4    the program as you described it, if Signal were to tell

5    you that they've allocated $5 million of their primary

6    Ace payment to debris removal, that would move the

7    physical loss of damage claim into your layer for that

8    $5 million; is that correct?

9         A.    I think potentially could based on the erosion

10   of the underlying limits.

11        Q.    Did anyone ever tell you that Mr. Whittington

12   and Mr. Cheglikov told Signal they could not apply the

13   $5 million sublimit of the primary policy proceeds to

14   pay for debris removal?

15        A.    No.

16        Q.    If they did, in fact, write a letter or tell

17   Signal's representatives through oral statements that

18   they had no right to allocate $5 million of the primary

19   payment to debris removal, would that not be, in fact, a

20   misrepresentation of the coverages?

21        A.    I don't know.

22        Q.    Well, you just told me that based upon your

23   understanding of the policy, Signal could allocate some

24   money towards the debris removal because it's sublimited

25   in the primary.  Did you not tell me that?

1      A.   That is purely my interpretation.

2      Q.   Well, you're the underwriter.

3      A.   That doesn't necessarily mean my

4  interpretation is the correct interpretation.

5      Q.   In other words, you're telling me that the

6  claims person who has no participation in issuing the

7  policy and negotiating the terms can overrule your

8  intent?

9           MR. BOWLES:  Objection.

10           THE DEPONENT:  I can tell you that our claims

11       staff in all likelihood has more experience

12       interpreting policy language than I do.

13  BY MR. NICOLETTI:

14      Q.   Was it your intent under this property program

15  to allow Signal to allocate the primary coverage

16  payments to any area it chose?

17      A.   Under the "Priority of Payment" section, I do

18  believe that they can utilize the underlying limits for

19  coverages that were not covered in the excess.

20      Q.   All right.

21      A.   That's the way I read it.

22      Q.   So to the extent that you don't believe you

23  have coverage under the excess policy for a particular

24  area of coverage which is covered under the primary

25  policy, Signal has the right to allocate those monies

Page 244

1    into that area on the primary level.

2          A.    That's my interpretation of, of the coverage.

3          Q.    As the underwriter, I'll accept it.  Thank

4    you.

5                Let's continue.

6                By the way, do you have any underwriting

7    guidelines?

8          A.    No, we do not.

9          Q.    Do you have any, what I'll call, annotation of

10   your coverage forms where your company tells you or

11   advises you the scope of coverage of a particular term

12   that's in your policy forms?

13         A.    No, we do not.

14         Q.    Have you ever sat down with any broker or

15   insured prior to the loss and explained to them that if

16   you have a sublimit in your primary policy, that the

17   Max Specialty excess form does not provide that

18   coverage?

19         A.    No.

20         Q.    When was the first time that you came to the

21   understanding that if there was a sublimit in the

22   primary policy, property policy, that Max Specialty did

23   not provide coverage through its following form excess?

24         A.    Would you mind repeating that question?

25         Q.    When did you first come to the understanding

1          A.    I mean, to me, that is the job of an insurance

2     agent to explain the coverages to the buyer, to the

3     ultimate buyer.

4          Q.    And what particular phrase in the

5     Max Specialty policy alerts the broker so that he can

6     advise the innocent insured that if he has a sublimit on

7     a coverage in a primary property policy, the

8     Max Specialty following form endorsement does not

9     follow?

10         A.    If I'm not mistaken, it's the Willis form that

11    provides the 100 percent program sublimits.

12         Q.    I understand that.

13         A.    In my mind, Willis should have explained that.

14         Q.    No, no.  They put a sublimit in their primary

15    property policy form, that's correct.

16              What's in the Max Specialty policy that tells

17    the broker to advise the innocent insured that if there

18    is a sublimit in that primary policy program, that the

19    Max Specialty following form excess policy does not

20    follow form?

21         A.    There's no wording in our form.

22         Q.    That's all I'm getting at.

23              So once again, how is Signal to understand

24    that despite no wording in the Max Specialty following

25    form excess contract that they have no excess coverage

 1        A.    I mean, to me, that is the job of an insurance

 2   agent to explain the coverages to the buyer, to the

 3   ultimate buyer.

 4        Q.    And what particular phrase in the

 5   Max Specialty policy alerts the broker so that he can

 6   advise the innocent insured that if he has a sublimit on

 7   a coverage in a primary property policy, the

 8   Max Specialty following form endorsement does not

 9   follow?

10        A.    If I'm not mistaken, it's the Willis form that

11   provides the 100 percent program sublimits.

12        Q.    I understand that.

13        A.    In my mind, Willis should have explained that.

14        Q.    No, no.  They put a sublimit in their primary

15   property policy form, that's correct.

16             What's in the Max Specialty policy that tells

17   the broker to advise the innocent insured that if there

18   is a sublimit in that primary policy program, that the

19   Max Specialty following form excess policy does not

20   follow form?

21        A.    There's no wording in our form.

22        Q.    That's all I'm getting at.

23             So once again, how is Signal to understand

24   that despite no wording in the Max Specialty following

25   form excess contract that they have no excess coverage

Page 248

1      for debris removal and cleanup costs because of the

2      sublimit in the primary policy program when you yourself

3      admitted you never told their broker?

4             A.    I believe their broker should have told them.

5             Q.    You never told them your understanding of your

6      own policy.  How is AmWINS supposed to understand it?

7             A.    The body of the policy is a Willis form.

8             Q.    I'm not talking about the primary.  I'm

9      looking at your Max Specialty form.

10            What is in the Max Specialty form that tells

11     anybody it doesn't follow form if there's a sublimit in

12     the primary policy?

13            A.    Nothing.

14            Q.    And you never told AmWINS about that either,

15     did you?

16            A.    No.

17            Q.    And, again, the only thing that's in the

18     primary policy form which you say cuts off coverage to

19     the primary -- to the excess is the schedule of limits;

20     is that correct?

21            A.    I believe so.

22            Q.    Right.

23            You believe so.

24            A.    I believe so.

25            Q.    Yeah.  It's a schedule of limits, isn't it?

1          A.    Correct.

2          Q.    Nowhere does it say that the excess policy

3    does not insure those areas, does it?

4          A.    It says 100 percent program limits.

5          Q.    Right.

6          A.    To me, that means that's all the limit they

7    purchased for those particular coverages.

8          Q.    And where is the definition of "program" in

9    any of these policies?

10         A.    I don't know.

11         Q.    So, again, it's your own understanding of the

12   term "program" which gives you the predicate to jump in

13   and say, "Because you have a sublimit in the limit

14   section, you get no coverage on your Max Specialty

15   following form."  Is that correct?

16         A.    That's correct.

17         Q.    All right.  So we've got no definition for

18   program, correct?

19         A.    That's correct.

20         Q.    There's nothing in the policy that says if you

21   have a program limit that's sublimitted in the primary,

22   that you don't get excess coverage.  There's nothing in

23   the policy that says that, does it?

24         A.    No.  It says that in the event that the

25   primary is eroded by coverages not providing in, in the

1    A.   No, it does not.

2    Q.   All it says there's a limit in the primary

3  policy for 10 million.

4    A.   But it shows a separate limit for debris

5  removal of 5 million.

6    Q.   And am I correct that there's like 25

7  sublimits in the Ace/Westchester policy?

8    A.   Yes.

9    Q.   And you're telling me your following form

10  Max Specialty excess policy gives no coverage for those

11  25 areas.

12    A.   That's correct.  But would drop down in the

13  event that those sublimited coverages erode the primary.

14    Q.   What do you mean it would drop down?

15    A.   It would recognize that those coverages were

16  they paid out under the primary would bring us closer to

17  being primary, could erode the underlying limits.  So

18  our attachment point would no longer be 10.

19    Q.   Let me look in this direction.

20         So if the insured is foolish enough to

21  allocate into a full limits area and not allocate into

22  the sublimited areas, Westchester doesn't honor those

23  other areas and pay them.

24    A.   I don't know.  I can't speak to what

25  Westchester did or does.