# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIREMAN'S FUND INSURANCE COMPANY, ONE BEACON INSURANCE COMPANY, NATIONAL LIABILITY AND FIRE INSURANCE COMPANY and QBE MARINE & ENERGY SYNDICATE 1036,

Plaintiffs,

v. 10-civ-1653 (LAK)

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, MAX SPECIALTY INSURANCE COMPANY and SIGNAL INTERNATIONAL, L.L.C.

Defendants.

DEPOSITION UPON ORAL EXAMINATION OF

RICHARD CODY WHITTINGTON

TAKEN ON BEHALF OF DEFENDANT SIGNAL INTERNATIONAL, LLC

Richmond, Virginia

Thursday, June 30, 2011

Appearances:

NICOLETTI HORNIG & SWEENEY
By: JOHN A. NICOLETTI, ESQUIRE
ROBERT A. NOVAK, ESQUIRE
88 Pine Street, 7th Floor
New York, New York 10005-1801
jnicoletti@nicolettihornig.com
rnovak@nicolettihornig.com
Counsel for the Plaintiffs

LE BLANC BLAND, P.L.L.C
By: DAVID S. BLAND, ESQUIRE
MATTHEW C. GUY, ESQUIRE
909 Poydras Street, Suite 1860
New Orleans, Louisiana 70112
dbland@leblancbland.com
mguy@leblancbland.com
Counsel for the Defendant Signal International, L.L.C.

NOURSE & BOWLES, LLP
By: LAWRENCE J. BOWLES, ESQUIRE
55 Broadway, 30th Floor
One Exchange Plaza
New York, New York 10006-3030
lbowles@nb-ny.com
Counsel for the Defendant Max Specialty Insurance Company

MATTIONI, LTD.
By: STEPHEN J. GALATI, ESQUIRE
399 Market Street, 2nd Floor
Philadelphia, Pennsylvania 19106
sgalati@mattioni.com
Counsel for the Defendant Great American Insurance Company of New York

Also Present:

Chris Cunningham, Signal International

I N D E X

| DEPONENT | PAGE |
|---|---|
| RICHARD CODY WHITTINGTON | |
| Examination By Mr. Bland | 7 |
| Examination By Mr. Nicoletti | 170 |
| Examination By Mr. Bland | 275 |
| Examination By Mr. Nicoletti | 376 |
| Examination By Mr. Bowles | 382 |
| Examination By Mr. Nicoletti | 388 |
| Examination By Mr. Bland | 389 |

R E Q U E S T E D D O C U M E N T S

| PAGE NO. | LINE NO. |
|---|---|
| 118 | 20 |
| 330 | 11 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 204 | Email Chain dated August 27, 2009 from Morano to Whittington | 72 |
| 205 | Email dated August 27, 2009 from Whittington to Morano | 75 |
| 206 | Letter dated September 15, 2009 from Spears to Willis with attachments | 76 |
| 207 | Email Chain dated September 15, 2009 from Morano to Cesare | 79 |

E X H I B I T S (Continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 208 | File Notes | 120 |
| 209 | Dufour Laskay report dated December 9, 2009 | 138 |
| 210 | Preliminary Claims Statement | 164 |
| 211 | Max Specialty Property and Casualty Claim Guidelines | 168 |
| 212 | Letter dated August 31, 2009 from Morisse to Massey and Whittington | 186 |
| 213 | York Report Number One | 189 |
| 214 | Email dated October 16, 2009 from Morisse to Massey and Whittington with attachment | 197 |
| 215 | York Report Number Three | 202 |
| 216 | York Report Number Four | 209 |
| 217 | York Report Number Five | 218 |
| 218 | Email Chain dated October 26, 2009 from Cruikshank to Whittington | 230 |
| 219 | York Report Number Six | 234 |
| 220 | Affidavit of Cody Whittington | 241 |
| 221 | Email Chain dated February 5, 2010 from Cruikshank to Whittington | 261 |

5

E X H I B I T S (Continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 222 | Email dated February 16, 2010 from Cheglikov to Baker with attachment | 268 |
| 223 | Email Chain dated August 2, 2010 from Cesare to Whittington | 287 |
| 224 | Accounting Statement prepared by Dempsey Partners | 300 |
| 225 | Email Chain dated August 3, 2010 from Whittington to Castillo | 301 |
| 226 | Email Chain Bates-stamped MSI 002723 | 308 |
| 227 | Email Chain dated August 9, 2010 from Baker to Bowles | 315 |
| 228 | Letter dated December 8, 2010 from Cunningham to Whittington | 342 |
| 229 | Email Chain dated December 13, 2010 from Hahn to Whittington | 344 |
| 230 | Letter dated December 21, 2010 from Whittington to Cesare | 346 |
| 231 | Letter dated December 21, 2010 from Whittington to Cunningham | 347 |
| 232 | Letter dated April 28, 2011 from Cunningham to Whittington | 348 |

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

6

E X H I B I T S (Continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 233 | Letter dated May 6, 2011 from Whittington to Cunningham | 349 |
| 234 | Email Chain dated May 5, 2011 from Boesen to Whittington | 358 |
| 235 | Max Specialty's Answers to Signal's Crossclaims with Additional Crossclaims Against Signal | 362 |
| 236 | Email dated October 22, 2009 from Whittington to Cruikshank | 377 |
| 237 | Email Chain dated November 2, 2009 from Whittington to Minx | 380 |

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

7

Deposition upon oral examination of RICHARD CODY WHITTINGTON, taken on behalf of the Defendant Signal International, L.L.C., before Marianne Martini Holmes, RPR, a Notary Public for the Commonwealth of Virginia at large, taken pursuant to Notice, commencing at 9:15 a.m. on Thursday, June 30, 2011, at the Omni Hotel, 100 South 12th Street, Richmond, Virginia; and this in accordance with the Federal Rules of Civil Procedure.

RICHARD CODY WHITTINGTON was sworn and deposed on behalf of the Defendant Signal International, L.L.C. as follows:

EXAMINATION

BY MR. BLAND:

Q. Mr. Whittington, I'm David Bland. I represent Signal International in connection with this lawsuit. We're here today to take your deposition.

MR. BLAND: Usual stipulations that we've been living by?

MR. NICOLETTI: That's correct.

MR. BLAND: Okay.

Mr. Bowles?

MR. BOWLES: Yes.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

8

MR. GALATI: That's fine.

BY MR. BLAND:

Q. You have the right to read and sign your deposition when it comes back in its transcribed form.

MR. BLAND: Larry, I'll let you decide on that.

MR. BOWLES: We'd like to review and sign.

BY MR. BLAND:

Q. During the course of the deposition should you not understand my question, just tell me, and I'll repeat it or rephrase it, okay?

A. Okay.

Q. You have to answer each question out loud with an audible --

A. Um-hum.

Q. -- response.

A. (Nodding head).

Q. A nod of the head or a grunt, the court reporter can't take that down. So each response needs to be in words, okay?

A. Okay.

Q. Should you need to take a break, let me know, as long as there's no question pending and your answer hasn't been given, okay?

A. Okay.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

Q. Would you state your name for the record.
A. Richard Cody, C-o-d-y, Whittington.
Q. And where do you live?
A. 3461, the road is Three Chopt, C-h-o-p-t, Road, Gum Spring, Virginia 23065.
Q. And where do you work?
A. Alterra Specialty Insurance Company.
Q. And how long have you worked there?
A. Since October of 1998.
Q. 1998?
A. Yes.
Q. When did Alterra Specialty -- Risk, is that what you said?
A. Yes.
Q. When did it come into existence?
A. It's Alterra Specialty Insurance Company.
Q. And when did it come into existence?
A. Last year.
Q. So you've worked for Alterra Specialty Insurance Company for one year.
And did you work for a predecessor company of Alterra before that?
A. Yes.
Q. And what company was that?
A. Max, M-a-x, Specialty Insurance Company.

Q. And how long did you work there?
A. My entire time at both company names was from October of 1998. It was a name change only.
Q. When did Max Specialty Insurance come into existence?
A. My understanding is 1997-'98.
Q. And has it always been known as Max Specialty Insurance?
A. I believe so, yes.
Q. What is your current position at Max Specialty?
A. I'm a claims specialist.
Q. What is your education?
A. I have a college degree.
Q. From where?
A. Old Dominion University.
Q. And what did you study?
A. Pre law, political science.
Q. What year did you graduate?
A. 2001.
Q. And have you had any other post-college education?
A. Other than industry-affiliated? No other.
Q. Seminars, that sort of thing?
A. Specialty schools.

Q. Which specialty schools?
A. I've attended Vale, V-a-l-e, Tech several times for advanced property claims.
Q. Do you hold any licenses?
A. Yes.
Q. What?
A. Texas and New Mexico.
Q. In what?
A. Insurance license.
Q. Say again?
A. Insurance license for adjusting.
Q. In Texas?
A. Yes.
Q. And in New Mexico?
A. Yes.
Q. And what is the name -- what's the actual name of the license? What is the official name of it?
A. It's property and casualty adjuster license, I believe.
Q. When did you get a Texas property and casualty adjuster's license?
A. This year.
Q. In 2011?
A. Yes, sir.
Q. And what about New Mexico?

A. Same.
Q. How did you come to get licensed in Texas and New Mexico for property and casualty this year?
A. We were required to take an examination given by the State.
Q. And why did you do that?
A. It was a requirement from my supervisor.
Q. During the course of your handling of the Signal drydock loss, you were not licensed in Texas?
A. No.
Q. As a claims specialist at Alterra, what types of risks do you adjust?
A. Can you clarify "types of risk"?
Q. Do you deal with property claims, marine claims?
A. I deal with property and inland marine claims.
Q. How long have you dealt -- well, let me ask you, what is your job as a claims specialist? What do you do?
A. I receive report of the claim, confirm coverage, initiate an investigation, document my file, my computer file, make recommendations usually to my supervisor.
Q. Who's your supervisor?
A. Vice-president Steve Boesen, B-o-e-s-e-n.

Q. Did you speak with Mr. Morano after his deposition yesterday?
A. I had contact with Mr. Morano but did not speak of his deposition.
Q. Have you talked to anyone else in preparing for the deposition?
A. I've spoken to Mr. Boesen.
Q. When did you do that?
A. Various times this week.
Q. What did you talk about with him?
A. Mostly location of certain documents in the file.
Q. Did you speak with anyone else?
A. No, sir.
Q. Did you review the underwriting file?
A. No.
Q. Have you --
A. Other than -- excuse me. Other than the Heller report out of that file.
Q. Have you ever reviewed the underwriting file?
A. Yes.
Q. When did you do that?
A. Soon after receipt of the initial claim.
Q. In August of 2009?
A. Yes.

Q. Before August of 2009 when you received notice of the loss of the AFDB-5, you had no contact or work on the Signal account; is that correct?
A. That's correct.
Q. You had nothing to do with the underwriting process for Signal in January of 2009; is that correct?
A. That's correct.
Q. Before August of 2009, did you even know that Max Specialty had an account with Signal International?
A. No.
Q. Do you maintain your own personal file?
A. No.
Q. Do you diary a file?
A. Yes.
Q. What is it when you diary a file? What does that mean?
A. It means you establish a date that a diary report will reflect the need to look at the file, go back to the file.
Q. Do you keep a chronological listing of notes in a file of activities that you have performed or other people are performing --
A. Yes.
Q. -- in the file?
A. Yes.

Q. Has that been produced?
A. I have never seen what's been produced other than the attachments to the file.
MR. BLAND: We call for the production of that.
MR. BOWLES: Mr. Whittington produced certain notes which appear to be mostly -- or all communications with counsel, so they would be withheld.
MR. BLAND: That's not what I'm talking about. His diary, his chronological listing that he just said he has has not been produced.
MR. BOWLES: I don't believe we received any such thing, but I'll double-check.
THE DEPONENT: The -- are we speaking of the diary?
BY MR. BLAND:
Q. I'm speaking of the diary and the documents that you told me about that you kept a chronological listing of what you were doing.
A. Okay. The diary every time you renew it is deleted and erased, so there is no listing.
Q. But that's just -- those are just deadlines, right?
A. Those are just dates of notification for you

to do something.
Q. What is the other thing you're talking about?
A. In the file, it's called "Notes," and it's where I make entries and explaining the attachments.
Q. Okay.
MR. BLAND: We call for the production of that today during this deposition because I'm not coming back here to do this again. That should have been produced.
MR. BOWLES: I didn't receive that -- such a document, as far as I know. We'll double-check. We can do it today during a break. We'll check.
MR. BLAND: Make a note of this.
BY MR. BLAND:
Q. You can get that, can't you?
A. Yes.
MR. BLAND: We want it brought over here so we can see it.
BY MR. BLAND:
Q. That's part of your guidelines, isn't it?
Have you ever read the claims handling guidelines for Max Specialty?
A. Yes.
Q. Isn't it true that keeping those notes and that diary are a part of your job?

Q. If the drydock sank from operator error and the insured sustains an actual loss, is the business interruption portion of the policy then triggered?
A. In general, yes.
Q. Do you know what the period of recovery is in an insurance policy like this?
A. I believe it's a maximum of two years.
Q. What does it mean generally, "the period of recovery"?
A. It's dependent on the activities of the insured and the type of loss sustained.
Q. For example, in this case here, it could be the time it takes to replace the drydock.
A. It could be, yes.
Q. Do you know or have you done any investigation as to the time it would take Signal to replace the AFDB-5?
A. It may be in the report from Cuevas, but other -- I do not know of any other.
Q. Now, who was the primary underwriter, the primary insurance company on this policy -- on this property policy?
A. Ace/Westchester.
Q. And have you spoken to anybody at Ace/Westchester about the loss of the AFDB-5?

A. Yes.
Q. And who's that?
A. The original adjuster was named Joanne, but I don't remember her last name. I believe she left the company, and then it resulted into a gentleman, but I don't remember his name.
Q. And when was the first time you spoke to anyone at Ace about the loss of the AFDB-5?
A. I could not give you a definitive date, but it was several months after the loss occurred.
Q. Several months?
A. Yes.
Q. And that was Joanne Massey?
A. I believe her name was Massey, yes.
Q. Did you speak to her on the phone?
A. Yes.
Q. And what did you speak to her about?
A. The circumstances of the loss, what they knew, what Ace/Westchester was going to do as far as coverage or payment. We discussed a coverage issue I wanted more information on.
I don't know of anything else.
Q. And that was several months after the sinking?
A. Yes.
Q. What was the coverage issue?

A. I believe there was an exclusion in the policy pertaining to workmanship defect. This is Westchester's policy. I'm not too familiar with their policy other than what I've read.
Q. Did you speak with Joanne Massey ever again?
A. I believe we communicated by email once or twice after.
Q. About what, do you remember?
A. Status of the claim, what they were going to do. I don't know of anything else at this time.
Q. Was it important to you to know what Ace was going to do about Signal's claim?
A. Yes.
Q. And why was that?
A. It would direct my part of the claim if the claim exceeded their coverage. It would give me a time period as to when their payment would be. It would give me more information as to what their direction to the adjuster had been given.
Q. And it's your understanding that Ace as the primary underwriter paid their limits?
A. Yes.
Q. When did they do that?
A. December 2009 or January of 2010. They did not tell us.

Q. When did you learn that they had paid?
A. I think in January of 2010.
Q. And what was your understanding of what Ace or Westchester paid for? What were they paying?
A. In followup with Ace and Westchester, they did not tell me what they paid for.
Q. They just paid $10 million in limits.
A. That's correct.
Q. They didn't -- either -- neither they nor the insured told you where that money was allocated; is that correct?
A. I never had any communications with the insured.
When asked, Ace/Westchester indicated -- they did not specify what the payment was for.
Q. Whether it was property damage, business interruption, they didn't say; is that right?
A. No.
Q. Is that correct?
A. That is correct.
Q. Do you know what information was provided to Ace and Westchester -- Ace or Westchester -- Ace and Westchester are the same thing, right?
A. Correct.
Q. Okay. To your knowledge, do you know what Ace

Q. Is this the first email that you had regarding the sinking of the drydock?
A. Yes.
Q. How did you come --
A. To Trip Morano, yes.
Q. How did you come to learn of the sinking of the drydock?
A. There was a loss notice received through AmWINS of the occurrence.
Q. Through AmWINS?
A. Yes.
Q. And who at AmWINS sent you that or did they send it to you?
A. They sent it to an email claims address for the company. It was received by a support person. I believe this was referred to the property manager at that time Mr. Smith who then may have discussed it with Mr. Boesen for my assignment.
Q. And at first, at least according to your email, you weren't certain as to whether the sinking of the drydock was covered by insurance that Max had placed?
A. There was confusion on my part because there was two different types or policies in the file.
Q. One was the excess property insurance and one

was the catastrophic excess policy?
A. Correct.
Q. And then you -- so you were emailing Mr. Morano to learn more about the policies that he had underwritten?
A. Yes.
Q. And as you've told me, this would have been the first time you learned of the Signal account; is that correct?
A. After reviewing his underwriting file, yes.
Q. In August of 2009?
A. Correct.
Q. And then Mr. Morano responded to you later that morning on August 27, 2009 as is reflected in Exhibit 204; is that right?
A. That's what the document shows.
Q. And he presented to you the two policies that he had underwritten; is that right?
A. That's what it states.
Q. As the claims specialist involved with this claim, after you received notice of the claim, what did you do?
A. I then went to find or locate the designated adjuster, Mr. Cruikshank.
Q. Did you yourself retain Mr. Cruikshank?

A. No. The policy reflects Mr. Cruikshank is the designated adjuster as requested by the insured agent, broker.
Q. Where does he work?
A. Mr. Cruikshank?
Q. Yeah.
A. I don't believe he's resident in Texas. I believe he's in Louisiana or close to the Gulf area.
Q. Do you know the name of the company he works at?
A. He works for York, Y-o-r-k, Adjusting.
Q. Have you ever dealt with York Adjusting before?
A. Yes.
Q. And in what context?
A. My previous employer Cunningham Lindsey used to do work for York Adjusting.
Q. What about Mr. Cruikshank? Did you know of his qualifications?
A. Did not know Mr. Cruikshank. Have never met him before.

(Email dated August 27, 2009 from Whittington to Morano was marked Deposition Exhibit Number 205.)

BY MR. BLAND:
Q. I'm going to show you a copy of the same

August 27, 2009 email which I'll mark as Whittington 205.
This one has some handwriting on it.
A. Um-hum.
Q. Whose handwriting is that?
A. It is not mine.
Q. Do you know whose it is?
A. No, sir.

(Letter dated September 15, 2009 from Spears to Willis with attachments was marked Deposition Exhibit Number 206.)

BY MR. BLAND:
Q. This is the only copy of this I have for either one of us.
I'm going to show you -- it may have been previously marked.
I'm going to mark it as Whittington 206. It is a September 15, 2009 letter from Signal to Willis of Alabama with CC to certain people at Signal, Dufour Laskay, York and Guy Matthews & Associates, and it attaches a September 2nd, 2009 Statement of Person Involved in Accident/Incident, two-page document and some statements. It is a Bates-stamped series MSI -- which is Max Specialty -- 3829 through 3838.
Do you recall receiving a copy of that letter

Q. What about when contact is made by the insured to Max Specialty? Is that something normally that Max Specialty itself would respond to?
A. Or if we had claim counsel representing our interest, he would.
Q. So if an insured wrote a letter to you at Max Specialty and you had a lawyer, the lawyer would answer to the insured, not Max Specialty?
A. No, it would be Max Specialty's position to respond.
Q. Right.
And in this case, you've written three letters to the assured; is that correct?
A. That's correct.
Q. And I'm going to ask you about those in detail in a little while.
But did you write those letters?
A. I wrote those letters in conjunction with counsel.
Q. Did Mr. Bowles write the letters and you signed them?
A. No.
Q. We'll go through them.
But in the event that the assured, regardless of whether you have a lawyer, if the assured contacts

you, is that something under the Max Specialty Property and Casualty Claim Guidelines that you would respond to at Max?
A. The guideline says I believe yes.
Q. Do you admonish assureds for contacting you?
A. No.
MR. BLAND: Let's take a break.
(A recess was taken from 3:53 p.m. until 4:03 p.m.)

EXAMINATION

BY MR. NICOLETTI:
Q. Mr. Whittington, my name is John Nicoletti, and together with Rob Novak, my partner, we represent the marine liability primary and excess insureds.
I will be asking you a series of questions. To the extent you do not understand my questions, please direct your attention -- my attention to that part of the question so that we can come to a common understanding.
Do you understand that instruction?
A. Yes, sir, I do.
Q. I also remind you of the other instructions which Mr. Bland gave you such as you have to answer orally as opposed to hand gestures or grunts.
A. Correct.

Q. To make it easier on the court reporter, I'm not offended if when you give your answer, you turn towards the court reporter --
A. Okay.
Q. -- so that she can fully take down your response.
A. Right.
Q. And as indicated in Mr. Bland's instructions, the court reporter can only take one of us down at a time. So please allow me to finish my question. Count to 3 in your mind before answering. That should make sure that I've finished my question before answering.
Do you understand that suggestion?
A. Yes, sir.
Q. Okay. Let me see if I can get your procedure down.
You got the first notice of claim sometime around August 20th, 2009?
A. Within a day.
Q. Day of that?
What is your standard practice when you get your first notice of claim?
A. The claim doesn't come direct to me. It goes to support personnel, their supervisor.
If the loss is significant, it goes to a

manager for decision whether it's sent to a third-party administrator or assigned to an in-house adjuster.
If it's assigned to me, I get a notification by email. I open the file, I read the loss information that was sent. I start to figure out what's going on. I look at the coverage to see what we afforded and then determine whether I need to assign outside investigation and go from there.
Q. All right. Let's -- when you first got the report of this loss, do you know if the manager considered this to be a significant loss?
A. This loss was considered significant, and I was to work under the property manager Rodney Smith.
Q. And what do you mean by "significant"? Is there a dollar amount on it?
A. The company is set up with authority thresholds. I have a $75,000 threshold. Mr. Smith has a hundred thousand dollar threshold for payments without approval. Anything over that goes to the vice-president.
Q. And who is -- who was the vice-president to whom you had to go to for any payment over a hundred thousand?
A. Steve Boesen.
Q. And what is his authority?

173

A. He has -- hum. He's not really discussed that with me.

I think he has several hundred thousand.

If the loss is significant, we produce first a, what's called a notice to underwriter advising the underwriter of any unusual aspects. In this case, the loss is over a hundred thousand dollars, which is one key, that was sent off with a copy to Mr. Boesen.

Q. And which underwriter was that sent to?

A. That was sent to the vice-president of underwriting, the regional manager, I believe Trip got a copy, too.

Q. Who is the VP of underwriting?

A. Jon Hahn.

Q. And who was the regional manager?

A. I think at that time it was Tom Krause, K-r-a-u-s-e.

Q. Okay. I think you indicated to me that this was known to the manager to be significant from day one; is that correct?

A. Right.

Let me side-step to complete.

The second report is one that's called Large Loss Notice in which I produce the report, recommending reserves, give a brief description of how

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

174

extensive the loss is.

I send that to Steve Boesen who looks at the file, the coverage, looks at my opinion as to the reserve amounts, whether he agrees with them or not. He'll change them if he needs to. We'll discuss it if need to. Then he will send it on to executives in the company.

Q. You filled out the Large Loss Report in this case?

A. Yes.

Q. And did you put a dollar amount of the claim in it?

A. I put I believe from history, it was 3.6 for the real property, the drydock and 1 million for the BI.

Q. Was the Large Loss Report on the disk? Because none of us seem to have located it in the production.

A. The Large Loss Report usually is in the coverage section, and I -- again, I did not review the CD to see all the documentation sent. It was supposed to be placed in there because that is a subfile that is normally replicated and sent.

Q. We'll check the disk. If not --

A. I'll get you a copy.

Q. Appreciate that.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

175

Now, you said you sent that Large Loss Report to Mr. Boesen.

Did you also have a reserve set forth in it?

A. Yes.

Q. And what was the reserve amount?

A. 3.6 million on the real property, 1 million on the BI.

Q. And these were just preliminary estimates because you didn't really have any real feel for the total claim, did you?

A. No, it, it -- at the original reporting time, it was a question whether this drydock had effectively destroyed itself, could it be raised, could it be salvaged, could it be repaired.

A million dollars is quite a lot for reserves.

Mr. Boesen's experience and final approval's always the case.

Q. Did your reserve of 4.6 million take into account the $10 million primary?

A. Yes.

Q. So in other words, at this point in time, you're valuing the loss at something like 14.6 million.

A. I'm reserving for our exposure which would be 14.6 total.

Q. At the time you did the Large Loss Report, had

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

176

you yet pulled a copy of the Max Specialty excess policy for review to determine the scope of the coverages?

A. Yes.

Q. Okay. At the time that you pulled the Max Specialty policy, did you also pull a copy of the primary Westchester policy?

A. The primary Westchester policy I don't believe was available in the file.

Q. Okay.

A. There was a problem, personal, of which policy coverage was afforded.

I believe we've seen a copy of that email to Trip where he, he explained both policies, the CAT policy, the regular policy to me, and the Westchester policy I don't believe was attached.

Q. Isn't it true that many of the coverages, if not all of the coverages, which are underwritten through the Max excess policy's a follow form to the Ace policy?

A. That is my understanding, yes.

Q. So for you to fill out completely accurate a Large Loss Report, you actually have to read the Westchester policy to determine what coverages may have been triggered.

A. Yes. But in this case with Mr. Morano's reply, he actually told me what the coverage was.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

177

Reading the policy was for details.
Q. Let me ask you. You said that Mr. Morano discussed with you the CAT cover which is the catastrophic loss excess policy which Max wrote and the Max excess property policy.
A. Right. That was in the email that I think we've seen today.
Q. All right. So insofar as you're preparing your Large Loss Report then --
A. That wasn't done immediately.
Q. Oh, that's what I'm asking about. Let's get this clear.
A. All right.
Q. So when you issue your Large Loss Report, you have not yet read the Westchester policy and have not yet received Mr. Morano's, his opinions or summaries of the Westchester coverage; is that correct?
A. I had received Mr. Morano's email which indicated the two policies. The Westchester policy I believe he recognized that we didn't have.
And based on his statement of coverage and what I read in the policy for us, then thereafter the notice to underwriter was issued, advised them of the loss of over a hundred thousand dollars, and then the Large Loss Report was, was produced. I don't think it

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

178

was immediately. I think it was several weeks later.
Q. Okay. Let me show you what I think you referred to as Mr. Morano's description of the coverages. It was marked as Whittington Exhibit 204.
Is that the email to which you referred?
A. Yes.
Q. Okay. Let me have that back for a moment, please.
A. Okay.
Q. I'm looking at this email. And where in this email does Mr. Morano explain to you the various and several coverages which exist in the Westchester primary policy?
A. He doesn't.
Q. Okay. Again I go back to my original question.
Am I correct in my understanding that when you prepared your Large Loss Report limiting the reserves to physical loss and BI, you had not yet reviewed and understood the full scope of coverages under the Westchester primary policy; is that correct?
A. That is correct.
Q. That's all I wanted.
A. The policy is in excess of 10 million resulting to us. The first 10 million is, is really not

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

179

our computation.
Q. But that's only in regards to the limits. It still doesn't tell you your full coverage under Max excess policy, correct?
A. Correct, including the sublimits.
Q. We'll get to the sublimits.
A. I know.
Q. Now, did you ever receive a copy of the Westchester policy?
A. Yes, we did.
Q. When did you receive that?
A. I believe that was forwarded through AmWINS to Trip. I can't tell you exactly when. Maybe the same month, maybe the next month.
Q. So you would have had the Westchester policy in hand sometime September, early October.
A. Right.
Q. Now, you indicated to me that on significant losses, the vice-president to whom you report would assign the claim to be handled by a third-party administrator; is that correct?
A. Yes.
Q. Was this claim assigned to a third-party administrator?
A. No.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

180

Q. How did it come about a significant loss which would ordinarily be assigned to a third-party administrator was not in this case?
A. Not all losses that are extraordinary are assigned to the third-party administrator. They are assigned to me.
Q. And then do you have the authority to assign it out to a third-party administrator?
A. I do not assign it to third-party administrators to do the work that I'm supposed to be doing.
Q. How does it come about that York -- strike that.
York -- I'll give you the exact company name. York Specialized Loss Adjusting.
A. Yes.
Q. Are you familiar with that company?
A. Yes, I am.
Q. Is that a third-party administrator?
A. One part of it is.
In this case, this was the field adjusting part of their company adjusters. But they do have a third-party administrator branch.
Q. I think you indicated this was their field adjuster?

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

A. Yes.
Q. What is a field adjuster?
A. A field adjuster's a representative of the parent company who does inspections of the damages, he provides reports, at times he can compute estimates or engage consultants and experts. He's the arm of the insurance company in the field.
Q. You say that York Adjusting Company is a division of the parent company.
Which parent company are you referring to?
A. I believe it's all of York. They call it York.
The third-party administrator function, I don't know whether it's the same name or something else.
But Mr. Cruikshank is with their field services.
Q. I was going to get to that.
In the context of York acting as a field adjuster, this was assigned to Mr. Cruikshank who worked for York, right?
A. Right.
Q. Who actually engaged York?
A. The -- well, the policy by Westchester per the broker's agreement designates York Adjusting Company. Mr. Cruikshank is the designated adjuster.

Q. In the Westchester policy itself.
A. In the Westchester policy.
Q. So in effect, Ace appoints -- Ace through their insurance contract appoints York as the field adjuster.
A. Let me pretext this.
The broker and Ace/Westchester agree that this is what the insured requests or the broker requests. The adjuster's designated in the policy.
When the loss occurs, I believe in this instance the broker notified Mr. Cruikshank direct. I don't believe Westchester -- Ace/Westchester called Mr. Cruikshank to report the claim. I do not know, though.
Q. I understand that the broker may have made the call.
A. Right.
Q. But the broker cannot make the call unless it's authorized by Ace through its insurance contract, isn't that correct?
A. That is correct.
Q. So in effect, Ace appointed York.
A. In summation, yes.
Q. That's all I'm getting at. I'm just trying to find out who appoints who.

A. Right. We did not.
Q. Does there come a time, though, when you join in the appointment of York to act as the field adjuster for Max Specialty?
A. We are normally carbon-copied on their investigative reports. If we request information from Mr. Cruikshank, he's to respond. We are a client company in this package.
Other than that, because the first part of the claim during investigation is subject to the Ace/Westchester policy, they are in direction, they are in control.
Q. I understand Ace is in front. But you're contractually also bound to utilize York's field adjusting pursuant to the program that Max and Ace wrote for Signal, isn't that correct?
A. By follow form, yes.
Q. Okay. So in effect, York is also Max Specialty's agent, isn't that correct?
A. That's correct.
Q. That's all I'm trying to get at. I know you're trying to be careful, but I'm -- these are just preliminary questions.
A. That's fine.
Q. If I'm going to get you, I'll get you before

you know it.
A. I don't know about that.
Q. Question. Was Mr. Cruikshank supplied -- strike that.
What was the scope of Mr. Cruikshank's assignment, if you know?
A. My opinion --
Q. No, I don't want your opinion. I want to know what you know.
A. Being that I have no information from Ace/Westchester and their assignment of Mr. Cruikshank to the loss, I, from his reports, assume that he was to go to the loss, determine the damages, photograph them, obtain information from the insured as to the circumstances of the loss, then continue to pursue with the insured information concerning additional claims such as the business income claim, the wreck debris removal and any other financial losses the insured would have.
Q. So in other words, Mr. Cruikshank was assigned to do an investigation into the damages which were insured under the Ace primary policy and also insured as part of the Max Specialty excess policy; is that correct?
A. That's correct, um-hum.

Q. And in doing so, isn't it true that Mr. Cruikshank would have received a copy of the Ace/Westchester policy and a copy of the Max Specialty policy?
A. Yes.
Q. Okay. So in doing his job then, Mr. Cruikshank has a copy of both, the Ace/Westchester primary policy and the Max Specialty excess policy.
A. Correct.
Q. Okay.
Now, do you know which of the York agencies Mr. Cruikshank works for?
A. I'm not sure of his location. He's in the Gulf area. I'm not --
Q. I'm not talking geographics. I'm talking about the various York entities, one being a field adjusting company, one being a TPA.
A. He's a field adjuster.
Q. Well, isn't York Specialized Loss Adjusting the third-party administrator?
A. As a second entity of that company, that's my understanding.
Q. And who does Mr. Cruikshank work for?
A. Mr. Cruikshank appears to work for the field services office.





MR. NICOLETTI: Let me have this document marked as Whittington Exhibit 212.
It's a York letter dated August 31, 2009 signed off by Michelle Morisse, executive assistant, York SIA Division.
(Letter dated August 31, 2009 from Morisse to Massey and Whittington was marked Deposition Exhibit Number 212.)
MR. BOWLES: This is the first page of the document?
MR. NICOLETTI: I believe it's the cover letter.
THE DEPONENT: It's an acknowledgment. It's usually one page.
MR. BOWLES: Okay.
BY MR. NICOLETTI:
Q. Now, this acknowledgment letter is written to Joanne Massey, who was the Ace/Westchester claims adjuster, and yourself as the Max Specialty claims adjuster; is that correct?
A. Yes.
Q. And in this letter Michelle Morisse on behalf of York SIA Division is acknowledging acceptance of the assignment that you have given her -- that you've given to York; is that correct?





A. That -- yes, that was given to York.
Q. Okay. What I'm going to ask you is a question based on what's in this document to see whether or not it refreshes your recollection.
What that means is you may not have a present recollection of a response to my question, but by reading something, that may jog your memory. Do you understand that instruction?
A. Yes.
Q. Okay. Can you read the second sentence of this letter into the record?
A. Second sentence after "We are in receipt"?
Q. Yes. That's the second sentence, "This loss."
A. "This loss will be handled out of our York Specialized Loss Adjusting Division by Ken Cruikshank."
Q. Isn't that the third-party administration division of York?
A. I do not know.
Q. All right. Isn't it true that Mr. Cruikshank was retained to act as a third-party administrator through York?
A. In my understanding of his capacity, he was not a third-party administrator.
Q. Who would know better, you or Ace/Westchester as to what capacity he was assigned?





A. Ace/Westchester, if we bypassed that he was a designated adjuster no matter what he did in the policy.
Q. I understand.
Now, did Mr. Cruikshank issue reports from time to time?
A. Yes.
Q. To both Ace/Westchester and to Max Specialty?
A. Yes.
Q. And what was the purpose of those reports?
A. To update the loss as determined to document our files.
Q. And when you received the report from Mr. Cruikshank, did you review it?
A. Yes.
Q. And if there was something incorrect in that report, would you contact Mr. Cruikshank immediately?
A. Yes.
Q. And if there was something wrong in that report, would you send him something in writing requesting that he correct the mistake?
A. Yes.
Q. Do you recall issuing any such corrective letters to Mr. Cruikshank in this case?
A. Letters or communication?
Q. Communications. Any kind of communications.

A. Yes.
Q. And when did you do that?
A. After determination that the policy that we were using had an incorrect deductible.
Q. And what was the incorrect deductible?
A. It was a 2 percent deductible in the original policy provided both to him and I. Later it was found to be a 5 percent deductible.
Q. Okay. Other than the deductible mistake which you picked up on and corrected with Mr. Cruikshank, in regards to receiving his reports, did you, did you notice any other errors that needed correction?
A. No.
MR. NICOLETTI: Let me have this next document marked as Whittington Exhibit 213.
(York Report Number One was marked Deposition Exhibit Number 213.)
BY MR. NICOLETTI:
Q. This is a document on York letterhead consisting of documents with -- bearing Bates Numbers MSI 000312 through and including 000354.
Mr. Whittington, do you have that document in front of you?
A. Yes, I do.
Q. First question, have you ever seen this

document before?
A. Yes.
Q. And what is this document?
A. This is Mr. Cruikshank's first report.
Q. And did he issue this on or about September 2nd, 2009?
A. It's handwritten on it September 2nd, 2009. It doesn't have a date for the report on it --
Q. Okay.
A. -- except for on the second page which reflects at the header September 2, 2009.
Q. Does that refresh your recollection that you did receive Mr. Cruikshank's report sometime in the first week of September?
A. Yes.
Q. All right. At that time, did you review the report?
A. Yes.
Q. Upon reviewing the report, did you note any errors or mistakes in it other than possibly the deductible error that you corrected?
A. Not to my knowledge at this time.
Q. Now, let me show you, let me direct your attention to the second page of the report, MSI 000313. Do you see that?

A. Yes.
Q. And at the top, it has that word "Estimate." Do you see that?
A. Correct.
Q. All right. What information is to be set forth below that term, based upon your familiarity with these types of York reports?
A. Repeat your question, please.
Q. What information do you expect Mr. Cruikshank to set forth in his reports below the subheading "Estimate"?
A. His approximation or estimation of damages per coverage.
Q. Okay. So if he puts an amount down, Mr. Cruikshank has made the determination that there's coverage for that particular type of issue or event.
A. Yes.
Q. Okay.
Now, first item under "Estimate" is Port Arthur drydock, 13,600,000.
A. Yes.
Q. You see that?
So Mr. Cruikshank is telling you that his estimation, you have exposure for $13,600,000 for the physical loss of the drydock.

A. Yes.
Q. Okay. The second item is debris removal, and he has $5 million listed there for that. Do you see that?
A. That is correct.
Q. And Mr. Cruikshank is telling you that in his estimation, that it's going to cost at least $5 million to remove the drydock and clean up the area, and he's listed that as a covered item under the Ace/Westchester policy.
A. Correct.
Q. All right. At any time did you write to Mr. Cruikshank and tell him, "You're wrong. There's no debris removal coverage for the removal of this drydock under the Ace/Westchester policy"?
A. No. The matter of wreck removal, debris removal was assigned out to counsel by Ace/Westchester for an opinion.
Q. And how do you know that?
A. Because they contacted me, Mr. Cruikshank I believe contacted me and asked me in two separate emails what accountant I wanted to use and was it approved to assign to Attorney Minx the coverage question concerning wreck.
Q. That comes much later, doesn't it?

A. Yes.

Q. In fact, that doesn't even come up until sometime in November or even later, December of 2009, isn't that correct?

A. The best of my knowledge, yes.

Q. So as of September, neither you nor Mr. Cruikshank or the Ace adjuster, whoever that may be, because I understand Miss Morisse had left, at this stage in time, no one is questioning that $5 million in debris removal coverage is available under the Ace/Westchester policy for the removal of the drydock, isn't that correct?

A. Repeat your question.

Q. As of the writing of this report and your receipt of this report, neither yourself, Mr. Cruikshank nor the Ace adjuster Joanne Morisse (sic) or her successor are questioning the coverage for debris removal of the drydock at a total $5 million, are you?

A. I cannot speak for Ace/Westchester.

Q. You can speak for yourself. You didn't question it, did you?

A. No.

Q. And you had no discussions with Mr. Cruikshank where he questioned it at that time.

A. No.

Q. Isn't that correct?

A. No.

Q. Okay. And you got no call from Ace/Westchester saying, "We have a question about the coverage for debris removal under our primary property policy," isn't that correct?

A. I never received any communication from Ace/Westchester.

Q. All right. That's my question. You never received anything from them where they questioned the coverage, did they?

A. Correct.

Q. For debris removal.

A. For any --

Q. At that time.

A. For any, any subject matter.

Q. I think you indicated -- excuse me.

I think you indicated to me that it was Ace/Westchester who first raised the question of coverage for debris removal for the drydock; is that correct?

A. That's correct.

Q. And who at Ace raised that issue?

A. It would have to have been Joanne Massey through or, or to Cruikshank.

Q. Who did you speak to about that issue? Did you speak to Mr. Cruikshank or Miss Massey or both?

A. What issue specifically?

Q. The questioning of the available coverage for debris removal under the property program.

A. I believe Mr. Cruikshank and Miss Massey both discussed this.

Q. And you had separate discussions with both of them?

A. I do not remember at this time having a discussion with Cruikshank or Miss Massey about debris removal.

Q. I'm talking at the time the issue came up where they were going to assign that issue of coverage for debris removal to counsel.

Who told you that? Ace/Westchester directly or Mr. Cruikshank of York?

A. I believe Mr. Cruikshank emailed asking if it was okay to assign Minx.

Q. Okay. So the information you got was from Mr. Cruikshank.

A. Correct.

Q. Did you ever get any direct communications from Ace where they questioned coverage for the debris removal?

A. No.

Q. How do you know that Mr. Cruikshank was talking on behalf of Ace when he requested permission to assign counsel to investigate coverage for debris removal under the property program as opposed to it being his own thought process?

A. Correct.

I believe there was a vague -- in my memory, there was a communication or in his -- one of his reports concerning the MGL carriers, and then that became a question as to whether the MGL insurer provided coverage for the wreck removal or debris removal.

Q. I understand that may have triggered the inquiry.

A. Yes.

Q. I'm asking you is that Ace/Westchester who triggers the inquiry or is it Mr. Cruikshank, the field adjuster, who does it on his own?

A. The communication I received from Mr. Cruikshank was asking me if it was, if it was approved by us to assign to Minx. It did not indicate where it came from.

Q. Okay. By the way, who paid the Minx bill?

A. I believe it was prorated.

Q. But as you sit here today, do you recall

having any communication directly with an Ace representative other than Mr. Cruikshank from York who questioned the availability of debris removal coverage under the property program?

A. To my knowledge at this time, I don't remember Ace contacting me to discuss that subject.

Q. Who actually engaged the Minx office? Was that Ace, Max or York?

A. I don't believe there was any indication who called, but I would imagine or assume that Mr. Cruikshank did because he had the most investigative material.

MR. NICOLETTI: All right. Let's have this next document marked as Whittington Exhibit 214. It bears production control numbers MSI 000379 through and including MSI 000410.

(Email dated October 16, 2009 from Morisse to Massey and Whittington with attachment was marked Deposition Exhibit Number 214.)

BY MR. NICOLETTI:

Q. Mr. Whittington, can you identify the first page of the document, Whittington Exhibit 214? First page.

A. It's a report from --

Q. No, no. The first page.

A. Oh, the first page.

Okay. From Michelle Morisse to J. Massey and me, "Please see attached report to you regarding above-captioned claim."

Q. And, again, this is the report issued by Mr. Cruikshank of York.

A. Correct.

Q. And that's what appears after the first page. That's the document that accompanied the forwarding email, correct?

A. That's correct.

Q. And this is the second report that he's issuing.

A. Yes.

Q. Again, under the term "Estimate," he's outlining his estimated damages for each of the covered items which may arise out of the sinking of the drydock, isn't that correct?

A. Yes.

Q. And, again, the first entry is Port Arthur drydock, 13,600,000. That's for the actual physical loss of the drydock, isn't that correct?

A. Yes.

Q. And the second line again is debris removal estimated at $5 million. And that's for the removal of

the drydock, isn't that correct?

A. That's correct.

Q. Now, when you received this, did you have any discussions with anyone at Ace concerning questions about the debris removal as being a covered item under the property program?

A. I, to my knowledge at this time, do not remember any communications.

Q. But if you had a communication or objection, it would be in writing, would it not?

A. It would be in some form of communication or notation.

Q. And you don't recall making any of those notations, do you?

A. At this time I do not remember.

Q. And if there are none in the file, then you made no objection; is that correct?

A. That could be an assumption, yes.

Q. Now, at this point in time, did you ever call up Mr. Cruikshank to discuss his estimates?

A. No.

Q. What did you do when -- what did you do when you got the report on or about October 16, 2009?

A. Reviewed it, read it, made notations in the file, attached a copy of them to the file.

Q. And at this point in time, are you aware that there are marine liability -- that there is marine liability insurance also available to Signal?

A. Yes, this report reflects the P and I carrier.

Q. So even though at this point in time you understand that there is a marine liability insurance program, you don't make any objection concerning the coverage for debris removal under the property program, do you?

A. His recommendation, no.

Q. In fact, this report actually specifically addresses other insurance at MSI 000383.

A. Yes.

Q. And under "Other Insurance," he identifies that Fireman's Fund writes the GL policy including P and I coverage which is endorsed with wreck removal.

A. Yes.

Q. So at the time you read this report, you have full knowledge that there is other insurance through Fireman's Fund for wreck removal, but you do not question the availability of debris removal coverage for the drydock under the property program, do you?

A. No, I do not. My policy hasn't been exposed because Ace/Westchester hasn't made payment.

Q. So you're telling me if you believed your

policy was exposed, you would have raised an objection at this time?

A. Yes.

Q. Yet, you've reserved since day one for 4.6 million into your layer, didn't you?

A. Based on what I told you, 3.6 for the drydock, 1 million for BI. Nothing for debris removal.

Q. So your policy was exposed.

A. Yes -- no. Terminology difference here.

Q. Your policy was not exposed.

A. Our policy was potentially exposed based on the payment first by Ace/Westchester.

Q. That's correct.

And if Ace utilized its money to pay the estimated items, you'd have to pay the balance above 10 million.

A. If I had coverage, yes.

Q. But at this point, you're not questioning the availability of debris removal under the Ace primary policy, are you?

A. No.

Q. Did you raise any questions about the availability of debris removal coverage under the excess policy at this time?

A. No.

Q. All right.

MR. NICOLETTI: Let's have this next document marked as Whittington Exhibit 215.

(York Report Number Three was marked Deposition Exhibit Number 215.)

BY MR. NICOLETTI:

Q. It has -- it consists of documents bearing production numbers MSI 00478 through and including MSI 00495.

Can you identify this document for me?

A. Mr. Cruikshank's third report dated November 3, 2009.

Q. And the reason you know it's his third report, he has a caption "Report Number," the word "three" appears next to it.

A. Yes.

Q. Is that a standard practice in how he identifies each successive report?

A. Yes.

Q. Again, this is addressed to Joanne Massey and to Cody Whittington; is that correct?

A. That is correct.

Q. And did you -- do you recall receiving this document on or about November 3rd, 2009?

A. To my knowledge, yes.

Q. Now, just to go back real quickly, I note that on the 9/2/09 report, he gives a net total property damage estimate of 17,218,000.

A. I'm sorry?

That's what it states on the first report.

Q. Right.

And on the second report, it shows an estimated value of 25 million.

A. That's what it states.

Q. Okay. Do you have any reason to question his estimates?

A. No.

Q. Did you ever question his estimates?

A. No.

Q. Were you fully aware that these were the amounts that were probably payable for this loss, if not more?

MR. BOWLES: Objection.

BY MR. NICOLETTI:

Q. You can answer.

A. Based on his recommendation, that is what he suggested.

Q. Right.

A. It's not acceptable to Max Specialty what he recommends.

Q. It was not acceptable?

A. It could not.

Q. Why not?

A. Let me clarify further. You've hooked me on that.

Reserving is based on recommendations of the adjuster. The final decision rests with Max.

Q. I understand that.

A. What they reserve.

Q. But once you reserve, that reflects what you believe to be an exposure.

A. A minimum or maximum, yes.

Q. Right.

And when -- at this point in time are you still carrying that $4.6 million reserve?

A. I believe, yes.

Q. And at this point in time, that shows you had some real exposure for this claim.

A. Yes.

Q. All right. And yet up to this point in time, you make no objection to the listing of debris removal as a covered item under the Westchester primary policy, do you?

A. No indications, no.

Q. Turning your attention back to Whittington

Exhibit 215, again this is Mr. Cruikshank's third estimate -- third report, and, again, he's got the estimate for the Port Arthur drydock being 13,600,000 for the physical loss; is that correct?

A. That is correct.

Q. And, once again, the second item is debris removal for $5 million.

A. That's correct.

Q. And based upon the way Mr. Cruikshank writes his reports, these are his estimated exposures for covered items under the Ace/Westchester policy.

A. Through Ace/Westchester?

Q. That's what I just said.

A. And not Max Specialty.

Q. I'm doing one at a time.

A. I can't speak for Ace/Westchester. It's not my policy.

Q. Did you consider these to be your exposures under the Max Specialty policy once the Ace policy was exhausted?

A. His total amount? No.

Q. I'm not talking about his total amount. The listed items.

A. The listed items?

Q. Yes. Maybe not the amounts, but the listed

items, since he says they are covered items.

A. Let me backtrack up through your question.

Q. Mr. Whittington, you've testified to me that what goes under the estimate column are those items of claim which Mr. Cruikshank believes are covered under the Ace/Westchester and Max Specialty policies.

A. Correct.

Q. Right.

That's his understanding.

A. That's his interpretation, yes.

Q. Right.

When you received his November 3rd report which listed the Port Arthur drydock for 13.6 million and debris removal for 5 million, it was Mr. Cruikshank's understanding of the property program, that is, the Ace/Westchester primary policy and Max Specialty excess policy, that these were covered under those policies.

A. That is his opinion and that was his suggestion, yes.

Q. Okay. At that point in time, did you make an objection to these opinions?

A. No.

Q. At that point in time, did you have any objection to his opinions?

A. No.

Q. So at this point in time, you believe these are covered items under the full property program issue -- I mean issued to Signal.

A. That's a summation I cannot agree to.

Q. Why not?

A. You're saying definitely that I did this. You have no information or suggestion that I did.

Q. I'm asking you.

A. I'm saying yes.

Q. Yes what?

A. To your question that you asked.

Q. That is, that it was your understanding that the items listed under the estimate column were covered under your policy.

A. Potentially covered under our policy.

Q. All right. When you say "potentially covered," are you questioning the dollar amount?

A. Yes, among other things.

Q. Are you questioning the actual coverage?

A. Yes.

Q. At this point in time, did you have questions concerning the available coverage for debris removal under the property program?

A. Did I have questions --

Q. In November --

A. -- or did I project questions to someone?

Q. Did you have questions in your mind as of November 3rd, 2009?

A. At that time, no.

Q. Okay. And if you didn't have any questions, you couldn't possibly project them to anybody.

A. Correct.

Q. Okay. We're on the same page.

A. Yes.

Q. By the way, do you have any legal training?

A. No.

Q. Have you ever dealt before with the situation where a floating object was insured under your property program?

A. No.

Q. And I gather from that then that you have no experience as to how the debris removal clauses in a property program operate on a floating object which may have sank.

A. Let's phrase it this way. I've never had something with debris removal coverage that sank.

Q. Okay.

A. I've had inland marine policies in which we've retrieved insured items out of the water.

209

Q. I was speaking solely about the property program.
A. You were asking me my experience, though.
Q. I thought I limited it to the property. If I didn't, I apologize.
A. Clarification is my point.
MR. NICOLETTI: Let's now have this next document marked as Whittington Exhibit 216. This does not have Bates stamps on it, so I'll identify it as the York report number 4 dated November 19, 2009.
(York Report Number Four was marked Deposition Exhibit Number 216.)
BY MR. NICOLETTI:
Q. All right, Mr. Whittington. We're going to go through the same series of questions here.
Can you identify the document which I've marked as Whittington Exhibit 216?
A. Report 4 dated November 19, 2009.
Q. And it's addressed to Mr. Cocker at Ace?
A. I think it's -- actually, I think his name is Crocker. But it's Cocker on this report.
Q. So it's just a misspelling.
A. I'm not sure.
Q. Okay. So if we rely on the document, it's

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

210

Cocker.
A. That's what it states.
Q. And I gather this is Miss Massey's replacement?
A. My understanding, yes.
Q. And the report is also addressed to you, Cody Whittington at Max Specialty.
A. That's correct.
Q. Again, the format is pretty much the same. He has the term "Estimate." Do you see that?
A. Yes.
Q. Do you know why Mr. Cruikshank is issuing a report only 16 days after his November 3rd report?
A. Apparently he has information here which he wishes both companies to be aware of.
Q. And what information is that?
A. Apparently the salvage contract for removal of the wreck removal. Also reflects valuations.
Q. Okay. But once again, I note that he's got the subcategory of "Estimate" --
A. Yes.
Q. -- which you've indicated to me are his estimate of damages for the covered items under the property program.
A. Yes.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

211

Q. Just so we can be -- we have a common understanding, when I use the term "property program," do you understand I mean both the primary and excess policies?
A. Yes.
Q. Okay. And you understood that in my prior questions.
A. Yes. It was not your policy or the insured you represent.
Q. So once again, the estimate shows the Port Arthur drydock being valued at 13.6 million as a covered item?
A. Yes.
Q. And it shows debris removal at 5 million as a covered item.
A. Yes.
Q. When you received this report, did you make any objections?
A. No.
Q. When you received this report and reviewed it, did you have any questions that debris removal for this drydock was covered under the property program issued by both Ace with the excess by Max Specialty?
A. I believe at that time I was awaiting Mr. Minx's opinion concerning the coverage question of

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

212

whether it was debris removal or wreck removal.
Q. Up to this point in time, had you reviewed the Westchester primary policy?
A. Yes.
Q. And after reviewing that policy, did that trigger any questions in your mind whether the property program did insure debris removal for the drydock?
A. Being that I am not familiar with the MGL's policy, how could I compare it to see any difference, any problem?
Q. I'm not asking whether you saw the MGL.
I'm asking in regards to your own policy, that is, the Ace/Westchester primary and the Max Specialty excess, was there anything in those policies that indicated to you that debris removal for this drydock was not covered under the property program?
A. Debris removal is afforded. There's no indication it's afforded for removal of drydock.
Q. When you say "debris removal is afforded," what do you mean?
A. It is available coverage for the policy and under the policy.
Q. For the policy and under the policy?
A. Yes.
Q. For --

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

A. It was provided under the policy.
Q. For all insured property.
A. Yes.
Q. And the drydocks were insured property under the property program.
A. Yes.
Q. By extension and using your own statements, you at this point believed that there was debris removal coverage for the drydock; is that correct?
A. That is not correct.
Q. You had objection to that coverage?
A. I did not have any objections to the coverage. I did not know it was, it was or was not covered under debris removal.
Q. I see.
A. I believe that's why we, we sent it to Mr. Minx --
Q. Well --
A. -- for review and his opinion.
Q. Before the Ace representative or Mr. Cruikshank on his own raised the question of whether the debris removal was covered under the property program, did you have any questions in your mind that it was covered --
A. No.

Q. -- or not covered?
A. No.
Q. Okay. So you believed it was covered.
A. Until otherwise advised, yes.
Q. Okay. I'm asking you, though, did you see anything in the policy, whether it be the Ace primary or the Max Specialty excess, that raised any doubts in your mind that debris removal was not covered?
A. In my mind, no.
Q. Okay.
A. Ace/Westchester, Mr. Cruikshank, apparently did.
Q. Well, it's either Mr. -- it could be Mr. Cruikshank on his own, correct?
A. I don't know.
Q. You don't know.
But we know Mr. Cruikshank raised the issue.
A. The issue was raised. By who is the question.
Q. Okay. So am I correct in my understanding when you read the Ace/Westchester policy and Max Specialty excess policy literally, just using the words, you believed there was coverage for debris removal for this drydock under the property program.
A. I had no indication that it would not be.
Q. Well, isn't it your job to state whether the

coverage is there or not?
A. In Mr. Cruikshank's report?
Q. No. Your, your job.
A. In Mr. Cruikshank's report? Stated in Mr. Cruikshank's report?
Q. Aren't you supposed to review it, and if you disagree, you send -- don't you send him something saying, "I object. You're wrong"?
A. No. At this time it's Ace/Westchester's exposure under the policy.
Q. So even though you read the policy and you see nothing in the policy that would exclude coverage for the debris removal, is it your testimony that you just didn't question it because you didn't think you were exposed?
A. My exposure begins when Ace/Westchester exhausts their limits. Until that time, Ace/Westchester's making the decision on their own coverages.
Apparently they noticed or discovered or questioned the coverage on debris removal.
Q. Okay. Did Mr. Cruikshank or Ace/Westchester -- strike that. You only spoke to Mr. Cruikshank on this issue.
Did Mr. Cruikshank ever tell you what in his

mind raised the question about coverage for debris removal under the property program?
A. No. My thought is he brought that up with Ace/Westchester.
Q. So you don't know the reason.
A. No.
Q. Okay.
A. I was not privy to their communications other than Mr. Cruikshank's report.
Q. Okay.
Now, does there come a time when you receive information from Mr. Cruikshank or the Minx office which advises you that the coverage, that the coverage may not be under the Ace property program?
A. Yes.
Q. Okay. Can you tell me what Minx told you -- first of all, did you agree with Mr. Minx's analysis?
A. Mr. Minx's analysis I believe was, was forwarded to Ace/Westchester and not us until later.
Q. Okay.
A. I agree with Mr. Minx.
Q. When you say you agree with Mr. Minx, did you agree with Mr. Minx before you saw his opinion in writing?
A. I believe he communicated by email the

217

summation of his report before I saw his report.
Q. Did you ever see his full report?
A. At this time? I believe I did. I might be mistaken.
Q. Okay. What in Mr. Minx's report caused you to come to the understanding that there was no coverage for the debris removal under the Ace property program for this drydock?
A. Rephrase your question. I'm sorry.
Q. Well, you said you agreed with Mr. Minx's opinion.
A. Right.
Q. What was Mr. Minx's opinion?
A. Do we have a copy of his opinion?
Q. Well, I'm entitled to exhaust your memory.
A. Right.
Q. Do you recall what Mr. Minx said?
A. In a few words, he indicated that the debris removal coverage under the property policy would not apply to this loss.
Q. Okay.
A. That the wreck removal coverage under the MGL policy was specifically for this incident.
Q. All right. What did Mr. -- what was --
A. That is my summation.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

218

Q. What was the grounds or basis for Mr. Minx saying that debris removal for this drydock is not available under the property program?
A. We would have to go back to his, his opinion and read it.
Q. Well, I'm asking you from your recollection.
A. I just stated it.
Q. Well, you gave me a general answer. I'm delving into it.
I'm asking you what was the factual or legal basis that Mr. Minx utilized as the foundation for his opinion that debris removal coverage was not available for the drydock under the property program?
A. Due to the specific nature, I'd have to review his letter and comment further.
Q. Okay. Let's see if we can find that. I'm certain we can.
MR. NICOLETTI: Let's have this next document marked as 217, Whittington 217. It is a York document dated December 9, 2009.
There are no production control numbers on it.
(York Report Number Five was marked Deposition Exhibit Number 217.)
MR. NICOLETTI: Mr. Bowles, you're not -- you're permitted to review the exhibit as marked.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

219

You're not permitted to point your pen at certain sections and instruct your witness on how to answer.
Please close the document or go down to the end of the table and review it.
MR. BOWLES: Objection.
MR. NICOLETTI: You're going to tell me, you're going to bold-face lie to me and tell me you didn't have your pen pointed to certain sections on that page?
MR. BOWLES: I pointed to the fact that they are enclosing --
MR. NICOLETTI: You shouldn't be pointing to anything.
MR. BOWLES: Objection. I'm trying to find out this is Donato Minx' opinion attached to this, and it says --
MR. NICOLETTI: Wait a minute. I don't need a speaking objection.
Mr. Whittington, please leave the room while we have this discussion.
That's the appropriate way to do it.
THE DEPONENT: Is that okay?
MR. BOWLES: Go ahead.
I'm trying to find out what's attached to this

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

220

document.
(The witness withdrew from the room.)
MR. BOWLES: I'm surprised that you have the Donato Minx opinion.
MR. NICOLETTI: Hey, I'm not the one -- you guys produced everything.
MR. BOWLES: Well --
MR. NOVAK: You produced it a half a year ago.
MR. NICOLETTI: And this -- and to the extent that it's in this document, this is one of their reports.
MR. BOWLES: All right.
MR. BLAND: What happened? I almost got run over by the witness.
MR. NICOLETTI: Mr. Bowles was prompting his witness --
MR. BOWLES: Objection.
MR. NICOLETTI: -- by pointing to certain sections of the document that I just marked as an exhibit.
MR. BOWLES: Objection.
MR. BLAND: Are we on break for a moment?
MR. NICOLETTI: Are we finished?
MR. BOWLES: Let me take a break.
MR. NICOLETTI: Please do not speak to your

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

witness.

MR. BOWLES: I'm not going to speak with the witness.

Do you want to come with me? I have to go to the bathroom.

MR. NICOLETTI: No, that's too ugly of a thought.

(A recess was taken from 5:02 p.m. until 5:06 p.m.)

BY MR. NICOLETTI:

Q. All right, Mr. Whittington. Let's go back on the record.

Let me show you what has been marked as Whittington Exhibit 217. This is York's -- Mr. Cruikshank from York's fifth report; is that correct?

A. That's correct, December 9, 2009.

Q. Excuse me? Yes, December 9, 2009.

It's addressed to Mr. Cocker and to yourself; is that correct?

A. That's correct.

Q. And under "Estimate," this time -- the first item remains the same, Port Arthur drydock, 13.6 million, but the category for debris removal has been deleted.

A. Yes.

Q. Am I correct in my understanding that the sole basis for deleting the debris removal from coverage, from the available coverages under the property program is the opinion provided to the property underwriters by Brook Minx of Donato Minx?

A. That's correct.

Q. Other than this opinion, does Max Specialty have any other basis for alleging that debris removal for the drydock is not a covered under the property program?

A. Any other evidence?

Q. Any other reasons or evidence.

A. No.

Q. Let me direct your attention -- unfortunately, this document is not numbered, but if you go from the back, third page from the, from the end, you see that?

A. What's the -- "Compulsory Wreck Removal"?

Q. It says "Debris Removal."

A. "Debris Removal."

Q. Do you see it?

A. Yes.

Q. Okay. Am I correct in my understanding -- and please review the entire document -- the sole basis for Mr. Minx's belief that debris removal for the drydock is

not covered under the property program is set forth under the subcategory "Debris Removal"?

A. That appears to be his summation opine, opinion.

Q. His summation or his opinion?

I believe that's his full opinion on that issue, isn't it?

A. If you want to mince words, yes.

Q. I'm not mincing words, because he does have an executive summary up front.

A. He does.

Q. Right.

But the basis of that summary or the foundation is the three paragraphs that appear under the heading "Debris Removal."

A. Are you asking me yes?

Q. I'm asking, is that yes?

A. Yes.

Q. Okay.

Now, can you tell me in your own words the basis of Mr. Minx's belief that debris removal of this drydock is not insured under the property program?

A. I can read you his opinion, which I agree with.

Q. I understand you agree with his opinion.

I'm asking if you can put it in your own words the basis for your agreement with Mr. Minx's opinion or is it limited just to what Mr. Minx stated?

A. Yes, it's limited to what Mr. Minx's opinion after review with Ace/Westchester and us, Max Specialty.

Q. I'm sorry. Say that again?

MR. NICOLETTI: Can you read his answer back -- it got kind of garbled on the end -- for me?

THE DEPONENT: In summation, Ace/Westchester, Max Specialty agrees to his opinion.

BY MR. NICOLETTI:

Q. Okay. How do you know Ace agrees?

A. By your own documentation and question, they did not do anything to refute his statement.

Q. Did you have any conversations with anyone at Ace/Westchester where they told you they agreed with Mr. Minx's opinion?

A. I never had any conversations with Ace/Westchester in their agreement or disagreement.

Q. So you really don't know what Ace/Westchester's position is, do you, with regard to Mr. Minx's opinion?

A. I would imagine if they disagree, they would have stated so, and Mr. Cruikshank would have repeated

A. Under the Max Specialty policy, yes.
Q. Right.
A. Right.
Q. And under the Ace policy also?
A. The Ace policy is separate. It is a follow form, but at that point what Ace was doing, potentially going to pay or reject debris removal coverage was their decision.
So I'm waiting at that time for what Ace wants to do.
Q. I'm a little -- I have to back up here.
A. I think you should.
Q. Is -- thank you.
Is the Minx opinion relative only to the Max Specialty policy?
A. I believe Mr. Minx's opinion is, is relative to both the Ace/Westchester and Max policy.
Q. Okay. That's -- I want to make that clear.
A. All right.
Q. All right. Prior to the issue coming -- prior to receiving the Minx opinion, is it your testimony you never questioned the coverages?
A. At that time, no, I did not.
MR. NICOLETTI: Let's have this document marked as Whittington Exhibit 218 for

identification. It's a two-page document bearing production control numbers MSI 00453 and 454.
(Email Chain dated October 26, 2009 from Cruikshank to Whittington was marked Deposition Exhibit Number 218.)
BY MR. NICOLETTI:
Q. It says here under -- strike that.
Can you identify the document first? This is Exhibit 218. If you can.
A. It's a series of emails --
Q. What is the document, though? Is that part of your log or diary system?
A. It's an email to me where apparently it's a series of emails that was placed in our file as an attachment.
Is that what you were looking for?
Q. I just wanted you to identify the document.
That's not part of your regular diary that lists all the emails?
A. No. This is an email.
I haven't read it yet. Do --
Q. No, I have to look at it again.
A. Okay.
Q. I just wanted you to identify it.
So this is just an email. This is not part of

a diary system.
A. No.
Q. Yes, it's an email.
A. It's an email. It's a series of emails.
Q. And it says -- this is an email, the second from the top, from Cody Whittington to Cruikshank, and it states -- the re is "AFDB-5 drydock," and it states, "You have assigned counsel per my email of 10/22/2009," question mark.
A. Yeah.
Q. Does that refresh your recollection -- read that to yourself, if you wish.
Does that refresh your recollection that you're the one who raised the issue of the available coverages?
A. No.
Q. Then why are you following up?
A. Because, one, I believe I was wondering where -- oh, this was in response to Preis & Roy.
Let me read this, please (reviewing the document).
Q. Please do.
A. Okay. What's the question again, please, sir?
Q. I just want to know if that refreshes your recollection that you were the person who raised the

issue concerning the available coverages for debris removal for the drydock under the Signal property --
A. It does not say that.
It states -- I asked Mr. Cruikshank did he assign counsel per my email of 10/20/2009.
The question was is counsel assigned to respond to -- Preis & Roy?
Q. Price Roy (phonetic).
A. Preis Roy.
-- and their communication which was attached and sent to Mr. Cruikshank, too.
Q. That's all.
My question was, does that refresh your recollection? I guess it doesn't refresh your recollection that you may have been more involved with the opening question -- opening the questioning on the available coverages for debris removal.
A. Well, I'm sure you're going to disprove me if I say yes, so let's wait.
Q. The question is, as you sit here today, do you recall bringing the issue up yourself in the first instance?
A. No. I believe, to the best of my knowledge at this time, that I was asked by Cruikshank if I wanted to assign Minx, and I don't think I ever responded, but I'm

241

A. Then why did we go over it?
Q. Because I like to know your understanding.
A. Oh. But the document speaks for itself.
MR. NICOLETTI: Let's have this next document marked as Whittington Exhibit 220. It is a document entitled "Affidavit of Cody Whittington in Support of Defendant Max Specialty's Motion for Continuance to Obtain Necessary Discovery."
(Affidavit of Cody Whittington was marked Deposition Exhibit Number 220.)
BY MR. NICOLETTI:
Q. By the way, Mr. Whittington, in preparation for this deposition, did you review this document with your attorney, Mr. Bowles?
A. I remember reviewing this document in preparation, submission. With Mr. Bowles, no.
Q. Can you say that again?
MR. NICOLETTI: Can you read that back to me because that didn't make --
THE DEPONENT: When Mr. Bowles prepared this, I read it then.
BY MR. NICOLETTI:
Q. Okay.
A. But after that, I haven't read it with Mr. Bowles of recent.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

242

Q. And I really think you've answered my first question, that is, did you draft this document?
A. Well, actually, Mr. Bowles drafted this document. I provided the information in answers to these questions and then made review and corrections.
Q. Do you have any drafts of this affidavit?
A. I don't believe I have any drafts of it.
Q. I thought you indicated you received things back from Mr. Bowles and marked it up and sent it back to him.
A. Physically marking it up, no. Electronically sending it back to him with my written comments, yes.
Q. Let me see if I can understand the process here.
Mr. Bowles asked you a series of questions, you answered those questions, and that's how he prepared the affidavit for you?
A. Mr. Bowles sent me copy of the questions, asked me for my answers. I gave him in response my information. He prepared the documents, and I reviewed it further or replied to him whether it was correct or not.
Q. So what came first, Mr. Bowles' questions to you?
A. I believe Mr. Bowles forwarded questions.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

243

They were submitted by other parties in the claim.
Isn't this -- oh, I'm sorry.
Q. This is your affidavit. This is not interrogatories.
A. I'm sorry.
Q. Okay.
A. I'm sorry.
Q. So my question to you is, did you draft this document yourself?
A. No, I did not.
Q. Okay.
A. I gave him the information to draft the document.
Q. My question is, how did you -- how did it come about that you knew what information to give to Mr. Bowles that went into this affidavit?
A. How did it come about that I knew the information?
Q. Right.
A. I assume from the contents of my file.
Q. No, my question to you is, did Mr. Bowles come to you and say, "These are the questions I need answers to put into your affidavit?" or did you propose to him the drafts that he put into this affidavit?
A. No, he proposed the drafts.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

244

Q. All right.
Well, that's what I'm getting to.
A. Okay.
Q. Did he ask you questions that you answered --
A. Yes.
Q. -- or did he present a draft to you for your review?
A. No. He asked me questions.
Q. Okay. And what questions did he ask you?
A. Assuming that the answers to his are stated in this affidavit -- shall we read each one?
Q. Well, I guess we can go paragraph by paragraph.
A. All right.
Q. It says here in paragraph -- it says -- paragraph 4 says, "After Signal's floating drydock, the AFDB-5, sank in Port Arthur, Texas in August 2009, I received and reviewed copies of the primary and excess marine general liability insurance policies (MGL) issued by plaintiffs to Signal."
When did you get those policies?
A. Those policies I believe were submitted to Mr. Cruikshank.
Let's start over.
Q. Did you ever receive actual physical copies of

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

245

both the primary marine general liability policy and the marine excess liability policy?

A. Is that the one term "Bumbershoot"?

Q. Yes.

A. Yes.

Q. And how did they come to you?

A. From vague memory, and I might be incorrect, but I believe Willis provided those copies to Cruikshank. Cruikshank provided it to us. I'm not sure, though.

Q. So --

A. Or Willis sent them direct to us. I'm not sure.

Q. Now, paragraph 5, you quote from a particular part of the policy. You see that?

A. Yes.

Q. Who selected the excerpts from the endorsement to be put in your affidavit?

A. My counsel.

Q. Okay. So in other words, you had nothing to do with leaving out the pollution exclusion which is contained within that endorsement, did you?

A. No, I did not.

Q. Did you ever read the entire endorsement and discuss with Mr. Bowles whether some additional language

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

246

should be put into this --

A. No.

Q. -- affidavit from that endorsement?

A. No.

Q. So in other words, you permitted your counsel to excerpt the document, and you just adopted it; is that correct?

A. I believe that's what I employ the counsel for.

Q. So you employ your counsel to write your affidavits and to select, and to select the material to go into it?

MR. BOWLES: Objection.

BY MR. NICOLETTI:

Q. Is that correct?

A. Rephrase the question.

Q. Did you employ your counsel to draft this affidavit in the form he wished and then you just signed off on it?

A. No.

Q. Okay. Is there --

A. He prepared the document, I believe is what I was trying to answer.

Q. My point is, I'm trying to see how much input you had in the preparation.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

247

A. Sure.

Q. Do you know why the pollution exclusion in the marine liability endorsement was not included as part of paragraph 5?

A. I do not.

Q. Are you aware that the Texas GLO order was issued under Chapter 40 which is the pollution section --

MR. GALATI: Objection to form.

BY MR. NICOLETTI:

Q. -- of the statute?

Are you aware of that?

A. At this time, no.

Q. Were you aware of it then?

A. Possibly, yes.

Q. And if the order arises out of a pollution incident, would it not be important to advise the judge that there was a pollution exclusion contained in the endorsement?

MR. GALATI: Objection form, foundation.

Can I have a continuing objection on your reference to the statute?

MR. NICOLETTI: Yes.

MR. GALATI: Thank you.

MR. NICOLETTI: That's fine. We'll get to you

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

248

next.

BY MR. NICOLETTI:

Q. Anyway...

A. Oh, I'm supposed to answer you?

Q. Yes.

A. Can you tell me your question again?

Q. Very simply, if the Texas GLO order was issued under a pollution statute, would it not be appropriate to advise the judge that the endorsement that you're citing also has a pollution exclusion?

MR. BOWLES: Objection.

THE DEPONENT: That I would feel is beyond my scope, and that is why I retained counsel to advise me further.

BY MR. NICOLETTI:

Q. So if it is relevant, your counsel left it out, you blame your counsel, not yourself; is that correct?

A. At this time I'm not blaming anyone.

Q. All right. We'll move on.

THE DEPONENT: Everybody makes comments, but I don't hear them.

What did you say?

MR. NICOLETTI: I didn't --

THE DEPONENT: Wait a minute. Why are you

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

allowed to make comments and I can't?

MR. NICOLETTI: You can. We'll put all your comments on the record. I have no problem.

THE DEPONENT: I'd like to hear his comment, if I could.

Did you hear it?

THE COURT REPORTER: I did not hear it.

THE DEPONENT: Why can't it be heard?

BY MR. NICOLETTI:

Q. Mr. Whittington, since I only have a limited amount of time...

A. I do.

Q. Thank you.

Item 6 says, "The excess marine general liability insurance policy refers to and incorporates Insurance Form SP23."

Do you know what Form SP23 is?

A. No, sir.

Q. What?

A. No, sir.

Q. Well, if you don't know what's in it, how do you then swear which -- in the same affidavit which contains coverage language identical to that in the primary MGL policy quoted above?

A. Counsel advises me of this.

Q. You swear to anything your counsel tells you.

MR. BOWLES: Objection.

THE WITNESS: I don't believe my counsel lies to me or provides me inaccurate information.

BY MR. NICOLETTI:

Q. I note that you -- when you, when you made this affidavit to Judge Kaplan, you said, "Cody Whittington, being duly sworn, deposes and says."

Nowhere in that line do you say "Upon information and belief," do you? At the very beginning.

A. At the very beginning.

Q. You say, "Cody Whittington, being duly sworn, deposes and says." That's all you say in the opening, isn't that correct?

A. Yes.

Q. You don't add "Upon information and belief," do you?

A. It does not state that, no.

Q. Do you understand when you make statements such as "Cody Whittington, being duly sworn, deposes and says," without the qualification "Upon information and belief," you're actually telling the judge under oath that you know these facts as set forth in this affidavit of your own personal knowledge? Are you aware of that?

A. Yes, I am now.

Q. Were you aware at the time you signed the affidavit?

A. Yes, I believe I was.

Q. All right. Then when you state here that Form SP23 -- I'm sorry, when you state in paragraph 6 that -- I'll quote the entire paragraph -- "The excess MGL insurance policy refers to and incorporates insurance Form SP23 marine general liability insurance form, which contains coverage language identical to that in the primary MGL policy quoted above," that's not an accurate statement because you've already told me that you don't know what Form SP23 is, isn't that true?

A. That is correct.

Q. So you have an inaccurate statement in your affidavit.

A. Is this statement inaccurate if my counsel has advised me of this?

Q. Well, what happens if your counsel's wrong?

A. Then that's an issue I take up with my counsel.

Q. And if your counsel is wrong, then this statement is incorrect, isn't that true?

A. That is correct.

Q. Okay. Do you know that the Form SP23 is not a general liability form; that, in fact, it's a very

specific protection and indemnity form? Did you know that?

A. No, I did not.

Q. Your counsel's a very experienced marine attorney.

Did you expect him to know the difference?

A. I expect him, yes.

Should I be reading this document, too?

Q. When I get to a point I want to ask you a question, yes, I'll direct your attention.

A. Okay.

Q. Is there anything in this document, your affidavit, where you advise the court that for the first four months of the claim, there was a belief by the property underwriters that debris removal was available for coverage under the property program?

A. I don't believe anything is in this document that states that.

Q. Is there anything in this document that tells the court that at some time after receiving the attorney's opinion, that the property underwriter Max Specialty altered its position?

A. Did we alter? I don't believe we altered our position.

Q. Well, came out and then said there was no

253

coverage after accepting five -- four reports where coverage was reflected?
A. I believe --
Q. Strike that. Let's go one step at a time.
In paragraph 12, you say -- read paragraph 12. "The debris removal provision in the primary property insurance policy issued by Westchester is intended to insure Signal for the costs of removing debris if, for example, a building on land is damaged as a result of a storm or other occurrence."
Where is that specific language in the Westchester policy limiting debris removal to buildings?
A. There is no statement in the Westchester policy that states this.
Q. I thought you said you don't go for intent. You go for policy language.
Didn't you just tell me that in an answer about 20 minutes ago?
A. I assume so.
Q. All right. Where do you come to the understanding that the Westchester policy is intended to insure Signal for debris removal of buildings only? Where do you derive Westchester's intent if there's nothing in the policy so limiting it?
A. Recommendations of two counsel.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

254

Q. Which two counsels?
A. Minx, Larry.
Q. Where does Mr. Minx say in his opinion that the Westchester policy is only intended to cover debris removal for buildings?
A. Do you have a copy of the policy?
Q. Policy or the opinion?
A. I don't need the opinion. I need the policy which you state.
Q. No, no. You told me that based upon --
A. Yeah, and I know how to ask for documents to refer to.
Q. Not till you answer my question.
You have just stated under oath that the basis for your saying that the Westchester policy was intended to insure Signal for the cost of removing debris if, for example, a building on land is damaged was based upon the opinion of your two counsel --
A. Yes.
Q. -- Mr. Minx and Mr. Bowles.
A. That's correct.
Q. Okay. Where in Mr. Minx's opinion does he so state that limitation?
A. I don't believe he states it in his, his opinion, but then again, it doesn't say that it isn't.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

255

Q. So you base your reliance on counsel based on them not telling you anything?
A. No, I base my decisions from counsel on what they tell me.
Q. All right. Where in the Minx -- did you have any telephone conversation with Mr. Minx?
A. No.
Q. Did you have any other communications with Mr. Minx other than receiving his opinion in writing?
A. Yes.
Q. What other communications?
A. Emails.
Q. Okay. And in those emails, did he ever tell you that there was specific language in the Westchester policy which limited debris removal to land-based covered property?
A. No.
Q. Is there anything in the policy -- I will now hand you the policy -- where it states that the debris removal coverage is limited solely to land-based covered property?
A. There is none.
Q. Okay. I thought you wanted to see the policy. You just asked me for it.
A. I did.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

256

Q. Okay. But you didn't even look at the first page.
A. The way you rephrased your question, I could answer you then.
Q. Thank you for helping me.
A. That's what I'm here for.
Q. So the sole basis for your statement in your sworn affidavit that debris removal is limited to land-based covered property is based upon your counsel's opinion, Mr. Minx and Mr. Bowles.
A. And my agreement.
Q. I understand you agree with it.
But what's your independent basis, other than your counsels telling you so, that the Signal -- that the Westchester primary property policy, debris removal coverage is limited to land-based covered property?
A. It is their opinion based on, I assume, their legal research.
Q. Did you see their legal research?
A. No. I did not ask for it either.
Q. I didn't ask you if you asked for it. I said did you see it?
A. I'm just helping you along.
Q. So you didn't see it.
A. No, sir.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

Q. Okay. Did they ever tell you they did legal research?
A. I assume they did legal research.
Mr. Minx's letter cites case law.
Q. That's right, cites two cases.
A. Yes.
Q. One of which actually supports the proposition that debris removal is covered under the property policy, doesn't it?
A. I'm not sure if it does.
Q. Well, wasn't there a cargo policy, which is property policy, where the court found that the debris removal did extend to removing the cargo from the sunken ship?
A. I can't remember that opinion in his letter.
Q. We can get back to it.
A. I'm here for the rest of the night.
Q. Thank you.
At any time did either Willis on behalf of Signal or Signal itself request that Max Specialty recognize their allocation of $5 million of the $10 million primary payment to the debris removal of the sunken drydock?
A. I believe they expressed their disagreement and that that was their intent, yes.

Q. So they specifically asked you to recognize their allocation of 5 million of the 10 million primary payment to debris removal.
A. Yes.
Q. Okay. Do you ever tell the Court in this affidavit that such a request was made?
A. No.
Q. The whole purpose of this affidavit was to persuade the court that there was no debris removal coverage under the property program, correct?
A. Yes.
Q. And, in fact, you actually make a big point about telling the judge that the insured itself was looking to the MGL policies to pay for wreck removal.
A. Based on the statements from Willis, that's what they were doing.
Q. Right.
Yet, you did have in your file subsequent to those positions a request by Signal for them to allocate $5 million of the primary $10 million payment for debris removal.
A. Yes.
Q. Okay.
A. There was a request.
Q. Right.

The point is, you never tell the Court that the insured itself had changed its mind and wanted $5 million of debris removal from the property program, isn't that true?
A. I believe you're correct.
Q. All right. Any reason why you didn't want to tell the Court the whole story and true story what was going on here?
A. What is untrue about what I've stated?
Q. Well, you're telling the court here Signal solely expected to get wreck removal from the MGL and the excess MGL.
A. Again, I rely on my counsel to prepare answers to the court based on information I give them.
Q. So you don't think it was necessary to tell Judge Kaplan the whole story as to how this claim was developed, is that your position?
A. I rely on my counsel to make answers to the court.
Q. So in other words, if your counsel violated some ethical rule to the court, the court should address it to him, not you; is that correct?
A. I do not know if it's an ethical question or not. That is your learned field.
Q. If Mr. Bowles has not followed the rules in

providing the court with sworn testimony, do you blame Mr. Bowles or yourself?
MR. BOWLES: Objection.
THE DEPONENT: I blame us both.
BY MR. NICOLETTI:
Q. Now, this affidavit is dated October 1st, 2010.
A. Okay.
Q. Isn't it true that as of February 2010, Signal made the request to Max Specialty to allow them to -- no, to recognize $5 million of the $10 million primary payment by Ace as debris removal and they put a further request for further payment of $5 million to Westchester for the actual physical loss to the drydock?
A. I don't believe they made an additional demand. I believe Willis disagreed. There was a discussion afterward. But please provide.
Q. Excuse me?
A. Please provide.
Q. In paragraph 18 of your affidavit, you state, "Signal and its broker, Willis, are the only entities of which I am aware which would have actual knowledge of, and the filings regarding, the express intent of the insurance program Willis arranged for Signal." Is that correct?

A. Yes. I think it's "files regarding," not "filings."

Q. I'm sorry, "files regarding."

Now, you had in your file --

MR. NICOLETTI: Let's have this marked as Whittington Exhibit 221. It bears production numbers MSI 001118 through and including MSI 001121.

(Email Chain dated February 5, 2010 from Cruikshank to Whittington was marked Deposition Exhibit Number 221.)

BY MR. NICOLETTI:

Q. Can you identify that document?

A. An email from Cruikshank, Ken Cruikshank to me dated February 5, 2010.

Q. Let me direct your attention to the bottom email appearing on that first page.

A. The first page from Lisa Spears?

Q. That's right.

It's addressed to Ken Cruikshank, is it not?

A. Yes.

Q. And you're a recipient of the emails above it, so you, in fact, did receive a copy of this email on the bottom, although it's not copied directly to you; is that correct?

A. From... no, I only received this from Ken Cruikshank.

Q. Well, that's what I'm saying. You did ultimately receive it.

A. Yes.

Q. And you received it on or about February 12th, 2010.

A. Mine says February 5th, 2010.

Q. Okay. I'll take February 5th, 2010.

A. When is February 10th?

Q. That's the Spears' email.

A. Spears' email is February 3rd.

Q. Well, there's one above it on February 10th also.

Okay.

A. I don't see it.

Q. I'm sorry. I have the wrong document.

In this email from Spears to Cruikshank which you ultimately received, Miss Spears -- do you recognize Miss Spears as working for Signal?

A. Yes.

Q. Okay. And in this email of February 3rd, Miss Spears is advising that she wants to use 5 million of the 10 million primary payment for debris removal, does she not?

A. (Reviewing the document).

Question, please, again?

Q. In Miss Spears' email of February 3rd, 2010 which you received in February 2010, she says, "Signal is using 5 million of the 10 million received towards debris removal."

A. Yes.

Q. All right.

A. I'm sorry. Where was the February 10th email you were --

Q. That was something else.

A. I'm sorry.

Q. So as of February 2010, Signal is demonstrating its intent that debris removal for the drydock is covered under the primary Ace policy, is it not?

A. That is their, their intent, yes.

Q. That's right.

Yet, in your October 2010 sworn affidavit to the judge, you never tell the judge of Signal's intent, do you?

A. No.

MR. BOWLES: Objection.

BY MR. NICOLETTI:

Q. In fact, you actually tell the judge that

Signal has a different intent, don't you?

A. I believe they changed afterward, yes.

Q. After when?

A. February 3rd, 2010.

Q. And how do you know they changed after February 10th (sic)?

A. I believe the, the contention that they could allocate $5 million for the debris removal out of a total of 10 million was dropped. They proceeded to, to make claim for the BI and the newly acquired property claim.

Q. Do you have an email to that effect?

A. Should have been produced and you should have it.

Q. Isn't it true that the reason Signal moved into a different direction is that they received a letter from -- or email from Mr. Cheglikov telling them they weren't entitled to make that allocation?

A. Mr. Cheglikov did issue a letter to that effect, yes.

Q. Right.

So they were forced to move into a different direction because of a position Max took, isn't that true?

A. Your use of the worse "forced."

Q. Compelled, coerced?

MR. BOWLES: Objection.

THE DEPONENT: Still, I don't agree to that.

BY MR. NICOLETTI:

Q. But in effect, they didn't change position until after getting Mr. Cheglikov's letter telling them they couldn't so allocate primary funds to debris removal, isn't that correct?

A. Maybe they understood then that they could or couldn't. I can't tell you what they did.

Q. All right.

A. They stopped making the claim, though.

Q. But the timing is this. Miss Spears requested the allocation.

A. Right.

Q. Immediately thereafter, Mr. Cheglikov on behalf of Max said they couldn't make the allocation.

A. Right.

Q. And that's when you believe they stopped asking for the allocation.

A. That's correct.

MR. GALATI: Off the record for a second.

(Discussion held off the record.)

MR. NICOLETTI: Give me two minutes.

(Discussion held off the record.)

BY MR. NICOLETTI:

Q. Let me show you, Mr. Whittington, what has been marked as Exhibit 158 during the Bullock deposition. It's an Alterra letter dated November 29, 2010.

A. Is this Mr. Cheglikov's letter?

Q. The answer is I believe Mr. Cheglikov signed it. Whether it's his letter may be a different story.

No, it's your letter.

A. Okay.

Q. That's your letter.

Did you draft this letter?

A. I assisted in the drafting of this letter, yes, by counsel.

Q. All right. How did you assist? What input did you have?

A. I'm sorry. What is your question again?

Q. How did you assist?

A. I believe I made corrections -- yeah, I believe I made corrections after counsel drafted the letter.

Q. Okay. So the initial draft comes from Mr. Bowles; is that correct?

A. I believe so, yes, sir.

Q. And then you say you made corrections.

A. Yes.

Q. How did you make the corrections?

A. In what form or what...

Q. What form?

A. Replied to him either verbally or written by email.

MR. NICOLETTI: Mr. Bowles, have you produced those emails?

MR. BOWLES: Probably not.

MR. NICOLETTI: On what basis?

MR. BOWLES: Attorney-client privilege.

MR. NICOLETTI: I'd --

MR. BOWLES: We're working through a letter for Signal. I believe that's privileged.

MR. NICOLETTI: But I think I'm entitled to understand the change- --

BY MR. NICOLETTI:

Q. What changes did you make to this letter?

A. I do not remember.

MR. NICOLETTI: I demand production of the emails.

MR. BOWLES: I'll take it under advisement.

MR. NICOLETTI: Let me mark this next document as Whittington 222. It bears production numbers

MSI 001203 including but not limited to MSI 001214.

(Email dated February 16, 2010 from Cheglikov to Baker with attachment was marked Deposition Exhibit Number 222.)

BY MR. NICOLETTI:

Q. By the way, when you say that Signal -- going back to your affidavit quickly -- intended to have the debris removal of the drydock covered under the MGL and/or the excess MGL policies, where did you derive that understanding?

A. I believe from Mr. Baker or Bullock's email.

Q. Any other source?

A. No.

Q. Okay.

A. Wait. Possibly it could be a Cruikshank report, but I'm not familiar or do not remember at this time.

Q. Well, if it is from a Cruikshank report -- have we marked all of his reports?

A. The reports that you've produced, you've marked, yes.

Q. Yes.

But were there any further reports beyond six?

A. Yes, I believe there was. I'm not sure, though.

269

Q. So if there's only six reports, we've marked them. If there's a seventh, it should be, should be in your production somewhere?

A. If there is a seventh report, yes.

Q. Okay.

A. I'm not sure if there is a seventh report, though, at this time.

Q. Please examine Exhibit 222.

Are you familiar with that letter?

A. Yes.

Q. Do you recall having seen that letter before?

A. Yes.

Q. Did you take any part in drafting that letter?

A. No.

Q. Is that something that was drafted by Mr. Cheglikov?

A. I do not know, sir.

Q. All right. How does it come about that you've been dealing all along with this claim and it's now given back to Mr. -- Mr. Cheglikov is involved in any way?

A. Mr. Cheglikov, being a marine manager, is more familiar with your policy than I am. He was asked --

Q. I don't have any policy. You mean the --

A. I'm sorry. For the company that you

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

270

represent.

He was asked to, to be involved concerning the MGL policy.

Q. What is your understanding -- where did you get the understanding that Mr. Cheglikov is more familiar with the MGL policy?

A. Than me?

Q. Yes.

A. Because I've never seen the MGL policy until this claim. I believe his whole life has been involved --

Q. Are you aware that Mr. Cheglikov's specialty is cargo insurance and not marine liability insurance?

A. Due to your personal relationship with Mr. Cheglikov, I'm sure you're right.

Q. Okay. So what gave you the understanding --

A. I don't have that same relationship with Mr. Cheglikov.

Q. What gave you the understanding that Mr. Cheglikov was more familiar with marine general liability policies than you other than you knew nothing about them?

A. Based on recommendations from Mr. Boesen, he was asked to, to join in and assist on this.

Q. We're talking about Mr. Cheglikov now.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

271

A. Yes.

Q. Was it Mr. Boesen's suggestion to get Mr. Cheglikov involved?

A. Yes.

Q. And what was his understanding of Mr. Cheglikov's past experience in marine insurance, if any?

A. I can't speak for Mr. Boesen and Mr. Cheglikov.

Q. All right. So is the basis of your answer that Mr. Cheglikov was involved with writing this letter because he was more familiar with MGL policies based on the fact that you knew nothing about MGL policies?

A. At that time, yes.

Q. Okay. Do you know anything --

A. And he had also attended the meeting you had scheduled in New York.

Q. Do you think you have -- do you now have a better understanding of MGL policies than you did when you wrote your affidavit?

A. I do not have any interest in MGL policies to make a study of it.

Q. So you've never made a study of the MGL policy; is that correct?

A. I've read the MGL policy several times, but

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

272

I've never made a study of it.

Q. What's the difference between reading and studying it?

A. I believe memorization and application for future use. I don't think I'll ever be exposed to another MGL policy.

Q. Do you know if Willis, either Mr. Baker or Mr. Bullock ever responded to Mr. Cheglikov's letter?

A. Yes, I believe Mr. Baker did respond to him by email. I'm not sure, though.

Q. Isn't it also true that they disagreed with the position taken in the Cheglikov letter?

A. I believe the entire time of this claim, Mr. Baker and Mr. Bullock have disagreed with everything we've done.

Q. So they all -- so it's your testimony then that to this day, they disagree with Max Specialty's refusal to permit Signal to allocate $5 million of the 10 million primary payment to debris removal.

A. I cannot say what Mr. Baker and Mr. Bullock has agreed to or disagreed to.

I believe they dropped the matter and pursued the MGL insurers for the debris removal and left us out of the claim further for debris removal.

Q. Isn't it true you're only left out of the

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

claim for debris removal because you refused -- because Max refused to contribute to the debris removal?

A. Isn't that a right under the policy?

Q. No.

A. Why not?

Q. That's my opinion, but let's move on.

A. Oh. Can I object to your opinion?

Q. Let me show -- well, either Mr. Minx is right or I'm right. Only Judge Kaplan will tell us.

Let's turn to Exhibit 155.

Do you recognize that email? Have you ever seen that email? Do you recall ever seeing that email?

A. May I read?

Q. Please do.

A. (Reviewing the document).

I believe I've seen the lower section of the email to Mr. Steve Boesen. I'm not sure that I have seen the response from Mr. Boesen to Mr. Baker.

Q. Okay. You saw the response from -- by Mr. Baker? I'm trying to get this straight now.

I'm focusing on the top email.

A. Response by Mr. Baker. There was no response by Mr. Baker.

Mr. Baker initiated the communication.

Mr. Boesen responded.

Isn't that what it says?

Q. Isn't it true this email exchange occurs after the Cheglikov letter is sent to Signal?

A. May I see that again?

Yes.

Q. Okay.

A. One month two days.

Q. And doesn't it say in the, in the second paragraph of Mr. Baker's email to Mr. Boesen, "In response to your questions as to whether the insured wishes to allocate a portion of the Ace claim, I refer you to page 4 of Mr. Cheglikov's letter to Signal"?

A. I believe the document states that, yes.

Q. Does that refresh your recollection that Mr. Baker was responding, was responding to the Cheglikov letter?

A. To Mr. Boesen, not me.

Q. Yes.

A. To Mr. Boesen, not me.

Q. Right.

A. Okay. You've answered my question -- my statement, yes.

Q. Were you ever shown this email at or about the time it came in from Mr. Baker to Mr. Boesen?

A. I believe the bottom from Mr. Baker was

received by me.

Q. Okay. So as of March 18th, 2010, Signal was still attempting to allocate 5 million of the primary $10 million towards debris removal for the drydock, isn't that correct?

A. As of that date of that email, yes.

Q. Okay. Again, none of these emails or none of these facts are presented to Judge Kaplan in your affidavit; is that correct?

A. Again, I rely on counsel as to the need for them.

MR. NICOLETTI: I will pass the witness back to Mr. Bland.

MR. GUY: Let's go off the record.

(Discussion held off the record.)

(A recess was taken from 6:14 p.m. until 6:23 p.m.)

EXAMINATION (Continued)

BY MR. BLAND:

Q. All right, Mr. Whittington. I'm back.

A. I never left.

Q. In your testimony with Mr. Nicoletti, you referenced the Large Loss Report?

A. Yes.

Q. Okay. And I think from your memory, you noted that when the Large Loss Report was generated, there was a question as to whether the drydock destroyed itself, I think is the way you put it. Do you remember that?

A. Yes, the cause.

Q. And, in fact -- and that was early days, right? That was in August 2009?

A. Yes.

Q. In fact, you since learned with the September 2009 submission that we looked at, looked at together, that the drydock sank as a result of operator error, correct?

MR. BOWLES: Objection. That's a statement.

BY MR. BLAND:

Q. Correct?

A. Can I answer?

Q. Yes.

MR. BOWLES: Yes.

THE DEPONENT: Okay.

BY MR. BLAND:

Q. Do you want me to repeat it?

A. I believe I understood what you said.

Based on the statements from Signal's employees, that's what it appeared to have occurred.

Q. Right.

293

a preliminary claim statement from Signal.

A. Correct.

Q. November of 2009.

A. Yes.

Q. We looked at that together.

Did you respond to that preliminary claim statement?

A. No.

Q. Have you ever responded to it?

A. No.

Q. Why not?

A. I am waiting for the underlying carrier to exhaust to trigger my coverage.

MR. NICOLETTI: What's the date on that?

MR. BLAND: It's November 17 -- I'm going to find it.

BY MR. BLAND:

Q. It's November 17, 2009. It's Exhibit 210, okay? And as I understand it, you've never responded to Signal's preliminary claim statement; is that correct?

A. Of August 20, 2009? No.

Q. Well, that's the date of loss, August 20, 2009.

A. Oh. Whatever the date is.

Q. The claim is November 17, 2009.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

294

A. Okay.

Q. Is that correct?

A. Yes.

Q. And as we sit here today, Max Specialty has never responded to this claim; is that correct?

MR. BOWLES: This letter, you mean?

MR. BLAND: No, to the preliminary claim statement.

THE DEPONENT: I think we've issued declination letters to everything the insured claimed.

BY MR. BLAND:

Q. Isn't it a fact -- and we'll look at it -- but you did not -- this preliminary claim statement is dated November 17, 2009, correct?

A. Right.

Q. And you did not issue what you call your declination letter until November of 2010, a year later; is that correct?

A. No. We issued two letters of declination. We also awaited Ace/Westchester's exhaustion of their limits and payment. We then scheduled meetings for the BI with the insured who cancelled the first meeting. We were asking questions concerning the newly acquired claim because we didn't understand what they were

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

295

claiming.

Q. Okay. Do you know when you sent -- at what point you sent your declination letter, the first one?

A. I believe that was November 19th or 29 -- 29th --

MR. BOWLES: 2010.

THE DEPONENT: -- 2010. I'm sorry.

BY MR. BLAND:

Q. So just listen to my question. Your letter declining Signal's claim was issued one year after that preliminary claim statement which is Exhibit 210; is that right?

A. That's correct.

Q. And do you know when Ace exhausted their limits?

A. After asking them, apparently they made payments in January of 2010.

Q. So after -- if you look at Whittington Exhibit 208, please, and go to the entry -- it's the one we looked at -- or it's on the page we looked at earlier that has a cutoff entry, but this one is complete.

If you look at the January 7, 2010 entry. It's the first full entry on the page.

A. Okay.

Q. And it's a note from you, Cody Whittington,

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

296

and it says, "Email from Ace, they have exhausted their limits." Is that correct?

A. I'm on the wrong -- okay, yes.

Q. January 7, 2010, 3:54 p.m.?

A. Right.

Q. In quote, Email from Ace, they have exhausted their him, period, end quote.

A. Correct.

Q. Why didn't you respond to Signal's claim at that time?

A. At that time we were awaiting the surveyor's report for payment of the remaining amount on the drydock. We were also investigating the bodily injury claim, awaiting additional information from the insured and scheduled meetings that occurred later.

The issue of wreck removal and debris removal appeared to be resolved.

Q. But you didn't respond to Signal, did you?

A. What type of response should I send?

Q. To their claim.

You didn't send a response to Signal of any kind.

A. Well --

MR. BOWLES: Objection.

ZAHN COURT REPORTING
NORFOLK 757.627.6554 RICHMOND 804.788.8899

A. I believe there's an email in the documents where I asked did he -- did he retain Minx, which would indicate to me that I never approved retention of Mr. Minx.

Q. Do you recall sending Mr. Cruikshank an email saying, "Ken, please assign the debris portion of this claim for review by Donato, Minx, Brown?

A. To my memory, I don't remember. Maybe that's why I asked him in the second email did they do that.

Q. Isn't it also true you were telling -- you were advising Cruikshank that you were contemplating assigning Cozen, which is the Cozen O'Connor law firm, to review the entire file?

A. No.

Q. You never said that.

A. Never said that.

MR. NICOLETTI: Let me have this marked as 236.

(Email dated October 22, 2009 from Whittington to Cruikshank was marked Deposition Exhibit Number 236.)

BY MR. NICOLETTI:

Q. Can you read -- is that an email from you to Mr. Cruikshank?

A. Yes.

Q. And dated October 22nd, 2009?

A. Yes.

Q. Can you read it into the record, please?

A. "Ken, please assign the debris portion of this claim for review by Donato, Minx, Brown. We are contemplating assigning Cozen the entire file after review per Donato."

Q. Does that refresh your recollection that you were the one who instructed Mr. Cruikshank to retain Donato, Minx & Brown?

A. I think your question was concerning Cozen.

Q. No.

A. Assigning Cozen.

Q. No.

My first question was does that refresh your recollection that it was you and not Ace/Westchester that directed Mr. Cruikshank to retain Donato, Minx & Brown?

A. I believe this email is a response to Ace/Westchester and/or Mr. Cruikshank asking if they should assign it to them -- to him.

I did not make the choice of Mr. Minx. I've never heard the name of the firm before.

Q. I'm not saying you made the choice for the Donato Minx firm. But you're the one who's directing Mr. Cruikshank to assign the claim to them.

A. Correct.

Q. Okay.

A. Per this email, that's what it's stated.

But I believe your questions were did I choose Donato Minx.

Q. I think we're playing semantics here.

A. I think we are, too, to your benefit.

Q. When you said, "We are contemplating assigning Cozen," who is the "we" you referred to?

A. Max Specialty.

Q. Okay. Just want to make sure it's not Ace.

It's not Ace. It's just Max contemplating assigning this claim to Cozen; is that correct?

A. Yes.

Q. Did you ever retain Cozen?

A. No. My information is Ace/Westchester did.

Q. Now, isn't it true as of November 2nd, 2009, you already knew Ace was paying its $10 million?

A. No.

Q. Isn't it also true that as of November 2nd, 2009, you were telling the Donato Minx firm to report to you as if you were the primary insurer on this matter?

A. I remember doing that, but the date I'm not sure.

Q. I'll help you with the date.

A. I knew you would.

MR. NICOLETTI: Let's have this marked as Whittington Exhibit 237. It Bates production control numbers MSI 000472 through 000475.

(Email Chain dated November 2, 2009 from Whittington to Minx was marked Deposition Exhibit Number 237.)

BY MR. NICOLETTI:

Q. Mr. Whittington, is that your email to bminx dated November 2nd, 2009?

A. Yes.

Q. Does that refresh your recollection -- please read the paragraph to yourself -- actually, no, read it into the record.

A. Which paragraph?

Q. The whole email.

A. From: Cody Whittington.
Sent: Monday November 2, 2009, 11:19 a.m.
To: Bminx@donatominxbrown.com.
CC: Ken.Cruikshank@yorkisg.com.
Subject: RE AFDB-5 drydock (Signal).

"Good morning, we have never spoken on this file and I wished to introduce myself. Please note we are not Max Re. It does make a difference. In that the debris coverage may fall to us for settlement, please

keep us informed of developments as primary insurer on this matter. Please let me know if there is anything we can help you with."

Q. Does that refresh your recollection that as of November 2nd, 2009, you knew that Ace/Westchester was going to pay its $10 million under the primary property program?

A. The information I had was from Ken Cruikshank's report (indicating). I had no definite information that Ace/Westchester was going to make the payment.

Q. Well, if you had no information that Ace/Westchester was going to make that payment, why are you telling Donato, quote, Please keep us informed of developments as primary insurer on this matter?

A. Expecting that Ace/Westchester would pay inevitably, that statement is correct.

Q. So as of November 2nd, 2009, you knew that Ace/Westchester was definitely going to pay the 10 million. You just didn't know when, isn't that correct?

A. After speaking to representative of Ace/Westchester concerning the coverage questions and review of Cruikshank's reports, it appeared that's what they were heading to.

MR. NICOLETTI: I have no further questions.

MR. BOWLES: Ten-minute break, and I'll have a few questions.

MR. NICOLETTI: If you have a few questions, go to it. It's already 9:30.

MR. BOWLES: I know. This has taken a long time. I need ten minutes.

(A recess was taken from 9:26 a.m. until 9:37 a.m.)

EXAMINATION

BY MR. BOWLES:

Q. Okay. Mr. Whittington, coming back to your testimony earlier this morning, you said you first became employed by Max Specialty in 1998.

Is that a correct statement, sir?

A. No. It's 2008. I've worked for a company that's only in business for about four, five years.

Q. Now, we've had a lot of discussion about information here.

Have I reported to you and to Steve regarding a large number of reports in Signal's files from the Heger Drydock Company?

A. Yes.

Q. Have I reported to you on its warnings to

Signal not to use the drydock without extensive repairs?

A. Yes.

Q. Have I reported to you on Heger Drydock recommendations regarding pontoon replacement if they didn't do extensive repairs?

A. Yes.

Q. Have I reported to you on the need for pumping of tanks of the pontoons of the drydock when oil rigs were on board that sometimes required pumping every hour?

A. Yes.

MR. BLAND: Object to the form. It's leading.

BY MR. BOWLES:

Q. Did I report to you and Steve Boesen that Signal admitted that it never made any of the repairs recommended by Heger?

MR. GUY: Object to the form.

THE DEPONENT: Yes.

BY MR. BOWLES:

Q. Have I reported to you on the repairs recommended by the Deloitte -- Dufour Laskay firm?

A. Yes.

Q. And have I reported to you that Signal never made any of those repairs either?

A. Yes.

MR. GUY: Object to the form.

MR. BLAND: Leading.

MR. GUY: And also misstates the facts.

MR. NICOLETTI: Mr. Bowles, I deem this entire line of questioning to be a waiver of the attorney-client privilege. I hereby demand production of all your written reports to Signal on this case -- to Max Specialty on this case.

MR. BLAND: I absolutely join in that.

MR. BOWLES: Objection. We'll take that under advisement, but I don't think that's going to be done.

MR. NICOLETTI: Whether it's done by you voluntarily or not, only the District Court will tell us whether you've waived all your privileges.

MR. BLAND: Keep asking those questions, please.

MR. NICOLETTI: You've now been duly warned.

BY MR. BOWLES:

Q. You've been shown a number of reports by the Dufour company, CBIZ, Mr. Cuevas, the Heller company and someone retained by Mr. Cesare, Mr. Falzarano, I believe.

Do you know if Signal provided to them all of the information it had from the Heger company regarding