# EXHIBIT 5

1

```
 1            UNITED STATES DISTRICT COURT

 2           SOUTHERN DISTRICT OF NEW YORK

 3

 4    * * * * * * * * * * * * * * * *

 5
      FIREMAN'S FUND INSURANCE COMPANY,
 6    ONE BEACON INSURANCE COMPANY,
      NATIONAL LIABILITY AND FIRE
 7    INSURANCE COMPANY and QBE MARINE
      & ENERGY SYNDICATE 1036,
 8
           Plaintiffs,
 9                                    10-cv-01653 (LAK)
      vs.
10
      GREAT AMERICAN INSURANCE COMPANY
11    OF NEW YORK, MAX SPECIALTY
      INSURANCE COMPANY and SIGNAL
12    INTERNATIONAL, LLC,

13         Defendants.

14    * * * * * * * * * * * * * * * *

15

16

17

18

19    Deposition of JOYCE JOHNSON, taken in the law

20    offices of Johnstone, Adams, Bailey, Gordon &

21    Harris, LLC, One St. Louis Centre, Suite 4000,

22    Mobile, Alabama, on April 18, 2011, commencing

23    at approximately 10:00 a.m.
```

```
1                    A P P E A R A N C E S

2


3      For FIREMAN'S FUND INSURANCE COMPANY:
            NICOLETTI, HORNIG & SWEENEY
4           Attorneys at Law
            Wall Street Plaza
5           88 Pine Street, 7th Floor
            New York, New York 10005-1801
6           (212) 220-3830
            BY: JOHN A.V. NICOLETTI, ESQUIRE
7                      and
               ROBERT A. NOVAK, ESQUIRE
8


9


10     For GREAT AMERICAN INSURANCE COMPANY OF NEW YORK:
            MATTIONI, LTD.
11          Attorneys at Law
            399 Market Street, Suite 200
12          Philadelphia, Pennsylvania 19106-2138
            (215) 629-1600
13          BY: GEORGE R. ZACHARKOW, ESQUIRE

14


15
       For MAX SPECIALTY INSURANCE COMPANY:
16          NOURSE & BOWLES, LLP
            Attorneys at Law
17          One Exchange Plaza
            55 Broadway, 30th Floor
18          New York, New York 10006-3030
            (212) 952-6200
19          BY: LAWRENCE J. BOWLES, ESQUIRE

20

21

22

23
```

```
 1    APPEARANCES (Continued)

 2

 3         For SIGNAL INTERNATIONAL, LLC:
                LeBLANC BLAND, PLLC
 4              Attorneys at Law
                909 Poydras Street, Suite 1860
 5              New Orleans, Louisiana  70112
                (504) 528-3088
 6              BY: MATTHEW C. GUY, ESQUIRE
                          and
 7                  JAMES D. PRESCOTT, III, ESQUIRE

 8

 9         For WILLIS of ALABAMA and JOYCE JOHNSON:
                BRADLEY, ARANT, BOULT, CUMMINGS, LLP
10              Attorneys at Law
                One Federal Place
11              1819 Fifth Avenue North
                Birmingham, Alabama  35203-2104
12              (205) 521-8000
                BY: RUSHA C. SMITH, ESQUIRE
13

14

15         Court Reporter:
                DEBRA AMOS ISBELL, CCR,RDR,CRR - ACCR #21
16              ISBELL & ASSOCIATES, LLC

17

18

19

20

21

22

23
```

4

```
1                    I N D E X

2          Witness
            JOYCE JOHNSON
3

4   EXAMINATION

5   MR. BOWLES - page 12

6   MR. ZACHARKOW - page 141

7   MR. NICOLETTI - page 172

8   MR. GUY - page 247

9   MR. BOWLES - page 301

10  MR. ZACHARKOW - page 311

11  MR. GUY - page 315

12

13

14  EXHIBITS

15  EXHIBIT 81 - page 19
         Brokerage Services Proposal for Signal
16       International, LLC, 1/30/05-1/30/06 -
         Willis 07459-07505
17
    EXHIBIT 82 - page 42
18       Friede Goldman Halter, Inc., Vessel Schedule as
         of 10/1/02 - Willis 06831
19
    EXHIBIT 83 - page 46
20       Signal International, LLC, Statement of Values,
         1/30/03 - Willis 06509
21
    EXHIBIT 84 - page 48
22       Emails between Joyce Johnson and Alistair Barnes,
         11/12&13/03 - Willis 19173-19174
23
```

INDEX OF EXHIBITS (Continued)

EXHIBIT 85 - page 54
     Fax cover sheets with attached Appraisal of
     Floating Dry Dock No.1 by Heger Dry Dock, Inc. -
     Willis 21638-21653

EXHIBIT 86 - page 58
     Email to Mike Johnson at Trident from Vernon
     Ewing, 1/6/05, and response to Vernon Ewing from
     Richard Flanagan, 1/7/05 - FF 00834

EXHIBIT 87 - page 65
     Emails between Vernon Ewing and Richard Flanagan,
     1/7/05, and email to Mike Johnson from Vernon
     Ewing, 1/6/05 - Willis 20879-20880

EXHIBIT 88 - page 67
     Email to Vernon Ewing from Mike Johnson, 1/7/05
     - Willis 20860

EXHIBIT 89 - page 68
     Emails between Vernon Ewing and Signal, 1/10/06
     - Willis 20189-20190

EXHIBIT 90 - page 69
     Emails between Vernon Ewing and Mike Johnson,
     1/7&10/05 - Willis 20854

EXHIBIT 91 - page 70
     Emails between Vernon Ewing and Mike Johnson,
     1/10&11/05 - Willis 20843

EXHIBIT 92 - page 71
     Email to Lisa Spears from Vernon Ewing, 1/10/05
     - Willis 20310

EXHIBIT 93 - page 73
     Email to Mike Johnson from Vernon Ewing, 1/13/05,
     with attachments regarding work performed on the
     drydock - FF 00802-00833

EXHIBIT 94 - page 77
     Signal International, LLC, Statement of Values as
     of 01/18/2005 - Willis 15569-15571

```
1   INDEX OF EXHIBITS (Continued)

2   EXHIBIT 95 - page 80
         Email to Vernon Ewing from Lisa Spears, 1/10/06
3        - Signal(NY) 010458

4   EXHIBIT 96 - page 82
         Email to Tom Cesare from Joyce Johnson, 9/6/06,
5        with attached Statement of Values as of 8/29/06 -
         Willis 10672-10675
6
    EXHIBIT 97 - page 85
7        Handwritten note to Signal from Vernon Ewing,
         1/29/07 - Willis 21843
8
    EXHIBIT 98 - page 89
9        Report from Sufour, Laskay & Strouse, 10/19/07 -
         Willis 012050-01221
10
    EXHIBIT 99 - page 91
11       Email to Vernon Ewing from Patsy Schroth, 12/19/07
         - Willis 23280
12
    EXHIBIT 100 - page 99
13       Inspection Report, Drill Rig Floating Dry Dock
         Pontoons, by Heger Dry Dock, Inc., 6/28/07
14
    EXHIBIT 101 - page 102
15       Compilation of documents, including emails,
         Westchester primary quote, Heller Property Risk
16       Assessment Report, Property Insurance Submission,
         1/30/09-1/30/10 - TripM 0082-191, 0056-0081
17
    EXHIBIT 102 - page 117
18       Emails between Terry Balla and Robert Heger,
         7/16/07
19
    Exhibit 103 - page 126
20       Westchester policy - Willis 00722-00800

21  Exhibit 104 - page 129
         Max Specialty policy - Willis 00696-00721
22
    Exhibit 105 - page 132
23       Fireman's Fund policy - Willis 03105-03182
```

```
 1   INDEX OF EXHIBITS (Continued)

 2   Exhibit 106 - page 140
          Fireman's Fund Marine Excess Liability
 3        (Bumbershoot) Declarations

 4   Exhibit 107 - page 158
          Brokerage Services Final Proposal for Signal
 5        International, 1/30/08-1/30/09
          - Willis 21333-21373
 6
     Exhibit 108 - page 160
 7        Hull and MGL Insurance Submission, 1/30/09-1/30/10
          - Willis 21539-21556
 8
     Exhibit 109 - page 161
 9        Vessel Pollution Insurance Submission,
          1/30/09-1/30/10 - Willis 21558-21566
10
     Exhibit 110 - page 161
11        Bumbershoot Liabilities Insurance Submission,
          1/30/09-1/30/10 - Willis 21568-21580
12
     Exhibit 111 - page 161
13        Email to Signal from Joyce Johnson, 1/28/05,
          with attached Brokerage Services Proposal,
14        1/30/05-1/30/06 - Willis 15556-15562

15   Exhibit 112 - page 165
          Signal International, LLC, Important Notices and
16        Consent to Compensation and Order to Bind, 1/26/06
          - Willis 21934-21935
17
     Exhibit 113 - page 166
18        Signal International, LLC, Important Notices,
          Consent to Compensation and Order to Bind, 1/29/07
19        - Willis 23217-23219

20   Exhibit 114 - page 167
          Email to Signal from Joyce Johnson, 1/30/07
21        - Willis 21842

22

23
```

```
 1   INDEX OF EXHIBITS (Continued)

 2   Exhibit 115 - page 168
          Signal International, LLC, Premium Summary and
 3        Payment Plan, Important Notices, Consent to
          Compensation and Order to Bind, 1/28/08
 4        - Willis 23037-23040

 5   Exhibit 116 - page 212
          Email to Alistair Barnes from Joyce Johnson,
 6        1/26/05 - Willis 15779-15780

 7   Exhibit 117 - page 218
          Final Brokerage Services Proposal, 1/30/04-1/30/05
 8        - Willis 16157-16196

 9   Exhibit 118 - page 222
          Final Brokerage Services Proposal, 1/30/06-1/30/07
10        - Willis 08469-08682

11   Exhibit 119 - page 224
          Final Brokerage Services Proposal, 1/30/07-1/30/08
12        - Willis 08959-09029

13   Exhibit 120 - page 228
          Emails between AmWINS and Max Specialty,
14        7/15&17/09, with attached Change Endorsement
          - TripM 0003-0004
15
     Exhibit 121 - page 238
16        Brokerage Services Proposal, 1/30/08-1/30/09
          - Willis 09133-09186
17
     Exhibit 122 - page 252
18        Email to Lisa Spears from Vernon Ewing, 1/23/07
          - Signal(NY) 011020
19
     Exhibit 123 - page 252
20        Email to Lisa Spears from Sallie Merchant, 4/5/07
          - Signal(NY) 011306
21

22

23
```

```
1   INDEX OF EXHIBITS (Continued)

2   Exhibit 124 - page 279
        A Summary Appraisal of Tangible Property Assets
3       for Signal International, LLC, Pascagoula, MS,
        11/14/08, by CBIZ Valuation Group, LLC
4       - Signal(NY) 014963-015097

5   Exhibit 125 - page 285
        Signal International Equipment by Dufour, Laskay &
6       Strouse, 12/14/07 - Willis 00113-00129

7

8                      EXHIBITS BOUND SEPARATELY

9

10

11  REQUEST FOR DOCUMENTS:

12  Page 273, line 12 - Request to Mr. Bowles from Mr. Guy

13

14

15

16

17

18

19

20

21

22

23
```

S T I P U L A T I O N

It is stipulated and agreed by and between
the parties hereto, through their respective counsel,
that the deposition of JOYCE JOHNSON may be taken
before Debra Amos Isbell, Notary Public for the State
at Large, at the law offices of Johnstone, Adams,
Bailey, Gordon & Harris, LLC, One St. Louis Centre,
Suite 4000, Mobile, Alabama, on April 18, 2011.

It is further stipulated and agreed that this
deposition is taken pursuant to the Federal Rules of
Civil Procedure.  The provisions of Rule 32(d)(3)
dealing with waiver of errors and irregularities as to
the taking of the deposition apply fully to this
deposition.

Notice of the deposition and any errors or
irregularities therein [Rule 32(d)(1)] and any
objections to the qualifications of the officer before
whom this deposition is taken [Rule 32(d)(2)] are
waived.

The submission of the deposition to the
witness for reading to or by her and the signing of
the deposition by her [Rule 30(e)] is not waived.

1     Filing of the original of the transcript of

2   this deposition [Rule 30(f)(1)] is waived.

3     Any other technicality or defect in the

4   taking of this deposition not otherwise covered by the

5   terms of this stipulation is waived.

6

7                     * * * * * * * *

8

9

10

11

12

13

14     I, Debra Amos Isbell, Commissioner and Court

15   Reporter, certify that on this date, as provided by

16   the Federal Rules of Civil Procedure and the foregoing

17   stipulation of counsel, there came before me at the

18   law offices of Johnstone, Adams, Bailey, Gordon &

19   Harris, LLC, One St. Louis Centre, Suite 4000, Mobile,

20   Alabama, on April 18, 2011, commencing at 10:00 a.m.,

21   JOYCE JOHNSON, witness in the above cause, for oral

22   examination, whereupon the following proceedings were

23   had:

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1                          JOYCE JOHNSON

2              was sworn and testified as follows:

3              THE WITNESS:  I do.

4                          EXAMINATION

5    BY MR. BOWLES:

6         Q.    By whom are you employed?

7         A.    Willis of Alabama.

8         Q.    And how long have you had that employment?

9         A.    Approximately 22 years.

10        Q.    And what education do you have?

11        A.    High school graduate as well as several

12   designations from insurance courses.

13        Q.    Prior to Willis did you have any employment

14   in the insurance field?

15        A.    No.

16        Q.    Was that your first job out of school?

17        A.    Yes, sir.

18        Q.    What are your duties for Willis?

19        A.    I am an account executive and sometimes act

20   as client manager on routine accounts.

21        Q.    And what does account executive mean?

22        A.    Account executive basically oversees the

23   day-to-day functions that the client manager handles.

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1       Q.    And what does the client manager do?

2       A.    The client manager handles the day-to-day

3    functions of the account.

4       Q.    And when you say clients, you're talking

5    about the insureds?

6       A.    The insureds.

7       Q.    Such as Signal?

8       A.    Yes.

9       Q.    And those are your clients or your company's

10   clients?

11      A.    Yes.

12      Q.    Do you consider yourself a broker?

13      A.    Yes.

14      Q.    And you work with a team of brokers?

15      A.    Yes.

16      Q.    Who is that?  Who is on the team?

17      A.    John Bullock, Vernon Ewing, Claire Parnell,

18   Linda Bell and Will Moorer.

19            MR. NICOLETTI:  I'm sorry.  Who was the last

20   one?

21            THE WITNESS:  Will Moorer.

22   MR. BOWLES:

23      Q.    Would it be fair to say that as client

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1          MR. GUY:  Object.

2          MS. SMITH:  Object to the form.

3          MR. NICOLETTI:  Same objection.

4   A.   I don't know enough about the two to

5   determine which one is correct.  So I can't say what

6   Signal should have done in that case.

7          MR. BOWLES:  Why don't we take a break then

8   now for lunch.

9          (JOHNSON EXHIBIT 100 WAS MARKED

10           FOR IDENTIFICATION.)

11         MS. SMITH:  1:30?

12         MR. BOWLES:  Sure.

13         (LUNCH RECESS FROM 12:27 P.M.

14          TO 1:33 P.M.)

15  MR. BOWLES:

16   Q.   Are you familiar with what Max Specialty was

17   told, what it was given by the brokers, any brokers

18   before they agreed to insure Signal for this year?

19         MS. SMITH:  Object to the form.

20   A.   No.  We submit to AmWINS who submits it to

21   Max.

22  MR. BOWLES:

23   Q.   Are you familiar with what AmWINS submitted

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1   to Max?

2        A.    Not directly.

3        Q.    Well, indirectly or however, what normally

4   would be provided to an insurer?

5        A.    I would assume --

6             MS. SMITH:  Wait.  Let him ask the question.

7             (REQUESTED PORTION OF RECORD READ.)

8             MR. NICOLETTI:  Objection as to form.

9             MR. GUY:  Same objection.

10       A.    I would assume that AmWINS would send the

11  same information that we sent to AmWINS to their

12  carriers.

13       Q.    And what did you send to AmWINS?

14            MR. NICOLETTI:  Objection as to form.

15            MS. SMITH:  I'm not certain what time frame

16  we're talking about either.  Ever?

17  MR. BOWLES:

18       Q.    Well, let's focus on the 2009/10 year --

19            MR. GUY:  I make an objection.

20  MR. BOWLES:

21       Q.    -- where Max is being asked whether they

22  would accept the risk, property risks.

23       A.    Okay.  I'd need to look at emails to know

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1    exactly.  But it would probably be the submission,

2    which is our submission document.

3        Q.   What is that?

4        A.   Which looks similar to the proposal.  It

5    lists the limits and coverages desired, Statement of

6    Values, and there was a recent Loss Prevention Report,

7    and I believe that was sent.

8        Q.   Who prepared the Loss Prevention Report?

9        A.   It was a third party.  I believe it's Heller

10   & Associates.

11       Q.   Stephen Heller & Associates?

12       A.   Yes.

13       Q.   S-H-A-I?  Their initials.

14       A.   I don't know if that's their initials.

15            MR. BOWLES:  In the interest of moving this

16   along, I'd like to try this, which is a group of

17   documents which I've been produced from the files of

18   Trip Morano who was the person at Max making the

19   decision on the insurance.  I've put together a number

20   of documents.  They're not in consecutive order but I

21   thought a reasonable order.  They're all Bates stamped

22   TripM various numbers.  Again, they're not in

23   consecutive order but in a form order.  I can break it

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1   down and do ten different documents or one big

2   document.  Does anyone have any objection?

3            MR. NICOLETTI:  You can do it as one

4   document.  Just identify the groups that make it up by

5   Bates number.

6            MR. BOWLES:  All right.  Anyone object to

7   that?

8            (NO RESPONSE.)

9            MR. BOWLES:  Mark this as the next exhibit

10  then.

11           THE REPORTER:  101.

12           MR. BOWLES:  101.

13           (JOHNSON EXHIBIT 101 WAS MARKED

14            FOR IDENTIFICATION.)

15  MR. BOWLES:

16      Q.   If I could just --

17           MS. SMITH:  Are you going to ask her

18  specific questions?

19  MR. BOWLES:

20      Q.   Well, why don't we first do what

21  Mr. Nicoletti suggested, try to identify the documents

22  included within this long document.  And if we start

23  from the beginning, there's an email dated January 28,

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

```
1    2009 --
2              MR. NICOLETTI:  Why don't we just do it by
3    Bates number.
4              MR. BOWLES:  Okay.
5              MR. NICOLETTI:  That's the easiest way to do
6    it.
7              MR. BOWLES:  Okay.
8              MR. NICOLETTI:  And I think the first group
9    is TripM 82 through 191?
10             MR. BOWLES:  No.
11             MR. NICOLETTI:  There are gaps?
12             MR. BOWLES:  There are gaps, yes.  That's
13   what I was trying to make clear before.
14             MR. NICOLETTI:  I looked through it
15   quickly.  I didn't see any gaps.
16             MR. BOWLES:  Okay.  So it's 82 -- let me
17   just go through it to make sure.
18             What did you say, John, the first group is
19   in consecutive order, 82 through --
20             MR. NICOLETTI:  191.
21             MR. BOWLES:  -- 191.
22             MR. NICOLETTI:  And the second group appears
23   to be 56 through 81.
```

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1      MS. SMITH:  So 56 through 191 total?

2      MR. BOWLES:  That's the first part.

3      MR. NICOLETTI:  It looks like it, but

4  there's two separate sections.

5      MR. BOWLES:  John, you had 56 through 81?

6      MR. NICOLETTI:  That's correct.

7      MR. BOWLES:  Okay.  I was going to do it a

8  little bit differently by type of document, but at

9  least we've got the Bates stamps.

10      MR. NICOLETTI:  Unless you want to ask her

11  on every document.

12      MR. BOWLES:  I'm going to ask her a couple

13  of questions on the various documents as we go

14  through.

15      MR. NICOLETTI:  That's fine.  Just identify

16  it by the Bates number as we go through it.  But the

17  composite is Exhibit 101.

18      MR. BOWLES:  Correct.

19  Q.   Are you familiar with the data in the email,

20  the discussion of the short fuse in ranging insurance,

21  excess insurance?

22      MS. SMITH:  Object to the form.

23      MR. NICOLETTI:  Same objection.

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1    to insurers that they're dealing with?

2              MR. NICOLETTI:  Object.

3              MS. SMITH:  Object to the form.

4         A.   I would expect that they would.

5              MS. SMITH:  Are we done with that exhibit?

6              MR. BOWLES:  Yeah.  Can you put that back

7    together?

8         Q.   Do you know if Ace Westchester received a

9    similar presentation as Max Specialty did?

10        A.   I don't know.

11        Q.   Well, would you expect that they did was my

12   question.

13             MS. SMITH:  Object to the form.

14        A.   I would expect that they did.

15   MR. BOWLES:

16        Q.   Did Westchester sign on for a 10 million

17   dollar primary property policy?

18        A.   Yes, they quoted 10 million primary.

19        Q.   Is this a copy of the policy?  Let's mark it

20   as the next exhibit.

21             THE REPORTER:  103.

22             (JOHNSON EXHIBIT 103 WAS MARKED

23              FOR IDENTIFICATION.)

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1    MR. NICOLETTI:  Any Bates numbers on it?

2    MR. BOWLES:  Willis 722 through 800.

3    MR. NICOLETTI:  It looks like more than

4  that.  Maybe it is only 80.  Can we take a look at it?

5    MR. BOWLES:  Yeah.  Here's a copy.  I was

6  just trying to count quickly.

7    THE WITNESS:  Could you repeat the question,

8  please?

9    (REQUESTED PORTION OF RECORD.)

10    A.    It appears to be a copy of the policy.

11    MS. SMITH:  I will note there are a couple

12  of handwritten pages that are perhaps tabs in the

13  document.  They do have a Willis Bates number.  But I

14  don't know if those were actually part of the policy.

15  But I just point that out for clarification purposes.

16    MR. BOWLES:  Do you want to show me which

17  pages?

18    MS. SMITH:  There were a couple.  An example

19  is 745.

20  MR. BOWLES:

21    Q.    That has a handwritten note "property

22  insured"?

23    A.    Right.

*JOYCE JOHNSON - EXAMINATION BY MR. BOWLES*

1    foundation.

2         A.    It would have come through AmWINS.  I don't

3    know what AmWINS sent to them.

4    MR. BOWLES:

5         Q.    But the general procedure was for Signal to

6    provide data values and so on to Willis, Willis would

7    provide it to intermediaries such as AmWINS, who would

8    pass it on to the property insureds; correct?

9              MR. NICOLETTI:  Object to the form.

10             MS. SMITH:  Object to the form.

11        A.    Correct.

12   MR. BOWLES:

13        Q.    Do you know of any investigation made by

14   Westchester of Signal's presentations?

15        A.    No, I do not.

16        Q.    And data?

17        A.    No.

18             MR. BOWLES:  Mark this as the next exhibit.

19             THE REPORTER:  104.

20             (JOHNSON EXHIBIT 104 WAS MARKED

21              FOR IDENTIFICATION.)

22             THE WITNESS:  I'm sorry.  What's the

23   question?

JOYCE JOHNSON - EXAMINATION BY MR. BOWLES

1  MR. BOWLES:

2      Q.     There is no question yet.  I just marked the

3  exhibit.  Is this a copy of the policy issued by Max

4  Specialty Insurance Company?

5      A.     Yes, it appears to be.

6      Q.     For the period January 30, 2009, to January

7  30, 2010?

8      A.     Yes; correct.

9      Q.     And the participation layer is 15 million

10  dollars per occurrence, excess of 10 million dollars

11  per occurrence?

12      A.     Correct.

13      Q.     And this policy was issued based on the

14  information provided by AmWINS to Max Specialty?

15          MR. NICOLETTI:  Object to the form.

16          MS. SMITH:  Object to the form.

17      A.     Whatever Max Specialty's underwriting review

18  consists of.  I assume that's what they based their

19  quote on.

20  MR. BOWLES:

21      Q.     And that includes the information provided

22  by Westchester -- I mean by AmWINS?

23          MS. SMITH:  Object to the form.

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1          A.    CPIW is Certified Professional Insurance

2    Woman.  That was a test I took as a member of

3    Insurance Women, which is an organization; I got that

4    designation.

5          Q.    That's an industry group; is that correct?

6          A.    Correct.

7          Q.    Are you licensed by any authorities, state

8    authorities for what you do?

9          A.    I'm licensed in Alabama.

10         Q.    And your license is for what?

11         A.    P&C.

12         Q.    Property and casualty?

13         A.    Yes.

14         Q.    Could you explain a little bit more in the

15   time frame of 2003 to 2009 with regard to the Signal

16   account how that account was handled amongst the

17   individuals at Willis who you spoke of:  you,

18   Mr. Ewing, Mr. Baker, Mr. Bullock?

19              MS. SMITH:  You mean just sort of the

20   dynamics of who did what?

21              MR. ZACHARKOW:  Right.

22         A.    I was the client manager on the account.

23         Q.    And I'll break you off.  What does that mean

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1   that you do on a regular basis?

2       A.   The client manager handles the day-to-day

3   requests, if they need a certificate, add an auto, add

4   or delete a property, whatever the client needs,

5   prepare the submission to give to the marketer who

6   will send to marketing.  And then when the policies

7   come in, the client manager checks the policies and

8   transmits them to the client.

9       Q.   Were you in that position as to Signal for

10  that entire time frame that I referenced, 2003 through

11  2009?

12      A.   Until Claire joined us, which I believe was

13  2008.  So in 2008 I believe she joined us, and the

14  account was assigned to her.

15      Q.   Now, you referenced earlier Claire Parnell.

16  Did her name -- did it used to be Spearman?

17      A.   It did.  She got married recently.

18      Q.   What about with regard to Mr. Ewing?  What

19  did he do in this time frame 2003 to 2009?

20      A.   He handles the marine marketing, marine

21  placement.  He would also review contracts that would

22  come in.  That's a big part of what he does.  Signal

23  would send him a contract to review to see if the

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1    insurance was in line with the contract, and he would

2    comment on it.

3        Q.    In other words, if they were going to be

4    repairing a rig, you mean, something like that, and

5    there was a contract?

6        A.    Right.

7        Q.    What about Mr. Bullock?

8        A.    He's the client advocate, sometimes called

9    the producer, the person who owns the account.  It's

10   his account.  So he works with the client manager and

11   the marketer and would generally present the proposal

12   to the client, get renewal instructions, meet with

13   them if they want to market, not market it that year.

14   So he's generally the top layer.

15       Q.    And when you say market or not market, are

16   you referring to whether to go out and try to look for

17   other underwriters for a given year?

18       A.    Correct.

19       Q.    As opposed to just really renewing as

20   expiring with the existing?

21       A.    Strategy, yes.

22       Q.    What about Mr. Baker?  What does he do?

23       A.    He is a claims advocate.  He would get

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1    involved if a claim --

2        Q.    Did I ask you that already?

3        A.    No.  He doesn't really report claims.  We

4    have a claim center that does that.  So if a claim

5    escalates where it needs assistance, he assists on

6    claims.

7        Q.    Was Willis the designated broker for Signal

8    in this time frame from 2003 to 2009 or was it a

9    competitive situation with other brokers?

10            MS. SMITH:  Object to the form.

11   MR. ZACHARKOW:

12       Q.    Do you understand the question?

13       A.    For the lines we write?

14       Q.    Yes, ma'am.

15       A.    I don't recall having direct competition.

16   There may have been one time when we did that.  I just

17   don't recall.

18       Q.    So basically Willis has been the broker for

19   Signal since 2003 to present, right, for those

20   particular lines; right?

21       A.    For those lines, yes.

22       Q.    When did Willis start as a broker for Friede

23   Goldman?

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1   MR. ZACHARKOW:

2        Q.   Within Willis, how does your team with

3   regard to Signal operate?  Do you have meetings?   How

4   do you go about doing the job that you have to do for

5   Signal?

6             MS. SMITH:  Object to the form.

7        A.   Could you repeat it for me?

8   MR. ZACHARKOW:

9        Q.   Sure.  How do you and Mr. Ewing and

10  Mr. Baker and Mr. Bullock operate within Willis in

11  terms of handling the account?

12            MS. SMITH:  Same objection.

13  MR. ZACHARKOW:

14       Q.   The Signal account?

15       A.   Are you referring to the renewal process?

16  Because we work on it all year long different things.

17       Q.   Sure.  Let's start -- this coverage ran

18  right from -- the coverage period was January 30 of

19  the given year through the following year; correct?

20       A.   Correct.

21       Q.   What would you do with regard to the

22  Signal --

23            MS. SMITH:  For the policies we're talking

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1   about at issue?

2           MR. ZACHARKOW:   Correct, yes.  Going

3   forward, I'm not talking about any other policies that

4   Willis was not involved with brokering.

5       A.   I'm going to say in general because I don't

6   know the specific dates that we did certain things.

7   But in general, around 120 days out, sometimes 90 days

8   out, we would send the current information to the

9   client and ask them to update the information.

10      Q.   When you say out, do you mean before the

11  policy period starts when you're getting ready to

12  renew?

13      A.   Yes.  120 days before the renewal we ask the

14  client to provide updated exposure information.

15  Within that time the client advocate will get with the

16  insured to see if they would like alternative quotes

17  or if they just want us to work with the incumbent

18  markets.  It kind of gives them an idea of our

19  recommendation versus what we think, and they decide

20  what we're going to do.  When the insured gives the

21  information back to us, we put a submission together,

22  send it to the markets, get the quotes together,

23  present the proposal, get the coverage bound up, then

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1   the policies would come in, they'd be checked in and

2   sent to the client.  That's the general flow of it.

3        Q.    While we were off the record I referenced

4   documents that I had copied from the production that

5   Signal -- excuse me -- that Willis made.  And the

6   cover page of the document that I copied is in

7   handwriting Signal International 2009-2010 marketing

8   file.  It's Bates stamped Willis 21239.  It's just

9   clipped together because it's large here.  And the end

10  page that we have is Willis 21580.  I believe this is

11  what was produced as the file for the 2009-10

12  renewal.  If you could just look at that for me,

13  Ms. Johnson, and tell me if it appears that that's the

14  case.  And for the record, I've put stickies on

15  certain pages that I wanted to ask you about which

16  seem to be breakouts within that file.

17            MS. SMITH:  You mean just for marketing?  Or

18  you're asking if it's everything related to the

19  '09-'10 submission?

20            MR. ZACHARKOW:  If there's some other page

21  somewhere, I'm not holding her to that.  I'm just

22  trying to get an idea how it was produced.

23            MS. SMITH:  Sure.

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1      A.    From a brief review of this, this appears to

2  be Vernon's marketing file, which would be marine

3  related.

4  MR. ZACHARKOW:

5      Q.    And then there would be another file that

6  would exist or other files that would exist?

7      A.    Yeah.   The client manager would normally

8  keep a file of what they do.   There are steps where

9  they ask the client for the information where it came

10  back.   And then the nonmarine marketer would have had

11  a file.   Or sometimes the client manager does the

12  marketing, so it depends on the situation.

13      Q.    Does the client manager go across all lines

14  that Willis is involved with?

15          MS. SMITH:   Object to the form.

16      A.    Yes.

17  MR. ZACHARKOW:

18      Q.    I'm talking within the context of Signal.

19  In other words, not just marine; it would be involved

20  with other lines as well?

21      A.    Correct.

22      Q.    As I said earlier, on the coverage page that

23  I have here, it references marketing file.   And you

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1   involved.

2        Q.   With Signal you mean; right?

3        A.   Yes, with Signal.  So I'd be a little less

4   involved, more as an overviewer helping when they

5   needed help.

6             And I'm sorry, what was your question?  I

7   got off track.

8        Q.   Were there particular lines for Signal that

9   you were involved with handling?

10       A.   I would probably more help on the nonmarine

11  side because Vernon would do the marine piece.  So I

12  would handle more of the nonmarine.  But I would also

13  kind of overview, I guess, when she's putting the

14  proposal together, try to check everything.

15       Q.   You told me this before, and I just didn't

16  -- it didn't register.  When was it that Ms. Spearman

17  came on and you started to take on a different role?

18       A.   I believe it was 2008.

19       Q.   The document that I flagged in this group

20  that we're talking about, Willis 2133, it's titled

21  Brokerage Services Final Proposal for Signal Effective

22  January 30, 2008, to January 30, 2009.  Could you look

23  at that and tell me --

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1          MR. ZACHARKOW:   (Complying.)

2     Q.    Now, continuing to look at the documents

3    within that collective group that we were looking at,

4    could you tell me generally what is in this next group

5    that's clipped together?  And the clipping is just

6    random.  It starts at Willis 21374 and goes through

7    21485.

8          MS. SMITH:  You just want the general idea?

9          MR. ZACHARKOW:  I just want a sense of

10   what's there.

11     A.    This appears to be Vernon's correspondence

12   with underwriters or intermediaries and some loss

13   experience.

14     Q.    Thank you.  And if you'd look at this next

15   group, which is Willis 21486 through Willis 21580.

16   Just generally what's in there?  And then I have some

17   questions.

18          MR. PRESCOTT:  Are you marking that?

19          MR. ZACHARKOW:  No.

20     A.    This appears to be a marine submission, the

21   documents from a marine submission.

22   MR. ZACHARKOW:

23     Q.    And in there the first tab that I put there

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1    is for what submission, Ms. Johnson?

2         A.    This is the hull and MGL insurance

3    submission for January 30th, 2009, through 2010.

4         Q.    And would you pull that out and find the end

5    point, please, and we'll mark that separately.

6         A.    This is the application that would have

7    probably gone with the submission, but this is the

8    word document that was the submission.  Do you want

9    these together?

10        Q.    Yes, please.

11             THE REPORTER:  Exhibit 108.

12             (JOHNSON EXHIBIT 108 WAS MARKED

13              FOR IDENTIFICATION.)

14   MR. ZACHARKOW:

15        Q.    108 is Signal Hull and MGL Insurance

16   Submission Insurance for January 30, 2009 to January

17   30, 2010; correct?

18        A.    Correct.

19        Q.    Starting at Bates stamp 21539 to Bates stamp

20   21556.  Would you look at the next document that I

21   flagged in there and tell me what that group is?

22        A.    That is the vessel pollution for January

23   30th, 2009, to 2010.

*JOYCE JOHNSON - EXAMINATION BY MR. ZACHARKOW*

1          MR. ZACHARKOW:  Could you pull that out and

2    we'll mark that separately, please, Ms. Johnson.

3          (JOHNSON EXHIBIT 109 WAS MARKED

4           FOR IDENTIFICATION.)

5    MR. ZACHARKOW:

6        Q.    For the record, that's the vessel pollution

7    insurance submission for January 30, 2009, to January

8    30, 2010, willis 21558 through willis 21566.  And is

9    there another submission that's within the group?

10   What is that?

11       A.    Bumbershoot liabilities.

12       Q.    Could you look at that and give us what

13   makes up that submission?

14          (JOHNSON EXHIBIT 110 WAS MARKED

15           FOR IDENTIFICATION.)

16          MR. ZACHARKOW:  And again for the record,

17   it's the Bumbershoot Liabilities Insurance Submission

18   for January 30, 2009, to January 30, 2010, willis

19   21568 to willis 21580.

20          Okay.  I'll take whatever is left.

21          (JOHNSON EXHIBIT 111 WAS MARKED

22           FOR IDENTIFICATION.)

23   MR. ZACHARKOW:

*JOYCE JOHNSON - EXAMINATION BY MR. NICOLETTI*

1      A.   Yes.

2      Q.   If you have a question concerning the

3  question itself, it should be directed to me as the

4  questioner.  Do you understand that request?

5      A.   Yes.

6      Q.   I'm going to try to break this up in years

7  because you've had a long history with this account.

8  Did you have involvement with the Signal account for

9  the 2003-2004 policy period?

10     A.   Yes.

11     Q.   What position did you hold at that time?

12     A.   It would have been as client manager.

13     Q.   Between 2003 -- for the 2004-2005 policy

14  period did you have involvement with the Signal

15  account?

16     A.   Yes.

17     Q.   As what?

18     A.   Client manager.

19     Q.   Is the same answer true for the 2005 to 2006

20  period?

21     A.   Yes.

22     Q.   Is it the same answer for the 2006 to 2007

23  period?

*JOYCE JOHNSON - EXAMINATION BY MR. NICOLETTI*

1    A.    Yes.

2    Q.    Is the same answer correct for 2007 to 2008?

3    A.    That's where I'm not sure when Claire

4  started.  Around when she started it was assigned to

5  her, so whatever that date was.

6    Q.    Well, this policy went from January 1, 2007,

7  through January 1, 2008.  I think your prior answer --

8    A.    So yes, I probably would have been client

9  manager at that time.

10    Q.    Now, for the 2008 to 2009 policy, I gather

11  Claire Parnell --

12    A.    Yes.

13    Q.    -- became the client manager.  What position

14  did you hold, if any, with regard to the Signal

15  account?

16    A.    My title is account executive.  And so

17  particularly during the period of time where she was

18  getting acclimated to the account, I would have still

19  been more involved at the beginning when she started

20  and a little bit less each year as she got more

21  familiar with the account.

22    Q.    So for the policy period 2008 to 2009 you

23  still had certain duties and responsibility as the

1    client manager of the account as you trained

2    Ms. Parnell?

3        A.    Yes.

4        Q.    For 2009 to 2010 what position -- what

5    involvement did you have, if any, with the Signal

6    account?

7        A.    As an account executive.

8        Q.    So to be clear on this, when you were the

9    client manager, what were your duties and

10   responsibilities in regard to the placement of the

11   Signal insurance program, as I'll call it?

12       A.    I would request the information from the

13   insured when it's time for the renewal.  I'd collect

14   that data, put it into a submission.  It would then,

15   depending on who marketed it, because it varies

16   sometimes, it would go to a marketer who would market

17   it.  I would get a proposal back and I would review

18   the proposal before it went out and then assist in

19   getting the binders together and then checking in the

20   policies when they came in.

21       Q.    One step at a time.  I think I have an idea

22   of what were your responsibilities.  Who was the

23   marketer?  Was that somebody at Willis of Alabama?

*JOYCE JOHNSON - EXAMINATION BY MR. NICOLETTI*

1      Q.    Let me hand you this and find my own copy.

2    Let me direct your attention to --

3           MR. ZACHARKOW:  What exhibit is this?

4           MR. NICOLETTI:  This is Exhibit 81.

5      Q.    Before I get there, based on everything I've

6    reviewed in this file from 2003 through 2010, the

7    drydocks were always part of the property program for

8    Signal; is that correct?

9           MS. SMITH:  Are you talking about in the

10   Willis documents?

11          MR. NICOLETTI:  Yeah, in the Willis

12   documents.  That's all I have in front of me.

13     A.    Yeah.  I believe they have been part of the

14   property program since we started handling it.

15     Q.    Did it ever come to your attention that

16   around 2005 or 2006 that Willis of Alabama had a

17   concern that they'd have to move the drydocks from the

18   property program to their marine hull program?

19     A.    There were several hurricane-type losses, so

20   this account has had some loss experience from the

21   hurricane side.  And so I know several renewals we

22   would be prepared because we never knew if the

23   property carriers were going to continue to cover the

*JOYCE JOHNSON - EXAMINATION BY MR. NICOLETTI*

1    Q.    Can you identify that document for me?

2    A.    It's an email from an underwriter to someone

3    at AmWINS.  And there's -- do you want me to continue?

4    Q.    Yes.

5    A.    And there's an endorsement attached that,

6    without looking at the current limits of liability

7    endorsement, that should be taking away the scheduled

8    amount to the Statement of Values and making it a

9    blanket policy.

10    Q.    Okay.  Now, the first email -- let's go back

11    to the email.  And it says:  "Hi, Linda.  Attached is

12    the endorsement for the above-mentioned account."

13          It goes on to say:  "Yes, we agree to follow

14    form."

15          Do you see that?

16    A.    Yes, I do.

17    Q.    Does that refresh your recollection that

18    with regard to the 2009-2010 policy period the Max

19    Specialty policy followed form to the Westchester

20    primary property policy?

21    A.    Yes.  The intent was for it to follow the

22    primary form, yes.

23    Q.    And that would include debris removal, if

JOYCE JOHNSON - EXAMINATION BY MR. NICOLETTI

1   any, under the primary form?

2        A.   Correct.

3        Q.   Just put them on the pile, as we say.

4             Who was the primary property insurer for

5   Signal in 2003-2004.

6        A.   I'd have to look.

7        Q.   Was Lexington one of the primary property

8   insurers?

9        A.   That sounds right.  I believe Lexington was

10  on it, then somebody else, and then Lexington came

11  back on it.

12       Q.   And who followed Lexington?

13            MS. SMITH:  Which time?

14       A.   I don't know.

15  MR. NICOLETTI:

16       Q.   The second time.  Would that have been

17  Westchester?

18       A.   I don't recall.  That sounds familiar, but I

19  can't confirm it.

20       Q.   Give me one minute while I look at

21  something.

22            Let me show you the 2007-2008 document,

23  Exhibit 119.  Can you identify that for me?  And if I

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1          I want to get clear the chain of

2   communication that goes into placing insurance for

3   Signal or indeed for any of Willis' clients.  As I

4   understand, Signal goes to Willis; is that correct?

5          A.    Correct.

6          Q.    And then Willis would approach a retail

7   broker.  In this case with the property insurance it's

8   AmWINS; is that correct?

9          A.    To access carriers that we cannot access

10  directly or in where they may have a better

11  relationship.  Some markets we would go direct to.

12         Q.    Okay.  But with regard to the property

13  insurance of the 2009-2010 years, that was done

14  through AmWINS; is that correct?

15         A.    Correct.

16         Q.    So would Signal ever communicate directly

17  with AmWINS?

18         A.    No.

19         Q.    Signal would always communicate through

20  Willis?

21         A.    Correct.

22         Q.    And flip that around, AmWINS would always

23  communicate with Willis --

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1        MR. GUY:  It's the one you decided to put in

2    a funny order, Larry.

3        MR. BOWLES:  Say again?

4        MS. SMITH:  Here.  (Indicating.)

5    MR. GUY:

6    Q.    Okay.  This has been previously introduced

7    and marked as Exhibit 101.  And it's taken from the

8    underwriter of Max Specialty's file.  And I'd like to

9    go through the covering email with you, if I may, to

10   see if I can clarify a number of things.  And I

11   appreciate you were not addressed on that, but I think

12   it may be implied in here.

13        The first thing on the email from Mr. Cesare

14   dated January 28, 2009, is:  "We have a short fuse

15   1/30/09 account that we have some history on."

16        Do you know what he means by "a short fuse"

17   there?

18   A.    It renewed January 30th and at the last

19   minute the incumbent carrier came back with

20   unacceptable terms.  So we were trying to get an

21   alternative.  And that was on January 28th that he was

22   sending that out.

23   Q.    Okay.  So if I understood your answer

JOYCE JOHNSON - EXAMINATION BY MR. GUY

1    correctly, January 28th looks like the existing

2    carrier's terms are unacceptable and you need to find

3    a new carrier by January 30th, 2009; is that correct?

4        A.    Yes, according to this.  I know it was short

5    term.  I don't know exactly when we found out

6    Lexington's quote.  It might have been a little bit

7    before that, but I'm not sure.

8        Q.    In any event, this is when it's being

9    communicated by AmWINS; is that correct?

10       A.    Right, correct.

11       Q.    And there are four bullet points below that

12   that are described as "the short story."

13       A.    (Reading.)

14       Q.    Now, I don't propose to read that out.  But

15   as I understand that, it's giving a brief sort of

16   summary of the loss history; is that correct?

17       A.    It's giving a summary of the last couple of

18   years as to who wrote it and then an issue with

19   losses.

20       Q.    Okay.  Now, after those four bullet points,

21   he now continues:

22              "Our retailer called me

23              yesterday and advised that all

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1           along Lex was indicating they

2           were going to offer 25 MM

3           renewal at 1,400,000 which was

4           up from 1,150,000 expiring, but

5           yesterday they advised that

6           they would only offer a 10

7           million primary at 1,750,000!"

8       Did I read that correctly?

9   A.   Correct.

10       MS. SMITH:  10 MM.

11       MR. GUY:  10 MM.  Fair enough.

12       MS. SMITH:  Not to split hairs.

13       MR. GUY:  Fair enough.

14       MS. SMITH:  I'm trying to be consistent.

15       MR. NICOLETTI:  Thank you.

16 MR. GUY:

17   Q.   Now, the reference to "our retailer," would

18 that be Willis?

19   A.   Willis is the retailer, yes.

20   Q.   Okay.  So when this email is referencing

21 "our retailer," he's referring to Willis?

22   A.   Correct.

23   Q.   Is it most likely that he's referring to

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1    you, Willis, do you think?

2         A.    Me personally?

3         Q.    Yes.

4         A.    I don't remember if it was me or John --

5         Q.    Bullock?

6         A.    John Bullock that called him.

7         Q.    Okay.  But one way or another, your

8    understanding is that somebody from Willis called him

9    to explain what's set out in that email there?

10        A.    Correct.

11        Q.    Okay.  So if we can back up, "our retailer

12   called me yesterday," we can assume that that was

13   January 27th of 2009; is that correct?

14        A.    Correct.

15        Q.    And it looks like that's when Willis became

16   aware that there was a -- or at least made AmWINS

17   aware that there was a problem, if you like, with the

18   Lexington quote?

19        A.    Yes, that's what it appears.

20        Q.    Okay.  The next paragraph goes on -- sorry,

21   let me pause that.  So that's January 27th on the

22   calendar schedule to renew on January 30th?

23        A.    Right.

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1    Q.    So we go three days?

2    A.    Actually two because you have to bind it the

3    29th because it goes out midnight, 12:01.  So you have

4    to bind it on the 29th.

5    Q.    Which is why it would be a short fuse?

6    A.    Correct.

7    Q.    Let's go to the next paragraph.  It reads:

8          "We have Westchester who

9          still likes this risk poised to

10         offer a 10 MM dollar primary @

11         1,400,000 though they may have

12         to cut back to a 5 MM primary @

13         1 million dollars (if the

14         referral underwriter does not

15         go along with the NY manager's

16         10 MM primary.)"

17         Can you explain what that means?

18   A.    AmWINS would have gotten a quote for the

19   primary.  And it looks like Westchester's underwriter

20   gave them an indication but had to send it to a higher

21   underwriter for approval.  So he didn't know if he was

22   going to get 10 million or 5 million at that point.

23   Q.    In policy limits?

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1      A.    In property limits; correct.

2      Q.    Okay.  And what's the 1,400,000?

3      A.    1,400,000 is the indication that Westchester

4  has given him for a 10 million dollar limit, primary

5  limit.

6      Q.    That's the premium?

7      A.    1,400,000, yes.

8      Q.    For a 10 million dollar limit?

9      A.    Correct.

10      Q.    And the alternative proposal is if there's a

11  5 million dollar primary limit, the premium for that

12  would be 1 million dollars; is that your

13  understanding?

14      A.    Correct.

15      Q.    Okay.  All right.  Let's continue.

16              "In any event, we need for

17          you to look at the following

18          layer in order of preference."

19      And there lists four different alternatives

20  here.  Okay?

21      A.    Yes.

22      Q.    Now, he then goes on to enclose some

23  information.  And I believe -- Mr. Bowles will correct

JOYCE JOHNSON - EXAMINATION BY MR. GUY

1   the first page?

2        MR. BOWLES:  Bates number, please?

3        MR. GUY: TripM 084.

4        MS. SMITH:   0084.

5        A.   This appears to be the 2008-2009 Ace

6   Westchester quote that they had previously given the

7   year before.

8   MR. GUY:

9        Q.   Okay.  And does that seem to square with

10  what's listed as Exhibit A -- "We are enclosing,"

11  number A on the front page of -- sorry -- on the

12  second page of Exhibit 101?

13       A.   Yes.

14       Q.   Okay.  Now, let's go and see if we can find

15  the next document in there, which is Willis' 2009

16  property submission.  And that's the one that's Bates

17  stamped TripM 0056; is that correct?

18       A.   Yes.

19       Q.   And does that look like it's the document

20  referred to in point B of Exhibit 101?

21       A.   Yes.

22       Q.   And that looks to me like it's 14 pages; is

23  that correct?

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1         MS. SMITH:  What does it end on?  What Bates

2    number, Matt?

3         MR. GUY:  I don't know.  I'm working off a

4    different Bates stamped version.

5         MS. SMITH:  Oh, I'm sorry.

6    A.    Okay.  That's the submission, and it stops

7    -- that document stops here.  (Indicating.)

8    MR. GUY:

9    Q.    Okay.  If you can read the Bates stamp

10   number out for the record, please.

11   A.    TripM 0071.

12        MS. SMITH:  It does have a 14 above it.

13   MR. GUY:

14   Q.    All right.  So that's the complete property

15   insurance submission that I think we've already

16   established that Willis would have sent to AmWINS and

17   AmWINS has then passed on to potentially interested

18   underwriters?

19   A.    It's the piece of the submission that

20   outlines the specifications.

21   Q.    Okay.

22   A.    Because the submission would also include

23   the Statement of Values and some other --

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1      Q.    Okay.  Let's come to that next.  Let's turn

2  to the next page.  I think you're saying that's a

3  Statement of Values.  But if we can back up, the

4  document we just last looked at, the 14-page document,

5  is it your understanding that that is the Willis 2009

6  property submission referred to in the email?

7      A.    Yes.

8      Q.    And then we get to the current 2009

9  Statement of Values?

10     A.    Correct.

11     Q.    And I think you just read out the Bates

12  stamp number.  Okay.  Now, if we look at the

13  statement --

14          MS. SMITH:  For the statement you want the

15  Bates number?

16          MR. GUY:  No.  I think she read out the last

17  Bates stamp page number.

18     Q.    So the Bates stamp number for the Statement

19  of Values you're looking at begins with TripM 0072.

20  And if we look at that page, it says:  "Signal

21  International Statement of Values - Blanket by

22  Location."

23          What does blanket by location mean?

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1      A.      Blanket by location means that the value at

2   any one given address would apply to the loss rather

3   than a line-by-line building or contents scheduled

4   value.

5      Q.      Okay.  And if we have a look at the middle

6   of that page, we see under TX division, item number 5,

7   it says 2500 MLK Boulevard, Port Arthur, Texas.  And

8   it lists under bulkheads, drydocks, ACV -- which

9   you've already told us stands for actual cash value --

10  $13,600,000?

11     A.      Yes.

12     Q.      And is it your understanding that that

13  refers to the AFDB-5 drydock?

14     A.      Yes, that's my understanding.

15     Q.      And I believe when Mr. Nicoletti was asking

16  you questions earlier, you explained that the values

17  that are given are used as a basis for calculating the

18  premium; is that correct?

19     A.      If it is a blanket policy.  It depends --

20  you can request something.  It may be different than

21  what you get.  But yes, a blanket policy, this would

22  be given for underwriting purposes for computing the

23  premium.

*JOYCE JOHNSON - EXAMINATION BY MR. GUY*

1    Q.    Okay.  And the total insured value by

2    location, the sort of bottom right-hand corner number

3    is $211,328,279; is that correct?

4    A.    Correct.

5    Q.    So is that the figure that's used to

6    calculate the premium payable to the property

7    insurers?

8    A.    That's what I've seen underwriters do.

9    That's usually what they base it on, the TIV, which is

10   the total insured value for all the locations.

11   Q.    So let's stick with the 13.6 million dollar

12   figure.  If that number had been lower, less premium

13   would have been charged by the property underwriters;

14   is that your understanding?

15   A.    Correct.

16   Q.    And if that figure had been higher, more

17   premium would have been charged?

18   A.    Correct.

19   Q.    And I think you testified earlier that the

20   numbers in these Schedule of Values -- or Statement of

21   Values, sorry, are prepared by Willis on information

22   given by the insured, in this case, Signal; is that

23   correct?

JOYCE JOHNSON - EXAMINATION BY MR. GUY

1    Statement of Values from the previous years of

2    account?

3         A.    No.

4         Q.    And earlier on it was introduced as Exhibit

5    -- the first exhibit, 82.  Here we go.  The Friede

6    Goldman Halter vessel schedule as of October 1, 2002.

7    It's Exhibit 82.  And I'm going to represent to you

8    that on that particular date Signal International,

9    LLC, the named insured under this policy, didn't

10   actually exist.  Does that sound correct to you?

11        A.    That sounds correct.

12        Q.    And you testified earlier that Signal bought

13   the assets of Friede Goldman Halter in bankruptcy; is

14   that correct?  That was your testimony?

15        A.    Yes.  Can I make an addendum to that?

16   Friede Goldman Halter had several divisions, and VT

17   Halter purchased the Halter Marine yards and Signal

18   purchased the assets of the Friede Goldman yards, I

19   believe.  Some of the assets but not necessarily all

20   of them.

21        Q.    Thank you.  That's what I was asking you.

22   You pre-empted me.  In any event, back to my original

23   question, if I'm an excess property underwriter in