# EXHIBIT 6

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4      * * * * * * * * * * * * * * * *

5    FIREMAN'S FUND INSURANCE COMPANY,

6    ONE BEACON INSURANCE COMPANY,
     NATIONAL LIABILITY AND FIRE

7    INSURANCE COMPANY and QBE MARINE
     & ENERGY SYNDICATE 1036,

8
          Plaintiffs,

9                                      10-cv-01653 (LAK)
     vs.

10
     GREAT AMERICAN INSURANCE COMPANY

11   OF NEW YORK, MAX SPECIALTY
     INSURANCE COMPANY and SIGNAL

12   INTERNATIONAL, LLC,

13        Defendants.

14     * * * * * * * * * * * * * * * *

15

16

17

18

19        Deposition of JOHN JOSEPH BULLOCK, taken in the

20        law offices of Johnstone, Adams, Bailey, Gordon &

21        Harris, LLC, One St. Louis Centre, Suite 4000,

22        Mobile, Alabama, on April 20, 2011, commencing

23        at approximately 10:00 a.m.

ISBELL & ASSOCIATES, LLC, REGISTERED PROFESSIONAL REPORTERS
910 GOVERNMENT STREET, MOBILE, AL  36604  251-432-DEPO

```
1                    A P P E A R A N C E S

2


3        For FIREMAN'S FUND INSURANCE COMPANY:
              NICOLETTI, HORNIG & SWEENEY
4             Attorneys at Law
              Wall Street Plaza
5             88 Pine Street, 7th Floor
              New York, New York 10005-1801
6             (212) 220-3830
              BY: JOHN A.V. NICOLETTI, ESQUIRE
7                        and
                 ROBERT A. NOVAK, ESQUIRE
8


9


10       For GREAT AMERICAN INSURANCE COMPANY OF NEW YORK:
              MATTIONI, LTD.
11            Attorneys at Law
              399 Market Street, Suite 200
12            Philadelphia, Pennsylvania 19106-2138
              (215) 629-1600
13            BY: GEORGE R. ZACHARKOW, ESQUIRE

14


15

16       For MAX SPECIALTY INSURANCE COMPANY:
              NOURSE & BOWLES, LLP
17            Attorneys at Law
              One Exchange Plaza
18            55 Broadway, 30th Floor
              New York, New York 10006-3030
19            (212) 952-6200
              BY: LAWRENCE J. BOWLES, ESQUIRE

20


21


22


23
```

```
1   APPEARANCES (Continued)

2

3        For SIGNAL INTERNATIONAL, LLC:
              LeBLANC BLAND, PLLC
4             Attorneys at Law
              909 Poydras Street, Suite 1860
5             New Orleans, Louisiana  70112
              (504) 528-3088
6             BY: MATTHEW C. GUY, ESQUIRE
                        and
7                 JAMES D. PRESCOTT, III, ESQUIRE

8

9        For WILLIS of ALABAMA and JOHN JOSEPH BULLOCK:
              BRADLEY, ARANT, BOULT, CUMMINGS, LLP
10            Attorneys at Law
              One Federal Place
11            1819 Fifth Avenue North
              Birmingham, Alabama  35203-2104
12            (205) 521-8000
              BY: RUSHA C. SMITH, ESQUIRE
13

14

15       Court Reporter:
              DEBRA AMOS ISBELL, CCR,RDR,CRR - ACCR #21
16            ISBELL & ASSOCIATES, LLC

17

18

19

20

21

22

23
```

```
 1                          I N D E X

 2           Witness
             JOHN JOSEPH BULLOCK
 3

 4    EXAMINATION

 5    MR. BOWLES - page 8

 6    MR. ZACHARKOW - page 75

 7    MR. NICOLETTI - page 95

 8    MR. GUY - page 118

 9    MR. BOWLES - page 186

10    MR. ZACHARKOW - page 212

11    MR. GUY - page 215

12    MR. NICOLETTI - page 218

13    MR. BOWLES - page 233

14

15    EXHIBITS

16    EXHIBIT 148 - page 31
           RMS Modeling Report - (retained by Ms. Smith)
17
      EXHIBIT 149 - page 44
18         Email to John Kuzniewski, John Nicoletti, etc.,
           from John Baker, 3/24/10
19
      EXHIBIT 150 - page 67
20         Letter to Jimmy Dike from Chris Cunningham, 9/8/09
           - 000867
21
      EXHIBIT 151 - page 70
22         First Amendment to Lease and Settlement Agreement
           By and Between The City of Port Arthur, Texas and
23         Signal International, 9/25/09
```

*ISBELL & ASSOCIATES, LLC, REGISTERED PROFESSIONAL REPORTERS*
*910 GOVERNMENT STREET, MOBILE, AL 36604  251-432-DEPO*

1    INDEX OF EXHIBITS (Continued)

2    EXHIBIT 152 - page 89
          Email to LeBlanc Bland from Vernon Ewing,
3         12/14/09, with attached letter from John Bullock -
          Willis 00351
4
     EXHIBIT 153 - page 102
5         Email to Mark Cheglikov of Max Specialty from
          John Bullock, 2/10/10, with attached Limits of
6         Liability

7    EXHIBIT 154 - page 105
          Email to Mark Cheglikov and Cody Whittington
8         from John Bullock, 2/22/10

9    EXHIBIT 155 - page 108
          Emails between Steve Boesen of Max Specialty and
10        John Baker, 3/16&18/10 - Willis 02624-02625

11   EXHIBIT 156 - page 114
          Emails between Signal and Willis, 4/9/10
12
     EXHIBIT 157 - page 156
13        Email to Cody Whittington from Wendy Chatelain of
          CSL North America, 3/2/10, with attached report of
14        Surveyor Armand Cuevas - MSI 001333-001337

15   EXHIBIT 158 - page 174
          Letter -- Notice of Declination of Signal's
16        Business Interruption Claim and Reservation of
          Rights -- to Signal from Max Specialty/Alterra,
17        11/29/10 - Signal(NY) 002174-002183

18   EXHIBIT 159 - page 177
          Letter to Cody Whittington from Chris Cunningham,
19        12/8/10 - Signal(NY) 002184-002187

20

21              EXHIBITS BOUND SEPARATELY

22

23

S T I P U L A T I O N

It is stipulated and agreed by and between the parties hereto, through their respective counsel, that the deposition of JOHN JOSEPH BULLOCK may be taken before Debra Amos Isbell, Notary Public for the State at Large, at the law offices of Johnstone, Adams, Bailey, Gordon & Harris, LLC, One St. Louis Centre, Suite 4000, Mobile, Alabama, on April 20, 2011.

It is further stipulated and agreed that this deposition is taken pursuant to the Federal Rules of Civil Procedure.  The provisions of Rule 32(d)(3) dealing with waiver of errors and irregularities as to the taking of the deposition apply fully to this deposition.

Notice of the deposition and any errors or irregularities therein [Rule 32(d)(1)] and any objections to the qualifications of the officer before whom this deposition is taken [Rule 32(d)(2)] are waived.

The submission of the deposition to the witness for reading to or by him and the signing of

1   the deposition by him [Rule 30(e)] is not waived.

2         Filing of the original of the transcript of

3   this deposition [Rule 30(f)(1)] is waived.

4         Any other technicality or defect in the

5   taking of this deposition not otherwise covered by the

6   terms of this stipulation is waived.

7

8

9

10

11

12

13

14         I, Debra Amos Isbell, Commissioner and Court

15   Reporter, certify that on this date, as provided by

16   the Federal Rules of Civil Procedure and the foregoing

17   stipulation of counsel, there came before me at the

18   law offices of Johnstone, Adams, Bailey, Gordon &

19   Harris, LLC, One St. Louis Centre, Suite 4000, Mobile,

20   Alabama, on April 20, 2011, commencing at 10:00 a.m.,

21   JOHN JOSEPH BULLOCK, witness in the above cause, for

22   oral examination, whereupon the following proceedings

23   were had:

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. BOWLES*

1              JOHN JOSEPH BULLOCK

2         was sworn and testified as follows:

3         THE WITNESS:  I do.

4         MS. SMITH:  We'll reserve the right to read

5    and sign.

6         MR. NICOLETTI:  Same stips we've been

7    operating under?

8         MR. BOWLES:  Yes.

9                   EXAMINATION

10   BY MR. BOWLES:

11        Q.    Please state your name for the record, sir.

12        A.    John Joseph Bullock.

13        Q.    Mr. Bullock, my name is Lawrence Bowles, and

14   I'm an attorney for Max Specialty in this litigation

15   in which you're giving your deposition.  Let me ask

16   this:  Have you been deposed before?

17        A.    I have not.

18        Q.    You have not.  Has your attorney given you

19   instructions as to procedures for the deposition,

20   listen to the questions and so on?

21        A.    Yes.

22        Q.    Okay.  If you have any question about a

23   question that I ask, let me know and we'll discuss the

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. BOWLES*

```
 1    changes, if necessary, to the text of the question.
 2         A.    Okay.
 3         Q.    Thank you.  By whom are you employed, sir?
 4         A.    Willis.
 5         Q.    Willis of Alabama?
 6         A.    Willis.
 7         Q.    Willis --
 8         A.    The insurance broker Willis.
 9         Q.    Where is that company based?
10               MS. SMITH:  Object to the form.
11         A.    London.
12    MR. BOWLES:
13         Q.    So you work out of the London office or
14    here?
15         A.    No.  You asked where is Willis based.
16    London.
17         Q.    Okay.  Your employer is Willis as opposed to
18    one of the subsidiaries, like Willis of Alabama?
19               MS. SMITH:  Object.
20         A.    Willis of Alabama is a subsidiary of Willis.
21    MR. BOWLES:
22         Q.    Okay.  And where is your office, sir?
23         A.    I have one in Mississippi and one in
```

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. BOWLES*

1    Mobile.

2        Q.    And how long have you been with Willis?

3        A.    23 years.

4        Q.    What did you do before that?

5        A.    Insurance.

6        Q.    With what company?

7        A.    Eselin-Bullock Insurance.

8        Q.    Is that a family company?

9        A.    No.

10       Q.    Just happened to be the same name?

11       A.    No.   I was brought in and made principal

12   after about five years.   It was the Eselin Insurance

13   Agency.

14       Q.    A brokerage agency?

15       A.    No.   An insurance agency.

16       Q.    You actually wrote insurance policies?

17       A.    Correct.

18       Q.    Tell us about your education, sir.

19       A.    Graduated from high school, went to the

20   University of Southern Mississippi.

21       Q.    And when did you graduate?   Or did you

22   graduate?

23       A.    Yes.   '76.

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. BOWLES*

1    Q.   And have you been in the insurance field

2  your entire career?

3    A.   Other than two years in banking, yes.

4    Q.   What has been your position with Willis in

5  the years 2001 to date, sir?

6    A.   Producer.

7    Q.   What does that mean?

8    A.   I would work with prospects and clients to

9  help arrange insurance coverage with them.

10   Q.   And what are your duties as a producer?

11   A.   Duties would be to educate prospects and

12  clients as to the resources and capabilities of Willis

13  and make sure they have the right portal to whatever

14  resource they need.

15   Q.   Signal International, LLC, is one of your

16  clients, sir?

17   A.   Yes.

18   Q.   And how long have they been a company, that

19  company been a client?

20   A.   I want to say since 2002, 2003.

21   Q.   Do you know the predecessor of Signal

22  International at Port Arthur, Texas?

23       MS. SMITH:  Object to the form.

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. BOWLES*

1   Q.   And had Signal received funds from the

2   primary property insurer, Westchester?

3   A.   Almost immediately.

4   Q.   Did they receive funds?

5   A.   Yes.

6   Q.   And how much did they receive?

7   A.   10 million dollars.

8   Q.   So that between the two payments, Signal

9   received 13.6 million dollars less deductible?

10   A.   Yes.  I don't have the exact numbers, but

11   that's the ballpark numbers that I recall.

12   Q.   Do you recall Signal suing the MGL insurers

13   in Texas with regard to the wreck removal costs?

14        MS. SMITH:  Object to the form.

15   A.   Honestly I don't recall them suing.  I know

16   that there was some legal maneuvering going on between

17   the carriers, but I was not part and parcel to a

18   lawsuit.

19        MR. BOWLES:  Mark this the next exhibit,

20   please.

21        (BULLOCK EXHIBIT 149 WAS MARKED

22         FOR IDENTIFICATION.)

23        MR. NICOLETTI:  Do we have Bates numbers on

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. ZACHARKOW*

```
 1                      EXAMINATION
 2   BY MR. ZACHARKOW:
 3      Q.   Mr. Bullock, I introduced myself earlier
 4   before we started.  My name is George Zacharkow.  I'm
 5   an attorney with Mattioni law offices, and we
 6   represent Great American in this litigation.  The same
 7   instructions apply that Mr. Bowles gave you earlier.
 8   If you don't understand my question, let me know.
 9      A.   Thank you.
10      Q.   And I'll try to clarify it for you.
11           Could you just give me a little bit better
12   sense of what your responsibilities are at Willis in
13   your current position?
14      A.   Sure.  I handle a production team and I'm
15   responsible for cultivating new business and servicing
16   existing business for our team.
17      Q.   Who are your team members?
18      A.   Vernon Ewing, Joyce Johnson, Linda Bell,
19   Claire Spearman --
20      Q.   I think she got married now, though.
21      A.   Parnell.  Don't tell her I said that.
22   Parnell.  Do you know Claire?
23      Q.   No.  It just came up in one of the earlier
```

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. ZACHARKOW*

1   the predecessor operation; right?

2       A.    Correct, correct.

3       Q.    And then with Signal who did you deal with?

4       A.    Lisa Spears, Chris Cunningham.

5       Q.    Did you ever deal with a gentleman named Bob

6   Shepherd?

7       A.    Yes.

8       Q.    What was his position?

9       A.    Bob was from the old organization.   And Bob

10  had some insurance functions in the old company.   And

11  I want to say that he -- I don't think he was ever

12  involved in Signal, but he was involved in the runoff

13  of some of the issues from the company that went into

14  bankruptcy.

15      Q.    With regard to the Signal account, did you

16  go to Signal and make any direct presentations to them

17  about possible coverages for their company?

18      A.    For the new entity?

19      Q.    Yes, sir.

20      A.    No, no.   Ironically I got a call from Jerry

21  St. Pé who was the past president of Ingalls Shipyard

22  who was on the board.   He was in Washington, DC.   They

23  were working out a legal arrangement and they also

1    needed some insurance.  And that's who I got the first

2    call from.

3        Q.    And then how did it progress from there,

4    Mr. Bullock?

5        A.    There was a pending closing for the new

6    owners, and we got involved in the first issue, as I

7    recall, was worker's compensation, which we were able

8    to put that together that afternoon, and then we

9    started working on the other exposures.

10       Q.    So did you ever have face-to-face meetings

11   with anyone at Signal in terms of the early -- excuse

12   me -- in the early stage when you started to propose

13   coverages for them?

14       A.    Yes.

15       Q.    Did you go alone or were there others of the

16   team that went?

17       A.    There were other members of the team there.

18   And that would be typical.  Vernon, Joyce.

19       Q.    Did Signal specify to Willis what type of

20   coverages they wanted?

21       A.    They did.  They had an asset list at the

22   time.  I think that was the foundation for the very

23   first placement.  And then it kind of evolved from

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. ZACHARKOW*

1    there.

2         MR. GUY:  Can we just get a time frame?

3         MR. ZACHARKOW:  Yeah.  I'm going to catch it

4    now.

5         Q.    And I'm talking about when you first were

6    starting with Signal.

7         A.    I am, too.

8         Q.    Willis.  Did you understand that to be the

9    context?

10        A.    Yes.

11        Q.    And then once the coverages were in place

12   for that first policy year, what was the routine after

13   that in terms of renewals?

14        A.    Routine would be 90 to 120 days in advance

15   of expiration we would request updated underwriting

16   information.

17        Q.    And when you say we, that would be Willis or

18   the team members; right?

19        A.    Yes, yes, it was the team.

20        Q.    So Signal would then respond to that inquiry

21   and provide information to Willis regarding any

22   changes that occurred during that policy term that

23   should be addressed in the new term?

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. ZACHARKOW*

1          MS. SMITH:  Object to the form.

2     A.    Correct.

3  MR. ZACHARKOW:

4     Q.    During the roughly six-year period between

5  the start of the new operation and the date that the

6  drydock sank, August 20, 2009, were the policies

7  basically the same that were maintained for Signal?

8          MS. SMITH:  Object to the form.

9     A.    You know, the lines of coverage would have

10  been the same.  I think there were probably additions

11  and deletions to schedules, whether it be automobiles,

12  vessels, things of that nature.

13  MR. ZACHARKOW:

14     Q.    Fair enough.  Better answer than the

15  question.  In terms of the coverages, are there any

16  significant changes that stick in your mind that

17  occurred?

18          MS. SMITH:  Object to the form.

19     A.    None that I recall.

20  MR. ZACHARKOW:

21     Q.    Earlier there were some discussions about

22  the coverage for the drydock being on the property

23  policy as opposed to on a hull policy; correct?

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1      A.    I don't recall seeing that.

2      Q.    The Exhibit 153, though, is an email from

3   you dated February 10, 2010, to a Mark Cheglikov.  Do

4   you know who Mr. Cheglikov is?

5      A.    Yes.

6      Q.    Who is he?

7      A.    He's a representative of Max Specialty.

8      Q.    Let me hand you this next document which

9   we'll mark as Exhibit 154.  I have extras copies of

10  this one.

11            (BULLOCK EXHIBIT 154 WAS MARKED

12             FOR IDENTIFICATION.)

13  MR. NICOLETTI:

14     Q.    Mr. Bullock, before you read the exhibit, do

15  you recall ever writing to Max Specialty advising them

16  that 5 million dollars of the primary payment by

17  Westchester involving the sinking of the drydock was

18  to be allocated toward debris removal of the drydock?

19     A.    Okay.  Now, you're asking me this prior to

20  reading this?

21     Q.    Yes.  Do you recall that?

22     A.    I don't recall it.

23     Q.    Okay.  Now you can look at the document.

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1    A.    This is like a drama.

2    Q.    Well, this is the way you do it,

3  unfortunately, technically.  This is an email from

4  yourself to Mr. Cheglikov dated February 22nd, 2010.

5  And I'd like you to read the document and see if it

6  refreshes your recollection.

7    A.    (Reading.)  Okay.

8    Q.    Does that refresh your recollection that you

9  were -- strike that.

10       Before I go there, do you know who Cody

11  Whittington is?

12    A.    Yes.

13    Q.    Who is Cody Whittington?

14    A.    He is also a Max representative.

15    Q.    Do you recall addressing the issue of

16  allocating 5 million dollars towards debris removal

17  under the Westchester policy?

18    A.    Yes.

19    Q.    You recall that now?

20    A.    I have this in front of me.

21    Q.    And do you know why you were writing this

22  particular letter to the representatives of Max

23  Specialty on February 22nd, 2010, or thereabouts?

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1   Email to be clearly accurate.

2       A.      Certainly it was an attempt to finalize the

3   claim on the excess policy.

4       Q.      And part of the reconciliation of finalizing

5   the claim on the excess was to have Max Specialty sign

6   off on a 5 million dollar allocation of primary money

7   to debris removal; is that correct?

8       A.      Correct.

9       Q.      And it was your opinion as of this point in

10  time that the primary policy did provide 5 million

11  dollars for debris removal of the sunken drydock;

12  isn't that correct?

13      A.      That's correct.

14      Q.      And I believe at this time Max Specialty was

15  making the argument that they didn't follow form or

16  didn't provide debris removal; is that correct?

17          MR. BOWLES:  Objection.

18      A.      That's my recollection.

19  MR. NICOLETTI:

20      Q.      In fact, what you did was you said even --

21  this letter actually was telling Max Specialty even if

22  you were correct that you didn't provide debris

23  removal, which you disagreed with, that based on their

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1    policy terms, that Signal had a right to allocate 5

2    million dollars from their primary towards debris

3    removal.  Isn't that the whole purpose of this email

4    which we've marked as Exhibit 154?

5         MS. SMITH:  Object to the form.

6      A.    That would be one purpose, yes.

7    MR. NICOLETTI:

8      Q.    And the other purpose was to finalize the

9    claim under the excess; is that correct?

10     A.    Yes.

11         MR. NICOLETTI:  Let's have this next

12   document marked as Exhibit 155.  It's a two-page

13   document bearing Willis production numbers 02624 and

14   25.

15         (BULLOCK EXHIBIT 155 WAS MARKED

16           FOR IDENTIFICATION.)

17   MR. NICOLETTI:

18     Q.    Mr. Bullock, I'd like you to review the

19   exhibit which we've marked as 155.

20     A.    (Reading.)  Okay.

21     Q.    Now, Exhibit 155 apparently is an email from

22   John Baker, whom you've identified, to Steven Boesen.

23   Do you know who Mr. Boesen is?

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1      A.   He's a claims representative at Max.

2      Q.   Do you recall ever seeing this letter

3  before?  Or this series of emails, I should say.

4      A.   I don't recall seeing them.  I'm just trying

5  to look.  I don't know that I was copied.  I do not

6  recall.

7      Q.   Do you recall that one or more

8  representatives of Max Specialty advised Signal that

9  they were forbidden or precluded from allocating

10  5 million dollars from the Westchester primary payment

11  for debris removal?

12      A.   I know there were discussions involving

13  that.  I don't know that I was aware that they

14  absolutely forbade it.  I know that it was certainly a

15  discussion point where we were advocating for that.

16      Q.   Let's look at Exhibit 155.  Can you read

17  into the record the first full sentence?  And to the

18  extent you have to read anything more to place it in

19  context, you're free to do so.  The first full

20  sentence of the second paragraph on the top email, the

21  Baker to Boesen email of May 14, 2010.

22      A.   Okay.  The first full sentence of where?

23      Q.   Second paragraph.

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1      A.    "In response"?

2      Q.    Yes.

3      A.    You'd like me to read that?

4      Q.    Yes.

5      A.    Sure.

6                 "In response to your question

7            as to whether the insured

8            wishes to allocate a portion of

9            the Ace claim, I refer you to

10           page 4 of Mr. Cheglikov's

11           letter to Signal above where he

12           states that the insured does

13           not have the right to allocate

14           under the Westchester policy.

15           He goes on to say:  Any attempt

16           to allocate on Signal's part

17           would not be acceptable to

18           Max."

19     Q.    Please continue.

20     A.       "Mr. Bullock disagreed with

21           this position in writing (also

22           attached above) and this is

23           another item that has never

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1                been responded to by Max."

2        Q.    Does that refresh your recollection that Max

3   was taking the position that Signal had no right to

4   allocate the primary policy payment by Westchester?

5        A.    Yes.

6        Q.    And you disagreed with that?

7        A.    Yes.

8        Q.    Did Max ever give you any explanation as to

9   why Signal did not have that right to allocate?

10       A.    I know that it was their contention.  I

11  don't know that I received anything in writing.

12       Q.    I'm not talking about anything in writing.

13       A.    Okay.  Great.

14       Q.    What I'm saying to you is they had taken a

15  position.

16       A.    Right.

17       Q.    Signal can't allocate 5 million to debris

18  removal from the primary payment made by Westchester;

19  right?

20       A.    Yes.

21       Q.    Okay.  It's one thing to take a position.

22  It's another thing to justify it.  I'm asking you if

23  they ever gave you any justification interfering with

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1   the way --

2        A.    No.

3        Q.    -- Max was dealing with the --

4             MR. BOWLES:  Objection.

5   MR. NICOLETTI:

6        Q.    -- with the way Signal was dealing with the

7   Westchester payment?  Did they ever give you any

8   justification?

9             MR. BOWLES:  Objection.

10       A.    No.

11  MR. NICOLETTI:

12       Q.    Did you request one?

13       A.    I think the conversations back and forth

14  would subordinate that.

15       Q.    Support that?

16       A.    Yes.

17       Q.    On how many occasions did you ask Max to

18  justify their position that Signal was precluded from

19  allocating the primary property policy payment by

20  Westchester?

21            MS. SMITH:  I'm sorry?  Could you repeat --

22       A.    How many times?

23            MS. SMITH:  Could you repeat the question

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1   for me?

2   MR. NICOLETTI:

3       Q.   On how many occasions do you recall having

4   that discussion with Max where they took the position

5   Signal could not allocate the primary property

6   payment?

7       A.   At least once, and I don't know the

8   subsequent numbers.

9       Q.   Now, were all three Max representatives

10  involved with these one or multiple discussions,

11  Mr. Boesen, Mr. Cheglikov and Mr. Whittington?

12      A.   No.

13      Q.   Who were involved with the direct

14  discussions on Max's end?

15      A.   I don't know that we had any direct

16  discussions with Max.  I think it was primarily done

17  through emails, if that's what you're asking.

18              MR. NICOLETTI:  All right.  Let me mark this

19  -- you'll like to hear this phrase -- this last

20  document as Exhibit 156.  Again it comes from the

21  Willis CD which was numbered without prefix.  And I

22  don't have extra copies of this, so we'll have to have

23  the reporter mark it and then we'll pass it around.

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

```
1              (BULLOCK EXHIBIT 156 WAS MARKED

2              FOR IDENTIFICATION.)

3    MR. NICOLETTI:

4         Q.    Mr. Bullock, for this particular exhibit I'd

5    like you to read it from the last page at the bottom

6    up to the first page at the top because that's the

7    appropriate chronology of the email string.  Do you

8    understand that instruction?

9         A.    Uh-huh (positive response).  (Reading.)

10   Okay.

11        Q.    Just for the record, the most recent or the

12   latest-in-time email is an email from Mr. Bullock to

13   Mr. Cunningham, Mr. Baker and Ms. Spears, and it

14   states -- discusses the 5 million dollar limit for

15   debris removal.

16             Does this document refresh -- and the email

17   is dated April 9th, 2010.

18             Does this document refresh your recollection

19   that you had this ongoing discussion with Max

20   Specialty concerning payment under their policy,

21   including the allocation of 5 million dollars from the

22   primary property payment for debris removal?

23        A.    Yes.
```

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1   Q.   So this was a running discussion, I gather,

2   then, based upon these emails, from February through

3   the beginning of April, is that correct, of 2009?

4   A.   Correct.

5   Q.   I'm sorry.  2010.  Sorry.  Does that refresh

6   your recollection of any further discussions or email

7   exchange you may have had with Max where they gave you

8   any justification for their position that Signal was

9   not permitted to allocate 5 million dollars from the

10  primary property policy payment by Westchester for

11  debris removal?

12  A.   State the first part again, John.  I'm

13  sorry.

14  Q.   What I'm getting at, does that refresh your

15  recollection whether or not Max Specialty ever gave

16  you a justification for their position that Signal

17  could not allocate?

18  A.   Yes.

19  Q.   What do you recall?

20  A.   My answer yes is that subordinates my

21  recollection that we had an ongoing dilemma with Max

22  relative to them allowing Signal to allocate the

23  5 million dollar debris removal.

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. NICOLETTI*

1        Q.   When you say subordinate, do you mean it

2   supports that?

3        A.   Supports that.

4        Q.   Supports that recollection?

5        A.   Supports that recollection.

6        Q.   As you sit here today, have you ever been

7   told either directly by Max or anybody at Signal or

8   anyone else the basis or justification for Max's

9   position that Signal could not allocate some of the

10  primary money for debris removal?

11       A.   Not that I recall.

12       Q.   I have just one quick question.  Do you

13  recall when Mr. Bowles showed you Exhibit 38 he asked

14  you to read a particular portion of the document into

15  the record?

16           MS. SMITH:  The last paragraph, I think.

17           MR. NICOLETTI:  Yeah, right.

18       A.   The second to last -- oh, is it the last?

19       Q.   Concerning that the drydock's useful life

20  may not equal the lease extension.  Do you recall

21  that?

22           MS. SMITH:  It starts with "That said."

23       A.   Do I recall this?

JOHN JOSEPH BULLOCK - EXAMINATION BY MR. GUY

1    Q.    You can answer.

2    A.    It appears that they are talking about the

3    option to renew the land lease for an additional

4    25-year period as exercised.

5         MR. NICOLETTI:  Thank you.  You'll be happy

6    to hear I have no further questions.

7         THE WITNESS:  Thank you.

8         MR. GUY:  Let's take five.

9         (A RECESS WAS TAKEN FROM 11:41 A.M.

10        TO 11:46 A.M.)

11                        EXAMINATION

12   BY MR. GUY:

13   Q.    Good morning, Mr. Bullock.

14   A.    Good morning.

15   Q.    My name is Matt Guy, and I'm an attorney in

16   this lawsuit representing Signal International.  I

17   have a number of questions to ask you.  I apologize if

18   I move around a bit.  Some of these fine gentlemen

19   have already covered some of the things I was going to

20   ask you.

21        The first thing I'd like to ask you to do is

22   to turn to Exhibit 101.

23        MR. BOWLES:  What is it?

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. GUY*

1          MS. SMITH:  101.  I don't think they're in

2    order again, so give me a second.  Here it is.

3          MR. BOWLES:  What is it?

4          MR. GUY:  This is the exhibit that was put

5    together by Mr. Bowles.

6          MS. SMITH:  It's your exhibit.

7          MR. GUY:  And some of the documents in there

8    have been shown to you before.  And I'd like you to

9    turn to the first email or the main email, if you

10   like, on there, which is from Thomas Cesare; is that

11   right?

12        A.   Cesare.

13        Q.   Cesare.  Who is Mr. Cesare?

14        A.   He is an employee of AmWINS who's an MGA,

15   managing general agent.

16        Q.   Okay.  And we went through this email in

17   some detail on Monday with Joyce Johnson.  And I don't

18   think it's necessary to do that again.  One of the

19   things I want to ask you is if you recall -- I think

20   this email outlines some problems that were being

21   encountered in renewing the Signal property policy

22   with Lexington in January of 2009.

23        A.   Okay.

JOHN JOSEPH BULLOCK - EXAMINATION BY MR. GUY

1      Q.    Do you recall those problems?

2      A.    I know there were some issues.  Without

3   doing a deep dive, I don't know exactly what their

4   position was.  But I know that they had offered a

5   renewal that was higher than anticipated.

6      Q.    Okay.  And I understood Ms. Johnson's

7   testimony to be that this therefore needed to be

8   sorted out with a different carrier quite quickly?

9      A.    That's correct.

10      Q.    And do you have an independent recollection

11   of that?

12      A.    I do.

13      Q.    And if we look at this email, it says here:

14            "Our retailer called me

15         yesterday and advised that all

16         along Lex was indicating that

17         they were going to offer 25 MM

18         renewal at $1,400,000 which was

19         up from $1,150,000 expiring,

20         but yesterday they advised that

21         they would only offer 10 MM

22         primary at $1,750,000!"

23         Do you recall who the retailer is that's

1   being referenced in that email?

2       A.    I would think the retailer he's referring to

3   would be Willis.

4       Q.    Okay.  Do you think he's referring to

5   Ms. Johnson or you or could it be either one of you or

6   somebody else?

7       A.    It would be someone within Willis.  It would

8   either be Joyce or Vernon or Zaleen Palmer, one of the

9   marketing people.

10      Q.    Okay.  If I could get the chronology here,

11  this email is from the 28th of January 2009.  The

12  reference there is to yesterday, so we can assume

13  that's January 27th, 2009; is that right?

14      A.    Correct.

15      Q.    And the renewal is due on January the 30th,

16  2009?

17      A.    Correct.

18      Q.    Now, I asked Ms. Johnson if that meant that

19  when it became clear that Lexington was not quoting on

20  favorable terms, Willis would have three days to find

21  an alternative placement, and she corrected me and

22  said actually it would be two days because it renews

23  at midnight.

*JOHN JOSEPH BULLOCK - EXAMINATION BY MR. GUY*

1      A.    At midnight; right.

2      Q.    Would you agree with that testimony?

3      A.    That is correct.

4      Q.    And Mr. Cesare here, would it be fair to say

5  that he is attempting to find that alternative cover

6  on what he describes as a short fuse in his email?

7      A.    Correct.

8      Q.    And he forwarded this to a man called John

9  Daniel.  Do you know who John Daniel is?

10      A.    Yes.  He is a coworker.

11      Q.    At AmWINS?

12      A.    Yes.

13      Q.    And it's courtesy copied to a Trip Morano.

14  Do you know who Trip Morano is?

15      A.    I don't.

16      Q.    It says:

17

18

19

20

21

22

23