# EXHIBIT 7

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

* * * * * * * * * * * * * * * *

FIREMAN'S FUND INSURANCE
COMPANY, ONE BEACON INSURANCE
COMPANY, NATIONAL LIABILITY
AND FIRE INSURANCE COMPANY and
QBE MARINE & ENERGY SYNDICATE
1036,

      Plaintiffs,

                         10-cv-01653 (LAK)

vs.

GREAT AMERICAN INSURANCE
COMPANY OF NEW YORK, MAX
SPECIALTY INSURANCE COMPANY
and SIGNAL INTERNATIONAL, LLC,

      Defendants.

* * * * * * * * * * * * * * * *

Deposition of VERNON EWING, taken in the law

offices of Johnstone, Adams, Bailey, Gordon &

Harris, LLC, One St. Louis Centre, Suite 4000,

Mobile, Alabama, on April 19, 2011, commencing

at approximately 8:58 a.m.

Isbell & Associates, LLC, Registered Professional Reporters
910 Government Street
Mobile, Alabama  36604
Telephone (251) 432-DEPO (3376)                    Facsimile (251) 432-6376

# A P P E A R A N C E S

For Plaintiff FIREMAN'S FUND
 INSURANCE COMPANY:
      NICOLETTI, HORNIG & SWEENEY
      Attorneys at Law
      Wall Street Plaza
      88 Pine Street, 7th Floor
      New York, New York 10005
      (212) 220-3830
      BY: JOHN A.V. NICOLETTI, ESQUIRE
                and
          ROBERT A. NOVAK, ESQUIRE


For Defendant GREAT AMERICAN INSURANCE
 COMPANY OF NEW YORK:
      MATTIONI, LTD.
      Attorneys at Law
      399 Market Street, 2nd Floor
      Philadelphia, Pennsylvania 19106
      (215) 629-1600
      BY: GEORGE R. ZACHARKOW, ESQUIRE


For Defendant MAX SPECIALTY INSURANCE COMPANY:
      NOURSE & BOWLES, LLP
      Attorneys at Law
      One Exchange Plaza
      At 55 Broadway, 30th Floor
      New York, New York 10006-3030
      (212) 952-6200
      BY: LAWRENCE J. BOWLES, ESQUIRE

```
1    APPEARANCES (Continued)

2

3         For Defendant SIGNAL INTERNATIONAL, LLC:
               LeBLANC BLAND, PLLC
4              Attorneys at Law
               909 Poydras Street, Suite 1860
5              New Orleans, Louisiana 70112
               (504) 528-3088
6              BY: MATTHEW C. GUY, ESQUIRE
                        and
7                  JAMES D. PRESCOTT, III, ESQUIRE

8

9         For WILLIS of ALABAMA and VERNON EWING:
               BRADLEY ARANT BOULT CUMMINGS, LLP
10             Attorneys at Law
               One Federal Place
11             1819 Fifth Avenue North
               Birmingham, Alabama  35203-2104
12             (205) 521-8000
               BY: RUSHA C. SMITH, ESQUIRE

13

14

15        Court reporter:
               DAVID MICHAEL CAMP, CCR - ACCR #298
16             ISBELL & ASSOCIATES, LLC

17

18

19

20

21

22

23
```

# INDEX

1

2        Witness
         VERNON EWING

3

4   EXAMINATION

5   MR. BOWLES - page 9

6   MR. ZACHARKOW - page 100

7   MR. NICOLETTI - page 190

8   MR. PRESCOTT - page 280

9   MR. BOWLES - page 290

10  MR. ZACHARKOW - page 300

11  MR. NICOLETTI - page 303

12

13  EXHIBITS

14  EXHIBIT 126 - page 85
     *(ABS Consulting Report of Maintenance Program Audit,*

15   *3/12/03 - Signal(NY) 006068-006086)*

16  EXHIBIT 127 - page 85
     *(ABS Consulting Report of Maintenance Program Audit,*

17   *9/17/03 - Willis 17709-17714)*

18  EXHIBIT 128 - page 90
     *(Email to Willis from Dorian Geraci, 11/3/08*

19   *- Willis 21474-21478)*

20  EXHIBIT 129 - page 114
     *(Confirmation of Cover from Global Special Risks, 2/2/04*

21   *- Willis 15672-15677)*

22  EXHIBIT 130 - page 130
     *(Great American Pollution Policy, 1/30/09-1/30/10*

23   *- Willis 02505-02526)*

Isbell & Associates, LLC, Registered Professional Reporters
910 Government Street
Mobile, Alabama  36604
Telephone (251) 432-DEPO (3376)                    Facsimile (251) 432-6376

1   INDEX OF EXHIBITS (Continued)

2   EXHIBIT 131 - page 132
      (Emails between Vernon Ewing and Reese Lever,
3      11/24&25/08, with attached pollution liability
       application - Willis 411-414)

4   EXHIBIT 132 - page 182
5      (Email to Joyce Johnson from Richard Flanagan, 12/9/04
        - FF 320)

6   EXHIBIT 133 - page 184
7      (Email to John Klernan from Richard Flanagan, 12/21/04
        - FF 317 to 318)

8   EXHIBIT 134 - page 185
9      (Email to Mike Johnson from Vernon Ewing, 1/6/05, and
        email to Vernon Ewing from Richard Flanagan, 1/7/05
10      - FF 00834)

11  EXHIBIT 135 - page 186
      (Email to Patsy Schroth from Vernon Ewing, 12/19/07
12     - Willis 23276)

13  EXHIBIT 136 - page 187
      (Email to Vernon Ewing from Patsy Schroth, 12/19/07
14     - Willis 23280)

15  EXHIBIT 137 - page 191
      (Brokerage Services Proposal - retained by Ms. Smith)
16
    EXHIBIT 138 - page 197
17     (Letter to Claire Spearman from Rebecca Cartwright with
        attached Fireman's Fund Insurance Company Renewal -
18      Signal(NY) 000198-000238)

19  EXHIBIT 139 - page 198
      (Letter to Vernon Ewing from Rebecca Cartwright with
20     attached Fireman's Fund Insurance Company Renewal -
      (Signal(NY) 000120-000197)
21
    EXHIBIT 140 - page 200
22     (Great American fax, 11/20/09, with attached Reservation
        of Rights)
23

INDEX OF EXHIBITS (Continued)

EXHIBIT 141 - page 217
  *(Email to David Passman from John Baker, 8/24/09)*

EXHIBIT 142 - page 229
  *(Endorsement of the Water Quality Insurance Syndicate,
   State Law, 4/16/01 - Willis 06319-06322)*

EXHIBIT 143 - page 245
  *(Email to Joseph MacDonald from John Baker, 9/3/09)*

EXHIBIT 144 - page 252
  *(Email to John Baker and Vernon Ewing from Chris
   Cunningham, 1/26/10)*

EXHIBIT 145 - page 264
  *(Email to Chris Cunningham, Lisa Spears, David Bland and
   Matt Guy from John Baker, 2/3/10)*

EXHIBIT 146 - page 267
  *(Email to Ken Cruikshank, John Bullock and John Baker
   from Lisa Spears, 2/3/10, with attachments
   - KC0103-0106)*

EXHIBIT 147 - page 283
  *(Statement of Person Involved in
   Accident/Incident, 9/2/09 -  Signal(NY) 000281-000282)*

EXHIBITS BOUND SEPARATELY

Isbell & Associates, LLC, Registered Professional Reporters

910 Government Street
Mobile, Alabama  36604

Telephone (251) 432-DEPO (3376)          Facsimile (251) 432-6376

## S T I P U L A T I O N

1     It is stipulated and agreed by and

2    between the parties hereto, through their

3    respective counsel, that the deposition of VERNON

4    EWING may be taken before David Michael Camp,

5    Notary Public for the State at Large, at the law

6    offices of Johnstone, Adams, Bailey, Gordon &

7    Harris, LLC, One St. Louis Centre, Suite 4000,

8    Mobile, Alabama, on April 19, 2011.

9     It is further stipulated and agreed that

10    this deposition is taken pursuant to the Federal

11    Rules of Civil Procedure.  The provisions of Rule

12    32(d)(3)dealing with waiver of errors and

13    irregularities as to the taking of the deposition

14    apply fully to this deposition.

15     Notice of the deposition and any errors

16    or irregularities therein [Rule 32(d)(1)] and any

17    objections to the qualifications of the officer

18    before whom this deposition is taken [Rule

19    32(d)(2)] are waived.

20     The submission of the deposition to the

21    witness for reading to or by him and the signing

22    of the deposition by him [Rule 30(e)] is not

1    waived.

2         Filing of the original of the transcript

3    of this deposition [Rule 30(f)(1)] is waived.

4         Any other technicality or defect in the

5    taking of this deposition not otherwise covered by

6    the terms of this stipulation is waived.

7

8                    * * * * * * * *

9

10

11

12

13

14         I, David Michael Camp, Commissioner and

15    Court Reporter, certify that on this date, as

16    provided by the Federal Rules of Civil Procedure

17    and the foregoing stipulation of counsel, there

18    came before me at the law offices of Johnstone,

19    Adams, Bailey, Gordon & Harris, LLC, One St. Louis

20    Centre, Suite 4000, Mobile, Alabama, on April 19,

21    2011, commencing at 10:00 a.m., VERNON EWING,

22    witness in the above cause, for oral examination,

23    whereupon the following proceedings were had:

1        VERNON EWING, having been first duly sworn to

2   speak the truth, the whole truth, and nothing but

3   the truth, testified as follows:

4                    EXAMINATION

5   BY MR. BOWLES:

6        Q     Good morning, Mr. Ewing.  My name is

7   Lawrence Bowles, attorney for Max Specialty

8   Insurance Company.

9        A     Morning.

10       Q     And I have a number of questions in this

11  matter.  I'm sure you've been prepared by your

12  attorney to listen to the questions and answer

13  what you know, and so on.  Do you need any further

14  advice on answering questions?

15       A     I think I'm good to go.

16       Q     Have you been deposed before?

17       A     Yes.

18       Q     So you know the drill.

19       A     Been a while, but, yes.

20       Q     Where are you employed?

21       A     Willis of Alabama.

22       Q     In what position?

23       A     I do primarily marketing, but I have

VERNON EWING - EXAMINATION BY MR. BOWLES    10

1  client responsibilities.

2      Q    What type of client responsibilities?

3      A    I have my own book of business that I

4  monitor and maintain and help in marine

5  sometimes.  But my primary duties are marine

6  marketing.

7      Q    Okay.  How old are you, sir?

8      A    Fifty-six.

9      Q    How long have you been employed by

10  Willis?

11      A    Since '89.

12      Q    And before that?

13      A    I was with Marsh McLennan in New

14  Orleans.

15      Q    And before that?

16      A    Part-time surveyor for Stanhope Hopkins

17  Surveyors.

18      Q    Okay.  Well, let's go back to the

19  beginning.  What is your education, sir?

20      A    I have a degree from Loyola in New

21  Orleans.

22      Q    In what field?

23      A    Liberal Arts.

1    MR. BOWLES:

2        Q     Is that correct?

3        A     Yes.

4              MR. ZACHARKOW:  You may just as well

5    tell him he can answer when you object to the

6    form.

7              MS. SMITH:  He knows that.

8    MR. BOWLES:

9        Q     And with Marsh McLennan, what field were

10   you in?  What type of business were you dealing

11   with?

12       A     Marine insurance, but there was more

13   than just marine.  But primarily marine.

14       Q     And you've been with Willis since 1989,

15   you said?

16       A     Correct.

17       Q     And tell us the progression of your

18   positions with Willis from 1989 to date.

19       A     In '89, I came purely as a marine

20   marketing manager, and transitioned to team up

21   with John Bullock and maintain his book in

22   marketing and handle some accounts myself.

23       Q     The issues in this case concern a

```
1        insured as part of Friede Goldman's package,

2     yes.

3   MR. BOWLES:

4        Q     Whatever the precise name was, it was --

5        A     Which entity it was a part of.

6        Q     Now, coming up to the more recent time,

7   particularly in 2003 through 2009, the drydock was

8   associated with a company called Signal

9   International, LLC?

10        A     Correct.

11        Q     And you arranged for coverages on the

12   drydock with Signal International?

13             MS. SMITH:  Object to the form.

14             THE WITNESS:  I don't recall in 2003

15     how the placement was structured.

16   MR. BOWLES:

17        Q     When is the first year you can recall

18   how the placement was structured?  Approximately.

19        A      I mean, it's varied every year a little

20   bit.  I mean, underwriters come on and go off.

21        Q     My question didn't concern

22   underwriters.  But did you arrange insurances for

23   Signal on the AFDB-5?  Yes or no, sir?
```

1              MS. SMITH:  Object to the form.

2      You're referring to him specifically, or

3      Willis?  I'm not sure who you mean by "you."

4              MR. BOWLES:  Sorry.

5              THE WITNESS:  And what type of

6      insurance?

7  MR. BOWLES:

8      Q      Well, in 2003 to 2009, what precisely

9  was your position?

10     A      Marine marketing.

11     Q      And did you have a title?

12     A      Vice president.

13     Q      Okay.  And one of the accounts that you

14  worked on was Signal International?

15     A      Yes.

16     Q      And did you place various forms or did

17  you, on behalf of Willis, assist Signal in

18  obtaining insurances on the AFDB-5 of various

19  types?

20     A      Yes.

21     Q      And did that include property insurance?

22     A      No.

23     Q      Who arranged that?

VERNON EWING - EXAMINATION BY MR. BOWLES      20

1      A      I believe Zaleen Palmer was the

2  marketing representative that did the property.

3      Q      Okay.  And what part did you play?

4      A      Marine liabilities.

5      Q      Specifically the marine liability

6  insurances?

7      A      Yes.

8      Q      Primary and excess?

9      A      Yes.

10      Q      And you did that for each of the years

11  from 2003 through 2009?

12      A      Yes.

13      Q      Let me turn to Exhibit 81, please.  I'll

14  show you a document marked Johnson Exhibit 81.

15      A      Okay.

16      Q      Is that a document with which you're

17  familiar, sir?

18              MS. SMITH:  Take a look at it and

19      make sure what it is.

20              THE WITNESS:  It looks familiar,

21      yes.

22  MR. BOWLES:

23      Q      Let's turn to page 1 for a moment, the

1   employee?

2                    MS. SMITH:  Object to the form.

3                    THE WITNESS:  No.

4   MR. ZACHARKOW:

5        Q     It's different language a little bit but

6   it's consistent with the language that we looked

7   at in the Willis proposal.  Correct?

8                    MS. SMITH:  Object to the form and

9        object to the extent the documents speak for

10       themselves.

11                   THE WITNESS:  It seems familiar.

12  MR. ZACHARKOW:

13       Q     Did you have anything to do with the

14  investigation of the sinking of the drydock?

15       A     No.

16       Q     Do you have anything to do at Willis

17  with regard to the placement of the pollution

18  insurance?

19       A     Yes.

20       Q     What is your involvement in that regard?

21       A     I contacted underwriters, sent them

22  underwriting information and received quotes.

23       Q     What information do you provide to

VERNON EWING - EXAMINATION BY MR. ZACHARKOW   117

1   underwriters with regard to pollution coverage in

2   the normal course?

3              MS. SMITH:   Object to the form.

4              THE WITNESS:   The submission would

5        include loss information, description of

6        operations, schedule of vessels with GRTs.

7   MR. ZACHARKOW:

8        Q     Gross tons?

9        A     I'm sorry.   Yes.

10        Q     For the record.   Have you been the one

11   who's involved with the placement of the pollution

12   for Signal since it's been operating the drydock?

13        A     Yes.

14        Q     The AFDB-5.   When I say "drydock," I'm

15   referring to the AFDB-5.

16        A     Okay.

17        Q     Do you understand that?

18              MR. NICOLETTI:   Can you put a time

19        frame on that?   Is that 2004 forward?   2003

20        forward?

21              MR. ZACHARKOW:   Well, I said since

22        Signal started operating the drydock.

23              MR. NICOLETTI:   But it's easier on

1    the record to use a date.

2  MR. ZACHARKOW:

3       Q      Do you know the date that Signal started

4  operating the drydock?

5       A      Signal commenced operations in 2003.

6  When the drydock specifically was first used, I

7  don't know.

8       Q      Let me put it this way.  Since Signal

9  was first responsible for insuring the drydock.

10  Is that better?

11      A      Yes.

12             MR. PRESCOTT:  Objection to the

13      form.

14  MR. ZACHARKOW:

15      Q      And prior to Signal becoming responsible

16  for insuring the drydock, is it correct that

17  Friede Goldman Offshore, LLC was operating the

18  drydock?  Is that correct?

19      A      I'm not sure which Friede entity was

20  responsible.  But it was a Friede asset, yes.

21      Q      And with regard to that, you also were

22  responsible for placing the pollution insurance

23  for that Friede Goldman entity?

1   MR. ZACHARKOW:

2       Q      Did you have any involvement in the

3   preparation or vetting of that contract?

4       A      No.

5       Q      Did anyone at Willis have any

6   involvement with that?

7       A      Don't believe so.

8       Q      Are you aware of any hazardous

9   substances other than oil which may have been

10  discharged or released from the drydock when it

11  sank?

12              MR. NICOLETTI:   Objection as to

13      form.

14              THE WITNESS:   No.

15  MR. ZACHARKOW:

16      Q      In looking at the documents, Mr. Ewing,

17  it appears that the pollution carrier in 2003 was

18  WQIS.   Is that correct?

19      A      For Signal?

20      Q      Yes, sir.

21      A      Don't recall.

22      Q      At some point, it was changed to Great

23  American.   Correct?

1      A      Correct.  I don't know if Great American

2  was on the inception or when they came on but it

3  was eventually with Great American.

4      Q      It appears from the records, I'll just

5  represent, that Great American's first policy year

6  was January 30, '04.

7      A      Okay.

8      Q      And then running forward.  And they're

9  still on the risk.  Correct?

10     A      Yes.

11     Q      Since January of '04 -- or let's go back

12  to the end of '03 because you'll be approaching

13  the renewal in '04 -- has the pollution cover been

14  marketed at all for other carriers or has it just

15  stayed with Great American?

16     A      Stayed with Great American.

17         MR. NICOLETTI:  The question was,

18     was it marketed to any other market during

19     that period.

20         THE WITNESS:  I don't think so.

21  MR. ZACHARKOW:

22     Q      From 2004 forward, have there been any

23  claims that were presented under the pollution

VERNON EWING - EXAMINATION BY MR. ZACHARKOW   128

1   policy?

2       A    I don't believe so.

3                 THE WITNESS:   Can you give me two

4   seconds?

5                 MR. ZACHARKOW:   Sure.

6            (A RECESS WAS TAKEN FROM 11:37 A.M.

7            TO 11:39 A.M.)

8   MR. ZACHARKOW:

9       Q    Who did you deal with at Great American

10  with regard to the placement of the pollution

11  policy?

12      A    There's three individuals; Steve Weber,

13  Cindy Stringer and Lever Reese.  Or Reese Lever.

14  I'm not sure.

15      Q    And in terms of the communications with

16  them, was it only at the time as renewals were

17  approaching?

18      A    Primarily, yes.

19      Q    And just would you explain what that

20  process was from your end?

21      A    We would send a submission to -- it

22  varied whether it be Steve or Cindy, and send

23  underwriting information with an updated schedule,

VERNON EWING - EXAMINATION BY MR. ZACHARKOW   129

1  obtain the quotes, confirm the terms and, you

2  know, present to Signal and then confirm the

3  renewal order back to Great American and get the

4  binder and confirmation.

5       Q     For each renewal, was there an

6  application that was completed by Signal for the

7  renewal of the --

8       A     Signal provided --

9       Q     -- pollution policy?  Let me ask the

10 question again.  For each renewal, was there an

11 application that was provided by or on behalf of

12 Signal --

13      A     Yes.

14      Q     -- for the pollution policy?

15      A     Yes.

16      Q     And that was provided through Willis.

17 Is that correct?

18      A     Correct.

19      Q     I've seen applications that had your

20 name on it that you had authority by Signal to

21 prepare the application and submit it.

22      A     Correct.

23      Q     Mr. Ewing, let me show you what we

VERNON EWING - EXAMINATION BY MR. ZACHARKOW   130

1  marked yesterday as Exhibit 109.

2      And I'll represent that was taken out of that

3  collection of documents that we were talking about

4  earlier and you indicated was your marketing file

5  or would appear to be your marketing file.  Do you

6  understand that?

7      A    Yes.

8      Q    Did you have a moment to look at that

9  submission?

10     A    Yes.

11     Q    Is that the submission that was

12 presented for the '09-10 pollution policy?

13     A    Yes.

14     Q    Does that appear to be the complete

15 submission, Mr. Ewing, or is there anything

16 missing from it?

17     A    The schedule of vessels isn't attached.

18     Q    What else, if anything?

19     A    I think that should account for

20 everything.

21         (EWING EXHIBIT 130 WAS MARKED

22         FOR IDENTIFICATION.)

23 MR. ZACHARKOW:

VERNON EWING - EXAMINATION BY MR. ZACHARKOW   131

1      Q    Mr. Ewing, I'm handing you what we've

2   marked as Exhibit 130.  Would you please take a

3   look at that?

4      A    Okay.

5           MS. SMITH:  Are you going to do the

6      Bates?

7           MR. ZACHARKOW:  Yeah.  I should do

8      that.  Bates stamp Willis 2505 to Bates stamp

9      Willis 2526.

10  MR. ZACHARKOW:

11     Q    Have you had a chance to look at that?

12     A    I glanced at it, yes.

13     Q    Is that the policy that was issued by

14  Great American for the term January 30, 2009 to

15  January 30, 2010?

16     A    It appears to be.

17     Q    And at the bottom it says: "Producer

18  Copy."  Is that you?  Is that Willis as the

19  producer?

20     A    Yes.

21     Q    During the time frame that Signal was

22  operating the drydock in the run of the 2004

23  period, which is when Great American came on the

1      Q      And I think you've indicated that it

2  looked familiar to you.

3                  MR. NICOLETTI:   Objection as to

4      form.

5  MR. ZACHARKOW:

6      Q      Correct?

7      A      Yes.

8      Q      Did you have any discussion with anyone

9  at Signal after having received that appraisal

10  report from Heger?

11      A      I don't recall.

12      Q      Let me correct that question because it

13  had a bad reference in it because you didn't

14  receive it from Heger.   You received the Heger

15  appraisal report from Signal.   Correct?

16      A      Correct.

17      Q      After that, did you have any discussions

18  with anyone at Signal regarding that report?

19      A      I don't recall any.

20      Q      Now, the way the renewal process works,

21  as I understand it, as you're approaching the

22  January renewals each year, do you start to

23  prepare the submissions and send them out to the

1   perspective carriers?

2        A    Correct.

3        Q    So does that process start sometime in

4   the fall of the preceding year?

5        A    Yes.

6        Q    So during the course of a year from the

7   time that the policy is bound in January of a

8   given year through that policy period, there may

9   be information that would develop regarding a

10   structure such as the drydock that would be

11   referenced at the time of renewal?

12              MS. SMITH:   Object to the form.

13              THE WITNESS:   Yes.

14   MR. ZACHARKOW:

15        Q    In other words, there could be a

16   collision or an allision or something could happen

17   that would be pertinent to a report at the time of

18   renewal?

19              MR. PRESCOTT:   Object to the form.

20              MS. SMITH:   Object to the form.

21              THE WITNESS:   Yes.

22   MR. ZACHARKOW:

23        Q    And you would do that.  Correct?

1          MS. SMITH:  Right after lunch.

2          MR. BOWLES:  I didn't know that.  So

3      I'll just take a look.

4          THE WITNESS:  I'm familiar.  We can

5      go on.

6    MR. NICOLETTI:

7          Q     Well, let me ask you this question.  Did

8    you compile all of the information in it or just

9    some of it?

10         A     Some of it.

11         Q     Which parts did you compile?

12         A     The marine sections.

13         Q     Did you have any involvement with

14   compiling the information in the property

15   sections?

16         A     No.

17         Q     In the ordinary course of your

18   involvement with the Signal account, did you ever

19   involve yourself with the placement of the

20   property sections of the Signal program?

21         A     No.

22         Q     At any time prior to the casualty, did

23   you ever review any particular policy contained

1  property policy within the Signal program prior to

2  the 2009-2010 period?

3      A    I don't recall specifics.

4      Q    Did you ever review the policy terms and

5  conditions in full?

6      A    No.

7      Q    With regard to the 2009-2010 property

8  program, that's the primary issued by Westchester

9  and the excess issued by Max Specialty.

10      Did you ever review the full terms and

11  conditions of the policy, of either policy?

12      A    No, I don't believe so.

13      Q    Did you review any of the terms set

14  forth in the primary policy?  Post casualty.

15          MS. SMITH:  Property again?

16          MR. NICOLETTI:  Property is the

17    focus now.

18          THE WITNESS:  I looked at the terms

19    post casualty, yes.

20  MR. NICOLETTI:

21      Q    What terms did you look at?

22      A    I don't remember specifics but, I mean,

23  the covered perils, the -- the various sections

1   that are coming up, BMI limits, the values,

2   schedules.

3        Q     Did you review it for any other purpose

4   other than the ones you've just described?

5        A     I don't believe so.

6        Q     Did you ever review it to determine

7   whether or not the policy contained debris removal

8   for the insured property under the program?

9        A     I did look at the debris removal

10  section, yes.

11       Q     In looking at the debris removal

12  section, did you come to the understanding that

13  the drydock was covered for debris removal?

14       A     Yes.

15       Q     Did you review the excess property

16  policy and its endorsements?

17       A     Possibly.  Don't recall.

18       Q     Okay.

19            MR. NICOLETTI:  Let me have marked

20       for identification a document bearing Bates

21       number Signal(NY) 000198 through and including

22       Signal(NY) 000238.

23            (EWING EXHIBIT 138 WAS MARKED

1              FOR IDENTIFICATION.)

2   MR. NICOLETTI:

3      Q      Mr. Ewing, I hand you what has been

4   marked as Exhibit 138.  Can you identify that

5   document for me?

6      A      Fireman's Fund issued bumbershoot for

7   Signal.

8      Q      When you say Fireman's Fund issued the

9   bumbershoot for Signal, was Fireman's Fund the

10  only insurer on this particular policy?

11     A      No.

12     Q      And the other two insurers are whom, if

13  you recall?

14     A      National Liability & Fire and Lloyd's.

15     Q      Lloyd's.  Would that be QBE?

16     A      Yeah.

17     Q      Just keep that in front of you, along

18  with the other policies, please.

19              MR. NICOLETTI:  Let's have this next

20     document bearing production control number

21     Signal(NY) 000120 through and including

22     Signal(NY) 000197 marked as Exhibit 139.

23         (EWING EXHIBIT 139 WAS MARKED

1          FOR IDENTIFICATION.)

2   MR. NICOLETTI:

3          Q      Let me hand you Exhibit 139.  Can you

4   identify that document, please?

5          A      This is the Fireman's Fund issued MGL

6   policy for Signal international.

7          Q      And that policy is also for the 2009-

8   2010 period, as was the excess?

9          A      Correct.

10         Q      And who are the underwriters on that

11  policy?

12         A      Trident -- I mean, it's Fireman's Fund

13  split with Trident.  But I'm trying to remember if

14  it's XL or One Beacon.  Yeah.  One Beacon.

15         Q      Trident was the managing general agent

16  for One Beacon at that time?

17         A      Yes.

18         Q      And prior to that time, Trident was the

19  managing general underwriter for XL.

20         A      Correct.

21             MR. NICOLETTI:  Now, let me mark

22      this document as -- unfortunately, I don't

23      have a Bates-stamped copy.  I believe this

1    two clauses and the other insurance clauses of

2    these policies and tell us how they operate?

3                MS. SMITH:  I'm going to object to

4        the extent that if that was asked, you're

5        asking for an attorney-client privilege.

6                MR. NICOLETTI:  I'm entitled to know

7        if they had the discussion.  I'm not entitled

8        to know what the discussion was about.  And

9        you know that's the rule.

10               MS. SMITH:  Well --

11               THE WITNESS: I don't know.

12   MR. NICOLETTI:

13       Q    Do you recall at one point receiving an

14   email from Signal where Signal, itself, stated

15   that the payment from Westchester would be split,

16   5 million dollars for debris removal and 5 million

17   dollars for the dock, itself?

18       A    I don't recall that.  I mean, I know

19   there was conversations and there were

20   negotiations.  Do I recall a specific email from

21   Signal?  No.

22               MR. NICOLETTI:  Let's have this

23       document marked as Exhibit 144.

1          (EWING EXHIBIT 144 WAS MARKED

2          FOR IDENTIFICATION.)

3    MR. NICOLETTI:

4          Q    Mr. Ewing, can you identify that

5    document?

6          A    It says, Linda Roussis at the top.  I'm

7    not sure who that is.

8          Q    That means it was printed by my

9    machine.  She's my -- one of my paras.

10         A    It's an email from Chris Cunningham to

11   Baker and myself.

12         Q    Who is Chris Cunningham?

13         A    He's the CFO at Signal.

14         Q    And who is Baker?

15         A    John Baker is our claims manager.

16         Q    Okay.  What's the date of the email?

17         A    January 26th, 2010.

18         Q    Are you copied on that email?

19         A    Yes.

20         Q    Can you read the email into the record,

21   please?

22         A    "Have you been able to hook up

23          with Cody yet??  We need a claim

1          submitted to Max for the total amount

2          of the dock beyond 5 million.  The

3          first 10 million that we received

4          from the primary was for 5 million of

5          debris removal and 5 million for the

6          dock.  Ken Cruikshank needs to be

7          made aware of this."

8     Q     Who is Cody?

9     A     I'm trying to remember.

10    Q     Was he the Max Specialty adjuster?

11    A     I believe so, yes.

12    Q     And who was Chris Cruikshank?

13         MS. SMITH:  Ken.

14         THE WITNESS:  Ken Cruikshank is --

15    he was --

16 MR. NICOLETTI:

17    Q     Again, Max Specialty?

18    A     Was he the primary?  I was just trying

19 to remember who Cruikshank represented.

20    Q     Primary Westchester?

21    A     I believe so.

22         MR. GUY:  Ken Cruikshank is an

23    independent adjuster.  I don't think he's