# EXHIBIT 21



3104 Edloe
Suite 203
Houston, Texas 77027
Phone: 713-993-9292
Fax: 713-993-9994
Ken.Cruikshank@yorkisg.com
www.yorkisg.com

The strength of York
Experience, Leadership, and Integrity

9/2/09

| Joanne F. Massey<br>ACE Westchester Specialty Group<br>j.massey@ace-ina.com | **Report Number:** | One |
|---|---|---|
| | **York File Number:** | SLA-1428 |
| | **Policy Number:** | D37362220-001-Ace Westchester<br>MAX2XP0004029-Max Specialty Excess Property |
| Cody Whittington<br>Max Specialty<br>cody.whittington@maxspecialty.com | **Policy Term:** | 01/30/2009 TO 01/30/2010 |
| | **Claim Number:** | JY09J0336171 |
| | **Name and Address of Insured:** | Signal International, LLC<br>P.O. Box 7007 Pascagoula, MS 39568 |
| | **Location of Loss:** | Port Arthur, TX |
| | **Date of Loss:** | 08/20/2009 |
| | **Type of Loss:** | Sunken dry dock, cause unknown |

***REPLY REQUESTED***

1. Please provide authority to appoint accountant Bill Minadeo with Meaden & Moore, Bill worked with me on the Signal Katrina and Rita losses and knows their business, accounting personnel and their accounting systems so there will be know learning curve?

2. Please provide Authority to appoint Callan Salvage to dispose of the fork lift and other equipment?

EXHIBIT
Whittington
213
MH 6-30-11



**ESTIMATE:**

| | |
|---|---|
| Port Arthur Dry Dock | $ 13,600,000.00 |
| Debris Removal | 5,000,000.00 |
| Surveyors & Divers | 175,000.00 |
| Contents | 100,000.00 |
| Claim Prep | 100,000.00 |
| Estimated Total | 18,975,000.00 |
| Less Estimated Salvage | (1,600,000.00) |
| Gross Loss | 17,375,000.00 |
| Less Deductible (2% of $13,600,000) | (272,000.00) |
| Net Estimate | $ 17,103,000.00 |
| | |
| Rented Equipment | $ 140,000.00 |
| Deductible | (25,000.00) |
| Net | $ 115,000.00 |
| | |
| Net Total Property Damage Estimate | $ 17,218,000.00 |

**BUSINESS INTERRUPTION:**

At this early date we have no data but there is a substantial exposure with a potential interruption period of 2 years. Verbally the Signal CFO has indicated that this location produced average revenue over the last 6 years of 25 million with an estimated margin in the range of 3.5 million for a total BI exposure of 7 million if the time period were 2 years.

This would result in a total loss estimate of $24,218,000 at this early stage.

**ABSTRACT COVERAGE:**

Your policy provides all risk coverage except as excluded within the policy. The property involved in this loss is scheduled as the Port Arthur Dock Yard Dry Dock AFEB-5 scheduled at $13,600.00. Also involved is debris removal, insured's equipment on the dry dock as well as coverage for rented equipment, claim prep, extra expense and Business Interruption (actual loss sustained).



The involved deductible on the dry dock is 2% of the scheduled value with a minimum of $250,000. There is an additional $25,000 deductible applicable to rented equipment with values excess $100,000. Debris removal is limited to 25% of the loss to the dry dock or $5 million which ever is greater

**DATE OF LOSS:**

August 20, 2009

**CAUSE OF LOSS:**

On August 20, 2009 all the Signal employees had left the Dock Yard site at approximately 6 PM and those that remained were the 2 dock watch and a security guard. The dock watch had completed their dry dock check and left to go up to the office about 8 PM. They returned 45 min later and found the dock was going down with water already lapping over the deck at the northwest corner of E pontoon. They ran, climbed the wing wall and went to the control room in an effort to turn on pumps but they had already shorted out with water in the machinery space. It was a cascade from that point, once the water got on the deck it filled the rest of the pontoons through open man holes. The dock watch then ran from the dock.

Based on review of the divers report just received at this point they have been unable to identify a cause of loss. Due to the severe visibility limitation further causation evaluation cannot be further developed until the dry dock is removed piece by piece.

**LOSS LOCATIONS:**

Signal International Dock Yard located in Port Arthur, Texas.



**RISK:**

Signal International, L.L.C. is the leading Gulf of Mexico provider of marine and fabrication services. The six Signal facilities located on the Gulf provide easy access to offshore rigs and platforms. There are four yards in Texas and two in Mississippi. The main offices are located at the East Yard in Pascagoula, Mississippi. The majority owner of Signal is the State of Alabama Teacher Retirement Fund.

The yard involved in this loss is the Texas division Dock Yard located at 2500 MLK Boulevard, Port Arthur, TX.

The primary item involved in this loss is the insured's floating dry dock which consists of two wing walls and five pontoons with a total dimension of 482 x 413 x 20 with a total weight of 32,000 long tons(71,680,000 lbs). This dry dock was originally constructed in 1942 and was delivered to US Navy on July 15, 1944. The dock was moved to be stationed at Port Arthur through a government transfer in 1984 from Hawaii. At that point it was operated by Bethlehem steel, it was then transferred to Texas Dry Dock in 1995 and to Signal in 2002. The estimated replacement cost of a new dry dock is be 50-60 million, with a construction time of at least 2 years. A search for any used docks in the US is being conducted. All income for this location is derived from the use of the dry dock. The only other dry docks (2) in the Signal operation are located in Pascagoula, Ms. All maintenance performed on this dry dock is done by Signal employees.



**CO-INSURANCE:**

None.

**SUBROGATION**

Will be reviewed.

**SALVAGE:**

Although this is still developing we have calculated an estimated value of the steel at 1.6 million as shown in the estimate. This is purely an educated guess. We will work with Dufour to develop bid specifications to be put out to the marine salvage industry.



There will be salvage value for the Fork Lift and any other of the Signal equipment found. We request your authority to appoint Callan Salvage for disposal?

**CONSULTANTS:**

Dufour, Laskay & Strouse, Inc.
3939 N. Causeway Blvd, Ste 300
Metairie, La. 70002.

They were initially appointed by the insured but they are a well respected company in this industry.

The Dive Company used for inspection was Resolve Marine Group, corporate office at 1850 SE 17th S Street, #204, Ft. Lauderdale, Florida 33316.

**OTHER INSURANCE:**

Fireman's Fund writes the GL Policy. We have received a copy of that policy for review. There is also a Pollution policy written by Great American, we have just received that policy for review also.

**ADJUSTMENT:**

**What Has Been Done**

Notification of this incident was received from the Willis Broker on August 21, 2009 and immediate contact was made with the insured. Inspection was conducted on Saturday morning August 22, 2009. Dufour was also on site along with the liability adjuster for Signal. After the initial inspection, diver bids were obtained and the contract let with Resolve Marine. Dive activity began on Wed August 26th. We attach a copy of the two diver cost proposals.

Since that time follow up inspections have been conducted, removal of rented equipment observed and daily diver reports monitored. We will note that the divers had extreme difficulty in their survey and equipment removal due to the



near zero visibility in the water. The underwater survey has now been completed and below are the damages found at this time. (Per the attached Resolve Report)

---

*Pontoon A:*
- Small tear (less than 12 inches) on pontoon deck outboard of wing wall in way of Diagonal brace to vertical rail guide
- Could not access between Pontoons A and B due to vent piping. Gap as per original – no apparent damage.
  - No other damage noted
  -

*Pontoon B:*
- Significant damage to pontoon deck outboard of wing wall due to collapse rail structure causing numerous tears and punch-throughs in way of vertical support columns
- Multiple tears, cracks and holes in way of strongback connection between Pontoons A and B. All damage sustained on Pontoon B side including a 6 ft tear, and 8 ft tear, and other cracks and holes where the strongback began separating from Pontoon B.
- Tear in river side pin connection structure on B pontoon, but hull not breached
- Pontoon B appears separated from Pontoon C – gap of 8 ft and 4 feet of height difference at the inboard shoulder (C side higher)
- Unable to inspect between Pontoons B and C due to obstructions and mud which has pushed through the gap on onto the deck of Pontoon B

*Pontoon C*
- Significant damage to pontoon deck outboard of wing wall due to collapse rail structure causing numerous tears and punch-throughs in way of vertical support columns
- Damage noted between Pontoons C and D. Vent pipes broken and distorted. Support brackets tripped and pushed into hull causing crushing and breaches (at a distance of 120 ft from the wing wall).
- Gap of 5 ft between Pontoons C and D at the inboard shoulder, Pontoon D 4 ft higher
- Tear on the outboard side of the river side pin connection on Pontoon C (approx. 6 ft tear in the deck) where connection tried to separate from the deck
  - 12" x 18" hole in side shell at nose of pontoon in vicinity of shore side pin connection
  -

*Pontoon D*
- Significant damage to pontoon deck outboard of wing wall due to collapse rail structure causing numerous tears and punch-throughs in way of vertical support columns
- Major damage to both pin connections and hull in way of pin connections where pin connections tore up from deck. Damage extends to the nose of the barge and down the front face. Approx. 20 ft wide section breached.
- Pontoon D 18" higher than Pontoon E at closest point
- Vent pipes broken off between Pontoon D and C

YORK

- 2 ft tear noted at the deck edge on the river side, approximately 15-20 ft from the wing Wall

*Pontoon E*
- Major damage to both pin connections and hull in way of pin connections where pin connections tore up from deck. Damage extends to the nose of the barge and down the front face. Approx. 20 ft wide section breached.
- 49 ft to the mud line on the river side of Pontoon E
- No damage noted to river side of Pontoon E
- No other damage or distortion noted on Pontoon E. Appears connected per original to Pontoon F

*Pontoon F*
- Separated from Pontoon G by 20 ft
- Pin connections appear intact
- 1 ft x 2 ft tear in Pontoon F deck between F and G in way of wing wall separation
- Unable to inspect between Pontoons E and F due to Pontoon H resting on blocks above
the gap
- No other damage noted
-

*Pontoon G*
- Limited damage noted on pontoon deck outboard of wing wall due to collapse rail structure causing tears in way of vertical support columns
- Pontoon G completely separated from Pontoon G wing wall. Unable to fully inspect beneath the separated wing wall for breaches into Pontoon G.
- 4 ft x 3 ft hole in deck of Pontoon G on shore side in way of broken wing wall connection
- Pin connections are structurally intact with minor distortion and tearing of connection structure – no breaches noted into pontoon deck in way of pin connection structure
- Unable to inspect side between F and G due to Pontoon H suspended overhead without
Supports

*Pontoon H*
- Resting on docking blocks on Pontoons E and F. No longer supported by blocks on Pontoon G.
- Shifted slightly inboard from original docking position per general comments above
- Did not conduct a detailed inspection of Pontoon H, which had been drydocked on the SITX dock for scrapping prior to the dock sinking

---



The diver report is being reviewed but based on the damages depicted and the condition under water there most probably will be no way of refloating this dry dock and it will be a salvage operation.

Also involved in this loss is a rented forklift that the insured has on rent from Sunbelt Rentals. This forklift was on the deck of the dry dock when it sunk and is a total loss. The insured is responsible for this equipment and will make payment direct to Sunbelt rentals. The replacement cost is approximately $140,000 and we are enclosing the rental information.

The insured also had some miscellaneous equipment on the dry dock which included a number of welding packages along with other miscellaneous electrical supplies and equipment which were being used for some modification work being conducted by Signal employees. We are developing all the details of work being performed, although we have determined no work was conducted in the



area of pontoon E that went down first. None of this equipment has been found and the insured's dry dock personnel are preparing an inventory of those items. We do not anticipate this would exceed $100,000 in value.

Also involved will be debris removal, this coverage is limited to 25% of the scheduled value of the dry dock or $5,000,000 which ever is greater. This will be further determined in due course. It is projected this operation will take at least six months.

**What is to be done**

We have just received the divers report this date and it is undergoing a thorough evaluation by all. Based on our preliminary review we do anticipate this will be a salvage operation. A bid package will be prepared and submitted to interested bidders. A key part of this removal process will that it be done in a manner so as to examine and determine if possible the cause of this sinking. We will continue to work with the Surveyor on this process.

We will work with the insured on the rented equipment claim as well as other equipment on the dock.

We will also meet with the Signal CFO to began evaluation of the BI exposure but at this time no decision have been made as to what they will do going forward regarding the dry dock replacement and potential interruption period..

We await your advices regarding the use of Meaden & Moore and Callan Salvage?

We will keep you advise as developments occur and a formal report within 30 days.

Sincerely,

**York Insurance Services Group, Inc.**

Kenneth M. Cruikshank
Executive General Adjuster



KMC/mrm

**ENCLOSURES**

1. Divers report
2. Daily Diver Report
3. General Land Office Dock Removal Demand Letter
4. Rental equipment data
5. Photographs



# ENCLOSURE ONE

# DIVERS REPORT

MSI 000323



RESOLVE
Marine Group

**Corporate Office**
1850 SE 17th St., #204
Ft. Lauderdale, FL 33316
Tel: 954-764-8700 ◊ Fax: 954-764-8724

**Dive Survey Report: Signal International Texas Drydock (SITX Drydock)**

**By:** **Todd Schauer, Resolve Towing and Salvage, Inc.**

**Report Date: September 1, 2009**

**Summary:**

Resolve Marine Services, Inc. performed a dive survey of the sunken SITX Drydock from August 26 – 30, 2009. The purpose of the survey was to document conditions found on the drydock after the recent uncontrolled flooding and sinking event. This document represents a report of survey and conditions found.

**Survey Particulars:**

The survey was conducted via a 4 man commercial dive team on surface supplied air with diver to topside communication. The survey was directed by Salvage Engineer Todd Schauer, who also recorded all survey findings.

Underwater visibility was poor, ranging from 0 to 6 inches, and occasionally 1 foot. Current was light and not a factor for the survey. Water depths varied from 36 to 44 feet to the top of the pontoon deck, and 50-55 ft along the exterior of the drydock to the mud line. The river bottom near the dry dock is soft mud.

The survey was conducted systematically from A pontoon through G pontoon inboard of the wing walls, followed by an external survey outboard of the wing walls.

**Conditions Found – General:**

The attached Signal drawing labeled "Diver Findings (General)" gives a good basic overview of the current condition of the drydock, including elevations, major damage noted, and the general condition of the drydock as it rests on the bottom. Significant conditions found include the following:

- Pontoon G was found separated from Pontoon G wing wall and also from Pontoon F. Pontoon G resting 5-7 feet lower than Pontoon F and has also shifted toward shore leaving a gap of 20 feet between F and G in the vicinity of the wing wall.
- Major damage was found on the pin connection ends of Pontoons D and E, including major hull breaches in way of the pin connection structure



**Corporate Office**
1850 SE 17th St. #204
Ft. Lauderdale, FL 33316
Tel: 954-764-8700 ◊ Fax: 954-764-8724

- Significant damage was found on the remainder of the pin connections from B to G and C to F. While these connections retain structural integrity, there are some limited hull breeches in the vicinity of the connection structure.
- The rail structure outboard of the wing walls was found collapsed in way of Pontoons B, C, D, and G.
- The pontoon decks outboard of the wing walls in way of the collapsed rail structure were found to have significant damage at the locations of the connection points of vertical support columns for the rail structure (Pontoons B, C, D, and G)
- In general, there is damage along the sides of each pontoon where they were in contact with adjacent pontoons during the sinking event. Vent pipes and support structure between the pontoons are damaged and this support structure has also created various damages to the hull (small tears, stiffener punch-through, etc.)
- Divers were not able to survey in between the pontoons past 40 ft of depth due to obstructions and also due to mud pushing up between the pontoons to within 4 ft of the pontoon deck in nearly all locations.
- Pontoon B found partially separated from Pontoon B wing wall - the outboard side of the wing wall is completely separated from the pontoon (with a 2 ft gap), but the inboard side is the wing wall remains mostly connected
- Pontoon H found resting on docking blocks, but has shifted slightly away from the B wingwall. There is now a separation of 20 ft between Pontoon H and the B wing wall on the river side, and 12 feet separation on the shore side. Pontoon H being supported only by the docking blocks on Pontoons E and F since Pontoon G has settled.
- Pontoons B and C are separated apart (approx. 8 ft gap at the pontoon shoulders on the pin connection end)
- Pontoons C and D appear separated. Pontoon D is 4 feet higher and 5 feet away from Pontoon C at the pontoon shoulder on the pin connection end
- Divers surveyed the inside of Pontoon E machinery space and found no anomalies that might indicate a cause of flooding. Machinery space was relatively clean and free of mud and debris.
- Manhole covers that were located into machinery spaces were found to be open
- Decks of pontoons were mostly free of equipment and debris. A few ancillary equipment items were noted including electric welding machines, electrical panels, etc.
- Working with a Signal crane barge, Resolve divers rigged a 75 ton crane, forklift, and manlift which were then lifted out of the drydock and onto the crane barge
- No other sources of pollution were noted

**Conditions Found – Specific:**

(In addition to the general comments stated above)

*Pontoon A:*



**Corporate Office**
1850 SE 17th St., #204
Ft. Lauderdale, FL 33316
Tel: 954-764-8700 ◊ Fax: 954-764-8724

- Small tear (less than 12 inches) on pontoon deck outboard of wing wall in way of diagonal brace to vertical rail guide
- Could not access between Pontoons A and B due to vent piping. Gap as per original – no apparent damage.
- No other damage noted

*Pontoon B:*

- Significant damage to pontoon deck outboard of wing wall due to collapse rail structure causing numerous tears and punch-throughs in way of vertical support columns
- Multiple tears, cracks and holes in way of strongback connection between Pontoons A and B. All damage sustained on Pontoon B side including a 6 ft tear, and 8 ft tear, and other cracks and holes where the strongback began separating from Pontoon B.
- Tear in river side pin connection structure on B pontoon, but hull not breached
- Pontoon B appears separated from Pontoon C – gap of 8 ft and 4 feet of height difference at the inboard shoulder (C side higher)
- Unable to inspect between Pontoons B and C due to obstructions and mud which has pushed through the gap on onto the deck of Pontoon B

*Pontoon C*

- Significant damage to pontoon deck outboard of wing wall due to collapse rail structure causing numerous tears and punch-throughs in way of vertical support columns
- Damage noted between Pontoons C and D. Vent pipes broken and distorted. Support brackets tripped and pushed into hull causing crushing and breaches (at a distance of 120 ft from the wing wall).
- Gap of 5 ft between Pontoons C and D at the inboard shoulder, Pontoon D 4 ft higher
- Tear on the outboard side of the river side pin connection on Pontoon C (approx. 6 ft tear in the deck) where connection tried to separate from the deck
- 12" x 18" hole in side shell at nose of pontoon in vicinity of shore side pin connection

*Pontoon D*

- Significant damage to pontoon deck outboard of wing wall due to collapse rail structure causing numerous tears and punch-throughs in way of vertical support columns
- Major damage to both pin connections and hull in way of pin connections where pin connections tore up from deck. Damage extends to the nose of the barge and down the front face. Approx. 20 ft wide section breached.
- Pontoon D 18" higher than Pontoon E at closest point
- Vent pipes broken off between Pontoon D and C
- 2 ft tear noted at the deck edge on the river side, approximately 15-20 ft from the wing wall

*Pontoon E*



**Corporate Office**
1850 SE 17th St., #204
Ft. Lauderdale, FL 33316
Tel: 954-764-8700 ◊ Fax: 954-764-8724

- Major damage to both pin connections and hull in way of pin connections where pin connections tore up from deck. Damage extends to the nose of the barge and down the front face. Approx. 20 ft wide section breached.
- 49 ft to the mud line on the river side of Pontoon E
- No damage noted to river side of Pontoon E
- No other damage or distortion noted on Pontoon E. Appears connected per original to Pontoon F

*Pontoon F*

- Separated from Pontoon G by 20 ft
- Pin connections appear intact
- 1 ft x 2 ft tear in Pontoon F deck between F and G in way of wing wall separation
- Unable to inspect between Pontoons E and F due to Pontoon H resting on blocks above the gap
- No other damage noted

*Pontoon G*

- Limited damage noted on pontoon deck outboard of wing wall due to collapse rail structure causing tears in way of vertical support columns
- Pontoon G completely separated from Pontoon G wing wall. Unable to fully inspect beneath the separated wing wall for breaches into Pontoon G.
- 4 ft x 3 ft hole in deck of Pontoon G on shore side in way of broken wing wall connection
- Pin connections are structurally intact with minor distortion and tearing of connection structure – no breaches noted into pontoon deck in way of pin connection structure
- Unable to inspect side between F and G due to Pontoon H suspended overhead without supports

*Pontoon H*

- Resting on docking blocks on Pontoons E and F. No longer supported by blocks on Pontoon G.
- Shifted slightly inboard from original docking position per general comments above
- Did not conduct a detailed inspection of Pontoon H, which had been drydocked on the SITX dock for scrapping prior to the dock sinking

By:

Todd Schauer, P.E.



YORK

# ENCLOSURE TWO

# DAILY DIVER REPORT

MSI 000328

**From:** Consavage, Paul [mailto:PConsavage@signalint.com]
**Sent:** Saturday, August 29, 2009 1:56 PM
**To:** Meisetschlaeger, Rodney
**Cc:** Duhon, Barney; Cooper, Kyle; Killeen, Pat; Spears, Lisa; Cunningham, Chris; Schnoor, Ronald
**Subject:** 04281 DDS... (DIVING ACTIVITIES & DAILY REPORT)... 8/26/09 - 8/29/09
**Importance:** High

Reference drawings depicting damages to the Dry-Dock (as described by the divers) have been provided... (please see attachments)

- 04281-180-100-01 (Rev-0) Dry-Dock General Arrangement "Normal Condition"
- 04281-180-100-02 (Rev-0) Dry-Dock General Arrangement "Present Condition"

**Saturday 8/29/09:**

- Diving operations begin at 7:00 AM.
- Final adjustments are made to the box beam & gangways... handrails are installed on the box beam.
- Divers identify some limited deck damage on Pontoon "G" in way of the collapsed auxiliary crane rail structure.
- Pontoons "E" & "F" outboard of the wing walls look good... (no collapsed structure).
- On the A-Side, there is heavy damage to the deck ("punch-throughs") in way of the vertical support connections (at the pontoon main deck) for the auxiliary crane rail structure. Now collapsed for most of the width of Pontoons "B", "C" & "D".
- The Section "B" wing wall has separated from Pontoon "B" on the outboard side (approx 2' gap between)... (inboard side appears to be connected per earlier dives on that side of the wing walls).
- Divers went into the machinery space of Pontoon "E"... no excessive mud was found which would have indicated a "blow-out" in the compartment.
- Propane tank racks have yet to be located.
- Diving operations stop at 3:00 PM... (the initial survey has been completed, Resolve Marine will submit their written summary Wednesday 9/2/09).

**Friday 8/28/09:**

- Diving operations begin at 7:00 AM.
- Recovered equipment is off-loaded (from the Pelican) at the SITX North Yard.
- The Peppy is moved to the T-Pier for final off-rent preparations & inspections.
- Box beam & gangways are temporarily placed to allow access to the A-Side wing wall.
- The Pelican transports the ramps, emergency generator & fuel tank, 13'x24' work barge (previously used to support ramps) & the DB3 barge to the SITX Orange Yard.
- A very light "sheen" which appeared to be some sort of leak/spill was spotted on the water's surface (both inside & outside of the containment boom) and was immediately reported to Malon Scoggin (who came out to investigate). Malon made the required alerts to the Texas GLO & Coast Guard (who came out to inspect). CG representatives did not see it to be a threat... no further action is anticipated.
- Divers discovered major damage to the upper pin connection (and surrounding main deck area) at Pontoon "D" & Pontoon "E"... (catastrophic damage to both units with "D" being the worst). The main deck & end of "D" is crushed-in, and heavily breached... the end of "E" is also damaged and breached.
- Divers discovered damage to the upper pin connection (and surrounding main deck area) at Pontoon "C" & Pontoon "F"... (limited tearing at the corners & base plates).
- Divers discovered damage to the upper pin connection (and surrounding main deck area) at Pontoon "B" & Pontoon "G"... (limited tearing at the corners & base plates).

- Divers discovered considerable damage to the "A/B" strong back... In particular on the "B" side.... (deck plate has peeled up in multiple places around the structure).
- Limited damage was discovered between all pontoons IWO vent pipes & related support brackets. Divers can only access approximately 4' down from the main deck in these areas due to mud... (pipes are broke off in numerous locations).
- Miscellaneous damage was identified in the "C/D/E/F" moon pool area where support structures pierced adjoining pontoons.
- The wing wall section has completely torn away from Pontoon "G" for the full width of 101'.
- After breaking loose from its wing wall, the nose of Pontoon "G" rotated counterclockwise away from Pontoon "F" by approximately 20'... and an elevation difference of 5' (with "G" being lower) The divers say that (although the connection has sustained substantial damage) "B" & "G" are still connected at the upper pin connections. I attempted to portray this in a cad drawing... however the dimensions they've provided to me thus far, make it impossible for the two to be connected... I'll work on it some more tomorrow.
- Needless to say, Pontoon "H" was found to have shifted... with "G" falling away, the blocks on "E" & "F" are the only things holding the unit up. Divers are exercising extreme caution in this area.
- Divers examined the West side (or "river" side) of Pontoon "E"... no indications of a "blow-out" were indicated. The mud line in this area is approximately 48'-49' below the surface, and the main deck of Pontoon "E" is at approximately 38'... (this means that only the upper half of the pontoon could be surveyed).
- Propane tank racks have yet to be located.
- Diving operations stop at 5:00 PM... (survey will continue with Section "E" & pontoon perimeter "outboard of the wing wall" areas tomorrow).

**Thursday 8/27/09:**

- Diving operations begin at 7:00 AM.
- Ramps are removed from the rented spud barge (the "Peppy").
- Forklift is discovered on Pontoon "G".
- Emergency generator & fuel tank are removed from Section "G" wing wall using the Pelican.
- With diver rigging assistance, the submerged cherry-picker, manlift & forklift are retrieved from the Dry-Dock basin using the Pelican.
- While rigging up on the cherry-picker, divers report that one of the outriggers appeared to be partially pinned underneath Pontoon "H"... (also that some of the rig blocks in that area had fallen over). This is an indication that some (or possibly all) of Pontoon "H" was afloat for a brief period, and moved on (or over) the blocks as the B-Side of the dock went under. Mooring lines still attached to the B-Side wing wall likely prevented further movement of the pontoon from the blocks, or possibly out of the Dry-Dock basin itself.
- Diving operations stop at 5:00 PM... (survey will continue with main pin connections, B-Side main deck & Section "E" tomorrow).
- Propane tank racks have yet to be located.
- Recovered equipment is transported (via the Pelican) to the SITX North Yard.
- The Pelican is moored at the SITX North Yard for the night.

**Wednesday 8/26/09:**

- After initial set up, diving operations begin at 10:00 AM.
- Diving was temporarily suspended due to thunderstorms.
- The Pelican arrived at the SITX Dock Yard, but due to thunderstorm delays... it was taken to the SITX North Yard & moored.
- Divers search for (and attach buoys to) the submerged pieces of diesel equipment... (the forklift & propane tank racks have not yet been located).

- While searching for the equipment, the divers identify a 2' to 3' *elevation deviation* between the Pontoon "C" & Pontoon "D" main decks... (with "D" being the higher of the two).
- Equipment identification continues through 8:00 PM or until all pieces have been located & tagged.
- If we are unable to locate the forklift tonight... we will suspend the search to go ahead and retrieve the cherry-picker, manlift & propane tank racks in the morning. These items will be taken to the SITX North Yard.
- Divers discovered a separation between the Pontoon "B" & Pontoon "C" main decks... (the separation increases as you walk from the wing wall towards the center of the dock, approx 30' from the wing wall a man can no longer touch both "B" & "C". Mud covers approximately half of the inboard end of the Pontoon "B" main deck. Along with the separation, there is also an elevation deviation between the Pontoon "B" & Pontoon "C" main decks... (with "C" being the higher of the two)... the extent of which is yet to be determined.
- Diving operations stop at 8:00 PM.

Regards,

Paul W. Consavage II
SITX Program Management
SITX Dockmaster
Signal International Texas, LLC
2500 MLK Drive
Port Arthur, TX 77640
Office: (409) 291-5465
Fax: (409) 980-5484
Cell: (409) 460-1008
pconsavage@signalint.com
www.signalinternational.com



# ENCLOSURE THREE

# GENERAL LAND OFFICE DOCK LETTER REMOVAL DEMAND LETTER

TEXAS GENERAL LAND OFFICE
JERRY PATTERSON, COMMISSIONER

September 2, 2009

Signal International Texas, LP
P. O. Box 2370
Orange, Texas 77631-2370

Attn: Mr. Rodney W. Meisetschlaeger, Senior VP & General Manager

Dear Mr. Meisetschlaeger:

The General Land Office (GLO) is investigating the recent sinking of the Signal International Texas dry dock on or about 20 August 2009 adjacent to the Signal International Texas facility at 2500 Martin Luther King Drive, in Port Arthur, Jefferson County, Texas. We appreciate your notification of our Region 1 Nederland Response Office, and any actions taken to minimize pollution impacts to waters of the state. The purpose of this letter is to inform you of the possible consequences of failing to recover the structure from Texas coastal waters. The Oil Spill Prevention and Response Act of 1991 (OSPRA), Texas Natural Resources Code, Chap. 40, gives the GLO authority to address abandoned vessels and structures in several ways.

OSPRA prohibits the abandonment of a vessel or structure in Texas coastal waters if the vessel or structure is in a wrecked, derelict, or substantially dismantled condition.

Texas Natural Resources Code, Chap. 40, §40.108. Derelict Vessels and Structures

*(a) A person may not, without the consent of the commissioner, leave, abandon, or maintain any structure or vessel in or on coastal waters, on public or private lands or at a public or private port or dock if the structure or vessel is in a wrecked, derelict, or substantially dismantled condition and the commissioner finds the structure or vessel to be:*

*(1) involved in an actual or threatened unauthorized discharge of oil;*
*(2) a threat to public health, safety, or welfare;*
*(3) a threat to the environment; or*
*(4) a navigation hazard.*

The GLO has determined that the Signal dry dock has sunken and should it not be raised and restored to its intended purpose, could be a threat to public health, safety or welfare and a threat to the environment.

Stephen F. Austin Building • 1700 North Congress Avenue • Austin, Texas 78701 1495
Post Office Box 12873 • Austin, Texas 78711-2873
512-463-5001 • 800-998-4GLO
www.glo.state.tx.us

MSI 000333

The Land Commissioner has not given you consent, nor will he give you consent, to leave or abandon the structure at its current location.

If the GLO formally determines the structure has been abandoned and needs to be disposed of, state funds may be expended to remove the structure from Texas coastal waters and dispose of it. The GLO has the authority to seek reimbursement for the costs of removal and disposal from you, as the person responsible for abandoning the structure. If the state must initiate legal action against you to obtain reimbursement for the costs associated with removal and disposal of the structure, you may also be assessed court costs and attorney fees. Additionally, OSPRA §40.251(c) gives the GLO authority to assess a penalty of between $100 and $10,000 per day against the owner of a vessel or structure that has been abandoned in Texas coastal waters.

If you fail to remove the structure from coastal waters and it is formally declared abandoned, you may also be charged with a Class A misdemeanor under OSPRA §40.251(a). Conviction of a Class A misdemeanor is punishable by a fine not to exceed $4,000, a prison term not to exceed one year, or both a fine and imprisonment.

Finally, if you do not the remove the structure and it is the source of an unauthorized discharge of a harmful quantity oil into Texas coastal waters, OSPRA §40.251(c) requires the GLO to assess a penalty against the responsible person of between $250 and $25,000. A "harmful quantity" of oil is defined as any amount of oil that causes a sheen upon or discoloration of the surface of the water. If an unauthorized discharge of oil originates from the Signal International dry dock, your refusal to remove the structure from Texas coastal waters will be a major factor in determining the appropriate penalty to assess against you.

I encourage you to take responsibility for this structure and initiate immediate action to recover the Signal International dry dock from Texas coastal waters. Please contact me at your earliest convenience to inform me of your plans to raise or recover the structure. You can contact me by phone at (512) 475-1464.

Sincerely yours,

William D. "Bill" Grimes
Abandoned Vessel Removal Program Manager
Oil Spill Prevention and Response Division

YORK

# ENCLOSURE FOUR

# RENTAL EQUIPMENT DATA

MSI 000335

2009/09/01 10:43:58 2 /4

# Signal International, LLC

*A Marine & Fabrication Company*

P.O.# T54786
Page 1 of 3

**Billing Address:**

SIGNAL INTERNATIONAL, LLC
P.O. BOX 2370
ORANGE, TX 77630-2370

## PURCHASE ORDER

**VENDOR**

Vendor #: 961382
RESOLVE MARINE SERVICES, INC.
1850 SE 17th STREET #204
FORT LAUDERDALE, FL 33316

**SHIP TO**

Signal Int, LLC - Dock
2500 M.L.K. BLVD.
PORT ARTHUR, TX 77640

**CHANGE ORDER**

Confirm Name: PETER
Confirm Date: 26-Aug-2009
Telephone#:
Fax #:

Terms: NET 30 DAYS
FOB #: DESTINATION
Ship VIA:

Buyer: Terri Laughlin, Buyer
409-291-8628 fax: 409-981-5674
PO Description: DIVE SURVEY/DOCK YARD
Order Date: 1-Sep-2009

| Line# | Qty | Part # | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|
| 1 | 20000.000 | # | 04281-180-100 | DO | 1.000 | $20,000.00 | 7-Sep-2009 | AIX-1547 |

SERVICE-DIVE SURVEY OF THE SIGNAL DRY DOCK VESSEL

Attn: PAUL CONSAVAGE

**NOTE: CONTRACTOR SHALL CONDUCT THE DIVE SURVEY SERVICE ON A T&M BASIS WITH AN ESTIMATED NOT TO EXCEED VALUE. CONTRACTOR SHALL PROVIDE OWNER WITH A DETAILED WRITTEN REPORT OF RESULTS OF THE DIVE SURVEY ON OR BEFORE SEPTEMBER 7,2009.
NOT TO EXCEED VALUE SHALL INCLUDE CONTRACTOR COST AS IDENTIFIED BY CONTRACTOR QUOTE DATED AUGUST 22,2009 HERETO ATTACHED AS EXHIBIT "A".
TERMS AND CONDITIONS ARE GOVERNED BY A MUTUALLY AGREED TO MARINE SERVICE AGREEMENT BETWEEN OWNER AND CONTRACTOR DATED AUGUST 26,2009.
CONTRACTOR SHALL NOT CONDUCT ANY PUBLIC RELEASE OF INFORMATION/DETAILS OF THE DIVE SURVEY FINDINGS TO ANY PARTY OR PARTIES OTHER THAN OWNER.
**PERIOD OF PERFORMANCE: AUGUST 26,2009 TO AUGUST 31,2009
PAY TERMS: NET 10 AFTER RECIEPT AND APPROVAL OF INVOICE.
CONTACT INFO.: RESOLVE MARINE GROUP
1850 SE. 17TH STREET SUITE 204
FORT LAUDERDALE, FL. 33316 PHONE# 954-764-8700
FAX# 954-764-8724 POC: PETER ROBINSON

>>> ALL SIGNED DELIVERY DOCUMENTATION MUST BE PROVIDED TO SIGNAL PRIOR TO SUBMITTAL OF INVOICE(S) FOR PAYMENT: ATT: SIGNAL PURCHASING or RECEIVING DEPT.

>>> ALL SIGNED DELIVERY DOCUMENTATION MUST BE PROVIDED TO SIGNAL PRIOR TO SUBMITTAL OF INVOICE(S) FOR PAYMENT: ATT: SIGNAL PURCHASING or RECEIVING DEPT.

* This is a "CONFIRMING" order. Please do not duplicate!!! DUPLICATES WILL BE RETURNED AT VENDOR EXPENSE.

* All invoices/documents must reference the Purchase Order number in order to be paid & addressed to "ACCOUNTS PAYABLE"

2009/09/01 10:43:58 4 /4

# Signal International, LLC

*A Marine & Fabrication Company*

P.O.# T64788
Page 3 of 3

**Billing Address:**

SIGNAL INTERNATIONAL, LLC
P.O. BOX 2370
ORANGE, TX 77630-2370

## PURCHASE ORDER

**VENDOR**

Vendor #: 961382
RESOLVE MARINE SERVICES, INC.
1850 SE 17th STREET #204
FORT LAUDERDALE, FL 33316

**SHIP TO**

Signal Int, LLC - Dock
2500 M.L.K. BLVD.
PORT ARTHUR, TX 77640

**CHANGE ORDER**

Confirm Name: PETER
Confirm Date: 26-Aug-2009
Telephone#:
Fax #:

Terms: NET 30 DAYS
FOB #: DESTINATION
Ship VIA:

Buyer: Terri Laughlin, Buyer
409-291-8628 fax: 409-981-5674
PO Description: DIVE SURVEY/DOCK YARD
Order Date: 1-Sep-2009

| Line# | Qty | Part # | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|

** Receiving hours for SIGNAL INT'L TEXAS Material control:
Orange, North & South locations;
>Mon - Fri 6:00am to 2:30pm (Break 9-9:15am, lunch 11:30-12:00pm)
Contact Tim Keltz or Mike Bellard for alternate arrangements if required (tel: 409-882-9311)

SIGNAL Dock Yard (Pleasure Island) location;
>Mon - Fri 6:00am to 4:00pm (Break 9-9:15am, lunch 11:30-12:00pm)
(tel: 409-983-3353)

**PO Total Costs:** $29,381.82

**Authorized By:** ______________________
Terri Laughlin

MSI 000337

2009/09/01 10:43:58 3 /4

# Signal International, LLC

*A Marine & Fabrication Company*

P.O.# T54786
Page 2 of 3

**Billing Address:**

SIGNAL INTERNATIONAL, LLC
P.O. BOX 2370
ORANGE, TX 77630-2370

## PURCHASE ORDER

**VENDOR**

Vendor #: 961382
RESOLVE MARINE SERVICES, INC.
1850 SE 17th STREET #204
FORT LAUDERDALE, FL 33316

**SHIP TO**

Signal Int, LLC - Dock
2500 M.L.K. BLVD.
PORT ARTHUR, TX 77640

**CHANGE ORDER**

Confirm Name: PETER
Confirm Date: 26-Aug-2009
Telephone#:
Fax #:

Terms: NET 30 DAYS
FOB #: DESTINATION
Ship VIA:

Buyer: Terri Laughlin, Buyer
409-291-8628 fax: 409-981-5674
PO Description: DIVE SURVEY/DOCK YARD
Order Date: 1-Sep-2009

| Line# | Qty | Part # | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|

* Signed acknowledgement receipt of this Order is requested by return fax/mail/e-mail.

SIG. [signature] DATE: Sept 01, 2009

Print name: FARHAT IMAM

TITLE: COO

>SIGNED PURCHASE ORDER RETURN REQUIRED FOR PAYMENT RELEASE<

| Line# | Qty | Part # | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|
| 2 | 1.000 # | | 04281-180-100 | DO | 9,381.820 | $9,381.82 | 1-Sep-2009 | AIX-1551 |

Attn: LEWIS HARKEY

APPEND TO PO #T54786 INCREASE PO FUNDING DUE TO ADDITIONAL COST INCURRED BY VENDOR

**NOTE: INCREASE DUE TO COST OF AIRLINE TICKETS, HOTEL, CAR RENTAL, FUEL FOR CAR RENTAL AND CONSUMABLES.

*SIGNAL INTERNATIONAL, LLC. FORM STD-1002(rev.05/09) T & C's is hereby made a part of this Purchase Order.

>>> ALL SIGNED DELIVERY DOCUMENTATION MUST BE PROVIDED TO SIGNAL PRIOR TO SUBMITTAL OF INVOICE(S) FOR PAYMENT: ATT: SIGNAL PURCHASING or RECEIVING DEPT.

* This is a "CONFIRMING" order. Please do not duplicate!!! DUPLICATES WILL BE RETURNED AT VENDOR EXPENSE.

* All invoices/documents must reference the Purchase Order number in order to be paid & addressed to "ACCOUNTS PAYABLE"

* Signed acknowledgement receipt of this Order is requested by return fax/mail/e-mail.

SIG.__________ DATE:__________

Print name:__________

TITLE:__________

>SIGNED PURCHASE ORDER RETURN REQUIRED FOR PAYMENT RELEASE<

# Signal International, LLC

*A Marine & Fabrication Company*

P.O.# T54380
Page 1 of 3

**Billing Address:**

SIGNAL INTERNATIONAL, LLC
P.O. BOX 2370
ORANGE, TX 77630-2370

## PURCHASE ORDER

**VENDOR**

Vendor #: 955509
SUNBELT RENTALS
ATTN: ACCOUNTS RECEIVABLE
P. O. BOX 409211
ATLANTA, GA 30384-9211

**SHIP TO**

Signal Int, LLC - Dock
2500 M.L.K. BLVD.
PORT ARTHUR, TX 77640

**CHANGE ORDER**

Confirm Name: SONNY
Confirm Date: 18-Aug-2009
Telephone#: 615-232-8680
Fax #:

Terms: NET 30 DAYS
FOB #: PPA
Ship VIA: Vendor Truck

Buyer: Maryann Marshall, Buyer
409-291-8626 fax: 409-981-5675
PO Description: TRANSFER RENTAL FORKLIFT 12K-
Order Date: 18-Aug-2009

| Line# | Qty | Part # | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|
| 1 | 2490.000 | # | 04854-001-001 | DO | 1.000 | $2,490.00 | 29-Jul-2009 | KMX-1802 Attn: WALLS, ROB |

RENTAL, TRANSFER, FORKLIFT JLG 12K S/N 0160016380

TRANSFER FORKLIFT FROM T231L TO 04854-001-001
PER KYLE COOPER
JLG 12K EXT FORKLIFT S/N 0160016380 REPLACED ORIGINAL SN# 0160027370
$1245/WEEK $3750/MONTH $400/DAY
REPLACEMENT COST $127500.00
TRANSFER PERIOD 7/27/09-8/07/09
CURRENT PURCHASE ORDER T53839 RWX-1860

THIS IS TO TRANSFER FOR TWO WEEKS TO OVERHEAD "MACHINE ALREADY ON SITE DO NOT DUPLICATE"

8/24/09 – THIS PIECE OF EQUIPMENT WAS ON THE DOCK AND WENT UNDER WATER. MM

************************************************************

THIS IS A "CONFIRMING ORDER". IT HAS BEEN GIVEN VERBALLY, VIA FAX OR EMAIL.

PLEASE DO NOT DUPLICATE. DUPLICATES WILL BE RETURNED AT VENDOR EXPENSE.
SIGNAL INTERNATIONAL, LLC. FORM STD-1002 T & C'S IS HEREBY MADE PART OF THIS PURCHASE ORDER
ALL INVOICES / DOCUMENTS MUST REFERENCE THE PURCHASE ORDER NUMBER IN ORDER TO BE PAID & ADDRESSED TO "ACCOUNTS PAYABLE".
ALL SIGNED DELIVERY DOCUMENTATION MUST BE PROVIDED TO SIGNAL PRIOR TO SUBMITTAL OF INVOICE(S) FOR PAYMENT: ATT: SIGNAL PURCHASING OR RECEIVING DEPARTMENT.
RECEIVING HOURS FOR SIGNAL TEXAS LOCATIONS: ORANGE, NORTH, & SOUTH YARD - 6:00 A.M. TO 2:30 PM, EXCEPTION 9:00 A.M. - 9:15 A.M BREAK; 11:30 A.M. - 12:00 NOON LUNCH; DOCK YARD - 6:00 A.M. TO 4:00 P.M., EXCEPTION 11:30 A.M. - 12:00 NOON LUNCH. AFTER HOUR DELIVERIES REQUIRE PRIOR APPROVAL. OTHER ARRANGEMENTS IF NECESSARY CAN BE MADE BY CONTACTING TIM

# Signal International, LLC

*A Marine & Fabrication Company*

P.O.# T54380
Page 2 of 3

**Billing Address:**

SIGNAL INTERNATIONAL, LLC
P.O. BOX 2370
ORANGE, TX 77630-2370

## PURCHASE ORDER

**VENDOR**

Vendor #: 955509
SUNBELT RENTALS
ATTN: ACCOUNTS RECEIVABLE
P. O. BOX 409211
ATLANTA, GA 30384-9211

**SHIP TO**

Signal Int, LLC - Dock
2500 M.L.K. BLVD.
PORT ARTHUR, TX 77640

Confirm Name: SONNY
Confirm Date: 18-Aug-2009
Telephone#: 615-232-8680
Fax #:

**CHANGE ORDER**

Terms: NET 30 DAYS
FOB #: PPA
Ship VIA: Vendor Truck

Buyer: Maryann Marshall, Buyer
409-291-8626 fax: 409-981-5675
PO Description: TRANSFER RENTAL FORKLIFT 12K-[
Order Date: 18-Aug-2009

| Line# | Qty | Part # | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|

KELTZ, SHIPPING & RECEIVING MANAGER, 409-291-5322 OR DOCK YARD RECEIVING DEPARTMENT 409-291-8957.
SUPPLIER IS REQUIRED TO SUBMIT COPY OF ORIGINAL FREIGHT BILL OR UPS PICKUP RECORD WITH INVOICES WHEN BILLING FOR FREIGHT CHARGES.
* SIGNED ACKNOWLEDGEMENT RECEIPT OF THIS ORDER IS REQUEST BY RETURN FAX/MAIL/E-MAL.

SIG.________________________ DATE:____________

Print name:__________________________

TITLE:______________________

SIGNED PURCHASE ORDER RETURN REQUIRED FOR PAYMENT RELEASE

OFF RENT DISCLAIMER: OFF RENTED EQUIPMENT MUST BE PICKED UP NO LATER THAN TWO (2) BUSINESS DAYS FROM DATE OF OFF-RENT NOTICE. ADDITIONALLY, VENDOR SHALL BE CHARGED REASONABLE STORAGE FEES FOR ANY EQUIPMENT LEFT ON SIGNAL'S PROPERTY IF NO ARRANGEMENTS ARE MADE WITHIN FIVE (5) DAYS OF THE OFF-RENT NOTICE.

FINAL BILLING DISCLAIMER: ALL RENTAL EQUIPMENT INVOICES MUST BE RECEIVED NO LATER THAN TEN (10) BUSINESS DAYS FROM DATE OF OFF RENT NOTICE. THIS INCLUDES BUT IS NOT LIMITED TO ANY REMAINING RENTAL CHARGES, TRANSPORTATION CHARGES, INSURANCE WAIVER CHARGES, SERVICE AND ENVIRONMENTAL CHARGES, OVERUSE CHARGES, CHARGES FOR LOST OR MISSING ITEMS, AND CHARGES FOR DAMAGED ITEMS.

REPAIR / SERVICE DISCLAIMER: PURCHASING APPROVAL REQUIRED PRIOR TO COMMENCEMENT OF REPAIR OR SERVICE AFTER RECEIPT OF VENDOR REPAIR / SERVICE QUOTE.

SWAP OUT: ALL RENTAL EQUIPMENT IN SIGNAL'S POSSESSION REQUIRES CORRECT SERIAL NUMBER AND REPLACEMENT COST TO BE COVERED BY INSURANCE IN CASE OF LOSS OR DAMAGE. PLEASE NOTIFY SIGNAL'S PURCHASING DEPARTMENT IN WRITING THE NEW EQUIPMENT NUMBERS AND NEW REPLACEMENT COST PRIOR TO OR IMMEDIATELY AFTER ANY EXCHANGE.

# Signal International, LLC

*A Marine & Fabrication Company*

P.O.# T54380
Page 3 of 3

**Billing Address:**

SIGNAL INTERNATIONAL, LLC
P.O. BOX 2370
ORANGE, TX 77630-2370

## PURCHASE ORDER

**VENDOR**

Vendor #: 955509
SUNBELT RENTALS
ATTN: ACCOUNTS RECEIVABLE
P. O. BOX 409211
ATLANTA, GA 30384-9211

**SHIP TO**

Signal Int, LLC - Dock
2500 M.L.K. BLVD.
PORT ARTHUR, TX 77640

Confirm Name: SONNY
Confirm Date: 18-Aug-2009
Telephone#: 615-232-8680
Fax #:

**CHANGE ORDER**

Terms: NET 30 DAYS
FOB #: PPA
Ship VIA: Vendor Truck

Buyer: Maryann Marshall, Buyer
409-291-8626 fax: 409-981-5675
PO Description: TRANSFER RENTAL FORKLIFT 12K-I
Order Date: 18-Aug-2009

| Line# | Qty | Part # | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|
| 2 | 3750.000 | # | 04854-001-001 | DO | 1.000 | $3,750.00 | 18-Aug-2009<br>Attn: KYLE | LWX-4339 |

RENTAL, APPEND, FORKLIFT JLG 12K S/N 0160016380

EXTEND RENTAL 1 MONTH
8/7/09-9/7/09

PO Total Costs: $6,240.00

Authorized By: [signature]
Maryann Marshall

Aug. 24. 2009 4:29PM No. 6853 P. 2

**Signal International, LLC**

*A Marine & Fabrication Company*

P.O.# T54380
Page 2 of 3

**Billing Address:**

SIGNAL INTERNATIONAL LLC
P.O. BOX 2370
ORANGE, TX 77630-2370

## PURCHASE ORDER

**VENDOR**

Vendor #: 955509
SUNBELT RENTALS
ATTN: ACCOUNTS RECEIVABLE
P. O. BOX 409211
ATLANTA, GA 30384-9211

**SHIP TO**

Signal Int, LLC - Dock
2500 M.L.K. BLVD.
PORT ARTHUR, TX 77640

**CHANGE ORDER**

Confirm Name: SONNY
Confirm Date: 18-Aug-2009
Telephone#: 615-232-8080
Fax #:

Terms: NET 30 DAYS
FOB 4: PPA
Ship VIA: Vendor Truck

Buyer: Maryann Marshall, Buyer
409-291-8626 fax: 409-981-5675
PO Description: TRANSFER RENTAL FORKLIFT 12K-D
Order Date: 18-Aug-2009

| Line# | Qty | Part# | Project | UoM | Unit Price | Extended Price | Delivery Date | REQ# |
|---|---|---|---|---|---|---|---|---|

KELTZ, SHIPPING & RECEIVING MANAGER, 409-291-5322 OR DOCK YARD RECEIVING DEPARTMENT 409-291-8957.
SUPPLIER IS REQUIRED TO SUBMIT COPY OF ORIGINAL FREIGHT BILL OR UPS PICKUP RECORD WITH INVOICES WHEN BILLING FOR FREIGHT CHARGES.
* SIGNED ACKNOWLEDGEMENT RECEIPT OF THIS ORDER IS REQUEST BY RETURN FAX/MAIL/E-MAIL.

SIG. [signature] DATE 8-24-09

Print name: Sonny Ohupson

TITLE: OSR

SIGNED PURCHASE ORDER RETURN REQUIRED FOR PAYMENT RELEASE

OFF RENT DISCLAIMER: OFF RENTED EQUIPMENT MUST BE PICKED UP NO LATER THAN TWO (2) BUSINESS DAYS FROM DATE OF OFF-RENT NOTICE. ADDITIONALLY, VENDOR SHALL BE CHARGED REASONABLE STORAGE FEES FOR ANY EQUIPMENT LEFT ON SIGNAL'S PROPERTY IF NO ARRANGEMENTS ARE MADE WITHIN FIVE (5) DAYS OF THE OFF-RENT NOTICE.

FINAL BILLING DISCLAIMER: ALL RENTAL EQUIPMENT INVOICES MUST BE RECEIVED NO LATER THAN TEN (10) BUSINESS DAYS FROM DATE OF OFF RENT NOTICE. THIS INCLUDES BUT IS NOT LIMITED TO ANY REMAINING RENTAL CHARGES, TRANSPORTATION CHARGES, INSURANCE WAIVER CHARGES, SERVICE AND ENVIRONMENTAL CHARGES, OVERUSE CHARGES, CHARGES FOR LOST OR MISSING ITEMS, AND CHARGES FOR DAMAGED ITEMS.

REPAIR / SERVICE DISCLAIMER: PURCHASING APPROVAL REQUIRED PRIOR TO COMMENCEMENT OF REPAIR OR SERVICE AFTER RECEIPT OF VENDOR REPAIR / SERVICE QUOTE.

SWAP OUT: ALL RENTAL EQUIPMENT IN SIGNAL'S POSSESSION REQUIRES CORRECT SERIAL NUMBER AND REPLACEMENT COST TO BE COVERED BY INSURANCE IN CASE OF LOSS OR DAMAGE. PLEASE NOTIFY SIGNAL'S PURCHASING DEPARTMENT IN WRITING THE NEW EQUIPMENT NUMBERS AND NEW REPLACEMENT COST PRIOR TO OR IMMEDIATELY AFTER ANY EXCHANGE.



PC#: 232
9991 HIGHWAY 69
PORT ARTHUR, TX 77640
409-724-7368

**SUNBELT RENTALS, INC.**

Salesman: 23205 CHAPMAN,EARL (232)
Typed By: JCONTRERAS

**RENTAL OUT**

Job Site:
SIGNAL INTERNATIONAL TEXAS, LP
PLEASURE ISLAND DRYDOCK
PORT ARTHUR, TX 77640

C#: 409-291-5028 J#: 409-963-2001

Customer: 3538421
SIGNAL INTERNATIONAL TEXAS, LP
PO BOX 2367
PORT ARTHUR, TX 77643

Contract #.. 21602468
Contract dt. 7/30/09
Date out.... 7/30/09 7:00 AM
Est return.. 8/27/09 7:00 AM
Job Loc..... PLEASURE ISLAND DRYDOCK, PORT AR
Job No...... 6 - SIGNAL INTERNATI
P.O. #...... T54380
Ordered By.. MARY, ANN
NET DUE UPON RECEIPT

| QTY | EQUIPMENT # | Min | Day | Week | 4 Week | Amount |
|---|---|---|---|---|---|---|
| 1.00 | 12,000LB 55'SHOOTING BOOM FORKLIFT RR0560630<br>Equipment #: JLT-06326<br>Make: JLG<br>Model: G12-55A<br>Serial #: 0160016380<br>Meter: 2915.000 | 400.00 | 400.00 | 1245.00 | 3750.00 | 3750.00 |

SALES ITEMS:

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | ENVIRONMENTAL<br>ENVIRONMENTAL | EA | 46.870 | 46.87 |
| 1 | RENTAL PROTECTION PLAN | EA | | 525.00 |

| | |
|---|---|
| Sub-total: | 4321.87 |
| Tax: | 356.56 |
| Total: | 4678.43 |

**Rate your rental experience www.sunbeltrentals.com/survey**

IF THE EQUIPMENT DOES NOT WORK PROPERLY, NOTIFY THE OFFICE AT ONCE | MULTIPLE SHIFTS OR OVERTIME RATES MAY APPLY | CUSTOMER IS RESPONSIBLE FOR REFUELING, DAMAGES AND REPAIRS

1. The total charges in this Contract is an estimate based on the estimated rental period provided by Customer.
2. Customer assumes all risks associated with the Equipment during the Rental Period, including injury and damage to persons, property and the equipment.
3. Customer is responsible for and shall only permit properly trained, authorized individuals, who are not under the influence of drugs or alcohol, to use the Equipment.
4. If the Equipment does not operate properly, the Equipment is not suitable for customer's intended use, the Equipment did not come with operating and safety instructions or customer has any questions regarding use of the Equipment, do not operate the Equipment and contact Sunbelt immediately.
5. Misuse of the Equipment or using damaged or malfunctioning Equipment may result in serious bodily injury or death.
6. Customer has received, read, understands and agrees to the estimated charges herein and all the terms and conditions of this Contract, including the Release and Indemnification provision in Section 8.
7. Customer must call to request pickup of Equipment, retain Pick Up Number given by Sunbelt and is responsible for Equipment until actually retrieved by Sunbelt.
8. For operations in California: Customer is renting equipment registered under the California Air Resources Board (CARB) Portable Equipment Registration Program (PERP). The operator of this equipment is subject to the requirements of the PERP regulation and local Air Pollution Control District rules. Under the PERP Regulation, the renter is required to keep a copy of the rental agreement and CARB registration certificate, including operating conditions and notification requirements, with the equipment at all times. By signing this form, the renter acknowledges receipt of these documents.

Customer is declining Rental Protection Plan________ (Customer Initials)

CUSTOMER SIGNATURE DATE NAME PRINTED DELIVERED BY DATE

PO1SHOLB-1 (Rev [illegible])

MSI 000343



# INVOICE

SEND ALL PAYMENTS TO:
P.O. Box 409211
Atlanta, GA 30384-9211

| | |
|---|---|
| INVOICE NO. | 21935804-000 |
| ACCOUNT NO. | 3538421 |
| INVOICE DATE | 8/24/09 |
| PAGE | 1 |

INVOICE TO

SIGNAL INTERNATIONAL TEXAS, LP
PO BOX 2367
PORT ARTHUR, TX 77643

RECEIVED BY: MARY, ANN

CONTRACT NO.: 21935804-000

PURCHASE ORDER NO.: QUOTE ONLY

JOB NO.: 6 - SIGNAL INTERNATI

JOB ADDRESS

SIGNAL INTERNATIONAL TEXAS, LP
PLEASURE ISLAND DRYDOCK
PORT ARTHUR, TX 77640

C#: 409-291-5028 J#: 409-963-2001

BRANCH
232 PORT ARTHUR

9991 HIGHWAY 69
PORT ARTHUR, TX 77640
409-724-7368

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 12,000# 55'JLG TELEHANDLER,ROPS, | EA | 127500.000 | 127500.00 |

G12-55A PKG2
Equipment #: JLT-06326 Year 2006
Make: JLG
Model: G12-55A
Serial #: 0160016380
replacement cost

DELIVERY CHARGE
SHIP TO: SIGNAL INTERNATIONAL TEXAS, LP
PLEASURE ISLAND DRYDOCK
PORT ARTHUR, TX 77640
**reference rental contract #21602468
dry dock collapse causing forklift to
fall into 60ft of water.

| | |
|---|---|
| Sub-total: | 127500.00 |
| Tax: | 10518.75 |
| Total: | 138018.75 |

*All Your Equipment Needs...*
*One Company.*

NET DUE UPON RECEIPT

| | |
|---|---|
| SUBTOTAL | |
| TAX | |
| INVOICE TOTAL | |



# INVOICE

SEND ALL PAYMENTS TO:
P.O. Box 409211
Atlanta, GA 30384-9211

| | |
|---|---|
| INVOICE NO. | 21602468-001 |
| ACCOUNT NO. | 3538421 |
| INVOICE DATE | 8/21/09 |
| PAGE | 1 |

INVOICE TO
SIGNAL INTERNATIONAL TEXAS, LP
PO BOX 2367
PORT ARTHUR, TX 77643

RECEIVED BY: MARY, ANN
CONTRACT NO.: 21602468-001
PURCHASE ORDER NO.: T54380
JOB NO.: 6 - SIGNAL INTERNATI

JOB ADDRESS
SIGNAL INTERNATIONAL TEXAS, LP
PLEASURE ISLAND DRYDOCK
PORT ARTHUR, TX 77640

C#: 409-291-5028 J#: 409-963-2001

BRANCH
232 PORT ARTHUR

9991 HIGHWAY 69
PORT ARTHUR, TX 77640
409-724-7368

| QTY | EQUIPMENT # | Min | Day | Week | 4 Week | Amount |
|---|---|---|---|---|---|---|
| 1 | 12,000LB 55'SHOOTING BOOM FORKLIFT | 400.00 | 400.00 | 1245.00 | 3750.00 | 3750.00 |
| | RR0560630 | | | | | |
| | Equipment #: JLT-06326 | | | | | |
| | Make: JLG | | | | | |
| | Model: G12-55A | | | | | |
| | Serial #: 0160016380 | | | | | |
| | Meter: 2915.000 | | | | | |

SALES ITEMS:

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | ENVIRONMENTAL<br>ENVIRONMENTAL | EA | 46.870 | 46.87 |
| 1 | RENTAL PROTECTION PLAN | EA | | 525.00 |

BILLED FOR FOUR WEEKS 7/30/09 THRU 8/26/09.

4321.87

*All Your Equipment Needs...*
*One Company.*

NET DUE UPON RECEIPT

| | |
|---|---|
| SUBTOTAL | 4321.87 |
| TAX | 356.56 |
| INVOICE TOTAL | 4678.43 |

MSI 000345

## ADDITIONAL TERMS AND CONDITIONS

1. TERMS. Customer's rental of the Equipment is conditioned upon Customer's agreement with the terms of this Contract. [illegible]

2. RENTAL CONTRACT. Sunbelt hereby rents to Customer and Customer rents from Sunbelt the Equipment pursuant to this Contract. [illegible]

3. PERMITTED USE. [illegible]

4. PROHIBITED USE. [illegible]

5. MAINTENANCE. [illegible]

6. CUSTOMER LIABILITY FOR DAMAGE AND LOSS. CUSTOMER ASSUMES DURING THE RENTAL PERIOD (DEFINED BELOW) ALL RISKS ASSOCIATED WITH THE POSSESSION, CUSTODY AND OPERATION OF AND FULL RESPONSIBILITY FOR, THE EQUIPMENT, INCLUDING BUT NOT LIMITED TO, PERSONAL INJURY, DEATH, RENTAL CHARGES, LOSSES, DAMAGES AND DESTRUCTION, INCLUDING TRANSPORT, LOADING AND UNLOADING. [illegible]

7. NO WARRANTIES. [illegible] SUNBELT DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE EQUIPMENT ITS DURABILITY, CONDITION, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES ACCEPTANCE OF THE EQUIPMENT ON AN "AS IS, WHERE IS" BASIS, WITH "ALL FAULTS" AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST SUNBELT. CUSTOMER ASSUMES ALL RISKS ASSOCIATED WITH THE EQUIPMENT AND RELEASES SUNBELT FROM ANY AND ALL LIABILITIES AND DAMAGES (INCLUDING LOST PROFITS, PERSONAL INJURY, AND SPECIAL, INCIDENTAL AND CONSEQUENTIAL DAMAGES) IN ANY WAY CONNECTED WITH THE EQUIPMENT, ITS OPERATION OR USE OR ANY DEFECT OR FAILURE THEREOF OR A BREACH OF SUNBELT'S OBLIGATIONS HEREIN.

8. RELEASE AND INDEMNIFICATION. TO THE FULLEST EXTENT PERMITTED BY LAW, CUSTOMER INDEMNIFIES, RELEASES, HOLDS SUNBELT HARMLESS AND AT SUNBELT'S REQUEST, DEFENDS (WITH COUNSEL APPROVED BY SUNBELT) FROM AND AGAINST ALL LIABILITIES, CLAIMS, LOSSES, DAMAGES, AND EXPENSES (INCLUDING ATTORNEY'S FEES AND EXPENSES) HOWEVER ARISING OR INCURRED, RELATED TO ANY INCIDENT, ANY DAMAGE TO PROPERTY, INJURY TO, OR DEATH OF, ANY PERSON OR ANY CONTAMINATION OR ALLEGED CONTAMINATION, OR VIOLATION OF LAW OR REGULATION CAUSED BY OR CONNECTED WITH THE USE, POSSESSION OR CONTROL OF THE EQUIPMENT DURING THE RENTAL PERIOD OR BREACH OF THIS CONTRACT, WHETHER OR NOT CAUSED BY THE ACTIVE OR PASSIVE NEGLIGENCE OR OTHER FAULT OF ANY PARTY INDEMNIFIED HEREIN AND ANY OF THE FOREGOING ARISING OR IMPOSED IN ACCORDANCE WITH THE DOCTRINE OF STRICT OR ABSOLUTE LIABILITY. CUSTOMER'S INDEMNITY OBLIGATIONS SHALL SURVIVE THE EXPIRATION OR TERMINATION OF THIS CONTRACT. IF ANY PART OF THIS SECTION IS DETERMINED INVALID BY A COURT OF COMPETENT JURISDICTION, CUSTOMER AGREES THAT THIS RELEASE AND INDEMNIFICATION SHALL BE ENFORCEABLE TO THE FULLEST EXTENT PERMITTED BY LAW.

9. INSURANCE. [illegible] not elected and paid for, property insurance against loss by all risks to the Equipment, in an amount at least equal to the MSLP thereof; (c) worker's compensation insurance as required by law; and (d) if the Equipment is to be used on any roadway, automobile liability and physical damage insurance (including comprehensive and collision coverage, a contractual vehicle endorsement and [illegible] coverage), in the same amounts set forth in subsections (a) and (b). Such policies shall be primary (and not on an excess basis), name Sunbelt as an additional insured and loss payee, and provide for Sunbelt to receive at least 30 days prior written notice of any cancellation or material change in such coverage. Customer shall provide Sunbelt with certificates of insurance evidencing the coverages required above prior to any rental and any time upon Sunbelt's request (failure to provide such certificates may constitute a breach of this Contract). THE INSURANCE REQUIRED HEREIN DOES NOT RELIEVE CUSTOMER OF ANY OF CUSTOMER'S RESPONSIBILITIES, INDEMNIFICATION OR OTHER OBLIGATIONS HEREIN, OR FOR WHICH CUSTOMER MAY BE LIABLE BY LAW OR OTHERWISE.

10. RENTAL PROTECTION PLAN ("RPP"). If Customer has elected the RPP and the Equipment is lost, stolen, damaged or destroyed, provided the Conditions are satisfied and no Exclusions thereto apply, then Customer's repair or replacement responsibility in Sections 5 and 6 is modified by the RPP and Sunbelt shall limit the amount Sunbelt collects from Customer for the Equipment loss, damage or destruction to the following amounts: (a) 10% of the MSLP for Equipment stolen from a secure location (being defined as under lock and key with only Customer having access thereto); (b) 50% of the MSLP for Equipment stolen from an unsecured location; (c) 50% of the cost of repairs for incidental or accidental damage to Equipment less the greater of $100 or 10% of the MSLP; (d) 50% of the MSLP of destroyed Equipment less the greater of $300 or 10% of MSLP; (e) costs in excess of $50 for the purchase repairs, if [illegible] by Sunbelt (excludes [illegible], filled tires, [illegible] tires and tire replacement, the entire cost of repair and/or replacement being Customer's responsibility in such events); and (f) nothing for the rental charges which would otherwise accrue during the period when damaged or destroyed Equipment is being repaired or replaced by Sunbelt or, for lost or stolen Equipment, after Sunbelt receives the police report. THE RPP IS NOT INSURANCE AND DOES NOT PROTECT CUSTOMER FROM LIABILITY TO SUNBELT OR OTHERS ARISING OUT OF POSSESSION OR OPERATION OF THE EQUIPMENT, INCLUDING INJURY OR DAMAGE TO PERSONS OR PROPERTY.

i. RPP Conditions. The following "Conditions" must be satisfied for the RPP to apply: (A) Customer accepts the RPP; (B) Customer pays 14% of the gross rental charges as the fee for the RPP; (C) Customer fully complies with the terms of this Contract; (D) Customer's account is current at the time of the loss, theft, damage or destruction of the Equipment; and (E) none of the Exclusions apply.

ii. RPP Exclusions. [illegible] NOT COVERED BY THE RPP.

iii. Recovery of Equipment. [illegible]

iv. Subrogation. [illegible]

11. RENTAL PERIOD. "Rental Period" commences when the Equipment is delivered to Customer or the Site Address and [illegible]

12. RENTAL RATES. [illegible]

13. PAYMENT. [illegible]

14. RETURN OF EQUIPMENT. [illegible]

15. DEFAULT. [illegible] Contract; (b) becomes a debtor in a bankruptcy proceeding, or goes into receivership; (c) places the Equipment at risk if Sunbelt, in good faith, deems itself insecure; (d) fails to return Equipment immediately upon Sunbelt's demand; or (e) is in default under any other contract with Sunbelt. If a Customer default occurs, Sunbelt shall have, in addition to all rights and remedies at law or in equity, the right to enter the Site Address or wherever the Equipment is located and repossess the Equipment without judicial process or prior notice. Customer shall pay all of Sunbelt's costs, including reasonable costs of collection, court costs and attorney's fees, incurred in exercising any of its rights or remedies herein. The use of false identification to obtain Equipment or the failure to return Equipment by the end of the Rental Period may be considered theft, subject to criminal prosecution and civil liability where permitted, pursuant to applicable law. CUSTOMER WAIVES ANY RIGHT OF ACTION AGAINST SUNBELT FOR SUCH ENTRY OR REPOSSESSION.

16. FINANCING. This Contract and all of Customer's rights in and to the Equipment are subject and subordinate to all rights, title and interest of all persons (including Sunbelt's secured lenders) who have financed or leased the Equipment or provided financing to Sunbelt.

17. LIMITATION OF SUNBELT'S LIABILITY. IN CONSIDERATION OF SUNBELT'S RENTAL OF THE EQUIPMENT TO CUSTOMER, CUSTOMER AGREES THAT SUNBELT'S LIABILITY WITH RESPECT TO THIS CONTRACT, INCLUDING ANY LIABILITY ARISING FROM SUNBELT'S OR ANY THIRD PARTY'S COMPARATIVE, CONCURRENT CONTRIBUTORY, PASSIVE OR ACTIVE NEGLIGENCE OR THAT ARISES AS A RESULT OF ANY STRICT OR ABSOLUTE LIABILITY, SHALL NOT EXCEED THE TOTAL RENTAL CHARGES PAID BY CUSTOMER UNDER THIS CONTRACT.

18. JURY TRIAL WAIVER. TO THE EXTENT PERMITTED BY LAW, IN ANY ACTION TO ENFORCE OR INTERPRET THE TERMS OF THIS CONTRACT, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY, THIS WAIVER BEING A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS CONTRACT.

19. COMPLIANCE WITH EXPORT AND IMPORT LAWS. Customer acknowledges and agrees that removal of the Equipment from the United States is prohibited under this Agreement. If Customer desires to transport or cause the transport of the Equipment outside of the United States and/or to operate the Equipment outside of the United States, Customer must notify Sunbelt prior to taking such action and, subject to agreement by Sunbelt, a separate Rider to this Agreement shall be executed and the terms of such Rider shall be incorporated herein. Although prohibited under this Agreement, if Customer exports or re-exports the Equipment, Customer acknowledges its understanding that the Equipment is subject to export control laws and regulations of the United States government, including (but not limited to) the Export Administration Regulations, and that Customer is responsible for complying with such laws and regulations. Customer further acknowledges that it is responsible for: (a) determining whether export or re-export licenses or other authorizations are required, (b) obtaining any required licenses, authorizations, or documentation prior to exporting or re-exporting the Equipment, (c) obtaining any required documentation necessary for return of the Equipment, and (d) ensuring no unauthorized transfers or diversions of the Equipment occur. Refer to [illegible] for information.

20. MISCELLANEOUS. If this Contract identifies any Equipment that is to be purchased by Customer, Sunbelt sells and delivers such Equipment to Customer on an "AS IS, WHERE IS" basis, with all faults and without any warranties (other than manufacturer warranties, if any) in consideration for Customer's payment to Sunbelt of the full purchase price of the Equipment. Sunbelt retains title to the Equipment until Customer has paid in full. This Contract: (a) together with any Customer executed credit application, constitutes the entire agreement of the parties regarding the Equipment and may not be modified except by written amendment signed by the parties; and (b) shall be governed by the laws of the State of North Carolina, without regard to any conflicts of law principles. If any provision of this Contract is prohibited by law in any state, such provision shall, as to such state, be ineffective to the extent of such prohibition without invalidating the remaining provisions. Headings in this Contract are for convenience only. Any failure by Sunbelt to insist upon strict performance of any provision of this Contract shall not be construed as a waiver of the right to demand strict performance in the future. Customer, and the person signing this Contract, represents that: (i) they both have full authority to execute, deliver and perform this Contract; and (ii) this Contract constitutes a legal, valid and binding obligation of Customer, enforceable in accordance with its terms. When Customer is a buyer of Equipment, they are hereby notified that Sunbelt has assigned its rights (but not its obligations) in the agreement to sell the asset(s) described herein to Sunbelt Rentals Exchange, Inc., a qualified intermediary, as part of Section 1031 exchange.



# ENCLOSURE FIVE

# PHOTOGRAPHS

MSI 000347



B side wing wall

MSI 000348



RT175

Removing cherry picker from deck 30' underwater

MSI 000349



Note top of deck lighting

MSI 000350



MSI 000351



Signal – Dry Dock

MSI 000352



MSI 000353



MSI 000354