UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FIREMAN'S FUND INSURANCE COMPANY,
ONE BEACON INSURANCE COMPANY,
NATIONAL LIABILITY AND FIRE INSURANCE
COMPANY and
QBE MARINE & ENERGY SYNDICATE 1036,

                       Plaintiffs,

                  – against –

GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK, MAX SPECIALTY INSURANCE
COMPANY and SIGNAL INTERNATIONAL, LLC,

                       Defendants.
------------------------------------------------------------X

10-cv-1653 (JPO) (JLC)

ECF Case

## MAX SPECIALTY INSURANCE COMPANY'S LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS

Defendant Max Specialty Insurance Company ("Max"), by its attorneys, Traub Lieberman Straus & Shrewsberry LLP, as and for its Local Rule 56.1 Statement of Uncontested Facts in opposition to Signal International, LLC's ("Signal") motion for partial summary judgment dated August 10, 2012, states as follows:

1.      Signal admits that the AFDB-5 was a vessel in its initial pleadings in this lawsuit. *See* Doc. Nos. 68 and 79, annexed collectively as Exhibit A to the Declaration of Stephen D. Straus dated September 14, 2012 ("Straus Decl."), ¶3(C).

2.      Signal purchased the AFDB-5 on or about December 29, 2005. In connection with the purchase, Signal's counsel filed various documents in support of Signal's application for

vessel documentation including, *inter alia*, an Application for Simplified Measurement with the United States Coast Guard ("USCG"). *See* Straus Decl., Ex. B.

3. The application was submitted on behalf of Signal by King, LeBlanc & Bland, P.L.L.C ("King, LeBlanc & Bland"). *Id.*

4. King, LeBlanc & Bland was a prior name of and/or a predecessor firm to LeBlanc & Bland, P.L.L.C., Signal's counsel of record in the instant action.

5. The sale was recorded with the USCG under the AFDB-5's official vessel number, 677876. *See* U.S. Coast Guard General Index or Abstract of Title, Straus Decl. Ex. C.

6. On the same date that the Bill of Sale was signed, a fleet preferred mortgage in favor of General Electric Capital Corporation ("GE") on, *inter alia*, the ADFB-5, was recorded with the USCG. *See Id.*

7. The GE mortgage is annexed as Exhibit D to the Straus Decl. The AFDB-5 is listed as one of five "vessels" encumbered by the mortgage. *Id.* at 1 (USCG0114).

8. In October, 2006, King, LeBlanc & Bland corresponded with the USCG seeking renewal of the AFDB-5's Certificate of Documentation ("Certificate"). *See* Straus Decl., Ex. E.

9. The USCG issued Certificates to Signal for the AFDB-5, while Signal owned it, on October 24, 2006, September 11, 2007 and November 20, 2008. *See* Straus Decl. Ex. F. The Certificates list, *inter alia*, the vessel's hull material, gross and net tonnage, depth, and operational endorsements ("Coastwise Registry"). *See Id.*

10. On November 20, 2008, a preferred mortgage with the AFDB-5 as collateral with Wachovia Bank, NA ("Wachovia"), as mortgagee in the amount of $48,600,000 was recorded. *See* Straus Decl. Ex. C at 2 (USCG0005); *see also* Straus Decl. Ex. G at 1 ("[Signal] is the sole legal owner of the following vessel [AFDB-5]").

11. A Release of Signal's mortgage obligations to Wells Fargo Bank, NA (successor to Wachovia) was filed on June 10, 2010, with the USCG National Vessel Documentation Center ("VDC"). *See* Straus Decl. Ex. H.

12. The AFDB-5, previously known as the AFSB-5, was built by the United States Navy during World War II in Morgan City, Louisiana and Pittsburgh, Pennsylvania, with assembly accomplished at MINSY (i.e., Mare Island Naval Shipyard, Vallejo, California). *See* Straus Decl. Ex. J.

13. The AFDB-5 was then towed in water thousands of miles to the western Pacific Ocean to service Navy vessels engaged in the war effort. *See* Straus Decl. Ex. K.

14. The AFDB-5 was built to be easily towed across these vast distances. In this regard, the eight (8) (originally seven (7)) steel pontoons which constituted the major part of the mobile floating drydock had ship-shaped hulls with curved edges and a ship bow shape at each end. *See* Straus Decl. Ex. L at Bates number KC0599.

15. This hull construction was in contrast to the flat bottoms and boxed-shaped (i.e., 90-degree angled) sides, front and back characteristic of most floating drydocks. *See* Affidavit of David L. Porter, Straus Decl. Ex. M, at ¶13.

16. Each pontoon was built with crews' quarters containing mess rooms, bunk beds, store rooms and fresh water tanks. Straus Decl. Ex. L at Bates No. KC0600.

17. At some point after World War II, the AFDB-5 was based in Hawaii. In or about 1984, the AFDB-5 was towed from Hawaii to Beaumont, Texas, a distance of thousands of miles. *See* Straus Decl. Ex. N.

18. When not in transit, the AFDB-5 was attached to the above-surface concrete caps of two (2) mooring dolphins consisting of steel pipe piles driven into the harbor bottom. Straus Decl. Ex. M at ¶¶15-17. A sliding mooring arm connected to the AFDB-5 was held in place on the mooring dolphins using two (2) steel pins. *Id.* at ¶17.

19. The drydock was disconnected from its mooring simply by removing one of the two pins on each of the two sliding mooring arms. *Id.* at ¶21. As the connection to the dolphins is above the surface of the water, removal of the pins is accomplished from the surface of the vessel, i.e., it does not require diving. *Id.* at ¶24. With a well-trained crew, the decoupling of each mooring could be accomplished in less than one (1) hour. *Id.* at ¶26.

20. Other lines connecting the AFDB-5 to shore, including those for electrical power, water and oxygen, were designed as well to be easily disconnected. *Id.* at ¶28. A well-trained crew could disconnect these services within twenty-four (24) hours, and probably much sooner than that. *Id.* at ¶30.

21.     In May, 2003, the AFDB-5 was moved laterally to Signal's North Yard to allow for dredging.  *See* Straus Decl. Exs. R, S.  The drydock did not return to its mooring until almost one (1) month later.  Straus Decl. Ex. S.

22.     John Haley testified at his deposition in this matter that the sea floor beneath the drydock was dredged every two to three (2-3) years.  Straus Decl. Ex. T, Transcript of Deposition of John Haley, at 72-73.

23.     The vessel was subsequently moved again for dredging.  *See* Straus Decl. Ex. U ("Initial Phases & Descriptions Needed to Begin Project: ... Move drydock, associated activities").

24.     Signal, in its "Hull and MGL Insurance Submission," affirmatively states that one hundred percent (100%) of its receipts are derived from marine-related operations.  Straus Decl. Ex. W, Signal International, LLC: Hull and MGL Insurance Submission, Bates stamped WILLIS21552.

25.     The AFDB-5 was far and away the greatest asset insured at Signal's Port Arthur facility, as was the Dual Carrier drydock at Signal's Pascagoula, Mississippi, location.  Of the total $14,949,980 of insured assets at the 2500 M.L. King Boulevard location, $13,600,000 represented the total claimed value of the AFDB-5.  Bland Aff. Ex. C at 3.

26.     The other property insured at that location listed by Signal, i.e., "Guard House," "Maintenance/Repair Shop," "Warehouse 1," "Warehouse 2," "Cafeteria," and "Security Hut" (*see Id.*) were clearly all property which supported the central operation of Signal's Port Arthur 2500 M.L. King Boulevard facility, which was the operation of the AFDB-5.

27. In fact, Signal's own counsel of record made this very point during the deposition of Max underwriter James Francis Morano, III:

> Q. [by David Bland, Esq., counsel for Signal]: So at that facility, at Martin Luther King Boulevard, the highest value by far was the drydock, wasn't it? . . .
>
> Q. Did you -- have you ever come to understand that the only purpose of that facility at Martin Luther King Boulevard was for the drydock?

Transcript of Deposition of James Francis Morano, III, Bland Aff., Ex. A at 40.

28. This was not the only time during the deposition that Signal's counsel emphasized the fact that the entire purpose for Signal's Port Arthur facility concerned the operation of the AFDB-5 floating drydock:

> Q. [by Mr. Bland]: Were you aware that the very reason that that yard existed was because of the AFDB-5 drydock? . . .
>
> Q. Did Mr. Heller in his report, do you recall whether or not in that report it was reflected that the AFDB-5 was a critical part of the Port Arthur facility?

*Id.* at 40.

29. The P&I Policy (a/k/a Marine General Liability) issued to Signal by Fireman's Fund Insurance Company ("FFIC") covers the AFDB-5. *See* FIC's Motion for Summary Judgment ("FFIC's MSJ") dated August 10, 2012, Ex. 16.

30. In the marine excess liability policy issued by FFIC, as well as in a pollution liability policy issued to Signal by Great American Insurance Company ("GAIC"), the AFDB-5 is listed as a "vessel." *See* FFIC MSJ Ex. 18 at page Bates No. Signal (NY) 228-229; Ex. 20 at Bates No. Willis 02507).

31. Signal was contractually obligated as "Operator" of the AFDB-5 to maintain marine hull and machinery (i.e., marine property) insurance on the AFDB-5. *See* Straus Decl. Ex. N, ¶2.12(a)(1). *See also* Straus Decl. Ex. B at USCG0203 ("By virtue of a November 2002 Asset Purchase Agreement, Signal acquired the rights, title and interest in the Project Agreement. Accordingly, Signal has assumed all of the above obligations of the 'Operator.'").

32. Signal's insurance brokers at Willis, who are very experienced marine insurance brokers, recommended a substitute primary property form, namely Willis' Brokers Manuscript Form. Willis has testified that the purpose of using the Willis Brokers Manuscript form instead of a marine hull and machinery insurance policy form for Signal's two vessels, AFDB-5 and DUAL CARRIER, was to have access to better business interruption insurance for Signal regarding those vessels than was available if a marine hull and machinery insurance policy was used to cover those vessels. (*See* Ewing Tr. 138:21-142:6, FFIC MSJ Ex. 7).

33. There is no coverage for business interruption losses in marine hull and machinery insurance policies. *See* Declaration of Fred Robertie ("Robertie Decl.") in Opposition to Plaintiffs' [FFIC's] Motion for Partial Summary Judgment Against Max Specialty Insurance Company, annexed to Straus Decl. in Opposition to FFIC's MSJ, ¶26. Instead, a separate loss of use insurance policy may be sought from a specialist insurer. *Id.* If loss of use insurance can be obtained, the cost is substantial. *Id.*

34. Willis' Brokers Manuscript form was accepted by Westchester Surplus Lines Insurance Company/ACE which agreed to provide $10 million in primary property insurance to Signal for the January 2009 – January 2010 insurance year. *See* FFIC MSJ, Ex. 12.

35. Paragraph F of the Definition Section on Page 43 of FFIC'S MSJ Exhibit 12, the Brokers Manuscript form, is entitled "General Average Contribution and Salvage Charges" and there is a reference therein to "parties in a sea adventure." These terms are unique to marine hull and machinery insurance policies available only to vessel owners. Robertie Decl. ¶28. Those terms can only refer to the AFDB-5 and Dual Carrier drydocks which are the only vessels covered on the Westchester property policy. *Id.*

Dated:   Hawthorne, New York
         September 14, 2012

                    TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP

              By:   /s/ Stephen D. Straus
                    Stephen D. Straus (SS 6183)
                    Jeremy P. Monosov (JM 0089)
                    Mid-Westchester Executive Park
                    Seven Skyline Drive
                    Hawthorne, New York 10532
                    (914) 347-2600
                    Attorneys for Max Specialty Insurance Company