UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FIREMAN'S FUND INSURANCE COMPANY,                    10-cv-1653 (JPO) (JLC)
ONE BEACON INSURANCE COMPANY,
NATIONAL LIABILITY AND FIRE INSURANCE                ECF Case
COMPANY and
QBE MARINE & ENERGY SYNDICATE 1036,

                                Plaintiffs,

                          – against –

GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK, MAX SPECIALTY INSURANCE
COMPANY and SIGNAL INTERNATIONAL, LLC,

                                Defendants.
-----------------------------------------------------------------------X

## MAX SPECIALTY INSURANCE COMPANY'S AMENDED RESPONSE TO DEFENDANT SIGNAL INTERNATIONAL, LLC's STATEMENT OF UNCONTESTED MATERIAL FACTS

Defendant Max Specialty Insurance Company ("Max"), by its attorneys, Traub Lieberman Straus & Shrewsberry LLP, as and for its response to defendant Signal International, LLC's ("Signal") Statement of Uncontested Material Facts Supporting Signal's Motion for Partial Summary Judgment Against Max Specialty Insurance Company, states as follows:

    1.    Signal owned the AFDB-5 Drydock.  Affidavit of John Haley, **Exhibit F**, para.11.

**RESPONSE:** Admit.

    2.    Signal maintained a Primary Property Insurance Policy underwritten by Westchester Surplus Lines Insurance with a limit of $10,000,000.  *See* Westchester Surplus Lines Insurance Co. – Primary Property Policy No. D37362220001, **Exhibit A**.

**RESPONSE:** Admit.

3. Signal maintained an Excess Property Insurance Policy underwritten by Max Specialty Insurance Company with limits of $15,000,000 in excess of the $10,000,000 primary property insurance policy. *See* Max Specialty Insurance Co. Commercial Property-Excess of Loss Policy No. MAX2XP0004029, **Exhibit B**.

**RESPONSE:** Admit.

4. The Excess Property Insurance Policy "followed form" in other words, was issued on the exact same terms as the Primary Property Insurance Policy. Deposition of James F. Morano, III, p. 238, I. 21- p. 239, I. 2, **Exhibit E**.

**RESPONSE:** Deny. The Max policy speaks for itself and contains an "Application of Underlying Provisions" clause as Section 2 which clearly provides following form limitations. Plaintiffs' Local Rule 56.1 Statement, Doc. No. 160, Ex. 14, (Willis 00714). *See also* Declaration of James F. Morano in Opposition to Plaintiffs' Motion for Summary Judgment, dated September 13, 2012, ¶¶5-14.

5. The Primary Property Insurance Policy and the Excess Property Insurance Policy both insured $211,328,279 of real and personal property and equipment, including (2) drydocks. See Signal International L.L.C., Statement of Values dated January 16, 2009, **Exhibit C**.

**RESPONSE:** Admit.

6. Drydocks permanently moored to a dock, river bank, or shore, are specifically included as covered property under the Primary and Excess Property Insurance Policies. *See* Westchester Surplus Lines Insurance Co. – Primary Property Policy No. D37362220001, **Exhibit A.**

**RESPONSE:** Deny. The Westchester and Max policies provide coverage to (i) the "Dual Carrier" drydock when it is located within five (5) miles of Signal's premises, and (ii) other drydocks, including the AFDB-5, while they are located within one (1) mile of Signal's premises. *See* Bland Aff. Ex. A at 62. There is no provision for drydocks "permanently moored." *See Id.*

7. The AFDB-5 Drydock was built by the U.S. Navy in 1943. Affidavit of John Haley, **Exhibit F**, para. 8.

**RESPONSE:** Deny. The AFDB-5 was built in 1944. *See* Straus Decl. Ex. J.
.

8. As originally designed, the AFDB-5 Drydock had a lift capacity of 56,000 LT. *Id*.

**RESPONSE:** Admit.

9. Prior to its sinking, the AFDB-5 was one of the largest drydocks in the world. Affidavit of John Haley, **Exhibit F**, para. 9.

**RESPONSE:** Admit.

10. The AFDB-5 Drydock consisted of eight 240' x 101' x 23.5' pontoons each complete with one fixed wing wall and one removable wing wall moored together in a two (2) pontoon by four (4) pontoon arrangement. This was known as the "rig configuration." *Id.*

**RESPONSE:** Admit.

11. The AFDB-5 Drydock was permanently moored to the shore using steel mooring dolphins and connected with a barge that served as a bridge to the shore. Affidavit of John Haley, **Exhibit F,** para. 10.

**RESPONSE:** Denies that the AFDB-5 was permanently moored to the shore. The AFDB-5 was attached to two (2) mooring dolphins by sliding mooring arms, which were attached to the dolphins by two (2) pins each. *See* Affidavit of David L. Porter, Straus Decl. Ex. M, at ¶¶15-20; Straus Decl. Ex. L at Bates numbers KC0639 and KC 0644.

12. The AFDB-5 Drydock was purchased by Signal outright from the Port of Port Arthur in March 2005. Affidavit of John Haley, **Exhibit F**, Para. 11.

**RESPONSE:** Admit.

13. The AFDB-5 Drydock has never been used by Signal, Texas Drydock or Freide Goldman Halter for any sort of marine transportation.  Affidavit of John Haley, **Exhibit F**, para.12.

**RESPONSE:** Deny.  The AFDB-5 was disconnected and towed away from its mooring on at least two (2) occasions while owned by Signal.  *See* Straus Decl. Exs. R; Ex. S; Ex.T at 72-73; Ex. U.

14. The AFDB-5 Drydock was incapable of use in marine transportation in the rig configuration and while permanently moored to the shore.  Affidavit of John Haley, Exhibit F, para.13.

**RESPONSE:** Deny.  The AFDB-5 was not permanently moored to the shore and was capable of marine transportation.  *See* Straus Decl. Ex. M.

15. The AFDB-5 Drydock has always remained permanently moored to the shore since it was installed in its current location in Port Arthur, Texas in 1984.  Affidavit of John Haley, **Exhibit F**, para. 14.

**RESPONSE:** Deny.  The AFDB-5 floating drydock was not permanently moored to the shore. *See* Straus Decl. Ex. M.  Moreover, it was freed from its mooring and towed to another location to allow for dredging during the time Signal owned it.  *See* Straus Decl. Exs. R; Ex. S; Ex.T at 72-73; Ex. U.

16. The AFDB-5 Drydock, while moored to the shore, has simply been raised and lowered in the slip so that mobile offshore drilling units, jack-up rigs, vessels and other offshore structures could be loaded and unloaded onto and off of the AFDB-5 Drydock so that work could be undertaken on them. *Id.*

**RESPONSE:** Deny.  See Response to SUF 15 above.

17. The AFDB-5 Drydock would only be ballasted and de-ballasted during the loading and unloading of offshore structures and vessels. *Id*.

**RESPONSE:** Admit.

18. Mr. Trip Morano, Max Specialty Insurance Company's executive underwriter for primary and excess property policies, who underwrote the EPI Policy at issue, specifically testified that the Excess Property Insurance Policy is a commercial property policy and is not a marine insurance policy.  See deposition of Mr. James F. Morano, III at 139, l. 3-21, **Exhibit E**.

**RESPONSE:** Deny, but admits that the following questioning took place:

    Q.    And the coverage is for commercial property excess of loss; is that right?

    A.    That's correct.

    Q.    This is not a marine insurance policy, is it?

    A.    That's correct.

Transcript of Deposition of James F. Morano, III at 139:17-21.

Dated: Hawthorne, New York
October 11, 2012

        TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP

By: <u>/s/ Stephen D. Straus</u>
Stephen D. Straus (SS 6183)
Jeremy P. Monosov (JM 0089)
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532
(914) 347-2600
Attorneys for Max Specialty Insurance Company