MATTIONI, LTD.
George R. Zacharkow (GZ7099)
Stephen J. Galati (SG0492)
Attorneys for Defendant, Great American
Insurance Company of New York
399 Market Street
Philadelphia, PA 19106
Tel.: 215-629-1600
Fax.: 215-923-2227

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
FIREMAN'S FUND INSURANCE
COMPANY, ONE BEACON INSURANCE               ECF CASE
COMPANY, NATIONAL LIABILITY AND
FIRE INSURANCE COMPANY and QBE
MARINE & ENERGY SYNDICATE 1036
       Plaintiffs               10-cv-1653 (LAK)

   v.
GREAT AMERICAN INSURANCE
COMPANY OF NEW YORK, MAX
SPECIALTY INSURANCE COMPANY
and SIGNAL INTERNATIONAL, LLC
       Defendants
-----------------------------------------------------------X

**DEFENDANT GREAT AMERICAN INSURANCE COMPANY OF NEW YORK'S
MEMORANDUM OF LAW IN RESPONSE TO THE COURT'S ORDER TO SHOW
CAUSE WHY THIS ACTION SHOULD NOT BE DISMISSED FOR LACK OF
SUBJECT MATTER JURISDICTION**


          Respectfully Submitted,


          MATTIONI, LTD.
          George R. Zacharkow (GZ7099)
          Stephen J. Galati (SG0492
          Attorneys for Defendant, Great American
          Insurance Company of New York
          399 Market Street
          Philadelphia, PA 19106
          Tel.: 215-629-1600
          Fax.: 215-923-2227

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.      Interpretation of Marine Insurance Policies Falls Within the Admiralty and
        Maritime Jurisdiction of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.      Applying the Principles of *Kirby* and the Analysis of *Folksamerica*, the Great
        American Vessel Owner Pollution Policy is a Contract of Marine Insurance and
        This Court Has Admiralty and Maritime Jurisdiction Pursuant to 28 U.S.C. §1333 . . . . 8

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## TABLE OF AUTHORITIES

### CASES

Certain Underwriters at Lloyds, London, Subscribing to Certificate of Insurance
OP01 0025 v. Inlet Fisheries, Inc.,
389 F. Supp. 2d 1145 (D. Al. 2005), affirmed 518 F. 3d 645 (9th Cir. 2008) . . . . . . . . . . . . . . . 9

Commercial Union Insurance Co. v. Detyens Shipyard, Inc.,
147 S. Supp. 2d 413 (S. D. S.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.,
413 F.3d 307, 317 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9

Insurance Co. v. Dunham,
78 U.S. (11 Wall.) 1 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Jeffcott v. Aetna Ins. Co.,
129 F.2d 852 (2d Cir. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Kossick v. United Fruit Co.,
365 U.S. 731, 735 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

La Reunion Francaise SA v Barnes,
247 F3d 1022, (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Norfolk S. Ry. Co. v. Kirby,
543 U.S. 14 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

St. Paul Fire and Marine Ins. Co. v. Board of Commissioners of Port of New Orleans,
418 Fed. Appx. 305; 2011 U.S. App. LEXIS 5318 (5th Cir 2011) . . . . . . . . . . . . . . . . . . . . . 8

St. Paul Fire & Marine Insurance Co. v. SSA Gulf Terminals, Inc.,
2002 U.S. Dist. LEXIS 19138 (E.D. La. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Windsor Mount Joy Mut. Ins. Co. v. Giragosian,
57 F.3d 50, 54 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

### STATUTES

28 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. §1333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 9, 10, 11

**OTHER AUTHORITY**

1 Benedict on Admiralty §182 at 12-4 (8th ed. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## I.   PRELIMINARY STATEMENT

This Memorandum of Law, with supporting Exhibits, is filed by Defendant Great American Insurance Company of New York ("Great American") in response to the Court's January 25, 2013 Memorandum Opinion regarding Defendant Signal International, LLC's ("Signal") Motion for Partial Summary Judgment against Defendant Max Specialty Insurance Company ("MSI") on the issue of vessel status and admiralty jurisdiction, and the Court's Order to Show Cause Why this Action Should Not Be Dismissed for Lack of Subject Matter Jurisdiction. While Defendant Great American was not a party to the referenced Motion, the Court invited all parties to respond to the Order to Show Cause.

## II.   FACTUAL BACKGROUND

Signal is in the business of providing marine construction and repair services at several locations in Texas, Mississippi, and Alabama. In 2003, Signal became the operator of a facility in Port Arthur, Texas which was centered around the AFDB-5, a floating drydock ("drydock"), that was berthed along the Sabine-Neches Waterway. (See Exhibits 1 and 2.) In addition to the AFDB-5, Signal also owned and operated a number of barges and tugs, as well as another drydock ("fleet").  In 2005, Signal purchased the AFDB-5.

Signal worked with Willis of Alabama, an insurance broker, to structure an insurance program to cover its assets and potential liabilities. This included in pertinent part, a primary property policy, a hull and machinery policy, a primary marine general liability policy, a vessel owner pollution policy, an excess property policy, and an excess (bumbershoot) marine general liability policy, among others. Plaintiffs issued the bumbershoot marine general liability policy to

-1-

Signal, which followed the primary form and covered various marine liabilities. (See Exhibit 3.)

Great American issued the vessel owner pollution policy to Signal to provide coverage for its

fleet of vessels with regard to certain costs and liabilities that may arise in the event of oil spills

or releases of hazardous materials into the navigable waters of the United States. (See Exhibit 4.)

On August 20, 2009, the AFDB-5 sank at its berth in Port Arthur, Texas. The 65 year old

drydock was declared a constructive total loss. Under the terms of the Conditional Sale

Agreement, Signal had a contractual obligation to properly dispose of the drydock. (See Exhibit

5.) Pursuant to the terms of the lease for the Port Arthur site where the drydock was berthed,

Signal had a contractual obligation to remove the drydock at the end of the lease term, and had to

extend the lease until the drydock was cleared from the site. (See Exhibit 6.) Accordingly, shortly

after the sinking, Signal undertook to engage a contractor to remove and dispose of the sunken

drydock, with the expectation that the costs would be covered by the marine general liability

insurers whose policies it had purchased to provide wreck removal coverage, *inter alia*.

However, counsel for the primary and bumbershoot marine general liability insurers

instructed Signal not to enter the contract for the raising and disposal of the drydock with the

belief that the costs would be covered by them under the wreck removal provision. They asserted

that the coverage for the handling of the sunken drydock must be under the primary and excess

property policies which covered debris removal, and/or the pollution policy because the drydock

was a "pollutant." Neither Signal nor the insurers agreed with this position. It was denied that the

sinking of the drydock was a pollution event and that Great American was responsible for raising

and disposing of the sunken drydock. As a result, Plaintiffs filed the instant lawsuit on March 2,

2010, against Signal, MSI, and Great American, seeking a declaration of the rights of the parties

under the respective insurance policies regarding the obligation to raise and dispose of the sunken drydock.

On March 11, 2010, Signal filed its own lawsuit against the marine general liability insurers, Fireman's Fund Insurance Company, One Beacon Insurance Company, National Liability & Fire Insurance Company, and Certain Underwriters at Lloyd's of London Subscribing To Policy No. I0268m09, Plaintiffs herein, in the United States District Court for the Eastern District of Texas. Signal alleged claims against Plaintiffs for breach of contract and bad faith for failure to pay for the raising and disposal of the drydock.

In due course, Plaintiffs agreed to advance the funds for the wreck removal without prejudice, in exchange for an assignment from Signal of its right to assert a claim against Great American under the pollution policy. Also included as part of the agreement was the dismissal of Signal's action against Plaintiffs in Texas, and Plaintiffs dismissal of their claims against Signal in the instant action.

As the Court has referenced in its Memorandum Opinion, Plaintiffs invoked admiralty jurisdiction when they filed their Declaratory Judgment Complaint, which was appropriate in view of the treatment that courts have given CGL policies when they cover marine interests and risks. Part of the relief sought by Plaintiffs against Signal, is a declaration that their policies do not provide coverage for the removal of the wrecked drydock (First Count), that the bumbershoot policy need not respond for the loss until after the Great American and primary MGL policies first respond (Second Count), and that construction of the "other insurance" clauses of the policies renders its coverage as excess (Third Count). Furthermore, Plaintiffs are seeking a declaration that Great American is obligated to pay its coverage limit toward the cost of raising

the drydock.

Great American answered the Complaint on April 6, 2010, and denied liability to Plaintiffs on the basis that the vessel owner pollution policy was not triggered by a pollution event, and it does not provide coverage for wreck removal. Great American asserted various other defenses to coverage under its policy, including an assertion that the policy it issued to Signal may be void *ab initio* under the marine insurance doctrine of *uberrimae fidei* in the event Signal failed to disclose all material facts or made any material misrepresentations during the insurance application process.

Subsequent discovery revealed that numerous material facts regarding the condition and operation of the drydock had not been disclosed to Great American over a period of years. As a result, Great American filed an Amended Answer with a Crossclaim seeking a declaratory judgment that the pollution policy was void *ab initio* because the record revealed that Signal had failed to disclose material facts. Great American also asserted a Counterclaim against Plaintiffs on the grounds that since the policy should be declared void, they were entitled to no relief. These claims were asserted as admiralty and maritime claims within the scope of Rule 9(h) of the Federal Rules of Civil Procedure.

MSI asserted a similar Crossclaim under the doctrine of *uberrimae fidei*. Signal filed a Motion for Partial Summary Judgment, arguing that the drydock was not a vessel, that the property policies were not marine insurance policies, and, therefore, MSI was not entitled to have the *uberrimae fidei* doctrine applied. As stated earlier, Great American was not a party to this Motion. By Memorandum and Order dated January 25, 2013, the Court ruled that the drydock was not a vessel and that the MSI policy was not a marine insurance policy. Based upon the

finding that the drydock was not a vessel, the Court then stated that it lacked admiralty

jurisdiction over all claims, counterclaims, and cross-claims asserted in this action, because

Plaintiffs had only alleged the existence of admiralty jurisdiction. The Court issued an Order to

Show Cause why the action should not be dismissed and invited the parties to provide relevant

materials as to whether the Court has subject matter jurisdiction.

It is submitted that diversity jurisdiction exists and Great American references the

submissions by the other parties, who it understands will be addressing this issue. However,

Great American also maintains that the Court has admiralty jurisdiction with regard to the claims

asserted by Plaintiffs and with regard to the claims asserted by Great American, because the

Court's determination that the drydock is not a vessel is not dispositive of the jurisdictional issue.

As discussed more fully below, the insurance policies issued by Plaintiffs and Great

American, which are under consideration by the Court, are marine insurance policies and

maritime contracts, and this supports the Court's admiralty pursuant to 28 U.S.C. §1333.

## III.   LEGAL ARGUMENT

### A.   Marine Insurance Policies Fall Within the Admiralty and Maritime Jurisdiction of the Court.

It is well established that claims arising under marine insurance policies are within the

admiralty and maritime jurisdiction of the Federal Courts, 28 U.S.C. §1333. *Insurance Co. v.*

*Dunham*, 78 U.S. (11 Wall.) 1 (1871). The Supreme Court explained that "it is well settled that a

marine insurance policy is a maritime contract within federal admiralty jurisdiction." *See, e.g.*

*Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961); *Jeffcott v. Aetna Ins. Co.*, 129 F.2d 852

(2d Cir. 1942); *see also Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir.

1995) (holding "the propriety of maritime jurisdiction over a suit involving a marine insurance policy is unquestionable.").

In determining whether an insurance policy is a maritime contract, the Court is to be guided by the principles established by the United States Supreme Court in *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14 (2004). In *Kirby* the Court ruled that whether a contract is maritime "depends upon . . . the nature and character of the contract and the true criterion is whether it has "reference to maritime service or maritime transactions" rather than "whether a ship or vessel was involved" or where the work was performed. 543 U.S. 14, 23-24 (2004) (internal citations omitted.) In *Kirby*, the Supreme Court was construing an intermodal bill of lading which was issued with regard to the transportation of cargo by sea and over land. The Supreme Court reasoned that the character of the bill of lading as a maritime contract "was not defeated simply because it also provides for some land carriage." Id at 27. The Court went on to state that as long as the bill of lading required substantial carriage by sea, "its purpose is to effectuate maritime commerce – and thus it is a maritime contract." Id.

In *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 317 (2d Cir. 2005), the Second Circuit followed the principles set forth by the Supreme Court in *Kirby* to decide whether an insurance policy was a maritime contract. The court observed that in *Kirby* the "Supreme Court exercised admiralty jurisdiction over a contract with non-maritime components deemed to be *more* than 'incidental'", and that the focus of the analysis was "on whether the principal objective of a contract is maritime commerce." Id. at 315 (quoting Kirby)(emphasis in original). The court went on to state the global principle that it derived from the Supreme Court analysis:

-6-

> As an insurance contract is maritime to the extent that it is
> "maritime insurance," see Jeffcot, 129 F. 2d at 584, admiralty
> jurisdiction will exist over an insurance contract where the primary
> or principal objective of the contract is the establishment of
> "policies of marine insurance," Dunham, 78 U.S. (11 Wall.) at 3,
> 20 L. Ed. 905.

Id. Bearing the above in mind, the court then construed a comprehensive general liability (CGL)

policy issued to a company that cleaned tanks on vessels to determine whether it qualified as

marine insurance and a maritime contract. The court explained that "[u]ltimately, coverage

determines whether a policy is 'marine insurance,' and coverage is a function of the terms of the

insurance contract and the nature of the business insured." Id. at 317. The court discussed the fact

that the CGL policy filled in some gaps in coverage for maritime risks that were left by other

policies that had been procured by the insured. It specifically referenced that pollution coverage

was provided, stating:

> Another endorsement involves pollution coverage. "It became
> obvious to the petroleum and tanker trade some time ago that
> extraordinary sources of financial protection would be necessary to
> meet the increasingly prohibitive costs of pollution clean-up and
> remediation activities." Hayden & Balick, supra, at 335. The CGL
> section of the Policy includes a "buy back" provision, permitting
> pollution coverage in certain circumstances.

Id. at 318. The court went on to observe that "[p]ollution coverage is widely recognized as

marine in nature" and that such coverage often is included within Protection & Indemnity (P & I)

policies. Id. at 320. The Second Circuit concluded that the district court erred in dismissing the

case for lack of subject matter jurisdiction, because the CGL policy's primary objective was

marine insurance and this supported admiralty jurisdiction pursuant to 28 U.S.C. §1333(1).

The pertinent factor in determining whether an insurance policy qualifies as marine

insurance is the policy itself, not the facts underlying the suit. As stated in *St. Paul Fire and*

*Marine Ins. Co. v. Board of Commissioners of Port of New Orleans*, 418 Fed. Appx. 305; 2011

U.S. App. LEXIS 5318 (5th Cir 2011):

> To determine admiralty jurisdiction in a contract action such as
> this, we do not consider merely whether a ship or vessel was
> involved but rather examine "the nature and character of the
> contract, and the true criterion is whether it has reference to
> maritime service or maritime transactions." *Norfolk S. Ry. Co. v.
> Kirby,* 543 U.S. 14, 24, 125 S. Ct. 385, 393, 160 L. Ed. 2d 283
> (2004) (internal quotation marks and citation omitted). The
> Supreme Court has instructed that the boundaries of admiralty
> jurisdiction are "conceptual rather than spatial," *id.* at 23, 125 S.
> Ct. at 393, and that because "the fundamental interest giving rise to
> maritime jurisdiction is the protection of maritime *commerce*," a
> court should focus its inquiry on whether maritime commerce is
> the principal objective of the contract. *Id.* at 25, 125 S. Ct. at 394
> (internal quotation marks and citations omitted) (emphasis in
> original).

*See, e.g. La Reunion Francaise SA v Barnes*, 247 F3d 1022, (9th Cir. 2001)(insurance policy was

wholly maritime so as to support jurisdiction under 28 U.S.C. §1333, although it required

policyholder to store boat on land for half year.)

    **B.**      **Applying the Principles of *Kirby* and the Analysis of *Folksamerica*, the Great American Vessel Owner Pollution Policy is a Contract of Marine Insurance and This Court Has Admiralty and Maritime Jurisdiction.**

The Great American vessel owner pollution policy provides coverage for Signal's fleet;

the "schedule of vessels" provided by Signal includes 25 vessels and 2 drydocks. (See Exhibit 4.)

Moreover, pursuant to the shipyard pollution endorsement, coverage was provided for the vessels

that were on the drydock for repairs or other work. (See Exhibit 4.) The coverage provided by

Great American is primarily with regard to oil spills or releases of hazardous materials into the

navigable waters of the United States, *inter alia*, and it is the same for Signal's 25 vessels as it is

for the 2 drydocks, as it is for whatever vessels were received on the drydocks. As noted by the Second Circuit in *Folksamerica,* pollution coverage has historically been provided through marine insurance policies.[1] Such coverage is mandatory for companies like Signal who own and operate vessels and perform marine maintenance and repair work on vessels. Considering the breakdown of the fleet and the coverage provided, the only reasonable conclusion is that the Great American vessel owner pollution policy "is primarily or principally concerned with maritime objectives" and is a marine insurance policy.

Great American submits that the fact that 2 drydocks are covered under the policy does not prevent it from being a marine insurance policy, since such coverage does not even rise to the permissible "more than incidental" status referenced by the Second Circuit in *Folksamerica.* However, there is additional authority that confirms that the status of the drydock as a non-vessel is not determinative of whether admiralty jurisdiction exists. It is the nature of the interests and risks that determine whether maritime jurisdiction exists. The courts have acknowledged that insurance on non-vessel structures may support the criteria to satisfy the requisites for admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

In *Commercial Union Insurance Co. v. Detyens Shipyard, Inc.,* 147 S. Supp. 2d 413 (S. D. S.C. 2001), a drydock sank at its berth. After observing that floating drydocks are not considered to be vessels when they are moored and in use as a drydock, the court posed the following question: "whether an insurance policy covering a moored drydock which operates to

---

[1] The Great American vessel owner pollution policy provides stand alone coverage for pollution risks that traditionally were covered by the P & I policy. *See Certain Underwriters at Lloyds, London, Subscribing to Certificate of Insurance OP01 0025 v. Inlet Fisheries, Inc.,* 389 F. Supp. 2d 1145 (D. Al. 2005), *affirmed* 518 F. 3d 645, 654 (9th Cir. 2008).

repair ships and barges is a policy of marine insurance [?]" Id. at 419. The court noted that: "A

maritime contract 'is one that ... relates to a ship and its use as such, or to commerce or to

navigation on navigable waters, or to transportation by sea or to maritime employment.'" Id. at

419, citing 1 Benedict on Admiralty §182 at 12-4 (8th ed. 1996).

In addressing the nature of the maritime interest, the court stated as follows:

> The interest insured in this case is Drydock Number 1, a drydock
> that was used in maritime business or commerce to repair ships and
> barges.  "It is axiomatic that the routine repair of vessels is a
> crucial maritime activity." *Sea Vessel, Inc. v. Reyes*, 23 F.3d 345,
> 351 (11th Cir. 1994). Moreover, contracts to repair or perform
> extensive reconstruction of a ship are within the admiralty
> jurisdiction of federal courts. See New Bedford Dry Dock Co. v.
> Purdy (The Jack-O-Lantern), 258 U.S. 96, 99-100, 66 L. Ed. 482,
> 42 S. Ct. 243 (1922); see also Sea Vessel, Inc., 23 F.3d at 351
> ("The routine repair of a vessel in a drydock on navigable waters
> bears a significant relationship to a traditional maritime activity
> such that admiralty jurisdiction attaches.") As such, drydocks play
> an integral role in the operation and maintenance of ships and other
> vessels -- a crucial maritime activity. Thus, it would be anomalous
> to find that the interest insured, i.e., Drydock Number 1 was
> anything other than a marine interest.

Id. The court then went on to conclude that the nature of the risks insured were fundamentally

maritime and that any non-maritime risks were not substantial and were incidental to the marine

risks. As a result, the court held that the hull, drydock, and P & I insurance policies were marine

insurance policies and that admiralty jurisdiction existed.[2]

Similarly, in *St. Paul Fire & Marine Insurance Co. v. SSA Gulf Terminals, Inc.*, 2002

U.S. Dist. LEXIS 19138 (E.D. La. 2002), a floating structure used to process the loading and

---

[2] Notably, current counsel for Plaintiffs also was counsel for underwriters in *Detyens* and made the argument that the policies were marine insurance policies and that the doctrine of *uberrimae fidei* applied.

offloading of grains from vessels sank at its permanent mooring in the Mississippi River. The structure was determined not to be a vessel. The court found that admiralty jurisdiction existed because the function of the structure was "'intimately connected' with maritime commerce since it assists in the loading and off loading of rice from ocean-going vessels." Id. at 8. The court observed that the insurance policies that were issued for the structure clearly provided coverage for maritime risks. As a result, the court held that the policies were marine contracts.

Here, Signal operated a facility in Port Arthur, Texas to perform marine construction and repairs and the drydock was a critical component of this operation. The drydock received oil rigs for repair and maintenance, but it also received barges and other vessels for such work. (See Exhibit 7.) These services are "intimately connected" with maritime commerce, and in particular, with the energy sector which operates in the Gulf of Mexico. Moreover, an oil spill emanating from the drydock, or a vessel on the drydock, would shut down the Sabine-Neches Waterway and interfere not only with Signal's business operations, but with commercial vessel traffic. See: http://www.ntsb.gov/doclib/reports/2011/MAR1104.pdf

## IV.   CONCLUSION

Both the marine general liability policy (bumbershoot) issued by Plaintiffs and the vessel owner pollution policy issued by Great American provide coverage for Signal's marine activities involving its fleet, which includes the 2 drydocks. They are primarily, if not exclusively, concerned with "maritime objectives" and therefore qualify as marine insurance policies. Marine insurance policies are marine contracts. Accordingly, notwithstanding the Court's finding that the drydock is not a vessel, admiralty jurisdiction exists pursuant to 28 U.S.C. §1333.

MATTIONI, LTD.


By:      _George R. Zacharkow_____
         George R. Zacharkow
         Stephen J. Galati
         399 Market Street, Suite 200
         Philadelphia, PA 19106
         (215) 629-1600 (T)
         (215) 923-2227 (F)
         gzacharkow@ mattioni.com
         sgalati@mattioni.com

Dated: February 6, 2013

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant Great American Insurance

Company of New York's Memorandum of Law in Opposition To Plaintiffs' Motion to Strike the

Twelfth and Thirteenth Affirmative Defenses of Defendant Great American Insurance  Company

of New York  via electronic notification on February 6, 2013, to the following:

John A.V. Nicoletti, Esquire
Nicoletti Hornig & Sweeney
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY 10005

Stephen D. Straus, Esquire
Adam Krauss, Esquire
Traub Lieberman Straus & Shrewsberry LLP
Seven Skyline Drive
Hawthorne, NY 10532

Stephen P. Kyne, Esquire
Burke & Parsons
100 Park Avenue
New York, NY 10017-5533

David S. Bland, Esquire
Matthew C. Guy, Esquire
LeBlanc Bland PLLC
1717 Saint James Pl. #360
Houston, TX 77056-3408

Allison R. Colon, Esquire
James D. Prescott, III, Esquire
LeBlanc Bland P.L.L.C.
909 Polydras Street
New Orleans, LA 70112

By: _____
George R. Zacharkow

-13-