UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X                    **ECF Case**

FIREMAN'S FUND INSURANCE
COMPANY, ONE BEACON INSURANCE                               10 Civ. 1653  (JPO)
COMPANY, NATIONAL LIABILITY AND
FIRE INSURANCE COMPANY and QBE
MARINE & ENERGY SYNDICATE 1036,

                    Plaintiffs,                           **PLAINTIFFS' AND
                                                           SIGNAL'S JOINT
                                                           LOCAL RULE 56.1**
       -against-                                   **STATEMENT_____**

GREAT AMERICAN INSURANCE
COMPANY OF NEW YORK, MAX
SPECIALTY INSURANCE COMPANY
and SIGNAL INTERNATIONAL, LLC

                   Defendants.
--------------------------------------------------------X

      Plaintiffs Fireman's Fund Insurance Company, One Beacon Insurance Company,

National Liability and Fire Insurance Company and QBE Marine & Energy Syndicate 1036

(herein sometimes collectively referred to as "Plaintiffs"), by their attorneys, Nicoletti Hornig

& Sweeney, and Defendant Signal International, LLC ("Signal"), by its attorneys LeBlanc

Bland P.L.L.C., set forth below as and for their Statement pursuant to Local Rule 56.1 the

following material facts as to which Plaintiffs and Signal contend there are no genuine issues to

be tried in regard to 1) Plaintiffs' motion for partial summary judgment against defendant Great

American Insurance Company of New York ("Great American") declaring that the policy of

insurance issued by Great American has been triggered as a result of the sinking and

subsequent order of removal of the drydock AFDB-5, formerly owned by Signal, 2) Plaintiffs'

and Signal's joint motion for partial summary judgment declaring that the Great American

pollution policy is not a maritime contract, does not come within the federal court's admiralty

jurisdiction and that the federal maritime doctrine of *uberrimae fidei* does not apply, dismissing

Great American's claims and defenses based on the doctrine of *uberrimae fidei*, and dismissing

Great American's claims of misrepresentation, concealment and/or material non-disclosure, and 3) Signal's motion for partial summary judgment against Max Specialty Insurance Company ("Max Specialty") dismissing Max Specialty's claims of fraud, misrepresentation, concealment and/or material non-disclosure.

## THE PARTIES AND THE POLICIES

1.      Plaintiff Fireman's Fund Insurance Company ("Fireman's Fund") was and is an insurance company duly organized under and existing by virtue of the laws of the State of California with a principal place of business in California and with an office and place of business at One Chase Manhattan Plaza, New York, New York 10005.  (Complaint ¶ 5, Docket No. 1, Exhibit "1").

2.      Plaintiff Fireman's Fund, as lead insurer, issued a policy of Marine General Liability Insurance bearing Policy No. OML 92001349 (the "MGL Policy") to defendant Signal International, LLC ("Signal") for the period January 30, 2009 through January 30, 2010. (Ewing Tr. 198:19-199:17, Exhibit "2"; Ewing Ex. 139, Exhibit "3").[1]

3.      A true and accurate copy of the MGL Policy was identified as Exhibit 139 to the deposition of Vernon Ewing.   (Ewing Tr. 198:19-199:17, Exhibit "2"; Ewing Ex. 139, Exhibit "3").

4.      The Fireman's Fund MGL Policy contains a full following clause with plaintiff Fireman's Fund as the lead insurer having full claims control over the acceptance and/or declination of claims made thereunder.  (Ewing Ex. 139 at p. Signal (NY) 00194, Exhibit "3").

---

[1] The exhibits referenced herein are annexed to the accompanying Affidavit of John A. V. Nicoletti, Esq. in Support of Plaintiffs' and Signal's Joint Motion for Partial Summary Judgment against Defendant Great American Insurance Company of New York and Signal's Motion for Partial Summary Judgment against Max Specialty, as well as Plaintiff's Motion for Partial Summary Judgment against Great American.

5.      Plaintiff One Beacon Insurance Company ("One Beacon") subscribed to a 50% participation in the MGL Policy, but only on a following basis.  (Ewing Ex. 139 at p. Signal (NY) 00197, Exhibit "3").

6.      The MGL Policy provided liability coverage, subject to its terms and conditions, in the amount of $1 million per occurrence, but subject to a $100,000.00 deductible.  (Ewing Ex. 139 at p. Signal (NY) 000123, Exhibit "3").

7.      Plaintiff Fireman's Fund also issued a policy of Marine Excess Liability Insurance bearing Policy No. OXL 92001369, with a coverage period of February 6, 2009 through January 30, 2010, to defendant Signal (the "Bumbershoot Policy"), in which Fireman's Fund subscribed to a 34% participation.  (Ewing Tr. 197:19-198:16, Exhibit "2"; Ewing Ex. 138, Exhibit "4").

8.      A true and accurate copy of the Bumbershoot Policy was identified as Exhibit 138 to the deposition of Vernon Ewing.  (Ewing Tr. 197:19-198:16, Exhibit "2"; Ewing Ex. 138, Exhibit "4").

9.      The Bumbershoot Policy contains a full following clause with plaintiff Fireman's Fund as the lead insurer having full claims control over the acceptance and/or declination of claims made thereunder.  (Ewing Ex. 138 at p. Signal (NY) 00236, Exhibit "4").

10.     Plaintiff National Liability and Fire Insurance Company ("National Liability") subscribed to a 34% participation in the Bumbershoot Policy, but only on a following basis. (Ewing Ex. 138 at pp. Signal (NY) 00236-237, Exhibit "4").

11.     Plaintiff QBE Marine & Energy Syndicate 1036 ("QBE") subscribed to a 32% participation in the Bumbershoot Policy, but only on a following basis.  (Ewing Ex. 138 at pp. Signal (NY) 00236-237, Exhibit "4").

12. The Bumbershoot Policy provided liability coverage, subject to its terms and conditions, in the amount of $25 million per occurrence in excess of the scheduled underlying insurance policies. (Ewing Ex. 138 at pp. Signal (NY) 000201, 226-27, Exhibit "4").

13. Defendant Signal International, LLC ("Signal") was and is a corporation duly organized under and existing by virtue of the laws of the State of Delaware with offices and places of business in the States of Mississippi and Texas. (Complaint ¶ 12, Answer ¶ 12).[2]

14. Defendant Great American Insurance Company of New York ("Great American") was and is an insurance company duly organized under and existing by virtue of the laws of the State of New York with a principal place of business located at 65 Broadway in the County, City and State of New York. (Complaint ¶ 13, Answer ¶ 13).

15. Defendant Great American issued a pollution liability insurance policy to defendant Signal, which bears policy no. OMH 6539337 05 for the policy period of January 30, 2009 through January 30, 2010 and which had a coverage limit of $5 million (the "Great American Policy"). (Ewing Tr. 130:21-131:20, Exhibit "2"; Ewing Ex. 130, Exhibit "5"; Stringer Tr. 105:13-106:10, Exhibit "6"; Stringer Ex. 247, Exhibit "7").

16. A true and accurate copy of the Great American Policy was identified as Exhibit 247 to the deposition of Cindy Stringer. (Stringer Tr. 105:13-106:10, Exhibit "6"; Stringer Ex. 247, Exhibit "7").

17. Both the MGL Policy and the Great American Policy are scheduled as underlying policies to the Bumbershoot Policy. (Ewing Ex. 138 at pp. Signal (NY) 000226-27, Exhibit "4").

---

[2] All references to "Answer" herein are references to the "Amended Answer of Defendant Great American Insurance Company of New York to Plaintiffs' Complaint, With Crossclaims and Counterclaim" [Docket No. 104] unless otherwise specifically stated.

18.     The Great American policy form is a primary cover.  (Stringer Tr. 116:25-117:4, Exhibit "6").

19.     Westchester Surplus Lines Insurance Company ("Westchester") issued to Signal property policy no. D37362220 001 for the period January 30, 2009 through January 30, 2010 (the "Westchester Policy").   (Johnson Tr. 126:8– 27:10, 129:5-11, Exhibit  "8"; Johnson Ex. 103, Exhibit "9"; Complaint ¶ 23; Answer ¶ 23).  Westchester is not a party to this action.

20.     In and by the terms of the Westchester Policy, Westchester insured defendant Signal for the first $10 million of exposure under Signal's property insurance program with respect to buildings and property, including the floating drydock AFDB-5.[3]  (Johnson Ex. 103, Exhibit "9").

21.     Defendant Max Specialty Insurance Company ("Max Specialty") issued to Signal a non-marine excess property policy no. MAX2XP0004029 for the period January 30, 2009 through January 30, 2010 (the "Max Specialty Policy").  (Johnson Tr. 129:18–130:19, Exhibit "8"; Johnson Ex. 104, Exhibit "10"; Morano Tr. 139:3-140:17, Exhibit "11").

22.     The Max Specialty Policy is written on a following form and provides the same coverage as that provided under the terms and conditions of the primary property policy issued by Westchester including Debris Removal.  (Morano Tr. 121:19-122:1, 216:2-20, Exhibit "11"; Whittington Tr. 176:16-19, Exhibit "12"; Johnson Tr. 229:17-230:2, Exhibit "8").[4]

## SIGNAL

23.     Signal came into existence in 2003 at which time Signal purchased the offshore repair division of Friede Goldman Halter in bankruptcy, which consisted of six (6) facilities, two (2) in Mississippi and four (4) in Texas, with one (1) of the Texas facilities being the Port

---

[3] In this litigation, Signal's dry dock at the core of the insurance claims has been referred to as the AFDB-5, Dry Dock No. 1, The Texas Dry Dock and/or the big dry dock.
[4] The Westchester and Max Specialty property policies are not at issue in this motion but are the subject of a separate motion for summary judgment.  (*See* Docket Number 159 *et. seq.*).

Arthur dockyard at which drydock AFDB-5, the subject of this litigation, was located.  (Haley Tr. 9:13-11:8, 12:19-13:3, Exhibit "13"; Johnson Tr. 300:4-20, Exhibit "8").[5]

24.     When Signal came into existence in 2003, its business was predominantly to repair, upgrade and/or perform conversions to offshore drilling rigs.  (Cunningham Tr. 28:11-17; 28:22-29:16, Exhibit "14").[6]

25.     In 2006, Signal's business model changed to include marine fabrication, performing new construction from engineering plans.  (Cunningham Tr. 28:3-10, 18-25; 30:22-40:24, Exhibit "14").

26.     In 2009, Signal received more than sixty percent (60%) of its revenue from new construction projects.  (Cunningham Tr. 70:20-71:15, Exhibit "14").

27.     In 2010, after the loss of drydock AFDB-5, Signal purchased the assets of Bender Shipbuilding in Mobile, Alabama which also put Signal into the ship repair business. (Cunningham Tr. 40:25-41:19, Exhibit "14").

## DRYDOCK AFDB-5

28.     In connection with Signal's 2003 purchase of assets from Friede Goldman Halter, Signal assumed the lease to operate drydock AFDB-5 which lease had originally been entered into in 1984 between the Port Arthur Navigation District Industrial Development Corporation ("PANDIC") and Bethlehem Steel.   (Haley Tr. 11:19-12:2, 20:12-18, 56:6-8, 194:3-5, Exhibit "13").

---

[5] John Haley retired from Signal in June, 2004 as Senior Vice-President and remains a consultant to Signal.  Mr. Haley has been involved with drydock AFDB-5 since 1996, when he was hired as the manager of the dockyard by TDI Halter, a prior operator of drydock AFDB-5.  (Haley Tr. 6:5-8, 7:15-10:7, 12:19-14:1, Exhibit "13").
[6] Mr. Chris Cunningham has been Signal's Chief Financial Officer since Signal came into existence in January, 2003.  (Cunningham Tr. 23:4-24:3, Exhibit "14").  Mr. Cunningham was produced by Signal as its Fed. R. Civ. P. 30(b)(6) witness.

29.     Drydock AFDB-5 was built in 1943/1944 for the United States Navy and was given to the Port of Port Arthur, Texas, in 1984.  (Haley Tr. 19:21-20:6, Exhibit "13").

30.     Signal purchased drydock AFDB-5 from the Port of Port Arthur in 2005.  (Haley Tr. 127:4-6, 211:9-13, Exhibit "13").

31.     The area where drydock AFDB-5 was located when it sank was once part of the land mass of Pleasure Island and was specifically carved out for the purpose of installing drydock AFDB-5.  (Haley Tr. 212:17-214:12, Exhibit "13"; Haley Ex. 25, Exhibit "15"; Cates Tr. 215:5-217:5, Exhibit "16"; Cates Ex. 292, Exhibit "17").

32.     Drydock AFDB-5 consisted of 8 pontoons, designated "A" through "H", that were each 240 feet long, 101 feet wide, and 23 ½ feet deep. Each pontoon had a fixed wing wall at one longitudinal end and a removable wing wall at the other longitudinal end.  The wing walls rose 48 feet above the pontoon deck.  (Answer (Crossclaims at ¶ 4); Signal Answer to G.A. CC at ¶ 4; Haley Tr. 22:23-24:7, 184:22-185:1, Exhibit "13").[7]

33.     The center of each pontoon of Drydock AFDB-5 had a compartment called the machinery space which housed the main ballast pumps as well as old engines, generators and a boiler room once used during the early days of the drydock.  (Meisetschlaeger Tr. 135:23-136:7, Exhibit "18"; Haley Tr. 27:1-21, 28:6-11, 32:3-22, Exhibit "13"; Cates Tr. 58:4-9, Exhibit "16").

34.     Each wing wall had a watertight level called the safety deck which, originally, was used as a machine shop and, although not used as such by Signal, still contained old machinery and parts at the time drydock AFDB-5 sank.  (Meisetschlaeger Tr. 131:10-23, 134:6-135:11, Exhibit "18"; Haley Tr. 175:1-177:1, 178:20-179:15, Exhibit "13").

---

[7] All references to "Signal Answer to G.A. CC" are references to "Signal's Answer to Great American's Crossclaims Against Signal" [Docket No. 107] unless otherwise specifically stated.

35.     At the time drydock AFDB-5 sank, significant quantities of asbestos and transite (an asbestos containing material) were contained in the safety deck of the pontoon wing walls and in the crew deck and machinery spaces of the pontoons themselves except for Pontoon H, which was abated prior to its being dydocked, and Pontoon E, which was abated years earlier after an incident involving damage from an anchor.  (Cates Tr. 127:3-131:25, 207:18-208:16, 209:24-210:24, 211:17-214:3, Exhibit "16"; Meisetschlaeger Tr. 154:18-160:23, 162:6-164:2, 170:7-172:11, Exhibit "18").

36.     Drydock AFDB-5 could be configured with the 8 pontoons connected in a row and both removable wing walls in place (ship mode), in which case its overall length was 829 feet, or it could be configured with two rows of four pontoons side by side and only the two fixed wing walls in place (rig mode), in which case its overall length was 413 feet and its width was 482 feet.  (Answer (Crossclaims at ¶ 5); Signal Answer to G.A. CC at ¶ 5).

37.     Signal only used the drydock AFDB-5 in the rig mode.  (Haley Tr. 24:10-17, 177:13-16, Exhibit "13").

38.     Drydock AFDB-5 had been used by Signal to assemble a newly constructed tension leg platform drilling rig.    (Cunningham Tr. 240:11-243:13; 405:24-406:25, Exhibit "14").

39.     A true and accurate photograph depicting an aerial view of drydock AFDB-5 with a rig on it was identified as Ex. 26 to the deposition of John Haley.  (Haley Tr. 182:15-183:8, Exhibit "13"; Haley Ex. 26, Exhibit "19").

40.     A drydock is used to lift objects out of the water by allowing the drydock's pontoons to flood with water, thereby lowering the drydock, and thereafter pumping the water out of the pontoons to raise the drydock after the object has been placed over the pontoons. (Meisetschlaeger Tr. 136:8-137:7, Exhibit "18").

8

41.     In and around 2007, Signal began investigating various alternatives to extend the useful life of drydock AFDB-5.  (Haley Tr. 39:4-40:2, 136:14-137:9, 138:4-13, Exhibit "13"; Meisetschlaeger Tr. 31:22-32:11, 130:7-13, 178:15-179:25, Exhibit "18").[8]

42.     Signal ultimately decided to implement a plan which, among other things, called for the removal and ultimate disposal of one of drydock AFDB-5's pontoons, Pontoon H, which was beyond economical repair, and which would result in the reconfiguration of the drydock from an 8-section drydock into a 7-section drydock.  (Cates Tr.  242:10-19, Exhibit "16"; Haley Tr. 141:1-15, Exhibit "13"; Meisetschlaeger Tr. 47:10-16, Exhibit "18").[9]

43.     Prior to the removal of Pontoon H, Signal hired a contractor to abate and properly dispose of the asbestos and transite contained in the wing wall safety deck and the pontoon machinery space of Pontoon H.  (Meisetschlaeger Tr. 154:18-157:18, 162:6-163:3, 170:7-21, 174:25-175:4, Exhibit "18"; Meisetschlaeger Ex. 67, Exhibit "20").

44.     From February 5, 2009 to April 7, 2009, Signal drydocked the drilling rig OCEAN AMERICA in drydock AFDB-5.  (Cates Tr. 233:9-25, Exhibit "16"; Consavage Tr. 31:1-13, Exhibit "21").[10]

45.     The OCEAN AMERICA was the heaviest item Signal ever lifted in drydock AFDB-5.  (Meisetschlaeger Tr. 111:3-21, Exhibit "18").

46.     From May 22, 2009 to June 3, 2009, Signal drydocked the drilling rig PRIDE NEVADA in drydock AFDB-5.  (Consavage Tr. 31:14-25, Exhibit "21").

---

[8] Rodney Meisetschlaeger joined Signal in February, 2007, as a project manager and thereafter became Senior Vice President and General Manager.  (Meisetschlaeger Tr. 7:5-13, 13:1-14, Exhibit "18").
[9] Patrick Cates began work on the drydock AFDB-5 in 1996 as an electrician's helper while the drydock was owned by TDI Halter and remained associated with drydock AFDB-5 through the succession of ownership, progressing to second class electrician, first class electrician, general foreman and ultimately maintenance superintendent in 2008 for Signal.  (Cates Tr. 14:19-15:13, 17:1-4, 17:13-16, 19:3-20:21, 21:18-22:7, 23:17-24:2, 27:21-28:20, 30:4-24, Exhibit "16").   From 1996 forward, Patrick Cates' primary duty was with regard to the maintenance of drydock AFDB-5 and its systems.  (Cates Tr. 66:23-67:2, Exhibit "16").
[10] Paul Consavage became Signal's dockmaster for drydock AFDB-5 in January or February, 2009. (Consavage Tr. 12:17-13:2, Exhibit "21").

## THE LOSS

47.     On August 20, 2009, Signal had reached the stage of the reconfiguration project for drydock AFDB-5 where it was ready to detach Pontoon H.   (Cates Tr. 204:8-18, Exhibit "16").

48.     On August 20, 2009, Signal lowered drydock AFDB-5, off-loaded a barge which had been in the drydock, positioned Pontoon H over the blocks set up on the deck of the drydock and raised the drydock AFDB-5 by pumping the water from the pontoons.  (Cates Tr. 75:14-76:8, 77:11-78:3, 84:2-23, Exhibit "16").

49.     The drydock AFDB-5 was raised and the drydocking of Pontoon H was complete prior to 3:00 p.m. on August 20, 2009.  (Cates Tr. 85:23-86:1, Exhibit "16").

50.     Drydock AFDB-5 sank rapidly during the evening of August 20, 2009.  (Cates Tr. 94:2-95:12, Exhibit "16"; Meisetschlaeger Tr. 140:8-141:14, Exhibit "18").

## THE ORDER TO REMOVE

51.     The Texas General Land Office ("Texas GLO") ordered the removal of drydock AFDB-5.   (Meisetschlaeger Tr. 145:1-4, 146:24-147:1, 147:23-150:4, Exhibit "18"; Cunningham Tr. 391:21-392:4; 392:7-393:5, Exhibit "14"; Meisetschlaeger Ex. 64, Exhibit "22").

52.     In a letter to Signal dated September 2, 2009, Texas GLO stated, in part:

> The General Land Office (GLO) is investigating the recent sinking of the Signal International Texas dry dock on or about 20 August 2009 adjacent to the Signal International Texas facility at 2500 Martin Luther King Drive, in Port Arthur, Jefferson County, Texas.  We appreciate your notification of our Region I Nederland Response Office, and any actions taken to minimize pollution impacts to waters of the state.  The purpose of this letter is to inform you of the possible consequences of failing to recover the structure from Texas coastal waters.  The Oil Spill Prevention and Response Act of 1991 (OSPRA), Texas Natural Resources Code, Chap. 40, gives the GLO authority to address abandoned vessels and structures in several ways.

OSPRA prohibits the abandonment of a vessel or structure in Texas coastal waters if the vessel or structure is in a wrecked, derelict, or substantially dismantled condition.

<u>Texas Natural Resources Code, Chap. 40, §40.108. Derelict Vessels and Structures</u>

*(a)     A person may not, without the consent of the commissioner, leave, abandon, or maintain any structure or vessel in or on coastal waters, on public or private lands or at a public or private port or dock if the structure or vessel is in a wrecked, derelict, or substantially dismantled condition and the commissioner finds the structure or vessel to be:*

> *(1)     involved in an actual or threatened unauthorized discharge of oil;*
> *(2)     a threat to public health, safety, or welfare;*
> *(3)     a threat to the environment; or*
> *(4)     a navigation hazard.*

The GLO has determined that the Signal dry dock has sunken and should it not be raised and restored to its intended purpose, <u>could be a threat to public health, safety or welfare and a threat to the environment</u>.  The Land Commissioner has not given you consent, nor will he give you consent, to leave or abandon the structure at its current location.

If the GLO formally determines the structure has been abandoned and needs to be disposed of, state funds may be expended to remove the structure from Texas coastal waters and dispose of it.  The GLO has the authority to seek reimbursement for the costs of removal and disposal from you, as the person responsible for abandoning the structure.  If the state must initiate legal action against you to obtain reimbursement for the costs associated with removal and disposal of the structure, you may also be assessed court costs and attorney fees.  Additionally, OSPRA §40.251(c) gives the GLO authority to assess a penalty of between $100 and $10,000 per day against the owner of a vessel or structure that has been abandoned in Texas coastal waters.

If you fail to remove the structure from coastal waters and it is formally declared abandoned, you may also be charged with a Class A misdemeanor under OSPRA §40.251(a).  Conviction of a Class A misdemeanor is punishable by a fine not to exceed $4,000, a prison term not to exceed one year, or both a fine and imprisonment.

Finally, if you do not the remove the structure and it is the source of an unauthorized discharge of a harmful quantity oil into Texas coastal waters, OSPRA §40.251(c) requires the GLO to assess a penalty against the responsible person of between $250 and $25,000. A "harmful quantity" of oil is defined as any amount of oil that causes a sheen upon or discoloration of the surface of the water. If an unauthorized discharge of oil originates from the Signal International dry dock, your refusal to remove the structure from Texas coastal waters will be a major factor in determining the appropriate penalty to assess against you.

I encourage you to take responsibility for this structure and initiate immediate action to recover the Signal International dry dock from Texas coastal waters. Please contact me at your earliest convenience to inform me of your plans to raise or recover the structure. You can contact me by phone at (512) 475-1464.

(Meisetschlaeger Ex. 64 at pp. 1-2 [emphasis added], Exhibit "22").

53.     In a further letter to Signal dated November 5, 2009, Texas GLO stated, in part:

The purpose of this letter is to request an update and/or timeline for recovery or removal and disposal of the referenced structure. Texas Natural Resources Code, §40.108 prohibits the abandonment of a wrecked vessel or structure in Texas coastal waters. The referenced structure sank on 20 August 2009, <u>and poses a threat to public health, safety and welfare and the environment</u>, and will be formally declared abandoned should you fail to take immediate action.

Signal is reminded that this office will initiate legal actions against you for the removal and disposal of the structure, and that you will be responsible for all associated costs. I encourage you to take responsibility for this structure and initiate immediate action to remove the Signal International dry-dock from Texas coastal waters. Therefore, we request that you provide this office an immediate update and/or timeline for the removal of the dry-dock structure.

If you fail to remove this structure from coastal waters and it is formally declared abandoned, you may also be charged with a Class A misdemeanor under OSPRA §40.251(a). Conviction of a Class A misdemeanor is punishable by a fine not to exceed $4,000, a prison term not to exceed one year, or both a fine and imprisonment. Additionally, OSPRA §40.251(f) gives the GLO authority to assess a penalty of between $100 and $10,000 per

12

day against the owner of vessels that have been abandoned in
Texas coastal waters.

(Meisetschlaeger Ex. 64 at p. 5 (emphasis added), Exhibit "22").

54.     Signal received no other orders from any other governmental entity other than
Texas GLO requiring removal of drydock AFDB-5.   (Meisetschlaeger Tr. 173:22-174:4,
Exhibit "18").

55.     Drydock AFDB-5 was not a hazard to navigation.  (Meisetschlaeger Tr. 144:3-
11, Exhibit "18").

## THE CLAIM AND INSURANCE

56.     Drydock AFDB-5 had a value of $13,600,000.00 set forth in the Statement of
Values provided to the property insurers Westchester and Max Specialty in connection with
their issuance of their respective policies.  (Statement of Values, Exhibit "23"; Boesen Tr. 75-
76, Exhibit "24").

57.     In or about early January, 2010, Westchester paid to Signal its full $10 million
limit less the property program 100% deductible in respect of the loss of drydock AFDB-5.
(Bullock Tr. 44:1-7, Exhibit "25"; Whittington Tr. 51:20-52:2, 295:14-296:8, Exhibit "12").

58.     Westchester did not attempt to allocate its $10 million payment (less the
property program 100% deductible) to any specific coverage (actual cash value of drydock,
debris removal, etc.) afforded to Signal under the property policies.  (Whittington Tr. 52:3-20,
Exhibit 12").

59.     Under its following form excess property policy, Max Specialty eventually paid
Signal $3,600,000.00 less deductible as the remainder of the actual cash value of drydock
AFDB-5.  (Docket No. 51 at ¶¶ 121 and 122; Docket No. 79 at ¶¶ 8 and 9).

60.     Prior to any work being conducted on the removal of the debris wreckage of
drydock AFDB-5, a question was raised by the Bumbershoot insurers concerning which

insurers were responsible for paying for the removal of the debris wreckage, including the layering of any excess policies and/or pro-rata sharing of those costs by and between excess insurers. (Docket No. 161, Piccolo Decl. at ¶ 13).[11]

61.     Because of the possibility of overlapping insurance coverages for the removal of the debris, a meeting was scheduled to be held in New York in the early part of 2010.  (Docket No. 161, Piccolo Decl. at ¶ 14).

62.     In January, 2010, a meeting was held in New York which was attended by Frank Piccolo, Mr. Terry Campbell as the representative of the MGL and Bumbershoot liability underwriters, Julia Price as representative of the pollution underwriter Great American Insurance Company of New York ("Great American"), and Mark Cheglikov as representative of Max Specialty together with representatives of Signal and its broker Willis of Alabama, Inc. ("Willis").  (Docket No. 161, Piccolo Decl. at ¶ 15).

63.     At that January meeting in New York, there was discussion concerning the joint funding of the removal of debris by the liability underwriters, Great American and Max Specialty on a without prejudice basis, leaving to later the exact allocation of the costs amongst the several insurers.  (Docket No. 161, Piccolo Decl. at ¶ 16).

64.     At the January meeting in New York and/or shortly thereafter, both Great American and Max Specialty declined any responsibility under their respective insurance contracts for the cleanup of the site and/or debris removal.  (Docket No. 161, Piccolo Decl. at ¶ 17).

65.     On February 16, 2010, Mark Cheglikov of Max Specialty sent to Signal a formal letter referencing the January meeting in New York and setting forth Max Specialty's position

---

[11] References to "Piccolo Decl." are to the "Declaration of Frank Piccolo in Support of the Bumbershoot Insurer's Motion for Summary Judgment Against Max Specialty Insurance Company" previously filed as Docket No. 161.

that it will not contribute to the removal of drydock AFDB-5 and that Signal has no right to allocate any portion of Westchester's payment under the primary property policy towards the removal expense.  (Cunningham Tr. 379:25-381:12, Exhibit "14"; Cunningham Dep. Ex. 367, Exhibit "26").

## THE REMOVAL CONTRACT

66.     By reason of Great American's and Max Specialty's refusal to contribute, the primary and excess liability insurers agreed to proceed with the process of obtaining bids for the cleanup of the site and removal of the debris wreckage, and placing Signal in funds sufficient to pay for those items, but on a reservation of rights basis only with full rights to seek reimbursement of these payments from Max Specialty and Great American. (Docket No. 161, Piccolo Decl. at ¶ 18).

67.     Fireman's Fund's reservation of rights was based on its not being required to respond for the funding of the removal of the drydock until such time as all primary policies were exhausted, including but not limited to the MGL Policy, if triggered, and the Great American pollution policy, both of which are scheduled as underlying insurance to the Bumbershoot Policy, and contribution from the primary and excess property policies issued by Westchester and Max Specialty, respectively, based on their "Debris Removal and Cost of Cleanup" coverage.  (Docket No. 161, Piccolo Decl. ¶¶ 7-18).

68.     On or about January 22, 2010, Signal issued a "Request for Best and Final proposals" for the removal of the wreckage.  (Docket No. 161, Piccolo Decl. at ¶¶ 19 and 22 and Exhibit annexed thereto at pages "Document 161-1 p. 16 of 30" to "Document 161-2 p. 14 of 31").

69.     Signal's January 22, 2010 Request for Best and Final Proposals provided, in part:

**Hazardous Materials:**

There are known and documented quantities of Hazardous Materials (HAZMAT) onboard the Drydock at the time of sinking.  Further, it is logical and probable that there are additional HAZMAT onboard that have not yet been documented.  The HAZMAT integral to the Drydock's construction is concentrated within the Machinery Compartments and the Wing Walls.  The majority of HAZMAT within the Wing Walls is thought to be mostly above the Security Deck.

Signal International has developed a list of "Known Contaminates and Hazardous Materials" with quantities indicated, the list is attached.  The list contains an entry "dielectric oil" that is annotated with the term "possible PCB".  It is not unreasonable to expect that the dielectric oils in electrical equipment installed by the Navy and into the 1980's would contain PCBs.

There are other HAZMAT that may possibility be found onboard the Drydock.  These include:

1.   PCBs found in the insulation of vintage electrical wiring insulation, gaskets, and adhesives,
2.   Mercury was used in period vessel construction might be found in the Machinery Compartments in items such as thermometers, king gauges, electrical switches and sensor elements,
3.   Heavy metals, Tributyltin (TBT), and naturally occurring radioactive materials (NORMs) may be contained in the mud and silt about and within the Drydock.  No reported testing has been found to date to indicate one way or the other the presence of these items.

\* \* \*

**SIGNAL INTERNATIONAL LLC**

**DRY DOCK AFDB5 – AFDB 6**

**KNOWN CONTAMINANTS AND HAZARDOUS MATERIALS**

Below is a listing of contaminants & hazardous materials known to be within the Dry-Dock.

* 80,500 sq.ft. of asbestos wall board
* 9,100 sq.ft. of asbestos boiler insulation

16

- 15,260 In.ft. of asbestos pipe cover insulation
- 152 gallons of 90w gear oil
- 48 gallons of 10w turbine oil
- 16 generators… (oil capacities unknown)
- 8 air compressors… (oil capacities unknown)
- 16 reserve lube oil tanks… (oil capacities unknown)
- 255 gallons of dielectric oil – possible PCB

(Docket No. 161, Piccolo Decl. Exhibit at pages "Document 161-1 p. 20 of 30" and "Document 161-2 p. 13 of 31").

70. On or about February 9, 2010, Weeks submitted its "Best and Final" bid to Signal offering to remove the wreckage by chopping/cutting the wing walls and pontoon platforms into suitable size for lifting by crane and placement into a hopper barge for disposal. (Docket No. 161, Piccolo Decl. ¶¶ 20 and 22 and Exhibit annexed thereto at pages "Document 161-2 p. 15 of 31" to "Document 161-3 at p. 27 of 27").

71. On June 21, 2010, Signal entered into a contract with Weeks for removal of the drydock AFDB-5. (Docket No. 161, Piccolo Decl. at ¶ 22 and Exhibit annexed thereto; Cunningham Tr. 395:6-10, Exhibit "14").

72. The Weeks/Signal contract provided in relevant part:

Signal International Drydock #1 Removal/Disposal

EXHIBIT A

Scope of Work

The scope of work includes the wreck removal of the sunken drydock AFDB 5/AFDB 6 (aka Signal Drydock No. 1) including, but not limited to, all materials on or in the dock including concrete/masonry, wood, blasting grit and other debris, possible friable asbestos containing materials, oils and/or petroleum products, scrap metal, solid waste, transportation and towing; all in accordance with the  Contract Documents set forth within Exhibit B.

(Docket No. 161, Exhibit "A" at page "Document 161-1 p. 14 of 30").

73.     Weeks Marine subcontracted with ESCO Marine, Inc. ("ESCO") for ESCO to perform certain services in connection with the removal of drydock AFDB-5.  (Greenberg Tr. 46:22-47:7, Exhibit "27").

74.     Mr. Joshua Greenberg is a Project Manager for ESCO in charge of outside projects for salvage and has worked for ESCO his entire career starting in 1971.  (Greenberg Tr. 6:1-2, 8:19-24, 9:2-23, 10:19-11:6, Exhibit "27").

75.     Clement J. Mire is and has been the Environmental Safety & Health Manager for ESCO since 2002, and has been in the environmental safety and health industry since 1982. (Mire Tr. 6:1-7:6, Exhibit "28").

76.     Clement Mire has had extensive training in environmental cleanup and the handling and disposal of pollutants.  (Mire Tr. 7:12-8:17; 9:7-23; 10:21-11:20, Exhibit "28").

77.     Clement Mire's duties as the Environmental Safety & Health Manager for ESCO included liaising with State and Federal agencies in regard to any environmental safety and health issue regarding a structure, identifying the materials within the structure that require special handling and disposal, and determining the regulations that need to be complied with to remove and dispose those materials.  (Mire Tr. 12:2-23; 13:4-14:9, Exhibit "28").

78.     ESCO regularly deals with the Texas General Land Office ("Texas GLO") and is licensed and has the necessary permits to remove and properly dispose of environmentally hazardous materials.  (Greenberg Tr. 14:5-24, Exhibit "27").

79.     The Texas GLO is the Texas State agency that is in charge of monitoring and regulating pollution issues that affect the Texas shoreline waters.   (Mire Tr. 8:18-9:6, Exhibit "28").

80.     The Signal drydock project was considered an outside project by ESCO that Mr. Greenberg first came across when Signal sought to dispose of Pontoon H but ESCO did not

18

get that job.  After the drydock sank, ESCO was first approached by Resolve to perform the hazardous material remediation with respect to the removal of the drydock, and after Weeks Marine was awarded the removal contract, was approached by Weeks Marine to perform the hazardous materials removal.  (Greenberg Tr. 16:21-17:5; 19:5-20:10, Exhibit "27").

81.     Under its sub-contract with Weeks Marine, ESCO removed all of the hazardous materials contained within the above water sections of the wingwalls at the location where the drydock sank (Site I) including removal of all asbestos by a certified asbestos team, received the scrap and all hazardous materials contained therein in its barges, removed the scrap and hazardous materials from Site I to a secondary on land site (Site II) for processing and proper segregation and handling for disposal in accordance with regulatory requirements.  (Greenberg Tr. 37:13-41:8; 49:10-20; 50:21-52:17; 56:4-57:8; 67:19-69:17; 87:1-19; 94:10-12; 103:18-104:1, Exhibit "27"; Mire Tr. 19:21-20:9; 23:5-15; 24:17-25:10; 28:16-29:8; 31:21-32:7; 33:9-34:6; 46:23-48:18; 50:5-13; 52:3-53:5, Exhibit "28").

82.     At the kick-off meeting for the removal of drydock AFDB-5 held on July 1, 2010, both the Texas GLO and the U.S. Coast Guard had representatives present because of their concern of any type of emissions of any type of hazardous materials into the waters. (Greenberg Tr. 53:3-55:1; 56:1-3, Exhibit "27"; Mire Tr. 55:13-56:13, Exhibit "28").

83.     At Site II, the Sabine River location, ESCO was required to build an environmental pad to catch any type of hazardous material.  (Greenberg Tr. 86:1-25, Exhibit "27"; Greenberg Ex. 311 (photograph of Environmental Pad), Exhibit "29"; Mire Tr. 34:18-35:10; 37:24-38:14, Exhibit "28").

84.     The steel from drydock AFDB-5 could not be sent to a mill without the steel being abated of all hazardous materials and cleaned.   (Greenberg Tr. 113:17-114:4, Exhibit "27"; Mire Tr. 105:2-106:10, Exhibit "28").

85.     The Texas GLO would not allow the scrap from drydock AFDB-5 to be cleaned or washed off at site I, the location where the drydock had formerly operated and sank, because of concerns of pollutants being discharged into the water. (Mire Tr. 106:16-107:6, Exhibit "28").

86.     ESCO personnel were personal protection outfits, including respirators, when handling the environmentally sensitive materials.   (Mire Tr. 26:15-27:1; 30:15-31:10, Exhibit "28").

87.     ESCO prepared summaries of how it would handle the asbestos, PCB's and Petroleum products during the removal of drydock AFDB-5.   (Mire Tr. 68:6-69:22, Exhibit "28"; Mire Dep. Ex. 344, Exhibit "30").

88.     In connection with the removal of drydock AFDB-5, ESCO removed and properly disposed of a total of 70.5 fifty-five (55) gallon drums of petroleum based materials, 443,290 pounds of PCB Bulk, 90,080 pounds of non-friable asbestos, and 6,699,360.1 pounds of contaminated soil.   (Mire Tr. 75:21-78:2, Exhibit "28"; Greenberg Dep. Ex. 313, Exhibit "31").

89.     The removal of the AFDB-5 and the cleanup of the location where it sank were completed by March, 2012.  (Piccolo Decl. ¶ 31).

90.     Plaintiffs have paid to Weeks Marine, Inc., on behalf of Signal and on a without prejudice basis, the amount of $12,395,026.00 in respect of the removal and cleanup of drydock AFDB-5.  (Piccolo Decl. ¶¶ 23-31; Cunningham Tr. 395:13-396:5, Exhibit "14").

91.     Upon completion of the removal of drydock AFDB-5 and the clean up of the site, the Texas GLO sent another letter to Signal, dated March 5, 2012, which stated in part:

> The Texas General Land Office (GLO) has periodically monitored the ongoing removal operations of your sunken dry-dock structure at the Signal International Texas facility located at

2500 Martin Luther King Drive, in Port Arthur, Jefferson County, Texas.

As you're aware, the Oil Spill Prevention and Response Act of 1991 (OSPRA), Texas Natural Resources Code, Chapter 40, subsection 40.108, prohibits the abandonment of a vessel or structure in Texas coastal waters if the vessel or structure is in a wrecked, derelict, or substantially dismantled condition, and is involved in an actual or threatened unauthorized discharge of oil, a threat to public health, safety or welfare, a threat to the environment, or a navigation hazard.

On February 28, 2012, staff from our Region I OSPR Field Office in Nederland surveyed the entire project area by side-scan sonar. The conclusion of the investigation is that none of the conditions noted above now exist at the facility. We are pleased to report that the sunken structure and all associated debris that could create a navigation or environmental hazard have been removed from Texas coastal waters.

This letter serves to inform you that the GLO has no further concerns related to this sunken structure and now considers this incident to be closed, with no further action required on your part.

We greatly appreciate your diligent efforts and the efforts of your contractors to effect removal of the dry-dock structure and to minimize its impact to Texas coastal waters. Your commitment to maintain a safe coastal environment for all stakeholders is laudable and we greatly value our association.

(Cunningham Tr. 396:9-398:2, Exhibit "14"; Cunningham Ex. 396, Exhibit "32").

## UNDERWRITING HISTORY

92.     Willis of Alabama, Inc. ("Willis") was and is engaged in the business of brokering marine and other insurance and was and is the broker for defendant Signal with regard to the insurance policies which are the subject matter of this litigation. (Complaint ¶ 17; Answer ¶ 17; Johnson Tr. 13:4-13, 147:7-21, Exhibit "8"; Cunningham Tr. 78:14-79:8, Exhibit "14").

93.     John Bullock was and is a Producer at Willis whose responsibilities include handling a production team, cultivating new business and serving existing business, and since

2003, Signal has been one of Mr. Bullock's accounts.  (Bullock Tr. 8:1-3 and 11-12, 9:3-10:3, 11:4-20, 75:10-16, 79:15-80:9, Exhibit "25"; Johnson Tr. 146:7-21, Exhibit "8").

94.     Ms. Joyce Johnson was the Client Manager at Willis for the Signal account from 2003 until 2008 and thereafter became the Account Executive and, in such positions, oversaw the placement of the various lines of coverages that Willis placed for Signal, both marine and non-marine.  (Johnson Tr. 12:1-20, 13:1-3 144:14-145:14, 152:13-21, 154:8-14, 174:6-176:7, Exhibit "8").

95.     Vernon Ewing has been the Marine Marketing Manager for Willis since 1989 and, on behalf of Willis, has placed Signal's marine insurance policies since 2003 but had no involvement with the placement of Signal's property coverages.  (Ewing Tr. 9:1–10:11, 15:14-22, 18:6-20:12, 194:17-21, 196:7-12, Exhibit "2"; Johnson Tr. 145:18-146:6, Exhibit "8").

96.     From Signal's inception in 2003, Willis was Signal's insurance broker for various lines of coverages.  (Bullock Tr. 79:15-82:12, Exhibit "25"; *see also* ¶¶ 92 through 95, *supra*).

97.     The policies placed by Willis on behalf of Signal were for an annual term that commenced on January 30 of the given year, and such policies would either be renewed by the incumbent insurance carrier or remarketed to other insurance carriers.  (Johnson Tr. 149:2-151:2, Exhibit "8"; Ewing Tr. 144:20-145:13, Exhibit "2").

98.     From its inception in 2003, Signal insured its drydock AFDB-5, as well as its other drydock Dual Carrier located in Pascagoula, Mississippi, for physical loss and damage and associated risks under its property insurance program and not under its marine hull insurance program.  (Johnson Tr. 206:5-14, Exhibit "8").

22

99. Mr. Ewing of Willis also placed Signal's pollution liability coverage, including the pollution liability coverage for Signal's AFDB-5 dry dock, since 2003. (Ewing Tr. 116:16-118:11, Exhibit "2"; Answer (Crossclaims at ¶ 50); Signal Answer to G.A. CC at ¶50).

100. Since January 30, 2004, Willis placed Signal's pollution liability insurance with Great American Insurance Company of New York ("Great American"). (Ewing Tr. 126:16-129:4, Exhibit "2").

101. The pollution policies issued by Great American to Signal were also for an annual term. (Stringer Tr. 42:17-23, Exhibit "6").

102. In addition, Signal insured certain of its liabilities arising out of it business operations under the MGL Policy. (Ewing Ex. 139, Exhibit "3").

103. Signal also maintained excess liability insurance under its Bumbershoot Policy. (Ewing Ex. 138, Exhibit "4").

**The Great American Policy**

104. There are only three (3) insurance companies that offer the type of insurance provided by Great American to Signal; Great American, Water Quality Insurance Syndicate and EPG. (Stringer Tr. 31:7-13, Exhibit "6").

105. Great American was a fairly new entrant in the pollution liability market and only began writing such policies in 1997. (Stringer Tr. 30:18-31:6, Exhibit "6").

106. In connection with Signal's initial solicitation of insurance coverage to Great American for the 2004/2005 policy year, Willis, on behalf of Signal, provided to Great American a completed "Vessel Pollution Liability Application" to which was attached a Vessel Schedule identifying the twenty-one pieces of equipment for which Signal sought pollution liability coverage, including drydock AFDB-5. (Stringer Tr. 62:8-63:15, Exhibit "6"; Stringer

Ex. 242, Exhibit "34"; Answer (Crossclaims at ¶¶ 51-53); Signal Answer to G.A. CC at ¶¶ 51-53).

107.  The 2004-2005 pollution policy issued by Great American to Signal was underwritten by a Mr. Dillon, who left Great American in 2005.  (Stringer Tr. 40:12-23, Exhibit "6").

108.  In 2005, after Mr. Dillon left Great American, Cindy Stringer took over as the Great American underwriter of the Signal account up through the 2009-2010 policy year. (Stringer Tr. 40:12-43:1, 257:8-258:24, Exhibit "6").

109.  Following the same underwriting methodology as for the 2004-2005 policy, Great American issued to Signal a pollution liability policy for each of the ensuing policy years 2005-2006, 2006-2007, 2007-2008 and 2008-2009.  (Answer (Crossclaims at ¶ 55); Signal Answer to G.A. CC at ¶ 55).

110.  Ms. Stringer has been employed by Great American as Senior Underwriter II since 1998, writing hull, protection and indemnity, marine commercial liability, maritime employer's liability and pollution coverages.  (Stringer Tr. 4:9-10; 16-17, 29:20-30:14, Exhibit "6").

111.  Prior to her employment with Great American, Cindy Stringer had long term experience in the marine insurance field.  (Stringer Tr. 11:19-14:2, 15:20-16:11, 19:11-20:4, 20:11-23:7, 25:12-25, Exhibit "6").

112.  However, Cindy Stringer only began writing pollution liability insurance in 1999 while at Great American.  (Stringer Tr. 30:11-17; 31:23-32:1, Exhibit "6").

113.  Reese Lever joined Great American in 2008 and, as part of his training, assisted Cindy Stringer by requesting renewal information for the Signal account for the 2009-2010 policy.  (Stringer Tr. 41:3-15, 177:10-24, Exhibit "6"; Lever Tr. 5:5-13, 8:1-10, Exhibit "35").

114.     Only Cindy Stringer and Reese Lever at Great American were involved in the underwriting of the 2009-2010 policy issued to Signal.  (Stringer Tr. 237:15-21, Exhibit "6").

115.     Reese Lever became the Great American underwriter for the Signal account beginning with the 2010-2011 policy year. (Stringer Tr. 133:23-134:5, Exhibit "6").

116.     In connection with the placement of Signal's pollution insurance for the January 30, 2009 to January 30, 2010 policy year, Willis again provided to Great American an insurance submission which contained a "Vessel Schedule" identifying, among other things, the age of each piece of equipment on which insurance was sought, including drydock AFDB-5.  (Ewing Tr. 129:23-130:20, Exhibit "2"; Johnson Ex. 109, Exhibit "35"; Stringer Tr. 180:6-183:16, Exhibit "6"; Stringer Ex. 251 at pp. GA-000044-45, Exhibit "36").

117.     Also, in connection with the placement of Signal's pollution insurance for the January 30, 2009 to January 30, 2010 policy year, Willis again provided Great American with a completed "Vessel Pollution Liability Application."   (Stringer Tr. 178:7-180:5, Exhibit "6"; Stringer Ex. 251 at pp. GA-000035-36, Exhibit "36").

118.     The largest single premium under the 2009-2010 Great American Policy was $12,804.00 for coverage with respect to the non-vessel drydock AFDB-5. (Stringer Ex. 247 at pp. GA-000354-55, Exhibit "7").

119.     The second largest single premium under the 2009-2010 Great American Policy was $6,806.00 for coverage with respect to the non-vessel drydock DUAL CARRIER. (Stringer Ex. 247 at pp. GA-000354-55, Exhibit "7").

120.     The total premium for coverage with respect to the two (2) non-vessel drydocks (the AFDB-5 and the DUAL CARRIER) under the 2009-2010 Great American Policy was $19,610.00.  (Stringer Ex. 247 at pp. GA-000354-55, Exhibit "7").

121.    The total premium for coverage with respect to all of the items other than drydocks AFDB-5 and DUAL CARRIER under the 2009-2010 Great American Policy was $11,782.00. (Stringer Ex. 247 at pp. GA-000354-55, Exhibit "7").

122.    The premium for coverage with respect to the vessel drydock AFDB-5 under the 2009-2010 Great American Policy was approximately 41% of the total of the premium for all items insured pursuant to the policy. (Stringer Ex. 247 at pp. GA-000354-55, Exhibit "7").

123.    The premium for coverage with respect to the two non-vessel drydocks AFDB-5 and DUAL CARRIER under the 2009-2010 Great American Policy was approximately 62% of the total of the premium for all items insured pursuant to the Policy. (Stringer Ex. 247 at pp. GA-000354-55, Exhibit "7").

**The "Add-On" Coverage Endorsements**

124.    Around 2004, Great American made available certain "add-ons" to its base policy form which were endorsements that expanded the coverage under the Great American base policy form, including the Non-OPA Non-CERCLA Endorsement and the State Law Extension Endorsement, which were offered as optional coverages.  (Stringer Tr. 84:4-87:20, Exhibit "6").

125.    Cindy Stringer did not provide Signal with any explanation as to the scope of coverage afforded under either the Non-OPA Non-CERCLA Endorsement or the State Law Enhancement Endorsement.  (Stringer Tr. 92:13-17, 97:3-9, 110:11-22, Exhibit "6"; Ewing Tr. 222:3-226:2, 229:16-20, Exhibit "2").

126.    Signal's broker, Willis, never had any discussions with Great American or Signal regarding the Non-OPA Non-CERCLA Endorsement and/or the State Law Extension Endorsement of the Great American Policy.  (Ewing Tr. 220:19-229:20, Exhibit "2").

127.    Signal has no understanding as to how the State Law Extension endorsement or the Non-OPA Non-CERCLA endorsement to the Great American policy operate. (Cunningham Tr. 399:25-400:19, Exhibit "14").

**The Post Loss Addition Of A Removal Exclusion**

128.    The 2011-2012 Great American pollution liability policy issued to Signal contained a new endorsement excluding coverage for wreck removal.  (Lever Tr. 108:14-109:7, Exhibit "34"; Lever Ex. 266, Exhibit "37"; Lever Ex. 259 at "Ocean Marine General Endorsement Removal of Wreck Exclusion", Exhibit "38").

129.    In March of 2011, Great American added a removal of wreck exclusion into the base form of its policy.  (Lever Tr. 107:6-16, 111:15-112:1, Exhibit "34").

130.    A true and accurate copy of Great American's 2011-2012 pollution liability policy issued to Signal was identified as Exhibit 259 to the deposition of Reese Lever.  (Lever Tr. 120:4-122:8, Exhibit "34").

**The Max Specialty Excess Property Insurance Policy**

131.    Willis prepared a 2009 Property Submission to solicit quotes for Property Insurance Coverage for the 2009-2010 coverage year (the "2009 Property Submission"). (Bullock Tr. 29, Exhibit "25"; Johnson Tr. 106 – 107, Exhibit "8"; Morano Ex. 196, Exhibit "39").

132.    The 2009 Property Submission consisted of the 2008 – 2009 Primary Property Insurance Quote (identical for 2009-2010), the Willis 2009 Property Submission, the 2009 schedule of values for each piece of Signal property, the RMS Workbook, and a risk assessment report prepared by an independent third party. (Johnson Tr. 269 – 270, Exhibit "8"; Morano Ex. 196, Exhibit "39").

133.    The AFDB-5 was valued at $13.6 million, which was based on a 2007 appraisal report from marine surveyors, Dufour, Laskey, and Strauss ("DLS") that had actually been prepared for Signal's financers, GE Capital.  (Bullock Tr. 136, Exhibit "25"; DLS 12/2007 Survey, Johnson Ex. 125, Exhibit "40").

134.    Signal at all times relied upon independent valuation of these experienced marine surveyors in listing the AFDB-5 Drydock's value in schedules of values and in its Proof of Loss submitted to Max Specialty after the AFDB-5 Drydock's sinking.  (Affidavit of Chris Cunningham ("Aff. Of Cunningham"), Exhibit "41"; Johnson Tr. 279 – 281, Exhibit "8"; Bullock Tr. 137 – 139, Exhibit "25"; Spears Tr. 136 – 139, Exhibit "42").

135.    Willis contacted a wholesale broker, AmWins of New York ("AmWins"), to place Signal's property insurance.  (Johnson Tr. 248, 266, Exhibit "8").

136.    Westchester Surplus Lines Insurance ("Westchester"), having been provided with the 2009 Property Submission, underwrote the Primary Property Insurance Policy ("PPI Policy") with a limit of $10 million.  (Bullock Tr. 125:22-23, 126:1, Exhibit "25"; Johnson Ex. 103, Exhibit "9").

137.    As Signal desired $25 million worth of property insurance coverage, AmWins also sought to place an excess property insurance policy.   (Bullock Tr. 144:18-22, Exhibit "25").

138.    On January 28, 2009, AmWins submitted the 2009 Property Submission to Max Specialty.  (Morano Tr. 138-139, Exhibit "11").

139.    On January 30, 2009, (less than 48 hours after receipt of the requested placing information) Max Specially agreed to underwrite the Excess Property Insurance Policy ("EPI Policy") in the amount of $15 million in excess of the PPI limit of $10 million. (Morano Tr. 138-139, Exhibit "11").

140.    The terms and conditions of the EPI were the same as the PPI, unless specifically noted otherwise. (Morano Tr. 238-239, Exhibit "11"; EPI Policy, Johnson Ex. 104, Exhibit "10").

141.    Westchester and Max Specialty were provided exactly the same information on Signal's property risk.  (Bullock Tr. 147:11-28, 148:1-8, Exhibit "25").

142.    Mr. Morano testified that he had "all of the information [he] needed to decide to underwrite the Signal excess insurance policy." (Morano Tr. 45:14-15, Exhibit "11").

143.    The package submitted by AmWins to Max Specialty was of the typical type Max Specialty would receive when it was deciding to underwrite an excess property insurance policy.  (Morano Tr. 53:1-8, Exhibit "11").

144.    The AFDB-5 was just one small piece ($13.6 million) of the $211 million worth of property that Signal sought to insure through the EPI.  (Morano Tr. 140:5-17, Exhibit "11").

145.    The individual pieces of property were not really Mr. Morano's concern in underwriting the EPI, as he never inquired about the condition of the AFDB-5 or any other Signal property.  (Morano Tr. 42:3-7, Exhibit "11").

146.    Mr. Morano never visited any of Signal's yards.   (Morano Tr. 20:18-19, Exhibit "11").

147.    In making his decision to underwrite the Signal EPI, one of Mr. Morano's primary concerns was who the primary underwriter was.  (Morano Tr. 27:7-9, Exhibit "11").

148.    In looking at the Signal account, the fact that Westchester underwrote the PPI provided Mr. Morano with a certain comfort level in deciding to underwrite the EPI.  (Morano Tr. 27:16-20, Exhibit "11").

149.    Mr. Morano testified he saw nothing fraudulent about Signal requesting an independent risk review of its Texas and Mississippi facilities.   (Morano Tr. 83:11-14, Exhibit "11").

**Max Specialty's Lack of Evidence of Fraud, Misrepresentation, or Concealment**

150.    Max Specialty seeks to void the EPI based upon what it alleges to be Signal's violation of Endorsement MBM 102, paragraph 3, of the EPI which states in pertinent part that coverage is void if the insured "*intentionally* conceals or misrepresents a material fact concerning: (1) This Coverage Part; (2) The Covered Property; … (4) A claim under this Coverage Part."   (Max Specialty Amended Crossclaims Against Signal, Rec. Docket 89, ¶ 96 (emphasis added); Boesen Tr. 94:6-20, Exhibit "24").

151.    Signal neither intended to nor actually concealed or misrepresented anything to anyone.   (Aff. of Cunningham, ¶¶ 8-9, Exhibit "41"; Spears Tr. 214:7-23, 215:1-23, 216:1-12, Exhibit "42").

152.    Max Specialty has admitted that the only evidence it has in support of its claims of fraud, misrepresentation and concealment is the mere existence of certain surveys in Signal's files and the condition of the Drydock.   (Boesen Tr. 136:23 – 137:5, Exhibit "24").

153.    Signal did not intend to (and, in fact, did not) defraud Max Specialty or misrepresent material information during the placement of the EPI Policy.   (Aff. of Cunningham, ¶¶ 8-9, Exhibit "41"; Spears Tr. 214:7-23, 215:1-23, 216:1-12, Exhibit "42"; Johnson Tr. 294:3-23, 295:1-8, Exhibit "8").

154.    Max Specialty's position that the only misrepresentation in Max Specialty's eye was the value of the AFDB-5 as listed on the schedule of values.   (Boesen Tr. 94:6-20, Exhibit "24").

155.    The value of the AFDB-5 came from an independent surveyor, himself retained by Signal's financiers. (Bullock Tr. 136, Exhibit "25"; DLS 12/2007 Survey, Johnson Ex. 125, Exhibit "40").

156.    Max Specialty's underwriter Trip Morano specifically admitted that relying on the surveyor's valuation of the AFDB-5 was not fraud. (Morano Tr. 195:23 – 196:7, Exhibit "11").

157.    The value of the AFDB-5 Drydock ($13.6 million) was a small percentage of the total $211 million worth of property insured.  (Morano Tr. 140:5-17, Exhibit "11").

158.    Mr. Morano was not concerned with individual pieces of property in underwriting the Excess Property Insurance Policy and he never inquired about nor sought to inspect any of Signal's property. (Morano Tr. 42:3-7, 20:18-19, Exhibit "11").

159.    The only facts that were material to Mr. Morano's decision to underwrite the EPI were the amount insured and who agreed to underwrite the PPI.  (Morano Tr. 27:7-9, 16-20, Exhibit "11").

160.    As Westchester had agreed to underwrite the PPI, Mr. Morano agreed to underwrite the Excess Property Insurance Policy.  (Morano Tr. 27:7-9, 16-20, Exhibit "11").

161.    The value ($13.6 million) and the age (1943) of the AFDB-5 Drydock were always correctly conveyed to Max Specialty both in the Property Submission and in Signal's Proof of Loss. (DLS 12/2007 Survey, Johnson Ex. 125, Exhibit "40").

162.    Mr. Morano testified that it was prudent of Signal to rely on the Dufour Laskey & Strauss December 14, 2007 Survey in placing insurance. (Morano Tr. 189:25 – 190:2, Exhibit "11").

163.   The value of the AFDB-5 Drydock was confirmed by Max Specialty's own post-casualty survey performed by independent appraiser CSL North America.  (Bullock Ex. 157, Exhibit "43").

164.   Mr. Morano testified that he was unaware of any misrepresentations of Signal's broker, AmWins.  (Morano Tr. 45:5-13, Exhibit "11").

165.   Mr. Morano testified that he doesn't "think there is a misrepresentation by Signal" contained in the property package submitted by AmWins in January 2009.  (Morano Tr. 91:13-14, Exhibit "11").

166.   Signal at all times relied upon the valuation of an independent marine appraiser when providing any values to its insurers or brokers.  (Aff. of Cunningham, ¶ 6, Exhibit "41"; Spears Tr. 137-138, Exhibit "42"; Johnson Tr. 279-280, Exhibit "8"; Bullock Tr. 137-139, Exhibit "25").

167.   Mr. Morano testified that Signal's reliance upon the DLS report from 2007 and the CBIZ report from 2008 does not constitute fraud:

> Q:  Now that you have seen them, the DLS report from 2007 and the CBIZ report from November 2008, just two months before you wrote the policy, how is it fraud when Signal lists an insured value of 13.6 million when they had in their possession from a professional appraiser an actual cash value for the drydock at 19,250,000?
>
> A:  It's not.

(Morano Tr. 195:23 – 195:7, Exhibit "11").

168.   Mr. Morano testified he saw nothing fraudulent about Signal requesting an independent risk review of its Texas and Mississippi facilities.  (Morano Tr. 83:11-14, Exhibit "11").

169.    Cody Whittington testified that Max Specialty doesn't have any evidence that Signal defrauded it:

> Q: Does Max Specialty have any evidence that Signal knowingly, deliberately and with an intent to defraud both Westchester and Max Specialty concealed and misrepresented material facts?  Do you have any evidence of that?
>
> A: At this time, I'm not aware of any or can remember any.

(Whittington Tr. 367:13-19, Exhibit "12").

170.    Mr. Morano testified that he would normally only request the most current evaluation or appraisal of a property when writing an Excess Property Insurance Policy. (Morano Tr. 31:21 – 32:5, Exhibit "11").

171.     Signal provided the most recent survey value of the AFDB-5, that of DLS in 2007.  (Bullock Tr. 137-139, Exhibit "25").

172.    No other information was requested by Max Specialty during the underwriting of the Excess Property Insurance Policy.  (Morano Tr. 31, Exhibit "11").

173.    Mr. Morano testified that he has never requested a survey from a broker or hired his own surveyor prior to underwriting an excess property policy, even though he could do so. (Morano Tr. 31:7-20, Exhibit "11").

174.    Max Specialty underwrote the EPI without qualifications, recommendation, or reservations placed on the decision to underwrite the EPI.  (Morano Tr. 32:9-20, Exhibit "11").

175.    If Max Specialty had requested additional information, it would have been provided.  (Aff. of Cunningham, ¶¶ 16-17, Exhibit "41"; Spears Tr. 223, Exhibit "42"; Johnson Tr. 284-285, Exhibit "8"; Bullock Tr. 136, Exhibit "25"; Boesen Tr. 116:9-15, Exhibit "24").

176.    Max had ample opportunity to request additional information and chose not to do so. (Boesen Tr. 136, Exhibit "24").

33

177.   Mr. Morano admitted that he had no evidence that Signal deliberately withheld or intentionally withheld information from him.  (Morano, p. 131, ll. 13-16, Exhibit "11").

178.   Surveys allegedly not provided to Max Specialty are not material, and have been testified to be obsolete.  (Heger Tr. 146:23 – 147: 4, Exhibit "44").

**<u>Great American's Lack of Evidence of Material Misrepresentation or Concealment</u>**

179.   Section 15 of the Great American Pollution Policy provides that, in certain circumstances of material concealment or misrepresentation, the policy will be void.  (2009 Great American Policy, Stringer Ex. 247, p. 9, Exhibit "7").

180.   Reese Lever, Great American's underwriter who took over the renewal underwriting of the Signal account for Cindy Stringer, testimony demonstrates that the alleged failure of Signal to disclose certain information never requested by Great American was not material to Great American's decision to underwrite the Pollution Policy for 2009-2010. (Lever Tr. 151:23-25, 152:1-15, Exhibit "34").

181.   Great American never requested any additional information beyond the 2009 Pollution Submission.  (Aff. of Cunningham, ¶ 12, Exhibit "42"; Ewing Tr. 206:10-16, Exhibit "2"; Lever Tr. 151:23-25, 152:1-15, Exhibit "34"; Spears Tr. 206:12-23, 207:8-23, 208:1-13, 209:12-18, Exhibit "42").

182.   Great American never requested that Signal provide it with any reports or surveys on the AFDB-5 or any other asset for which it provided pollution coverage except for the vessels acquired by Signal from Bender Ship Repair.  (Stringer Tr. 222:21-23, 225:5-13, 227:24 – 228:1, Exhibit "6"; Lever Tr. 159:1-17, 159:22 – 160:2, Exhibit "34").

183.   Great American's underwriter Cindy Stringer admitted that she has no reason to believe Signal intentionally or inadvertently withheld documents from Great American during

the placement of the 2009-2010 Pollution Insurance Policy.  (Stringer Tr. 214:18 – 215:5, Exhibit "6").

184.    Willis and/or Signal would have provided any and all information upon request from Great American. (Spears Tr. 223, Exhibit "42"; Ewing Tr. 282-284, Exhibit "2"; Bullock Tr. 136, Exhibit "25").

185.    Great American requested surveys from Signal for the vessels and marine assets it was acquiring from Bender Ship Repair.  (Lever Tr. 45:5-10, Exhibit "34").

186.    The assets acquired by Signal from Bender Ship Repair included a drydock. (Lever Tr. 77, Exhibit "34").

187.    The survey requested by Great American on the Bender Ship Repair drydock acquired by Signal indicated concern about the drydock's condition and recommended that repairs be performed.  (Lever Tr. 77-80, Exhibit "34").

188.    Great American agreed to add that drydock (and all of the Bender vessels and marine assets) to the Signal Pollution policy.  (Lever Tr. 80:8-22, Exhibit "34").

189.    Great American renewed the Signal Pollution policies with full knowledge of the recommendations and condition of the assets acquired from Bender Ship Repair and continues to cover those vessels and marine assets against Pollution.  (Lever Tr. 86:15 – 88:23, Exhibit "34").

190.    Great American recognized its right to have surveys performed prior to renewing the Pollution Policy, and decided against doing so. (Lever Tr. 99:19 – 100:10, Exhibit "34").

191.    Signal made no representations to Great American. (Spears Tr. 106:12-20, Exhibit "42"; Johnson Tr. 248-250, Exhibit "8").

192.    Great American has no evidence that representations made by other parties were false.  (Spears Tr. 214, 215-217, Exhibit "42"; Lever Tr. 163:24 – 164:1, 164:14-18, Exhibit "34").

193.    Great American did not rely on any representations when deciding to underwrite the Pollution Insurance Policy.  (Stringer Tr. 229:9-14, 23 – 230:14, Exhibit "6").

194.    The value of the AFDB-5 was not material to Great American's decision to underwrite the Pollution Insurance Policy but only relevant to the calculation of premium. (Stringer Tr. 229:9-14, 23 – p. 230:14, Exhibit "6").

195.    The 2009-2010 Pollution Submission was consistent with all prior years' respective Pollution Submissions from Willis.  (Spears Tr. 207:1-7, Exhibit "42").


Dated:  New York, New York
        March 19, 2013

                                Yours etc.

                                NICOLETTI HORNIG & SWEENEY
                                *Attorneys for Plaintiffs*


                        By:   ____/s/ John A.V. Nicoletti_____
                                JOHN A. V. NICOLETTI (JN-7174)
                                Wall Street Plaza
                                88 Pine Street, 7th Floor
                                New York, New York 10005-1801
                                Tel: (212) 220-3830
                                Fax: (212) 220-3780
                                OUR FILE:  42000055 JAVN


TO:

George Richard Zacharkow, Esq.
Stephen J. Galati, Esq.
MATTIONI, LTD.
*Attorneys for Defendant*
*Great American Insurance Company of New York*
399 Market Street, 2nd Floor
Philadelphia, Pennsylvania 19106

Ph: (215) 629-1600
Fax: (215) 923-2227
Email: gzachark@mattioni.com;
       sgalati@mattioni.com


Stephen D. Straus, Esq.
TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP
*Attorneys for Defendant*
*Max Specialty Insurance Company*
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York  10532
Ph: (914) 347-2600
Fax: (914) 347-8898
Email: sstraus@traublieberman.com


Stephen Patrick Kyne, Esq.
BURKE & PARSONS
100 Park Avenue, 30th Floor
New York, New York 10017
Ph: (212) 354-3814
Fax: (212) 221-1432
Email: kyne@burkeparsons.com

and

David S. Bland, Esq.
Matthew C. Guy, Esq.
LEBLANC BLAND P.L.L.C.
*Attorneys for Defendant*
*Signal International, LLC*
909 Poydras Street, Suite 1860
New Orleans, LA  70112
Ph: (504) 528-3088, Ext. 208
Fax: (504) 586-3419
Email: dbland@leblancbland.com;
       mguy@leblancbland.com