UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
FIREMAN'S FUND INSURANCE COMPANY, :
ONE BEACON INSURANCE COMPANY, :
NATIONAL LIABILITY AND DIRE :
INSURANCE COMPANY and QBE MARINE :
& ENERGY SYNDICATE 1036, :         10 Civ. 1653 (JPO)
:
      Plaintiffs, :         MEMORANDUM
:                                   AND ORDER
  -against- :
:
GREAT AMERICAN INSURANCE :
COMPANY OF NEW YORK, MAX :
SPECIALTY INSURANCE COMPANY and :
SIGNAL INTERNATIONAL, LLC, :
:
      Defendants. :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

  This is a dispute about insurance coverage. Fireman's Fund Insurance Company ("Fireman's Fund"), One Beacon Insurance Company ("One Beacon"), National Liability and Fire Insurance Company ("National Liability"), and QBE Marine & Energy Syndicates ("QBE") (together, "Plaintiffs") initiated this action against Great American Insurance Company of New York ("Great American"), Max Specialty Insurance Company ("MSI"), and Signal International, LLC ("Signal"). Cross-claims and counterclaims were subsequently filed by MSI, Great American, and Signal.

  Before this Court is Plaintiffs' motion for summary judgment against MSI, seeking a declaration that MSI must contribute on a pro-rata basis towards the cost of removing and cleaning the wrecked drydock at issue in this case, or, in the alternative, that MSI be compelled to allocate $5 million of a $10 million payment, paid by Signal's

1

primary insurer, to wreckage removal coverage. For the reasons that follow, Plaintiffs' motion is granted.

I.   **Background**

    A.    **Factual Background**

        1.    **The Life and Death of a Drydock**

This case concerns drydock AFDB-5 ("the Drydock"), which sank at its berth in Texas on August 20, 2009. Upon sinking, the Drydock was wrecked beyond repair and rendered a total constructive loss. The Drydock had been in Signal's possession since 2003,[1] the year Signal purchased the offshore repair division of the bankrupt company Friede Goldman Halter. Signal's purchase included a dockyard in Port Arthur, Texas ("the Port Arthur facility"), at which the Drydock was located. The Port Arthur facility was used by Signal to repair and refurbish offshore drilling rigs.

The Drydock—which, until its sinking, was one of the largest drydocks in the world—had been constructed during World War II, during which it was towed to the western Pacific Ocean to service Navy vessels engaged in the war effort. After the war, the Drydock spent several decades in Hawaii before being towed to Texas. The Drydock remained in Texas from 1984 until its demise in 2009.

        2.    **The Policies**

At the time of the Drydock's sinking, Signal had five lines of insurance that potentially provided coverage with respect to the Drydock: (1) a marine general liability ("MGL") policy subscribed to by Fireman's Fund and One Beacon on a 50-50 basis with

---

[1] The Drydock appears to have been purchased outright by Signal in 2005.

Fireman's Fund being the lead insurer ("the MGL Insurers"), (2) a Bumbershoot policy[2] subscribed to by Fireman's Fund, National Liability, and QBE, with Fireman's Fund being the lead insurer ("the Bumbershoot Insurers"), (3) a pollution liability policy issued by Great American, (4) a primary property policy issued by Westchester Surplus Lines Insurance Company ("Westchester") for $10 million ("the PPI Policy"), and (5) a following form excess property policy with limits of $15 million in excess of the PPI Policy, issued by MSI ("the EPI Policy").  Primarily at issue in the instant motions are the PPI and EPI Policies.

The PPI Policy provides in relevant part:

The Insurer's maximum Limit of Liability in a single "occurrence" regardless of the number of "locations" or coverages involved shall not exceed the Policy Limit of Liability of [USD 10,000,000.]

When a Limit of Liability for a "location" or other specified property is shown, such Limit shall be the maximum amount payable for any loss or damage arising from physical loss, damage or destruction of the type insured by this Policy at the "location" or involving such other specified property.

Sub-limits stated in the Sub-limits schedule, or elsewhere in this Policy, shall apply as a part of and not in addition to the Policy Limit of Liability.  Limits and sub-limits do not include the amount of any applicable Deductibles.

Limits of Liability apply per "occurrence" unless otherwise stated.  When a Sub-limit of Liability is shown as applying in the aggregate during any Policy year, the Insurer's maximum Limit of Liability shall not exceed such Limit during any Policy year regardless of the number of "locations" and coverages involved.

**Schedule of 100% Program Sub-limits (all in United States Dollars)**

Property Damage and "Time-Element" coverages are subject to the following Sub-limits, unless otherwise stated:
\*\*\*

---

[2] A Bumbershoot policy is an umbrella insurance policy that covers shipyards.  To this Court's knowledge, it has nothing to do with the renowned annual music festival in Seattle also called Bumbershoot.

3

| | |
|---|---|
| USD 5,000,000. or 25% of the Property Damage and "Time Element" claim payable under this Policy, whichever is greater. | Debris Removal and Cost of Cleanup |

\*\*\*

III.   PROPERTY INSURED

   Except as hereinafter excluded, this Policy insures:

\*\*\*

   B.   ADDITIONAL COVERAGES

   1.   Debris Removal and Cost of Clean Up

   Notwithstanding the provisions of any exclusion contained herein or any provision respecting pollution and/or contamination, in the event of physical loss, damage or destruction of property insured by a peril insured by this Policy, this Policy (subject otherwise to its terms, conditions, and limitations, including but not limited to any applicable Deductible) insures:

   a.   Expenses necessarily and reasonably incurred in removal of debris of such property of such property from the "location" of the insured physical loss, damage or destruction and/or from other premises when blown by wind or carried by water

   and/or

   b.   Cost of clean up at the "location" made necessary as a result of physical loss, damage or destruction of property of the type insured by this Policy by a peril insured by this Policy.

   Provided such expenses are reported to the insurer within 365 days of the date of direct physical loss, damage or destruction.

   This provision does not insure against the costs of decontamination or removal of water, soil or any substance not insurance by this Policy on or under such "location."

   It is a condition precedent to recovery under this provision that the Insurer shall have paid or agreed to pay for physical loss, damage or destruction of property insured unless such payment is precluded solely by the operation of any Deductible.

   2.   Contamination Cleanup

>Notwithstanding anything in this Policy to the contrary, this Policy insures costs or expenses incurred to clean up and/or remove polluted or contaminated land and/or water from an insured "location" provided the contamination or pollution results directly from physical loss, damage or destruction of property insured by a peril insured by this Policy, and provided such expenses are reported to the insurer within 365 days of the date of the direct physical loss, damage or destruction.
>
>\*\*\*

As explained *supra*, the EPI Policy insures Signal in excess of the PPI Policy.

The EPI Policy contains to following relevant provisions:

| 1. | **Coverage Part(s):** Commercial Property-Excess of Loss |
| 2. | **Participation Layer:** $15,000,000 per occurrence excess of $10,000,000 per occurrence |
| 3. | **Coverage Form:** Excess of Loss Agreement MEP003 (07/08) |
| 4. | **Covered Property:** Building, Contents, and Business Income with Extra Expenses as per the schedule of values on file with this company dated 01/30/2009 |
| 5. | **Perils:** All Risks of Direct Physical Loss or Damage excluding Named Windstorm, Flood, Storm Surge/Ensuing Flood, and Earthquake <br> \*\*\* |
| 11. | **Primary/Underlying Carrier(s):** <br> as per the Commercial Property Supplemental Declarations MEP002 (07/08) |

\*\*\*

## OCCURRENCE LIMIT OF INSURANCE ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies the insurance provided under the following:

**Excess of Loss Agreement MEP003 (07/08)**

LIMITS OF INSURANCE Sections as found in the above referenced coverage forms are deleted and replaced by the following:

**Occurrence Limit of Insurance** $  15,000,000

The most we will pay for loss or damage in any occurrence is the Occurrence Limit of Insurance shown above, irrespective of the number of locations involved.

<u>In the event of loss or damage we will not pay more than the **least** of the following:</u>

(1) The actual amount of the adjusted loss as defined elsewhere throughout the policy, or

(2) The stated value for each scheduled item of coverage applicable to the lost or damaged property, as shown on the Statement of Values on file with the Company, or on MBM106 if attached to this policy, plus any additional limits of Insurance for Property Additional Coverage or Coverage Extensions included in, or that modify the Property Coverage Parts; and any limit(s) of Insurance as shown on Coverage Declaration(s) or Schedules of any inland marine coverage forms; or

(3) The Occurrence Limit of Insurance shown above,

Less applicable deductible(s).

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**
\*\*\*

**Commercial Property Supplemental Declarations Primary/Underlying Insurance**

| Item No. | |
|---|---|
| 1. Schedule Of Primary / Underlying Carrier | Primary Carrier: Westchester Surplus Lines<br>Company: Signal International, LLC<br>Policy Number: D37362220 001<br>Term: 1/30/2009-01/30/2010 |
| 2. Attachment | $15,000,000 per occurrence excess of $10,000,000 per occurrence |
| 3. Participation and Layer Limit(s) | LIMIT                                   P/O PER OCCURRENCE<br>Primary: $10,000,000                            100%<br>(Subject to Occurrence Limit<br>of Liability) |
| 4. Perils | All Risks of Direct Physical Loss or Damage including Earthquake and Flood |
| \*\*\* | \*\*\* |
| 6. Sublimits | n/a |

\*\*\*

**EXCESS PHYSICAL DAMAGE FORM**

**1. INSURING AGREEMENT:**

Subject to the limitations, terms and conditions in this Policy or added hereto, the Insurer(s) agree to indemnify the Insured named in the Declaration herein in respect of Direct Physical loss or damage to the property described in Declarations, while located or contained as described in the Declarations, occurring during the period stated in the Declarations and caused by any of such perils as are set forth in Declarations and which are also covered by and defined in the Policy/ies specified in the Declarations and issued by the "Primary Insurer(s)" stated therein.

2. **APPLICATION OF UNDERLYING PROVISIONS:**
   In respect of the perils hereby insured against this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and Limits of Liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the Policy/ies of the Primary Insurer(s) prior to the happening of a loss for which claim is made hereunder and should any alteration be made in the premium for the Policy/ies of the Primary Insurer(s), then the premium hereon may be adjusted accordingly.

3. **LIMIT OF LIABILITY:**
   Provided always that liability attaches to the Insurer(s) only after the Primary and Underlying Excess Insurer(s) have paid or admitted liability for the full amount of their respective liability as set forth in Declarations and designated Primary and Underlying Excess Limit(s) and then the limits of the Insurer(s) Liability shall be those set forth in Declarations under the designation Excess Limit(s) and the Insurer(s) shall be liable to pay up to the full amount of such Excess Limit(s).

\*\*\*

6. **DEFINITIONS:**
   (a) Loss:  The word "loss" shall mean each and every loss or series of losses arising out of one "loss occurrence."
   (b) Loss Occurrence: The sum of all individual losses directly occasioned by any one disaster, accident, or loss or series of disasters, accidents, or losses arising out of one event.  The duration and extent of any one loss occurrence will be limited to all individual losses sustained by the Company occurring during any period of 168 consecutive hours arising out of and directly occasioned by the same event except that the term "loss occurrence" will be further defined as follows:

   1. As regards windstorm, hail, tornado, hurricane, and cyclone, including ensuing collapse and water damage . . .

   2. As regards riot . . .

   3. As regards earthquake . . .

\*\*\*

The EPI Policy also contains a "Commercial Property Conditions" section, which voids coverage "if the named insured, at any time, intentionally conceal or misrepresent a material fact concerning," *inter alia*, the covered property.

### 3. After the Sinking

Following the sinking of the Drydock, Signal made a demand upon its insurers. (*But see* Dkt. No. 170 ("Great American's Resp.") at 2.) Signal also notified the Texas General Land Office ("GLO") of the sinking. In a reply letter from GLO, Signal was warned that, as the sunken structure posed a threat to the public's health and safety, GLO would initiate legal action against Signal "should [it] fail to take immediate action." (*Id.*, Ex. C at 15.)

Signal entered into a contract with Weeks Marine, Inc. ("Weeks Marine") for the removal of the Drydock, which the MGL and Bumbershoot Insurers agreed to fund on a without prejudice basis. Plaintiffs paid West Marine $12,395,026.00 to remove the wrecked Drydock and clean up the site of the Drydock. As of February 2012, the cleanup was complete.

In January 2010, Westchester paid Signal its full $10 million layer of insurance. Westchester did not attempt to allocate the $10 million payment to any specific coverage afforded to Signal under the property program. For its part, MSI has paid $3.6 million (less deductible) to Signal on Signal's property damage claim. However, MSI has denied any responsibility for payment and/or contribution toward the removal and/or cleanup of the Drydock. This denial is at the center of the case at bar.

### C. Procedural Background

On March 2, 2010, Plaintiffs filed a Complaint against Defendants.[3] (Dkt. No. 1 ("Compl.").) Great American answered on April 6, 2010. (Dkt. No. 10.) MSI answered on April 21, 2010. (Dkt. No. 14 ("MSI Ans.").) On July 30, 2010, MSI moved to amend

---

[3] On October 15, 2010, Plaintiffs voluntarily dismissed the suit as to one of the Defendants, Signal. (Dkt. No. 70.)

8

its Answer to include a Counterclaim against Plaintiffs and a Cross-claim against Signal. (Dkt. No. 47.)  MSI's motion was granted on August 30, 2010, and MSI filed its Amended Answer on September 10, 2010.  (Dkt. Nos. 50 & 51.)[4]  Plaintiffs filed an Answer to the Counterclaim on September 17, 2010.  (Dkt. No. 53.)   Signal filed its Answer to MSI's Cross-claim on October 14, 2010.  (Dkt. No. 68.)  Signal's Answer was amended on December 23, 2010 to include a Cross-claim against MSI.  (Dkt. No. 79.)  MSI filed its Answer to Signal's Cross-claims on January 28, 2011, which included additional Cross-claims against Signal.  (Dkt. No. 84.)  MSI's Answer to Signal's Cross-claims was amended on February 18, 2011.  (Dkt. No. 89.)  On March 14, 2011, Signal filed its Answer to MSI's Cross-claims. (Dkt. No. 96.)  MSI then answered Signal's additional Cross-claims on March 16, 2011.  (Dkt. No. 97.)  Great American then amended its Answer to the Complaint, now including Cross-claims against Signal and a Counterclaim against Plaintiffs.  (Dkt. No. 105.)  Plaintiffs filed an Answer to Great American's Counterclaim on April 6, 2011 (Dkt. No. 105), and Signal filed an Answer to Great American's Cross-claims on April 15, 2011.  (Dkt. No. 107.)

     On April 26, 2010, Plaintiffs moved for summary judgment seeking declaratory relief against Great American. (Dkt. No. 18.)  Plaintiffs then moved for summary judgment against MSI on September 17, 2010.  (Dkt. No. 54.)  Judge Kaplan[5] denied these motions on November 11, 2010.  (Dkt. No. 78.)

---

[4] MSI again amended its Answer to the Complaint on March 18, 2011. (Dkt. No. 101.)

[5] This case, originally assigned to Judge Kaplan, was reassigned from Judge Kaplan to my docket on October 6, 2011.  (Dkt. No. 125.)

On August 10, 2012, Plaintiffs filed a Motion for Summary Judgment against MSI. (Dkt. No. 159. ("Pls.' Mot."); Dkt. No. 166 ("Pls.' Mem.").)[6] Great American, not a party to this Motion, filed a Response to Plaintiffs' Motion on August 29, 2012. (Great American's Resp.) MSI filed its Opposition to Plaintiffs' Motion on September 15, 2012. (Dkt. No. 181 ("MSI's Opp'n.").) Plaintiffs replied on October 12, 2012. (Dkt. No. 197 ("Pls.' Rep.").) Oral argument was held on March 5, 2013.

## II.     Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "is appropriate when the evidence 'show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 265-66 (S.D.N.Y. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)) (alteration in original). In such cases, the non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The Supreme Court has advised that an issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The initial burden of a movant on summary judgment, or partial summary judgment, is to provide evidence on each material element of his claim or defense illustrating his entitlement to relief. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

---

[6] Signal also filed a Motion for Partial Summary Judgment against MSI on August 10, 2012. (Dkt. No. 162.) On February 5, 2013, Signal's Motion was denied as moot. (Dkt. No. 212.)

The Court must view all evidence and facts "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citing *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 572 (2d Cir. 1993)).  To prevail on a claim for summary judgment, it must be shown that "no reasonable trier of fact could find in favor of the nonmoving party." *Id.*; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere "conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587); *see also Anderson*, 477 U.S. at 249-50.

### III.   Discussion

Plaintiffs argue that MSI is liable for the removal and cleanup of the Drydock wreckage, because coverage for removal of the Drydock was triggered under the PPI Policy as a matter of law, meaning that coverage must be triggered under the EPI Policy as well.  MSI argues that the EPI Policy does not adopt the Debris Removal and Cost of Clean Up coverage of the PPI Policy and that, even if it does, the cleanup and removal of wreckage are not covered by the PPI Policy.

### A.     Interpreting an Insurance Contract under New York Law[7]

"[T]he construction of an insurance contract is ordinarily a matter of law to be determined by the court." *Channel Fabrics, Inc. v. Hartford Fire Ins. Co.*, No. 11 Civ. 3483 (JPO), 2012 WL 328484, at *5 (S.D.N.Y. Aug. 13, 2012) (citation omitted). "In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990)); *accord Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) ("When interpreting the meaning of a contract, it is the objective intent of the parties that controls. The secret or subjective intent of the parties is irrelevant." (internal citations omitted)). When a written agreement "is complete, clear and unambiguous on its face," a court must enforce that

---

[7] Federal courts sitting in diversity apply the choice of law rules of their forum state. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994) ("Federal courts sitting in diversity cases will, of course, apply the substantive law of the forum State on outcome determinative issues." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In New York, to determine whether to conduct a choice of law analysis, a court must first "determine whether there is an actual conflict between the laws of the jurisdictions involved." 28 N.Y. Prac., Contract Law § 8:4. Where there is no conflict between the jurisdictions, *a fortiori*, a determination of which law will apply is unnecessary. *Id.*; *see also Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis."). It does not appear that any such conflict exists in this case. In any event, while MSI purports to "reserve[] the right to assert application of another state's law," MSI has marshaled no argument against the use of New York law, and, like Plaintiffs, uses New York law in its brief. Thus, MSI has impliedly consented to the use of New York law. *See Tehran-Berkeley Civil and Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F. 2d 239, 242 (2d Cir. 1989); *see also Cal Distrib., Inc. v. Cadbury Schweppes Ams. Beverages, Inc.*, 06 Civ. 0496 (RMB) (JCF), 2007 WL 54534, at *3 (S.D.N.Y. Jan. 5, 2007) ("The parties' briefs rely upon New York law, and such implied consent . . . is sufficient to establish choice of law." (citation and internal quotation marks omitted)).

agreement "according to the plain meaning of its terms[.]"  *UBS Financial Services, Inc. v. West Virginia University Hospitals*, *Inc.,* 660 F.3d 643, 649 (2d Cir. 2011) (alteration in original).  "[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  *Federal Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (quoting *Empire Fire & Marine Ins. Co. v. Eveready Ins. Co.* 851 N.Y.S.2d 647, 648 (2008)).

Whether a contract is ambiguous is a "threshold question of law to be determined by the court."  *Parks Real Estate Grp. v. St. Paul Fire & Marine Ins. Co*, 472 F.3d 33, 42 (2d Cir. 2006) (citation omitted).  "Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to its meaning." *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir.1998); *see also United States Fire Ins. Co. v. General Reins. Corp.*, 949 F.2d 569, 572 (2d Cir.1991) ("As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading.").  "If the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."  *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, *England*, 136 F.3d 82, 86 (2d Cir. 1998).  "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy any ambiguity in [the] . . . policy should be resolved in favor of the insured."  *Morgan Stanley Grp. Inc. v. New England Ins. Co.*,

225 F.3d 270, 275 (2d Cir. 2000) (alterations in original) (citations and internal quotation marks omitted).

### B.     Coverage under the PPI Policy

The threshold question is whether the PPI Policy covers the cost of removing the wrecked Dryock.[8]  The PPI Policy promises to cover, under subsection (a) of the "Debris Removal and Cost of Clean Up" coverage, "[e]xpenses necessarily and reasonably incurred in removal of debris of such property from the 'location' of the insured physical loss . . ." as well as, under subsection (b), the "[c]ost of clean up at the 'location' made necessary as a result of physical loss, damage or destruction of the type insured by this Policy by peril insured by this Policy."

MSI argues that PPI Policy's coverage of "debris removal" does not include costs associated with the removal of the wrecked Drydock.  Whether or not the wrecked Drydock constitutes "debris," however, subsection (b) of the "Debris Removal and Cost of Clean Up" section unambiguously covers the costs of cleanup "at the 'location'" resulting from "physical loss, damage or destruction of the property" covered by the policy; the Drydock indisputably suffered such physical loss, thereby "ma[king] necessary" cleanup at the location.

Moreover, this Court agrees with Plaintiffs that the language of the PPI Policy unambiguously provides for the coverage of the removal of the wrecked Drydock.  "'Debris' is defined in Webster's Third New International Dictionary (1986) as, *inter alia:* 'the remains of something broken down or destroyed.'" *Lenard v. 1251 Ams. Assocs.*, 241 A.D.2d 391, 394 n.2 (N.Y.A.D. 1 Dept., 1997)  While it may have been

---

[8] If it does not, then the inquiry can come to an end, as the EPI Policy cannot be read to provide excess coverage where the PPI Policy did not provide primary coverage.

intact when it sank, the Drydock post-sinking constituted nothing more than "the remains of something . . . destroyed." And indeed, other dictionary definitions explicitly indicate that "wreckage" and "debris" are synonymous. *See, e.g., The American Heritage Dictionary* (4th ed. 2000) (defining "debris" as "the scattered remains of something broken or destroyed; rubble or wreckage . . . carelessly discarded refuse; litter"); [9] *Oxford English Dictionary Online* (2005) (defining "debris" as "The remains of anything broken down or destroyed; ruins, wreck"). Because the wrecked Drydock constituted "debris," its removal, as well as the subsequent cleanup, is covered under the "Debris Removal and Cost of Clean Up" section as a matter of law.

### C. Coverage under the EPI Policy

Next, this Court must determine whether the EPI Policy adopts the "Debris Removal and Cost of Cleanup" coverage of the PPI Policy.

The EPI Policy makes clear that it is, for the most part, written on the same "terms and conditions" as the PPI Policy. (*See also* Compl. at ¶ 48 (alleging that MSI issued its policy "on a full following form to the [PPI] policy issued by Westchester . . . .); MSI's Ans. at ¶ 48 ("admit[ting] the matters alleged in Paragraph 47 of the Complaint).) Indeed, the very purpose of an excess insurance policy is to provide coverage for a loss that, while covered by the PPI policy, exceeds the amount of coverage afforded in the primary policy. However, the EPI Policy explicitly provides for certain limitations on its following of the PPI Policy. Specifically, the EPI Policy provides that "the perils hereby insured against this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and Limits of Liability other than the deductible or

---

[9]*The American Heritage Dictionary* not only defines "debris" as, *inter alia*, "wreckage," but also defines "wreckage" as "the debris of something wrecked." *Id*.

15

self-insurance provision where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN)."

The question then becomes whether the EPI Policy "provide[s] [t]herein" for an "except[ion]" to "Debris Removal and Cost of Cleanup" coverage.  In support of its argument that it does, MSI points to the "Commercial Property Supplemental Declarations Primary/Underlying Insurance" section of the EPI Policy, which states, somewhat cryptically, that "sublimits" are "n/a."  This language, argues MSI, indicates that the EPI Policy does not provide coverage for any sublimits in the PPI Policy.  It is more sensible, however, to read this language as providing that there are no sublimits in the *EPI* Policy, rather than as an exception to following the *PPI* Policy.  *Accord Libra Bank Ltd. v. Banco Nacional De Costa Rica, S.A.*, 570 F. Supp. 870, 893 (S.D.N.Y. 1983).  ("[C]ontractual ambiguity is not established simply because the parties disagree as to the meaning of a particular provision.")  If the EPI Policy excluded all coverage under the PPI sublimits, one would expect the EPI Policy to state that "sublimit *coverage*" is "n/a" (or even better, that such coverage is *excluded*).  This reading of the "sublimit" "n/a" language comports with the EPI Policy's provision that it follows form "except as regards the . . . Limits of Liability" in the PPI Policy.[10]  Together, these provisions plainly demonstrate that the EPI Policy follows the different *areas* of coverage

---

[10] In other words, to read, as MSI would have this Court do, the "sublimits" "n/a" language together with the "EXCEPT AS OTHERWISE PROVIDED HEREIN" language as excepting all PPI Policy sublimits from coverage would contradict the EPI Policy's language about not following the "Limits of Liability" mandated by the PPI Policy.  *Accord United States Naval Inst. v. Charter Communications, Inc.*, 875 F.2d 1044, 1049 (2d Cir.1989) ("The court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms." (citations omitted)).

in the PPI Policy, but removes any sublimits for any particular coverage, thereby making the limit for coverage co-extensive with the full program limits.

Moreover, the language of the PPI Policy unambiguously contemplates the EPI Policy's providing excess insurance for claims under the debris sublimit. As is indicated in the lengthy quotation from the PPI Policy *supra*, "Debris Removal and Cost of Cleanup" coverage is enumerated in the PPI Policy as a "100% Program Sublimit." The PPI Policy provides that "USD 5,000,000 or 25% of the Property Damages and 'Time Element' claim payable under this Policy, whichever is greater" applies to "Debris Removal and Cost of Cleanup." As Plaintiffs point out, the "or 25%" language would be superfluous unless the PPI Policy contemplated the sublimit being covered by the EPI Policy; the most that can be sought under the PPI Policy is $10 million, so that the "claim payable under this Policy" can surpass $20 million (making 25 percent of the claim greater than $5 million) only if the EPI Policy covers the sublimit.

Because the EPI Policy explicitly eschews all "limits of liability" in the PPI Policy and does *not* provide for an exception to coverage for "Debris Removal and Cost of Cleanup," this Court concludes that the EPI Policy provides excess coverage of "Debris Removal and Cost of Cleanup" unambiguously and as a matter of law.

**IV.     Conclusion**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is

GRANTED.

The Clerk of the Court is directed to close the motion at docket number 159.

SO ORDERED.


Dated: New York, New York
       March 25, 2013

_____
J. PAUL OETKEN
United States District Judge