UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIREMAN'S FUND INSURANCE CO., ONE BEACON INSURANCE CO., NATIONAL LIABILITY AND FIRE INSURANCE CO., and QBE MARINE & ENERGY SYNDICATE 1036,<br>*Plaintiffs*<br>v.<br>GREAT AMERICAN INSURANCE CO. OF NEW YORK, MAX SPECIALITY INSURANCE CO. and SIGNAL INTERNATIONAL, LLC,<br>*Defendants* | CIVIL ACTION NO. 10-cv-1653 (LAK) |

**DEFENDANT GREAT AMERICAN INSURANCE CO. OF NEW YORK'S RESPONSE TO PLAINTIFFS' AND SIGNALS' JOINT LOCAL RULE 56.1 STATEMENT**

MATTIONI, LTD.
George R. Zacharkow
Stephen J. Galati
399 Market Street, Suite 200
Philadelphia, PA 19106
Attorneys for Defendant
Great American Insurance Co. of New York

(215) 629-1600 (T)
(215) 923-2227 (F)
gzacharkow@mattioni.com
sgalati@mattioni.com

Defendant Great American Insurance Co. of New York ("Great American"), by and through its attorneys, hereby responds to the Joint Local Rule 56.1 Statement filed by Signal International, LLC and Plaintiffs, Fireman's Fund Insurance Co., One Beacon Insurance Co., National Liability and Fire Insurance Co., and QBE Marine and Energy Syndicate 1036 ("Plaintiffs") in support of their Joint Motion for Summary Judgment against Great American seeking a declaration that the general maritime law and the entrenched maritime doctrine of *uberrimae fidei* is not applicable under the Great American Vessel Owner Pollution Policy, and Plaintiffs' Motion for Summary Judgment against Great American seeking a declaration that coverage has been triggered under the Great American Vessel Owner Pollution Policy with regard to the costs for the removal and disposal of the Drydock.

Great American will reference by paragraph number only those paragraphs containing averments that it contests and submits are not proper statements, in full or in part, based on the record.

25. To the extent Signal started to perform marine fabrication for new construction, this work was performed at the Orange, Texas shipyard or other Signal locations, and not on the AFDB-5 drydock (Drydock). (Cunningham Tr. 35: 24 – 40:24.; Heger Ex. 195)

35. The cited testimony does not contain the phrase "significant quantities of asbestos and transite (an asbestos containing material) and it should be disregarded.

38. The assembly of the tension leg platform on the Drydock was a one time event. The Drydock was not used for new construction. It was used for vessel repairs Signal's list of vessel (rig) dockings reveals. (Heger Ex. 195)

51. Plaintiffs completely and totally mischaracterize the September 2, 2009 letter issued by the Texas General Land Office, and in doing so, ignore the Affidavit of Greg Pollock

in which he confirms that neither this letter, nor any of the other letters that were issued by GLO to Signal were "orders". Great American also objects to the heading "The Order to Remove" inserted by Plaintiffs for the same reasons. (See Affidavit of Greg Pollock.)

52. Great American objects to the partial recitation of the September 2, 2009 letter from GLO. The letter, being a document, speaks for itself and must be read in its entirety. (See Affidavit of Greg Pollock.)

53. Great American objects to the partial recitation of the November 5, 2009 letter from GLO, as well as Plaintiffs addition of emphasis. The letter, being a document, speaks for itself and must be read in its entirety. Moreover, under the Rules, a Rule 56.1 Statement is intended to be a statement regarding alleged facts, not argument, so the addition of emphasis by counsel is improper. (See Affidavit of Greg Pollock.)

54. Plaintiffs completely and totally mischaracterize the September 2, 2009 and November 5, 2009 letters issued by the Texas General Land Office, and in doing so, ignore the Affidavit of Pollock in which he confirms that neither none of the letters that were issued by GLO to Signal were "orders". Great American also maintains its objection to the heading "The Order to Remove" inserted by Plaintiffs for the same reasons. (See Affidavit of Greg Pollock.)

55. While GLO did not identify the sunken Drydock as a hazard to navigation in its September 2, 2009 and November 5, 2009 letters, it did indicate in its March 5, 2012 letter that now that the berth was cleared of the Drydock, there was no longer a hazard to navigation.

60. The term "debris wreckage" is a phrase or reference manufactured by Plaintiffs' attorneys and has no independent meaning. Great American objects to the use of the term to manufacture an argument.

61. Great American denies that this was the purpose of the referenced meeting. The meeting was agreed to be treated as confidential and disclosures were prohibited pursuant to FRE 408. The reference to the meeting is improper and irrelevant.

62. The meeting was agreed to be treated as confidential and disclosures were prohibited pursuant to FRE 408. The reference to the meeting is improper and irrelevant.

63. The meeting was agreed to be treated as confidential and disclosures were prohibited pursuant to FRE 408. The reference to the meeting is improper and irrelevant.

64. The meeting was agreed to be treated as confidential and disclosures were prohibited pursuant to FRE 408. The reference to the meeting is improper and irrelevant.

66. The term "debris wreckage" is a phrase or reference manufactured by Plaintiffs' attorneys and has no independent meaning. Great American objects to the use of the term to manufacture an argument.

67. The referenced letter, being a writing, speaks for itself and must be read in its entirety. Furthermore, Great American objects to the extent that this paragraph, and the referenced letter, assert conclusions of law. Great American also objects to the contentions asserted.

68. The referenced letter, being a writing, speaks for itself and must be read in its entirety. Furthermore, Great American objects to the extent that this paragraph, and the referenced letter, assert conclusions of law. Great American also objects to the contentions asserted.

69. The referenced document, being a writing, speaks for itself and must be read in its entirety.

72. The referenced document, being a writing, speaks for itself and must be read in its entirety.

80. The term "hazardous material remediation" is not used or supported by the cited testimony.

85. The cited testimony does not use the term "pollutants."

91. The referenced document, being a writing, speaks for itself and must be read in its entirety. (See Affidavit of Greg Pollock.)

114. Reese Lever testified that Steve Webber, the underwriting director of the Houston office was involved in the process. (Lever TR. 150: 19 – 151: 19). Captain Ed Wilmot originally had approved the inclusion of the Drydock in the Vessel Owner Pollution Program for Signal. (See Ed Wilmot Unsworn Declaration.)

179. The referenced document, being a writing, speaks for itself and must be read in its entirety. The misrepresentation provision states as follows:

> Any concealment or misrepresentation by You of any material fact or circumstance relating to this insurance, or any claim or incident hereunder will void this policy completely as to any and all claims and incidents, whether such concealment or misrepresentation is deliberate, negligent, inadvertent, innocent, or otherwise.

180. Steve Weber was involved in the process and addressed the materiality of the information that it has been determined that Signal did not disclose during the period 2003 – 2009. (See Steve Weber Unsworn Declaration; also see Ed Wilmot Unsworn Declaration.)

191. Great American only had communications with Willis, Signal's broker, who is an agent for Signal. As evidenced by the records and more specifically set forth in Great American's supplemental Statement of Undisputed Facts, Signal improperly represented that the Drydock was in satisfactory condition by failing to disclose the true known facts.

192. Jim Booker, Signal's former docking master, has testified that the surveyor from Dufour, Laskay & Strouse did not perform as represented. (Booker Tr. 136: 6-17.)

193. As evidenced by the records and more specifically set forth in Great American's supplemental Statement of Undisputed Facts, Signal improperly represented that the Drydock was in satisfactory condition by failing to disclose the true known facts.

                                                MATTIONI, LTD.

By: *George R. Zacharkow* (signature)
        George R. Zacharkow
        Stephen J. Galati
        399 Market Street, Suite 200
        Philadelphia, PA 19106
        (215) 629-1600 (T)
        (215) 923-2227 (F)
        gzacharkow@mattioni.com
        sgalati@mattioni.com

Date: April 16, 2013

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Great American's Response To Plaintiffs' And Signals' Joint Local Rule 56.1 Statement was served via electronic notification on April 16, 2013, to the following:

*Attorney for Plaintiffs Fireman's Fund Ins. Co.,*
*One Beacon Ins. Co., National Liability and Fire Ins. Co., and*
*QBE Marine & Energy Syndicate 1036*
John A.V. Nicoletti, Esquire
Nicoletti Hornig & Sweeney
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY 10005

*Attorney for Defendant Max Specialty Insurance Company*
Adam D. Krauss, Esquire
Traub Lieberman Straus & Shrewsberry LLP
Seven Skyline Drive
Hawthorne, NY 10532

*Attorneys for Signal Insurance Company*
David S. Bland, Esquire
Matthew C. Guy, Esquire
LeBlanc Bland PLLC
1717 Saint James Pl. #360
Houston, TX 77056-3408

Allison R. Colon, Esquire
James D. Prescott, III, Esquire
LeBlanc Bland P.L.L.C.
909 Polydras Street
New Orleans, LA 70112

Stephen P. Kyne, Esquire
Burke & Parsons
100 Park Avenue
New York, NY 10017-5533

By: /s/ George R. Zacharkow
George R. Zacharkow

### Page 1

```
 1       UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF NEW YORK
 3
   FIREMAN'S FUND            )
 4 INSURANCE COMPANY, ONE    )
   BEACON INSURANCE          )
 5 COMPANY, NATIONAL         )
   LIABILITY AND FIRE        )
 6 INSURANCE COMPANY, AND    )
   QBE MARINE & ENERGY       )
 7 SYNDICATE 1036            ) Case No.:
                             ) 10-cv-1653
 8 VERSUS                    ) (JPO)(JLC)
                             )
 9 GREAT AMERICAN            ) ECF Case
   INSURANCE COMPANY OF      )
10 NEW YORK, MAX SPECIALTY   )
   INSURANCE COMPANY, and    )
11 SIGNAL INTERNATIONAL,     )
   L.L.C.                    )
12
13              VOLUME I
14
15    Deposition of CHRISTOPHER SCOTT CUNNINGHAM,
16 C.P.A., and 30(b)(6) deposition of SIGNAL
17 INTERNATIONAL, L.L.C., through its designated
18 representative, CHRISTOPHER SCOTT CUNNINGHAM,
19 C.P.A., taken on Thursday, February 14, 2013, in
20 the office of LeBlanc Bland, P.L.L.C., 909 Poydras
21 Street, Suite 1860, New Orleans, Louisiana 70112,
22 commencing at 9:11 a.m.
```

### Page 2

```
                I N D E X
                                      Page
   Caption..............................1
   Appearances..........................5
   Agreement of Counsel.................7
   Witness' Certificate...............218
   Reporter's Certificate.............219

                E X A M I N A T I O N
   MR. STRAUS...........................8

                E X H I B I T S
   Exhibit No. 353.....................82
     Second Amended Notice of Rule 30(b)(6)
     Deposition
   Exhibit No. 354.....................82
     Amended Notice of Deposition of Signal
     International, LLC, by Chris Cunningham
   Exhibit No. 355.....................82
     Cross Notice of Rule 30(b)(6) Deposition
   Exhibit No. 356.....................86
     Plaintiff's Second Amended Cross-Notice
     of Rule 30(b)(6) Deposition of Signal
     International, LLC
   Exhibit No. 357.....................86
     Letter from D. Bland to J. Nicoletti
     dated 2/6/13
   Exhibit No. 358.....................86
     Letter from D. Bland to S. Strauss
     dated 2/6/13
   Exhibit No. 359.....................86
     Letter from D. Bland to G. Zacharkow
     dated 2/6/13
```

### Page 3

```
   Exhibit No. 360.....................88
     E-mail correspondence, FF 04005 - 04006
   Exhibit No. 361.....................94
     Letter from L. Spears to Willis of
     Alabama, Inc., dated 9/15/09
   Exhibit No. 362....................100
     Letter from L. Spears to Willis of
     Alabama, Inc., dated 10/13/09,
     Signal (NY) 000293 -294
   Exhibit No. 363....................109
     Conditional Bill of Sale,
     Signal (NY) 008813 - 8815
   Exhibit No. 364....................129
     E-mail correspondence,
     Re:  Signal Drydock Claim
   Exhibit No. 365....................137
     E-mail correspondence,
     Re:  Signal Drydock Agreement
   Exhibit No. 366....................147
     E-mail correspondence,
     SIGNAL00039748
   Exhibit No. 367....................150
     Letter from Max to C. Cunningham,
     dated 2/16/10, MSI 001204 - 1214
   Exhibit No. 368....................153
     E-mail correspondence, Re:  Signal
     International Max Claim# MXBP04423
   Exhibit No. 369....................161
     E-mail correspondence, Re:  Texas
     Drydock - Attorney Client Privilege
   Exhibit No. 370....................170
     Letter from D. Bland to Interested
     Insurers, dated 3/23/10
   Exhibit No. 371....................180
     Settlement Agreement & General Release,
     Signal (NY) 002865 - 2873
```

### Page 4

```
   Exhibit No. 372....................184
     Assignment, Signal (NY) 002860 - 2864
   Exhibit No. 373....................187
     Lease Agreement between The City of
     Port Arthur and Port of Port Arthur
     Navigation District
   Exhibit No. 374....................189
     Letter from R. Meisetschlaeger to
     President, Port Arthur Navigation
     District Industrial Development Corp.,
     dated 9/24/07
   Exhibit No. 375....................198
     Pleasure Island Commission proposal,
     dated 8/18/09
   Exhibit No. 376....................200
     Letter from J. Creighton to
     R. Meisetsenlaeger [sic], dated 8/19/09
   Exhibit No. 377....................202
     Letter from J. Creighton to
     R. Meisetsenlaeger, dated 8/12/09
   Exhibit No. 378....................206
     Cover sheet and letter from
     R. Meisetschlaeger to J. Dike,
     dated 3/24/09
   Exhibit No. 379....................208
     Letter from J. Creighton to Signal
     International, LLC, dated 6/24/09,
     GA-003475 - 3476
   Exhibit No. 380....................210
     Letter from R. Meisetschlaeger to
     J. Creighton, dated 7/24/09
   Exhibit No. 381....................214
     Letter from C. Cunningham to J. Dike,
     dated 9/8/09, 000867
```



Page 33

1  A. -- on the rigs. Yes. But it was not
2  self-propelled. I mean, motors for the
3  production --
4  Q. Sure.
5  A. -- or the operation of the drilling.
6  Q. Again, this was constructed from plans?
7  A. Correct.
8  Q. Who was that for?
9  A. LeTourneau.
10 Q. Any other new construction projects?
11 A. Yes. We were subcontracted by Northrop
12 Grumman to build ship modules for their LPD
13 program, LPD 21, 22, and 23.
14 Q. LPD 21, 22, 23, what was that? What are
15 those? Let's start -- I'll strike that.
16 A. They're Navy ships.
17 Q. What's LPD stand for?
18 A. I'm not sure.
19     MR. PRESCOTT: Landing -- landing platform
20     dock.
21     THE WITNESS: I think landing platform
22     dock. Yeah. They were built for the Navy
23     to transport, I think, marine divisions.
24     (There is an off-the-record discussion.)
25 BY MR. STRAUS:

Page 34

1  Q. Were the -- were the -- these ship
2  modules, they were -- the LPD 21, 22, 23, were
3  they self-propelled?
4  A. No.
5     Do you want me to explain what -- what
6  the -- what this is? Because I --
7  Q. Yeah.
8  A. -- think there's confusion?
9     MR. ZACHARKOW: Off the record.
10    (There is an off-the-record discussion.)
11    THE WITNESS: In -- in -- in modern
12    shipbuilding -- modern -- modern
13    shipbuilding, these -- these big ships are
14    built in modules. And they'll break them
15    down into as many -- I think the LPDs had
16    at least a couple hundred modules, maybe
17    300 modules. And each one would be up to,
18    I think about -- I don't know -- one, two,
19    300 tons. Okay. And each module will be
20    fabricated with electrical, piping,
21    outfitting as much as possible.
22       You -- we would build the modules,
23    put it on a barge, ship it to Northrop
24    Grumman. And they did the assembly of
25    putting these modules together to build

Page 35

1  the ship.
2     And during this time period, we
3  built close to 200 modules for the -- this
4  LPD program.
5  BY MR. STRAUS:
6  Q. They were kind of kits that you sent back
7  to Northrop Grumman that they would assemble into
8  their ships?
9  A. Yeah.
10    They would send us all the materials and
11 all the drawings. We would assemble it, put it
12 together, build the module, barge it back to them.
13 And they would piece it altogether and weld it up.
14 Q. So everything that left you, it was a
15 ship, just not assembled?
16    MR. NOVAK: Objection to form.
17    THE WITNESS: It was a piece of a ship.
18    MR. BLAND: It would be like building this
19    room and attaching it in the building.
20 BY MR. STRAUS:
21 Q. So what you built and sent to them went
22 -- went into a larger ship?
23 A. Correct.
24 Q. Where were these -- you've mentioned three
25 new construction projects. Where were -- where

Page 36

1  was the building spar --
2  A. The spar was built in Orange, Texas.
3  Q. What about the jack-up rig you mentioned?
4  A. The jack-up was also built in Orange,
5  Texas.
6  Q. And what about the Northrop Grumman LPDs?
7  A. It was built in both Orange, Texas and
8  Pascagoula, Mississippi.
9  Q. Do you have an estimate in your mind of
10 how many new construction projects such as these
11 Signal has been involved in?
12 A. Actually, I could count them. Yes.
13    Do you want to know?
14 Q. Sure.
15 A. Well, what I've already described to you.
16 And additionally, there have been two barges, big
17 offshore barges that Signal has built. And
18 currently, we are finishing construction of two
19 articulated tugs and barges in Orange, Texas. And
20 we are soon to begin construction of an
21 articulated tug and barge dredging unit.
22 Q. I count eight. Is that about the extent
23 of it?
24    MR. NOVAK: Objection to form.
25    THE WITNESS: It depends on if you include

Page 37

1     an ATB as one unit.
2  BY MR. STRAUS:
3     Q. All right. Let's -- let's -- lets --
4     A. Its really two units.
5     Q. All right. The two barges were -- where
6  were they constructed?
7     A. In Orange, Texas.
8     Q. What was -- who was the customer?
9     A. One was Signet Maritime. And the second
10 one -- gosh, I'm not -- I forget who the customer
11 was.
12    Q. Were they the same -- the same model
13 barge?
14    A. Virtually the same.
15    Q. Can you describe it for -- for me.
16    A. It was approximately 300 feet in length by
17 100 feet wide with --
18    Q. What was the purpose? What was the barge
19 going to be used for?
20    A. Offshore construction, hauling equipment
21 out to rigs and drilling units. It had 5,000
22 pounds per square inch deck strength. So you
23 could put very heavy construction equipment on the
24 barge.
25    Q. Was it motorized?

Page 38

1     A. No. It was not self-propelled.
2     Q. What about the articulated -- the two
3  articulated dugs and barges? Are these -- were
4  those -- strike that.
5        What is -- what is an articulated tug and
6  barge?
7     A. It is a large offshore barge. I believe
8  it's about 400 feet in length. And the way it's
9  constructed, it has a notch. And the tug will fit
10 into the notch. And with a connecting system, it
11 becomes one. And it's almost like a ship at that
12 point. But it can bring its -- the barge to
13 wherever it's delivering its cargo, drop the barge
14 off; and then the tug is free to be able to either
15 pick up another load or -- or do something else.
16    Q. Does -- did Signal construct these tugs as
17 well?
18    A. Yes.
19    Q. The tugs are motorized?
20    A. Yes.
21    Q. Again, the -- these constructions of the
22 articulated tugs and barges were from plans that
23 were provided to Signal --
24    A. Yes.
25    Q. -- by the purchasers?

Page 39

1     A. Yes.
2     Q. Who were the customers?
3     A. Kirby Corporation.
4     Q. Oh. Both of them, Kirby?
5     A. Yes.
6     Q. Did Signal purchase the -- the engines
7  from an outside source?
8     A. Yes.
9     Q. When were the articulated tugs and barges
10 constructed? And I apologize if you -- you
11 answered that. I don't recall.
12    A. The contract was signed in, I believe,
13 March of 2011. And actual construction began, I
14 believe, in September of 2011.
15    Q. Are they completed?
16    A. The Barge No. 1 is complete and delivered.
17 The other three units are about to deliver.
18    Q. You said the other three units. I know
19 you mentioned you -- you group them in two and one
20 before -- before. When you said the other
21 two -- the other two are about to be delivered,
22 you're now talking about them all the same?
23    A. There are two contracts each for the
24 construction of the tug and the barge. The tug
25 and the barge are two separate units, though.

Page 40

1     Q. I got you.
2        And you did mention you had one
3  articulated tug and barge under construction; is
4  that correct?
5     A. Another one is in the engineering phase,
6  construction to start in the next couple months.
7     Q. Who's the customer for that one?
8     A. Great Lakes Dredge & Dock Company.
9     Q. And is -- is this articulated tug and --
10 tug and barge similar in design to the two that
11 Kirby purchased?
12    A. It's an articulated tug and barge. But
13 the barge is completely different. It's a
14 dredging unit complete with dredging equipment
15 that can go out and dredge whatever necessary.
16 The Kirby barges are cargo barges.
17       MR. ZACHARKOW: Those are dry -- dry cargo
18       barges?
19       THE WITNESS: Dry cargo. I think it's
20       primarily going to be coal.
21 BY MR. STRAUS:
22    Q. Is -- the Great Lakes' tug and barge,
23 where is that being constructed?
24    A. In Orange, Texas.
25    Q. Okay. So in 2006, Signal began to do the



SIGNAL TEXAS DOCK YARD VESSEL DOCKINGS

| DATE CONTRACT SIGNED | NAME OF PERSON WHO SIGNED CONTRACT FOR CUSTOMER | NAME OF PERSON WHO SIGNED CONTRACT FOR SIGNAL | JOB NUMBER | DOCKED | UNDOCKED | NAME OF VESSEL | OWNER | OWNER'S NOTICE ADDRESS IN CONTRACT | TYPE OF VESSEL | WEIGHT AT DOCKING (LONG TONS) | REVENUE | COST | PROFIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 8179 | 12/10/02 | 01/15/03 | CLAIR | NAVIGARE | | SEMI | 13676 | 253,128.48 | (13,140.72) | 266,269.48 |
| | | | 3181 | 04/21/03 | 05/30/03 | ENSCO 95 | ENSCO | | JACK-UP | 7303 | 973,100.00 | 864,801.13 | 108,191.87 |
| | | | 3102/T000L | 07/04/03 | 06/16/03 | PRIDE VIKING | PRIDE | | SEMI | 11906 | 5,064,004.27 | 3,503,033.33 | 1,560,970.94 |
| 9/26/2003 | John Barone, Vice President | Robert Shepherd, Executive VP | 1507 | 03/26/03 | 10/06/03 | ROWAN TEXAS | ROWAN | Rowan Inc., 2800 Post Oak Blvd Suite 5450 Houston, TX 77056 | JACK-UP | 8309 | 544,649.71 | 406,130.77 | 158,559.94 |
| 10/10/2003 | E.E. Thiele, Vice President | Robert Shepherd, Executive VP | 1506 | 10/14/03 | 10/26/03 | ROWAN NEW ORLEANS | ROWAN | Rowan International Inc., 2800 Post Oak Blvd, Suite 5450 Houston, TX 77056 | Cert'f Pmt Ins on Pen Payments | | 361,517.92 | 273,120.37 | 86,397.55 |
| | | | 1509 | 11/20/03 | 12/15/03 | UNCLE JOHN | CAL DIVE | | SEMI | 1036 | 790,241.00 | 715,507.49 | 74,373.51 |
| 1/26/2004 | John Cloerty, President | Richard Marti, President & CEO | 1510 | 02/03/04 | 06/24/04 | MAD DOG (HULL 114/04) | PRIDE | Fiter Offshore, Inc., 518 S. Van Avenue, Houma, LA 70001 | DRILLING MODULE | 3456 | 15,407,676.34 | 13,325,702.82 | 2,082,060.52 |
| 10/3/2003 | Mose Pizzo, President | Ronald Schenel, President - LSE Operations | 1511 | 07/15/04 | 07/30/04 | JU20 | PARKER | Parker Drilling Offshore USA, LLC, 1110 Ladrys Post New Road, LA 70500 | JACK-UP | 6514 | 641,710.10 | 468,216.43 | 163,493.67 |
| 7/26/2004 | Don P. Rodney, CFO | Thomas Rigolo, Sr VP-GM TX Operations | 1512 | 07/16/04 | 07/30/04 | JU20 | HERCULES | Hercules Offshore Corp, 2929 Briargrit Dr Suite 400 Houston, TX 77042 | JACK-UP | | 150,226.20 | 49,306.53 | 100,920.07 |
| | | | 1513 | 04/11/04 | 04/15/04 | INTREPID | CAL DIVE | | MULTI-SERVICE | 1200+ | 219,063.33 | 175,900.75 | 44,163.08 |
| | | | 1514 | 06/21/04 | 06/26/04 | INTREPID | CAL DIVE | | MULTI-SERVICE | 1200+ | 167,881.60 | 110,058.50 | 57,823.10 |
| | | | 1516 | 12/01/04 | 12/10/04 | INTREPID | CAL DIVE | | MULTI-SERVICE | 1200+ | 348,767.00 | 275,700.52 | 73,000.48 |
| | | | 1517 | 01/06/04 | 01/20/05 | INTREPID | CAL DIVE | | MULTI-SERVICE | 1200+ | 360,260.00 | 194,968.74 | 165,291.26 |
| 10/19/2004 | John M. Voelcher, Sr VP Tech Serv | Thomas Rigolo, Sr VP-GM TX Operations | 1515 | 01/26/05 | 03/04/05 | OCEAN SARATOGA | DIAMOND | Diamond Offshore Services Co. 15415 Katy Freeway, Suite 400 Houston, TX 77094 | SEMI | 12745 | 630,502.55 | 474,878.13 | 145,624.43 |
| 11/8/2007 | John T. Rynd, VP | Thomas Rigolo, Sr VP-GM TX Operations | 1518 | 03/04/05 | 04/18/05 | EVAN DUGGER | NOBLE | Noble Drilling (US) Inc., 13135 S. Dairy Ashford, Suite 800 Sugar Land, TX 77478 | JACK-UP | 5011 | 4,365,954.86 | 3,823,207.83 | 541,752.23 |
| | | | 1523 | 05/17/05 | 05/26/05 | Q-4000 | CAL DIVE | | SEMI | 1478+ | 514,752.43 | 384,542.30 | 170,769.14 |
| | | | 1525 | 06/06/05 | 06/06/05 | INTREPID | CAL DIVE | | MULTI-SERVICE | 1200+ | 105,626.75 | 84,366.00 | 21,160.70 |
| 3/31/2005 | Andrew Blake, Managing Partner | Chris Cunningham, VP & CFO | 1520 | 06/20/05 | 07/31/05 | BLAKE 303 | BLAKE | Blake Offshore LLC, PO Box 6080, Metairie, LA 70009 | JACK-UP | 8464 | 1,113,192.06 | 1,021,946.77 | 96,279.20 |
| 3/31/2005 | Michael Blake, Managing Partner | Chris Cunningham, VP & CFO | 1521 | 08/31/05 | 07/30/05 | BLAKE 303 | BLAKE | Blake Offshore LLC, PO Box 6080, Metairie, LA 70009 | JACK-UP | 8142 | 954,852.93 | 667,294.40 | 287,558.53 |

Vessels Docked and washed alongside dock with invoices from safety.

Page 1 of 3



| DATE CONTRACT SIGNED | NAME OF PERSON WHO SIGNED CONTRACT FOR CUSTOMER | NAME OF PERSON WHO SIGNED CONTRACT FOR SIGNAL | JOB NUMBER | DOCKED | UNDOCKED | NAME OF VESSEL | OWNER | OWNER'S NOTICE ADDRESS IN CONTRACT | TYPE OF VESSEL | WEIGHT AT DOCKING (LONG TONS) | REVENUE | COST | PROFIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/8/2005 | John M. Vecchio, Sr VP Tech Serv | Thomas Rigolo, Sr VP/GM, TX Operations | 1521 | 08/12/05 | 09/13/05 | OCEAN NEW ERA | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway Suite 400, Houston, TX 77094 | SEMI | 12472 | 4,528,340.70 | 4,308,973.31 | 219,371.68 |
| 5/25/2005 | Leland E Tate, CFO | Richard Martin President & CEO | 1526 | 09/16/05 | 09/21/05 | ROWAN MIDLAND | ATP OIL & GAS CORP | ATP Oil & Gas Corp 4600 Post Oak Place Suite 200, Houston TX 77027 | BEAM | 11200 | 10,732,461.66 | 9,658,205.42 | 1,074,256.24 |
| | | | | 10/15/05 | 11/23/05 | ROWAN MIDLAND | ATP OIL & GAS CORP | ATP Oil & Gas Corp 4600 Post Oak Place Suite 200, Houston TX 77027 | BEAM | 11115 | | | |
| | INTERNAL JOB FOR DOCKING CRANE BARGE | | | 12/10/05 | 01/30/06 | PELICAN | SIGNAL | | CRANE BARGE | 2500 | | | |
| 10/13/2005 | William C Hartman, VP Marketing | Chris Cunningham VP & CFO | 1531 | 11/17/05 | 01/29/06 | JOE ALFORD | NOBLE | Noble (Gulf of Mexico) Inc., 13135 S Dairy Ashford, Suite 800, Sugar Land TX 77478 | SEMI | 7345 | 18,010,703.63 | 15,150,698.63 | 341,004.66 |
| | | | 1533 | 02/14/06 | 02/24/06 | Q-4000 | CALDIVE | | BEAM | 14900 | 444,303.76 | 326,668.12 | 117,635.64 |
| 3/10/2006 | John M. Vecchio, Sr VP Tech Services | Thomas Rigolo, Sr VP/GM, TX Operations | 1536 | 03/18/06 | 04/27/06 | OCEAN NUGGET | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway, Suite 400, Houston, TX 77094 | JACK UP | 7600 | 6,337,034.03 | 4,631,275.80 | 1,705,767.23 |
| 6/19/2006 | William C, Hartman VP | Thomas Rigolo, Sr VP/GM, TX Operations | 1538 | 06/20/06 | 07/20/06 | THERALD MARTIN | NOBLE | Noble Drilling (US) Inc., 13135 S Dairy Ashford, Suite 800, Sugar Land TX 77478 | SEMI | 12400 | 3,261,463.67 | 2,989,272.46 | 272,191.21 |
| 6/15/2006 | David Crumley, Sr VP Operations | Thomas Rigolo, Sr VP/GM, TX Operations | 1544 & 1549 | 06/29/06 | 09/24/06 | THE 261 & THE 266 - duel docking | TODCO | The Offshore Drilling Company, 2000 W Sam Houston Pkwy S, Suite 800, Houston, TX 77042 | JACK-UP | 7500 EA | 1,992,206.70 | 1,390,433.65 | 609,772.05 |
| 7/26/2006 | John M. Vecchio, Sr VP Tech Services | Thomas Rigolo, Sr VP/GM, TX Operations | 1543 | 10/04/06 | 12/11/06 | OCEAN WHITTINGTON | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway, Suite 400, Houston, TX 77094 | SEMI | 12000 | 30,681,671.41 | 28,830,637.84 | 7,050,003.51 |
| 7/1/2005 | Tony Mace, President | Richard Martel President & CEO | 1215L | 12/22/06 | 05/16/07 | NEPTUNE TLP (new construction) Sub Array SUB077 | ATLANTIA | Atlantia Offshore Ltd. 1255 Enclave Parkway, Suite 600, Houston TX 77077 | TENSION LEG PLATFORM | 2700 | 50,378,367.01 | 71,644,647.88 | (13,265,700.57) |
| | | | | 02/18/07 | 07/26/07 | DREDGING - DOCK OUT HULL BEFORE TLP INST | | | | | | | |
| 0/7/2007 | John Vecchio, Sr VP Tech Services | Rodney Mallenschlegel, Sr VP/GM, TX Operations | 1549 | 10/27/07 | 12/16/07 | OCEAN QUEST | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway, Suite 400, Houston, TX 77094 | | | 11,627,390.10 | 5,823,056.37 | 5,804,334.74 |
| 3/19/2008 | George M Yarbell, CFO | Rodney Mallenschlegel, Sr VP/GM, TX Operations | 1562 | 04/01/08 | 04/06/08 | LOUISIANA DRILLING BARGES 103 & 104 | SUPERIOR DERRICK | Superior Derrick Services, LLC P O Box 14338, New Iberia, LA 70562 | | | 410,370.82 | 164,340.72 | 250,036.20 |
| 7/1/2008 | Port Captain | Chris Cunningham VP & CFO | 1564 | 07/07/08 | 07/14/08 | DIXIE PATRIOT | POWER MARINE | Power Marine LLC, 215 Humbel Lane, Brae Chaine LA 10037 | LIFT BOAT | 2700 | 249,370.35 | 109,601.50 | 139,705.05 |

Vessels Docked are sorted alongside dock with revenue from vandy

Page 2 of 3

| DATE CONTRACT SIGNED | NAME IN PERSON WHO SIGNED CONTRACT FOR CUSTOMER | NAME OF PERSON WHO SIGNED CONTRACT FOR SIGNAL | JOB NUMBER | DOCKED | UNDOCKED | NAME OF VESSEL | OWNER | OWNER'S NOTICE ADDRESS IN CONTRACT | TYPE OF VESSEL | WEIGHT AT DOCKING (LONG TONS) | REVENUE | COST | PROFIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/15/2006 | Tray Dunn, Director Operations | Thourney Works/Ilustrator or VP/GM TX Operations | 1558 | 10/1/2006 | 12/12/06 | THUNDER HAWK | BHP ATLANTIS | BHP Atlantis Inc, 1255 Enclave Parkway, Houston, TX 77077 | Platform | 13700 | 9,400,891.14 | 6,646,580.25 | 2,754,311.89 |
| 12/15/2006 | John Vecchio, VP Tech Services | Randy Malraschlanger, VP/GM TX Operations | 1557 | 02/05/08 | 04/07/08 | OCEAN AMERICA | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway, Suite 400, Houston, TX 77084 | | 28,420 bt (23,514) | 17,411,408.16 | 15,113,807.70 | 2,297,630.46 |
| Updated Exhibits 6.1, A-Q, D & C to 2003 MSA | Chip MSA signed in 2003 by David Hourgeois, VP | Orig MSA signed in 2003 by John Haley, President | 1238 | 05/22/08 | 08/08/08 | NEVADA | PRIDE (SEAHAWK) | Pride International Inc, 5847 San Felipe, Suite 3300 Houston TX 77057 | | | 1,337,411.66 | 1,172,658.15 | 165,754.14 |
| | | | | | | TOTAL OF JOBS ON DOCK | | | | | 211,174,985.31 | 197,136,610.31 | 15,734,481.89 |
| | | | | | | JOBS WORKED ALONGSIDE DOCK | | | | | | | |
| 12/13/03 renewed by ACON 1/6/06 | William C. Long, Vice President | John Haley, President | 1506 | | 06/24/08 | OCEAN NEW ERA | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway, Suite 400, Houston, TX 77084 | BERTHING AGREEMENT | | 352,732.00 | 567.39 | 352,064.61 |
| 7/17/2007 | John Vecchio, VP Tech Services | Rodney Malraschlanger, VP/GM TX Operations | 1548 | | 10/21/07 | OCEAN BARONESS | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway, Suite 400, Houston, TX 77084 | ALONGSIDE DOCK FROM 7/15/07 THRU 10/31/07 | | 7,909,470.20 | 4,771,600.85 | 3,133,869.35 |
| 7/1/2005 | John Vecchio, VP Tech Services | Rodney Malraschlanger, VP/GM TX Operations | 1234 | | 07/05/05 | OCEAN VALIANT | DIAMOND | Diamond Offshore Services Co, 15415 Katy Freeway, Suite 400, Houston, TX 77084 | ALONGSIDE DOCK EFF JULY 4 WEEKEND | | 4,126,418.03 | 3,456,510.49 | 670,903.14 |
| | | | | | | TOTAL OF JOBS WORKED ALONGSIDE DOCK | | | | | 12,389,611.83 | 8,227,278.33 | 4,161,333.10 |

Hurricane Rita 9/24/05 Severe Pass
Dry Dock Reconfiguration underway after NEVADA departure on 8/8/08   OCEAN VALIANT being worked alongside eff July 4 weekend
DRY DOCK SANK AUGUST 28, 2008

## Page 1

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF NEW YORK

FIREMAN'S FUND INSURANCE      )
COMPANY, ONE BEACON           )
INSURANCE COMPANY, NATIONAL   )
LIABILITY AND FIRE            )
INSURANCE COMPANY and QBE     )
MARINE & ENERGY SYNDICATE     )
1036,                         ) EFC CASE
     Plaintiffs,              )
                              ) 10 Civ. 1653 (LAK)
VS.                           )
                              )
GREAT AMERICAN INSURANCE      )
COMPANY OF NEW YORK, MAX      )
SPECIALTY INSURANCE COMPANY   )
and SIGNAL INTERNATIONAL,     )
LLC,                          )
     Defendants.              )

        **********************************
                ORAL DEPOSITION OF
                   REESE LEVER
                 December 15, 2011
        **********************************

     ORAL DEPOSITION OF REESE LEVER, produced as a
witness at the instance of the PLAINTIFFS, and duly
sworn, was taken in the above-styled and numbered cause
on December 15, 2011, from 8:55 a.m. to 12:54 p.m., by
machine shorthand before MICHELLE R. PROPPS, CSR, in and
for the State of Texas, reported at the offices of
LeBlanc Bland, 1717 St. James Place, Suite 360, Houston,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated in the record or attached
hereto.
```

## Page 2

```
                   A P P E A R A N C E S

FOR THE PLAINTIFFS:

     MR. JOHN A.V. NICOLETTI
         - and -
     MR. ROBERT A. NOVAK
     Nicoletti, Hornig & Sweeney
     Wall Street Plaza
     88 Pine Street, 7th Floor
     New York, New York 10005-1801
     Fax: 212.220.3780
     E-mail: jnicoletti@nicolettihornig.com

FOR THE DEFENDANT GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK:
     MR. GEORGE R. ZACHARKOW
     Mattioni, Ltd.
     399 Market Street, Suite 200
     Philadelphia, Pennsylvania 19106-2138
     Fax: 215.923.2227
     E-mail: gzacharkow@mattioni.com

FOR THE DEFENDANT SIGNAL INTERNATIONAL, LLC:

     MR. MATTHEW C. GUY
     LeBlanc Bland
     909 Poydras Street, Suite 1860
     New Orleans, Louisiana 70112
     Fax: 504.586.3419
     E-mail: mguy@leblancbland.com

FOR THE DEFENDANT MAX SPECIALTY INSURANCE COMPANY:
     MR. ADAM KRAUSS     (Via Telephone)
     Traub Lieberman Straus & Shrewsberry, LLP
     Mid-Westchester Executive Park
     Seven Skyline Drive
     Hawthorne, New York 10532
     Fax: 914.347.8898
     E-mail: akrauss@traublieberman.com

                    * * * * *
```

## Page 3

```
                         INDEX
                                                    PAGE
Appearances......................................... 2
REESE LEVER
    DIRECT EXAMINATION BY MR. JOHN A.V. NICOLETTI...   5
    CROSS EXAMINATION BY MR. MATTHEW C. GUY.......... 123
    RE-DIRECT EXAMINATION BY MR. NICOLETTI........... 169
    CROSS EXAMINATION BY MR. GEORGE R. ZACHARKOW..... 172
    FURTHER DIRECT EXAMINATION BY MR. NICOLETTI...... 174

Document Requests................................... 176
Changes and Signature............................... 177
Reporter's Certification............................ 178

                        EXHIBITS
EXHIBIT NO.       DESCRIPTION                         PAGE
Exhibit 255   DLS Survey Report Summary - Breasting
              Barge No. 1740........................  67
Exhibit 256   DLS Survey Report Summary - WW Drydock.  77
Exhibit 257   Underwriting File.....................   83
Exhibit 258   Great American Insurance Company of New
              York Vessel Pollution Liability
              Application...........................  86
Exhibit 259   Pollution Policy Declarations Page and
              Schedule of Vessels...................  86
Exhibit 260   Loss History Report - Extract Dated
              10-16-10..............................  93
Exhibit 261   Signal International's Chartered Vessel
              Schedule..............................  94
Exhibit 262   Signal International, LLC, Vessel
              Pollution Shipyard Schedule...........  95
Exhibit 263   Signal International, LLC Vessel Schedule. 96
Exhibit 264   Signal International Vessel Pollution
              Insurance Submission..................  97
Exhibit 265   E-mail Chain Beginning 1-5-11 From Ewing
              To Lever..............................  97
Exhibit 266   Renewal Quotation.....................  98
Exhibit 267   E-mail Chain Beginning 1-11-11 From Lever
              To Ewing.............................. 102
Exhibit 268   Renewal Quotation For Term: 1-30-11
              through 2010.......................... 105
```

## Page 4

```
Exhibit 269   Renewal Quotation 2011-2012........... 111
Exhibit 270   Confirmation of Coverage.............. 114
Exhibit 271   Renewal Quotation For Term 1-30-2011-2012.. 116
Exhibit 272   E-mail Dated 1-06-11 From Lever To Wilmot.. 117
Exhibit 273   E-mail Dated 1-6-11 From Wilmot To Lever... 118
Exhibit 274   E-mail Dated 1-28-11 From Lever To Ewing
              and Attachment........................ 119
Exhibit 275   Letter Dated 2-22-10 From Wilmot To
              Signal................................ 169
Exhibit 276   E-mail Dated 2-22-10 From Lever To Bell
              and Certificate of Financial
              Responsibility........................ 171
```

Pages 1 to 4

Page 149

1  Q.  You'd agree with that.
2  A.  Yeah.
3  Q.  Do you know who provided the attorney who
4  drafted it with the information that's in there?
5  A.  I -- I don't know.  I can make a guess, but it
6  would be a guess.
7  Q.  All right.  Well, let's not guess.
8  A.  Okay.
9  Q.  The --
10      MR. ZACHARKOW:  For the record, just so
11 we're clear, the claim itself references documents that
12 were obtained through discovery in the case.
13      MR. GUY:  Yes.
14      MR. ZACHARKOW:  Okay.  So when you say,
15 who provided information, there's information that was
16 obtained in discovery, Mr. Guy, you know, that's
17 reflected in some of the --
18  Q.  (By Mr. Guy)  That comes to an important point
19 that I'd like to ask you about.  You're aware that Great
20 American has sued Signal International, my client.
21  A.  Yes.
22  Q.  In your experience, is it common for an
23 insurance company to sue its insured?
24      MR. ZACHARKOW:  Objection.
25  A.  I don't know.

Page 150

1  Q.  (By Mr. Guy)  Have you ever been involved in a
2  case like that before?
3  A.  This is the first case I've ever been involved
4  in.
5  Q.  Are you aware of what the allegations made
6  against Signal by Great American are?
7  A.  Some of them from reading through this.  Yes.
8  Q.  Were you aware of those allegations before you
9  read that cross claim?
10  A.  No.
11  Q.  There's numerous exhibits referenced in there.
12 I'm sure everybody in the room will be delighted to hear
13 I don't intend to go through each one, but I want to
14 show them to you, just for your own education.  Have you
15 seen -- please take time to just flip through it.  Have
16 you seen those documents before?
17  A.  I would say I've seen some of them, but not
18 all of them.
19  Q.  You and Ms. Stringer are the only underwriters
20 at Great American who were involved in this renewal; is
21 that correct?
22  A.  Steve Weber was involved as well.
23  Q.  I don't see his name own any of the
24 correspondence with Willis.
25      MR. NICOLETTI:  Talking about the '09

Page 151

1  renewal?
2      MR. GUY:  Yes.
3  Q.  (By Mr. Guy)  2009-2010.  You and Ms. Stringer
4  are the only underwriters at Great American responsible
5  for this account; is that correct?
6      MR. ZACHARKOW:  Objection.
7  A.  No.  Steve Weber was involved as well.
8  Q.  (By Mr. Guy)  What was Mr. Weber's
9  involvement?
10 A.  He reviewed the file before the quote was
11 sent.
12 Q.  Okay.
13 A.  He did his own underwriting -- I mean, he
14 would have gone through the whole file as well before we
15 sent the renewal quote.  And his initials are on the
16 mock-up.
17 Q.  And did he -- do you recall if he raised any
18 issues with you about a renewal?
19 A.  No, I don't.
20 Q.  If he had done, they would presumably be in
21 the file; is that correct?
22 A.  Yes.
23 Q.  So we've established already that -- from
24 yesterday, Ms. Stringer never requested any surveys of
25 any of the assets subject to the renewal.  You never

Page 152

1  asked for any.  Are you aware if Mr. Weber asked for
2  anything?
3  A.  No, I'm not aware.
4  Q.  Okay.  The majority of the exhibits that are
5  in that binder that are referenced in the cross claim
6  against Signal are survey reports on the AFDB-5 dating
7  back from 2001 till 2007 or '8.  Okay?
8      Did anybody ever present these to you and
9  say, would -- any one of these documents and say -- ask
10 you this question.  Would seeing this document have been
11 material to your decision to underwrite this risk.
12 A.  Prior to this being...(indicating)
13 Q.  Yes.
14 A.  No.
15 Q.  So nobody at Great American ever asked you the
16 actual question as to whether or not the allegations in
17 here about what was material to you as an underwriter
18 was ever put to you before this lawsuit was filed?
19 A.  No.
20 Q.  Are you aware if those type of questions were
21 put to Ms. Stringer, as the underwriter and your
22 supervisor?
23 A.  I don't know.  Can I elaborate on that a
24 little?  I would say normally in claims situations in
25 our office, the claims department talks to Steve Weber.

Pages 149 to 152

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

**JIMMY BOOKER - October 11, 2012**

Page 1

```
 1         UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3  FIREMAN'S FUND INSURANCE    )
    COMPANY, ONE BEACON         )
 4  INSURANCE COMPANY,          )
    NATIONAL LIABILITY AND      )
 5  FIRE INSURANCE COMPANY      )
    AND QBE MARINE & ENERGY     )
 6  SYNDICATE 1036              )
                                )
 7           PLAINTIFFS,        )
                                )
 8  VS.                         )  10-CV-1653
                                )
 9  GREAT AMERICAN INSURANCE    )
    COMPANY OF NEW YORK, MAX    )
10  SPECIALITY INSURANCE        )
    COMPANY AND SIGNAL          )
11  INTERNATIONAL, LLC          )
                                )
12           DEFENDANTS.        )
13
14  *********************************************************
15
              ORAL DEPOSITION OF
16
                 JIMMY BOOKER
17
                OCTOBER 11, 2012
18
19  *********************************************************
20
21
22
23
24
25
```

Page 2

```
 1      ORAL DEPOSITION OF JIMMY BOOKER, produced as a
 2  witness at the instance of the Defendants, and duly
 3  sworn, was taken in the above-styled and numbered cause
 4  on OCTOBER 11, 2012, from 9:08 a.m. to 6:36 p.m.,
 5  before Mark A. Miller, CSR in and for the State of
 6  Texas, reported by machine shorthand, at the offices of
 7  Signal International, Orange, Texas pursuant to the
 8  Federal Rules of Civil Procedure and the provisions
 9  stated on the record or attached hereto.
```

Page 3

```
 1              APPEARANCES
 2  FOR THE PLAINTIFF FIREMEN'S FUND INSURANCE COMPANY:
       MR. VAL WAMSER
 3     NICOLETTI HORNIG & SWEENEY
       WALL STREET PLAZA
 4     88 PINE STREET, 7TH FLOOR
       NEW YORK, NEW YORK 10005
 5     TEL: 212.220.3830
       FAX: 212.220.3741
 6     EMAIL: vwamser@nicolettihornig.com
 7  FOR SIGNAL INTERNATIONAL, LLC:
       MR. MATTHEW C. GUY
 8     LEBLANC BLAND PLLC
       1717 SAINT JAMES PLACE, SUITE 360
 9     HOUSTON, TEXAS 77056
       TEL: 713.627.7100
10     FAX: 713.627.7148
       EMAIL: mguy@leblancbland.com
11
    FOR THE DEFENDANT GREAT AMERICAN INSURANCE COMPANY OF
12  NEW YORK:
       MR. GEORGE R. ZACHARKOW
13     MATTIONI, LTD.
       399 MARKET STREET, SUITE 200
14     PHILADELPHIA, PENNSYLVANIA 19106
       TEL: 215.629.1600
15     FAX: 215.923.2227
       EMAIL: gzacharkow@mattionl.com
16
    FOR THE DEFENDANT MAX SPECIALTY INSURANCE COMPANY:
17     MR. ADAM D. KRAUSS
       TRAUB, LIEBERMAN, STRAUS & SHREWSBERRY, LLP
18     MID-WESTCHESTER EXECUTIVE PARK
       SEVEN SKYLINE DR.
19     HAWTHORNE, NY 10532
       TEL: 914.347.2600
20     FAX: 914.347.8898
       EMAIL: akrauss@traublieberman.com
21
    ALSO PRESENT:
22     MR. JOHN HALEY
23
24
25
```

Page 4

```
 1                  INDEX
                                            PAGE
 2
       Appearances..........................  2
 3
 4  JIMMY BOOKER
 5     Examination by Mr. Zacharkow........    5
 6     Examination by Mr. Krauss...........  244
 7     Examination by Mr. Wamser...........  275
 8     Examination by Mr. Mr. Guy..........  281
 9     Examination by Mr. Zacharkow........  297
10     Examination by Mr. Krauss...........  301
11     Examination by Mr. Wamser...........  304
12  Signature and Changes...................  306
    Reporter's Certificate..................  308
13
14              EXHIBITS
15  NO. DESCRIPTION                          PAGE
16  321 Curriculum Vitae                       17
17  322 Document Survey Report                136
18  323 DLS Survey Report                     140
19  324 Email, Re: Solicitation by Jim Booker 212
20  325 Email, Re: Resignation                215
21  326 Email, Re: Conversation with Booker   223
22  327 Email, Re: Attorney Contact           236
23  328 Consulting Agreement                  240
24  329 Fax, Re: Drydock Dredging Agreement   252
25  330 Tidal Info Map, Port Arthur           297
```

**JIMMY BOOKER - October 11, 2012**

Page 133

1  I mean, there is a — when you pump them down,
2  I think you said you have 11 feet of side shell left,
3  exposed?
4  A. Well, you do, but you can inspect them from
5  inside the pontoons.
6  Q. Right.
7  A. I mean, you're looking at the same steel
8  that's submerged underwater if you go down inside to
9  the bottom of the tank.
10  Q. And what do you do about the mud?
11  A. That particular area you have from two to
12  maybe three and a half feet of mud. You can't do very
13  much of an inspection of that, obviously.
14  Q. Look at Exhibit 27, please.
15       Were you told about the fact that an emergency
16  meeting was called by Pleasure Island?
17       MR. GUY: I object to the stress on the
18  word "emergency" there, that I think it's testimony
19  from Mr. Haley's deposition but that doesn't mean there
20  is an emergency, it just means it's not an ordinary
21  meeting.
22       MR. ZACHARKOW: Well, it's their
23  language. I mean, you can have your objection noted.
24  A. I've never seen this document before.
25  Q. (BY MR. ZACHARKOW) My question is: Were you

Page 134

1  made aware there was a meeting that was called
2  between — by the Pleasure Island commission and Signal
3  regarding the observations that were made by the ABS
4  Consulting surveyor in his September report?
5  A. I don't think so.
6  Q. Look at Exhibit 29, please, Mr. Booker.
7       Were you told by anyone at Signal that there
8  was an agreement that was entered between Signal and
9  the Port Arthur Navigation District Industrial
10  Development Corporation, PANDIDC, regarding ongoing
11  maintenance obligations for the drydock in October 1,
12  2003?
13  A. I don't ever recall seeing this document.
14  Although, I may have been advised that there was a
15  maintenance agreement with the port.
16  Q. Were you instructed by anyone at Signal to
17  consult with someone for the preparation of anode and
18  cathode — let me strike that question.
19       MR. GUY: Let me lodge an objection to
20  the discussion about this. This is dated October 1,
21  2003. It's before Mr. Booker started. It's also
22  before the drydock was sold to Signal in 2005. So I
23  think it would be obsolete by the time that Mr. Booker
24  started.
25  Q. (BY MR. ZACHARKOW) We can still do our thing.

Page 135

1  A. Sure.
2  Q. Were you told by anyone at Signal, Mr. Booker,
3  that Signal was required by PANDIDC to consult with and
4  investigate the development of a cathodic protection
5  system for the drydock?
6  A. Not that I recall.
7  Q. So when you did your investigation for having
8  the anodes applied, you did that independently of any
9  suggestions?
10  A. Well, I thought I was doing it independently,
11  based upon some of those earlier reports that I
12  reviewed about cathodic protection.
13  Q. Let me show you just the front page and it has
14  some highlights of a survey report dated December 22,
15  2005?
16  A. Okay. DLS.
17  Q. I think I asked you about it, if you've ever
18  seen any DLS reports before, and if I recall correctly,
19  I think you said you didn't recall seeing any DLS
20  reports.
21       Just looking at that format, does that refresh
22  your recollection as to whether you've seen any reports
23  from the DLS surveyors?
24  A. Well, I think I have seen something with the
25  DLS letterhead on it.

Page 136

1  Q. And that report is dated what, December --
2       MR. GUY: 22nd, 2005. Why don't we agree
3  we mark this as Exhibit 322, and I'll provide the court
4  reporter with a clean copy.
5       (Off record discussion.)
6  Q. (BY MR. ZACHARKOW) And for further reference
7  that is a Signal Bates-stamped, starts at 1111, and if
8  I have the entire report here, it goes through 1143.
9       Do you ever recall Captain Strous being aboard
10  the drydock conducting a survey?
11  A. Well, he -- Captain Strous would have had to
12  have been on board the drydock to conduct the survey.
13  I do remember meeting Captain Strous, I don't remember
14  if that meeting occurred on the dock itself.
15  Q. So you remember him attending to do a survey?
16  A. You can't survey a drydock from the office up
17  on a hill. That's what I remember.
18  Q. You've met Captain Strous?
19  A. I believe I have.
20  Q. And you met him when he was at Port Arthur to
21  do a survey of the drydock?
22  A. I guess that's what he was doing at Port
23  Arthur.
24  Q. Well, when Mr. Hager came to do his inspection
25  and surveys, you were aware that he was there to do