UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
FIREMAN'S FUND INSURANCE COMPANY,
ONE BEACON INSURANCE COMPANY,
NATIONAL LIABILITY AND FIRE INSURANCE
COMPANY and QBE MARINE & ENERGY
SYNDICATE 1036,                                                      10-cv-1653 (JPO) (JLC)

                                  Plaintiffs,

        – against –

GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK, MAX SPECIALTY INSURANCE
COMPANY and SIGNAL INTERNATIONAL, LLC,

                                  Defendants.
---------------------------------------------------------------------X

**MAX SPECIALTY INSURANCE COMPANY'S LOCAL RULE 56.1
STATEMENT OF UNCONTESTED MATERIAL FACTS**

Defendant Max Specialty Insurance Company ("Max Specialty"), by its attorneys, Traub Lieberman Straus & Shrewsberry LLP, as and for its Local Rule 56.1 Statement of Uncontested Facts in support of its motion for an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting Max Specialty summary judgment dismissing defendant Signal International, LLC's ("Signal") cross-claim claim for insurance coverage, states as follows:

1.     The AFDB-5 was fabricated by the U.S. Navy during World War II in Morgan City, Louisiana, and in Pittsburgh, Pennsylvania, with assembly performed at Mare Island Naval Shipyard in Vallejo, California.  *See* Declaration of Stephen D. Straus dated April 17, 2013 ("Straus Decl.") Ex. 2.  The drydock was then towed in water to the western Pacific Ocean to service Navy vessels engaged in the war effort.  *See* Straus Decl. Ex. 3.

2. Following World War II, the AFDB-5 was based in Hawaii. In or about 1984, it was towed from Hawaii to Texas for use in the private sector. On September 26, 1984, Bethlehem Steel Corporation ("Bethlehem") entered into a Project Agreement with the Port Arthur Navigation District Industrial Development Corporation ("PANDIDC") to operate the AFDB-5, then owned by PANDIDC, at a facility located in the City of Port Arthur, Texas. *See* Straus Decl. Ex. 4.

3. The Port of Port Arthur ("Port") leased the facility from the City of Port Arthur under a Lease Agreement, also dated September 26, 1984, and assigned its leasehold interest to PANDIDC. Straus Decl. Ex. 5 at 1.

4. Under the Project Agreement, the "Operator" of the drydock (ultimately Signal) assumed all the Port's obligations under the Lease Agreement with the City of Port Arthur. The Operator also assumed PANDIDC's obligations under a Land and Dry Dock Agreement comprising a sublease of the facility from the Port. Straus Decl. Ex. 4 at §2.1.

5. The Lease Agreement was for a term of twenty-five (25) years with an option to renew for an additional twenty-five (25) years. Straus Decl. Ex. 4 §10.6; Ex. 5 Art. II, XXVI.

6. To exercise the option to renew, notice had to be provided to PANDIDC, the Port and the City of Port Arthur of its intent to exercise the option not less than two (2) years prior to the expiration of the Agreement – in this instance by September 26, 2007, for a September 26, 2009 expiration. Straus Decl. Ex. 4 §10.6; Ex. 5 Art. II, XXVI.

7. The Lease Agreement also required rent in the amount of $50,000 per quarter ($200,000 per year) which was paid to the City of Port Arthur, as well as "dry dock toll payments." *See* Straus Decl. Ex. 4 § 4.1; Straus Decl. Ex. 5 Art. IV.

8.      In 2005, Signal purchased the drydock from PANDIDC by way of a Conditional Bill of Sale ("CBOS").  *See* Straus Decl. Ex. 6.[1]  The CBOS required Signal to, *inter alia*, make payments to PANDIDC in varying amounts depending upon whether, on a given day, the drydock was not occupied, operated in rig mode or operated in ship mode.  *Id.* at 1.

9.      Signal's obligation to make payments under the CBOS expressly terminated "at the end of the useful life" of the drydock.  Straus Decl. Ex. 6 at 1.  Signal assumed various other obligations pertaining to the drydock under the CBOS, all of which applied "during the useful life of the Dry Dock."  *Id.* at 1-2.

10.     Following the purchase, Signal paid rent required by the Lease Agreement directly to the Pleasure Island Commission ("PIC"), an arm of the City of Port Arthur.  *See* Straus Decl. Ex. 7.

11.     On September 24, 2007, Signal sent a letter to PANDIDC stating that it wanted to renew the Lease Agreement.  *See* Straus Decl. Ex. 7.  Yet, Signal's proposal rejected the express requirement in the Lease Agreement and Project Agreement that, *inter alia*, the renewal period be another 25 years.  *Id.*  Instead, Signal cited the fact that the drydock was approaching "the end of its useful life and . . . [would] likely not be operational for the entirety of the renewal period" and made a counter proposal whereby there would be an automatic termination of its obligations "in the event that the Dry Dock must be disposed of prior to the current expiration of the renewal period and a suitable replacement dry dock cannot be obtained."  *Id.*

12.     In a letter to PIC dated March 24, 2009, Signal's Senior Vice President and General Manager for Texas Operations, Rodney Meisetschlaeger, gratuitously stated that any attempt by PIC to raise the rent for any hypothetical renewal period would be improper based upon PIC's purported failure to notify Signal twenty-one (21) months before the expiration of the

---

[1] PANDIDC retained its leasehold interest for the dockyard under the Lease Agreement, however.

current lease term of its intent to raise the rent. Straus Decl. Ex. 8. Signal cited the Lease Agreement as authority for its position prospectively rejecting any attempt to raise rent in a hypothetical lease extension. *Id.* Signal also offered "to negotiate" an adjustment to the twenty-five (25) year renewal term due to the drydock's poor physical condition. *Id.*

13. By this time, Signal had analyzed the feasibility of replacing the drydock at the end of its useful life. Straus Decl. Ex. 9 at 90. According to Signal's Chief Financial Officer, Christopher Cunningham, Signal decided that it would not replace the drydock upon the end of its useful life:

> Q. Was there a conclusion made, again, before the sinking of the dry dock as to whether Signal would purchase an existing dry dock or have a dry dock made for Port Arthur?
>
> A. Yes. That – to – involving these types of numbers . . . for the purchase of a dock, it would not be economically feasible. . . .
>
> Q. Having made that conclusion, was it Signal's intent then to stay at the Port Arthur facility, using AFDB-5 until it came to the end of its useful life?
>
> A. Yes. . . .
>
> Q. And was it Signal's business plan at the Port Arthur facility that once the AFDB-5 came to the end of its useful life, that Signal was no longer going to operate a dry dock there?
>
> A. That would be a correct assumption.

*Id.* at 92-93.

14. On June 24, 2009, the law firm of Creighton, Fox, Johnson & Mills, PLLC, sent a letter to Signal on behalf of PIC. Straus Decl. Ex. 10. In that letter, PIC's lawyers stated that it was in default under the Lease Agreement as it failed to: (1) provide PIC and PANDIDC with evidence of insurance coverage; (2) record an assignment to one of Signal's creditors; (3) obtain

consent for construction of a new parking lot; (4) construct and properly maintain a solid barrier along the boundaries of the premises; and (5) "stabilize all ships, inlets and channel frontage so as to prevent erosion." *Id.*

15. Signal responded to the landlord's default letter by correspondence dated July 24, 2009. Straus Decl. Ex. 11. Among other things, Signal: (1) provided copies of certificates of insurance, (2) denied executing an assignment; (3) contested that it had constructed a new parking lot, claiming it merely re-graveled a former parking area; (4) represented that a fence would be installed by August 31, 2009; and (5) stated that it would provide a proposed action plan to control erosion. *Id.*

16. By correspondence dated August 12, 2009, PIC's lawyers replied to Signal's letter of July 24, 2009. Straus Decl. Ex. 12. In this response, PIC emphasized that Signal failed to obtain general liability insurance in the amounts required by the Lease Agreement and to deliver a copy of an assignment of its leasehold interest to a mortgagee. *Id.* at 1. Moreover, the letter stated that although Signal placed additional gravel over a former parking area, it also constructed a new, unapproved road providing ingress and egress from the premises. *Id.* at 1-2. The road was constructed after the former road deteriorated as a result of Signal's failure to prevent erosion on the premises. *Id.* at 2. PIC's lawyers stated that not only was Signal in default of the Lease Agreement but that its failures caused a diminution of value and reduction in the amount of real property that would revert to the lessor upon termination of the lease. *Id.*

17. In the August 12, 2009 letter, PIC also rejected Signal's proposed fence construction plan as it did not meet the lease requirement that the entire premises be enclosed. Straus Decl. Ex. 12 at 2. The attorney's letter further stated that Signal was in default of the lease because Signal was required to construct the fence within twenty-four (24) months of the

inception of the lease. *Id.* The letter also rejected Signal's plan for erosion control of a portion of the "channel footage," as insufficient under the lease. *Id.*

18. Due to Signal's defaults, the August 12, 2009 letter from PIC's lawyers formally notified Signal that the landlord was exercising its contractual right to terminate the lease, effective September 15, 2009. Straus Decl. Ex. 12 at 3. Moreover, PIC demanded, in accordance with the lease, two (2) years' rent representing liquidated damages for termination of the lease. *Id.*

19. On August 18, 2009, John Haley, on behalf of Signal, and Jimmy Dike, the Director of PIC, signed a "proposal" for an extension of the lease. Straus Decl. Ex. 13. The document proposed (i) a six (6) year lease extension with annually rent increasing and (ii) two (2) options to renew for additional six-year terms with rent to be determined. *Id.* No other proposed terms were set forth in the proposal. *Id.* By its terms, the proposal was to be presented to the respective managerial officers of Signal and PIC for approval. *Id.* PIC was to respond to the proposal by September 3, 2009. *Id.*

20. The following day, August 19, PIC lawyers again wrote to Signal, stating they would be meeting with PIC to discuss the lease renewal proposal the following week, on August 26, 2009. Straus Decl. Ex. 14. The lawyer's letter expressly stated that PIC would provide Signal "with a counter-proposal" no later than September 2. *Id.* In the meantime, the lawyer stated that PIC would defer termination of the lease as set forth in the August 12, 2009, correspondence, but reserved all rights as expressed in that letter. *Id.*

21. The drydock sank the next day, August 20, 2009. PIC never approved the proposed lease extension. Straus Decl. Ex. 9 at 199.

22. On September 8, 2009, Signal's CFO, Chris Cunningham, sent a letter to Jimmy Dike of PIC informing him that the drydock had sunk and was thus "at the end of its useful life." Straus Decl. Ex. 15. Following what it had determined to do in such an eventuality a year before the sinking, Signal informed PIC that it would not replace the drydock and thus would not enter into a new lease for the premises. *Id.*

23. Signal and PIC executed a First Amendment to Lease and Release Agreement, effective September 25, 2009 ("Amendment"). Straus Decl. Ex. 16. The purpose of the Amendment was to (i) resolve PIC's claims concerning Signal's default under the existing lease and (ii) permit Signal to remain on site to complete drydock salvage and removal operations. *Id.*

24. The Amendment expressly stated: (1) that Signal's September 24, 2007 notice of intent to renew was withdrawn; (2) the lease was extended six (6) months to March 25, 2010, with an option to extend the lease on a month-to-month basis thereafter through September 25, 2010, for the purpose of drydock salvage and removal; and (3) Signal was to tender $800,000 to PIC for rental through March 25, 2010, and to resolve Signal's breaches/defaults under the lease. Straus Decl. Ex. 16 at ¶¶2-4.

25. The Policy issued to Signal by Max Specialty is excess over a primary property insurance policy issued by Westchester Surplus Lines Insurance Company ("Westchester Policy"). *See* Straus Decl. Exs. 17, 18. Both policies were issued for the same period of January 30, 2009 to January 30, 2010. For purposes of this motion, the Policy issued by Max Specialty incorporates the business interruption coverages from the Westchester Policy, summarized below.

26. The Westchester Policy covers, in pertinent part, loss

> resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused

> by physical loss, damage or destruction, by a Peril insured by this Policy, of property insured.

Straus Decl. Ex. 17 at WILLIS00752.

27. Business interruption coverage is afforded for "Actual Loss Sustained"[2] during the "Period of Recovery resulting from the interruption or reduction of operations." Straus Decl. Ex. 17 at WILLIS00752. The policy also covers "extra expenses" resulting from the same circumstances. *Id.* at WILLIS00753.

28. The "Period of Recovery" may not exceed the time required:

> with the exercise of due diligence and dispatch to rebuild, repair or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss.

Straus Decl. Ex. 17 at WILLIS00756.

29. Business interruption coverage also includes an "Extended Period of Recovery," not exceeding one hundred twenty (120) days, "to restore the Insured's business to the condition that would have existed had no 'Time Element' loss occurred." Straus Decl. Ex. 17 at WILLIS00740, WILLIS00756.

Dated: Hawthorne, New York
April 17, 2013

        TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP

        By:   /s/ Stephen D. Straus
              Stephen D. Straus (SS 6183)
              Jeremy P. Monosov (JM 0089)
              Mid-Westchester Executive Park
              Seven Skyline Drive
              Hawthorne, New York 10532
              (914) 347-2600
              Attorneys for Max Specialty Insurance Company

---

[2] Defined as "Gross Earnings" less charges and expenses "that do not necessarily continue during the interruption or reduction in the business operations." *Id.*