UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
FIREMAN'S FUND INSURANCE COMPANY, ONE
BEACON INSURANCE COMPANY, NATIONAL
LIABILITY AND FIRE INSURANCE COMPANY and
QBE MARINE & ENERGY SYNDICATE 1036,

     Plaintiffs,       10-CIV-1653 (JPO) (JLC)

 – against –

GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK, MAX SPECIALTY INSURANCE
COMPANY and SIGNAL INTERNATIONAL, LLC,

     Defendants.
-----------------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT ON CROSS-CLAIM**


        TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
        Mid-Westchester Executive Park
        Seven Skyline Drive
        Hawthorne, New York 10532
        (914) 347-2600

        Attorneys for Defendant
        Max Specialty Insurance Company

Of Counsel:
 Stephen D. Straus
 Jeremy P. Monosov

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................. 1

PRELIMINARY STATEMENT ....................................................................................... 1

FACTS SUPPORTING REQUESTED RELIEF .............................................................. 2

    A. History of the AFDB-5 ........................................................................................ 2

    B. Signal's Expiring Lease Facility .......................................................................... 3

    C. The Westchester and Max Specialty Policies ...................................................... 7

ARGUMENT ..................................................................................................................... 9

I. ........................................................................................................................................ 9

LEGAL STANDARDS ..................................................................................................... 9

    A. Summary Judgment ............................................................................................. 9

    B. Business Interruption Coverage .......................................................................... 9

    C. Contract Formation ............................................................................................ 10

II. ..................................................................................................................................... 11

SUMMARY JUDGMENT DISMISSING SIGNAL'S CLAIM FOR
BUSINESS INTERRUPTION COVERAGE MUST BE ENTERED
BECAUSE THE LEASE FOR THE PREMISES WAS NOT RENEWED
AND SIGNAL HAD A PRE-LOSS INTENT TO STOP OPERATING
A DRYDOCK AT THE FACILITY ONCE THE ADFB-5 SANK .............................. 11

    A. Signal is Not Entitled to Business Interruption Coverage
        Because it Had No Agreement to Extend the Premises Lease .......................... 12

    B. Business Interruption Coverage Should Be
        Denied Because Signal Did Not Intend To
        Continue Operations After the Drydock Sank .................................................. 14

CONCLUSION ................................................................................................................ 15

i

# **TABLE OF AUTHORITIES**

**Cases**

*2004 McDonald Ave. Realty, LLC v. 2004 McDonald Ave. Corp.*, 25 Misc. 3d 1204(A) (N.Y. Sup. Ct. Kings County June 4, 2007) .............................................................. 10

*50 Pine Co. v. CapitalSource Finance, LLC (In re 50 Pine Co.)*, 317 B.R. 276 (Bankr. S.D.N.Y. 2004).................................................................................................. 11

*Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155 (Miss. 2010) ......................................... 10

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970).......................................................................... 9

*Adjustrite Systems, Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543 (2d Cir. 1998).......................... 11

*Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21 (Tex. App. 14th Dist. Houston 2005) ............................................................................................................... 10

*Allstate Ins. Co. v. Am. Home Prods. Corp.,* 2010 U.S. Dist. LEXIS 32091, *20 (S.D.N.Y. Mar. 31, 2010) .......................................................................................................... 9

*Architex Ass'n v. Scottsdale Ins. Co.*, 27 So. 3d 1148 (Miss. 2010)............................................ 10

*Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067 (2d Cir. 1993).................................................. 9

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187 (2008) ............................. 9

*Brause v. Goldman*, 10 A.D.2d 328 (1st Dep't 1960) ............................................................. 10, 11

*Cifarelli v. Village of Babylon*, 93 F.3d 47 (2d Cir. 1996) ............................................................. 9

*Coastal Ref. & Mktg. v. Coastal Offshore Ins.*, 1996 Tex. App. LEXIS 846, 5-6, 1996 WL 87205 (Tex. App. 14th Dist. Houston 1996). .............................................. 10

*Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88 (2d Cir. 2003) ........................................ 9

*Cosmetics Plus Group, Ltd. v. Am. Int'l Group, Inc. (In re Cosmetics Plus Group, Ltd.)* ("*Cosmetics Plus Group*"), 379 B.R. 464 (Bankr. S.D.N.Y. 2007).................. 9, 10, 12, 13

*C-Suzanne Beauty Salon, Inc. v. Gen. Ins. Co. of Am.*, 574 F.2d 106 (2d Cir. 1978) .................... 9

*Czech Beer Imps., Inc. v. C. Haven Imps., LLC*, 2005 U.S. Dist. LEXIS 12310 (S.D.N.Y. 2005)............................................................................................................ 10

*Excess Ins. Co. v. Factory Mut. Ins. Co.*, 2 A.D.3d 150 (N.Y. App. Div. 1st Dep't 2003)................................................................................................................................. 10

*Frazer Exton Dev., L.P. v. Kemper Envtl., Ltd.*, 2004 U.S. Dist. LEXIS 14602 (S.D.N.Y. 2004)............................................................................................................ 10

*Ggnsc Batesville, LLC v. Johnson*, 2013 Miss. LEXIS 73 (2013)............................................... 10

*Howard Stores Corp. v. Foremost Ins. Co.*, 82 A.D.2d 398 (N.Y. App. Div. 1st Dep't 1981)................................................................................................................................ 10

*In Re Paul Revere Life Ins. Co. v. Bavaro*, 957 F. Supp. 444 (S.D.N.Y. 1997)........................... 10

*Jericho Group, Ltd. v. Midtown Dev., L.P.*, 32 A.D.3d 294 (N.Y. App. Div. 1st Dep't 2006) ........................................................................................................................ 13

*Quality Oilfield Prods. v. Michigan Mut. Ins. Co.*, 971 S.W.2d 635 (Tex. App. 14th Dist. Houston 1998) .................................................................................................... 10

*Richbell Information Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288 (1st Dep't 2003) ........................................................................................................................ 11

*Rozsa v. May Davis Group, Inc.*, 152 F. Supp. 2d 526 (S.D.N.Y. 2001) ..................................... 10

*Scheck v. Francis*, 26 N.Y.2d 466 (1970) .................................................................................... 10

*Technology Finance Group, Inc. v. Grumman Data Systems Corp.*, 159 A.D.2d 385 (N.Y. App. Div. 1st Dep't 1990) ......................................................................................... 10

**Statutes**

Fed. R. Civ. P. 56(c)(2) .................................................................................................................. 9

**INTRODUCTION**

Defendant Max Specialty Insurance Company ("Max Specialty") submits this memorandum of law in support of its motion for an Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary judgment dismissing defendant Signal International, LLC's ("Signal") cross-claim for insurance coverage under the Max Specialty excess property insurance policy at issue in this case.

**PRELIMINARY STATEMENT**

This is a declaratory judgment action concerning the parties' respective rights and obligations under various policies of insurance with respect to the sinking of a drydock known as the ADFB-5 ("ADFB-5" or "drydock"), which sank where it was moored on August 20, 2009. Signal has filed a cross-claim for coverage under a Commercial Property – Excess of Loss insurance policy ("the Policy") issued by Max Specialty. *See* Declaration of Stephen D. Straus dated April 17, 2013 ("Straus Decl."), Ex 1. The Policy includes a coverage provision for loss associated with business interruption and extra expense arising out of accidental destruction or damage to insured property.

Signal contends it is entitled to business interruption coverage in connection with purported loss of profits and extra expense arising from the sinking of the AFDB-5. This claim is unsustainable under the surrounding facts and circumstances. As demonstrated herein, summary judgment dismissing Signal's cross-claim is warranted as a matter of law because (1) the lease between Signal and the municipal agency that was the landlord for the premises where the AFDB-5 was located was near expiration and had not been renewed before the drydock sank and; (2) Signal had expressly stated before the drydock sank that Signal would leave the premises and would not replace the drydock at the end of its useful life. Signal thus cannot

1

prove that it sustained business interruption loss or incurred extra expense associated with the drydock after it sank. Based on the undisputed record developed in this case, there is no issue of material fact precluding summary judgment dismissing Signal's claim for such insurance coverage as a matter of law.

## FACTS SUPPORTING REQUESTED RELIEF

### A.  History of the AFDB-5

The AFDB-5 was fabricated by the U.S. Navy during World War II in Morgan City, Louisiana, and in Pittsburgh, Pennsylvania, with assembly performed at Mare Island Naval Shipyard in Vallejo, California.  *See* Straus Decl. Ex. 2.  The drydock was then towed in water to the western Pacific Ocean to service Navy vessels engaged in the war effort.  *See* Straus Decl. Ex. 3.

Following World War II, the AFDB-5 was based in Hawaii.  In or about 1984, it was towed from Hawaii to Texas for use in the private sector.  On September 26, 1984, Bethlehem Steel Corporation ("Bethlehem") entered into a Project Agreement with the Port Arthur Navigation District Industrial Development Corporation ("PANDIDC") to operate the AFDB-5, then owned by PANDIDC, at a facility located in the City of Port Arthur, Texas.  *See* Straus Decl. Ex. 4.  The Port of Port Arthur ("Port") leased the facility from the City of Port Arthur under a Lease Agreement, also dated September 26, 1984, and assigned its leasehold interest to PANDIDC.  Straus Decl. Ex. 5 at 1.  Under the Project Agreement, the "Operator" of the drydock (ultimately Signal) assumed all the Port's obligations under the Lease Agreement with the City of Port Arthur.  The Operator also assumed PANDIDC's obligations under a Land and Dry Dock Agreement comprising a sublease of the facility from the Port.  Straus Decl. Ex. 4 at §2.1.

2

B.     **Signal's Expiring Lease Facility**

The Lease Agreement was for a term of twenty-five (25) years with an option to renew for an additional twenty-five (25) years. Straus Decl. Ex. 4 §10.6; Ex. 5 Art. II, XXVI.  To exercise the option to renew, notice had to be provided to PANDIDC, the Port and the City of Port Arthur of its intent to exercise the option not less than two (2) years prior to the expiration of the Agreement – in this instance by September 26, 2007, for a September 26, 2009 expiration. Straus Decl. Ex. 4 §10.6; Ex. 5 Art. II, XXVI.  The Lease Agreement also required rent in the amount of $50,000 per quarter ($200,000 per year) which was paid to the City of Port Arthur, as well as "dry dock toll payments." *See* Straus Decl. Ex. 4 § 4.1; Straus Decl. Ex. 5 Art. IV.

In 2005, Signal purchased the drydock from PANDIDC by way of a Conditional Bill of Sale ("CBOS"). *See* Straus Decl. Ex. 6.[1]  The CBOS required Signal to, *inter alia*, make payments to PANDIDC in varying amounts depending upon whether, on a given day, the drydock was not occupied, operated in rig mode or operated in ship mode. *Id.* at 1.

Signal's obligation to make payments under the CBOS expressly terminated "at the end of the useful life" of the drydock. *Id.*  Signal assumed various other obligations pertaining to the drydock under the CBOS, all of which applied "during the useful life of the Dry Dock." *Id.* at 1-2.  Following the purchase, Signal paid rent required by the Lease Agreement directly to the Pleasure Island Commission ("PIC"), an arm of the City of Port Arthur. *See* Straus Decl. Ex. 7.

On September 24, 2007, Signal sent a letter to PANDIDC stating that it wanted to renew the Lease Agreement. *See Id.*  Yet, Signal's proposal rejected the express requirement in the Lease Agreement and Project Agreement that*, inter alia*, the renewal period be another 25 years. Instead, Signal cited the fact that the drydock was approaching "the end of its useful life and . . .

---

[1] PANDIDC retained its leasehold interest for the dockyard under the Lease Agreement, however.

3

[would] likely not be operational for the entirety of the renewal period" and made a counter proposal whereby there would be an automatic termination of its obligations "in the event that the Dry Dock must be disposed of prior to the current expiration of the renewal period and a suitable replacement dry dock cannot be obtained." *Id.*

In a letter to PIC dated March 24, 2009, Signal's Senior Vice President and General Manager for Texas Operations, Rodney Meisetschlaeger, gratuitously stated that any attempt by PIC to raise the rent for any hypothetical renewal period would be improper based upon PIC's purported failure to notify Signal twenty-one (21) months before the expiration of the current lease term of its intent to raise the rent. Straus Decl. Ex. 8. Signal cited the Lease Agreement as authority for its position prospectively rejecting any attempt to raise rent in a hypothetical lease extension. *Id.* Signal also offered "to negotiate" an adjustment to the twenty-five (25) year renewal term due to the drydock's poor physical condition. *Id.*

By this time, Signal had analyzed the feasibility of replacing the drydock at the end of its useful life. Straus Decl. Ex. 9 at 90. According to Signal's Chief Financial Officer, Christopher Cunningham, Signal decided that it would not replace the drydock upon the end of its useful life:

> Q. Was there a conclusion made, again, before the sinking of the dry dock as to whether Signal would purchase an existing dry dock or have a dry dock made for Port Arthur?
>
> A. Yes. That – to – involving these types of numbers . . . for the purchase of a dock, it would not be economically feasible. . . .
>
> Q. Having made that conclusion, was it Signal's intent then to stay at the Port Arthur facility, using AFDB-5 until it came to the end of its useful life?
>
> A. Yes. . . .

4

> Q. And was it Signal's business plan at the Port Arthur facility that once the AFDB-5 came to the end of its useful life, that Signal was no longer going to operate a dry dock there?
>
> A. That would be a correct assumption.

*Id.* at 92-93.

On June 24, 2009, the law firm of Creighton, Fox, Johnson & Mills, PLLC, sent a letter to Signal on behalf of PIC. Straus Decl. Ex. 10. In that letter, PIC's lawyers stated that it was in default under the Lease Agreement as it failed to: (1) provide PIC and PANDIDC with evidence of insurance coverage; (2) record an assignment to one of Signal's creditors; (3) obtain consent for construction of a new parking lot; (4) construct and properly maintain a solid barrier along the boundaries of the premises; and (5) "stabilize all ships, inlets and channel frontage so as to prevent erosion." *Id.*

Signal responded to the landlord's default letter by correspondence dated July 24, 2009. Straus Decl. Ex. 11. Among other things, Signal: (1) provided copies of certificates of insurance, (2) denied executing an assignment; (3) contested that it had constructed a new parking lot, claiming it merely re-graveled a former parking area; (4) represented that a fence would be installed by August 31, 2009; and (5) stated that it would provide a proposed action plan to control erosion. *Id.*

By correspondence dated August 12, 2009, PIC's lawyers replied to Signal's letter of July 24, 2009. Straus Decl. Ex. 12. In this response, PIC emphasized that Signal failed to obtain general liability insurance in the amounts required by the Lease Agreement and to deliver a copy of an assignment of its leasehold interest to a mortgagee. *Id.* at 1. Moreover, the letter stated that although Signal placed additional gravel over a former parking area, it also constructed a new, unapproved road providing ingress and egress from the premises. *Id.* at 1-2. The road was

constructed after the former road deteriorated as a result of Signal's failure to prevent erosion on the premises. *Id.* at 2. PIC's lawyers stated that not only was Signal in default of the Lease Agreement but that its failures caused a diminution of value and reduction in the amount of real property that would revert to the lessor upon termination of the lease. *Id.*

PIC also rejected Signal's proposed fence construction plan as it did not meet the lease requirement that the entire premises be enclosed. *Id.* The attorney's letter further stated that Signal was in default of the lease because Signal was required to construct the fence within twenty-four (24) months of the inception of the lease. *Id.* The letter also rejected Signal's plan for erosion control of a portion of the "channel footage," as insufficient under the lease. *Id.*

Due to Signal's defaults, the August 12, 2009 letter from PIC's lawyers formally notified Signal that the landlord was exercising its contractual right to terminate the lease, effective September 15, 2009. *Id.* at 3. Moreover, PIC demanded, in accordance with the lease, two (2) years' rent representing liquidated damages for termination of the lease. *Id.*

On August 18, 2009, John Haley, on behalf of Signal, and Jimmy Dike, the Director of PIC, signed a "proposal" for an extension of the lease. Straus Decl. Ex. 13. The document proposed (i) a six (6) year lease extension with annually rent increasing and (ii) two (2) options to renew for additional six-year terms with rent to be determined. *Id.* No other proposed terms were set forth in the proposal. *Id.* By its terms, the proposal was to be presented to the respective managerial officers of Signal and PIC for approval. *Id.* PIC was to respond to the proposal by September 3, 2009. *Id.*

The following day, August 19, PIC lawyers again wrote to Signal, stating they would be meeting with PIC to discuss the lease renewal proposal the following week, on August 26, 2009. Straus Decl. Ex. 14. The lawyer's letter expressly stated that PIC would provide Signal "with a

6

counter-proposal" no later than September 2. *Id.* In the meantime, the lawyer stated that PIC would defer termination of the lease as set forth in the August 12, 2009, correspondence, but reserved all rights as expressed in that letter. *Id.*

The drydock sank the next day, August 20, 2009.  PIC never approved the proposed lease extension.  Straus Decl. Ex. 9 at 199.

On September 8, 2009, Signal's CFO, Chris Cunningham, sent a letter to Jimmy Dike of PIC informing him that the drydock had sunk and was thus "at the end of its useful life."  Straus Decl. Ex. 15.  Following what it had determined to do in such an eventuality a year before the sinking, Signal informed PIC that it would not replace the drydock and thus would not enter into a new lease for the premises.  *Id.*

Signal and PIC executed a First Amendment to Lease and Release Agreement, effective September 25, 2009 ("Amendment").  Straus Decl. Ex. 16.  The purpose of the Amendment was to (i) resolve PIC's claims concerning Signal's default under the existing lease and (ii) permit Signal to remain on site to complete drydock salvage and removal operations.  *Id.*  The Amendment expressly stated: (1) that Signal's September 24, 2007 notice of intent to renew was withdrawn; (2) the lease was extended six (6) months to March 25, 2010, with an option to extend the lease on a month-to-month basis thereafter through September 25, 2010, for the purpose of drydock salvage and removal; and (3) Signal was to tender $800,000 to PIC for rental through March 25, 2010, and to resolve Signal's breaches/defaults under the lease.  *Id.* at ¶¶2-4.

### C. **The Westchester and Max Specialty Policies**

The Policy issued to Signal by Max Specialty is excess over a primary property insurance policy issued by Westchester Surplus Lines Insurance Company ("Westchester Policy").  *See* Straus Decl. Exs. 17, 18.  Both policies were issued for the same period of January 30, 2009 to

7

January 30, 2010. For purposes of this motion, the Policy issued by Max Specialty incorporates the business interruption coverages from the Westchester Policy, summarized below.

The Westchester Policy covers, in pertinent part, loss

> resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused by physical loss, damage or destruction, by a Peril insured by this Policy, of property insured.

Straus Decl. Ex. 17 at WILLIS00752.

Business interruption coverage is afforded for "Actual Loss Sustained"[2] during the "Period of Recovery resulting from the interruption or reduction of operations." *Id.* The policy also covers "extra expenses" resulting from the same circumstances. *Id.* at WILLIS00753.

The "Period of Recovery" may not exceed the time required:

> with the exercise of due diligence and dispatch to rebuild, repair or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss.

*Id.* at WILLIS00756.

Business interruption coverage also includes an "Extended Period of Recovery," not exceeding one hundred twenty (120) days, "to restore the Insured's business to the condition that would have existed had no 'Time Element' loss occurred." *Id.* at WILLIS00740, WILLIS00756.

When the legal precedents discussed below are applied to the pertinent facts concerning the demise of the AFDB-5, it is clear that business interruption coverage is not triggered and that Signal's cross-claims seeking such coverage must be dismissed as a matter of law.

---

[2] Defined as "Gross Earnings" less charges and expenses "that do not necessarily continue during the interruption or reduction in the business operations." *Id.*

## ARGUMENT

## I.

## LEGAL STANDARDS

A.  **Summary Judgment**

Summary judgment is appropriate where there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment must establish that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970). Once the movant has met its initial burden, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Allstate Ins. Co. v. Am. Home Prods. Corp.,* 2010 U.S. Dist. LEXIS 32091, *20 (S.D.N.Y. Mar. 31, 2010) (citing *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir. 1993)). Conclusory allegations, speculation or conjecture by the responding party will not defeat summary judgment. *See, e.g., Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)).

B.  **Business Interruption Coverage**

The purpose of business interruption insurance is to "indemnify the insured against losses arising from inability to continue normal business operation and functions due to the damage sustained as a result of the hazard insured against." *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 194 (2008) (internal quotations omitted). The policyholder bears the burden to prove the extent of the damage and the factual and legal applicability of the policy to the loss. *See, e.g., C-Suzanne Beauty Salon, Inc. v. Gen. Ins. Co. of Am.*, 574 F.2d 106, 114 (2d Cir. 1978); *Cosmetics Plus Group, Ltd. v. Am. Int'l Group, Inc. (In re Cosmetics Plus Group, Ltd.)* ("*Cosmetics Plus Group*"), 379 B.R. 464, 470 (Bankr. S.D.N.Y. 2007); *In Re Paul Revere*

9

*Life Ins. Co. v. Bavaro*, 957 F. Supp. 444, 447 (S.D.N.Y. 1997); *Howard Stores Corp. v. Foremost Ins. Co.*, 82 A.D.2d 398, 401 (N.Y. App. Div. 1st Dep't 1981) (citations omitted). Where business interruption does not result from physical loss, the policyholder is not entitled to such coverage. *See, e.g., Cosmetics Plus Group,* 379 B.R. 464.[3]

## C.  **Contract Formation**

A binding contract requires: (1) an offer; (2) acceptance; (3) consideration; (4) mutual assent; and (5) and intent to be bound. *See, e.g., Rozsa v. May Davis Group, Inc.*, 152 F. Supp. 2d 526, 533 (S.D.N.Y. 2001) (construing New York law).[4] When parties have clearly expressed an intent not to be bound until negotiations have culminated in a formal contract, no binding contract exists until one is executed. *See, e.g., Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970) (citations omitted); *Technology Finance Group, Inc. v. Grumman Data Systems Corp.*, 159 A.D.2d 385, 385 (N.Y. App. Div. 1st Dep't 1990); *Brause v. Goldman*, 10 A.D.2d 328, 332 (1st Dep't 1960); *2004 McDonald Ave. Realty, LLC v. 2004 McDonald Ave. Corp.*, 25 Misc. 3d 1204(A) (N.Y. Sup. Ct. Kings County June 4, 2007) (citations omitted).

Moreover, when communications between the parties reveal a conflict as to material terms, or nothing other than an agreement "to continue negotiations with the possible ultimate

---

[3] To the extent the law of Mississippi, the location of Signal's corporate headquarters at the relevant time, or the law of Texas, the location of the drydock, may apply to this issue, they do not differ.  *See, e.g., Architex Ass'n v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1157 (Miss. 2010) (insured has burden to prove coverage). *See also, Quality Oilfield Prods. v. Michigan Mut. Ins. Co.*, 971 S.W.2d 635, 638 (Tex. App. 14th Dist. Houston 1998); *Coastal Ref. & Mktg. v. Coastal Offshore Ins.*, 1996 Tex. App. LEXIS 846, 5-6, 1996 WL 87205 (Tex. App. 14th Dist. Houston 1996).  As no conflict of law exists, resolution of this issue is determined under the law of the forum state, New York.  *See, e.g., Czech Beer Imps., Inc. v. C. Haven Imps., LLC*, 2005 U.S. Dist. LEXIS 12310 at 9 (S.D.N.Y. 2005); *Frazer Exton Dev., L.P. v. Kemper Envtl., Ltd.*, 2004 U.S. Dist. LEXIS 14602 (S.D.N.Y. 2004); *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 2 A.D.3d 150, 151 (N.Y. App. Div. 1st Dep't 2003).

[4] To the extent the laws of Mississippi or Texas apply to this issue, they are in accord.  *See Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App. 14th Dist. Houston 2005) (citation omitted).  *See also Ggnsc Batesville, LLC v. Johnson*, 2013 Miss. LEXIS 73, *5-6 (2013) (quoting *Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155, 1158 (Miss. 2010)).

10

meeting of minds deferred until some future time," no binding contract is formed. *Brause*, 10 A.D.2d at 332. Put another way, where the parties have reached "preliminary agreements contemplating future negotiations, subsequent approvals or a further contract, binding obligations are not typically created." *50 Pine Co. v. CapitalSource Finance, LLC (In re 50 Pine Co.)*, 317 B.R. 276, 281-82 (Bankr. S.D.N.Y. 2004) (citing, *inter alia*, *Richbell Information Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 297 (1st Dep't 2003) (holding that a term sheet constituted a "classic example of an unenforceable mere agreement to agree")). *See also Adjustrite Systems, Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).

## II.

### SUMMARY JUDGMENT DISMISSING SIGNAL'S CLAIM FOR BUSINESS INTERRUPTION COVERAGE MUST BE ENTERED BECAUSE THE LEASE FOR THE PREMISES WAS NOT RENEWED AND SIGNAL HAD A PRE-LOSS INTENT TO STOP OPERATING A DRYDOCK AT THE FACILITY ONCE THE ADFB-5 SANK

There are two (2) independently dispositive grounds upon which summary judgment dismissing the cross-claim for business interruption coverage can and should be entered. Firstly, Signal and its landlord, PIC, never reached agreement on a lease renewal before the drydock sank. Indeed, the negotiations for a renewal were often contentious and never advanced beyond proposals and counter proposals. It is thus no more than rote speculation to argue that Signal and its landlord would have agreed to the material terms of a lease renewal.

Secondly, Signal had declared to its landlord well before the drydock sank that it intended to cease drydock operation at the facility as soon as the AFDB-5 reached the end of its useful life. This is precisely what Signal did when the drydock sank. Signal advised the landlord that the AFDB-5 had reached the end of its useful life and Signal thus was no longer interested in negotiating a lease renewal.

11

We address each of the foregoing grounds for summary judgment in the following sections.

### A. Signal is Not Entitled to Business Interruption Coverage Because it Had No Agreement to Extend the Premises Lease

The lease for the premises expired little more than one (1) month after the drydock sank and Signal cannot establish that the lease would have been renewed.  Signal is thus unable to prove that had no loss occurred it could continue operations at the premises.  Signal therefore cannot demonstrate that it sustained lost future earnings or incurred any extra expenses to continue operation of the business. The cross-claim for business interruption and extra expense coverage must be dismissed as a matter of law.

In *Cosmetics Plus Group*, 379 B.R. 464 (Bankr. S.D.N.Y. 2007), the bankruptcy debtors submitted a claim for business interruption coverage with their property insurer, American International Group, Inc. (AIG), which was denied.  *Id.* at 468.  The debtors operated two cosmetic stores located in and near the World Trade Center.  *Id.* at 464.  The store located in the World Trade Center was destroyed as a result of the September 11, 2001, terrorist attacks.  *Id.* at 467.  The store located a few blocks away survived the attacks but sustained a broken plate glass window that day, or the following one, allowing ash and debris to enter the store, rendering it inoperable.  *Id.*

Prior to the loss, the businesses were failing and the debtors had filed for bankruptcy.  At the time of the loss, the debtors were liquidating inventory.  *Id.* at 467.  The debtors were obligated by a court-approved agreement, issued before the September 11 attacks, to vacate and surrender the premises by December 24, 2001 – little more than three (3) months following the attacks.  *Id.* at 466.  Despite these undisputed facts, the debtors asserted a business interruption

12

claim in the amount of $1,669,357, representing two (2) years of lost profit after September 11, 2001. *Id.* at 468.

The court in *Cosmetics Plus Group* held that no potential business interruption loss could exist after December 24, 2001, when the businesses were ordered to close, as there could be no demonstrable probable future earnings after that point. *Id.* at 471.

In the instant matter, it is clear that the one-page "Proposal" dated August 18, 2009, regarding a possible extension of the lease for the subject premises was not binding. In fact, the proposal expressly contemplated the need for future approval by each party. Straus Decl. Ex. 13. It was thus no more than a non-binding term sheet proposal which each party's representative merely agreed to submit to their respective constituencies. *Id.*

The very next day, August 19, 2009, the landlord's lawyers stated in writing that they would be meeting with PIC a week later to discuss the proposal. Straus Decl. Ex. 14. In the same letter, PIC's lawyers also stated that PIC (i) would communicate a "counter proposal" and (ii) reserved PIC's rights in connection with Signal's previously stated breaches of the Lease Agreement. This establishes beyond dispute that no meeting of the minds had occurred regarding any lease extension. *See Jericho Group, Ltd. v. Midtown Dev., L.P.*, 32 A.D.3d 294, 299 (N.Y. App. Div. 1st Dep't 2006) ("it is a fundamental tenet of contract law that a counteroffer constitutes a rejection of an offer as a matter of law.") (citations omitted).

Moreover, the First Amendment to Lease and Release Agreement, executed after the loss for the sole purpose of enabling Signal to salvage and remove the sunken drydock, provided, (i) that Signal's letter dated September 24, 2007, purporting to exercise an option to renew the lease was withdrawn and (ii) partly settled PIC's claims concerning Signal's breaches and defaults under the Lease Agreement. Straus Decl. Ex. 16. This further demonstrates that there was no

mutual assent to the terms of the proposal for a lease extension and no meeting of the minds concerning a lease extension or resolution of Signal's defaults, which PIC had expressly tied to any proposed lease extension.

As Signal cannot prove that any further lease for the premises existed, or would have been agreed to, it cannot prove that it had any ability to operate at the premises beyond the lease's expiration (i.e., September 25, 2009).[5]  Signal thus cannot prove that it sustained any lost future earnings resulting from physical loss, or incurred any extra expense to keep the business running after the loss, as required by the Policy.  There are thus no facts precluding the entry of summary judgment dismissing Signal's business interruption claim against Max Specialty.

**B.    Business Interruption Coverage Should Be Denied Because Signal Did Not Intend To Continue Operations After the Drydock Sank**

Signal's business interruption and extra expense claims should also be rejected for the independent reason that it admittedly had resolved, prior to the loss, that it would not replace the AFDB-5 and thus would not continue drydock operations at the facility. Signal thus cannot demonstrate that it would have sustained lost future earnings as a result of the sinking of the drydock or incurred any extra expense to keep the business operating thereafter.

As discussed above, Signal admitted that, prior to the AFDB-5's sinking, it had determined that it would not replace the drydock at the end of its useful life and thus would not continue operations at the premises.  Straus Decl. Ex. 9 at 92-93.  Indeed, this was the very reason Signal originally issued a counter proposal to PIC in its notice of intent to exercise the

---

[5] Although a little more than one (1) month lapsed between the sinking of the AFDB-5 and the expiration of the existing lease term, no business interruption loss during this period is cognizable because, as of the date of the sinking on August 20, 2009, no contracts or service requests were in place for service following the projected completion of reconfiguration of the drydock on August 31, 2009. Straus Decl. Ex. 9 at 194.

14

lease renewal option, rather than agree to the 25 year term it was required to accept to enforce the lease renewal provision. *See* Straus Decl. Ex. 5, Art. XXVI; Ex. 7. Signal thus admitted that the sinking of the drydock constituted the end of its useful life and refused to further negotiate a lease extension. Straus Decl. Ex. 15.[6]

Just as in *Cosmetics Plus Group*, discussed *infra*, there can be no claim for lost earnings and expenses when it was determined, prior to the loss, the business would cease when the loss occurred. In the instant matter, this occurred when the AFDB-5 sank because it thus reached the end of its useful life. By Signal's own admission, it cannot demonstrate probable lost future earnings or recover for extra expenses for operation of the business beyond the sinking of the drydock. Signal's business interruption and extra expense claims therefore must be dismissed as a matter of law.

## **CONCLUSION**

For the reasons set forth above, it is respectfully requested that the Court enter an Order granting Max Specialty's motion for summary judgment dismissing Signal's cross-claim for insurance coverage in its entirety, together with such other relief as this Court deems appropriate.

Dated: April 17, 2013
      Hawthorne, New York

                            Respectfully Submitted,

                            TRAUB LIEBERMAN STRAUS
                            & SHREWSBERRY LLP

                            By:   /s/ Stephen D. Straus
                                  Stephen D. Straus (SS 6183)
                                  Jeremy P. Monosov (JM 0089)

---

[6] Since there is no dispute that the drydock constituted a constructive total loss after its sinking, Signal would be hard-pressed to argue that this was not the case.