UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
FIREMAN'S FUND INSURANCE COMPANY, ONE
BEACON INSURANCE COMPANY, NATIONAL
LIABILITY AND FIRE INSURANCE COMPANY and
QBE MARINE & ENERGY SYNDICATE 1036,

       10-cv-1653 (JPO) (JLC)

     Plaintiffs,

 – against –

GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK, MAX SPECIALTY INSURANCE
COMPANY and SIGNAL INTERNATIONAL, LLC,

     Defendants.
------------------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION
TO SIGNAL'S MOTION FOR PARTIAL SUMMARY
<u>JUDGMENT AND IN SUPPORT OF CROSS-MOTION</u>**

    TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
    Mid-Westchester Executive Park
    Seven Skyline Drive
    Hawthorne, New York 10532
    (914) 347-2600

    Attorneys for Defendant
    Max Specialty Insurance Company

Of Counsel:
 Stephen D. Straus
 Jeremy P. Monosov

## INTRODUCTION

Defendant Max Specialty Insurance Company ("Max Specialty") submits this memorandum of law: (1) in opposition to Signal International, LLC's motion for partial summary judgment dated March 19, 2013; and (2) in support of its cross-motion for an Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting partial summary judgment in favor of Max Specialty (i) declaring Max Specialty insurance policy no. MAX2XP0004029 ("the Policy"), issued to defendant SIGNAL INTERNATIONAL, LLC ("Signal"), void *ab initio*, (ii) ordering Signal to return the $2,920,000 paid by Max Specialty to Signal for loss under the policy, and (iii) awarding Max Specialty the fees and costs, including attorney's fees, it has incurred in litigating this action.

## PRELIMINARY STATEMENT

This is a declaratory judgment action concerning the parties' respective rights and obligations under various policies of insurance with respect to the sinking of a drydock known as the ADFB-5 ("ADFB-5" or "drydock"), which sank where it was moored on August 20, 2009. Max Specialty has filed a cross-claim against Signal seeking a judgment voiding *ab initio* the Policy issued to Signal based upon the withholding of material information concerning the dangerously dilapidated condition of the drydock. *See* Declaration of Stephen D. Straus dated April 17, 2013 ("Straus Decl."), Ex 1.

The overwhelming evidence demonstrates that Signal, when it sought insurance coverage from Max Specialty, provided a report painting a favorable picture of the risk to be insured while withholding voluminous information – which it concedes it had in its possession – which portrayed a material risk of imminent catastrophic failure of the drydock. Max Specialty's underwriter, James F. Morano, III, relied on the information provided by Signal –

and on the fact that there were no indications of unfavorable conditions – in issuing the Policy to Signal.  Moreover, had the material information regarding the condition of the drydock been provided to Max Specialty before the Policy was issued, Max Specialty would have either declined to issue the Policy, issued it excluding the drydock, if Signal would so accept, or cancel the Policy once in effect.  For the reasons discussed below, there is no reasonable dispute that Signal misrepresented the condition of the drydock and withheld material information concerning such condition from Max Specialty.  Max Specialty thus is entitled to summary judgment on its cross-claim seeking rescission of the Policy.

## ARGUMENT

## I.

## LEGAL STANDARDS

A. **Summary Judgment**

Summary judgment is appropriate where there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c)(2).  The party seeking summary judgment must establish that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970).  Once a summary judgment movant has met its initial burden, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Allstate Ins. Co. v. Am. Home Prods. Corp.,* 2010 U.S. Dist. LEXIS 32091, *20 (S.D.N.Y. Mar. 31, 2010) (citing *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir. 1993)).  Conclusory allegations, speculation or conjecture by the non-movant will not defeat summary judgment. *See, e.g., Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)).

## II.

## MAX SPECIALTY IS ENTITLED TO VOID THE MAX SPECIALTY POLICY *AB INITIO* BASED UPON THE WITHHOLDING OF MATERIAL FACTS AT THE TIME COVERAGE WAS SOUGHT

**A.** **Choice of Law**

Beginning at page eighteen (18) of its memorandum of law (Doc. No. 227), Signal cites Texas law only concerning the rescission claim at issue. However, Signal provides absolutely no facts or argument in support of the applicability of Texas law to resolution of Max Specialty's cross-claim. Given the contacts in multiple states which existed at the relevant time, and the conflict between the potentially relevant states as to the pertinent legal standards, Signal had a burden as a summary judgment movant to prove the applicability of Texas law. Its failure to do so constitutes a failure by Signal to meet its *prima facie* burden on summary judgment. Consequently, Signal's motion for partial summary judgment should be denied. At the very least, Signal should be precluded from offering any choice of law argument in its opposition to the instant cross-motion or reply to its summary judgment motion.

A federal court sitting in diversity will apply the forum state's choice of law rules where a conflict of law exists between various states. *See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.,* 449 F.3d 377, 382 (2d Cir. 2006). *See also Locke v. Aston*, 31 A.D.3d 33, 37 (N.Y. App. Div. 1st Dep't 2006). Thus, this Court should apply New York's choice of law rules. In choosing between the controlling contract law of different states, New York courts apply a "grouping of contacts" test, *GlobalNet,* 449 F.3d at 383; *IBM v. Liberty Mut. Ins. Co.,* 363 F.3d 137, 143 (2d Cir. 2004), and generally defer "to the law of the jurisdiction which has the greatest interest in the matter." *Avondale Indus. Inc. v. Travelers Indem. Co.,* 774 F. Supp. 1416, 1422 (S.D.N.Y. 1991).

Where the dispute concerns an insurance contract, courts consider the location of the insured risk, the parties' residence, and where the policy was negotiated, issued and delivered. *Id.*; *Steadfast Ins. Co. v. Sentinel Real Estate Corp.*, 283 A.D.2d 44, 50 (N.Y. App. Div. 1st Dep't 2001). The law of the state which the parties understood was to be the principal location of the insured risk should generally apply. *Zurich Ins. Co. v. Shearson Lehman Hutton*, 84 N.Y.2d 309, 318 (1994); *Wausau Bus. Ins. Co. v. Horizon Admin. Servs., LLC*, 803 F. Supp. 2d 209, 214 (E.D.N.Y. 2011). However, where the insured risks are spread more or less equally across multiple states, the principal location of the insured risk should be replaced with the insured's principal place of business. *Wausau*, 803 F. Supp. 2d at 214 (citing *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 22-23 (1st Dep't 2006)).

In the instant matter, the value of assets insured under the Max Specialty policy were almost evenly split between Mississippi and Texas. *See* Straus Decl. Ex. 3, Statement of Values, at TRIPM 0072. Signal has asserted that Texas law applies to resolution of this dispute. As Signal sets forth in Plaintiffs' and Signal's Joint Memorandum of Law ("Joint MOL"), to void an insurance policy *ab initio* under Texas law, an insurer is required to demonstrate, *inter alia*, the insured's intent to induce the insurers to take or refrain from action. Joint MOL at 21. Under Mississippi law, no such intent is required. *See, e.g, Prudential Ins. Co. v. Estate of Russell*, 274 So. 2d 113, 116 (Miss. 1973); *Carroll v. Metropolitan Ins. and Annuity Co.*, 166 F.3d 802, 805 (5th Cir. 1999). A conflict of laws thus exists between Texas and Mississippi making a choice of law analysis necessary.

Max Specialty respectfully submits that the law of Mississippi applies to resolution of Max Specialty's cross-claim for the reasons discussed above *supra* as it is (i) the state listed in

Signal's address as reflected in the Max Specialty Policy declarations, (ii) where the policy was delivered to Signal, and (iii) where Signal's principal place of business was located at the time it sought and received coverage from Max Specialty in January, 2009.  Straus Decl. Ex. 2 at WILLIS00697; Ex. 26; Ex. 27 ¶3.  The foregoing multiple contacts, including, *inter alia*, the location of Signal's principal place of business where the Policy was issued, clearly favor Mississippi over the singular contacts with (i) Texas, merely where the drydock happens to be located,[1] (ii) Alabama, where Signal's broker, Willis, was located at pertinent times, (iii) New York, where the policy was negotiated by broker AmWins, and (iv) Virginia, Max Specialty's principal place of business.  There is no reasonable dispute that Mississippi law applies to resolution of Max Specialty's cross-claim.

**B.     Rescission of Policy**

Under Mississippi law, a material misrepresentation has been made while applying for insurance when (1) the insured sets forth information which is false, incomplete, or misleading, and (2) the false, incomplete or misleading information must be material to the risk insured against or contemplated by the policy.  *See, e.g., Carroll v. Metropolitan Ins. and Annuity Co.*, 166 F.3d 802, 805 (5th Cir. 1999); *Republic Fire & Cas. Ins. Co. v. Azlin*, 2012 U.S. Dist. LEXIS 137869, 17, 2012 WL 4482355 (N.D. Miss. 2012) ("*Azlin*").  An omission or concealment of material facts constitutes misrepresentation.  *See Guastella v. Wardell,* 198 So. 2d 227, 230 (Miss. 1967).  Whether a misrepresentation was intentional, negligent or innocent is irrelevant.  *See, e.g, Prudential Ins. Co. v. Estate of Russell*, 274 So. 2d 113, 116 (Miss. 1973); *Carroll*, 166 F.3d at 805.  A misrepresentation is material if "it might have led a prudent insurer

---

[1] Max Specialty's rescission claim is by definition grounded in contract, not tort.  Thus the location of the loss should bear little, if any, significance in the Court's choice of law analysis.

to decline the risk, accept the risk only for an increased premium, or otherwise refuse to issue the exact policy requested by the applicant." *Carroll*, 166 F.3d at 805 (citation omitted).

An insurer is entitled to rely on the information supplied by its insured. *Id.* An insurer has no duty to commence an inquiry upon receiving information from the insured where it has not been provided with facts which would have caused a prudent insurer to do so. *See Id.*

In the instant matter, it is beyond dispute that Signal set forth favorable information concerning the condition of its properties, while failing to disclose material information concerning the material risk of imminent catastrophic failure of the AFDB-5. Whether Signal intentionally withheld such information is irrelevant. As set forth in the accompanying Statement of Uncontested Facts ("SUF"), the information concerning the condition of the drydock which Signal withheld from Max Specialty includes:[2]

- Repeated findings over several years – by both Signal and third-party surveyors and/or engineers -- that the pontoons were wasted and leaking and needed to be renewed, and that Signal's efforts to patch over holes in the decking were inadequate (SUF ¶¶ 17-48);

- Signal's own Dry Dock Facility – Staff Study, completed in April, 2003, which, *inter alia*, (i) estimated that if the dilapidated drydock was not repaired, bottom plating would last only three to five years and pontoon decks only five to seven years, and (ii) that it would take $21,880,000 to renew all main deck and bottom plating, as Signal found was needed to extend the drydock's life (SUF ¶¶28-30);

---

[2] Signal misstates the facts when it states that Max Specialty's position is that Signal's only misrepresentation concerns the value of the drydock. The deposition testimony cited by Signal for this proposition consists of a response to an open-ended question, to which an objection was lodged, and the giving of a qualified answer. Plaintiffs' and Signal's Joint Statement of Uncontested Fact Ex. 24 at 94:6-20. Nevertheless, it is clear that Max Specialty underwriter James F. Morano, III, who was responsible for reviewing information when issuing the Policy, avers that material information was withheld from Max Specialty which, if provided, would have led it to not issue the Policy, issue it without the AFDB-5, or cancel the Policy once issued. Morano Decl. ¶10.

- A report from a well-respected marine engineering firm that 3,500,000 pounds of steel needed to be replaced to keep the drydock in safe, stable operating condition, the overwhelming majority of which was never replaced prior to the drydock's sinking, (SUF ¶¶ 22, 54, 56-9);[3]

- That the drydock was leaking so severely that water needed to be pumped out as often as every two (2) hours (SUF ¶32);

- Repeated admonitions from independent marine engineers and surveyors, as late as May, 2008, that operation of the drydock was unsafe and unstable and should not be used until the recommended repairs (including renewal of steel plating, which was not accomplished) were effected (SUF ¶¶ 33, 52-3);

- A survey report from an independent marine surveyor in October 2007 mandating, within the succeeding eighteen (18) months from the date of the survey (i.e., by April, 2009, before the AFDB-5 sank), the pontoons were to be separately drydocked, one at a time, on the AFDB-5 renewal and/or repair of the hull bottoms and sides "in order to render this vessel in good stable operating condition and provide a life extension to the drydock," which was never carried out (SUF ¶¶ 48-9); and

The only report submitted by Signal when applying to Max Specialty for insurance was a Property Risk Inspection Report prepared by Stephen Heller & Associates, Inc. ("Heller Report"), which Max Specialty's underwriter, James Francis Morano III relied on in issuing coverage to Signal. Morano Decl. ¶5; Straus Decl. Ex. 4 at 32, 40. The Heller Report stated that "[o]verall, the Signal International facilities reviewed are rated as an 'Above Average' risk as it relates to insurance property and boiler machinery coverage." Straus Decl. Ex. 3, Heller

---

[3] Signal distorts the factual record when it alleges that the surveys of the AFDB-5 "have been classified as obsolete." Joint MOL at 23. The deposition testimony of Robert Heger cited in support of this proposition only relates to the replacement cost contained within the report prepared by his company in December 2002. *See* Transcript of Robert Heger, Straus Decl. Ex. 21 at 146-47. With respect to that report, the fact remains that Signal admittedly did not comply with recommendations to replace the pontoon decks, which involved replacement of 3,500,000 pounds of steel.

7

Report at 8; Morano Decl. ¶7.  The Heller Report defines "Above Average" as meeting "acceptable standards including some industry best practices."  Straus Decl. Ex. 3, Heller Report at 8; Morano Decl. ¶7.  Mr. Morano relied on the Heller Report "which gave a favorable overview of the condition of the properties." Straus Decl. Ex. 4 at 40.

Nevertheless, having made such a representation, the Heller Report provides no indication of the serial recommendations and warnings issued to Signal concerning the dilapidated condition of the drydock summarized *supra*.  Straus Decl. Ex. 3, Heller Report at 8.  The Heller Report also lists a possible loss of the drydock as a "Maximum Foreseeable Loss," one which has an "extremely low probability and frequency [of occurrence] based on previous industry experience."  Straus Decl. Ex. 3, Heller Report at 36-37; Morano Decl. ¶8.  Based upon such a report, Mr. Morano had no reason to suspect the dilapidated condition of the drydock and thus no duty to seek further information from Signal.

Moreover, the unsupported statement in the Heller Report that loss of the drydock was an extremely low probability was objectively false given the repeated, consistent assessments by well-respected independent marine engineers and surveyors that the drydock was (i) leaking heavily, (ii) riddled with holes and its outer shell significantly wasted and thinned, and (iii) needed immediate renewal of multiple surfaces for continued safe operation.  As set forth by Mr. Morano, the information withheld from Max Specialty as summarized above would have been material to his decision whether to issue the policy, attempt to exclude the drydock from coverage if Signal would so accept, or cancel the policy once issued.  Morano Decl. ¶10-12.

Thus, the conclusion that Signal concealed material information when seeking insurance coverage from Max Specialty is inescapable.[4]

Furthermore, Signal personnel admit, *inter alia*, (i) that there were wastage holes in the bottom of the pontoons, (ii) that it never complied with the serial admonitions from multiple experienced marine surveyors and engineers – one of which Signal lauds in the Joint MOL as "experienced marine surveyors"[5] -- to renew or replace the pontoons, and (iii) were concerned over Signal's drydock maintenance program due to the fact that "the dock was getting old, [and] the skin was getting thin."  Statement of Uncontested Facts  at ¶39, 49, 50, 54.  Moreover, between 2007 and 2009, Signal only replaced (i) 8.6% of the pontoon decks and (ii) 0.1% of the pontoon bottoms and side shells, a small fraction of the amount recommended by Heger in his "extremely thorough and detailed condition surveys." Straus Decl. Ex. 25 at 33-4.  Signal did not replace any of the 14,812 sq. ft. of steel in the wing walls as recommended by Heger.  *Id.* at 34.  Overall, only 17.4% of the 3,500,000 pounds of steel which Signal itself, in the Dry Dock Facility Study, indicated needed to be replaced was actually replaced between 2003 and 2009.  *Id.*

After reviewing the numerous reports concerning the dilapidated condition of the drydock and the serial recommendations to repair it, as well as drydock maintenance records, Captain Michael A. Jacobs, a marine surveyor with over forty (40) years experience, concluded, *inter alia*, that:

> Signal's decision to continue operating the drydock without performing the extensive specified renewals and repairs, including

---

[4] Signal's reference to the apparent fact that Westchester has not sought to void the policy it issued to Signal is inapposite.  An excess carrier may make conduct its own investigations and is entitled to make its own coverage determinations.  *See, e.g., American Home Assur. Co. v. International Cas. Co.*, 90 N.Y.2d 433, 443 (1997).
[5] Joint MOL at 13.

9

>either replacing the pontoons with new pontoons or self-docking and repairing the existing pontoons was imprudent and significantly increased the likelihood of a 'major loss event' occurring in the short term as recognized by Signal.

*Id.* at 35.

The record is crystal clear that Signal was not following the recommendations of "experienced marine surveyors" which warned that the stated repairs were needed to continue the safe operation of the drydock in the short term and extend its life. The fact that this information was withheld from Max Specialty is unimpeachable.

Moreover, the $13,600,000 value for the drydock was contained in a report from the same "experienced marine surveyors," DLS, which, since 2005, advised Signal as to the drydock's dilapidated condition. Critically, less than three (3) months before the report upon which Signal allegedly relied for the $13,600,000 value, the same surveyors admonished Signal directly – not its financers – that, by April, 2009 – three (3) months after Max Specialty issued the policy to Signal and four (4) months before the drydock sank – all of its pontoons needed to be self-drydocked for renewal or repair. Straus Decl. Ex. 18. This information was not provided to Max Specialty. As discussed above, Signal admits it never complied with this recommendation from these "experienced marine surveyors." Thus, there is no reasonable dispute that Signal misrepresented the condition of the drydock to Max Specialty.[6]

For the foregoing reasons, there is no issue of material fact precluding partial summary judgment for Max Specialty voiding the Max Specialty Policy *ab initio*.

---

[6] Signal again attempts to distort the record by referring to the report prepared by CSL North America dated February 26, 2010. This report is inherently unreliable given the information not disclosed concerning the dangerously dilapidated condition of the drydock as it was prepared *after* the drydock sank and was still on the water bottom, and thus this surveyor was expressly unable to survey the drydock. Doc. No. 229-47 at 1. The report was expressly based upon a previous survey and discussions with Signal personnel, who evidently never disclosed the dangerously dilapidated condition of the drydock to the surveyor. *Id.* at 1, 2.

C.  **The "Concealment, Misrepresentation or Fraud" Provision**

While Signal argues that the "Concealment, Misrepresentation or Fraud" provision in the Policy controls, Mississippi courts have applied Mississippi common law concerning misrepresentation even in the face of such provisions. *See, e.g., Azlin*, 2012 U.S. Dist. LEXIS 137689.  Thus, Max Specialty need not prove Signal intentionally concealed or misrepresented facts when seeking insurance coverage from it.

Nevertheless, Max Specialty respectfully submits that even under such provision the record clearly substantiates its claim for rescission of the Max Specialty Policy.  In Mississippi, a policy may be voided under a "concealment" clause where the insured's statements were false, material, and knowingly and willfully made.  *See, e.g., McCord v. Gulf Guar. Life Ins. Co.*, 698 So. 2d 89, 92 (Miss. 1997); *Hall v. State Farm Fire & Cas. Co.*, 937 F.2d 210, 214 (5th Cir. 1991); *Azlin*, 2012 U.S. Dist. LEXIS 137689, 26.   An insurer need only prove breach of a concealment clause by a preponderance of the evidence.  *McCord*, 698 So. 2d at 92; *Hall*, 937 F.2d at 214; *Azlin*, 2012 U.S. Dist. LEXIS 137689, 26.  Mississippi takes a broad view of materiality when construing such clauses.  *Azlin*, 2012 U.S. Dist. LEXIS 137689, 26 (citing *Edmiston v. Schellenger*, 343 So. 2d 465, 466 (Miss. 1977).  A fact is material if it "enables the Company to possess itself of all information as to other sources and means of knowledge of facts material to the insurer's rights." *Azlin*, 2012 U.S. Dist. LEXIS 137689, 26 (internal quotation marks omitted).

The numerous facts set forth above also prove that Signal knowingly and willfully withheld material information from Max Specialty:

- Signal's admissions that it knew of and ignored the serial admonitions summarized above *ad nauseum* to carry out immediate, critical repairs to the drydock;

11

- Signal proffered a report indicating a favorable overview of its properties while withholding the abundant information it concedes was in its possession indicating a material risk of imminent catastrophic failure of the drydock; and

- Mr. Morano's testimony and Declaration that had such information been disclosed to Max Specialty prior to issuance of the Policy, Max Specialty would have either declined to bind coverage, or offered coverage that expressly excluded claims arising out of the drydock, because the full picture regarding the condition of the drydock, as revealed in the many engineer reports discussed in the following paragraphs, portrayed a material risk of imminent catastrophic failure (SUF ¶12; Morano Decl. ¶10).

For the foregoing reasons, there is no reasonable dispute that Signal knowingly and willfully proffered favorable information while withholding material information concerning the dangerously dilapidated condition of the drydock from Max Specialty.[7]  There thus is no issue of material fact precluding entry of summary judgment for Max Specialty voiding the Max Specialty Policy *ab initio*.[8]

### D. Signal Misstates the Factual Record Concerning the Testimony of Max Specialty Underwriter James F. Morano, III

Signal seeks to skew the record in a desperate attempt to demonstrate that Max Specialty "was provided with all the information" it needed to underwrite the Max Specialty Policy.  Joint MOL at 14.  Mr. Morano testified that he came to find out after the loss that the Heller Report constituted a "rosy" report of the overall condition of Signal's properties.  Straus Decl. Ex. 4 at 87.  He further testified that Signal misrepresented facts concerning condition of the drydock to

---

[7] The conclusory statements in the Affidavit of Christopher Cunningham and the deposition testimony of (i) former Signal risk manager Lisa Spears and (ii) Joyce Johnson (employed by Willis, Signal's insurance broker) submitted by Signal in support of its motion simply do not constitute evidence that Signal never intended to or actually concealed or misrepresented any facts.  Resolution of these issues will turn on the facts and the law as discussed herein.

[8] Under either Mississippi common law or the Policy, Max Specialty need not prove Signal committed fraud in seeking coverage to void the policy *ab initio*.

Max Specialty because, while the Heller Report gave Signal's assets an "above average" grade, Signal withheld information contained within several other reports which "gave a far less rosy view" of the drydock's condition. Straus Decl. Ex. 4 at 85-86. The Heller Report indicated that Signal's facilities represented a favorable risk, however Max Specialty found out after the fact that the drydock was in "a deteriorating, unsafe, unseaworthy condition and there was documentation to that effect that was not provided to [Max Specialty]." Straus Decl. Ex. 4 at 91. Mr. Morano further testified that "Signal had other reports in their possession that spoke to the less than seaworthiness, the danger of using that equipment for repair work on large rigs, and [Max Specialty was] not presented that material." Straus Decl. Ex. 4 at 90. He also testified that he would have wanted Signal to provide surveys indicating the drydock's deteriorated condition and repairs that have been done. Straus Decl. Ex. 4 at 131.

Contrary to Signal's mischaracterization, Mr. Morano did not testify "specifically' that the "AFDB-5 was just one small piece ($13.6 million) of the $211 million worth of property that Signal sought to insure." Joint MOL at 14 (citing Morano Tr. at 140). The cited testimony merely reflected the fact that Signal sought to insure a total insurable value of $211 million. Straus Decl. Ex. 4 at 140. This constitutes a brazen distortion of the record, especially in light of Signal's counsel's efforts, at the deposition, to characterize the drydock as follows:

> Q. [by David Bland, Esq., counsel for Signal]: So at that facility, at Martin Luther King Boulevard, the highest value by far was the drydock, wasn't it? . . .
>
> Q. Did you – have you ever come to understand that the only purpose of that facility at Martin Luther King Boulevard was for the drydock? . . .
>
> Q. [by Mr. Bland]: Were you aware that the very reason that that yard existed was because of the AFDB-5 drydock? . . .

13

> Q. Did Mr. Heller in his report, do you recall whether or not in that report it was reflected that the AFDB-5 was a critical part of the Port Arthur facility?

Straus Decl. Ex. 4 at 40.[9]

## CONCLUSION

For the reasons set forth above, it is respectfully requested that the Court issue an Order granting Max Specialty's Signal's Motion for Partial Summary Judgment voiding the Max Specialty Policy *ab initio*, together with such other relief as this Court deems appropriate.

Dated: April 17, 2013
       Hawthorne, New York

                                 Respectfully Submitted,

                                 TRAUB LIEBERMAN STRAUS
                                 & SHREWSBERRY LLP

                                 By:   /s/ Stephen D. Straus
                                          Stephen D. Straus (SS 6183)
                                          Jeremy P. Monosov (JM 0089)

---

[9] Mr. Morano also did not testify that "the individual pieces of property were not really Mr. Morano's concern in underwriting the" Max Specialty Policy." Joint MOL at 14. *See* Straus Decl. Ex. 4 at 42.