UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
FIREMAN'S FUND INSURANCE COMPANY,
ONE BEACON INSURANCE COMPANY,
NATIONAL LIABILITY AND FIRE INSURANCE
COMPANY and QBE MARINE & ENERGY
SYNDICATE 1036,                                        10-cv-1653 (JPO) (JLC)

                                    Plaintiffs,


                – against –


GREAT AMERICAN INSURANCE COMPANY OF
NEW YORK, MAX SPECIALTY INSURANCE
COMPANY and SIGNAL INTERNATIONAL, LLC,

                                    Defendants.
------------------------------------------------------------------X

### MAX SPECIALTY INSURANCE COMPANY'S LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS

Defendant Max Specialty Insurance Company ("Max Specialty"), by its attorneys, Traub Lieberman Straus & Shrewsberry LLP, as and for its Local Rule 56.1 Statement of Uncontested Facts: (1) in opposition to Signal International, LLC's ("Signal") motion for partial summary judgment dated March 19, 2013; and (1) in support of its cross-motion granting partial summary judgment in favor of Max Specialty (i) declaring Max Specialty insurance policy no. MAX2XP0004029, issued to defendant Signal International, LLC ("Signal"), void *ab initio*, (ii) ordering Signal to return the $2,920,000 paid by Max Specialty to Signal for loss under the policy, and (iii) awarding Max Specialty the fees and costs, including attorney's fees, it has incurred in litigating this action,   states as follows:

1.      Max Specialty issued property policy No. MAX2XP0004029, providing Commercial Property – Excess of Loss insurance to Signal International, LLC ("Signal") for the

policy period of January 30, 2009 to January 30, 2010 ("the Policy"). Exhibit 2 to the Declaration of Stephen D. Straus dated April 17, 2013 ("Straus Decl.").

2.     As part of the application process for the Policy, Signal's broker, Willis of Alabama, Inc. ("Willis), provided certain materials concerning the risk to be insured, including: (1) a Statement of Values regarding Signal's physical assets, dated January 16, 2009; and (2) a Property Risk Inspection Report prepared by Stephen Heller & Associates, Inc., dated January 2009 ("Heller Report").   Straus Decl. Ex. 3.

3.     Max Specialty underwriter James F. Morano, III, reviewed the Statement of Values and the Heller Report at the time they were presented by Signal's broker, to determine whether Max Specialty would agree to issue the Policy in the excess layer immediately above a primary property insurance policy issued to Signal by Westchester Surplus Lines Insurance Company.  Declaration of James F. Morano, III, dated April 16, 2013 ("Morano Decl."), ¶5.

4.     According to the Statement of Values, the AFDB-5 drydock (hereinafter "AFDB-5" or "drydock"), located at a Signal facility in Port Arthur, Texas,[1] was the highest value asset to be insured, with a stated Actual Cash Value of $13,600,000.  Straus Decl. Ex. 3, Statement of Values at TRIPM 0072; Morano Decl. ¶6.

5.     According to the Statement of Values, as of January, 2009, when Policy was issued to Signal, the assets insured under the Policy were almost evenly split between Mississippi and Texas.  *See* Straus Decl. Ex. 3, Statement of Values at TRIPM 0072.

6.     The Heller Report was the only document provided to Max Specialty concerning the condition of Signal's physical property to be insured.  Morano Decl. ¶7.

7.     The Heller Report stated, *inter alia*, that "[o]verall, the Signal International facilities reviewed are rated as an 'Above Average' risk as it relates to insurance property and

---

[1] The AFDB-5 sank at its berth on August 20, 2009.

boiler machinery coverage."  Straus Decl. Ex. 3, Heller Report at 8; Morano Decl. ¶7.  The Heller Report defines "Above Average" as meeting "acceptable standards including some industry best practices."  Straus Decl. Ex. 3, Heller Report at 8; Morano Decl. ¶7.

8.      The Heller Report also characterized the risk of the AFDB-5 becoming a total loss as having an "extremely low probability and frequency [of happening] based on previous industry experience."  Straus Decl. Ex. 3, Heller Report at 36-7; Morano Decl. ¶8.

9.      Having made such representations, the Heller Report provides no indication of the serial recommendations and warnings issued to Signal concerning the dilapidated condition of the drydock as set forth below.  Straus Decl. Ex. 3, Heller Report.

10.     Mr. Morano relied on the Heller Report, which gave a "favorable overview of the condition of [Signal's] properties," in deciding to issue the Policy.  Straus Decl. Ex. 4 at 32, 40.

11.     It was not until after the discovery process began in this lawsuit that numerous reports and communications concerning the dilapidated condition of the AFDB-5, prepared prior to the Heller Report, were disclosed to Max Specialty.  None of these materials, or the information contained therein, were provided to Max Specialty prior to issuance of the Policy in January, 2009, or before the AFDB-5 sank on August 20, 2009.  Morano Decl. ¶9.

12.     Had the conflicting information regarding the condition of the drydock been provided to Max Specialty before the Policy was issued, Mr. Morano would have either declined to bind coverage, or offered coverage that expressly excluded claims arising out of the drydock, because the full picture regarding the condition of the drydock, as revealed in the many engineer reports discussed in the following paragraphs, portrayed a material risk of imminent catastrophic failure.  *Id.* ¶10.

13. The information and facts discussed in paragraphs 14-43 of Mr. Morano's Declaration would have been material to Max Specialty's decision to issue the Policy, had such information been provided. The failure of Signal to provide such information with its insurance submission induced Max Specialty to issue the Policy, which would not have been issued had such information been originally disclosed. *Id.* ¶11.

14. Moreover, had the conflicting information regarding the condition of the drydock been provided to Max Specialty after issuance of the Policy, but prior to the loss of the AFDB-5, Max Specialty could and would have exercised its right to cancel the Policy. *Id.* ¶12.

15. In this regard, the Policy contains, *inter alia*, the following Cancellation provisions:

> A. Cancellation
>
>       *      *      *
>
> 2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
>
>> a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
>>
>> b. 30 days before the effective date of cancellation if we cancel for any other reason.

Ex. 2 at WILLIS00710.

> 8. CANCELLATION:
>
> This insurance may be cancelled by the Insured at any time by written notice or by surrender of this Policy. This insurance may also be cancelled by or on behalf of the Insurer(s) by delivering to the Insured or by mailing to the Insured . . . written notice stating when, not less than thirty (30) days thereafter, the cancellation shall be effective.

*Id.* at WILLIS00715. Morano Decl. ¶12.

16.     The numerous non-disclosed engineer reports contained information that conflicted with the description of the drydock in the Heller Report included in the application submission to Max Specialty.  In particular, the non-disclosed materials, discussed below in chronological order, depicted the drydock as posing a significant risk of imminent catastrophic failure. *Id.* ¶13.

17.     ABS Worldwide Technical Services, Inc., issued a report dated June 21, 1989 ("ABS Report").  Straus Decl. Ex. 5.  Neither the report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  *Id.* ¶14.

18.     The ABS Report states among other things, that the plating of the AFDB-5's support pontoons was "wasted," and "thinned" and contained corrosion holes.  Straus Decl. Ex. 5 at 14; Morano Decl. ¶15.  The ABS Report further stated that, to maintain the AFDB-5 in operating condition, the steel plating of the wing walls and pontoon decks, which were wasted in excess of 25% from original thickness, had to be replaced.  The ABS Report further stated that "doublers," expediently used to repair portions of the pontoon decks, were insufficient and needed to be renewed with deck plating.  Straus Decl. Ex. 5 at 15; Morano Decl. ¶15.

19.     Heger Dry Dock, Inc. ("Heger"), prepared a report regarding the condition of the drydock dated July 9, 2001 ("2001 Heger Report").  Straus Decl. Ex. 6.  Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶16.

20.     The 2001 Heger Report concluded, among other things, that the pontoons supporting the drydock were leaking and that the pontoon decks were in poor condition and needed to be renewed.  Straus Decl. Ex. 6 at Page 9 of 10; Morano Decl. ¶16.

21.     Heger prepared an Appraisal of Floating Dry Dock No. 1, dated December 9, 2002 ("Heger Appraisal").  Straus Decl. Ex. 7.  Neither the Heger Appraisal nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶17.

22.     The Heger Appraisal states, among other things, that 3,500,000 pounds of steel were needed to replace the pontoon deck to make the drydock operational.  *See* Straus Decl. Ex. 7 at Page 3 of 4; Morano Decl. ¶18.  This would also reduce the value of the drydock to $800,000 assuming it was moved outside the United States, or to a negative (-) $1,150,000 if it remained in the United States.  Straus Decl. Ex. 7 at Page 4 of 4; Morano Decl. ¶18.

23.     On January 29, 2003, Friede Goldman Offshore Texas, LP, which operated the AFDB-5 by agreement with the Port Arthur Navigation District Industrial Development Corporation ("PANDIDC"), assigned its rights to operate the drydock to Signal.  *See* Straus Decl. Ex. 8.

24.     ABS also prepared a Drydock 'AFDB-5' Report of Maintenance Program Audit dated March 12, 2003 ("March 2003 ABS Report").  Straus Decl. Ex. 9.  Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶19.

25.     The March 2003 ABS Report states, among other things, that Signal was "only marginally keeping up with the rapidly increasing rate of overall deterioration" of the AFDB-5.  Straus Decl. Ex. 9 at 2; Morano Decl. ¶20.  It lists a litany of serious physical deficiencies impacting the immediate life of the AFDB-5, including: "fractures in the heavily wasted, brittle, bottom plating;" continued leaking in Pontoon "H;" and leaking deck platings caused by "wastage/pitting."  Straus Decl. Ex. 9 at 2; Morano Decl. ¶20.

26.     The March 2003 ABS Report also noted that "within the last year more than a hundred doubler plates have been welded over severely wasted/holed original main deck platings," and that "wasted holes and/or fractures continue to appear on a very frequent basis." Straus Decl. Ex. 9 at 3; Morano Decl. ¶21.

27.     Based on an engineering assessment, the March 2003 ABS Report contains the following conclusions:

> In January of 2000 owners and operators were advised of our concern about the advanced state of pontoon shell and deck plating deterioration and our recommendation for drydocking or outright renewal of the pontoons.  At that time we estimated that without such maintenance the drydock could conceivably become unserviceable well within the next 5 years, assuming the approved preventive maintenance program continued.  Since then operators [including Signal] have made no apparent efforts toward removing the pontoon sections for drydocking and permanent hull repairs. . . .
>
> *          *          *
>
> The impressed current cathodic protection system continues to be inoperative and the sacrificial anodes in ballast tanks are said to have largely wasted away some time ago.  While we are certain that these situations will have some detrimental effect on the life expectancy of pontoon hull platings we have no way to actually quantify the amount of life expectancy that will be lost.

Straus Decl. Ex. 9 at 3; Morano Decl. ¶22.

28.     Signal prepared a Dry Dock Facility – Staff Study dated April 16, 2003.  Straus Decl. Ex. 10.  Neither the document nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶23.

29.     In the Dry Dock Facility- Staff Study, Signal acknowledged that structurally integral metal plating was in poor condition and that if Signal continued to operate *status quo ante*, it could expect side and bottom plating on the drydock to last just 3-5 years.  Straus Decl. Ex. 10 at 1-2; Morano Decl. ¶24.  The drydock's cathodic protection system also remained non-operational.  Straus Decl. Ex. 10 at 2; Morano Decl. ¶24.

30.     Signal also estimated in the Dry Dock Facility – Staff Study that it would cost $21,880,000 to renew all main deck and bottom plating and quoted the municipal landlord, Port of Port Arthur, as commenting that the drydock "is too much potential liability."  Straus Decl. Ex. 10 at 2, 3; Morano Decl. ¶25.

31.     On September 17, 2003, ABS prepared a further Drydock 'AFDB-5' Report of Maintenance Program Audit ("September 2003 ABS Report").  Straus Decl. Ex. 11.  Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶26.

32.     The September 2003 ABS Report stated, among other things, that support Pontoon H was severely leaking at the time a drilling rig was being drydocked for repairs.  It further noted the abnormal need to operate ballast pumps every two (2) hours to keep up with water flowing into the support pontoon. Straus Decl. Ex. 11 at 4; Morano Decl. ¶27.  It was also reported that all supporting pontoons were leaking, with pontoons E, G and H taking on the greatest amounts of water.  Straus Decl. Ex. 11 at 4; Morano Decl. ¶27.  Deck fractures as a result of buckling due to severe wastage of metal plating were also noted, as were various inoperative electrical systems that needed immediate attention.  Straus Decl. Ex. 11 at 4; Morano Decl. ¶27.

33.     The September 2003 ABS Report included these further engineering observations and conclusions:

> To emphasize previously reported information, in January of 2000 owners and operators were aware of our concerns about the advanced state of pontoon shell and deck plating deterioration, as well as our recommendations for drydocking, or outright renewal, of the pontoons.  At that time we estimated that without such maintenance the drydock could conceivably become unserviceable well within the next 5 years, even if the approved maintenance program continued to be active.  We are now about halfway

through that estimated period of life expectancy.  Since January of 2000, no major, permanent, hull plating repairs have been accomplished. . . .

Based on findings as set forth herein above, even with the repairs and maintenance that have been done, the overall rate of drydock deterioration appears to be progressing at an ever increasing rate. In the opinion of the undersigned, the drydock is now well past the point where a major restoration effort would be economically practical. . . .

[B]ecause permanent repairs have not been accomplished, as previously recommended, deck platings are failing due to excessive wastage, much of the watertight compartmentation has been lost due to excessive bulkhead wastage and hull shell platings are failing due to excessive wastage, with leaks now occurring in greater number and frequency than ever before.

At time of this survey, due largely to excessive leakage in 'H' pontoon, it appeared that *unsafe drydock operations* were being conducted and, based on information reported to the undersigned, it would seem that it is the Operator's [Signal's] intention to continue with same.  According to Mr. White and Mr. Corcoran it is presently the shipyard's intention to drydock two (2) additional drilling rigs before effecting necessary hull and ballast pump repairs on 'H' pontoon, or repair leakage in 'E' and 'G' pontoons.

*Given the conditions found, it is highly recommended that drydock Owners advise Operators not to conduct additional drydockings until substantial hull repairs are made to 'H' pontoons and the repairs are verified.*  Additional priority should be given to pumping out pontoons 'G' and 'E' for inspection and repair as necessary, to substantially reduce the amount of leakage now present in those units.  Reportedly, all pontoons are presently experiencing some leakage and are in need of repair.

Straus Decl. Ex. 11 at 5-6 (emphasis in original); Morano Decl. ¶28.

34.     In 2005, Signal purchased the drydock from PANDIDC by virtue of a Conditional Bill of Sale ("BOS").  *See* Straus Decl. Ex. 12.

35.     Dufour, Laskay & Strouse ("DLS") prepared Survey Report (No. 05-3459), dated December 22, 2005 ("December 2005 DLS Survey") concerning the physical condition of the drydock.  *See* Straus Decl. Ex. 13.   Neither this report nor the information contained therein

were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.
Morano Decl. ¶29.

36.     The  December 2005 DLS Survey noted, among other things, the following with
respect to the condition of the AFDB-5:

> At the time of inspection, the vessel was under load with a drill rig aboard.
>
> The vessel had significant water in most compartments and that water content was being monitored by the computerized monitoring system observed by a dock master and requires pumping and trimming every four hours.
>
> Due to the fact that the drydock must be pumped every four hours it is indicative of some wastage holes in the bottom. . . .
>
> The deck plating was noted to have significant doubler plates where plating has either wasted or separated from internal framing due to shear stresses aboard the drydock.  At the time of inspection, there was noted to be a 12' long tear in the plating extending along a transverse frame . . . .

Straus Decl. Ex. 13 at 26; Morano Decl. ¶30.

37.     DLS also prepared Survey Report (No. 06-35553), dated December 19, 2006
("December 2006 DLS Survey").  *See* Straus Decl. Ex. 14.   Neither this report nor the
information contained therein were provided to Max Specialty prior to issuance of the Policy, or
before the AFDB-5 sank.  Morano Decl. ¶31.

38.     The December 2006 DLS Survey states, among other things, the following with
respect to the deteriorated condition of the drydock:

> At the time of inspection, the vessel was afloat and pumped out as much as possible.  At the time of inspection, there were divers present and those divers were patching holes or deficient areas of the bottom of the drydock, primarily in way of compartment C, compartment H and other areas noted to have some form of deficiency.

The vessel's water content is monitored by a computerized monitoring system and observed by a dock master and requires pumping and trimming every four hours.

Due to the fact that the drydock must be pumped every four hours, it is indicative of some wastage holes in the bottom and/or some deficiencies requiring constant attention.

*        *        *

The deck plating was noted to have significant doubler plates where plating has either wasted or separated from internal framing due to shear stresses aboard the drydock.  At the time of inspection, there was noted to be a 12' long tear in the plating extending along a transverse frame and, reportedly, this will be fitted with a proper doubler in the near future.  Furthermore, there was numerous 6" to 1' tears in the deck plating . . . .

Straus Decl. Ex. 14 at 27; Morano Decl. ¶32.

39.    Signal employee Patrick Cates agreed that wastage holes existed in the drydock bottom.  Straus Decl. Ex. 15 at 55.

40.    Heger prepared a report dated May 18, 2007 ("May 2007 Heger Report") concerning the condition of the wing walls of the drydock.  *See* Straus Decl. Ex. 16.  Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶33.

41.    The engineering analysis contained in the May 2007 Heger Report states, in pertinent part, the following:

The wing walls are in fair to poor condition and are in need of repairs before continuing with their use.  Almost all areas of the wing ballast tanks and safety decks have lost their protective coatings (paint).  In the majority of areas, the steel has corroded to the point where significant additional corrosion cannot be tolerated.  In some areas, the corrosion is extensive and steel must be renewed.  We estimate the approximate weight of this required steel renewal to be 460,955 pounds.  It is therefore imperative that the areas with extensive corrosion be repaired and the entire wing ballast tank structure and safety deck be blasted to bare metal and

11

recoated before the wing walls can be placed back into service with the new pontoons.

Any attempt to re-use the wing walls with the new pontoons without painting the internal structure of all compartments (i.e. repairing the extensive corrosion but not recoating the other areas) will result in an extremely limited useful life for the wings.

If the areas of heaviest corrosion are repaired as suggested and all the ballast compartments and safety decks are recoated with a high quality coating system the wing walls should have an expected useful life of 10 to 15 years.

Straus Decl. Ex. 16 at Page 31 of 31; Morano Decl. ¶34.

42.     Heger prepared a report dated June 28, 2007 ("June 2007 Heger Report") concerning condition of the support pontoons of the drydock.  *See* Straus Decl. Ex. 17.  Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶35.

43.     The June 2007 Heger Report states, among other things, that the lower and side shell and pontoon deck plating had thinned and in some places was more than 50% wasted. Straus Decl. Ex. 17 at Page 2 of 27 – Page 22 of 27; Morano Decl. ¶36.   The report also noted thinning of the flanges on the stiffeners to a "knife's edge," as well as buckling of certain vertical T stiffeners, indicating overload.  Straus Decl. Ex. 17 at Page 2 of 27 – Page 22 of 27; Morano Decl. ¶36. There was also extensive rust noted on the pontoons.  Straus Decl. Ex. 17 at Page 2 of 27 – Page 22 of 27; Morano Decl. ¶36.

44.     The June 2007 Heger Report further stated that "the pontoons are in poor condition and are in need of extensive repairs before continuing with their use."  Straus Decl. Ex. 17 at Page 23 of 27; Morano Decl. ¶37.  Heger identified numerous repairs that were required to continue using the drydock in the short term, including, among other things, replacement of the entire pontoon deck.  These repairs would require a recommended replacement of 2,920 long

tons of steel.  Straus Decl. Ex. 17 at Page 23 of 27 – Page 25 of 27; Morano Decl. ¶37.   Even if

Signal performed these necessary repairs, it would have allowed Signal to operate the drydock

for a period of just 3 to 5 years, at most, while still requiring significant ongoing maintenance.

Straus Decl. Ex. 17 at Page 25 of 27; Morano Decl. ¶37.

  45. It was also noted in the June 2007 Heger Report that Signal personnel reported

abnormal operational problems with the drydock, including, among other things, the necessity to

regularly pump ballast tanks due to leakage; significant leakage in every machinery compartment

requiring temporarily plugs so the pumps could keep up with the inflow volume; an out-of-date

and faulty power distribution system; a main power cable that was 20 years old and had been

patched numerous times; and an emergency generator that could only run one (1) dewatering

pump, which was not enough to keep up with leakage inflow should be power be lost.  Straus

Decl. Ex. 17 at Page 22 of 27 – Page 23 of 27; Morano Decl. ¶38.

  46. The engineers thus concluded in the June 2007 Heger Report that:

> Pontoon sections E, F, G and H are in very poor condition
> throughout and need complete replacement if long term use is to be
> considered.
>
> Although the internal structure of pontoon sections A, B, C, and D
> is in better condition, significant other portions of these sections
> are in need of replacement.  (At least 900 tons of steel per section)
> The portions in need of replacement include the pontoon deck, hull
> shell, machinery deck, crew deck, access corridors, localized areas
> of bulkheads and mechanical and electrical equipment.   It is
> obvious that the cost to carry out this renovation would far exceed
> building complete new pontoons.
>
> It is our recommendation that Signal International proceed with
> obtaining new pontoons for use with the existing wing walls that
> will be renovated as described in our previous report.

Straus Decl. Ex. 17 at Page 27 of 27; Morano Decl. ¶39.

47.     DLS prepared Survey Report (No. 0158-16N07), dated October 19, 2007 ("October 2007 DLS Survey").  *See* Straus Decl. Ex. 18.  Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank.  Morano Decl. ¶40.

48.     The October 2007 DLS Survey Report largely set forth the same findings concerning the teetering condition of the drydock but added, among other things, the following recommendations to merely keep it afloat in the short term:

> 1.     While this vessel is in operation and while the subject vessel is idle, the tanks are to be continuously monitored as Signal International personnel are presently doing in order to maintain this vessel in a stable operational condition.
>
> 2.     All known deficiencies in way of the hull [are] to be fitted with doublers or plate to be cropped and part renewed as found necessary.
>
> 3.     As soon as practical within the succeeding eighteen months from date of survey, the hulls [are] to be separated into individual units and each individual unit [is] to be drydocked on the remaining drydock hull section and once drydocked, deficiencies in way of the bottom and sides of the hull [are] to be either renewed and/or repaired in order to render this vessel in good stable operating condition and provide a life extension to the drydock.  Subsequently, the units are to be swapped and the other unit[s are] to be drydocked with the same recommendation pertaining to [them].

Straus Decl. Ex. 18 at 5; Morano Decl. ¶41.

49.     Signal personnel admit that it never complied with the recommendations of DLS, which Signal lauds in its motion as "experienced marine surveyors."  Straus Decl. Ex. 15 at 55-6.

50.     Indeed, Mr. Cates was concerned over the inadequacy of Signal's maintenance program, as "the dock was getting old, the skin was getting thin."  Straus Decl. Ex. 19 at 234.

51.     On May 13, 2008, Signal sent an e-mail to Heger concerning a proposal to "extend the life of the AFDB-5" by removing 2 support pontoons constituting the base of the

drydock and reconfiguring the remaining support pontoons.  *See* Straus Decl. Ex. 20; Straus Decl. Ex. 21 at 55-56.  Neither this e-mail nor the information contained therein were provided to Max Specialty prior to issuance of the Max Specialty Policy or the AFDB-5's sinking. Morano Decl. ¶42.

52.     On May 14, 2008, Heger responded with his comments concerning the proposal. *See* Straus Decl. Ex. 22; Straus Decl. Ex. 21 at 56-58.  Neither this e-mail nor the information contained therein were provided to Max Specialty prior to issuance of the Max Specialty Policy or the AFDB-5's sinking.  Morano Decl. ¶43.  In the e-mail, Heger indicates:

> As you know it is our opinion that all the sections need major repair work before they can be safely used.  Any designs we perform will be provided with the understanding the dock will nor [sic] be operated with our 'blessing' until all sections are repaired to our satisfaction.

53.     Robert Heger, a marine engineer with over thirty (30) years' experience working with drydocks, testified as follows:

> Q.      And you go on to say, [']Any designs we perform will be provided with the understanding . . . .['] Why did you say that, sir?
>
> A.      I said that because I didn't want them to get the impression that by putting it into this three-by-three mode that they could just go and use the drydock without any – without doing those repairs. We didn't want – again, we didn't want to be involved with the drydock, if they opted to do it without repairing it.
>
> Q.      Why is that, sir?
>
> A.      Because, in our opinion, the dock was not structurally adequate in the condition it was in.
>
> Q.      In other words, they shouldn't use it for lifting drill rigs or other vessels?
>
> A.      Correct.

15

Straus Decl. Ex. 21 at 57-58.

54.     Signal personnel admitted that Signal never renewed the pontoon decks as mandated by Heger.  *See* Straus Decl. Ex. 23 at 208; Ex. 24 at 77-79, 102.

55.     On August 20, 2009, shortly after pontoon H was removed from the drydock as part of the reconfiguration to a seven (7) pontoon configuration, the drydock sank.

56.     Captain Michael A. Jacobs, a marine surveyor with over forty (40) years experience, prepared a report dated December 14, 2012, concerning the condition and maintenance of the AFDB-5 and the serial recommendations made by the surveyors and engineers set forth above.  Straus Decl. Ex. 25.

57.     Captain Jacobs reviewed the numerous reports concerning the dilapidated condition of the drydock and the serial recommendations to repair it, as well as maintenance records for the drydock.  *Id.*

58.     Captain Jacobs concluded that, between 2007 and 2009, Signal only replaced (i) 8.6% of the pontoon decks and (ii) 0.1% of the pontoon bottoms and side shells as recommended by Heger in his "extremely thorough and detailed condition surveys."  *Id.* at 33-4.  Signal did not replace any of the 14,812 sq. ft. of steel in the wing walls as recommended by Heger.  *Id.* at 34. Overall, only 17.4% of the 3,500,000 pounds of steel which Signal itself, in the Dry Dock Facility Study, indicated needed to be replaced was actually replaced between 2003 and 2009. *Id.*

59.     Captain Jacobs concluded, *inter alia*, that:

> Signal's decision to continue operating the drydock without
> performing the extensive specified renewals and repairs, including
> either replacing the pontoons with new pontoons or self-docking
> and repairing the existing pontoons was imprudent and
> significantly increased the likelihood of a 'major loss event'
> occurring in the short term as recognized by Signal.

The actual steel replacement carried out by Signal was inconsequential as compared to the recommendations from Heger, and did not extend the life of the drydock in any significant way.

Signal's approach to patching leaks by applying doublers (temporary repairs) rather than inserts (permanent repairs) did not restore the overall bending strength of the pontoon[s] nor prevent additional cracks from forming on a regular basis. . . .

In summary, it is my considered opinion that Signal was made aware of significant deficiencies regarding the condition of the drydock over a period of several years by competent marine professionals.  These professionals acted independently of each other but they observed the same deteriorating conditions, expressed the same concerns and made similar recommendations.  Signal chose not to follow these very critical recommendations.  The failure to carry out these recommendations exposed the drydock to a risk of a major loss event.

*Id.* at 35.

60.     At the time Signal sought and received insurance coverage from Max Specialty in January, 2009, Signal's principal place of business was located in Mississippi. Straus Decl. Ex. 26; Ex. 27 ¶3.

61.     The Policy was delivered to Signal in Mississippi.  Straus Decl. Ex. 2 at WILLIS00697.

Dated:     Hawthorne, New York
           April 17, 2013

                    TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP


           By:     /s/ Stephen D. Straus
                   Stephen D. Straus (SS 6183)
                   Jeremy P. Monosov (JM 0089)
                   Mid-Westchester Executive Park
                   Seven Skyline Drive
                   Hawthorne, New York 10532
                   (914) 347-2600
                   Attorneys for Max Specialty Insurance Company