UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X          **ECF Case**
FIREMAN'S FUND INSURANCE COMPANY,
ONE BEACON INSURANCE COMPANY,                                                10 Civ. 1653 (JPO)(JLC)
NATIONAL LIABILITY AND FIRE
INSURANCE COMPANY and QBE
MARINE & ENERGY SYNDICATE 1036,

                         Plaintiffs,

        -against-

GREAT AMERICAN INSURANCE COMPANY
OF NEW YORK, MAX SPECIALTY INSURANCE
COMPANY and SIGNAL INTERNATIONAL, LLC,

                         Defendants.
-----------------------------------------------------------------X

**PLAINTIFFS' AND SIGNAL'S JOINT RESPONSES AND
OBJECTIONS TO GREAT AMERICAN INSURANCE COMPANY
OF NEW YORK'S RULE 56.1 STATEMENT OF UNDISPUTED
FACTS IN SUPPORT OF ITS MOTIONS FOR SUMMARY
JUDGMENT [DOCKET NO. 247]**

        Plaintiffs Fireman's Fund Insurance Company, One Beacon Insurance Company,

National Liability and Fire Insurance Company and QBE Marine & Energy Syndicate 1036

(herein sometimes collectively referred to as "Plaintiffs"), by their attorneys, Nicoletti Hornig &

Sweeney, and Defendant Signal International, LLC ("Signal"), by its attorneys LeBlanc Bland,

P.L.L.C., set forth below as and for their Responses and Objections to Great American Insurance

Company of New York's Rule 56.1 Statement of Undisputed Facts in Support of Its Motions for

Summary Judgment [Docket No. 247], as follows:

The Drydock

        196.   Deposition Exhibit 281 provides a perspective of the location of the Drydock

through a series of aerial photographs showing the Gulf of Mexico and Port Arthur, and

then focusing on the specific location of the Drydock along the Sabine-Neches Canal. (Cates Ex. 281, "Exhibit 1").

**RESPONSE AND OBJECTIONS**

Undisputed except Plaintiffs and Signal point out that the area where drydock AFDB-5 was located when it sank was once part of the land mass of Pleasure Island and was specifically carved out for the purpose of installing drydock AFDB-5. (SUF ¶ 31).[1]

\* \* \*

197.    Deposition Exhibit 282 shows an aerial view of the Drydock without a vessel on deck. The pontoons had letter designations and they have been labeled A – H on the photograph. Pontoon H is the pontoon that came from the AFDB-6. (Cates Ex. 282, "Exhibit 2").

**RESPONSE AND OBJECTIONS**

Undisputed.

\* \* \*

198.    Signal utilized the Drydock primarily to perform repair, maintenance, and conversion work on mobile offshore drilling units (MODU's). <u>See</u> Signal's Dockyard Vessels' Dockings, ("Exhibit 75").

**RESPONSE AND OBJECTIONS**

Disputed. There is no admissible evidence to support this statement. The referenced exhibit does not indicate what type of work was performed. Drydock AFDB-5 had been used by

---

[1] References to "SUF ¶ ___" are to the corresponding paragraph numbers in "Plaintiffs' and Signal's Joint Local Rule 56.1 Statement" [Docket No. 228].

Signal to assemble a newly constructed tension leg platform drilling rig.  (SUF ¶38).  The statement is also objected to on the ground of relevance.

* * *

199.    Deposition Exhibit 283 shows a series of aerial views with a MODU loaded on the Drydock. (Cates Ex. 283, "Exhibit 3").

**RESPONSE AND OBJECTIONS**

Disputed.  Exhibit 3 (deposition Ex. Cates 283) shows a single aerial view of drydock AFDB-5 with the rig Ocean America on it which was docked on February 5, 2009.  (Ex.14, Cates Tr. 50:3-51:20).[2]  The Ocean America, undocked on April 7, 2009, was the heaviest item Signal ever lifted in drydock AFDB-5.  (SUF ¶¶44, 45).  The statement is also objected to on the ground of relevance and materiality.

* * *

200.    When dockings take place, tugs are used to  assist with the  positioning of  the vessels within the Drydock and over the blocks upon which they will rest after the Drydock  is raised.   Tugs also are used to assist with undockings.  When performing this assist work, the tugs often will be positioned within the Drydock, as well as in the waters outside of the Drydock.  Deposition Exhibit 75 shows a series of views of tugs undocking the barge DB-3 (Meisetschlaeger  Ex. 75, "Exhibit  4") and Deposition Exhibit 74 shows the  docking  of Pontoon H on the date that the Drydock sank (Meisetschlaeger Ex. 74, "Exhibit 5").

**RESPONSE AND OBJECTIONS**

Irrelevant.

---

[2] References to "Ex. ___" are to the exhibits annexed to the Declaration of John A.V. Nicoletti, Esq. filed contemporaneously herewith.

\* \* \*

201.    When Signal took over the Drydock lease and assumed responsibility for the operation and maintenance of the Drydock in 2003, it was in poor condition and was deteriorating at an increasing rate. (Haley Ex. 14, "Exhibit 8").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 8 - ¶¶ 9 and 10 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

\* \* \*

202.    Signal knew from the time it began operating the Drydock in 2003 that the pontoons had holes in their shell plating which permitted water to leak into the ballast tanks and machinery spaces, and as a result, that it was necessary to periodically pump the tanks to keep the pontoons, and the Drydock itself, afloat and stable. (Haley Ex. 14, "Exhibit 8").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's

Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 8 - ¶¶ 9 and 10 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

203.   Since PANDIC was the owner of the Drydock, it retained ABS Consulting, Inc. to monitor the condition of the Drydock by reviewing the maintenance records and periodically surveying the Drydock.   The ABS Consulting surveyor issued reports regarding his observations and recommendations.   ABS Consulting was performing this service since at least the year 2000. (Haley Ex. 18, "Exhibit 6").

## RESPONSE AND OBJECTIONS

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 3 and 4 - ¶¶ 1, 2 and 3 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

204.   On March 12, 2003, the ABS Consulting surveyor conducted a survey of the Drydock and Signal's docking master (Corcoran) and maintenance superintendent, Homer White, were in attendance.  The ABS Consulting surveyor issued a report of his findings on March 12, 2003. (Haley Ex. 12, "Exhibit 7").

## RESPONSE AND OBJECTIONS

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 4, 5, 6 and 7 - ¶¶ 4 through 8, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

205.    Signal's records contain a Dry Dock Facility — Staff Study dated April 2003, which notes that PANDIC wants to sell the Drydock because it "is too much potential liability."  (Haley Ex. 14, "Exhibit 8".)  The Study analyzes whether Signal should purchase the Drydock or continue to lease it.  As part of the analysis Signal comments on the condition of the Drydock. It states in pertinent part that the "pontoon deck plate is in poor condition" and goes on to state that it has been able to keep the deck areas over the machinery space watertight by installing doublers and insert plates. By continuing with this approach, Signal projects that it can expect the deck plate to last 5 — 7 years, i.e., 2008-2010.  Signal goes on to state that "the side and bottom plating is in very poor condition — worse than the deck plating."  It then projects that if it continues as it is doing, adding doublers and inserts, it can expect these areas to last 3 — 5 years, i.e., 2006-2008. Signal estimated that 3.5 Million pounds of steel plate would be needed to renew the deck plating and a similar amount to renew the bottom plating, with a total cost of approximately $21 million.  In order to perform this

work, the Drydock would need to be out of operation for approximately 2 years. (Haley Ex. 14, "Exhibit 8").

**RESPONSE AND OBJECTIONS**

Irrelevant.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 8 - ¶¶ 9 and 10 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

206.    In the April 2003 Dry Dock Facility – Staff Study, after addressing the condition and expected life of the Drydock, Signal discussed the advantages and disadvantages of buying versus leasing the Drydock. Signal recognized that under its lease agreement with PANDIC, it was responsible for disposing of the Drydock when it was no longer serviceable. It noted that the useful life of the Drydock was only 3-5 years without expending major renewal costs. Ultimately, Signal concluded that it could not "economically justify the Drydock purchase as a result of the relatively short remaining useful life and extreme costs of renewals/life extension and subsequent/eventual dry-dock disposal." (Haley Ex. 14, "Exhibit 8").

**RESPONSE AND OBJECTIONS**

Irrelevant.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 8 - ¶¶ 9 and 10 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

207.    On September 16, 2003, the ABS Consulting surveyor conducted a survey of the Drydock and docking master Corcoran and maintenance superintendent White, were in attendance. The ABS Consulting surveyor issued a report of his findings on September 17, 2003. ("Exhibit 6").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 3 and 4 - ¶¶ 1, 2 and 3 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

208.    In pertinent part, the ABS Consulting surveyor stated that "the overall rate of drydock deterioration appears to be progressing at an ever increasing rate" and that "the drydock is now well past the point where a major restoration effort would be economically

practical."   He stated that "deck platings are failing due to excessive wastage … and hull shell platings are failing due to excessive wastage, with leaks now occurring in greater number and frequency than ever before." ("Exhibit 6").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 3 and 4 - ¶¶ 1, 2 and 3 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

209.   The ABS surveyor observed that pontoon H exhibited "very serious hull leakage." He reported that Maintenance Superintendent White estimated the leakage rate to be 8,000 - 10,000 gallons per minute. The pumps for pontoon H could not keep up with this inflow of water, so an additional six auxiliary pumps were being used. The leakage into pontoons E and G also was identified as a concern. Signal was monitoring the water levels of the ballast tanks at 4 hour intervals and pumping the water down when it was deemed excessive. (See "Exhibit 6").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant

Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 3 and 4 - ¶¶ 1, 2 and 3 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

210.   The ABS surveyor observed also that approximately 200 doublers (steel plates) had been welded to the decks of the pontoons to cover fractures and holes due to wastage/corrosion of the steel, and that workers were in the process of adding more. (See Exhibit "6").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 3 and 4 - ¶¶ 1, 2 and 3 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

211.   The ABS surveyor  reported that the cathodic protection system was inoperative and that no new anodes had been installed in the ballast tanks.  He stated that the deterioration of the Drydock plating was progressing at an increasing rate and that the Drydock is now "well past the point where a major restoration effort would be economically practical."  He considered the Drydock to be unsafe for ongoing operations and

recommended against any further drydockings until pontoon H was substantially repaired and pontoons E and G were inspected and repaired. (See Exhibit "6").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 3 and 4 - ¶¶ 1, 2 and 3 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

\* \* \*

212.    As a result of the observations and concerns contained in the September 2003 ABS Consulting report, PANDIDC conducted an emergency meeting on September 30, 2003, through the Board of Commissioners of Port Arthur, to address the condition of the Drydock and its maintenance. As a result of the emergency meeting, an Agreement was entered between Signal and PANDIDC on October 1, 2003, whereby Signal made various commitments, including the completion of the preventative maintenance program records, the implementation of a cathodic protection system, and the removal of the Drydock from service not later than October 30, 2003 for the performance of the repairs referenced in the ABS Consultants survey report. (Haley Ex. 29, "Exhibit 9").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 8 and 9 – ¶¶ 11 and 12 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

213.   In October 2003, Signal hired Jim Booker to serve as docking master for the Drydock. Booker was an experienced mariner.  (Booker Ex. 321, "Exhibit 10").

**RESPONSE AND OBJECTIONS**

Irrelevant.

* * *

214.   In the last quarter of 2003, Willis communicated with Charles Dillon, an underwriter at Great American, about providing pollution insurance coverage for Signal's fleet.  Based on the document production in this matter, the September 2003 ABS Consulting survey report was contained in the Willis files for the Signal account. (See Exhibit "6").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said

defendant's Cross-Motions for Summary Judgment" at pp. 3 and 4 – ¶¶ 1, 2 and 3 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

215.    Willis did not provide either the September 2003 ABS Consulting survey report or the information contained therein regarding the condition and operation of the Drydock to Great American or any other insurers providing quotes for the Signal account and placement of insurance in anticipation of the January 30, 2004.

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

216.    Signal continued to be engaged in discussions with PANDIC about renegotiating the lease for the Drydock. Pursuant thereto, in March 2004, Signal provided PANDIC with a copy of an appraisal report for the Drydock prepared by Robert Heger. (Haley Ex. 9, "Exhibit 11") The report was issued in December 2002 and was based on a survey conducted in July 2001. (Haley Ex. 8 and Heger Ex. 163, "Exhibit 12").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 10, 11 and 12 - ¶¶ 15 through 17, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

217.   In the December 2002 appraisal report, Heger reported that the deck plating on all of the pontoons was in poor condition and needed to be replaced to make it operational. He estimated this would require installation of approximately 3,500,000 pounds of steel plating. Heger calculated that the cost of performing this work in the United States would be in excess of $8 Million, and that based on the fair market value of the Drydock, as is, where is, its net value would be less than zero. (Haley Ex. 19, "Exhibit 11").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 9 and 10 – ¶¶ 13 and 14 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

218.    In preparation for the insurance renewals in January 2005, Willis was seeking to obtain some quotes for possibly insuring the Drydock in the hull insurance market. (Ewing Ex. 133, "Exhibit 13").  In connection therewith, Willis provided Heger's December 2002 appraisal report to underwriters at Trident Marine and Fireman's Fund, who were providing ship repairer's liability insurance and marine general liability insurance to Signal.  (J. Johnson Ex. 86, "Exhibit 14").  Willis was seeking to insure the Drydock for $5 Million.  Both underwriters noted that Heger had reported that the deck plating of all pontoons was in poor condition and needed to be replaced, and asked Willis to verify if the work had been done. (J. Johnson Ex. 87 and 88, "Exhibit 15").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 12 and 13 - ¶¶ 18 and 19 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

219.    Willis acknowledged that the Heger report indicated that the Drydock required a lot of work, and represented that Signal had performed a great deal of work, but that he did not have the specifics.  Willis noted that the underwriters probably would want a new C & V (condition and valuation survey), but requested that they provide quotes subject to receipt of an acceptable survey.  (J. Johnson Ex. 90, "Exhibit 16").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 13 - ¶¶ 20 and 21 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

\* \* \*

220.    The Trident underwriter stated that he would need full specifics regarding the work that was done before he even could provide a quote.  Willis notified the risk manager at Signal regarding the issues that had been raised by the underwriters about the condition of the Drydock and requested that information be provided about the work that Signal had performed.  Willis also informed Signal that the property underwriters wanted information about the condition of the Drydock.  (J. Johnson Ex. 91 and 92, "Exhibit 17").  Subsequently, Willis received some maintenance reports from Signal, which were then provided to the underwriters at Trident and Fireman's Fund. (J. Johnson Ex. 93, "Exhibit 18"). These reports indicated only that doublers had been applied; not that the deck plates for the pontoons had been renewed.

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 13 and 14 - ¶¶ 22 through 25, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

221.    Despite the conclusions and recommendations set forth in Signal's Staff Study, Signal decided to purchase the Drydock. PANDIC sold the Drydock for the payment of $10 in March 2005. (Haley Ex. 22, "Exhibit 19"). At the time, the Drydock had a scrap value in the range of at least $1.5 Million.

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 14 - ¶¶ 26 and 27 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

222.    A Conditional Bill of Sale was executed, with an effective date of March 16, 2005. This provided in pertinent part that Signal was responsible and liable for the

disposal of the Drydock at the end of its useful life, which included removing it from the Port Arthur Navigation District for disposal in accordance with applicable law. (Exhibit "19").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 14 - ¶¶ 26 and 27 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

\* \* \*

223.   Based on the condition of the pontoons and its own work-life projection, Signal began to consider replacement of the pontoons in 2006.  Preliminary analysis was performed by Signal's docking master, Jim Booker. Signal #15602.  In February 2007, Booker contacted Heger about being involved in the project. (Heger Ex. 166, "Exhibit 20"). The intended plan was to continue to use the wing walls, but to have replacement pontoons constructed. Signal indicated that it had financial approval, but because of "construction cost, we are looking at a phased approach — initially changing out two pairs, (one pair at a time) starting with float out/float in of A & H and then D & E sections." Signal's plan was to refurbish the existing wing walls and re-use them with the new pontoons.

**RESPONSE AND OBJECTIONS**

Disputed.

18

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 14 and 15 - ¶¶ 28 and 29 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

224.    On February 23, 2007, Heger provided Signal with a response to the request for a proposal for designing replacement pontoons for the Drydock. (Heger Ex. 167and 168, "Exhibit 21").  This was approved by Signal.  Thereafter, on March 27, 2007, Heger provided Signal with a response to the request for a proposal to inspect the wing walls of the Drydock. (Heger Ex. 170, "Exhibit 22").  On May 23, 2007, Heger provided Signal with a response to the request for a proposal to inspect the pontoons of the Drydock. (Heger Ex. 172, "Exhibit 23").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 15 through 22, inclusive - ¶¶ 30 through 49, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

19

225.    During April 3 0 – May 2, 2007, Heger attended in Port Arthur and conducted an inspection of the wing walls to evaluate their condition and determine whether or not they were suitable to be refurbished and used with new pontoons.  He issued a detailed Inspection Report o n May 18, 2007, in which he described the condition of the wing walls. He stated in pertinent part that the wing walls are in "fair to poor condition and are in need of repairs before continuing with their use."  Heger found that "almost all areas of the ballast tanks and the safety decks had lost their protective coatings (paint)."   As a result, the steel had "corroded to the point where additional corrosion cannot be tolerated."  He estimated that at least 460,955 pounds of steel had to be renewed.  He indicated that any attempt to continue to use the wing walls without performing the recommended work would result in an extremely limited useful life. He stated that it was "imperative that the areas with extensive corrosion be repaired and the entire wing ballast tank structure and safety deck be blasted to bare metal and recoated before the wing walls can be placed back into service with the new pontoons." (Meisetschlaeger Ex. 33, "Exhibit 24").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 22 through 25, inclusive - ¶¶ 50 through 57, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

226.    On June 19 – 22, 2007, Heger and two of his colleagues attended at Port Arthur and conducted an inspection of the 8 pontoons. (Meisetschlaeger Ex. 34 and J. Johnson Ex. 100, "Exhibit 25"). He issued a detailed Inspection Report on June 28, 2007. Heger reported that the "pontoons are in poor condition and are in need of extensive repairs before continuing with their use." The Heger inspectors found numerous holes in the outer shell of the pontoons in various locations, along with substantial thinning of the plate, corrosion, rust scale, and bubble rust. The paint coating was found to be completely failed in all areas. They found that doublers had been applied to parts of the deck area of all the pontoons and that the areas that were not covered with doublers were extremely corroded with many holes and cracks. No gauging of the deck plating was performed due to the obvious poor condition.

## RESPONSE AND OBJECTIONS

Disputed.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 25 through 29, inclusive - ¶¶ 58 through 66, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

227.    Heger's view was that repairs were not economically justifiable, but he identified the repairs he considered to be necessary for short term use at reduced capacity. Heger specified that for short term use the deck plating for all of the pontoons needed to

be replaced, along with approximately 25% of the deck stiffeners. He also specified additional areas that required across the board replacement. Heger projected that a total of 6,540,800 pounds of steel needed to be replaced in order to continue the use of the Drydock in the short term, a range of 3-5 years (2010-2012). Heger recommended that new pontoons be purchased. (Meisetschlaeger Ex. 34 and J. Johnson Ex. 100, "Exhibit 25").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 25 through 29, inclusive - ¶¶ 58 through 66, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

228.    Although the Heger inspectors did not undertake to survey the mechanical and electrical systems of the Drydock, they were informed of the following known operational problems with the systems:

> All ballast tanks leak and must be pumped on a regular basis to maintain water levels. Interval between pumping is anywhere from 2 hours to 24 hours depending on the amount of leakage in the tank.
>
> Whenever the dock is submerged every machinery compartment leaks significantly. The crew must search out leaks and temporarily plug them in order for the stripping pumps to keep up with the flow volume.

All pumps are presently working but impellors need to be rebuilt on a regular basis.

Pump check valve bodies are thin and continually develop holes that must be plugged.

Discharge piping adjacent to pump is thin and section of pipe needs rebuilding on a regular basis.

Fresh water tanks leak into machinery space. All packing gland leak.

140 out of 152 valve operators are original 1940's equipment. No spare parts are available. Replacement parts must be machined.

Ballast computer control system is 20 years old and no parts are available. Reconditioned parts must be found if possible.

Main power distribution is 20 years old.

Main power cable extending across dock is 20 years old and been patched numerous times.

Emergency generator can only run 1 dewatering pump. This is probably not enough to keep up with all the leakage should power be lost at a critical point in a docking or undocking evolution.

(See Exhibit "25").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said

defendant's Cross-Motions for Summary Judgment" at pp. 25 through 29, inclusive - ¶¶ 58

through 66, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

229.   In July 2007, Signal asked Heger to describe the repairs that he considered

necessary for the safe operation of the Drydock for a 2 year period. (Meisetschlaeger Ex. 51,

"Exhibit 27"). His recommendations were based on his recent inspections of the wing walls

and pontoons. He reiterated that the deck plate for all of the pontoons needed to be replaced.

He went on to explain that:

> Pontoon deck is extremely thin with many holes
> and cracks. Many areas of the deck have been
> doubled with small patches but these do not
> restore the overall bending strength of the
> pontoon nor prevent additional cracks from
> forming on a regular basis. The pontoon deck
> over the machinery compartments develop
> significant leaks every time the dock is
> submerged.  The crew spends considerable effort
> during each submergence finding and plugging
> leaks in the machinery compartment just to
> enable the stripping pumps to keep up with the
> leakage.  A blow out of the pontoon deck could
> rapidly flood the machinery compartment.

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil

Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant

Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's

Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said

defendant's Cross-Motions for Summary Judgment" at pp. 29 and 30 - ¶ 67 annexed as Exhibit

15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

230.    Heger also recommended replacement of the bottom shell plate under the machinery compartments on all pontoons, and 3' sections of the side shell plating around the circumference of all pontoons.  Reference should be made to #51 for the balance of Heger's recommendations.  Heger stated that the deck plating on all of the pontoons had to be replaced, explaining:

> Pontoon deck is extremely thin with many holes and cracks. Many areas of the deck have been doubled with small patches but these do not restore the overall bending strength of the pontoon nor prevent additional cracks from forming on a regular basis. The pontoon deck over the machinery compartments develop significant leaks every time the dock is submerged.  The crew spends considerable effort during each submergence finding and plugging leaks in the machinery compartment just to enable the stripping pumps to keep up with the leakage.  A blow out of the pontoon deck could rapidly flood the machinery compartment.

(See Exhibit "27").

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 29 and 30 - ¶ 67 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

231.    Heger stated that the heavily corroded plate on the side shell of each pontoon had to be replaced for a distance of 3' below the height of the deck.   He also set forth additional requirements for the pontoons as well as the wing walls.   However, Heger provided the following conclusion:

> Because the dock no longer has any protective coating and there will still be extensive areas of structure that are corroded but not being replaced, the expected life extension of the dock with the above repairs made will only be a few years. It is my opinion that the cost, time and effort to perform this work is not economically justifiable.

(See Exhibit "27").

## RESPONSE AND OBJECTIONS

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 29 and 30 - ¶ 67 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

232.    On October 19, 2007, DLS surveyor Strouse provided Signal with a condition and valuation report for insurance purposes, reportedly based on surveys of the Drydock that he conducted on December 15, 2006 and July 10, 2007. (J. Johnson Ex. 98, "Exhibit 28")

26

The observations regarding the condition appear to be a verbatim repeat of those recorded in the earlier December 22, 2005 report. However, he made several recommendations to be carried out by Signal regarding operations and repairs:

> While this vessel is in operation and while the subject vessel is idle, the tanks are to be continuously monitored as Signal International personnel are presently doing in order to maintain this vessel in a stable operational condition.
>
> All known deficiencies in way of the hull to be fitted with doublers or plate to be cropped and part renewed as found necessary.
>
> As soon as practical within the succeeding eighteen months from the date of survey, the hulls to be separated into individual units and each individual unit to be drydocked on the remaining drydock hull section and once drydocked, deficiencies in way of bottom and sides of the hull to be either renewed and/or repaired in order to render this vessel in good stable operating condition and provide a life extension to the drydock. Subsequently, the units are to be swapped and the other unit[s] to be drydocked with the same recommendation pertaining to it.

(See Exhibit "28").

## RESPONSE AND OBJECTIONS

Irrelevant and Argumentative.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said

defendant's Cross-Motions for Summary Judgment" at p. 44 - ¶ 137 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

233.    Both Heger and Strouse were  concerned about the  condition of the pontoons; particularly the side shell and bottom plating. Pursuant to Strouse's recommendation, all of the pontoons should have been drydocked for inspection and repair by February 2009.

## RESPONSE AND OBJECTIONS

Irrelevant and Argumentative.

See objections above to Heger and Dufour reports.  No evidentiary support cited by Great American.

* * *

234.    Great American  was not provided with either of Heger's Inspection  Reports, and was not informed about any of the findings and recommendations, in anticipation of the January 2008 renewal.  (Unsworn Declaration of Steve Weber  and Edward F.  Wilmot, Exhibit 58 and 59).

## RESPONSE AND OBJECTIONS

Irrelevant and Immaterial.

Plaintiffs and Signal incorporate by reference as if fully set forth herein at length each statement of undisputed fact (paragraph "1" through "40") set forth in "Plaintiffs' and Signal's Supplemental Joint Local Rule 56.1 Statement in Opposition to Great American's Cross-Motion for Summary Judgment [Docket No. 244]", filed contemporaneously herewith, in response to the statement.

28

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 30 through 40, inclusive - ¶¶ 68 through 126, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

235.    Great American also was not provided with the DLS Report, or made aware of the surveyor's observations and recommendations in anticipation of the January 2008 renewal.

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

See objections above to Heger and Dufour reports. No evidentiary support cited by Great American.

* * *

236.    Pursuant to Signal's own 2003 Staff Study, it knew that in the absence of major renewal work (which it did not do), the life expectancy of the pontoons was projected to expire sometime between April of 2008 and April of 2010. (Meisetschlaeger Ex. 56, "Exhibit 29").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's

Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 44 and 45 - ¶ 138 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

237.    The records reveal that the highest levels of Signal management were aware of and involved with the advancement of the pontoon replacement project: Richard Marler, President; Chris Cunningham, Chief Financial Officer; Rodney Meisetschlaeger, Senior Vice President; Lisa Spears, Risk Manager. (Signal #16054-16067 and #16167-16168, "Exhibit 30"). It is implicit in the rationale for soliciting bids for replacement pontoons that the existing pontoons required replacement; otherwise, there would be no need for the project.

**RESPONSE AND OBJECTIONS**

Irrelevant, Immaterial and Argumentative.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at p. 45 - ¶ 139 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

238.    On January 24, 2008, Signal informed Heger that the bidding process was completed and that Signal would be evaluating the total cost for the project, including that for refurbishing the wing walls, to decide if it was financially feasible. Signal considered several possible options regarding the purchase of replacement pontoons, but ultimately

concluded that the cost was too high to proceed with the replacement pontoon project. (Spears Ex. 338, "Exhibit 31").

**RESPONSE AND OBJECTIONS**

Irrelevant, Immaterial and Argumentative.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 45 and 46- ¶ 140 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

239.   On May 13, 2008, Booker communicated with Heger about Signal's proposal to "extend the life of the AFDB-5 by removing two pontoons" and operating with three sets of 2 pontoons. (Meisetschlaeger Ex. 41, "Exhibit 32").  The concept was to remove the two pontoons that were in the worst condition, H and E. Heger responded the following day, indicating that the 6 pontoon configuration would not have adequate stability with the existing ballast tank segregation of only 4 compartments per pontoon, and that greater tank segregation would be required. (Meisetschlaeger Ex. 42, "Exhibit 33").  While he indicated that the ballast system could be modified and the necessary mooring dolphin could be designed, Heger advised Signal as follows:

> As you know, it is our opinion that all the sections need major repair work before they can be safely used.  Any designs we perform will be provided with the understanding the dock will

[sic] be operated with our "blessing" unless all
sections are repaired to our satisfaction.

(See Exhibit "33").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

The statement is not supported by evidence which would be admissible. Local Civil

Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant

Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's

Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said

defendant's Cross-Motions for Summary Judgment" at pp. 46 and 47 - ¶ 141 annexed as Exhibit

15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

240.    On June 9, 2008, Heger provided Signal with a series of options for a 6

pontoon configuration and a 7 pontoon configuration. (Meisetschlaeger Ex. 46, "Exhibit 34").

Heger included the following note on his design drawings: "Pontoon and wing wall structure

and mechanical and electrical equipment should be restored to satisfactory condition before

using the dock or proceeding with any mooring alterations described here."

(Meisetschlaeger Ex. 46, "Exhibit 34"). As a result, the discussions turned to the design and

implementation of a 7 pontoon configuration. Signal thereafter directed Heger to develop the

design for the 7 pontoon configuration, which called for the removal of pontoon H.

(Meisetschlaeger Ex. 47, "Exhibit 35").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 47 and 48 - ¶¶ 142 and 143 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

241.   On June 30, 2008, Heger provided Booker with a stability analysis regarding the 7 pontoon configuration and recommended that the ballast tanks in the pontoons be re-segregated to 12 compartments. (Meisetschlaeger Ex. 49, "Exhibit 36"). Signal requested that further analysis be done to determine if there was a way to reduce the number of pontoons that required full re-segregation, in order to save money. (Meisetschlaeger Ex. 52, "Exhibit 37"). Heger determined  that the re-segregation could be limited to 4 pontoons,  provided the vessels being lifted remained within certain parameters. (Meisetschlaeger Ex. 53, "Exhibit 38"). Signal's records for the Drydock reveal that the work for the re-segregation of the ballast tanks in the 4 pontoons was going forward in December 2008, if not earlier, and ongoing in January 2009.

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said

33

defendant's Cross-Motions for Summary Judgment" at pp. 48, 49 and 50 - ¶¶ 144, 145 and 146 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

242.   In anticipation of the insurance renewal on January 30, 2009, Great American was not informed by Willis that Signal intended to reconfigure the Drydock by removing a pontoon, making up 12.5% of the structure. Nor was it informed of the reason for the removal; that the condition of pontoon H was so poor that it had reached the end of its useful life. (Unsworn Declaration of Steve Weber and Edward F. Wilmot, Exhibit "58" and "59").

## RESPONSE AND OBJECTIONS

Irrelevant and Immaterial.

Plaintiffs and Signal incorporate by reference as if fully set forth herein at length each statement of undisputed fact (paragraph "1" through "40") set forth in "Plaintiffs' and Signal's Supplemental Joint Local Rule 56.1 Statement in Opposition to Great American's Cross-Motion for Summary Judgment [Docket No. 244]", filed contemporaneously herewith, in response to the statement.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 30 through 40, inclusive - ¶¶ 68 through 126, inclusive annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

243.    Although Heger agreed to develop the design for the reconfiguration, he was adamant that the reconfiguration not take place unless and until his specific recommendations to restore the condition of the Drydock had been performed. In April 2009, he warned Signal:

> "Because ballast water height versus draft is critical (i.e. leaks cannot be tolerated) and the existing structure is being utilized as part of the connection, it is imperative that all [pontoons] and original connection plates be adequately repaired according to our reports of May 18, 2007, "Inspection Report – Drill Rig Floating Dock Wing Walls" and June 28, 2007, "Inspection Report -- Drill Rig Floating Dock Pontoons" prior to adding this connection box."

(Meisetschlaeger Ex. 58 and 59, "Exhibit 39").

## RESPONSE AND OBJECTIONS

Irrelevant, Immaterial and Argumentative.

The statement is not supported by evidence which would be admissible. Local Civil Rule 56.1(d). See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" at pp. 50 and 51- ¶ 147 annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

244.    Signal did not carry out the renewals and repairs recommended by Heger in his 2007 reports prior to installing the connection box (strongback) and separating pontoon H from the remaining 7 pontoons.

## RESPONSE AND OBJECTIONS

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

245.    Signal did not self drydock any of the pontoons for inspection and repair as recommended by Strouse in his 2007 report.

**RESPONSE AND OBJECTIONS**

Disputed.

The statement does not cite any evidentiary support.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

246.    Pontoon H was separated from the Drydock on August 20, 2009, and landed on blocks situated on pontoons G, F, and E shortly before 3:00 p.m.

**RESPONSE AND OBJECTIONS**

Disputed: Irrelevant and Immaterial.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.

\* \* \*

247.    The ballast tanks of the 7 active pontoons now making up the Drydock were pumped at 5:00 p.m. on August 20, 2009, pursuant to the normal schedule.

**RESPONSE AND OBJECTIONS**

Disputed: Irrelevant and Immaterial.

No evidentiary support cited.

\* \* \*

248.    It is reported that the workers went to the control room on top of pontoon D's wing wall to try to engage the pumps, but were unable to do so because the water already had entered the machinery space in pontoon E through the open access hatches and shorted out the electrical circuits.

**RESPONSE AND OBJECTIONS**

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.  Plaintiffs and Signal further object to this statement on the ground that it does not refer to any temporal period.

\* \* \*

249.    The pumping records reveal that pontoon E was taking on increasing amounts of water during the weeks prior to the reconfiguration and sinking.  Prior to the reconfiguration pontoon E was identified as being in the next worst condition after pontoon H, and the reason that Signal originally wanted to reconfigure to 6 pontoons was to eliminate both H and E.

**RESPONSE AND OBJECTIONS**

Disputed: Irrelevant and Immaterial.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.  Plaintiffs and Signal further object to the unsupported statement on the ground that 1) it is vague, 2) constitutes hearsay, and 3) constitutes argument.

\* \* \*

250.   The night watch stated that they heard loud noises when the Drydock was sinking.   This is consistent with a catastrophic failure due to the stresses created on the compromised pontoon shell plating as a result of the reconfiguration.

**RESPONSE AND OBJECTIONS**

Disputed: Irrelevant, Immaterial and Argumentative.

The statement is not supported by evidence which would be admissible.   Local Civil Rule 56.1(d).   See "Plaintiffs' Objections to Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.   Plaintiffs and Signal further object to the unsupported statement on the grounds that 1) it constitutes hearsay and 2) it constitutes argument.

\* \* \*

251.   In its March 2009 analysis regarding whether to seek to purchase the property where the Drydock was located from The Pleasure Island Commission or to continue to lease the property, Signal noted that the Drydock was "at the end of life" and referred to its 2003 Staff Study. (See "Exhibit 29").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

The statement is not supported by evidence which would be admissible.   Local Civil Rule 56.1(d).   See "Plaintiffs' Objections to 'Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's

Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said

defendant's Cross-Motions for Summary Judgment" at pp. 44 and 45 - ¶ 138 annexed as Exhibit

15 to the Declaration of John A.V. Nicoletti, Esq.

* * *

252.    There was no discharge of oil as a result of the Drydock sinking.  (Unsworn

Deposition of Captain Plunket, Exhibit 43) (Pollock Aff., Docket No. 37, Exhibit "42").

**RESPONSE AND OBJECTIONS**

Disputed.  See SUF ¶ 88.

Irrelevant and Immaterial.  See Plaintiffs' Memorandum of Law 1) In Opposition to

Great American Insurance Company of New York's Motion for Summary Judgment [Docket

No. 242] and 2) In Reply to Great American's Opposition [Docket No. 239] to Plaintiffs'

Motion for Partial Summary Judgment (hereinafter referred to as "Plaintiffs' Memorandum").

* * *

253.    There was no release of any hazardous substances as a result of the Drydock

sinking. (Unsworn  Declaration of Captain Thomas D. Neumann, Docket No. 28, Exhibit "41").

**RESPONSE AND OBJECTIONS**

Disputed.  See SUF ¶¶ 73-88.

Irrelevant and Immaterial.  See Plaintiffs' Memorandum.

* * *

254.    There was no substantial threat of a  discharge of  oil or release  of hazardous

substances as a result of the Drydock sinking. (See Exhibit "41").

**RESPONSE AND OBJECTIONS**

Disputed.  See SUF ¶¶ 73-88.

Irrelevant and Immaterial.  See Plaintiffs' Memorandum.

* * *

255.    Ken Cruikshank, the assigned property adjuster, was at the site of the sunken Drydock on August 21, 2009, and he reported that there was "all booms in place and zero sign of pollution.  Coast guard has also inspected with no problem from what they tell me." He also was in communication with the Coast Guard and reported that no action was required from a pollution standpoint. (Exhibit "68").

## RESPONSE AND OBJECTIONS

Disputed.

The statement is not supported by evidence which would be admissible.  Local Civil Rule 56.1(d).  See "Plaintiffs' Objections to Evidence' and Materials Submitted by Defendant Great American Insurance Company of New York in Opposition to 1) Plaintiffs' and Signal's Joint Motion and 2) to Plaintiffs' Motion for Partial Summary Judgment and in Support of said defendant's Cross-Motions for Summary Judgment" annexed as Exhibit 15 to the Declaration of John A.V. Nicoletti, Esq.  Plaintiffs and Signal further object to the unsupported statement on the grounds that 1) it constitutes hearsay and 2) it constitutes argument.

Irrelevant and Immaterial.  See Plaintiffs' Memorandum.

* * *

256.    Great American's  Emergency Response Manager, Tom Neumann of Meredith Management  received notification  of  the  sinking  from  Willis  on  August 21, 2009. He communicated  with  the  authorities  and  confirmed  that  no  action  was  required  from  a pollution standpoint. (See Exhibit "41").

## RESPONSE AND OBJECTIONS

Irrelevant and Immaterial.  See Plaintiffs' Memorandum.

\* \* \*

257.    TGLO never did open a spill file as a result of the sinking of the Drydock. (Affidavit of Greg Pollock, Docket No. 37, Exhibit "42".)

**RESPONSE AND OBJECTIONS**

Disputed.  The referenced exhibit does not support the statement.

Irrelevant and Immaterial.  See Plaintiffs' Memorandum.

\* \* \*

258.    TGLO did not issue any order to Signal with regard to the sunken Drydock. (See Exhibit "42").

**RESPONSE AND OBJECTIONS**

Disputed.  See SUF ¶¶ 51-53, 82, 85 and 91.  See also Plaintiffs' Memorandum.

\* \* \*

259.    The Coast Guard did not issue any order to Signal with regard to the sunken Drydock. (Unsworn Declaration of J.J. Plunket, "Exhibit 43").

**RESPONSE AND OBJECTIONS**

Undisputed.

Irrelevant and Immaterial.

* * *

260.    Signal never intended to abandon the sunken Drydock and did not do so.

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

* * *

261.    Under the terms of the land lease with Pleasure Island, which included the berth area of the Drydock, Signal was required to restore the premises at the end of the lease term. Signal continued to pay rent until the Drydock was removed.

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.  <u>See</u> Plaintiffs' Memorandum.

* * *

262.    Under the terms of the Conditional Sale Agreement with PANDIC, Signal had an obligation to remove and properly dispose of the Drydock when it reached the end of its useful life.

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.  <u>See</u> Plaintiffs' Memorandum.

* * *

263.    On March 8, 2010, at 1101 hours, Booker sent an email message to Joseph Macdonald of Willis to advise him about facts regarding the "unseaworthiness" of the

Drydock prior to its sinking and other facts, including crew incompetence. Macdonald is a Senior Vice President at Willis. (Booker Ex. 324, "Exhibit 45").

**RESPONSE AND OBJECTIONS**

     Irrelevant and Immaterial.

* * *

264.    On March 8, 2010, at 1123 hours, Macdonald forwarded Booker's email to Philip Gran and Raymond Miles at Willis. (See Exhibit "45").

**RESPONSE AND OBJECTIONS**

     Irrelevant and Immaterial.

* * *

265.    On March 8, 2010, at 1416 hours, Miles forwarded Booker's email to John Baker at Willis of Alabama, Inc. (See Exhibit "45").

**RESPONSE AND OBJECTIONS**

     Irrelevant and Immaterial.

* * *

266.    On March 9, 2010, at 1000 hours, Baker forwarded Booker's email to Vernon Ewing and John Bullock of Willis of Alabama, Inc. ("Exhibit 46").

**RESPONSE AND OBJECTIONS**

     Irrelevant and Immaterial.

* * *

267.    On March 9, 2010, Andrew Wasserman, Vice President and Assistant General Counsel at Willis forwarded Booker's email to David Passman, Senior Vice President at Willis and National Director/National Property Claims, suggesting that Booker's email be

forwarded to Signal and inquiring whether it had any instructions and whether there are any issues that should be passed on to underwriters. ("Exhibit 47").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

* * *

268.    On March 12, 2010, at 1024 hours, Passman sent an email to Baker regarding Signal, identified as High Importance. ("Exhibit 48").

**RESPONSE AND OBJECTIONS**

Irrelevant, Immaterial and Argumentative.

* * *

269.    On March 12, 2010, at 0942 hours, signal's risk manager, Lisa Spears, sent an email to broker at Willis asking whether he had made contact with booker. ("Exhibit 49").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

* * *

270.    On March 21, 2010, Booker sent an email to counsel for Plaintiffs advising that he was aware of the lawsuit that had been filed as a result of the sinking of the Signal Drydock and that he knew facts about the condition and operation of the Drydock. He went on to state that he had read about the duty of utmost good faith and that he was "quite sure that [Signal] did not disclose certain facts concerning the poor material condition of the dry-dock, recent findings concerning material condition surveys conducted by a licensed Professional Engineer, possibly less recent insurance claims made and not disclosed prior to

new policies being issued, the documented unseaworthiness of the dry-dock just prior to the August 20, 2009 loss and, complete lack of experience and ability on behalf of their new minted 'Dockmaster', Mr. Paul Consavage." Booker further advised that "there is a blatant misrepresentation made by DLS (Signals' (sic) marine surveyors) regarding previous suitability surveys and their opinion of the material condition of the dry-dock." (Booker Ex. 325, "Exhibit 50").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

\* \* \*

271.   On March 24, 2010, a representative of Plaintiffs, Ken Edgar, interviewed Booker. Booker provided more details about the condition and operation of the Drydock. Edgar prepared a report summarizing the information provided by Booker and provided it to counsel for Plaintiffs on March 25, 2010. (Booker Ex. 326, "Exhibit 52").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

\* \* \*

272.   The report regarding Booker's disclosures was provided to various representatives of Plaintiffs, including Darrin W. Kolbet, Claim Director for Hull and Marine Liabilities for Allianz Global Corporate & Specialty, the underwriting agent and administrator for claims under marine policies issued by Fireman's Fund Insurance Company. (See "Exhibit 51"). The report also was provided to Terry Campbell.

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

46

\* \* \*

273.    On March 29, 2010, Booker sent an email to Rodney Meisetschlaeger, advising him that he had been contacted by a representative of counsel for Plaintiffs in the action against Signal. Booker reported that counsel wanted to meet with him on Wednesday in Houston.   Meisetschlaeger forwarded the email to Chris Cunningham, Signal's Chief Financial Officer, and requested that he call him.   On the same day, Cunningham forwarded the email to outside counsel for Signal, and to representatives at Willis, Messrs. Bullock, Baker, and Ewing. Cunningham asked two questions: 1) "How should we respond?"; and 2) "Do you think we should employ him as our consultant?" Counsel responded to the email by stating "let's discuss." (Booker Ex. 327, "Exhibit 76").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

\* \* \*

274.    On April 15, 2010, Signal entered an agreement with Booker which was memorialized in a Consulting Agreement. (Booker Ex. 328, "Exhibit 53"). The term of the agreement was for 6 months, to October 15, 2010, during which time Booker would provide services on an "as-needed basis," but with a minimum guarantee of 2 days per week.   Booker was to be paid $1,000 per day, plus expenses.   Based on these terms, Booker was guaranteed payment of $52,000.00.   When Booker worked full time for Signal, before he resigned in October 2008, his salary including bonuses was "somewhere around the neighborhood of $75,000.00 a year."  (Booker Tr. p. 106, "Exhibit 54").

**RESPONSE AND OBJECTIONS**

Irrelevant and Immaterial.

* * *

275.    On April 6, 2010, Great American filed its Answer to Plaintiffs' Complaint, and asserted various affirmative defenses, including the following at No. 13: "Answering Defendant invokes the doctrine of <u>uberrimae fidei</u>, to the extent it may be applicable, and reserves the right to maintain that the [Great American] Policy is void <u>ab initio</u>. (Answer of Great American Insurance Company of New York to Plaintiffs' Complaint, Docket No. 10, "Exhibit 55").

**<u>RESPONSE AND OBJECTIONS</u>**

Undisputed.

* * *

276.    On April 23, 2010, Plaintiffs filed a Motion to Strike Great American's affirmative defense of <u>uberrimae fidei</u>, asserting in pertinent part that it lacked sufficient particularity.   (Notice of Motion to Strike Affirmative Defenses of Great American Insurance Company of New York, Docket No. 15; Memorandum of Law in Support of Plaintiffs' Motion to Strike the Twelfth and Thirteenth Affirmative Defenses of Defendant Great American, Docket No. 17, "Exhibit 56").

**<u>RESPONSE AND OBJECTIONS</u>**

Disputed: Irrelevant and Immaterial.

* * *

277.    Plaintiffs admitted in their Memorandum of Law that: "On or before August 20, 2009, drydock AFDB-5 was in such poor condition that it required daily pumping by its main pumps to prevent it from sinking. On or about August 20, 2009, drydock AFDB-5 sank at its berth in Texas during a period of calm weather.  Due to the drydock's poor

condition and its sinking, the drydock no longer had the capability of dewatering and refloating itself, thereby constituting a constructive total loss without any further usefulness or value." (Docket No. 17, p. 3, "Exhibit 56").

## RESPONSE AND OBJECTIONS

Irrelevant and Immaterial.

Dated: New York, New York
       May 22, 2013

                              NICOLETTI HORNIG & SWEENEY
                              *Attorneys for Plaintiffs*

                    By:        /s/ John A.V. Nicoletti
                              JOHN A. V. NICOLETTI (JN-7174)
                              Wall Street Plaza
                              88 Pine Street, 7th Floor
                              New York, New York 10005-1801
                              Tel: (212) 220-3830
                              Fax: (212) 220-3780
                              (FILE NO.:  42000055 JAVN)

                                    -and-

                              David S. Bland, Esq.
                              Matthew C. Guy, Esq.
                              LEBLANC BLAND P.L.L.C.
                              *Attorneys for Defendant*
                              *Signal International, LLC*
                              909 Poydras Street, Suite 1860
                              New Orleans, LA  70112
                              Tel: (504) 528-3088
                              Fax: (504) 586-3419
                              Email: dbland@leblancbland.com
                                      mguy@leblancbland.com

TO:

George Richard Zacharkow, Esq.
Stephen J. Galati, Esq.
MATTIONI, LTD.
*Attorneys for Defendant*
*Great American Insurance Company of New York*
399 Market Street, 2nd Floor
Philadelphia, Pennsylvania 19106
Ph: (215) 629-1600
Fax: (215) 923-2227
Email: gzacharkow@mattioni.com
        sgalati@mattioni.com


Stephen D. Straus, Esq.
TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP
*Attorneys for Defendant*
*Max Specialty Insurance Company*
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York  10532
Ph: (914) 347-2600
Fax: (914) 347-8898
Email: sstraus@traublieberman.com


Stephen Patrick Kyne, Esq.
BURKE & PARSONS
100 Park Avenue, 30th Floor
New York, New York 10017
Ph: (212) 354-3814
Fax: (212) 221-1432
Email: kyne@burkeparsons.com