David S. Bland
Matthew C. Guy
LeBlanc Bland P.L.L.C.
909 Poydras Street, Suite 1860
New Orleans LA 70112
(504) 528-3088

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **FIREMAN'S FUND INSURANCE COMPANY, ONE BEACON INSURANCE COMPANY, NATIONAL LIABILITY AND FIRE INSURANCE COMPANY and QBE MARINE & ENERGY SYNDICATE 1036,** | **10 civ 1653-JPO-JLC** |
| **Plaintiffs,** | **ECF CASE** |
| **v.** | |
| **GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, MAX SPECIALTY INSURANCE COMPANY and SIGNAL INTERNATIONAL, L.L.C.** | |
| **Defendants.** | |

**DEFENDANT SIGNAL INTERNATIONAL'S AND PLAINTIFFS' FFIC
RESPONSE TO MAX SPECIALTY'S
RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
<u>MOTIONS FOR SUMMARY JUDGMENT</u>**

Plaintiffs Fireman's Fund Insurance Company ("Fireman's Fund"), One Beacon Insurance Company ("One Beacon"), National Liability and Fire Insurance Company ("National Liability") and QBE Marine & Energy Syndicate 1036 ("QBE") (hereafter sometimes collectively referred to as "Plaintiffs") and defendant Signal International, LLC ("Signal") set forth the following responses and objections to Defendant, Max Specialty's ("Max Specialty") Rule 56.1 Statement:

1.  Max Specialty issued property policy No. MAX2XP0004029, providing Commercial
    Property – Excess of Loss insurance to Signal International, LLC ("Signal") for the
    policy period of January 30, 2009 to January 30, 2010 ("the Policy"). Exhibit 2 to the
    Declaration of Stephen D. Straus dated April 17, 2013 ("Straus Decl.").

    Response to No. 1:

    Undisputed.

2.  As part of the application process for the Policy, Signal's broker, Willis of Alabama, Inc.
    ("Willis"), provided certain materials concerning the risk to be insured, including: (1) a
    Statement of Values regarding Signal's physical assets, dated January 16, 2009; and (2) a
    Property Risk Inspection Report prepared by Stephen Heller & Associates, Inc., dated
    January 2009 ("Heller Report"). Straus Decl. Ex. 3.

    Response to No. 2:

    Disputed. Not all documents provided to or by Willis are disclosed.

3.  Max Specialty underwriter James F. Morano, III, reviewed the Statement of Values and
    the Heller Report at the time they were presented by Signal's broker, to determine
    whether Max Specialty would agree to issue the Policy in the excess layer immediately
    above a primary property insurance policy issued to Signal by Westchester Surplus Lines
    Insurance Company. Declaration of James F. Morano, III, dated April 16, 2013 ("Morano
    Decl."), ¶5.

    Response to No. 3:

    Disputed.  Not all documents provided by Willis or reviewed by Morano are disclosed.

4.  According to the Statement of Values, the AFDB-5 drydock (hereinafter "AFDB-5" or
    "drydock"), located at a Signal facility in Port Arthur, Texas,1 was the highest value asset

to be insured, with a stated Actual Cash Value of $13,600,000. Straus Decl. Ex. 3, Statement of Values at TRIPM 0072; Morano Decl. ¶6.

<u>Response to No. 4:</u>

Undisputed.

5.   According to the Statement of Values, as of January, 2009, when Policy was issued to Signal, the assets insured under the Policy were almost evenly split between Mississippi and Texas. *See* Straus Decl. Ex. 3, Statement of Values at TRIPM 0072.

<u>Response to No. 5:</u>

Undisputed.

6.   The Heller Report was the only document provided to Max Specialty concerning the condition of Signal's physical property to be insured. Morano Decl. ¶7.

<u>Response to No. 6:</u>

Disputed.  The Heller report was not a condition and valuation survey; it was a property risk assessment report.

7.   The Heller Report stated, *inter alia*, that "[o]verall, the Signal International facilities reviewed are rated as an 'Above Average' risk as it relates to insurance property and boiler machinery coverage." Straus Decl. Ex. 3, Heller Report at 8; Morano Decl. ¶7. The Heller Report defines "Above Average" as meeting "acceptable standards including some industry best practices." Straus Decl. Ex. 3, Heller Report at 8; Morano Decl. ¶7.

<u>Response to No. 7:</u>

Disputed.  The Heller report is a statement of opinion, speaks for itself, and must be read in its entirety.

8. The Heller Report also characterized the risk of the AFDB-5 becoming a total loss as having an "extremely low probability and frequency [of happening] based on previous industry experience." Straus Decl. Ex. 3, Heller Report at 36-7; Morano Decl. ¶8.

Response to No. 8:

Disputed.  The Heller report is a statement of opinion, speaks for itself, and must be read in its entirety.

9. Having made such representations, the Heller Report provides no indication of the serial recommendations and warnings issued to Signal concerning the dilapidated condition of the drydock as set forth below. Straus Decl. Ex. 3, Heller Report.

Response to No. 9:

Disputed.  The Heller report is a statement of opinion, speaks for itself, and must be read in its entirety.

10. Mr. Morano relied on the Heller Report, which gave a "favorable overview of the condition of [Signal's] properties," in deciding to issue the Policy. Straus Decl. Ex. 4 at 32, 40.

Response to No. 10:

Disputed.  Mr. Morano stated he had all the information he needed to underwrite Max Specialty's EPI Policy.  Morano Depo., p. 45.

11. It was not until after the discovery process began in this lawsuit that numerous reports and communications concerning the dilapidated condition of the AFDB-5, prepared prior to the Heller Report, were disclosed to Max Specialty. None of these materials, or the information contained therein, were provided to Max Specialty prior to issuance of the

Policy in January, 2009, or before the AFDB-5 sank on August 20, 2009. Morano Decl. ¶9.

Response to No. 11:

Disputed.  Max Specialty never requested any additional information on the AFDB-5 Drydock thus any additional documents are irrelevant.

12. Had the conflicting information regarding the condition of the drydock been provided to Max Specialty before the Policy was issued, Mr. Morano would have either declined to bind coverage, or offered coverage that expressly excluded claims arising out of the drydock, because the full picture regarding the condition of the drydock, as revealed in the many engineer reports discussed in the following paragraphs, portrayed a material risk of imminent catastrophic failure. *Id.* ¶10.

Response to No. 12:

Disputed.  Directly contradicted by deposition testimony of Trip Morano. Mr. Morano stated he had all the information he needed to underwrite Max Specialty's EPI Policy. Morano Depo., p. 45.

13. The information and facts discussed in paragraphs 14-43 of Mr. Morano's Declaration would have been material to Max Specialty's decision to issue the Policy, had such information been provided. The failure of Signal to provide such information with its insurance submission induced Max Specialty to issue the Policy, which would not have been issued had such information been originally disclosed. *Id.* ¶11.

Response to No. 13:

Disputed.  Directly contradicted by deposition testimony of Trip Morano.  Mr. Morano stated he had all the information he needed to underwrite Max Specialty's EPI Policy. Morano Depo., p. 45.

14. Moreover, had the conflicting information regarding the condition of the drydock been provided to Max Specialty after issuance of the Policy, but prior to the loss of the AFDB-5, Max Specialty could and would have exercised its right to cancel the Policy. *Id.* ¶12.

   Response to No. 14:

   Disputed. Directly contradicted by deposition testimony of Trip Morano.  Mr. Morano stated he had all the information he needed to underwrite Max Specialty's EPI Policy. Morano Depo., p. 45.

15. In this regard, the Policy contains, *inter alia*, the following Cancellation provisions:

   A. Cancellation

   * * *

   2.     We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      a.     10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      b.     30 days before the effective date of cancellation if we cancel for any other reason.

Ex. 2 at WILLIS00710.

   8.     CANCELLATION:
          This insurance may be cancelled by the Insured at any time by written notice or by surrender of this Policy. This insurance may also be cancelled by or on behalf of the Insurer(s) by delivering to the Insured or by mailing to the Insured . . . written notice stating when, not less than thirty (30) days thereafter, the cancellation shall be effective.

*Id.* at WILLIS00715. Morano Decl. ¶12.

6

Response to No. 15:

Max Specialty's EPI Policy speaks for itself.

16. The numerous non-disclosed engineer reports contained information that conflicted with the description of the drydock in the Heller Report included in the application submission to Max Specialty. In particular, the non-disclosed materials, discussed below in chronological order, depicted the drydock as posing a significant risk of imminent catastrophic failure. *Id.* ¶13.

Response to No. 16:

Disputed.

17. ABS Worldwide Technical Services, Inc., issued a report dated June 21, 1989 ("ABS Report"). Straus Decl. Ex. 5. Neither the report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. *Id.* ¶14.

Response to No. 17:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

18. The ABS Report states among other things, that the plating of the AFDB-5's support pontoons was "wasted," and "thinned" and contained corrosion holes. Straus Decl. Ex. 5 at 14; Morano Decl. ¶15. The ABS Report further stated that, to maintain the AFDB-5 in operating condition, the steel plating of the wing walls and pontoon decks, which were wasted in excess of 25% from original thickness, had to be replaced. The ABS Report further stated that "doublers," expediently used to repair portions of the pontoon decks,

7

were insufficient and needed to be renewed with deck plating. Straus Decl. Ex. 5 at 15; Morano Decl. ¶15.

Response to No. 18:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

19. Heger Dry Dock, Inc. ("Heger"), prepared a report regarding the condition of the drydock dated July 9, 2001 ("2001 Heger Report"). Straus Decl. Ex. 6. Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶16.

Response to No. 19:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

20. The 2001 Heger Report concluded, among other things, that the pontoons supporting the drydock were leaking and that the pontoon decks were in poor condition and needed to be renewed. Straus Decl. Ex. 6 at Page 9 of 10; Morano Decl. ¶16.

Response to No. 20:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

21. Heger prepared an Appraisal of Floating Dry Dock No. 1, dated December 9, 2002 ("Heger Appraisal"). Straus Decl. Ex. 7. Neither the Heger Appraisal nor the information

contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶17.

Response to No. 21:

Disputed. The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

22. The Heger Appraisal states, among other things, that 3,500,000 pounds of steel were needed to replace the pontoon deck to make the drydock operational. *See* Straus Decl. Ex. 7 at Page 3 of 4; Morano Decl. ¶18. This would also reduce the value of the drydock to $800,000 assuming it was moved outside the United States, or to a negative (-) $1,150,000 if it remained in the United States. Straus Decl. Ex. 7 at Page 4 of 4; Morano Decl. ¶18.

Response to No. 22:

Disputed. The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

23. On January 29, 2003, Friede Goldman Offshore Texas, LP, which operated the AFDB-5 by agreement with the Port Arthur Navigation District Industrial Development Corporation ("PANDIDC"), assigned its rights to operate the drydock to Signal. *See* Straus Decl. Ex. 8.

Response to No. 23:

Undisputed.

24. ABS also prepared a Drydock 'AFDB-5' Report of Maintenance Program Audit dated March 12, 2003 ("March 2003 ABS Report"). Straus Decl. Ex. 9. Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶19.

Response to No. 24:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

25. The March 2003 ABS Report states, among other things, that Signal was "only marginally keeping up with the rapidly increasing rate of overall deterioration" of the AFDB-5. Straus Decl. Ex. 9 at 2; Morano Decl. ¶20. It lists a litany of serious physical deficiencies impacting the immediate life of the AFDB-5, including: "fractures in the heavily wasted, brittle, bottom plating;" continued leaking in Pontoon "H;" and leaking deck platings caused by "wastage/pitting." Straus Decl. Ex. 9 at 2; Morano Decl. ¶20.

Response to No. 25:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

26. The March 2003 ABS Report also noted that "within the last year more than a hundred doubler plates have been welded over severely wasted/holed original main deck platings," and that "wasted holes and/or fractures continue to appear on a very frequent basis." Straus Decl. Ex. 9 at 3; Morano Decl. ¶21.

<u>Response to No. 26:</u>

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

27. Based on an engineering assessment, the March 2003 ABS Report contains the following conclusions:

> In January of 2000 owners and operators were advised of our concern about the advanced state of pontoon shell and deck plating deterioration and our recommendation for drydocking or outright renewal of the pontoons. At that time we estimated that without such maintenance the drydock could conceivably become unserviceable well within the next 5 years, assuming the approved preventive maintenance program continued. Since then operators [including Signal] have made no apparent efforts toward removing the pontoon sections for drydocking and permanent hull repairs. . . .

> \* \* \*

> The impressed current cathodic protection system continues to be inoperative and the sacrificial anodes in ballast tanks are said to have largely wasted away some time ago. While we are certain that these situations will have some detrimental effect on the life expectancy of pontoon hull platings we have no way to actually quantify the amount of life expectancy that will be lost.

Straus Decl. Ex. 9 at 3; Morano Decl. ¶22.

<u>Response to No. 27:</u>

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

11

28. Signal prepared a Dry Dock Facility – Staff Study dated April 16, 2003. Straus Decl. Ex. 10. Neither the document nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶23.

Response to No. 28:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

29. In the Dry Dock Facility- Staff Study, Signal acknowledged that structurally integral metal plating was in poor condition and that if Signal continued to operate *status quo ante*, it could expect side and bottom plating on the drydock to last just 3-5 years. Straus Decl. Ex. 10 at 1-2; Morano Decl. ¶24. The drydock's cathodic protection system also remained non-operational. Straus Decl. Ex. 10 at 2; Morano Decl. ¶24.

Response to No. 29:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

30. Signal also estimated in the Dry Dock Facility – Staff Study that it would cost $21,880,000 to renew all main deck and bottom plating and quoted the municipal landlord, Port of Port Arthur, as commenting that the drydock "is too much potential liability." Straus Decl. Ex. 10 at 2, 3; Morano Decl. ¶25.

Response to No. 30:

Disputed. The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

31. On September 17, 2003, ABS prepared a further Drydock 'AFDB-5' Report of Maintenance Program Audit ("September 2003 ABS Report"). Straus Decl. Ex. 11. Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶26.

Response to No. 31:

Disputed. The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

32. The September 2003 ABS Report stated, among other things, that support Pontoon H was severely leaking at the time a drilling rig was being drydocked for repairs. It further noted the abnormal need to operate ballast pumps every two (2) hours to keep up with water flowing into the support pontoon. Straus Decl. Ex. 11 at 4; Morano Decl. ¶27. It was also reported that all supporting pontoons were leaking, with pontoons E, G and H taking on the greatest amounts of water. Straus Decl. Ex. 11 at 4; Morano Decl. ¶27. Deck fractures as a result of buckling due to severe wastage of metal plating were also noted, as were various inoperative electrical systems that needed immediate attention. Straus Decl. Ex. 11 at 4; Morano Decl. ¶27.

Response to No. 32:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

33. The September 2003 ABS Report included these further engineering observations and conclusions:

> To emphasize previously reported information, in January of 2000 owners and operators were aware of our concerns about the advanced state of pontoon shell and deck plating deterioration, as well as our recommendations for drydocking, or outright renewal, of the pontoons. At that time we estimated that without such maintenance the drydock could conceivably become unserviceable well within the next 5 years, even if the approved maintenance program continued to be active. We are now about halfway through that estimated period of life expectancy. Since January of 2000, no major, permanent, hull plating repairs have been accomplished. . . .
>
> Based on findings as set forth herein above, even with the repairs and maintenance that have been done, the overall rate of drydock deterioration appears to be progressing at an ever increasing rate. In the opinion of the undersigned, the drydock is now well past the point where a major restoration effort would be economically practical. . . .
>
> [B]ecause permanent repairs have not been accomplished, as previously recommended, deck platings are failing due to excessive wastage, much of the watertight compartmentation has been lost due to excessive bulkhead wastage and hull shell platings are failing due to excessive wastage, with leaks now occurring in greater number and frequency than ever before.
>
> At time of this survey, due largely to excessive leakage in 'H' pontoon, it appeared that *unsafe drydock operations* were being conducted and, based on information reported to the undersigned, it would seem that it is the Operator's [Signal's] intention to continue with same. According to Mr. White and Mr. Corcoran it is presently the shipyard's intention to drydock two (2) additional drilling rigs before effecting necessary hull and ballast pump repairs on 'H' pontoon, or repair leakage in 'E' and 'G' pontoons.

14

> *Given the conditions found, it is highly recommended that drydock Owners advise Operators not to conduct additional drydockings until substantial hull repairs are made to 'H' pontoons and the repairs are verified.* Additional priority should be given to pumping out pontoons 'G' and 'E' for inspection and repair as necessary, to substantially reduce the amount of leakage now present in those units. Reportedly, all pontoons are presently experiencing some leakage and are in need of repair.

Straus Decl. Ex. 11 at 5-6 (emphasis in original); Morano Decl. ¶28.

<u>Response to No. 33:</u>

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

34. In 2005, Signal purchased the drydock from PANDIDC by virtue of a Conditional Bill of Sale ("BOS"). *See* Straus Decl. Ex. 12.

<u>Response to No. 34:</u>

Undisputed, however the actual entity that purchased the AFDB-5 Drydock was Signal International Texas, LP.

35. Dufour, Laskay & Strouse ("DLS") prepared Survey Report (No. 05-3459), dated December 22, 2005 ("December 2005 DLS Survey") concerning the physical condition of the drydock. *See* Straus Decl. Ex. 13. Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶29.

<u>Response to No. 35:</u>

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

36. The December 2005 DLS Survey noted, among other things, the following with respect to the condition of the AFDB-5:

> At the time of inspection, the vessel was under load with a drill rig aboard.
>
> The vessel had significant water in most compartments and that water content was being monitored by the computerized monitoring system observed by a dock master and requires pumping and trimming every four hours.
>
> Due to the fact that the drydock must be pumped every four hours it is indicative of some wastage holes in the bottom. . . .
>
> The deck plating was noted to have significant doubler plates where plating has either wasted or separated from internal framing due to shear stresses aboard the drydock. At the time of inspection, there was noted to be a 12' long tear in the plating extending along a transverse frame . . . .

Straus Decl. Ex. 13 at 26; Morano Decl. ¶30.

<u>Response to No. 36:</u>

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

37. DLS also prepared Survey Report (No. 06-35553), dated December 19, 2006 ("December 2006 DLS Survey"). *See* Straus Decl. Ex. 14. Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶31.

Response to No. 37:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never

requested any additional information on AFDB-5 Drydock, which was, in any event, not

material to Max Specialty's underwriting decision.

38. The December 2006 DLS Survey states, among other things, the following with respect

to the deteriorated condition of the drydock:

> At the time of inspection, the vessel was afloat and pumped out as
> much as possible. At the time of inspection, there were divers
> present and those divers were patching holes or deficient areas of
> the bottom of the drydock, primarily in way of compartment C,
> compartment H and other areas noted to have some form of
> deficiency.
>
> The vessel's water content is monitored by a computerized
> monitoring system and observed by a dock master and requires
> pumping and trimming every four hours.
>
> Due to the fact that the drydock must be pumped every four hours,
> it is indicative of some wastage holes in the bottom and/or some
> deficiencies requiring constant attention.
>
> * * *
>
> The deck plating was noted to have significant doubler plates
> where plating has either wasted or separated from internal framing
> due to shear stresses aboard the drydock. At the time of inspection,
> there was noted to be a 12' long tear in the plating extending along
> a transverse frame and, reportedly, this will be fitted with a proper
> doubler in the near future. Furthermore, there was numerous 6" to
> 1' tears in the deck plating . . . .

Straus Decl. Ex. 14 at 27; Morano Decl. ¶32.

Response to No. 38:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never

requested any additional information on AFDB-5 Drydock, which was, in any event, not

material to Max Specialty's underwriting decision.

39. Signal employee Patrick Cates agreed that wastage holes existed in the drydock bottom. Straus Decl. Ex. 15 at 55.

<u>Response to No. 39:</u>

Disputed.  Mr. Cates' testimony was that a pinhole leak existed and was fixed.

40. Heger prepared a report dated May 18, 2007 ("May 2007 Heger Report") concerning the condition of the wing walls of the drydock. *See* Straus Decl. Ex. 16. Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶33.

<u>Response to No. 40:</u>

Document speaks for itself; further, Max Specialty never requested additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

41. The engineering analysis contained in the May 2007 Heger Report states, in pertinent part, the following:

> The wing walls are in fair to poor condition and are in need of repairs before continuing with their use. Almost all areas of the wing ballast tanks and safety decks have lost their protective coatings (paint). In the majority of areas, the steel has corroded to the point where significant additional corrosion cannot be tolerated. In some areas, the corrosion is extensive and steel must be renewed. We estimate the approximate weight of this required steel renewal to be 460,955 pounds. It is therefore imperative that the areas with extensive corrosion be repaired and the entire wing ballast tank structure and safety deck be blasted to bare metal and recoated before the wing walls can be placed back into service with the new pontoons.

> Any attempt to re-use the wing walls with the new pontoons without painting the internal structure of all compartments (i.e. repairing the extensive corrosion but not recoating the other areas) will result in an extremely limited useful life for the wings.

> If the areas of heaviest corrosion are repaired as suggested and all
> the ballast compartments and safety decks are recoated with a high
> quality coating system the wing walls should have an expected
> useful life of 10 to 15 years.

Straus Decl. Ex. 16 at Page 31 of 31; Morano Decl. ¶34.

Response to No. 41:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never

requested any additional information on AFDB-5 Drydock, which was, in any event, not

material to Max Specialty's underwriting decision.

42. Heger prepared a report dated June 28, 2007 ("June 2007 Heger Report") concerning

condition of the support pontoons of the drydock. *See* Straus Decl. Ex. 17. Neither this

report nor the information contained therein were provided to Max Specialty prior to

issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶35.

Response to No. 42:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never

requested any additional information on AFDB-5 Drydock, which was, in any event, not

material to Max Specialty's underwriting decision.

43. The June 2007 Heger Report states, among other things, that the lower and side shell and

pontoon deck plating had thinned and in some places was more than 50% wasted. Straus

Decl. Ex. 17 at Page 2 of 27 – Page 22 of 27; Morano Decl. ¶36. The report also noted

thinning of the flanges on the stiffeners to a "knife's edge," as well as buckling of certain

vertical T stiffeners, indicating overload. Straus Decl. Ex. 17 at Page 2 of 27 – Page 22 of

27; Morano Decl. ¶36. There was also extensive rust noted on the pontoons. Straus Decl.

Ex. 17 at Page 2 of 27 – Page 22 of 27; Morano Decl. ¶36.

Response to No. 43:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

44. The June 2007 Heger Report further stated that "the pontoons are in poor condition and are in need of extensive repairs before continuing with their use." Straus Decl. Ex. 17 at Page 23 of 27; Morano Decl. ¶37. Heger identified numerous repairs that were required to continue using the drydock in the short term, including, among other things, replacement of the entire pontoon deck. These repairs would require a recommended replacement of 2,920 long tons of steel. Straus Decl. Ex. 17 at Page 23 of 27 – Page 25 of 27; Morano Decl. ¶37. Even if Signal performed these necessary repairs, it would have allowed Signal to operate the drydock for a period of just 3 to 5 years, at most, while still requiring significant ongoing maintenance. Straus Decl. Ex. 17 at Page 25 of 27; Morano Decl. ¶37.

Response to No. 44:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

45. It was also noted in the June 2007 Heger Report that Signal personnel reported abnormal operational problems with the drydock, including, among other things, the necessity to regularly pump ballast tanks due to leakage; significant leakage in every machinery compartment requiring temporarily plugs so the pumps could keep up with the inflow volume; an out-of-date and faulty power distribution system; a main power cable that was

20 years old and had been patched numerous times; and an emergency generator that could only run one (1) dewatering pump, which was not enough to keep up with leakage inflow should be power be lost. Straus Decl. Ex. 17 at Page 22 of 27 – Page 23 of 27; Morano Decl. ¶38.

<u>Response to No. 45:</u>

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

46.  The engineers thus concluded in the June 2007 Heger Report that:

> Pontoon sections E, F, G and H are in very poor condition throughout and need complete replacement if long term use is to be considered.
>
> Although the internal structure of pontoon sections A, B, C, and D is in better condition, significant other portions of these sections are in need of replacement. (At least 900 tons of steel per section) The portions in need of replacement include the pontoon deck, hull shell, machinery deck, crew deck, access corridors, localized areas of bulkheads and mechanical and electrical equipment. It is obvious that the cost to carry out this renovation would far exceed building complete new pontoons.
>
> It is our recommendation that Signal International proceed with obtaining new pontoons for use with the existing wing walls that will be renovated as described in our previous report.

Straus Decl. Ex. 17 at Page 27 of 27; Morano Decl. ¶39.

<u>Response to No. 46:</u>

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

21

47. DLS prepared Survey Report (No. 0158-16N07), dated October 19, 2007 ("October 2007 DLS Survey"). *See* Straus Decl. Ex. 18. Neither this report nor the information contained therein were provided to Max Specialty prior to issuance of the Policy, or before the AFDB-5 sank. Morano Decl. ¶40.

Response to No. 47:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

48. The October 2007 DLS Survey Report largely set forth the same findings concerning the teetering condition of the drydock but added, among other things, the following recommendations to merely keep it afloat in the short term:

1. While this vessel is in operation and while the subject vessel is idle, the tanks are to be continuously monitored as Signal International personnel are presently doing in order to maintain this vessel in a stable operational condition.

2. All known deficiencies in way of the hull [are] to be fitted with doublers or plate to be cropped and part renewed as found necessary.

3. 3. As soon as practical within the succeeding eighteen months from date of survey, the hulls [are] to be separated into individual units and each individual unit [is] to be drydocked on the remaining drydock hull section and once drydocked, deficiencies in way of the bottom and sides of the hull [are] to be either renewed and/or repaired in order to render this vessel in good stable operating condition and provide a life extension to the drydock. Subsequently, the units are to be swapped and the other unit[s are] to be drydocked with the same recommendation pertaining to [them].

Straus Decl. Ex. 18 at 5; Morano Decl. ¶41.

22

Response to No. 48:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

49. Signal personnel admit that it never complied with the recommendations of DLS, which Signal lauds in its motion as "experienced marine surveyors." Straus Decl. Ex. 15 at 55-6.

Response to No. 49:

Disputed.

50. Indeed, Mr. Cates was concerned over the inadequacy of Signal's maintenance program, as "the dock was getting old, the skin was getting thin." Straus Decl. Ex. 19 at 234.

Response to No. 50:

Disputed.

51. On May 13, 2008, Signal sent an e-mail to Heger concerning a proposal to "extend the life of the AFDB-5" by removing 2 support pontoons constituting the base of the drydock and reconfiguring the remaining support pontoons. *See* Straus Decl. Ex. 20; Straus Decl. Ex. 21 at 55-56. Neither this e-mail nor the information contained therein were provided to Max Specialty prior to issuance of the Max Specialty Policy or the AFDB-5's sinking. Morano Decl. ¶42.

Response to No. 51:

Disputed.  The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

52. On May 14, 2008, Heger responded with his comments concerning the proposal. *See* Straus Decl. Ex. 22; Straus Decl. Ex. 21 at 56-58. Neither this e-mail nor the information contained therein were provided to Max Specialty prior to issuance of the Max Specialty Policy or the AFDB-5's sinking. Morano Decl. ¶43. In the e-mail, Heger indicates:

> As you know it is our opinion that all the sections need major repair work before they can be safely used. Any designs we perform will be provided with the understanding the dock will nor [sic] be operated with our 'blessing' until all sections are repaired to our satisfaction.

Response to No. 52:

Disputed. The Document speaks for itself; further, it is irrelevant as Max Specialty never requested any additional information on AFDB-5 Drydock, which was, in any event, not material to Max Specialty's underwriting decision.

53. Robert Heger, a marine engineer with over thirty (30) years' experience working with drydocks, testified as follows:

> Q.   And you go on to say, [']Any designs we perform will be provided with the understanding . . . .['] Why did you say that, sir?
>
> A.   I said that because I didn't want them to get the impression that by putting it into this three-by-three mode that they could just go and use the drydock without any – without doing those repairs. We didn't want – again, we didn't want to be involved with the drydock, if they opted to do it without repairing it.
>
> Q.   Why is that, sir?
>
> A.   Because, in our opinion, the dock was not structurally adequate in the condition it was in.
>
> Q.   In other words, they shouldn't use it for lifting drill rigs or other vessels?

A.      Correct.

Straus Decl. Ex. 21 at 57-58.

<u>Response to No. 53:</u>

Undisputed.

54. Signal personnel admitted that Signal never renewed the pontoon decks as mandated by
Heger. *See* Straus Decl. Ex. 23 at 208; Ex. 24 at 77-79, 102.

<u>Response to No. 54:</u>

Disputed.

55. On August 20, 2009, shortly after pontoon H was removed from the drydock as part of
the reconfiguration to a seven (7) pontoon configuration, the drydock sank.

<u>Response to No. 55:</u>

Disputed.  The AFDB-5 Drydock sank due to operator error.

56. Captain Michael A. Jacobs, a marine surveyor with over forty (40) years' experience,
prepared a report dated December 14, 2012, concerning the condition and maintenance of
the AFDB-5 and the serial recommendations made by the surveyors and engineers set
forth above. Straus Decl. Ex. 25.

<u>Response to No. 56:</u>

Disputed.  Mr. Jacobs' statements are expert <u>opinions</u> that are hearsay, inadmissible, and
improper to support a Motion for Summary Judgment.

57. Captain Jacobs reviewed the numerous reports concerning the dilapidated condition of
the drydock and the serial recommendations to repair it, as well as maintenance records
for the drydock. *Id.*

Response to No. 57:

Disputed.  Mr. Jacobs' statements are expert opinions that are hearsay, inadmissible, and improper to support a Motion for Summary Judgment.

58. Captain Jacobs concluded that, between 2007 and 2009, Signal only replaced (i) 8.6% of the pontoon decks and (ii) 0.1% of the pontoon bottoms and side shells as recommended by Heger in his "extremely thorough and detailed condition surveys." *Id.* at 33-4. Signal did not replace any of the 14,812 sq. ft. of steel in the wing walls as recommended by Heger. *Id.* at 34. Overall, only 17.4% of the 3,500,000 pounds of steel which Signal itself, in the Dry Dock Facility Study, indicated needed to be replaced was actually replaced between 2003 and 2009. *Id.*

Response to No. 58:

Disputed.  Mr. Jacobs' statements are expert opinions that are hearsay, inadmissible, and improper to support a Motion for Summary Judgment.

59. Captain Jacobs concluded, *inter alia*, that:

> Signal's decision to continue operating the drydock without performing the extensive specified renewals and repairs, including either replacing the pontoons with new pontoons or self-docking and repairing the existing pontoons was imprudent and significantly increased the likelihood of a 'major loss event' occurring in the short term as recognized by Signal.
>
> The actual steel replacement carried out by Signal was inconsequential as compared to the recommendations from Heger, and did not extend the life of the drydock in any significant way.
>
> Signal's approach to patching leaks by applying doublers (temporary repairs) rather than inserts (permanent repairs) did not restore the overall bending strength of the pontoon[s] nor prevent additional cracks from forming on a regular basis. . . .
> In summary, it is my considered opinion that Signal was made aware of significant deficiencies regarding the condition of the drydock over a period of several years by competent marine

> professionals. These professionals acted independently of each other but they observed the same deteriorating conditions, expressed the same concerns and made similar recommendations. Signal chose not to follow these very critical recommendations. The failure to carry out these recommendations exposed the drydock to a risk of a major loss event.

*Id.* at 35.

Response to No. 59:

Disputed.  Mr. Jacobs' statements are expert opinions that are hearsay, inadmissible, and improper to support a Motion for Summary Judgment.

60. At the time Signal sought and received insurance coverage from Max Specialty in January, 2009, Signal's principal place of business was located in Mississippi. Straus Decl. Ex. 26; Ex. 27 ¶3.

Response to No. 60:

Undisputed as to Signal International, LLC.  Signal International Texas, L.P.'s (the legal owner of the AFDB-5 Drydock principal place of business, however, was located in Texas.

61. The Policy was delivered to Signal in Mississippi. Straus Decl. Ex. 2 at WILLIS00697.

Response to No. 61:

Disputed.  The EPI Policy was delivered in both Mississippi and Texas.

Respectfully submitted,

Dated:    May 22, 2013
             New Orleans, LA

**LeBlanc Bland P.L.L.C**
Attorneys for Defendant
Signal International, L.L.C.


By:  /s/ David S. Bland
David S. Bland
Matthew C. Guy
LEBLANC BLAND P.L.L.C.
909 Poydras Street, Suite 1860
New Orleans LA 70112
(504) 528-3088
dbland@leblancbland.com
mguy@leblancbland.com

Stephen P. Kyne
BURKE & PARSONS
100 Park Avenue
New York NY  10017-5533
(212) 354-3800
kyne@burkeparsons.com

Attorneys for Plaintiffs
Fireman's Fund Insurance Company,
One Beacon Insurance Company,
National Liability and Fire Insurance Company
QBE Marine & Energy Syndicate 1036

John A.V. Nicoletti, Esq.
Robert Novak, Esq.
NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, 7th Fl.
New York NY 10005-1801

To:
Stephen D. Straus
Adam Krauss
TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
Attorneys for Defendant
Max Specialty Insurance Company
Mid Westchester Executive Park
Seven Skyline Drive
Hawthorne, NY 10532

George R. Zacharkow, Esq
Stephen J. Galati, Esq.
MATTIONI, LTD.
Attorneys for Defendant
Great American Insurance Company of New York
399 Market Street, 2nd Fl.
Philadelphia PA 19106