David S. Bland
Matthew C. Guy
LeBlanc Bland P.L.L.C.
909 Poydras Street, Suite 1860
New Orleans LA 70112
(504) 528-3088

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **FIREMAN'S FUND INSURANCE COMPANY,<br>ONE BEACON INSURANCE COMPANY,<br>NATIONAL LIABILITY AND FIRE INSURANCE<br>COMPANY and QBE MARINE & ENERGY<br>SYNDICATE 1036,**<br><br>                    Plaintiffs,<br><br>          v.<br><br>**GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, MAX SPECIALTY INSURANCE COMPANY and SIGNAL INTERNATIONAL, L.L.C.**<br><br>                    Defendants. | 10 civ 1653-JPO-JLC<br><br><br><br><br>ECF CASE |

**DEFENDANT SIGNAL INTERNATIONAL'S RESPONSE TO MAX SPECIALTY'S
RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
<u>MOTIONS FOR SUMMARY JUDGMENT</u>**

Defendant, Signal International, L.L.C., by and through its attorneys, LeBlanc Bland P.L.L.C., responds to Max Specialty Insurance Company's Statement of Undisputed Facts as follows:

1. The AFDB-5 was fabricated by the U.S. Navy during World War II in Morgan City, Louisiana, and in Pittsburgh, Pennsylvania, with assembly performed at Mare Island Naval Shipyard in Vallejo, California. *See* Declaration of Stephen D. Straus dated April

1

17, 2013 ("Straus Decl.") Ex. 2. The drydock was then towed in water to the western Pacific Ocean to service Navy vessels engaged in the war effort. *See* Straus Decl. Ex. 3.

Response to No. 1:

Undisputed.

2. Following World War II, the AFDB-5 was based in Hawaii. In or about 1984, it was towed from Hawaii to Texas for use in the private sector. On September 26, 1984, Bethlehem Steel Corporation ("Bethlehem") entered into a Project Agreement with the Port Arthur Navigation District Industrial Development Corporation ("PANDIDC") to operate the AFDB-5, then owned by PANDIDC, at a facility located in the City of Port Arthur, Texas. *See* Straus Decl. Ex. 4.

Response to No. 2:

Undisputed.

3. The Port of Port Arthur ("Port") leased the facility from the City of Port Arthur under a Lease Agreement, also dated September 26, 1984, and assigned its leasehold interest to PANDIDC. Straus Decl. Ex. 5 at 1.

Response to No. 3:

Undisputed.

4. Under the Project Agreement, the "Operator" of the drydock (ultimately Signal) assumed all the Port's obligations under the Lease Agreement with the City of Port Arthur. The Operator also assumed PANDIDC's obligations under a Land and Dry Dock Agreement comprising a sublease of the facility from the Port. Straus Decl. Ex. 4 at §2.1.

Response to No. 4:

Undisputed.

5. The Lease Agreement was for a term of twenty-five (25) years with an option to renew for an additional twenty-five (25) years. Straus Decl. Ex. 4 §10.6; Ex. 5 Art. II, XXVI.

   Response to No. 5:

   Undisputed.

6. To exercise the option to renew, notice had to be provided to PANDIDC, the Port and the City of Port Arthur of its intent to exercise the option not less than two (2) years prior to the expiration of the Agreement – in this instance by September 26, 2007, for a September 26, 2009 expiration. Straus Decl. Ex. 4 §10.6; Ex. 5 Art. II, XXVI.

   Response to No. 6:

   Undisputed. Signal properly exercised its rights and provided notice of intent to renew on September 24, 2007.

7. The Lease Agreement also required rent in the amount of $50,000 per quarter ($200,000 per year) which was paid to the City of Port Arthur, as well as "dry dock toll payments." *See* Straus Decl. Ex. 4 § 4.1; Straus Decl. Ex. 5 Art. IV.

   Response to No. 7:

   The document speaks for itself, however the above statement is undisputed.

8. In 2005, Signal purchased the drydock from PANDIDC by way of a Conditional Bill of Sale ("CBOS"). *See* Straus Decl. Ex. 6.1 The CBOS required Signal to, *inter alia*, make payments to PANDIDC in varying amounts depending upon whether, on a given day, the drydock was not occupied, operated in rig mode or operated in ship mode. *Id.* at 1.

   Response to No. 8:

   Disputed. Signal is undefined. The AFDB-5 Drydock was owned by Signal International Texas, L.P.

9. Signal's obligation to make payments under the CBOS expressly terminated "at the end of the useful life" of the drydock. Straus Decl. Ex. 6 at 1. Signal assumed various other obligations pertaining to the drydock under the CBOS, all of which applied "during the useful life of the Dry Dock." *Id.* at 1-2.

    Response to No. 9:

    Undisputed.

10. Following the purchase, Signal paid rent required by the Lease Agreement directly to the Pleasure Island Commission ("PIC"), an arm of the City of Port Arthur. *See* Straus Decl. Ex. 7.

    Response to No. 10:

    Undisputed.  The Pleasure Island Commission was charged and commissioned by the City of Port Arthur with the management of the land comprising the Dock Yard which Signal leased.

11. On September 24, 2007, Signal sent a letter to PANDIDC stating that it wanted to renew the Lease Agreement. *See* Straus Decl. Ex. 7. Yet, Signal's proposal rejected the express requirement in the Lease Agreement and Project Agreement that, *inter alia*, the renewal period be another 25 years. *Id.* Instead, Signal cited the fact that the drydock was approaching "the end of its useful life and . . . [would] likely not be operational for the entirety of the renewal period" and made a counter proposal whereby there would be an automatic termination of its obligations "in the event that the Dry Dock must be disposed of prior to the current expiration of the renewal period and a suitable replacement dry dock cannot be obtained." *Id.*

Response to No. 11:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

12. In a letter to PIC dated March 24, 2009, Signal's Senior Vice President and General Manager for Texas Operations, Rodney Meisetschlaeger, gratuitously stated that any attempt by PIC to raise the rent for any hypothetical renewal period would be improper based upon PIC's purported failure to notify Signal twenty-one (21) months before the expiration of the On September 24, 2007, Signal sent a letter to PANDIDC stating that it wanted to renew the Lease Agreement. *See* Straus Decl. Ex. 7. Yet, Signal's proposal rejected the express requirement in the Lease Agreement and Project Agreement that, *inter alia*, the renewal period be another 25 years. *Id.* Instead, Signal cited the fact that the drydock was approaching "the end of its useful life and . . . [would] likely not be operational for the entirety of the renewal period" and made a counter proposal whereby there would be an automatic termination of its obligations "in the event that the Dry Dock must be disposed of prior to the current expiration of the renewal period and a suitable replacement dry dock cannot be obtained." *Id.*

Response to No. 12:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

13. By this time, Signal had analyzed the feasibility of replacing the drydock at the end of its useful life. Straus Decl. Ex. 9 at 90. According to Signal's Chief Financial Officer, Christopher Cunningham, Signal decided that it would not replace the drydock upon the end of its useful life:

>Q. Was there a conclusion made, again, before the sinking of the dry dock as to whether Signal would purchase an existing dry dock or have a dry dock made for Port Arthur?
>
>A. Yes. That – to – involving these types of numbers . . . for the purchase of a dock, it would not be economically feasible. . . .
>
>Q. Having made that conclusion, was it Signal's intent then to stay at the Port Arthur facility, using AFDB-5 until it came to the end of its useful life?
>
>A. Yes. . . .
>
>Q. And was it Signal's business plan at the Port Arthur facility that once the AFDB-5 came to the end of its useful life, that Signal was no longer going to operate a dry dock there?
>
>A. That would be a correct assumption.

*Id.* at 92-93.

Response to No. 13:

Signal does not dispute that it would not replace the AFDB-5 Drydock at the end of its useful life.  All other characterizations are disputed.

14. On June 24, 2009, the law firm of Creighton, Fox, Johnson & Mills, PLLC, sent a letter to Signal on behalf of PIC. Straus Decl. Ex. 10. In that letter, PIC's lawyers stated that it was in default under the Lease Agreement as it failed to: (1) provide PIC and PANDIDC with evidence of insurance coverage; (2) record an assignment to one of Signal's creditors; (3) obtain consent for construction of a new parking lot; (4) construct and properly maintain a solid barrier along the boundaries of the premises; and (5) "stabilize all ships, inlets and channel frontage so as to prevent erosion." *Id.*

Response to No. 14:

The document speaks for itself.  Signal disputes any characterization of the contents of that document.

15. Signal responded to the landlord's default letter by correspondence dated July 24, 2009. Straus Decl. Ex. 11. Among other things, Signal: (1) provided copies of certificates of insurance, (2) denied executing an assignment; (3) contested that it had constructed a new parking lot, claiming it merely re-graveled a former parking area; (4) represented that a fence would be installed by August 31, 2009; and (5) stated that it would provide a proposed action plan to control erosion. *Id.*

    Response to No. 15:

    The document speaks for itself.  Signal disputes any characterization of the contents of that document.

16. Signal responded to the landlord's default letter by correspondence dated July 24, 2009. Straus Decl. Ex. 11. Among other things, Signal: (1) provided copies of certificates of insurance, (2) denied executing an assignment; (3) contested that it had constructed a new parking lot, claiming it merely re-graveled a former parking area; (4) represented that a fence would be installed by August 31, 2009; and (5) stated that it would provide a proposed action plan to control erosion. *Id.*

    Response to No. 16:

    The document speaks for itself.  Signal disputes any characterization of the contents of that document.

17. In the August 12, 2009 letter, PIC also rejected Signal's proposed fence construction plan as it did not meet the lease requirement that the entire premises be enclosed. Straus Decl. Ex. 12 at 2. The attorney's letter further stated that Signal was in default of the lease because Signal was required to construct the fence within twenty-four (24) months of the

inception of the lease. *Id.* The letter also rejected Signal's plan for erosion control of a portion of the "channel footage," as insufficient under the lease. *Id.*

Response to No. 17:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

18. Due to Signal's defaults, the August 12, 2009 letter from PIC's lawyers formally notified Signal that the landlord was exercising its contractual right to terminate the lease, effective September 15, 2009. Straus Decl. Ex. 12 at 3. Moreover, PIC demanded, in accordance with the lease, two (2) years' rent representing liquidated damages for termination of the lease. *Id.*

Response to No. 18:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

19. Due to Signal's defaults, the August 12, 2009 letter from PIC's lawyers formally notified Signal that the landlord was exercising its contractual right to terminate the lease, effective September 15, 2009. Straus Decl. Ex. 12 at 3. Moreover, PIC demanded, in accordance with the lease, two (2) years' rent representing liquidated damages for termination of the lease. *Id.*

Response to No. 19:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

20. On August 18, 2009, John Haley, on behalf of Signal, and Jimmy Dike, the Director of PIC, signed a "proposal" for an extension of the lease. Straus Decl. Ex. 13. The document

proposed (i) a six (6) year lease extension with annually rent increasing and (ii) two (2) options to renew for additional six-year terms with rent to be determined. *Id.* No other proposed terms were set forth in the proposal. *Id.* By its terms, the proposal was to be presented to the respective managerial officers of Signal and PIC for approval. *Id.* PIC was to respond to the proposal by September 3, 2009. *Id.*

Response to No. 20:

The document speaks for itself. Signal disputes any characterization of the contents of that document. Moreover, John Haley and Jimmy Dike both confirm that they agreed to the extension and rates for a new lease that would have been approved by the Pleasure Island Commission but for the sinking of the AFDB-5 Drydock. *See* Haley Affidavit; Dike Affidavit.

21. The drydock sank the next day, August 20, 2009. PIC never approved the proposed lease extension. Straus Decl. Ex. 9 at 199.

Response to No. 21:

Disputed. The lease extension was moot due to the sinking of the AFDB-5 Drydock. *See* Haley Affidavit; Dike Affidavit.

22. On September 8, 2009, Signal's CFO, Chris Cunningham, sent a letter to Jimmy Dike of PIC informing him that the drydock had sunk and was thus "at the end of its useful life." Straus Decl. Ex. 15. Following what it had determined to do in such an eventuality a year before the sinking, Signal informed PIC that it would not replace the drydock and thus would not enter into a new lease for the premises. *Id.*

Response to No. 22:

The document speaks for itself.  Signal disputes any characterization of the contents of that document and further disputes any characterizations of the sinking by Max Specialty.

23. Signal and PIC executed a First Amendment to Lease and Release Agreement, effective September 25, 2009 ("Amendment"). Straus Decl. Ex. 16. The purpose of the Amendment was to (i) resolve PIC's claims concerning Signal's default under the existing lease and (ii) permit Signal to remain on site to complete drydock salvage and removal operations. *Id.*

Response to No. 23:

The document speaks for itself.  Signal disputes any characterization of the contents of that document.

24. Signal and PIC executed a First Amendment to Lease and Release Agreement, effective September 25, 2009 ("Amendment"). Straus Decl. Ex. 16. The purpose of the Amendment was to (i) resolve PIC's claims concerning Signal's default under the existing lease and (ii) permit Signal to remain on site to complete drydock salvage and removal operations. *Id.*

Response to No. 24:

The document speaks for itself.  Signal disputes any characterization of the contents of that document.

25. The Amendment expressly stated: (1) that Signal's September 24, 2007 notice of intent to renew was withdrawn; (2) the lease was extended six (6) months to March 25, 2010, with an option to extend the lease on a month-to-month basis thereafter through September 25, 2010, for the purpose of drydock salvage and removal; and (3) Signal was to tender

$800,000 to PIC for rental through March 25, 2010, and to resolve Signal's breaches/defaults under the lease. Straus Decl. Ex. 16 at ¶¶2-4.

Response to No. 25:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

26. The Westchester Policy covers, in pertinent part, loss

> resulting from the necessary interruption or reduction of business operations conducted by the Insured and caused
>
> by physical loss, damage or destruction, by a Peril insured by this Policy, of property insured.

Straus Decl. Ex. 17 at WILLIS00752.

Response to No. 26:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

27. Business interruption coverage is afforded for "Actual Loss Sustained" during the "Period of Recovery resulting from the interruption or reduction of operations." Straus Decl. Ex. 17 at WILLIS00752. The policy also covers "extra expenses" resulting from the same circumstances. *Id.* at WILLIS00753.

Response to No. 27:

The document speaks for itself. Signal disputes any characterization of the contents of that document.

28. The "Period of Recovery" may not exceed the time required:

> with the exercise of due diligence and dispatch to rebuild, repair or replace lost, damaged or destroyed property and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the loss.

Straus Decl. Ex. 17 at WILLIS00756.

> Response to No. 28:
>
> The document speaks for itself.  Signal disputes any characterization of the contents of that document.

29. Business interruption coverage also includes an "Extended Period of Recovery," not exceeding one hundred twenty (120) days, "to restore the Insured's business to the condition that would have existed had no 'Time Element' loss occurred." Straus Decl. Ex. 17 at WILLIS00740, WILLIS00756.

> Response to No. 29:
>
> The document speaks for itself.  Signal disputes any characterization of the contents of that document.

Signal further supplements its response with the following paragraphs of additional undisputed material facts.

1. Jimmy Dike is the Chairman of the Pleasure Island Commission in Port Arthur, Texas. Decl. of Bland, Attachment A.

2. The Pleasure Island Commission is charged and commissioned with the management of the land owned by the City of Port Arthur and leased to the Port of Port Arthur Navigation District ("PANDIDC"), including the area commonly known as the "Dock Yard" that was leased to Signal prior to the AFDB-5 Drydock's sinking.

3. PANDIDC assumed the Port of Port Arthur Navigation District's obligations under the original lease.  Decl. of Bland, Attachment A.

4. Payments under that lease have always been paid to the Pleasure Island Commission. Decl. of Bland, Attachment A.

5. On September 24, 2007, Signal sent correspondence to PANDIDC, the Port of Port Arthur Navigation District and the Pleasure Island Commission stating its intention to renew the lease but for a period of less than 25 years. Decl. of Bland, Attachment A.

6. Correspondence followed between Signal and attorneys retained on behalf of the Pleasure Island Commission about the renewal of the lease and other issues concerning the existing lease.  Decl. of Bland, Attachment A.

7. Ultimately, in August 2009, Jimmy Dike met with John Haley of Signal to discuss terms for renewal. Decl. of Bland, Attachments A & B.

8. Jimmy Dike and John Haley agreed to a new lease between the Pleasure Island Commission and Signal that was to run for a six year from September 2009 to September 2015, with escalating rent and an option to renew.   Decl. of Bland, Attachments A & B.

9. Mr. Dike believed that the Pleasure Island Commission would have accepted the proposal and it would have been formalized into a new lease agreement.  Decl. of Bland, Attachment A.

10. John Haley contacted Jimmy Dike shortly after the sinking of the AFDB-5 and explained that Signal no longer needed a six year lease for the site.  Rather, Signal required only a brief extension of the lease for the removal of the wreck of the AFDB-5, which was agreed instead.  Decl. of Bland, Attachments A.

11. The wreck of the AFDB-5 was subsequently removed and on March 15, 2012, Jimmy Dike confirmed on behalf of the Pleasure Island Commission that Signal had met its obligations under the lease and its extension and that Signal's obligations were now terminated.  Decl. of Bland, Attachment A.

12. Neither Jimmy Dike, the City of Port Arthur, the Port Arthur Navigation District, the Port Arthur Navigation District and Industrial Development Corporation, nor the Pleasure Island Commission have any financial or other interest in the outcome of the insurance disputes between Signal and Max Specialty.  Decl. of Bland, Attachment A.

Respectfully submitted,

Dated:   May 22, 2013
         New Orleans, LA

**LeBlanc Bland P.L.L.C**
Attorneys for Defendant
Signal International, L.L.C.

By:  /s/ David S. Bland
David S. Bland
Matthew C. Guy
LeBlanc Bland P.L.L.C.
909 Poydras Street, Suite 1860
New Orleans LA 70112
(504) 528-3088
dbland@leblancbland.com
mguy@leblancbland.com

STEPHEN P. KYNE
Burke & Parsons
100 Park Avenue
New York NY  10017-5533
(212) 354-3800
kyne@burkeparsons.com

To:
Stephen D. Straus
Adam Krauss
TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
Attorneys for Defendant
Max Specialty Insurance Company
Mid Westchester Executive Park
Seven Skyline Drive
Hawthorne, NY 10532

George R. Zacharkow, Esq
Stephen J. Galati, Esq.
MATTIONI, LTD.
Attorneys for Defendant
Great American Insurance Company of New York
399 Market Street, 2nd Fl.
Philadelphia PA 19106


John A.V. Nicoletti, Esq.
Robert Novak, Esq.
NICOLETTI HORNIG & SWEENEY
Attorneys for Plaintiffs
Fireman's Fund Insurance Company,
One Beacon Insurance Company,
National Liability and Fire Insurance Company
QBE Marine & Energy Syndicate 1036
Wall Street Plaza
88 Pine Street, 7th Fl.
New York NY 10005-1801