**EXHIBIT A**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIREMAN'S FUND INSURANCE COMPANY, ONE BEACON INSURANCE COMPANY, NATIONAL LIABILITY AND FIRE INSURANCE COMPANY and QBE MARINE & ENERGY SYNDICATE 1036, Plaintiffs, VS. GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, MAX SPECIALTY INSURANCE COMPANY and SIGNAL INTERNATIONAL, LLC, Defendants. | EFC CASE 10 Civ. 1653 (LAK) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
REESE LEVER
December 15, 2011

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF REESE LEVER, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on December 15, 2011, from 8:55 a.m. to 12:54 p.m., by machine shorthand before MICHELLE R. PROPPS, CSR, in and for the State of Texas, reported at the offices of LeBlanc Bland, 1717 St. James Place, Suite 360, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated in the record or attached hereto.

ORAL DEPOSITION OF REESE LEVER

Page 70

1  exactly what their response said, so I don't remember.
2    Q.  Whatever response you got was in the file; is
3  that correct?
4    A.  Yes.
5    Q.  And isn't it also true you added this vessel
6  as is, where is, as reflected on the survey, on the
7  promise that the insured would follow the
8  recommendations?
9    A.  Yes.
10   Q.  Isn't it also true you never sent a surveyor
11  down to confirm the recommendations had been followed?
12  Isn't that true?
13   A.  That's correct.
14   Q.  Isn't it also true you received no audio gauge
15  reports on this vessel?
16   A.  That's correct.
17   Q.  Isn't it also true you never received advice
18  that the audio gauging had, in fact, been done?
19   A.  That, I don't remember.
20   Q.  Again, if there's anything, it's in the file?
21   A.  Yes.
22   Q.  Before we leave this survey, the second -- the
23  second item down on conditions, it says, "The vessel
24  deck was sighted in good condition with doubler plates
25  scattered throughout the deck." Do you know what a

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 71

1  doubler plate is?
2    A.  Not off the top of my head.
3    Q.  You were a deck officer, and you don't know
4  what a doubler plated is?  No?
5    A.  It's not coming back to me right now.
6    Q.  Would it refresh your recollection that a
7  doubler plate is a second sheet of steel placed over a
8  deck area where there's corrosion, rust or holing in the
9  deck?
10   A.  Yes.
11   Q.  Now, we have a common understanding of what a
12  doubler is.  So the fact that it had doubler plates
13  scattered through the deck did not raise any concerns
14  with you?
15       MR. ZACHARKOW:  Objection.
16   A.  I'm not saying it did or it didn't.  That's --
17   Q.  (By Mr. Nicoletti)  Did it prevent you from --
18  did it prevent you from adding this vessel to the fleet
19  policy for pollution liability?
20   A.  No.
21   Q.  And isn't it true there was no recommendation
22  to fix the deck, or make it a single -- to remove the
23  doublers and insert the steel?
24   A.  I'd have to look back at the recommendations.
25   Q.  Well, take a look.  What page do the

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 72

1  recommendations appear?
2    A.  128.  Where was the doubler plate?
3    Q.  I'm sorry.  I might have read from the wrong
4  report.  I apologize.  Strike that.
5        MR. ZACHARKOW:  Objection.
6        MR. NICOLETTI:  What basis? I withdrew
7  the question.
8        MR. ZACHARKOW:  Wrong report.
9        MR. NICOLETTI:  I withdrew the question.
10   Q.  (By Mr. Nicoletti)  Now, one of the
11  recommendations is that, "Wastage holes in bulkheads
12  need to be addressed."  Now, that was a condition noted.
13  But I gather that was not of underwriting consideration
14  for you; is that correct?  Because you didn't identify
15  it going through.
16   A.  It would have been.
17   Q.  Now, it is.  What did you do to follow up to
18  determine whether or not the wastage hulls had been
19  sealed?
20   A.  The follow-up we had was sending an e-mail
21  requesting the status of the recommendations in the
22  survey.
23   Q.  But again, you bound this risk -- you added
24  this risk to the policy day one on the promise from the
25  insured it would complete these recommendations; is that

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 73

1  correct?
2    A.  Yes.  And as an accomodation to Signal, again,
3  since we had been writing the business since 2004.
4    Q.  So I gather Signal's word to you was
5  sufficient for you to bind the risk --
6        MR. ZACHARKOW:  Objection.
7    Q.  (By Mr. Nicoletti) -- for this vessel?
8    A.  Yes.
9    Q.  You trusted Signal's word; is that correct?
10  You trusted Signal in its representations; is that
11  correct?
12   A.  Yes.
13   Q.  Do you have any understanding why in this
14  particular litigation that Great American is accusing
15  Signal of deceptive practices?  Any basis for that,
16  based on your dealing with them?
17       MR. ZACHARKOW:  Objection.
18   A.  On -- not on my -- I've never dealt directly
19  with Signal, always through Willis, so --
20   Q.  (By Mr. Nicoletti)  Willis is the agent of
21  Signal, are they not?
22   A.  Yes.
23   Q.  So anything Willis gave you comes from Signal;
24  is that correct?
25   A.  Yes.

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

19 (Pages 70 to 73)

ORAL DEPOSITION OF REESE LEVER

Page 78

1  Q. Long ton. Now, again, based upon what you've
2  told me in the past, the particular points of interest
3  in the survey would be in the conditions and
4  recommendations. Do you recall that?
5  A. Yes.
6  Q. Let's turn to the conditions and
7  recommendations, the conditions starts at GA-161, and go
8  through them all and advise me which of these would
9  raise concerns in your underwriting analysis.
10  A. The second condition, the last sentence, "This
11  area of the drydock does show old extensive pitting."
12  Q. That relates to the hull, the pontoons?
13  A. Yes, hull and wing walls of the drydock.
14  Q. Okay. Anything else on page -- on the
15  following page, GA-162?
16  A. Then the fourth condition down on Page 162.
17  Q. Okay. Please read that.
18  A. The last sentence, "Heavy wastage was found on
19  the overhead longitudinal angles and in way of the
20  outboard, non-tight bulkhead with waste hulls located 6
21  to 8 feet above the bottom of the pontoon."
22  Q. Anything further?
23  A. I mean, it does say, "heavy rust and scale,"
24  that would be -- in the same paragraph.
25  Q. Okay. Anything further going down?

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 79

1  A. The next condition, "Transverse bulkheads in
2  Bay C were noted to have wastage and holed in the area
3  of 6 to 8 feet above the bottom."
4  Q. Anything further?
5  A. The next one, "The No. 1 starboard compartment
6  was consistent with the No. 1 port compartment with
7  heavy rust and scale and overhead angles having heavy
8  wastage."
9  Q. Anything further in Conditions?
10  A. The next one, "Reportedly there is side shell
11  damage in Bay C and horizontal stiffener is wasted."
12  Q. You would not have taken note of the fact that
13  they were unable to inspect the starboard compartment
14  because of 2 to 3 feet of water in the bottoms?
15  A. Well, yes. I was saying that was probably
16  because reportedly there was side shell damage and the
17  horizontal stiffener was wasted. I think that's what
18  they were saying.
19  Q. Anything else?
20  A. The next condition as well, "The forward end
21  of the No. 2 port compartment showed signs of heavy rust
22  and scale, and bottom longitudinal is wasted in way of
23  the flanges. Forward bulkhead vertical stiffeners
24  wasted in way of the flanges. Deck transverse channels
25  showed signs of wastage along with the bottom chords.

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 80

1  The aft end of the No. 2 port compartment was in
2  good" --
3  Q. The aft end --
4  A. Well, that was -- that says it was in good
5  condition. So...
6  Q. Okay.
7  A. That's it for the conditions.
8  Q. Despite all of the conditions you noted as
9  being a concern to you, you added this drydock to the
10  Signal pollution policy, fleet policy, did you not?
11  A. Yes.
12  Q. Now, let's look at Recommendations. Which are
13  the recommendations you would focus on as needing to be
14  corrected in the future?
15  A. The main one would be, "All wasted and damaged
16  structural members in way of the vessel's internals need
17  to be addressed and repaired to make structurally
18  sound."
19  Q. Despite this to be an ongoing recommendation,
20  not yet completed, you added this vessel to Signal's
21  fleet policy, did you not?
22  A. Yes.
23  Q. And the policy I'm referring is the Great
24  American pollution policy; is that correct?
25  A. Vessel pollution policy. Yes.

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 81

1  Q. Right. Did you at any time follow up to
2  ensure that these recommendations were completely
3  followed -- completely fulfilled?
4  A. We did follow up, yes.
5  Q. When you followed up, did you ever confirm the
6  recommendation was complied with that all structural
7  internals were renewed and replaced?
8  A. I don't remember the exact responses to our
9  follow-ups. But it was -- we were definitely told they
10  were being worked on. I don't know if it was totally --
11  all the recommendations had been complied with yet or
12  not.
13  Q. So you relied upon Signal's representation
14  that these recommendations would be completed sometime
15  in the future?
16  A. Yes.
17  Q. Did you ever tell Signal how long they had to
18  fulfill these recommendations or comply with the
19  recommendations?
20  A. Not that I remember.
21  Q. In other words, you never threatened to take
22  this vessel off the schedule if it took them a couple of
23  years to complete those recommendations, did you?
24  A. No.
25  Q. In fact, you would have left the vessel on as

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 82

1  long as they were showing some good faith progress in
2  correcting the vessel; isn't that correct?
3      A. More than likely. Like I say, that's
4  situational. I mean, it just depends.
5      Q. I'm going to apologize to you, Mr. Lever, even
6  though it's really your counsel's fault. I have no
7  copies of the 2011 -- or do we have copies of it? We
8  don't have copies of the 2011 file, so --
9          MR. GUY: It's the one we got this
10 morning.
11         MR. NICOLETTI: Yes. That's why I was
12 burning George.
13         MR. ZACHARKOW: You asked for it
14 yesterday afternoon, we got it to you today.
15         MR. GUY: Here's mine. (Handing)
16         MR. NICOLETTI: I thought it was part of
17 my underlying request. Anyway, let me have the entire
18 document marked, this way -- because there are not Bates
19 numbers on it.
20         MR. ZACHARKOW: No. And as we discussed,
21 it was --
22         MR. NICOLETTI: No, I understand.
23         MR. ZACHARKOW: Let me just make it clear
24 on the record. It came up yesterday at Ms. Stringer's
25 deposition that you wanted it. We arranged to get it

Sunbelt Reporting & Litigation Services
Houston Austin Bryan/College Station Corpus Christi Dallas/Fort Worth East Texas San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 83

1  overnight, we've brought it here and provided it to you.
2  It's not Bates stamped. We will provide a Bates stamped
3  copy as well as --
4          MR. NICOLETTI: Privileged log to be --
5          MR. ZACHARKOW: -- a supplement to our
6  privileged log to cover certain -- a handful of
7  documents that were removed.
8          MR. NICOLETTI: Let's have this
9  compilation of documents, which has been represented to
10 us as being the underwriting file for the renewal of the
11 Signal pollution liability policy for the year January
12 2011 through January 2012, marked.
13         (Exhibit No. 257 marked.)
14     Q. (By Mr. Nicoletti) Mr. Lever, I'm going to
15 hand you what we've marked as Exhibit 257. It was
16 represented to us as being your underwriting file. Are
17 you familiar with that file?
18     A. Yes.
19     Q. Is it one of your files that you actually are
20 responsible for?
21     A. Yes.
22     Q. Can you go through it, take as much time as
23 you need, to let me know if that's the complete
24 underwriting file?
25         MR. ZACHARKOW: With the exception of the

Sunbelt Reporting & Litigation Services
Houston Austin Bryan/College Station Corpus Christi Dallas/Fort Worth East Texas San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 84

1  documents that --
2          MR. NICOLETTI: Documents that were
3  removed for privilege.
4      A. To my knowledge, I pointed through and printed
5  out everything yesterday, so it should all be there.
6      Q. (By Mr. Nicoletti) Okay. Good. Now, can you
7  turn to that section of the file which, in your
8  understanding, represents the communications on the
9  renewal?
10     A. That would be towards the back.
11     Q. I think it might start with this document.
12 (Indicating)
13     A. All right. I think we're on the same
14 document.
15     Q. Since there are no Bates numbers, can you
16 identify the document you've turned to by the title?
17     A. The Great American Insurance Company of New
18 York Vessel Pollution Liability Application.
19     Q. And this was for the Signal account?
20     A. Yes.
21     Q. And this was for the 2011 to 2012 policy year?
22     A. Yes.
23     Q. Is this the same basic application form that's
24 been used for the 2009, 2010, and now the 2011 renewal
25 of the Signal pollution liability policy?

Sunbelt Reporting & Litigation Services
Houston Austin Bryan/College Station Corpus Christi Dallas/Fort Worth East Texas San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 85

1      A. Yes, it looks like it.
2      Q. And again, on this policy, it shows that the
3  P&I is through an MGL, including watercraft endorsement?
4      A. Yes.
5      Q. Who is AIHC?
6      A. I think that's saying that that's the form
7  they're using for the hull form, American Institute Hull
8  Clauses.
9      Q. Okay. Do you know who the underwriter is this
10 year, for 2011, on the MGL?
11     A. Well, it says, "One Beacon" above it.
12     Q. Well, that says, "Current Hull/P&I Carrier" is
13 "Allianz/One Beacon"; is that correct?
14     A. Yes.
15     Q. And then it says, "Current hull/P&I Form,"
16 it's your understanding that Allianz and One Beacon are
17 on the MGL?
18     A. Yes.
19     Q. Again, the application form does not request
20 any information on the condition of any vessel to be
21 insured under the pollution policy, does it?
22     A. No.
23     Q. Now, the next series of documents in the file
24 appears to be the declaration page for the policy that
25 was issued for 2011-2012?

Sunbelt Reporting & Litigation Services
Houston Austin Bryan/College Station Corpus Christi Dallas/Fort Worth East Texas San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 102

1  in the file.
2      MR. NICOLETTI: Well, I agree. If I have
3  it in the file, that's fine. I'm looking for things
4  that are not in the file. I leave that to you gentlemen
5  to figure out how you get that information to me.
6      Again, I need a list of my requests at
7  the end of the transcript.
8      Q. (By Mr. Nicoletti) Let me direct your
9  attention to an e-mail from yourself to Mr. Vernon dated
10  Tuesday, January 11th, 2011. Do you see that in front
11  of you?
12      A. Yes.
13      Q. Let's have that marked as Exhibit 267.
14          (Exhibit No. 267 marked.)
15      Q. At the bottom is Mr. Ewing's e-mail to you
16  dated January 5th, 2011, saying, "Attached please find
17  the renewal submission for the pollution for Signal."
18  You see that?
19      A. Yes.
20      Q. And the top e-mail on that same page is your
21  response attaching your renewal quotation.
22      A. Yes.
23          MR. ZACHARKOW: Is that what 267 was?
24          MR. NICOLETTI: Yeah.
25      Q. (By Mr. Nicoletti) Now, your e-mail to Mr.

Sunbelt Reporting & Litigation Services

ORAL DEPOSITION OF REESE LEVER

Page 103

1  Ewing references the renewal quotation. Is that
2  Exhibit 266?
3      A. Yes.
4      Q. You also say, "I've also attached our current
5  valued loss run for your review."
6      A. Yes.
7      Q. What is that? What document is that? Have we
8  seen it?
9      A. We have not seen it, no.
10      Q. Okay. Then it says, "Please note that due to
11  current open claim, we will not be able to offer a
12  reduction on the renewal." What open claim are you
13  referring to?
14      A. This one. (Indicating)
15      Q. Okay. All along, I've been told by you and
16  Ms. Stringer there was no claim, but I gather this now
17  tells me you have an open claim on this file, on this
18  account.
19      A. Well, what I've been told is there's been no
20  claim submitted, but we have an open claim number for
21  this -- this.
22      Q. Who told you that no claim was submitted?
23      A. Julia Price.
24      Q. And do you know the basis of Ms. Price's
25  statement that there's no open claim on this file,

Sunbelt Reporting & Litigation Services

ORAL DEPOSITION OF REESE LEVER

Page 104

1  despite the pending lawsuit?
2      MR. ZACHARKOW: Objection.
3      Q. (By Mr. Nicoletti) You can answer.
4      A. No, I don't know.
5      Q. Okay. Now, let's go to the next document,
6  which looks like a -- a reprint of your renewal
7  quotation. Do you see that?
8      A. Yes.
9      Q. Are these your handwritten notes whereby
10  you're trying to calculate the premium?
11      A. Those are Steve Weber's notes.
12      Q. Oh, these are Weber's notes. Okay. Does this
13  indicate to you that Mr. Weber was reviewing for
14  purposes of approving your work on this account?
15      A. Yes.
16      Q. Did you have authority to write this account
17  without Mr. Weber approving it?
18      A. I don't know if this one fell within my
19  authority or not, but he wanted to approve this one.
20      Q. Do you know why Mr. Weber wanted to approve
21  this particular quote? Did he tell you?
22      A. No, he did not.
23      Q. We have a rule when a person's name is
24  mentioned more than three times, he's the next witness
25  on the list.

Sunbelt Reporting & Litigation Services

ORAL DEPOSITION OF REESE LEVER

Page 105

1      MR. ZACHARKOW: That's your rule, not
2  ours. Your name's been mentioned a lot in these
3  depositions, Mr. Nicoletti.
4      MR. NICOLETTI: You can take my
5  deposition anytime. I'm certain it's not going to help
6  you. Can you please mark that as the next exhibit,
7  which I think is Exhibit 268?
8          (Exhibit No. 268 marked.)
9      MR. ZACHARKOW: Where did 268 start?
10      MR. NICOLETTI: These two pages.
11  (Indicating)
12      MR. ZACHARKOW: Thank you.
13      Q. (By Mr. Nicoletti) Now, you've identified the
14  printing as Mr. Weber's; is that correct?
15      A. Yes.
16      Q. Is there any information on here, other than
17  suggested pricing changes for the premium?
18      A. The addition of a removal of wreck exclusion.
19      Q. Where do you see that? Ah. Is that the first
20  time that that was placed in the policy? It says,
21  "Removal of waiver exclusion," doesn't it, not "wreck"?
22      A. I'm not going to interpret his handwriting.
23      Q. He's got an arrow going to a line. What does
24  the printed line state?
25      A. We should be able to see that on the

Sunbelt Reporting & Litigation Services

ORAL DEPOSITION OF REESE LEVER

Page 130

1  was material to you in underwriting this -- or renewing
2  the underwriting of this pollution policy.
3       A. Yes. For renewing this policy, yes.
4       Q. Now, Mr. Nicoletti showed you earlier a series
5  of underwriting guidelines, pollution guidelines, I
6  think they were called. And there are a total of four
7  editions. Do you recall that?
8       A. Yes.
9       Q. Here it is somewhere. Here they are. Okay.
10 Edition No. 1 was marked as Exhibit 241. That's dated
11 December 31st, '98.
12      A. Yes.
13      Q. Edition No. 2, that's Exhibit 245 -- sorry.
14 I'm sorry. We don't have Exhibit 243, but it's dated
15 January 1st, 2005. And that was Exhibit 243.
16      A. Okay.
17      Q. Then we have Edition 3, what's called again --
18 and it's dated January 1st, 2007. Okay. And that was
19 Exhibit 245. And I'm not entirely clear from your
20 earlier testimony which of these you relied on, if any,
21 when renewing the Signal account for 2009 in late 2008,
22 early 2009.
23      A. If there would have been, it would have been
24 version one, because when I got to Great American, I
25 would have just copied whatever Cindy Stringer had. And

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 131

1  I think -- I'm pretty sure that's the one she had.
2       Q. This is the 1998 one?
3       A. Yes.
4       Q. You hadn't seen the 2005 or 2007 versions?
5       A. Not that I remember, no. And I don't --
6  truthfully, I don't even remember if I looked at the
7  guidelines for the renewal.
8       Q. Okay. Ms. Stringer testified -- and if
9  counsel objects to my -- how I describe her testimony,
10 we'll see if we can work it out so that we're happy --
11 that one of the important things from a pollution
12 underwriter's point of view was that this was an
13 acceptable -- the vessels being insured were acceptable
14 to a hull insurer. You're nodding your head. If you
15 can say yes or no. Would you agree with that?
16      A. I think, as I stated earlier to Mr. Nicoletti,
17 the way I interpreted it is that would have to be an
18 acceptable risk for us as a hull underwriter, for Great
19 American, yes. So similar to what you're saying, yes.
20      Q. Okay. But as I understood Ms. Stringer's
21 testimony, she was saying if there was existing hull
22 insurance that satisfied hull underwriters, the fact
23 that there was such underwriters in and of the itself
24 would be satisfactory to Great American.
25          MR. ZACHARKOW: Objection. Is that a

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 132

1  question or a statement?
2       Q. (By Mr. Guy) Is that correct?
3          MR. NICOLETTI: Do you agree with that?
4  If that is Ms. Stringer's testimony, do you agree with
5  it?
6          MR. ZACHARKOW: Objection.
7          MR. NICOLETTI: You can ask it that way.
8  You can answer.
9       A. What I would say is if -- if there is current
10 hull insurance, we would expect that they had done their
11 due diligence to -- and that the vessels are good to be
12 covered.
13      Q. (By Mr. Guy) Okay. Same thing with P&I
14 insurance.
15      A. Yes.
16      Q. Ms. Stringer's testimony was that if there is
17 P&I insurance in place, then, again, to use your words
18 just now, you would expect they had done their due
19 diligence when considering this as a pollution risk.
20 Would you agree with that?
21      A. Yes.
22      Q. In this particular case, the AFDB-5 drydock
23 that's the subject of this litigation is not insured on
24 a hull policy. Did you know that?
25      A. I truthfully -- I didn't remember that until

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 133

1  we just went through that, to tell you the truth.
2       Q. In fact, it's insured on an inland property,
3  non-marine policy. Did you know that?
4       A. Yes, I knew that.
5       Q. And Ms. Stringer's testimony, when I asked her
6  if that made any difference that it was on a property
7  policy rather than a hull policy, was that that would
8  make no difference as long as there was that coverage
9  for physical damage. Would you agree with that?
10         MR. ZACHARKOW: Objection. You can
11 answer.
12      A. Yes, because I remember looking back at the
13 app., that it said that -- the AIHC, which would be the
14 American Institute of Hull Clauses.
15      Q. (By Mr. Guy) The point being a hull -- marine
16 hull policy or a land based property policy, as long as
17 the coverage is there for physical damage, you assume
18 that those underwriters had done their due diligence.
19 Correct?
20      A. Yes.
21      Q. Similarly, you understand that there's no P&I
22 policy, as such, in place for this risk? You understand
23 that?
24      A. Yes.
25      Q. And instead, there's a marine general

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

34 (Pages 130 to 133)

ORAL DEPOSITION OF REESE LEVER

Page 134

1  liability policy.
2     A. Yes.
3     Q. Who's represented by -- primary and excess is
4  represented by Mr. Nicoletti here. Again, is that
5  satisfactory to you as a pollution underwriter?
6     A. Yes.
7     Q. If we look at the later versions of the
8  underwriting criteria -- and it doesn't matter if we
9  look at Exhibit 243, which is the 2005 edition, or if we
10 look at Exhibit 245, which is the 2007 edition. Both of
11 them taking, insofar as the questions I'm going to ask
12 you, the relevant -- the same words under underwriting
13 criteria. Okay?
14    A. Okay.
15    Q. Both of them say, "Vessels must be acceptable
16 as hull risks." Do you believe that in the renewal of
17 this risk in 2008, 2009 year -- policy year that the
18 property insurance was in place on the AFDB-5 and the
19 hull insurance that was in place on the other vessels in
20 the schedule indicated to you that that criteria had
21 been fulfilled?
22    A. Yes.
23       MR. NICOLETTI: You misspoke. You said
24 2008, and it's the 2009-2010 policy.
25       MR. GUY: Correct. I was talking about

ORAL DEPOSITION OF REESE LEVER

Page 135

1  the time of the renewal --
2       MR. NICOLETTI: Right.
3       MR. GUY: -- 2008. But it's --
4     Q. (By Mr. Guy) He's correct. It's 2009 policy.
5  So that underwriting criteria, even though you didn't
6  have these pollution policy guidelines, was being
7  fulfilled. Correct?
8     A. Yes.
9     Q. The other thing that's said on the application
10 from 2007, and this is different -- yeah, from
11 Exhibit 245, it's not in the 2005 Exhibit 243, is that
12 applications containing vessels over 25 years old should
13 be accompanied by a recent survey. Do you recall that?
14 You can see it again if you like.
15    A. Yes, I recall seeing that on the exhibit.
16 Yes.
17    Q. Mr. Nicoletti asked you a series of questions
18 about that. Do you recall that?
19    A. Yes.
20    Q. And I think I understood your answer to be --
21 and please correct me if I'm wrong -- that your practice
22 was not to do that for existing accounts where you were
23 just renewing them.
24    A. That's correct.
25    Q. Are you aware of -- and we've agreed already

ORAL DEPOSITION OF REESE LEVER

Page 136

1  there are a number of vessels on the schedule that was
2  attached to the exhibit I showed you earlier that
3  are more than 25 years old.
4     A. Yes.
5     Q. And includes the AFDB-5.
6     A. Yes.
7     Q. Are you aware -- at any time prior to the
8  Bender surveys that Mr. Nicoletti showed to you, are you
9  aware of any time that Great American, on the pollution
10 policy, requested surveys from Signal International on
11 any of the vessels on that schedule, or any other piece
12 of marine property?
13    A. Not that I'm aware of. But I was only there
14 about six months before this renewal.
15    Q. Fair enough. Have you ever checked the file
16 to see if there were such surveys?
17    A. I've checked the survey section and did not
18 see any other surveys.
19    Q. Would you agree with me that as a -- an
20 existing underwriter, for that matter, one seeking
21 renewal of an existing policy in 2008 for 2009 year, you
22 would be perfectly entitled to ask for surveys on any of
23 the property that was part of the proposed schedule?
24    A. Yes, you'd be entitled to ask that.
25    Q. Okay. I believe that you testified earlier

ORAL DEPOSITION OF REESE LEVER

Page 137

1  that you may have done that with some of the Bender
2  assets and there may not have been surveys on them; is
3  that correct?
4     A. Yes.
5     Q. Going back to the 2009 renewal, at no time did
6  you request any surveys on them.
7     A. No, nothing. Yeah. No.
8     Q. If you were to have requested a survey, would
9  you want the most recent survey on any particular marine
10 asset or vessel?
11       MR. ZACHARKOW: Objection. You can
12 answer.
13    A. Yes, we'd want the most recent survey.
14    Q. (By Mr. Guy) And you would always make these
15 approaches to the broker, who would then pass it on to
16 the insured; is that correct?
17    A. Yes.
18    Q. In this case, that would be Willis and then
19 Signal?
20    A. Yes.
21    Q. Okay. If you did ask Willis for a survey on
22 any particular piece of property or vessel on the
23 schedule, and they responded, we've got surveys going
24 back a decade on this, would you want all those surveys
25 or just the most recent?

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

35 (Pages 134 to 137)

ORAL DEPOSITION OF REESE LEVER

Page 138

1  A. I'd want to see all of them, to tell you the
2  truth. I'd want as much information as I could get on
3  the vessel.
4  Q. Did you ever ask that?
5  A. I never asked for all the surveys.
6  Q. You never asked for any surveys. Right?
7  A. Yeah. Besides the Bender.
8  Q. Right.
9  A. I asked for those surveys.
10  Q. Do you believe that, even without asking, the
11  insured should provide those -- all surveys on all 27
12  pieces of marine property, even without you asking?
13      MR. ZACHARKOW: Objection. You may
14  answer.
15  A. No, I don't believe they should provide all
16  the surveys. But I do believe if there's any vessels
17  that aren't, I guess, up to spec, that they should let
18  us know what they're doing to get these vessels back up
19  and operational, I guess.
20  Q. (By Mr. Guy) How does the insured know that?
21  You don't communicate with Signal directly. Correct?
22  A. No, I do not.
23  Q. Did you ever tell Willis if there are any
24  vessels that aren't up to spec, Signal should provide us
25  with a survey?

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 139

1  A. No, I did not.
2  Q. How would the insured know that that is what
3  you expect?
4      MR. ZACHARKOW: Objection. Go ahead.
5  A. I think it's -- I would say it's common sense
6  that you would give an accurate picture of what state
7  your vessels are in.
8  Q. (By Mr. Guy) So why would you provide all
9  surveys going back ten years, rather than just the most
10  recent one?
11  A. To see what kind of work has been done in the
12  last ten years, how their maintenance program might
13  work.
14  Q. There's 27 pieces of marine equipment in this
15  schedule. Right?
16  A. Yes.
17  Q. Some of them are quite old.
18  A. Yes.
19  Q. You'd like every survey going back to when
20  they were built? Is that really correct?
21      MR. ZACHARKOW: Just for point of
22  reference, you're talking about for the '9-'10 renewal?
23      MR. GUY: Yes.
24  A. If I requested surveys, I'd want as much
25  information as I could get, yes.

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 140

1  Q. (By Mr. Guy) Right. But how would you make
2  that request?
3  A. I would send an e-mail to Willis requesting
4  C&V surveys.
5  Q. Okay. Now, we've already established that you
6  didn't do that.
7  A. Yes.
8  Q. Do you have any reason to believe that if you
9  had done that, Signal would not have provided everything
10  that you requested that was in their possession to
11  Willis to be passed on to you?
12  A. I don't have any reason to believe that.
13  Q. Have you ever spoken to anybody at Signal?
14  A. No.
15  Q. Do you know who Dick Marler is?
16  A. No.
17  Q. Do you know who Chris Cunningham is?
18  A. No.
19  Q. Do you know who Lisa Spears is?
20  A. No.
21  Q. Okay. With regard to Willis, do you know who
22  John Bullock is?
23  A. I -- I don't know for sure, but I think I've
24  met John. Yes. He's the producer on the account.
25  Q. You think you might have met him socially or

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

ORAL DEPOSITION OF REESE LEVER

Page 141

1  at an industry function?
2  A. I've been to their office on a marketing trip
3  before. I was meeting with Vernon, but I think he
4  introduced me to John.
5  Q. Okay. So you met with Vernon, you may have
6  met with John Bullock. Have you met John Baker? Do you
7  know who that is?
8  A. Not that I know of.
9  Q. Do you know who Joyce Johnson is?
10  A. Yes.
11  Q. Who's Joyce Johnson?
12  A. She's, I would say, like the lead CSR on the
13  account working for Vernon.
14  Q. Fair enough. Other than what was included in
15  the -- the exhibit we looked at, I forget the number.
16  This one. (Indicating)
17  A. Same one? 251?
18  Q. 251. Other than Exhibit 251, were any other
19  representations made to you with regard to placing the
20  Signal pollution policy for 2009-2010 year?
21  A. Not that I remember, no.
22  Q. Okay. If we go to another exhibit that was
23  introduced earlier,
24      MR. NICOLETTI: What are you looking for?
25      MR. GUY: His response with the quote.

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

## ORAL DEPOSITION OF REESE LEVER

Page 154

1  were made to you or Ms. Stringer; is that correct?
2  　A.　Yes.
3  　Q.　And no representations at any time have been
4  made to you by Signal International itself; is that
5  correct?
6  　A.　That's correct.
7  　Q.　Any representations made to you with regard to
8  this account, when it comes to placing of the insurance
9  or its renewal, have been made through Willis; is that
10 correct?
11 　A.　Yes.
12 　Q.　I asked you earlier if you were aware of
13 anything that Willis has said to you, the only party
14 that communicated to you about this account, that was
15 untrue.
16 　A.　(Nods affirmatively.)
17 　Q.　Are you aware of anything Willis has said to
18 you in the placing of this account, particularly the
19 renewal in 2009 that was untrue?
20 　A.　No.
21 　Q.　Are you aware of them misrepresenting
22 anything?
23 　　　MR. ZACHARKOW: Objection. You may
24 answer.
25 　A.　No, not on the information we requested.

Sunbelt Reporting & Litigation Services

## ORAL DEPOSITION OF REESE LEVER

Page 155

1  　Q.　(By Mr. Guy) Okay. And have you -- you
2  mentioned that -- I asked you earlier if you had come to
3  learn of anything that they did not disclose to you that
4  you believe that they should have disclosed to you. I'd
5  like you to listen to my question carefully. Okay? Can
6  you point to any specific document that would fall into
7  that category of something that they did not tell you,
8  but you believed that they should have done because it
9  was material to the risk?
10 　A.　I don't -- I don't remember what state the
11 most recent surveys said the vessel was in that I saw,
12 so I don't -- I don't know.
13 　Q.　If the most recent survey said the condition
14 of the vessel was fair to -- the condition of the AFDB-5
15 was fair to good condition, that wouldn't be material to
16 the risk, would it?
17 　　　MR. ZACHARKOW: Objection.
18 　　　MR. NICOLETTI: You can answer.
19 　A.　To me, it would depend on what we went through
20 earlier on the surveys, the conditions and any
21 recommendations, how major or minor those were.
22 　Q.　(By Mr. Guy) Well, if the two previous
23 surveyors -- the two previous surveys from the same
24 company, okay, if they both describe the condition as
25 fair condition one year, the next year was fair

Sunbelt Reporting & Litigation Services

## ORAL DEPOSITION OF REESE LEVER

Page 156

1  condition, and the next year is fair to good condition,
2  that's not material to the risk, is it?
3  　　　MR. ZACHARKOW: Objection.
4  　A.　It's -- I mean, if they're doing repairs on a
5  vessel, it's something -- if they're major repairs, it's
6  something we'd want to know about.
7  　Q.　(By Mr. Guy) How does the insured know that
8  if they are doing, to you use your words, major repairs
9  on the vessel, they should tell you through your broker?
10 　A.　I would say if you're doing major repairs on a
11 vessel, I think it's common sense you'd want to let your
12 insurers know that you're repairing these vessels,
13 trying to make them better.
14 　Q.　Where does it say that in the policy?
15 　A.　It doesn't.
16 　Q.　Okay. My question again, how should the
17 insured know?
18 　A.　As I said, I think it's common sense that
19 you'd want to let your insurers know that you're --
20 you're repairing -- if there are major repairs to be
21 done, that you're doing the major repairs.
22 　Q.　Okay. Great American has had this account
23 since 2004, 2005. Correct?
24 　A.　Yes.
25 　Q.　We've had the files produced for all of those

Sunbelt Reporting & Litigation Services

## ORAL DEPOSITION OF REESE LEVER

Page 157

1  years. And at no time has any such request for any
2  surveys, nor details of any repairs, be they major or
3  minor, of any of the assets been requested. Do you
4  agree with that?
5  　A.　Yes. Besides Bender, yes.
6  　Q.　Aside from Bender in 2010, which was a new
7  acquisition.
8  　A.　Yes.
9  　Q.　All right. So my question again, given that
10 history, how is the insured to know what it is that
11 they're meant to provide to the underwriter with regard
12 to repairs, and what action they're doing, especially
13 when the most recent survey does not -- does not reveal
14 any increased risk as a result of a poor condition on a
15 vessel?
16 　　　MR. ZACHARKOW: Objection.
17 　A.　I think it goes back to the duty of utmost
18 good faith. If there are vessels that have problems,
19 the underwriter should be aware of it.
20 　Q.　(By Mr. Guy) Do you have any evidence that
21 Signal was aware of serious problems with any of its
22 assets that it did not tell you about?
23 　A.　Yes, in some of these surveys.
24 　Q.　Which survey?
25 　A.　The one from the ABS.

Sunbelt Reporting & Litigation Services

## ORAL DEPOSITION OF REESE LEVER

Page 170

1   nature to reflect a cancellation of the coverage for the
2   AFDB-5 as of January 30th, 2010?
3       A.  The way this should have worked would not have
4   been included on the renewal quotation.
5       Q.  But this letter says the policy was cancelled,
6   does it not?
7       A.  Well, that policy had expired.
8       Q.  With regard -- isn't it also correct to get
9   back the certificates of financial responsibility, you
10  have to show evidence to the Coast Guard that the policy
11  on that vessel was canceled?
12      A.  Well, the renewal policy wouldn't have
13  included that vessel. Is that correct?
14      Q.  Well, the second sentence of Mr. -- can you
15  identify Captain Ed Wilmot's signature?
16      A.  Yes.
17      Q.  Is that his signature on this document?
18      A.  I would assume so, yes.
19      Q.  And doesn't this document on its face, which
20  was from Great American to Signal, say, number one,
21  Great American is canceling the pollution policy as of
22  January 30th with regard to the AFDB-5? Isn't that what
23  the document states?
24      A.  It says it was canceled on January 30th, yes.
25      Q.  Right. And the next line is -- from Captain

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

## ORAL DEPOSITION OF REESE LEVER

Page 171

1   Ed is he's going to cancel the outstanding COFR
2   guaranty.
3       A.  Yes, that's what he says.
4       Q.  And that COFR guaranty will continue for 30
5   days beyond the cancellation of the policy; isn't that
6   true?
7       A.  That's what the letter says, yes.
8       Q.  Do you have any reason to disagree with what
9   Captain Ed is saying here?
10      A.  I think -- well, I would use "expired" instead
11  of "canceled." But besides that, no.
12          MR. NICOLETTI: Let's mark this next
13  document as Lever Exhibit 276. It's a two page document
14  bearing production number GA-277 and 282.
15          (Exhibit No. 276 marked.)
16      Q.  (By Mr. Nicoletti) Can you identify
17  Exhibit 276, please?
18      A.  It's a letter to our COFR -- or an e-mail to
19  our COFR person, Linda Bell in New York, to cancel the
20  guaranty for the AFDB-5, from me to Linda dated
21  February 22nd, 2010.
22      Q.  And in this case, you're using the word
23  "cancel" and not "expired." Correct?
24      A.  Well, since the policy is expired, we'll
25  cancel the guaranty, yes.

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

## ORAL DEPOSITION OF REESE LEVER

Page 172

1       Q.  And the second page is the actual Certificate
2   of Financial Responsibility?
3       A.  That is our -- that's a certificate -- that's
4   our COFR guaranty, that's not the actual guaranty. Yes.
5           MR. NICOLETTI: I have no further
6   questions.
7           MR. ZACHARKOW: Give me five minutes to
8   run to the restroom.
9           MR. GUY: Mr. Krauss, have you got
10  anything?
11          MR. KRAUSS: No questions.
12          MR. ZACHARKOW: Just a few questions.
13              CROSS EXAMINATION
14  QUESTIONS BY MR. GEORGE R. ZACHARKOW:
15      Q.  Mr. Lever, you were asked by Mr. Guy about
16  survey reports performed by the Dufour, Laskay firm.
17      A.  Yes.
18      Q.  Right? And you're familiar with that firm?
19      A.  Yes.
20      Q.  Now, if the surveyor for Dufour, Laskay had
21  indicated in one of their survey reports that all of the
22  pontoons should be separately removed and drydocked for
23  inspection of the bottom plating and repairs, is that
24  something -- is that the type of information that would
25  be significant to an underwriter?

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

## ORAL DEPOSITION OF REESE LEVER

Page 173

1           MR. NICOLETTI: Objection as to form.
2           MR. GUY: Object as to form.
3           THE WITNESS: Do I answer?
4           MR. NICOLETTI: You can answer.
5       A.  Yes. As I said, if it was something major
6   like that, that's something we'd want to be aware of.
7       Q.  (By Mr. Zacharkow) And is that something that
8   you would follow up with as you were referencing the
9   Bender surveys?
10      A.  Yes.
11      Q.  And if, in fact, the -- the same Dufour
12  surveyor provided a time frame when the pontoons should
13  be individually drydocked, inspected, and repaired, is
14  that something that you would wish to be informed of as
15  an underwriter?
16      A.  Yes.
17      Q.  And what -- why would you want to know that?
18      A.  Well, again, we'd want to know about the major
19  repairs, and if they're being done.
20      Q.  If Signal had to have staff attending to the
21  drydock 24 hours, seven days a week in order to monitor
22  the inflow of water and pump it out, is that the type of
23  information you'd like to know as an underwriter?
24          MR. GUY: Object to the form.
25          MR. NICOLETTI: Lack of foundation. Lack

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

44 (Pages 170 to 173)

ORAL DEPOSITION OF REESE LEVER

Page 174

1  of competence, really.
2      MR. ZACHARKOW: I'm sorry. Lack of what?
3      MR. NICOLETTI: Competence.
4   Q. (By Mr. Zacharkow) You may answer.
5   A. Yeah. If that's something irregular for this
6  type of drydock, that's something we'd want to know if
7  they have to do that.
8   Q. If someone had inspected the drydock and
9  stated that the -- the decking for all of the pontoons
10 needed replacement, is that the type of information
11 you'd like to know as an underwriter?
12     MR. GUY: Object to form. No foundation.
13  A. Yeah. Again, if it's a major repair, we want
14 to know if the vessel needs major repair.
15  Q. (By Mr. Zacharkow) Are you aware of whether
16 Dufour, Laskay are experts in drydocks, inspecting
17 drydocks?
18  A. I'm not aware if that's their expertise or
19 not.
20  Q. No further questions. Thank you.
21     MR. NICOLETTI: I've got a couple of
22 follow-ups.
23     FURTHER DIRECT EXAMINATION
24 QUESTIONS BY MR. NICOLETTI:
25  Q. Now, based upon your practice in dealing with

Sunbelt Reporting & Litigation Services

ORAL DEPOSITION OF REESE LEVER

Page 175

1  the Bender surveys --
2   A. Uh-huh.
3   Q. -- had Signal disclosed the alleged conditions
4  that Mr. -- that Mr. Zacharkow just gave to you in those
5  questions, isn't it true you still would have
6  written the -- you still would have insured the drydock,
7  but elicited a promise from Signal that it would do
8  those repairs?
9   A. If it was --
10     MR. ZACHARKOW: Objection.
11  A. If it was this renewal?
12  Q. (By Mr. Nicoletti) Yes.
13  A. Yes, that's probably true.
14  Q. And if it was 2009, it would be the same
15 thing. Had they disclosed all the information, you
16 still would have added the -- kept, not even added,
17 continued to insure the drydock on the representation
18 that they were going to do the repairs; isn't that true?
19  A. Yes.
20     MR. NICOLETTI: I have no further
21 questions. I think we're done.
22
23          ***********
24
25

Sunbelt Reporting & Litigation Services

ORAL DEPOSITION OF REESE LEVER

Page 176

```
                 DOCUMENT REQUESTS
                              PAGE    LINE
   Document Request No. 1      23      6
   Document Request No. 2      24     10
   Document Request No. 3      25      1
   Document Request No. 4      89     24
   Document Request No. 5     101     17
   Document Request No. 6     102      7
   Document Request No. 7     112      3
   Document Request No. 8     112     19
   Document Request No. 9     113     24
   Document Request No. 10    114     15
```

Sunbelt Reporting & Litigation Services

ORAL DEPOSITION OF REESE LEVER

Page 177

CHANGES AND SIGNATURE

WITNESS NAME:                DATE OF DEPOSITION
REESE LEVER                  DECEMBER 15, 2011
PAGE   LINE    CHANGE        REASON

_____

I, REESE LEVER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted herein.

Job No. 97679

Sunbelt Reporting & Litigation Services