# EXHIBIT B

# ORAL DEPOSITION OF CINDY STRINGER

## Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
2
   FIREMAN'S FUND                )
3  INSURANCE COMPANY, ONE        )
   BEACON INSURANCE              )
4  COMPANY, NATIONAL             )
   LIABILITY AND FIRE            )
5  INSURANCE COMPANY and         )
   QBE MARINE & ENERGY           )
6  SYNDICATE 1036,               )   ECF Case
     Plaintiffs,                 )
7                                )   10 Civ. 1635 (LAK)
   VS.                           )
8                                )
   GREAT AMERICAN                )
9  INSURANCE COMPANY OF          )
   NEW YORK, MAX SPECIALTY       )
10 INSURANCE COMPANY and         )
   SIGNAL INTERNATIONAL,         )
11 LLC,                          )
     Defendants.                 )
12
13 ***************************
          ORAL DEPOSITION OF
14          CINDY STRINGER
           December 14, 2011
15 ***************************
16
17
18
19
20
          ORAL DEPOSITION OF CINDY STRINGER, produced as
21 a witness at the instance of the PLAINTIFFS, and duly
   sworn, was taken in the above-styled and numbered cause
22 on December 14, 2011, from 8:50 a.m. to 3:39 p.m., by
   machine shorthand before MICHELLE R. PROPPS, CSR, in and
23 for the State of Texas, reported at the offices of
   LeBlanc Bland, 1717 St. James Place, Suite 360, Houston,
24 Texas, pursuant to the Federal Rules of Civil Procedure
   and the provisions stated in the record or attached
25 hereto.
```

## Page 2

```
1        A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3
     MR. JOHN A.V. NICOLETTI
4     - and -
     MR. ROBERT A. NOVAK
5  Nicoletti, Hornig & Sweeney
   Wall Street Plaza
6  88 Pine Street, 7th Floor
   New York, New York 10005-1801
7  Fax: 212.220.3780
   E-mail: jnicoletti@nicolettihornig.com
8
   FOR THE DEFENDANT GREAT AMERICAN INSURANCE COMPANY OF
9  NEW YORK:
10   MR. GEORGE R. ZACHARKOW
     Mattioni, Ltd.
11   399 Market Street, Suite 200
     Philadelphia, Pennsylvania 19106-2138
12   Fax: 215.923.2227
     E-mail: gzacharkow@mattioni.com
13
   FOR THE DEFENDANT SIGNAL INTERNATIONAL, LLC:
14
     MR. MATTHEW C. GUY
15   LeBlanc Bland
     909 Poydras Street, Suite 1860
16   New Orleans, Louisiana 70112
     Fax: 504.586.3419
17   E-mail: mguy@leblancbland.com
18 FOR THE DEFENDANT MAX SPECIALTY INSURANCE COMPANY:
19   MR. ADAM KRAUSS (Via Telephone)
     Traub Lieberman Straus & Shrewsberry, LLP
20   Mid-Westchester Executive Park
     Seven Skyline Drive
21   Hawthorne, New York 10532
     Fax: 914.347.8898
22   E-mail: akrauss@traublieberman.com
23
24        * * * * *
25
```

## Page 3

```
1                    INDEX
                                              PAGE
2  Appearances.......................................  2
3  CINDY STRINGER
4    DIRECT EXAMINATION BY MR. JOHN A.V. NICOLETTI....  4
     CROSS EXAMINATION BY MR. MATTHEW C. GUY..........170
5    RE-DIRECT EXAMINATION BY MR. NICOLETTI...........251
     RE-CROSS EXAMINATION BY MR. GUY..................259
6    CROSS EXAMINATION BY MR. GEORGE R. ZACHARKOW.....260
     FURTHER CROSS EXAMINATION BY MR. GUY.............268
7
8  Changes and Signatures............................271
   Reporter's Certification..........................272
9
10                 EXHIBITS
11 EXHIBIT NO.       DESCRIPTION              PAGE
```

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 239 | Amended Answer of Defendant Great American Insurance Company of New York to Plaintiff's Complaint With Crossclaims and Counterclaim | 54 |
| Exhibit 240 | Reservation of Rights Letter Dated 11-19-09 | 55 |
| Exhibit 241 | Oil Pollution Cleanup Underwriting Guidelines | 59 |
| Exhibit 242 | E-mail String Beginning 1-9-04 From Ewing To Dillon | 62 |
| Exhibit 243 | Pollution Policy | 70 |
| Exhibit 244 | E-mail Dated 12-22-06 From Hennington To merchant_sa | 79 |
| Exhibit 245 | 2007 Pollution Policy | 83 |
| Exhibit 246 | State Law Extension | 98 |
| Exhibit 247 | Pollution Policy Declarations Page 1-09 To 1-10 | 105 |
| Exhibit 248 | 2009 Pollution Policy | 120 |
| Exhibit 249 | Ocean Marine General Endorsement | 126 |
| Exhibit 250 | OLS YD-105 Report Summary | 146 |
| Exhibit 251 | E-mail Dated 11-24-08 From Lever To Ewing | 178 |
| Exhibit 252 | D&B Business Information Report Dated | 183 |
| Exhibit 253 | D&B Business Information Report Dated 12-28-09 | 184 |
| Exhibit 254 | E-mail Dated 12-29-08 From Lever To Ewing and Attachment | 185 |

## Page 4

```
1                    CINDY STRINGER,
2  having been first duly sworn, testified as follows:
3            MR. ZACHARKOW:  Before we start, John,
4  just to be clear, Ms. Stringer is being produced as a
5  fact witness today, not a corporate designee.
6            MR. NICOLETTI:  That's correct.
7            DIRECT EXAMINATION
8  QUESTIONS BY MR. JOHN A.V. NICOLETTI:
9    Q.   Please state your name for the record.
10   A.   Cindy Stringer.
11   Q.   And what is your residential address?
12   A.   It's 11902 Osage Park, Houston, Texas, 77065.
13   Q.   And do you have a business address?
14   A.   3200 Wilcrest, Suite 300, Houston, 77042.
15   Q.   By whom are you presently employed?
16   A.   Great American Insurance Company.
17   Q.   Do you have any residential addresses in any
18 state, other than in Texas?
19   A.   No.
20   Q.   Do you have any business address, your
21 personal office location, other than in Texas?
22   A.   Personal?
23   Q.   Yes.
24   A.   No.
25   Q.   Ms. Stringer, my name is John Nicoletti.  And
```

Pages 1 to 4

**ORAL DEPOSITION OF CINDY STRINGER**

## Page 49

1   Q.   Were there more than one application submitted
2  by Signal during the course of Great American's
3  underwriting their pollution liability program?
4   A.   Could you clarify that?
5   Q.   Well, you say you looked at an application.
6  Was it for a particular year?
7   A.   Oh, I think it was for the 2009 year.
8   Q.   Did you look at any prior applications?
9   A.   Not at that time.
10   Q.   Did you have any discussions with Mr. Chip
11  Downey about the upcoming testimony?
12   A.   No.
13   Q.   Who is Mr. Downey?
14   A.   Mr. Downey is our profit center manager.
15   Q.   Do you hold any professional licenses?
16       MR. GUY:  Want to take a break, George?
17   Q.   (By Mr. Nicoletti)  Oh, by the way, this is
18  not a torture test.  If you need to take a break, just
19  tell me.
20   A.   This is not the camel test.  Right?
21   Q.   That's right.  Why don't we take a five-minute
22  break.
23       (A brief recess was taken.)
24   Q.   I apologize for repeating the question, but
25  the reporter did not get your answer.  Do you hold any

## Page 50

1  professional licenses in the insurance area?
2   A.   No.
3   Q.   Have you ever heard of the Doctrine of
4  Uberrimae Fidei?
5   A.   I have.
6   Q.   And does that doctrine also go by the name of
7  the Doctrine of Utmost Good Faith?
8   A.   Yes.
9   Q.   Have you ever been involved in any policy that
10  you wrote where the company denied the claim on the
11  alleged breach of that doctrine?
12   A.   No.
13   Q.   What is your understanding of that doctrine,
14  if you have one?
15   A.   That -- that the insured is obligated to give
16  you all information that may be material to underwriting
17  a risk.
18   Q.   Do you know anything further than that?
19   A.   That's the basic premise of it.
20   Q.   Do you have an understanding of the term
21  "information material to the risk"?
22   A.   I thought I just said that.
23   Q.   No.  I'm asking you to define -- what do you
24  mean by "information material to the risk"?
25   A.   Well, say, for example, that they were aware

## Page 51

1  of, say, the condition of a vessel that might have a
2  material -- that might materially affect whether you
3  would be able to underwrite it or not.  That would be an
4  example.
5   Q.   And you, as the underwriter, is that one of
6  the areas of inquiry you make on a regular basis to the
7  insured seeking hull or pollution insurance?
8   A.   I'm not sure I understand what you're getting
9  at.
10   Q.   Well, you now gave me the doctrine.
11   A.   Right.
12   Q.   I'm now asking you, is that an area that you
13  would make inquiry into as part of --
14   A.   It would depend on what type of insurance I
15  was writing.
16   Q.   I asked specifically with regard to hull
17  insurance.
18   A.   With regard to hull insurance, I would ask, if
19  there were a reason to ask.
20   Q.   I'm sorry.  You would ask what?
21   A.   I would ask if there were a C&V survey
22  available.
23   Q.   Okay.  And with regard to pollution liability
24  insurance, when do you make the inquiry, if ever,
25  concerning the condition of the hull?

## Page 52

1   A.   When they fill out an application form, they
2  state on there that -- whether they have hull and P&I
3  insurance.  So it's a reasonable expectation that --
4  whether I specifically ask for it or not -- that the
5  hull underwriter would have seen that information.
6   Q.   So in other words, if -- so when you assess an
7  application --
8   A.   Right.
9   Q.   -- for Great American's pollution liability
10  covers, if the insured advises you that he has hull or
11  P&I insurance, that is a representation -- that is the
12  type of information which you deem to be satisfactory
13  for you to write the risk, if all other factors are
14  equal.
15   A.   Sure.  Yes.
16   Q.   So in other words, if the vessel owner has
17  hull insurance, you consider that sufficient disclosure;
18  is that correct?
19   A.   Yes.
20       MR. ZACHARKOW:  Objection.
21   Q.   (By Mr. Nicoletti)  If the vessel owner has
22  P&I insurance, you consider that sufficient disclosure
23  as to the condition of the vessel; is that correct?
24       MR. ZACHARKOW:  Objection.
25   A.   I have to believe that they're telling me the

Pages 49 to 52

**Sunbelt Reporting & Litigation Services**
**Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio**

ORAL DEPOSITION OF CINDY STRINGER

## Page 53

1  truth.
2      Q.   (By Mr. Nicoletti)  Right.  But if a P&I
3  underwriter has issued the policy, you, in effect, as
4  the pollution underwriter reply upon that other
5  underwriter to assess the acceptability of the risk;
6  isn't that correct?
7          MR. ZACHARKOW:  Objection.
8      A.   Yes.
9      Q.   (By Mr. Nicoletti)  Are you aware that in this
10 case, Great American, through an amended complaint,
11 seeks to deny coverage to Signal under the pollution
12 liability policy issued by Great American on the basis
13 of the violation of the Doctrine of Utmost Good Faith?
14          MR. GUY:  Object to form.
15     Q.   (By Mr. Nicoletti)  The alleged violation of
16 utmost good faith.
17     A.   I'm aware of it.
18     Q.   How did you become aware of it?
19     A.   I believe it was probably mentioned in -- may
20 have been mentioned in some of the correspondence or
21 e-mails that were going back and forth.
22     Q.   Did anyone discuss with you -- strike that.
23          Do you recall the material fact or
24 factors, which Great American alleges were not disclosed
25 to you as the underwriter?

## Page 54

1      A.   I had seen a copy of the complaint, but I
2  really -- it was just in passing, and I really don't
3  remember everything that was in it.
4      Q.   Did anyone, including your attorneys, ever
5  have a discussion with you concerning -- just answer
6  this yes or no -- your views of what was in the
7  complaint?
8      A.   No.
9      Q.   Did anyone, including your attorneys, ever ask
10 you whether or not the information -- the allegations
11 set forth in the complaint would have caused you not to
12 write the policy?
13     A.   No.
14     Q.   Let's have this marked as Stringer
15 Exhibit 239.  It is a document entitled Amended Answer
16 of Defendant Great American Insurance Company of New
17 York to Plaintiff's Complaint With Crossclaims and
18 Counterclaim.
19          (Exhibit No. 239 marked.)
20     Q.   Please further designate -- identify the
21 document as being Document 104 in the court docket.
22          Let me show you what has been marked as
23 Stringer Exhibit 239.  Have you ever seen that document
24 before?
25     A.   I may have seen it in passing, but I can't say

## Page 55

1  for sure.
2      Q.   Am I correct in my understanding of your
3  testimony that no one ever reviewed the allegations in
4  this complaint with you?
5      A.   Not that I recall.
6      Q.   I'm sorry.  When I say, "complaint," it's
7  really Document 104 I was referring to in that question.
8  Just so I can be clear on the record, so at no time did
9  you sit down with anyone at Great American, including
10 the attorneys, to discuss the accuracy of Document 104.
11     A.   No.
12     Q.   Is that correct?
13     A.   No.
14     Q.   That's not correct?
15     A.   No.  I mean, that is correct.  I didn't sit
16 down with anybody, no.
17          MR. NICOLETTI:  Let me have this next
18 document marked as Stringer Exhibit 240.  It's a letter
19 on the letterhead of Great American Insurance Group
20 entitled Reservation of Rights, dated November 19, 2009.
21          (Exhibit No. 240 marked.)
22     Q.   (By Mr. Nicoletti)  Ms. Stringer, have you
23 ever seen this document before?
24     A.   No.
25     Q.   Did anyone ever -- anyone ever advise you that

## Page 56

1  Great American reserved its rights then in part
2  based its declination on Signal's alleged failure to
3  have P&I insurance and wreck removal coverage?
4      A.   I wasn't aware of that.
5      Q.   Isn't it true that every year that you wrote
6  this policy -- or bound this policy for Signal, it, in
7  fact, did have P&I insurance via an MGL endorsement?
8      A.   That's what was shown on the application.
9      Q.   Right.  So, in other words, from 2004 right
10 through 2009 renewal, isn't it true you knew that the
11 P&I coverage, including the wreck removal, was being
12 provided not under a standard form, but under an
13 endorsement to an MGL policy?
14     A.   It was on the application.
15     Q.   Right.  At any time, did you request from
16 Signal or its brokers a copy of that MGL endorsement to
17 determine the scope of coverage under that MGL P&I form?
18     A.   No, not that I'm aware of.
19     Q.   Going back to the P&I form, the coverages that
20 you are familiar with.  What are the parameters of
21 coverage under those forms -- and if they're different
22 let me know -- for wreck removal?  Scope of coverage
23 available under those P&I forms, SP-23, SP-38, AIMU
24 1983.
25     A.   I'd have to see an actual copy of the form,

Pages 53 to 56

**ORAL DEPOSITION OF CINDY STRINGER**

## Page 65

1  Q.   What is a loss history, so a reader can
2  understand that?
3  A.   It's an outline of whatever losses may have
4  occurred during a particular policy.
5  Q.   Losses which may be recoverable under the
6  policies being identified?
7  A.   Right.
8  Q.   Such as the hull/P&I, and pollution?
9  A.   Right.
10 Q.   All right.
11 A.   And then it says the current P&I carrier, and
12 they've answered the question.  Current and --
13 Q.   Who was --
14 A.   I'm sorry?
15 Q.   On this form, who was the then current P&I
16 carrier?
17 A.   Fireman's Fund and Excel.
18 Q.   And do they also tell you the form of P&I
19 insurance?
20 A.   It says, "included in the MGL."
21 Q.   So per this endorsement, Signal is advising
22 Great American that its P&I coverage is included in the
23 MGL?
24 A.   There were certain periods of time that that
25 was in common practice, where you would include the P&I

## Page 66

1  cover under the MGL.
2  Q.   Okay.
3  A.   Sometimes it would be in the form of an
4  endorsement.  Sometimes it would be in the form of an
5  actual P&I policy form being attached to the policy.
6  Q.   Such as the SP-23?
7  A.   Or the SP-38.
8  Q.   What is an MGL, just so we can be clear on the
9  record?
10 A.   Well, MGL in this case stands for marine
11 general liability.
12 Q.   So the fact that Signal was having its P&I
13 coverage included in an MGL form was common in the
14 industry at that time.  Is that your --
15 A.   Absolutely.  And as far as I know, they still
16 do.
17 Q.   Is there anything on this form which
18 specifically asks Signal information on the condition of
19 any of the vessels to be insured?
20 A.   There's nothing on the application.
21 Q.   And the reason it's not on the application is
22 because you rely upon the existence of the hull and P&I
23 policies; is that correct?
24 A.   That would be a correct statement.
25 Q.   And the fact that they had no known or

## Page 67

1  reported losses would also give you comfort as to the
2  insurability of the risks; is that correct?
3  A.   Absolutely, yes.
4  Q.   We're going to put this aside.  We're going to
5  go back to it, because it's part of another form.  We'll
6  go back to it in a moment.  Now, let's go back to
7  Stringer 241.  Do the guidelines set forth the matter in
8  which you are to price the premium for the risk?
9  A.   It gives a rating plan.
10 Q.   What is a rating plan?
11 A.   Those are the suggested ratings for the
12 different types of vessels.  This particular one
13 outlines fishing vessels, passenger vessels, and then it
14 has a separate section for tug boats and tow boats.
15 Q.   I believe on the next page, it allows for
16 certain discounts?
17 A.   Correct.
18 Q.   Now, this pricing is a guideline; is that
19 correct?
20 A.   That's right.
21 Q.   You, as the underwriter, have the ability to
22 set a higher rate, or a higher premium, or a lower rate,
23 therefore a lower premium; is that correct?
24 A.   That's correct.
25 Q.   And what information do you use in deviating

## Page 68

1  from a guideline rate?
2  A.   Generally, it would be like the size of the
3  fleet.  It would be the type of vessel that would be
4  involved.
5  Q.   Anything further?
6  A.   Every account is a different account.  You
7  have to underwrite each one individually.
8  Q.   I understand that.  But the point is, I'm
9  trying to ascertain from you what factors you would
10 consider in deviating from the guidelines, either by
11 giving a higher rate, therefore a higher premium, or a
12 lesser rate, therefore a lesser premium.
13 A.   Here again, I would say it would depend on the
14 type of vessel.  It would depend on the number of
15 vessels.  And that's basically what you would consider.
16 Q.   And am I correct the rates that you would
17 charge are based upon the gross rated tonnage of each
18 vessel?
19 A.   Yes.
20 Q.   There's nothing in this guideline which would
21 indicate a higher or lesser rate for age of vessel; is
22 that correct?
23 A.   No, there's not.
24 Q.   Is that something you might take into account
25 subjectively, or no?

Pages 65 to 68

**ORAL DEPOSITION OF CINDY STRINGER**

### Page 73

1  Q.   Am I correct in my understanding that in
2  underwriting your pollution risks, you did not refer to
3  those three sections?
4  A.   I didn't have these guidelines.
5  Q.   When you say "these guidelines," you mean the
6  2005 edition?
7  A.   Correct.
8  Q.   Which is Stringer 243.  Correct?
9  A.   Yes.
10  Q.   Do you recall at any time discussing with
11  Captain Ed or anyone else at Great American, separate
12  and apart from this document, that for the Great
13  American pollution liability programs, the vessels must
14  be acceptable as a hull risk?
15  A.   I don't recall discussing that particular
16  verbiage, but it's -- would be common sense that it
17  would need to be acceptable as a hull risk.
18  Q.   So if the hull or floating property has a
19  first party insurance cover, that's acceptable to you?
20  It's showing --
21  A.   It's showing me that it does have the proper
22  cover on it.
23  Q.   And that's an acceptable risk to you?
24  A.   Sure.  Yes.
25  Q.   Do you know what the Coast Guard PSIX is?

### Page 74

1  A.   It's the Port State Information Exchange.
2  Q.   Do you recall ever, on any of your accounts,
3  seeking information from the Coast Guard Port -- the
4  Coast Guard PSIX?
5  A.   Yes.
6  Q.   You ever do that on the Signal account?
7  A.   Not that -- I don't recall.
8  Q.   If you did do such a search, it would be in
9  the files?
10  A.   It would be.
11  Q.   And how would it appear in the file?
12  A.   As a print-out that says "Port State
13  Information Exchange" from the Coast Guard website.
14  Q.   Which is available to you at your desktop?
15  A.   It is.
16  Q.   As you sit here today, you don't recall ever
17  doing that search for Signal; is that correct?
18  A.   Not particularly, no.
19  Q.   Any reason why you didn't do the search?
20  A.   Probably didn't have a reason to.
21  Q.   Okay.  Let's look at the second page of that
22  2005 edition of the guidelines.
23  A.   Okay.
24  Q.   It says, "The law gives rise to a broad range
25  of clients, including, but not limited to."  You see

### Page 75

1  that?
2  A.   Sure.
3  Q.   And let's look at B.  That states, "Natural
4  resource damage."
5  A.   Yes.
6  Q.   Do you see that?
7  A.   I see that.
8  Q.   Do you have any understanding of what they're
9  talking about in regards to natural resource damage?
10  A.   An example that I can think of would probably
11  be, say, damage to a coral reef.
12  Q.   That would also include -- are you familiar
13  with the term of NRDA agencies?
14  A.   No.
15  Q.   Ever hear the term Natural Resource Damage
16  Assessment Agency?
17  A.   Not that I recall.
18  Q.   In addition to coral reef damage, you could
19  have fouling of river banks by a pollutant as part of a
20  natural resource damage?
21  A.   I really don't know.
22  Q.   Would dead birds fall within a natural
23  resource damage?
24  A.   I suppose they could.
25  Q.   Does dead fish fall into natural resource

### Page 76

1  damage?
2  A.   I suppose that could, too.
3  Q.   Contamination of -- of the sediment at the
4  bottom of a river or canal, would that be considered
5  natural resource damage?
6  A.   I really don't know.
7  Q.   What about damage to the water column of a
8  river or body of water, would that be a natural resource
9  damage?
10  A.   I don't know.
11  Q.   But you are aware that environmental factors
12  can cause natural resource damage, are you not?
13       MR. ZACHARKOW:  Objection.
14  Q.   (By Mr. Nicoletti)  Strike that.  Isn't it
15  true that damage to -- isn't it true that damage to
16  fish, water fowl, water columns, all forms of sediment,
17  and banks along a river or canal, they all could be
18  impacted by environmental damage?
19       MR. ZACHARKOW:  Objection.
20  Q.   (By Mr. Nicoletti)  You can answer.
21  A.   It would depend on how they were damaged.
22  Q.   Okay.  If a pollutant damages them, that would
23  fall within that type of natural resource damage?
24  A.   Now, that, I don't know.
25  Q.   You don't know?

Pages 73 to 76

ORAL DEPOSITION OF CINDY STRINGER

Page 141

1  condition.  I didn't know all the details about that.
2  But apparently, it had -- I guess the maintenance on it
3  had not been good and, you know, various details like
4  that.
5     Q.   Okay.  Who told you the maintenance wasn't any
6  good?
7     A.   I really don't remember.
8     Q.   Did they give you any details about the
9  maintenance to indicate to you why it wasn't good?
10    A.   I didn't get any details on it at all.
11    Q.   Did you get any details on the condition of
12 the dry dock itself?
13    A.   At the time of the loss?
14    Q.   From the time of the loss to the present time
15 that would have caused you concern in writing the
16 policy.
17    A.   Had I -- had I been able to read those
18 surveys, I definitely would have been concerned.
19    Q.   Well, do you know what's in the surveys?
20    A.   Well, I haven't read them in detail.  No, I
21 don't know.
22    Q.   That's right.  So the point is --
23    A.   All I know is what I've been told.
24    Q.   Well, that's what I'm asking you.  What were
25 you told, from the date of the casualty forward to the

Page 142

1  present date, that would cause you any concerns with
2  issuing a pollution policy for the dry dock?
3     A.   Just what I said.  I was told the dry dock was
4  in poor condition and the maintenance on it had not been
5  done.  And apparently, they had been told in the past
6  that they had to -- were supposed to renew certain
7  sections of the pontoons that wasn't done properly.  I
8  mean, there was a lot of different things that I was
9  told about it.  I don't remember exact specifics.
10    Q.   Well, that's my question.  I want to know
11 exact specifics of what you were told.
12    A.   I can't tell you that.
13    Q.   So the most you can tell me is that it had
14 poor maintenance, it was in poor condition and certain
15 of the sections had to be renewed?
16    A.   That's the little bit that I remembered.
17    Q.   Do you remember anything else?
18    A.   Not right now.
19    Q.   Now, had Signal told you that it had a better
20 maintenance program than reported to you, and was going
21 to do complete renewals, or at least a good deal of work
22 on this dry dock in the upcoming months, would that have
23 lessened your concerns?
24    A.   No.  If I had known it was in bad shape, and
25 Signal told me they were going to fix it up, I would --

Page 143

1  more than likely, I would have told them I didn't want
2  to cover that vessel until they completed all the
3  recommendations.
4     Q.   Have you ever done that to an insured before?
5     A.   On a pollution policy?
6     Q.   Yeah.
7     A.   No.
8     Q.   So --
9     A.   We've done it on a hull policy, but not on a
10 pollution policy.
11    Q.   Right.  We're dealing with a pollution policy,
12 are we not?
13    A.   That's correct.
14    Q.   Okay.  We're not dealing with a hull policy.
15    A.   No.  I'm just explaining.
16    Q.   Right.  And the underwriting criteria are
17 different for a hull policy and a pollution policy;
18 isn't that correct?
19    A.   Yes.
20    Q.   Were you involved at all with the Bender --
21 the equipment which Signal acquired from Bender?
22    A.   Was I involved with it?
23    Q.   Yeah.
24    A.   No.
25    Q.   Who did that?

Page 144

1     A.   I believe when they acquired that equipment
2  that Reese was -- was the underwriter on the policy.
3     Q.   So am I correct in my understanding, then,
4  that when they acquired this equipment, you had no
5  involvement with requesting surveys?
6     A.   No, I didn't.
7     Q.   And you had no involvement reviewing those
8  surveys?
9     A.   No, I did not.
10    Q.   Are you aware that all of the Bender equipment
11 came with surveys that had multiple recommendations
12 concerning their respective conditions?
13    A.   I was aware of it, yes.
14    Q.   Are you aware that Great American agreed and
15 did issue a policy -- a pollution insurance for those
16 three structures, even though those recommendations had
17 not been completed?
18    A.   No.
19    Q.   You're not aware of that?
20         MR. GUY:  John, you may need to clarify
21 what you mean by structures there.  I think you're
22 talking about the Bender dry dock.
23    Q.   (By Mr. Nicoletti)  I'm sorry.  Are you aware
24 that the Bender dry docks and other floating equipment
25 for which Great American had surveys --

Pages 141 to 144

ORAL DEPOSITION OF CINDY STRINGER

Page 165

1  the surveyor to find out how important this is and how
2  much time they have to fix it before I made a decision.
3      Q.   (By Mr. Nicoletti)  Is that true with all
4  Great American underwriters --
5      A.   I have no idea.
6      Q.   -- in the pollution side?
7      A.   I can't tell you.
8      Q.   By the way, any of the testimony you just gave
9  me about the procedure you would follow to determine the
10  condition of a vessel, do they appear anywhere in any of
11  the guidelines prior to -- your underwriting guidelines,
12  prior to August 2009?
13      A.   Not that I'm aware of.  It's just common
14  sense.
15      Q.   I believe it's your testimony that the
16  conditions noted in here do not automatically disqualify
17  the vessel from being added; is that correct?
18      A.   Correct.
19      Q.   That's really based upon the insured's intent
20  to do the corrections and maintenance, and the
21  surveyor's comments; is that correct?
22      A.   It would be based on that.
23      Q.   Right.  Now, based upon the allegations in the
24  complaint, it is stated that Signal should have
25  disclosed the condition of this vessel, some of which

Page 166

1  are commented on in the surveys in the year 2000 to
2  Great American.  And that's the basis for the action to
3  void the policy.  My question is this:  Since these
4  conditions -- since Great American wrote this dry dock
5  for pollution insurance from 2003 right up to it
6  sinking -- in fact, after its sinking in 2009, how --
7  how was the decision made that Great American would only
8  void the insurance coverage for 2009?
9      A.   How was that decision made?
10      Q.   Yeah.
11      A.   I have no idea how that decision was made.  I
12  wasn't -- I wasn't part of this process.
13      Q.   My question is really basic.  I mean,
14  according to the complaint, you're complaining about
15  Signal's failure to disclose the condition of the dry
16  dock from 2003 to 2009.
17      A.   Okay.
18      Q.   All right?
19      A.   Yeah.
20      Q.   How is it you only decide to void the cover
21  for the dry dock on the year of the incident, if these
22  conditions were so material to you?
23      A.   Maybe they would void it all the way back.  I
24  don't know.
25      Q.   You don't know why?

Page 167

1      A.   No.
2      Q.   Okay.
3      A.   Why they would do it for that particular year?
4  No, I --
5      Q.   And not the prior years.
6      A.   I have no idea.
7      Q.   Well, if something is material in the year of
8  the casualty, and those same material facts existed
9  prior to that, is it not inconsistent of Great American
10  to void the contract for 2009 and not the prior years?
11          MR. ZACHARKOW:  Objection.
12      A.   What would be the point?
13      Q.   (By Mr. Nicoletti)  What would be the point of
14  voiding the contract of the dry dock?
15      A.   Yeah.  All the way back.
16          MR. GUY:  Give us the money.
17      Q.   (By Mr. Nicoletti)  Because you have to give
18  back the premium.
19      A.   You could do that if you wanted to.  I suppose
20  it's their choice as to what -- how they wanted to
21  handle it.
22      Q.   Whose choice?  Whose choice?
23      A.   It would be --
24          MR. ZACHARKOW:  Objection; getting
25  argumentative --

Page 168

1      A.   -- whoever at Great American was making --
2          MR. ZACHARKOW:  -- Mr. Nicoletti.
3          MR. NICOLETTI:  I'm just trying to find
4  out --
5      A.   No.  It would be -- whoever at Great American
6  is making that decision, it would be their choice.
7      Q.   (By Mr. Nicoletti)  Well, you were the
8  underwriter on this risk.  And the allegation is that
9  you, the underwriter, would not write this policy had
10  you known the facts.  Do you understand that's what the
11  complaint says?
12      A.   I wouldn't have put that particular vessel on
13  the contract, no.
14      Q.   All right.  My point to you is, who at Great
15  American did you discuss that with and how did they come
16  up with the decision, if you know, to only void the
17  contract for the year of the incident?
18      A.   I don't know.  I didn't -- it wasn't -- I
19  wasn't involved in that process.
20      Q.   In fact, you weren't involved with the
21  decision to void the contract, were you?
22          MR. ZACHARKOW:  Objection.
23      Q.   (By Mr. Nicoletti)  For any year.
24      A.   No.
25      Q.   The decision to void this policy was made by

Pages 165 to 168

ORAL DEPOSITION OF CINDY STRINGER

## Page 173

1 administrative than substantive questions. Is that
2 fair?
3     A.  Yes. Absolutely.
4     Q.  Okay. When a claim is made, generally, are
5 you asked to produce your underwriting file to the
6 claims department?
7     A.  In the past, we -- we had done that. Since
8 we've gone to electronic files, now there's no reason to
9 do that.
10     Q.  In other words, they can access your --
11     A.  They can access the underwriting file.
12     Q.  Okay. And the flip side of that is that the
13 claims department doesn't have any role in the
14 underwriting; is that correct?
15     A.  Not really, no.
16     Q.  When you say "not really," is there some
17 involvement they have?
18     A.  You might have occasion to call somebody in
19 the claims department to ask their advice on something.
20 But other than that, they're not actually involved in
21 the underwriting information.
22     Q.  Is that like a loss history question?
23     A.  It could be.
24     Q.  On the Signal account in 2009, do you know if
25 anybody from the claims department was involved in the

## Page 174

1 underwriting?
2     A.  No. I don't know. I don't know.
3     Q.  Do you recall if anyone was involved?
4     A.  No, I don't.
5     Q.  During the underwriting process, the claims
6 department itself had never requested information from
7 an insured or a broker then?
8     A.  Not that I'm aware of, no.
9     Q.  Any such request would come from you as the
10 underwriter. Correct?
11     A.  More than likely, it would.
12     Q.  Who is the claims handler for this loss?
13     A.  Oh, wow. I honestly don't know who's working
14 on it.
15     Q.  Is it Julia Price?
16     A.  It could be Julia, yeah. Well -- yeah, she
17 would be the one that's working on it.
18     Q.  Do you know if Julia Price had any involvement
19 in the underwriting of this account?
20     A.  No.
21         MR. ZACHARKOW:  You don't know or --
22     A.  No, as far as I know she didn't.
23     Q.  (By Mr. Guy) Mr. Nicoletti was just showing
24 you a survey on a piece of marine equipment that Signal
25 acquired as part of an asset purchase agreement from

## Page 175

1 Bender. Right?
2     A.  Uh-huh.
3     Q.  As a matter of your general practice, how
4 often do you request surveys from insureds?
5     A.  Are you talking about for pollution policies?
6     Q.  Yes, on the pollution policies.
7     A.  It's usually not part of the general process.
8     Q.  Do you ever commission surveys, rather than
9 request ones which the insured may have already?
10     A.  For a pollution policy?
11     Q.  Yes.
12     A.  Not normally, no.
13     Q.  Would you agree that you're entitled to do
14 that if you wish to do so?
15     A.  We could.
16     Q.  Have you ever done that?
17     A.  No.
18     Q.  You would agree with me that even if you don't
19 want to retain a surveyor to go and inspect the property
20 that you're insuring or might be insuring, you can ask
21 the insured for as much information as possible?
22     A.  When you say "ask the insured," we don't
23 correspond directly with the insured at all. We always
24 correspond through the broker.
25     Q.  That's a good point. Anything you want to

## Page 176

1 know about the risk, you can always ask the broker.
2     A.  Yeah.
3     Q.  Correct? Do you recall doing that on the
4 Signal account?
5     A.  For additional information on Signal?
6     Q.  Yes.
7     A.  I don't think so.
8     Q.  That was just -- my question was meant to be
9 just for the 2009 year.
10     A.  No, nothing specific comes to mind.
11     Q.  For any of the policy years that Great
12 American has provided pollution insurance, do you recall
13 ever asking Willis, the broker, for more information?
14     A.  Nothing specific comes to mind.
15     Q.  When you're requesting information through the
16 broker from an insured, do you look for the loss
17 history?
18     A.  Yes -- well, sometimes we specifically ask for
19 it.
20     Q.  Do you know if you did that in the 2009
21 renewal?
22     A.  I really don't remember.
23     Q.  When you ask for valuation reports --
24     A.  Uh-huh.
25     Q.  -- do you want every valuation report on a

Pages 173 to 176

**Sunbelt Reporting & Litigation Services**
**Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio**

**ORAL DEPOSITION OF CINDY STRINGER**

## Page 185

1    A.    No, it doesn't look like it.  Because usually
2  when I requested them, they would have my name on the
3  top of them.
4    Q.    Okay.
5         MR. GUY:  Introduce this as Exhibit 254.
6         (Exhibit No. 254 marked.)
7    Q.    (By Mr. Guy)  Okay.  This is a -- what I've
8  just shown you as Exhibit 254, fit is an e-mail from
9  Reese Lever to Vernon Ewing at Willis.
10   A.    Right.
11   Q.    Again, you were courtesy copied, and it's
12  dated December 29th, 2008.  The e-mail says, "Vernon,
13  attached is our formal pollution renewal quote for
14  Signal International.  Please let us know if we can help
15  with anything else.  We look forward to hearing from
16  you."
17   A.    Okay.
18   Q.    And if we look at the back, there's a Schedule
19  of Vessels --
20   A.    Correct.
21   Q.    -- which looks to have a premium for each
22  individual vessel and some terms and conditions.  And at
23  the top, it says, "Renewal Quotation."
24   A.    Okay.
25   Q.    Again, is this the typical renewal quotation

## Page 186

1  that Great American issues?
2    A.    It's a typical format.
3    Q.    Okay.  In between -- earlier we looked at the
4  e-mail from Mr. Lever reminding Mr. Ewing that this
5  account was up for renewal.
6    A.    Correct.
7    Q.    Correct?  And in the files that have been
8  produced by Great American's attorney, these are the
9  only correspondence I've seen about the renewal of this
10  account.  Okay?
11   A.    Okay.
12   Q.    In other words, it's an e-mail from Mr. Lever
13  to Mr. Ewing.
14   A.    Right.
15   Q.    A response from Mr. Ewing, which includes the
16  pollution submission from Willis and the Schedule of
17  Vessels.  And then a month later -- just over a month
18  later is the response from Mr. Lever with the quote.
19   A.    Okay.
20        MR. ZACHARKOW:  And the scope of your
21  question is for the '09-'10 policy term.  Correct?
22        MR. GUY:  Yes.
23   Q.    (By Mr. Guy)  My question is this:  Three
24  e-mails --
25   A.    Okay.

## Page 187

1    Q.    -- is that a pretty typical renewal?
2    A.    Typical, yes.
3    Q.    And as far as you're aware, all of Great
4  American's documents concerning that renewal have been
5  produced?
6    A.    Correct.
7    Q.    Okay.  See, I haven't seen anything in that
8  renewal where at any point Great American asks for the
9  production of condition and value surveys on any of the
10  vessels insured, including, but not limited to the dry
11  dock AFDB-5; is that correct?
12   A.    It doesn't appear to be in there at all.
13   Q.    And when I looked at the previous years from
14  this account, from 2004 up to and including the renewal
15  after this loss --
16   A.    Uh-huh.
17   Q.    -- I've still never seen any requests for any
18  condition and value surveys, with the exception of the
19  ones from the new acquisition in Bender that Mr.
20  Nicoletti discussed.
21   A.    I believe that's correct.
22   Q.    So here's the thing.  Great American has been
23  underwriting this account for pollution insurance for
24  eight years, nine years?
25   A.    At least that long.

## Page 188

1    Q.    Including the facility -- Signal's facilities
2  at Pascagoula and in East Texas?
3    A.    I believe all the vessel locations are named
4  on the policy.
5    Q.    Right.  I've never seen a single request, not
6  one, for a vessel condition and valuation survey.
7    A.    That's not typically something that we ask
8  for.
9    Q.    Okay.  Do you believe that the insured should
10  have provided you condition and valuation surveys for
11  AFDB-5, or any other vessel that's insured?
12   A.    If the insured had information that could
13  materially affect our policy, it would be their
14  obligation to furnish us with that information.
15   Q.    Okay.  How does the insured know what is
16  material to you?
17   A.    Well, say, for example, if you were to read a
18  survey that said that you had a vessel that was about
19  ready to collapse or something like that, that would be
20  something that you should bring to the attention of your
21  broker, who would then bring it to our attention.
22   Q.    Okay.  Is there such a survey that you've seen
23  and read in this account?
24   A.    That I've read?
25   Q.    Yes.

Pages 185 to 188

ORAL DEPOSITION OF CINDY STRINGER

Page 189

1    A.  I've heard reference to the surveys that were
2  done on the dry dock.
3    Q.  See, that's called hearsay, and that's not
4  good enough, because you're the underwriter.  Okay?
5        MR. ZACHARKOW:  Objection.
6    Q.  (By Mr. Guy)  Where is the survey that says
7  this is about to collapse?
8    A.  I have no idea.
9    Q.  And nobody's ever asked you that?
10   A.  Nobody ever asked me that, no.
11   Q.  Do you know if Mr. Lever has been asked that
12 question?
13   A.  I don't think so.
14   Q.  Again, to my question, how does the insured
15 know what is material to you, the underwriter?
16   A.  Well, I would think it would be common sense
17 if you had a vessel that was about ready to collapse or
18 was in danger of sinking or something like that, you
19 would definitely want to let somebody know about it.
20   Q.  Well, beauty is in the eye of the beholder.
21 And a lot of these vessels, as you say, it's typical for
22 them to have dings on them, for them to have doubler
23 plates, to have paint corroded; is that fair enough, in
24 shipyard vessels?
25   A.  And it is typical.  But you -- it should be

Page 190

1  common sense that if you were to look at a vessel that
2  had a hole in the side of it, you'd know that it was in
3  eminent danger of sinking, and that should be brought to
4  somebody's attention.
5    Q.  Okay.  Was there a big hole in the side of the
6  AFDB-5?
7    A.  I have no idea.
8    Q.  You just don't know?
9    A.  I don't know.  I was using that as an example.
10   Q.  Okay.  But it's not an example that's actually
11 applicable to the facts of this case as you know.
12 Right?
13   A.  I don't know whether it's applicable to this
14 case or not.  But my point was that if a prudent insured
15 was aware of a condition that would put a vessel in
16 jeopardy, that it -- they owe the duty to let
17 underwriters know of that condition.
18   Q.  Okay.  Are you aware of anything that Signal
19 knew that put the vessel in jeopardy, as you say, to --
20   A.  I don't know.
21   Q.  You don't know?
22   A.  I don't know.
23   Q.  Who would know at Great American?
24   A.  I don't know who would know at Great American.
25   Q.  I mean, how could -- if a representation about

Page 191

1  the insured property was made, any insured property,
2  it's made to you as the underwriter.  Correct?
3        MR. ZACHARKOW:  Objection.  That's the
4  whole point.  The representations weren't made.
5    Q.  (By Mr. Guy)  All right.  If a
6  misrepresentation --
7    A.  It wouldn't necessarily be made to me.
8    Q.  All right.  Any representation or lack of
9  representation, when it comes to underwriting --
10       MR. GUY:  If that keeps you happy,
11 George.
12   Q.  (By Mr. Guy) -- is made to the underwriter.
13 Correct?
14   A.  It should be.
15   Q.  Okay.  So what I want to know is, how can you,
16 as the underwriter, not be able to tell us what you
17 should have been told, or what you weren't told?
18   A.  Well, that's --
19       MR. ZACHARKOW:  Objection.
20   A.  That's one of the --
21       MR. NICOLETTI:  You can answer.
22   A.  Well, I mean, that's one of the principles of
23 a marine policy, that you're supposed to -- that word --
24 you're supposed to be in utmost good faith.  And if
25 you're aware of a situation that could materially affect

Page 192

1  the policy, it's your obligation to let us know.
2    Q.  (By Mr. Guy)  All right.  One of the things
3  that you said earlier to Mr. Nicoletti was that -- one
4  of the things that might concern you is if a piece of
5  insured property was not capable of operating as it's
6  supposed to work.  Do you recall testifying that?
7    A.  Something similar to that, yes.
8    Q.  Has anybody given you any information on what
9  the working history of the AFDB-5 dry dock was before
10 this loss?
11   A.  What it was before the loss?
12   Q.  Yes.
13   A.  No.
14   Q.  So let's have a look at what was previously
15 introduced and marked as Exhibit 195.  And this
16 document, I'm going to represent to you, lists all of
17 the docking on the AFDB-5 prior to this loss from 2003.
18   A.  Okay.  I'll take your word for it, because I
19 can't read it.
20   Q.  Well, I appreciate it's quite small print.
21 But let's just go to the last one.
22   A.  (Complies.)
23   Q.  Are you on the last page?
24   A.  Yes.
25   Q.  And if we look at the -- it's the second one

Pages 189 to 192

**ORAL DEPOSITION OF CINDY STRINGER**

Page 225

1   A.   In 2009?
2   Q.   At the time of this report that we were just
3   talking about, which was from February 2007.
4   A.   2007, yeah.
5   Q.   Yeah.  Did you ever request these reports in
6   2007?
7   A.   No.
8   Q.   Did you ever request them in 2008?
9   A.   2008, no.
10  Q.   Is it your testimony today that these reports
11  are material to the risk in 2009?
12  A.   I never saw them, so I couldn't say one way or
13  the other.
14  Q.   Do you think they were material in 2007?
15  A.   If I had seen them, they may have been.
16  Q.   Who else would know -- at Great American would
17  know if they were material, if not you the underwriter?
18  A.   You'd have to see the report to determine
19  whether it was material or not.
20  Q.   Right.  But you'd agree with me the
21  underwriter is the person who has to say whether it --
22  A.   It would have to be the underwriter that would
23  have to look at them.  Sure.  Of course.
24  Q.   Right.  But you've never been asked to do that
25  until I -- until Mr. Nicoletti and I have been asking

Page 226

1   you today.
2   A.   None of these reports were brought to my
3   attention at all until after the occurrence.
4   Q.   Okay.  After the occurrence.
5   A.   After.
6   Q.   When were they brought to your attention?
7   A.   I'd say probably -- well, of course, I've seen
8   them here today.
9   Q.   First time you've seen them here in --
10  A.   This is the first time I've had a chance to
11  look at them, yeah.
12  Q.   Paragraph 26, "At Signal's request Robert
13  Heger attended at the dry dock on April 30th through
14  May 2nd, 2007, and conducted an inspection of the wing
15  walls to evaluate their condition and determine whether
16  or not they were suitable to be refurbished and used
17  with the new pontoons.  On May 18th, 2007, he issued his
18  inspection report to Signal.  See Exhibit 8," which is
19  in the binder if you would like to look at it.  Which
20  has previously been introduced as Exhibit 33 and again
21  as Exhibit 171.
22       MR. ZACHARKOW:  171?
23       MR. GUY:  Yeah.
24  Q.   (By Mr. Guy)  Real simple question.  Again, do
25  you believe that report would be material to the risk in

Page 227

1   2009 if it had been superseded by other reports of a
2   later date?
3       MR. ZACHARKOW:  Objection.  You can
4   answer.
5   A.   This would -- this would have been useful
6   information for me to have.  If I knew that the wing
7   walls were in poor condition, I definitely want to know
8   what was being done about it.
9   Q.   (By Mr. Guy)  It says they're in fair to poor
10  condition.
11  A.   I'm sorry?
12  Q.   It says they're in fair to poor condition.
13  A.   Right.
14  Q.   This report was from May 2007.
15  A.   Right.
16  Q.   So you were the underwriter for that year on
17  the account.
18  A.   Yes.
19  Q.   You were the underwriter who would have been
20  renewing that account at the end of 2008-2009.
21  A.   Right.
22  Q.   Is that correct?
23  A.   Right.
24  Q.   When did you request the reports from 2007, as
25  the underwriter?

Page 228

1   A.   I never requested reports.
2   Q.   How would Willis know that you would want such
3   reports?
4       MR. ZACHARKOW:  Objection.
5   A.   I would think it would be a matter of common
6   sense that they would make me aware that there was some
7   kind of a condition affecting this dry dock.
8   Q.   (By Mr. Guy)  How would Signal know that you
9   might be interested in that report?
10       MR. ZACHARKOW:  Objection.
11  A.   As a prudent insured, I would think that
12  they'd want to make their underwriter aware of some kind
13  of a report like that.  I guess my question would be,
14  did they make the hull underwriter aware of it, or was
15  the hull underwriter aware of it?
16  Q.   (By Mr. Guy)  We'll come back to that in a
17  minute.  But the -- this is just one piece of marine
18  property that's insured under the Great American
19  pollution policy.  Correct?
20  A.   Yes.
21  Q.   Okay.  So should they be giving you every
22  report on each single piece of property?
23       MR. ZACHARKOW:  Objection.
24  Q.   (By Mr. Guy)  Let's take an easy example.  If
25  we go back to the Schedule of Vessels, there's a spud

Pages 225 to 228

ORAL DEPOSITION OF CINDY STRINGER

Page 249

1    Q.   (By Mr. Guy)  Last question on that.  The
2  words "a recent survey," that would mean the most recent
3  survey; is that correct?
4    A.   The most recent survey.  We -- usually when we
5  say a current survey, you're looking for something maybe
6  a year or no more than two years old.
7    Q.   And one that hasn't been superseded by another
8  survey.
9    A.   Correct.
10   Q.   Mr. Nicoletti asked you earlier if you were
11 aware that the premium for the AFDB-5 for the 2009
12 policy year had been tendered for return to Signal.  Do
13 you recall that?
14   A.   I don't.
15   Q.   Do you know what I mean by return of premium
16 being tendered?
17   A.   If you delete a vessel from the schedule.  Is
18 that what you're referring to?
19   Q.   Well, the Great American has sought to void
20 the policy with regard to -- the 2009 policy with regard
21 to the AFDB-5.
22   A.   Okay.
23   Q.   Okay.  And its attorneys have offered to
24 return the premium for the AFDB-5, which has not been
25 accepted by Signal.  Mr. George and I have entered into

Page 250

1  a stipulation about that.  Did you have any involvement
2  in that?
3    A.   No.
4    Q.   Okay.  Do you know who would have been
5  involved in that?
6    A.   I'm not aware that anybody asked to -- what,
7  delete it from the policy?
8    Q.   No.  To return the premium for it.  To --
9         MR. ZACHARKOW:  I'll object.  It's a
10 pretty broad question and it gets into legal issues.
11   Q.   (By Mr. Guy)  Well, the question I want to
12 know -- the question I want to ask, which is the same
13 one John asked, and I'm not sure we have an answer, is
14 if you're going to do that for 2009, why not all the
15 previous policy years?
16        MR. NICOLETTI:  The question is posed to
17 her, not you, George.
18        MR. ZACHARKOW:  I'll object.
19   A.   I don't know anything about a request for
20 return of premium for any policy.
21   Q.   (By Mr. Guy)  So you can't answer that?
22   A.   I don't -- because I have no knowledge of it.
23   Q.   Fair enough.  Do you know who the person to
24 ask that would be?
25   A.   I really don't.

Page 251

1    Q.   Would it be Captain Ed Wilmot?
2    A.   I don't know if we was involved in that or
3  not.  I have no idea.
4    Q.   Okay.  Thank you very much.
5    A.   Okay.
6         MR. NICOLETTI:  I've got a couple of
7  follow-up questions.
8              RE-DIRECT EXAMINATION
9  QUESTIONS BY MR. NICOLETTI:
10   Q.   With regard -- now, this is all with regard to
11 your understanding.
12   A.   Okay.
13   Q.   Not as to what the law really is.  And my
14 questions are focusing on the -- on Signal's obligation
15 to voluntarily disclose information.
16   A.   Okay.
17   Q.   You understand that?  If Signal has in its
18 possession the most current survey, which states that
19 the vessel's in fair and good condition, it's within
20 Signal's own decision making whether or not to disclose
21 that information to the underwriter; isn't that true?
22        MR. ZACHARKOW:  Objection.
23   A.   I don't know.
24   Q.   (By Mr. Nicoletti)  You don't know.  Let's
25 approach it from this perspective.  An insured under the

Page 252

1  Doctrine of Utmost Good Faith is only obligated to
2  disclose to the underwriter material facts; isn't that
3  correct?
4    A.   I would say or anything that could be
5  detrimental to the risk.
6    Q.   Right.  Well, a material fact, by definition,
7  is detrimental to the risk.
8    A.   Okay.
9    Q.   Isn't it true?  You don't know that -- do you
10 have that understanding or not?
11   A.   If it's detrimental to the risk, I'd want to
12 know about it.
13   Q.   Right.  If a vessel is in fair to good
14 condition, is that detrimental to the risk?
15   A.   If it's in good condition, no.
16   Q.   So if Signal has a most current survey that
17 says the vessel's in fair to good condition, there's
18 no obligation to disclose it; isn't that correct?
19   A.   I don't know the answer to that.
20   Q.   Okay.  Again, the obligation of the insured to
21 disclose material information detrimental to the risk is
22 in the formulation of what the insured believes to be
23 material.  Is that correct, to your understanding?
24        MR. ZACHARKOW:  Objection.
25   Q.   (By Mr. Nicoletti)  You can answer.

Pages 249 to 252

ORAL DEPOSITION OF CINDY STRINGER

Page 265

1      A.   It would.
2      Q.   (By Mr. Zacharkow)  Now, you were asked about
3   Exhibit 12, which was referenced, which was the Dufour
4   survey report dated October 19th, 2007.
5           MR. ZACHARKOW:  Was 12 taken out?
6           THE WITNESS:  I don't know.
7           MR. GUY:  I don't know.  I was kind of
8   confused on that.  It confused me as well.  The tabs are
9   messed up or something.  There it is.  (Indicating)
10     Q.   (By Mr. Zacharkow)  And that survey report
11  indicates that the surveys were conducted when, Ms.
12  Stringer?
13     A.   Looks like it says December 15, 2008 --
14  wait -- 2006 and July of 2007.
15     Q.   Now, you weren't asked about Exhibit 11.
16          MR. ZACHARKOW:  You're killing me.
17          MR. GUY:  (Indicating.)
18     Q.   (By Mr. Zacharkow)  Which is an e-mail dated
19  July 16th, 2007, from Robert Heger to Terry Ballard at
20  Signal?
21     A.   I was not asked about that, no.
22     Q.   And in that, it's referenced as -- well, let
23  me ask you this:  Would you please read the section on
24  the pontoons for the record, please?
25     A.   Okay.  "Replace entire pontoon deck plate on

Page 266

1   all sections.  Pontoon deck is extremely thin with many
2   holes and cracks.  Many areas of the deck have been
3   doubled with small patches, but these do not restore the
4   overall banding strength of the pontoon, nor prevent
5   additional cracks from forming on a regular basis.  The
6   pontoon deck over the machinery compartments develop
7   significant new leaks every time the dry dock is
8   submerged.  The crew spends considerable effort during
9   each submergence finding and plugging leaks in the
10  machinery compartment, just to enable the stripping
11  pumps to keep up with the leakage.  A blowout of the
12  pontoon deck could rapidly flood the machinery
13  compartment.  Replace heavily corroded pontoon deck
14  stiffeners, about 25 percent, all sections.  Replace the
15  bottom shell plates and under the machinery compartment
16  on all compartments.  This shell plate" -- "the shell
17  plate under the machinery compartment reportedly has
18  many holes which have flooded the double bottom tanks.
19  The tank tops of the double bottom are now acting as the
20  shell.  The tank top plates are extremely corroded and
21  very thin.  A blowout of the tank top plate could
22  rapidly flood the machinery compartment."  And then it
23  goes on --
24     Q.   Okay.  That --
25     A.   Yeah.  It goes on to say, "Survey the access

Page 267

1   quarters and machinery compartment and repair areas of
2   localized heavy corrosion."
3      Q.   Okay.
4      A.   Do you want me to finish?
5      Q.   No.  Does that section still go on?  No.
6   That's okay for now.
7      A.   Okay.
8      Q.   Now, those conditions are described -- those
9   comments are describing conditions with regard to the
10  watertight integrity.  Right?
11     A.   Yes, it is.
12     Q.   Is that something that's of significance to
13  you as an underwriter in evaluating the risk?
14     A.   That would be a significant concern to me if I
15  knew that.
16     Q.   And, you know, regardless of whether the
17  survey report was provided to you, that information was
18  not provided to you.  Correct?
19     A.   This is correct.  As a matter of fact, I don't
20  think I've ever seen this before.
21          MR. ZACHARKOW:  I have no further
22  questions at this time.
23          MR. GUY:  I have one I think I want to
24  clarify.
25          RE-CROSS EXAMINATION

Page 268

1   QUESTIONS BY MR. GUY:
2      Q.   As an underwriter sometimes, a pollution
3   underwriter, perhaps more commonly as a hull
4   underwriter, you commission surveys from marine
5   surveyors; is that correct?
6      A.   As a hull underwriter?
7      Q.   Yeah.  I mean, hull underwriters generally or
8   a pollution underwriter, which you are now, you
9   commission surveys.
10     A.   As a hull underwriter, yes.
11     Q.   Right.  And the reason why a hull underwriter
12  commissions surveys -- or what happens with those
13  surveys, rather, is it is a condition of coverage that
14  certain recommendations are complied with; is that
15  correct, just in general?
16     A.   In general, if there are recommendations, yes,
17  there would be -- certain ones would be a condition of
18  the coverage.
19     Q.   Right.  And that's pretty standard in hull
20  insurance, the marine surveyor, at the request of the
21  underwriter, goes out, looks at the vessel, provides his
22  survey, and may find some recommendations that the
23  underwriter will require the insured to comply with
24  before the coverage is bound.
25     A.   That's true.

Pages 265 to 268