UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                          :
FIREMAN'S FUND INSURANCE CO., ONE          :
BEACON INSURANCE CO., NATIONAL             :
LIABILITY AND FIRE INSURANCE CO., and      :          10 Civ. 1653 (JPO)
QBE MARINE & ENERGY SYNDICATE 1036,  :
                                      Plaintiffs,    :          OPINION AND ORDER
                                                          :
                    -v-                                   :
                                                          :
GREAT AMERICAN INSURANCE CO. OF          :
NEW YORK, MAX SPECIALTY INSURANCE      :
CO., and SIGNAL INTERNATIONAL, LLC,        :
                                      Defendants.   :
                                                          :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

On August 20, 2009, one of the world's largest drydocks, the AFDB-5 (the "Drydock"),

sank at its berth in calm waters in Port Arthur, Texas.  Fireman's Fund Insurance Company

("FFIC"), One Beacon Insurance Company ("One Beacon"), National Liability and Fire

Insurance Company ("National Liability"), and QBE Marine & Energy Syndicate 1036 ("QBE")

(collectively, "Plaintiffs") brought this action against Great American Insurance Company of

New York ("Great American"), Max Specialty Insurance Company ("MSI"), and the insured,

Signal International, LLC ("Signal"), seeking a declaration as to the rights and obligations of the

parties under various insurance policies.  After several years of discovery and the unearthing of

documents reflecting the Drydock's dilapidated condition, disagreement over the extent of

coverage has given way to accusations of fraud and concealment.  MSI and Great American have

moved for declarations that their respective policies are void on such grounds.  Plaintiffs and

Signal have cross-moved on the same, and seek declarations requiring payment under the

policies.  For the reasons that follow, the Court holds that both policies are void *ab initio*.  MSI

and Great American's motions for summary judgment on these issues are therefore granted; all remaining motions are denied.

## I.   Background

### A.   Factual Background

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and other submissions made in connection with the instant motions. They are undisputed unless otherwise indicated.

#### 1.   Signal

Signal is a marine repair and fabrication company that came into existence in 2003 when it purchased the offshore repair division of Friede Goldman Halter in bankruptcy. The division consisted of six facilities in Mississippi and Texas, including a dockyard in Port Arthur, Texas ("dockyard"). Initially, Signal was predominantly involved in the repair, upgrade, and conversion of offshore drilling rigs. In 2006, it expanded its business model to include marine fabrication—performing new construction from engineering plans. By 2009, more than sixty percent of its revenue was derived from new construction projects. In 2010, Signal entered the ship repair business by purchasing the assets of Bender Shipbuilding in Alabama.

#### 2.   The Life and Death of a Drydock

In connection with its 2003 asset purchase, Signal assumed a lease with the Port Arthur Navigation District Industrial Development Corporation ("PANDIDC") to operate the AFDB-5 drydock at the Port Arthur dockyard. The Drydock was built by the United States Navy during World War II for the purpose of repairing naval vessels, and acquired by the Port of Port Arthur ("Port") in 1984. Later that year, the Port entered into a Lease Agreement to lease the dockyard from the City of Port Arthur ("City") and assigned its leasehold interest to PANDIDC, which contemporaneously entered into a Project Agreement with Bethlehem Steel Corporation

2

("Bethlehem") for the latter to operate the Drydock at the dockyard.  Under the Project

Agreement, the Drydock operator—first Bethlehem, and ultimately Signal—assumed all of the

Port's obligations under the Lease Agreement.  The Lease Agreement was for a term of twenty-

five years, with an option for the operator to renew for another twenty-five years provided it

gave two years' notice to PANDIDC, the Port, and the City.

The Drydock consisted of eight pontoons designated "A" through "H."  Each pontoon

was 240 feet long, 101 feet wide, and twenty-three and a half feet deep, with a fixed wing wall at

one end and a removable wing wall at the other.  The wing walls rose 48 feet above a pontoon

deck, and each had a watertight level called the safety deck.  The center of each pontoon had a

compartment called the machinery space, which housed the main ballast pumps as well as old

engines, generators, and a boiler room no longer in use.  The safety deck, which once functioned

as a machine shop, also contained old machinery and parts.  Asbestos and transite (an asbestos-

containing material) were present in the safety deck and in the crew deck and machinery spaces

of the pontoons.  The Drydock was located in navigable waters along the Sabine-Neches

Waterway in an area that had been carved out of the land by Bethlehem for the purpose of its

installation.  In addition to the AFDB-5, Signal owned and operated a second drydock—the

"Dual Carrier" in Pascagoula, Mississippi.

Signal became aware soon after acquiring the Drydock that it was nearing the end of its

useful life and in need of serious renovation.[1]  A December 2002 appraisal report prepared by

---

[1] Plaintiffs and Signal raise a litany of evidentiary objections to consideration of the following
surveys and reports, as well as testimony related to these reports and the condition of the
Drydock.  (Dkt. No. 275, Ex. 15.)  The Court has considered these objections and overrules them
in their entirety, including for the reasons stated by Great American in its response.  (Dkt. No.
288.)  The Court has also considered Plaintiffs' letter requesting that certain portions of Great
American's response be stricken because they contain improper arguments relating to the merits.
(Dkt. No. 300.)  This request is denied as moot; the Court has relied upon Great American's
response only to the extent necessary to consider Plaintiffs' and Signal's evidentiary objections.

surveyor Robert Heger stated that "[t]he dry dock would require extensive repairs to the pontoon deck to make it operational," which would require some 3.5 million pounds of steel, and the cost of doing so in the United States rendered its value "below zero."  (Dkt. No. 246 ("Zacharow Decl."), Ex. 11 ("2002 Heger Report") at 7-8.)[2]  Neither the Drydock's owners nor its operators seemed interested in making such costly repairs.  A March 2003 condition and valuation ("C&V") survey issued by ABS Consulting, Inc. ("ABS"), which had been retained by PANDIDC to periodically inspect the condition of the Drydock, found that "the shipyard is only marginally keeping up with the rapidly increasing rate of overall deterioration" and "within the last year more than a hundred doubler plates have been welded over severely wasted/holed original main deck platings."  (Zacharow Decl., Ex. 7 ("Mar. 2003 ABS Survey") at 3-4.)[3]  The survey also stated that although ABS had notified the Drydock's owners and operators in January 2000 of the "advanced state of pontoon shell and deck plating deterioration" and recommended "drydocking or outright renewal of the pontoons" to prevent the Drydock from "conceivably becom[ing] unserviceable well within the next 5 years," "the drydock operators are attempting to effect essential maintenance/repair work (that can be accomplished without removing pontoons) in order to keep the facility operational in the short term."  (*Id.* at 5.)

Consistent with this observation is an April 2003 staff study conducted by Signal to determine whether it would be economically justifiable to purchase the Drydock from the Port. On the one hand, if Signal purchased the Drydock it would have discretion over "operation, maintenance, and disposal costs," and could prevent the Port from offering to sell it to Signal's

---

[2] Signal was in possession of the 2002 Heger Report at least as early as March 2004, when it submitted the report to PANDIDC during lease renegotiations.  (2002 Heger Report.)

[3] The Court highlights only a sample of the descriptions and recommendations contained in the documents in Signal's possession in order to illustrate the type of information not disclosed.  A discussion of every potential red flag in those materials would unduly lengthen the facts section and is not necessary to the decision.

largest competitor.  (Zacharow Decl., Ex. 8 ("Staff Study") at 2-3.)  On the other hand, the

pontoon deck plate, which was being kept watertight with doublers and insert plates, was

expected to last only another three to five years absent major renewal efforts which could cost

$22 million and render the Drydock inoperable for two years.  (*Id.*)  Moreover, even if Signal

owned the Drydock, it would remain responsible under the Lease Agreement for disposal costs

that "could run into the millions or even tens of millions of dollars due to age, condition and the

presence of asbestos."  (*Id.* at 4-5.)  In light of "the relatively short remaining useful life and

extreme costs of renewals/life extensions and subsequent/eventual dry-dock disposal," the study

concluded that, "[i]n the Port's own words, [the Drydock] is too much potential liability," and

recommended that Signal decline the Port's offer and attempt to renegotiate the Lease

Agreement to place the burden of disposal upon the Port.  (*Id.*)

       In a subsequent C&V survey dated September 2003, ABS observed that Pontoon H was

"the most deteriorated pontoon" and had "very serious hull leakage," such that pumps were used

constantly to maintain ballast levels.  (Zacharow Decl., Ex. 6 ("Sept. 2003 ABS Survey") at 5.)

The survey went on to state that since ABS's January 2000 recommendation, "no major,

permanent, hull plating repairs have been accomplished," and "even with the repairs and

maintenance that have been done, the overall rate of drydock deterioration appears to be

progressing at an ever increasing rate," such that "the drydock is now well past the point where a

major restoration effort would be economically practical."  (*Id.* at 7.)  "At the time of inspection,

repair personnel were actively looking for deck fractures over pontoon machinery areas and were

affixing doublers as necessary," and "due largely to excessive leakage in 'H' pontoon, it

appeared that *unsafe drydock operations* were being conducted and . . . that it [was] the

Operator's intention to continue the same."  (*Id.* at 5-6 (emphasis in original).)  The survey

concluded by "highly recommend[ing] that drydock Owners advise Operators not to conduct

additional drydockings until substantial repairs are made to the 'H' pontoon and the repairs are verified." (*Id.* at 6 (emphasis removed).) In light of the survey's conclusions, PANDIDC held an emergency meeting on September 30, 2003 to address the Drydock's condition. As a result of that meeting, Signal and PANDIDC entered into an agreement whereby Signal made various commitments, including that it would remove the Drydock from service no later than October 2003 to perform the repairs mentioned in the survey. (Zacharow Decl., Ex. 9.)[4]

In March 2005, Signal purchased the Drydock from the Port for $10 pursuant to a Conditional Bill of Sale. (Zacharow Decl., Ex. 19 ("CBOS").) Under the CBOS, Signal continued to bear the burden of disposal and was required to make payments to PANDIDC in varying amounts depending upon Drydock usage. However, its obligations to make such payments ceased "at the end of the useful life" of the Drydock. (*Id.*) It also now paid rent under the Lease Agreement to the Pleasure Island Commission ("PIC"), an arm of the City.

In December 2005, marine surveyors Dufour, Laskey, and Strauss ("DLS") issued a report finding that the Drydock "had significant water in most compartments . . . [which] requires pumping and trimming every four hours," and "[t]he deck plating was noted to have significant doubler plates where plating was either wasted or separated from internal framing due to shear stresses aboard the drydock." (Dkt. No. 259 ("Straus Decl."), Ex. 13 ("2005 DLS Survey") at 26.) Despite these problems, the survey concluded that the Drydock was in "fair" condition, relying upon reports from Signal that it would be "self-drydocked in the near future to effect repairs to the bottom of each of the pontoon sections," and the fact that the Drydock was "overbuilt and significantly strong at the time of its construction," which "translated into a significant effective age as well as extended remaining economic life considering that the noted maintenance is performed on a regular and continuing basis." (*Id.*) In December 2006, DLS

---

[4] There is no indication in the record that such repairs were ever made.

issued another survey concluding that the Drydock was in "fair" condition.  (Straus Decl., Ex. 14 ("2006 DLS Survey") at 27.)  The observations in the 2006 survey were largely verbatim of the 2005 survey, but added that "[a]t the time of inspection there were divers present and those divers were patching holes or deficient areas of the bottom of the drydock."  (*Id.*)

In 2007, Signal began investigating alternatives to extend the useful life of the Drydock. In February, its docking master, Jim Booker, contacted Heger about replacing the pontoons two at a time and refurbishing the wing walls.  Heger subsequently conducted an inspection of the wing walls to determine whether they were suitable for refurbishment and issued a report in May 2007.  That report concluded that the wing walls were in "fair to poor" condition and the ballast tanks and safety tanks had lost their protective coating and needed to be repainted; otherwise, any attempt to continue using the wing walls "would result in an extremely limited useful life for the wings."  (Zacharow Decl., Ex. 24 ("May 2007 Heger Report") at 31.)  In a report issued in June 2007, Heger observed that "[p]ontoon sections E, F, G, and H are in very poor condition throughout and need complete replacement if long term use is to be considered," and recommended that Signal build new pontoons as "repair of the pontoons is not economically justifiable."  (Zacharow Decl., Ex. 25 ("June 2007 Heger Report") at 28, 32.)  In July, in response to an inquiry from Signal about what repairs were necessary for the Drydock's continued safe operation, Heger reiterated that the deck plate for the pontoons needed to be replaced and observed that, in addition to other issues requiring repair, the "[p]ontoon deck is extremely thin with many holes and cracks" and "[a] blow out . . . could rapidly flood the machinery compartment."  (Zacharow Decl., Ex. 27 at 2-3.)

On September 24, 2007, two days before expiration of the Lease Agreement, Signal sent a letter to PANDIDC, the Port, and PIC indicating its desire to renew.  However, citing the fact that the Drydock was approaching "the end of its useful life and . . . [would] likely not be

operational for the entirety of the renewal period," Signal rejected the twenty-five year renewal term and proposed a term that would automatically expire "in the event that the Drydock must be disposed of prior to the current expiration of the renewal period and a suitable dry dock cannot be obtained."  (Dkt. No. 250, Ex. 7.)  In October 2007, DLS issued a C&V survey that essentially parroted the observations in its 2005 and 2006 surveys, but concluded that the Drydock was in "satisfactory" rather than fair condition, and recommended that the pontoons be drydocked and repaired "[a]s soon as practical within the succeeding eighteen months . . . in order to render this vessel in good stable operating condition and provide a life extension to the drydock."  (Zacharow Decl., Ex. 28 ("2007 DLS Survey") at 7.)

In May 2008, having determined that it would not be economically feasible to replace the pontoons, Signal proposed a plan to Heger to extend the Drydock's life by removing the two worst pontoons—H and E—and converting the Drydock to a 6-pontoon configuration.  Heger stated that this configuration would not be stable without certain modifications and reiterated that "it is our opinion that all sections need major repair work before they can be safely used," and therefore "[a]ny designs we perform will be provided with the understanding that the dock will no[t] be operated with our 'blessing' unless all sections are repaired to our satisfaction." (Zacharow Decl., Ex. 33 at 2.)  On June 9, Heger provided Signal with design options for reconfiguring the Drydock to a 6- or 7-pontoon configuration.  Signal directed Heger to develop the design for the 7-pontoon configuration, which called for the removal of Pontoon H, and began work on the project around December 2008.

In January 2009, Stephen Heller & Associates, Inc. ("Heller") issued a 2009 Property Risk Assessment Report concluding that "the Signal International facilities reviewed are rated as an 'Above Average' risk."  (Dkt. No. 260 ("Morano Decl."), Ex. 2 ("2009 Heller Report") at 8.) This was the second highest rating possible, defined as "[a]cceptable standards including some

best industry practices." (*Id.*)  The report also described the risk of the Drydock becoming a total loss as one of "extremely low probability and frequency based on previous industry experience." (*Id.* at 36-37.)  In April 2009, Heger warned Signal that "it is imperative that all [pontoons] and original connection plates be adequately repaired according to our reports of May 18, 2007 . . . and June 28, 2007" prior to reconfiguring the Drydock.  (Zacharow Decl., Ex. 39 at 2.)  Despite this warning, Signal proceeded to reconfigure the Drydock without making such repairs, beyond the continued periodic installation of new insert plates.  (Straus Decl., Ex. 15 at 55:2–56:15; Ex. 23 at 207:15–208:7; Ex. 24 at 77:19–80:1, 102:13-23.)

In a letter dated August 12, 2009, PIC's lawyers informed Signal that, because it was in default of the Lease Agreement for various reasons, PIC was exercising its contractual right to terminate, effective September 15, 2009, and demanding in accordance with the lease two years' rent representing liquidated damages.  On August 18, representatives from Signal and PIC signed a proposal for an extension of the lease, which reflected mutual agreement upon a six-year lease extension with specified annual rent, and two options to renew for additional six-year terms with rent to be determined.  By its own terms, the proposal was "to be presented to each entity for approval" and PIC was to respond by September 3, 2009.

On August 20, 2009, Signal reached the point in the reconfiguration where it was ready to remove Pontoon H.  Shortly before 3:00 p.m., it removed and drydocked Pontoon H on blocks situated on Pontoons G, F, and E.[5]  At 5:00 p.m., the ballast tanks of the remaining seven pontoons were pumped.  Later that evening, the Drydock sank.

---

[5] These were the same pontoons described as being in "very poor condition throughout and need[ing] complete replacement if long term use is to be considered."  (June 2007 Heger Report at 28.)

### 3.    The Policies and Underwriting Process

At the time of the sinking, Signal held five insurance policies that potentially provided coverage for the Drydock: (1) a marine general liability policy subscribed to by FFIC and One Beacon on a 50-50 basis with FFIC as lead insurer having full claims control, providing $1 million coverage per occurrence less a $100,000 deductible ("MGL Policy"); (2) a marine excess liability policy subscribed to by FFIC, National Liability, and QBE on a 34-34-32 basis, also with FFIC as lead insurer, providing $25 million coverage per occurrence ("Bumbershoot Policy"); (3) a pollution policy subscribed to by Great American, providing $5 million coverage ("Pollution Policy"); (4) a primary property policy subscribed to by Westchester Surplus Lines Insurance Company ("Westchester"), providing $10 million coverage ("PPI Policy"); and (5) an excess property policy subscribed to by MSI, providing $15 million coverage in excess of the PPI Policy ("EPI Policy").

The PPI and EPI Policies insure loss or damage to real and personal property listed in a property schedule, as well as business interruption and "extra expenses."  Business interruption covers loss resulting from interruption or reduction of business operations due to loss or damage to insured property; extra expenses are the reasonable and necessary costs incurred to temporarily continue the business pending recovery.  The Pollution Policy provides coverage for pollution liability based upon discharges into navigable waters arising under the Oil Protection Act ("OPA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Federal Water Pollution Control Act ("FWPCA"), and corresponding state law.  Pursuant to an endorsement, the policy also provides coverage for "the on-water removal of materials of a non-OPA and non-CERCLA nature which has been mandated by an authorized public authority and is the result of a defined single, sudden and accidental event."  (Dkt. No. 215, Ex. 4 ("Pollution Policy") at GAI2279.)  In addition to the Drydock, the Pollution Policy

covers the Dual Carrier, Signal's fleet of twenty-five barges and tugs that were used in connection with its Drydock operations, and any vessels that were on the Drydock for business purposes.

Signal obtained these policies through its insurance broker, Willis of Alabama, Inc. ("Willis"). From its inception, Signal insured its drydocks under its property insurance program. However, prior to soliciting property coverage from MSI, it attempted to obtain hull insurance on the Drydock in 2005. In connection with applications to Trident Marine ("Trident") and FFIC, Willis submitted the 2002 Heger Report. Both underwriters singled out the report's description of the poor condition of the pontoon deck plating and asked Willis if any work had been done. The FFIC underwriter stated that he would need a description of the repairs done or else he would "have a tough time convincing anybody that this is worth $5,000,000." (Zacharow Decl., Ex. 15 at 2.) The Trident underwriter similarly remarked that "[w]e would need confirmation from the assured that [the pontoon deck of all sections and Pontoon H has been replaced or fixed] before we would commit to cover it." (*Id.* at 4.) Willis indicated that Signal had "performed a great deal of work" but it did not know the specifics; offered to obtain a new C&V survey; and requested a quote assuming receipt of an acceptable survey. (Dkt. No. 215, Ex. 16 at 2.) The Trident underwriter responded that he "c[ould not] support *any* pricing without some feedback from the assured detailing what work had been done on the Drydock." (Dkt. No. 215, Ex. 17 at 2 (emphasis added).)

Signal subsequently sought property insurance on the Drydock. In connection with the solicitation of coverage for the 2009-10 year, Willis employed AmWins of New York ("AmWins"), a wholesale broker, which provided Westchester with a 2009 Property Submission. That submission contained, among other things, the 2009 Heller Report and a Statement of Values listing the Drydock's value as $13.6 million based upon the most recent survey, the 2007

DLS Survey.  Westchester relied upon this submission to underwrite the PPI Policy.  Seeking additional coverage, AmWins provided MSI with the same submission, which it relied upon to underwrite the EPI Policy.

Signal held pollution coverage with Great American beginning in 2004.  In connection with its solicitation of coverage for the 2009-10 year, Willis, on behalf of Signal, submitted a Vessel Pollution Liability Application and an attached Vessel Schedule.  The Vessel Schedule identified the pieces for which Signal sought coverage, including the Drydock, and described, among other things, the age of each item.  Willis did not submit any surveys or reports regarding the condition of the Drydock.

### 4.  After the Sinking

The Drydock was declared a constructive total loss.  Signal subsequently made demand upon its insurers and notified the Texas General Land Office ("GLO") of the sinking.  In a letter dated September 2, 2009, the GLO notified Signal that it had determined that the Drydock "could be a threat to health, safety, or welfare and a threat to the environment," noted the potential consequences of abandonment, and inquired as to what actions Signal would take "to minimize pollution impacts to waters of the state."  (Dkt. No. 19, Ex. 5 ("Sept. 2009 GLO Letter").)  The GLO cited as authority the Oil Spill Prevention Act of 1991 ("OSPRA"), which prohibits a person from leaving a wrecked structure in coastal waters if the GLO finds it to be involved in an actual or threatened discharge of oil; a threat to public health, safety, or welfare; a threat to the environment; or a navigation hazard.  (*Id.* (citing Tex. Nat. Res. Code § 40.108).)[6]

---

[6] Signal received a follow-up letter from the GLO dated November 5, 2009, which requested an update of its removal plans.  This letter notified Signal of the GLO's determination that the Drydock "pose[d] a threat to public health, safety and welfare and the environment."  (Dkt. No. 19, Ex. 6 ("Nov. 2009 GLO Letter").)

On September 8, Signal's Chief Financial Officer, Chris Cunningham, sent a letter to PIC informing it that the Drydock had sunk, and because Signal would not be purchasing a replacement, it would not be entering into a new lease. Effective September 25, 2009, Signal and PIC executed a First Amendment and Lease and Release Agreement, which reflected Signal's withdrawal of its September 24, 2007 notice of intent to renew; extended the lease for six months to March 25, 2010 for the purpose of removal and cleanup; and required Signal to pay PIC $800,000 for rent through March 25, 2010 and in resolution of its alleged breaches under the lease.

In January 2010, Westchester paid Signal the full $10 million coverage under the PPI Policy, without allocating the payment between coverage for the value of the Drydock and coverage for removal costs. MSI also eventually paid Signal $3.6 million less deductible as the remainder of the cash value of the Drydock. However, MSI and Great American took the position that their respective policies did cover removal costs. FFIC, as lead insurer for the liability policies, took the position that removal and cleanup were covered under the property and pollution policies, and if the liability policies responded at all, it was not until the other policies were exhausted or at least contributed. In due course, the liability insurers agreed to assist Signal in the process of obtaining bids for removal of the Drydock and provided it with funds on a reservation of rights basis.

In late January 2010, Signal issued a request for best and final proposals for removal and cleanup of the Drydock, which provided that there were known and documented hazardous materials on the Drydock when it sank, including asbestos, transite, PCBs, and oil. In June 2010, Signal contracted with Weeks Marine, Inc. ("Weeks") for the removal of the Drydock, including "possible friable asbestos containing materials, oils and/or petroleum products." (Zacharow Decl., Ex. 66 at 14.) Weeks subcontracted ESCO Marine, Inc. ("ESCO") to remove all

13

hazardous materials and process them in accordance with regulatory requirements.

Representatives of the GLO and the United States Coast Guard were present at the Drydock

removal kick-off meeting on July 1, 2010 due to concerns over emissions of hazardous materials

into the water.  In connection with the project, ESCO removed and properly disposed of 70.5

fifty-five gallon drums of petroleum-based materials, 443,290 pounds of PCB bulk, 90,080

pounds of non-friable asbestos, and approximately 6.5 million pounds of contaminated soil.

The removal of the Drydock and cleanup of the location were completed by March 2012.

Plaintiffs ultimately paid Weeks $12,395,026 on Signal's behalf.  In a letter dated March 5,

2012, the GLO informed Signal that "the sunken structure and all associated debris that could

create a navigation or environmental hazard have been removed from Texas coastal waters," and

therefore the incident was closed.  (Dkt. No. 225, Ex. 7 ("2012 GLO Letter").)

### B.      Procedural Background

Plaintiffs initiated this action on March 2, 2010, invoking this Court's admiralty

jurisdiction and seeking declaratory relief.  (Dkt. No. 1.)  Signal subsequently filed crossclaims

against MSI for failure to cover business interruption and extra expenses, and for mishandling its

insurance claims in violation of state law.  (Dkt. No. 79.)[7]  MSI answered these crossclaims on

January 28, 2011, and added crossclaims against Signal to void the EPI Policy for fraud,

concealment, and material non-disclosure; recover payments made; and decline Signal's

remaining insurance claims.  (Dkt. No. 84.)  On March 18, MSI amended its answer to the

complaint to include an affirmative defense that the EPI Policy is void for the same reasons.

(Dkt. No. 101.)  On March 25, Great American also amended its answer to include a

counterclaim against Plaintiffs and crossclaims against Signal asserting that the Pollution Policy

is void under the doctrine of utmost good faith, and for misrepresentation and willful

---

[7] Plaintiffs voluntarily dismissed their claims against Signal on October 15, 2010.  (Dkt. No. 70.)

misconduct.  (Dkt. No. 104.)  This case was reassigned from Judge Kaplan to the undersigned on October 6, 2011.  (Dkt. No. 125.)

On August 10, 2012, after discovery, Plaintiffs moved for summary judgment seeking a declaration that the EPI Policy must contribute on a prorated basis for removal and cleanup of the Drydock, and Signal moved for partial summary judgment seeking a declaration that the EPI Policy is not a maritime contract subject to *uberrimae fidei*.  (Dkt. Nos. 159 & 162.)  On January 25, 2013, the Court held that because the Drydock was not a "vessel" under *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735 (2013), none of the insurance policies were maritime contracts and it therefore lacked admiralty jurisdiction over all claims in the case.  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 2013 WL 311084 (S.D.N.Y. Jan. 25, 2013).  The Court subsequently determined that it has jurisdiction over all claims pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367(a), limited its January 25 Order to the PPI and EPI Policies, and reserved judgment on the maritime status of the remaining policies.  (Dkt. Nos. 219 & 232.)  On February 5, the Court denied Signal's motion for partial summary judgment as moot in light of its January 25 Order.  (Dkt. No. 212.)  On March 25, it granted Plaintiffs' motion for summary judgment and held that the EPI Policy provides coverage for removal and cleanup of the Drydock.  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 2013 WL 1195277 (S.D.N.Y. Mar. 25, 2013).

The eight pending motions relate exclusively to the Pollution and EPI Policies.  With respect to the former, Plaintiffs and Signal jointly move for summary judgment seeking a declaration that the policy is not a maritime contract subject to *uberrimae fidei*, and is not otherwise void for misrepresentation, concealment, or material non-disclosure.  (Dkt. No. 226.)  Plaintiffs also independently move for partial summary judgment seeking a declaration that the policy covers removal of the Drydock.  (Dkt. No. 230.)  Great American cross-moves for

summary judgment on the same issues.  (Dkt. Nos. 242 & 244.)  With respect to the EPI Policy, Signal moves for partial summary judgment seeking a declaration that the policy is not void for fraud, misrepresentation, concealment, or material non-disclosure, and MSI cross-moves for summary judgment on the same.  (Dkt. Nos. 226 & 257.)  MSI also moves for summary judgment to dismiss Signal's business interruption crossclaim, and for an order reconsidering or altering this Court's March 25 Order.  (Dkt. Nos. 249 & 253.)

## II.     Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden of a movant on summary judgment is to provide evidence on each element of his claim or defense illustrating his entitlement to relief.  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant makes this showing, the burden shifts to the non-moving party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence.  Fed. R. Civ. P. 56(f); *Anderson*, 447 U.S. at 250-51.  The court should view all evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor," and a motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and quotations

16

omitted).  At the same time, the non-moving party cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its burden.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citations omitted).

### B. Reconsideration or Alteration of Judgment

A motion to alter judgment pursuant to Federal Rule of Civil Procedure 59(e) may be granted "only if the movant satisfies the heavy burden of demonstrating an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Hollander v. Members of the Bd. of Regents of the Univ. of the State of New York*, 524 Fed. App'x 727, 729 (2d Cir. 2013) (citation and quotations omitted).  A motion for reconsideration of an order is appropriate pursuant to Local Civil Rule 6.3 to correct clear error, prevent manifest injustice, or upon the availability of new evidence.  *See, e.g.*, *Virginia Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation omitted). "[T]he standards for relief under Local Civil Rule 6.3 and Rule 59(e) are identical."  *Briese Lichttechnik Vertriebs GmbH v. Langton*, No. 09 Civ. 9790 (LTS), 2013 WL 498812, at *1 (S.D.N.Y. Feb. 11, 2013) (citation and quotations omitted).  Both motions are "extraordinary remed[ies] to be employed sparingly in the interests of finality and conservation of scarce judicial resources," and will not be granted "unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Goonan v. Fed. Reserve Bank of N.Y.*, No. 12 Civ. 3859 (JPO), 2013 WL 1386933, at *1 (S.D.N.Y. Apr. 5, 2013) (citations and quotations omitted).

III.     Discussion

A.     The Pollution Policy

1.     Admiralty Jurisdiction Over Marine Insurance

Article III, Section 2 of the Constitution vests federal courts with jurisdiction over "all Cases of admiralty and maritime Jurisdiction."  U.S. CONST. art. III, § 2, cl. 1; *see also* 28 U.S.C. § 1333(1) (granting federal district courts exclusive original jurisdiction over all civil admiralty and maritime cases).  Pursuant to this grant, federal courts have developed decisional law governing maritime contracts. *Norfolk S. Ry. Co. v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 23 (2005) (citations omitted).  "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract's interpretation." *Id.* at 22-23 (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).

Maritime contracts are those which "relate to the navigation, business or commerce of the sea." *Jeffcott v. Aetna Ins. Co.*, 129 F.2d 582, 585 (2d Cir. 1942) (quoting *DeLovio v. Boit*, 2 Gall. 398, 444 (C.C.D. Mass. 1815) (Story, J.)).  It is well settled that marine insurance contracts are within the admiralty jurisdiction. *Ins. Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 29-31 (1870).  However, "[t]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick*, 365 U.S. at 735; *see also CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 379 (2d Cir. 1982) ("The precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction have proven particularly elusive.").  Whether a contract is maritime depends not upon "whether a ship or vessel was involved in the dispute," or "the place of the contract's formation or performance," but rather upon "the nature and character of the contract, [where] the true criterion is whether it has reference to maritime service or maritime transactions." *Kirby*, 543 U.S. at 23-24 (citations and quotations omitted).  "Therefore, the

contract's subject matter must be [the] focal point." *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 312 (2d Cir. 2005) (citations omitted).  If the contract's "purpose is to effectuate maritime commerce . . . it is a maritime contract." *Kirby*, 543 U.S. at 27.

In conducting this conceptual inquiry, "[p]recedent and usage are helpful insofar as they exclude or include certain common types of contract." *Kossick*, 365 U.S. at 735.  Courts are also guided by "the purpose of the jurisdictional grant—to protect maritime commerce." *Folksamerica*, 413 F.3d at 311 (citing *Exxon Corp v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991)).  With respect to insurance contracts in particular, the Second Circuit has instructed that "an insurance policy's predominant purpose, as measured by the dimensions of the contingency insured against and the risk assumed, determines the nature of the insurance." *Folksamerica*, 413 F.3d at 317 (quoting *Acadia Ins. Co. v. McNeil*, 116 F.3d 599, 603 (1st Cir. 1997)); *see also Royal Ins. Co. of Am. v. Pier 39 Ltd. P'ship*, 738 F.2d 1035, 1036 (9th Cir. 1984) ("For an insurance policy to be within admiralty jurisdiction, the interests insured, and not simply the risks insured against, must be maritime.").  "Ultimately, coverage determines whether a policy is 'marine insurance,' and coverage is a function of the terms of the insurance contract and the nature of the business insured." *Folksamerica*, 413 F.3d at 317.

Historically, admiralty jurisdiction existed over a contractual dispute only if the contract was "*purely* maritime" in nature. *Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 36 (2d Cir. 1994) (citing *Rea v. The Eclipse*, 135 U.S. 599, 608 (1890)).  In time, two exceptions arose extending the jurisdiction to "mixed contracts" containing both maritime and non-maritime elements.  Under the first, known as the "severability exception," jurisdiction exists if "the claim arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract." *Folksamerica*, 413 F.3d at 314 (citation and quotations omitted).

Under the now-obsolete second, known as the "incidental exception," jurisdiction arose if "the non-maritime elements of [the] contract [were] 'merely incidental' to the maritime ones." *Id.* (citations omitted).  In *Kirby*, the Supreme Court indicated that the incidental exception was untenable, at least in the context of bills of lading, because of its spatial focus.  543 U.S. at 26-27.  In *Folksamerica*, the Second Circuit understood *Kirby* to suggest a "global principle"—not limited to bills of lading—and reformulated the incidental exception as the "primary or principal objective exception."  413 F.3d at 314-15.  Under this new exception, jurisdiction will exist even if a contract's non-maritime components are "*more* than 'incidental,'" provided the "principal objective of [the] contract is maritime commerce."  *Id.* at 315 (citation omitted) (emphasis in original).

### 2.   The Doctrine of Utmost Good Faith

Marine insurance is "a contract *uberrimae fidei*, and the principles which govern it, are those of an enlightened moral policy."  *McLanahan v. Universal Ins. Co.*, 26 U.S. (1 Pet.) 170, 185 (1828) (Story, J.).  Under the doctrine of utmost good faith, "parties to a marine insurance policy must accord each other the highest degree of good faith," and the insured is obligated to "disclose any information that materially affects the risk being insured, because [it] is more likely to be aware of such information."  *St. Paul Fire & Marine Ins. Co. v. Matrix Posh, LLC*, 507 Fed. App'x 94, 95 (2d Cir. 2013) (citations and quotations omitted).  This duty extends to all material information, "whether inquired for or not."  *Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 688 (S.D.N.Y. 2008) (citation and quotations omitted).

"A non-disclosed fact is material if it would have affected the insurer's decision to insure at all or at a particular premium."  *N.Y. Marine & General Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 123 (2d Cir. 2001) (citation omitted); *see also McLanahan*, 26 U.S. at 188 (recognizing that "the test of materiality" is "whether the risk be increased so as to enhance the

premium"). The standard for materiality is an objective one which asks "whether a reasonable person in the assured's position would know that the particular fact is material." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986) (citation omitted); *see also Btesh v. Royal Ins. Co., Ltd. of Liverpool*, 49 F.2d 720, 721 (2d Cir. 1931) (noting that a fact is material if it is "something which would have controlled the underwriter's decision," "[b]y [which] we understand only what a reasonable person in the assured's position would suppose"). Even if a non-disclosed fact is material, however, the policy "cannot be voided for misrepresentation where the alleged misrepresentation was not relied upon and did not in any way mislead the insurer." *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985) (citation and quotations omitted); *see also* 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 19-14 (5th ed.) (describing this separate requirement as "inducement").

Thus, what has generally been described as the "materiality" element consists of two questions, one objective, one subjective: (i) would a reasonable insured believe that the disclosure would be material to the insurer's decision; and (ii) was the non-disclosure in fact material to the insurer's decision?[8] If the insured breaches its duty of utmost good faith, the insurer is entitled to void the policy *ab initio*, "regardless of whether the misrepresentation or

---

[8] Courts usually do not analyze the subjective component of materiality, which raises a question whether inducement is a distinct inquiry, or is rather inherent to—or presumed upon—proof of the objective component. 2 Schoenbaum § 19-14 ("Many courts . . . blur the objective and subjective aspects of th[e] test and fail to distinguish whether they are applying it to the prudent underwriter or the particular underwriter in question. Presumably what is meant is that the 'controlling' or 'decisive influence' test," under which "at a minimum 'the risk must be increased so as to enhance the premium,'" "satisfies both aspects.") (citations omitted). In *Puritan Insurance Co.*, which continues to be the leading case on inducement in this Circuit, the insurer failed to prove inducement because its actions had not changed once it learned of the allegedly material information. 779 F.2d at 871. There was, therefore, evidence that the insurer in fact was not affected by the failure to disclose, rather than evidence that the insurer in fact *would not* have been affected.

21

omission was intentional or was the result of accident or mistake." *PGG Realty*, 538 F. Supp. 2d at 688 (citations omitted).

### 3.     The Threshold Inquiry

Prior to *Kirby*, courts in this Circuit were required to conduct a "threshold inquiry" to determine "whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." *Atl. Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.*, 968 F.2d 196, 200 (2d Cir. 1992) (citation omitted) (emphasis removed).  If the threshold inquiry was not satisfied, the court lacked admiralty jurisdiction.  *Folksamerica*, 413 F.3d at 312 (citations omitted).  In *Folksamerica*, the Second Circuit expressed "some uncertainty" as to whether the inquiry survives *Kirby*—which did not mention it and focused solely upon the primary objective of the contract—but left resolution of the issue for an appropriate case.  *Id.* at 313-14.

It would seem that if the inquiry continues to play a role, it must be as a useful tool in assessing whether the primary objective of the contract is maritime commerce, rather than an independent basis for declining jurisdiction.  *See Marubeni Int'l Petroleum (Singapore) Pte Ltd. v. Prestige Marine Servs. Pte Ltd.*, 591 F. Supp. 2d 386, 388 n.1 (S.D.N.Y. 2009) ("[S]uch an inquiry is, at best, a threshold inquiry, and a court must still inquire into whether the primary objective of the contract [is maritime commerce].") (citation omitted); *see also N.H. Ins. Co. v. Home Sav. & Loan Co. of Youngstown, Ohio ("NHIC")*, 581 F.3d 420, 425 (6th Cir. 2009) (finding the Second Circuit's justification for the threshold inquiry "persuasive," but declining to adopt the inquiry as inconsistent with *Kirby*).  Even assuming that the inquiry continues to act as a threshold, however, it is readily satisfied in this case.  The Second Circuit has only twice encountered cases that failed the inquiry, and both involved claims for the loss of "coffee—a good without any inherently maritime character—that was designated for land transportation

only, never became marine cargo, and never entered maritime commerce." *Folksamerica*, 413

F.3d at 312-13 (discussing *In re Balfour Maclaine Intern. Ltd.*, 85 F.3d 68 (2d Cir. 1996); *Atl.*

*Mut.*, 968 F.2d 196).  In *Folksamerica*, the Court concluded that the case "easily" satisfied the

threshold because "the parties' dispute concern[ed] an insurance claim based on a ship-

maintenance-related injury sustained by a ship oil-tank cleaner aboard an ocean going vessel in

navigable waters."  *Id.* at 313.

 Here, too, the dispute concerns an insurance claim based on the loss of a drydock, located

in navigable waters, which was designed for and predominantly engaged in the repair of vessels,

a business that has "long been recognized as maritime."  *Id.* (citations omitted).  It is therefore

"fair to say" that when the Drydock sank, giving rise to a potential threat to the navigation and

environment of commercial waters, it "became a casualty of the business of maritime

commerce."  *Id.* (citation omitted).[9]  Although *Folksamerica* is distinguishable because this

dispute does not involve a vessel, that fact alone cannot preclude jurisdiction.  *See Kirby*, 543

U.S. at 23 (noting that courts may not rely upon "whether a ship or vessel was involved in the

dispute" to determine whether jurisdiction exists) (citation omitted).  Moreover, even though the

dispute does not involve a vessel, it arises from a claim on a policy that provides coverage to

---

[9] Plaintiffs contend that the Drydock was not a hazard to navigation, but there can be no doubt
that the GLO believed that the Drydock and its debris posed a potential threat to navigation.  (*See*
2012 GLO Letter ("[T]he sunken structure and all associated debris that could create a
navigation or environmental hazard have been removed from Texas coastal waters.").)  Plaintiffs
also argue that this dispute has no connection to maritime commerce because Signal's potential
liability arose under Texas law; Signal sought coverage under a state law extension; and only the
GLO, a state agency, "ordered" Signal to remove the Drydock.  Plaintiffs cite no authority for
the proposition that the source of liability—federal or state—is relevant, much less determinative
over the factors already discussed by the Court.  Moreover, the GLO did not "order" Signal to
take any actions; it described the law and the potential consequences for failing to remove the
Drydock in the event that it made a formal determination of abandonment.  The GLO's
involvement in the incident was therefore comparable to that of the Coast Guard, whose
representatives were present at the July 2010 removal kick-off meeting due to concerns
regarding the removal project's impact upon coastal waters.

twenty-five vessels that were part of Signal's Drydock operations, as well as any vessels that were on board the Drydock for business purposes.  Under these circumstances, the dispute is not "so attenuated" from maritime commerce that admiralty jurisdiction is precluded.

### 4.     The Pollution Policy is Marine Insurance

In its January 25 Order, the Court held that the PPI and EPI Policies were not maritime contracts because the "predominant item" insured—the Drydock—was not a vessel.  *Fireman's Fund*, 2013 WL 811084, at *5.  Plaintiffs[10] argue that the same reasoning applies to the Pollution Policy.  This is an incomplete account of the holding.  While the Court emphasized the vessel status of the "predominant item" insured, this was because "the Drydock was by far the most expensive asset insured," and therefore "if [it was] in fact a vessel, the insurance's predominant *purpose* was to insure maritime risks."  *Id.* at *1 n.4 (citing *Folksamerica*, 413 F.3d at 315) (emphasis added).  Thus, the vessel status of the Drydock was relevant because it informed the primary purpose of the PPI and EPI Policies, and it was *dispositive* because the Drydock was "by far" the largest piece of property insured.

It does not follow that the vessel status of the Drydock is also dispositive of a policy that insures pollution liability arising out of Signal's general business operations, rather than property damage or loss.  On the contrary, the fact that a vessel was not involved in a dispute or is not the predominant object of a contract generally will not answer the jurisdictional question.  *See, e.g.*, *Kirby*, 543 U.S. at 24 ("To ascertain whether a contract is a maritime one, we cannot look to whether a ship or vessel was involved in the dispute, as we would in a putative maritime tort case."); *Kossick*, 365 U.S. at 735 ("[A] contract to repair or to insure a ship is maritime, but a contract to build a ship is not.") (citations omitted); *Catlin (2003 Syndicate) at Lloyd's v. San*

---

[10] For sake of convenience, unless otherwise indicated, the Court will collectively refer to Plaintiffs and Signal as "Plaintiffs."

*Juan Towing & Marine Servs., Inc.*, 946 F. Supp. 2d 256, 264-65 (D.P.R. 2013) (observing that "in light of *Kirby*, the [floating drydock's] non-vessel status pursuant to 1 U.S.C. § 3 does not *ipso facto* preclude it from qualifying as a maritime interest"); *St. Paul Fire & Marine Ins. Co. v. SSA Gulf Terminals, Inc.*, 2002 WL 31260153, at *2 (E.D. La. Oct. 8, 2002) ("In order to invoke this Court's admiralty jurisdiction, the contract need not insure a vessel, but it must bear a certain nexus to a vessel's operations and navigation.") (citation omitted).  Nor, as a logical matter, should it.  The concepts of vessels and maritime contracts are distinct: one hinges upon the capacity of the object as a means of transportation over water, the other upon the object's relationship to maritime commerce.  *Lozman*, 133 S. Ct. at 739 (stating that vessel status is determined based upon whether "a reasonable observer, looking to the [object]'s physical characteristics and activities, would . . . consider it to be designed to any practical degree for carrying people or things on water").  Consequently, although the vessel status of the Drydock is relevant, it does not end the analysis.  Rather, the Court must determine whether the primary purpose of the contract is maritime commerce in light of the nature of the business and interests insured and the risks assumed.

### i.  Severability

As a preliminary matter, it is necessary to determine the scope of the inquiry.  The Pollution Policy is clearly severable.  The scheduled interests are listed separately and each has its own premium.  *See, e.g.*, *Atl. Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.*, 775 F. Supp. 101, 106 (S.D.N.Y. 1991) (relying upon the existence of separate premiums to conclude that the contract was severable), *aff'd*, 968 F.2d 196.  Great American relied upon this severability to

tender only the premium and interest due for the Drydock coverage, and it has sought to void only that portion of the policy.[11]

Under the traditional severability analysis, this Court would sever the Drydock coverage and consider it in isolation to determine whether maritime law governs its interpretation. "Yet *Kirby* by its terms requires analysis of the maritime contract as a whole." *Tradhol International, S.A. v. Colony Sugar Mills Ltd.*, No. 09 Civ. 00081 (RJH), 2009 WL 2381296, at *5 (S.D.N.Y. Aug. 4, 2009) (citations and quotations omitted), *aff'd*, 354 Fed. App'x 463 (2d Cir. 2009). By focusing upon "whether the principal objective of a contract is maritime commerce," *Kirby*'s conceptual approach "vindicates" the fundamental interest of the jurisdictional grant—"the protection of maritime commerce." *Kirby*, 543 U.S. at 25 (citations and quotations omitted) (emphasis removed). Where the relevant contractual provision is non-maritime, the severability exception threatens to frustrate, rather than further, this interest. Were a court to sever the non-maritime element first and analyze it in isolation, maritime law would not govern its interpretation, even if the primary purpose of the contract as a whole is maritime commerce. In contrast, were the court to first analyze the contract as a whole and conclude that its primary purpose is maritime commerce, maritime law would wholly govern its interpretation, rendering the severability analysis moot; severed or not, the non-maritime element would be subject to maritime law.

Recognizing this problem, the Ninth Circuit has disavowed the severability exception in light of *Kirby*. *See Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1218-19 (9th

---

[11] Great American asserts that the use of itemized premiums was for accounting purposes only. It also argues that the severability doctrine applies to "obligations," and there was only one, non-severable obligation under the policy—coverage for statutory pollution liability arising from Signal's business operations. Both claims are in tension with the ordinary practice of relying upon the existence of separate premiums to determine severability. Regardless, in light of the Court's holding, they are moot.

Cir. 2007) (citations and brackets omitted) (observing, *inter alia*, that "if the Court [in *Kirby*] had wished to recognize a severability exception, then there could not have been a better context in which to fashion this exception than the intermodal shipping context—the Court could have treated the ocean shipping leg as maritime and severed the non-maritime land leg of the bill of lading"). In *Tradhol*, Judge Holwell similarly "question[ed] whether the severability doctrine survives *Kirby*," since "[t]he premise . . . is that a court may divide a contract into its component parts and pronounce some but not all of them 'salty.'" 2009 WL 2381296, at *5 (citation omitted). It was not necessary to resolve the issue, however, because the plaintiff failed to allege a severable contract. *Id.*

This Court is also doubtful that the severability exception is not abrogated or at least altered by *Kirby*, since it too can lead to a spatial rather than conceptual focus. Indeed, if the incidental exception must be reformulated to the "principal or primary purpose exception"— which seems to be just another way of asking whether the "principal objective of a contract is maritime commerce"—then it is hard to see why the severability exception should not also yield to this purposive inquiry. Notwithstanding these issues, because the exception remains the law of this Circuit, the Court proceeds to analyze the Drydock coverage as a separate component of the policy. *See Tradhol*, 354 Fed. App'x at 464-65 (2d Cir. 2009) (conducting the severability analysis); *Folksamerica*, 413 F.3d at 314 (discussing the two exceptions and reformulating the incidental exception in light of *Kirby* without suggesting that the severability exception was also altered).

### ii.      *Folksamerica* **and Marine Pollution Insurance**

The conclusion, though made, is in any event academic. Even when viewed in isolation, the Drydock coverage has a "genuinely salty" flavor. *Kossick*, 365 U.S. at 742. *Folksamerica* is instructive. There, a worker who was injured while cleaning the oil tank of a barge moored in

navigable waters in New York Harbor sued Clean Water, the company that subcontracted the work to his employer, in state court. 413 F.3d at 309. When Clean Water notified its insurer of the action, the insurer's successor in interest, Folksamerica, sued in federal court seeking a declaration that it had no duty to indemnify or defend. *Id.* The policy, which had a single premium, consisted of two parts: a Comprehensive General Liability ("CGL") section providing coverage for pollution liability, among other things; and a Shiprepairers Legal Liability ("SLL") section providing coverage for loss of or damage to vessels undergoing repairs by the insureds. *Id.* at 309-10. The insureds were all "marine companies whose business operations relate[d] entirely to either ship repair, marine oil transport, marine cargo transport, or, in the case of Clean Water, ship tank cleaning," and the policy had been issued by a marine insurer through a marine broker. *Id.* at 310, 315 (citation and quotations omitted). Folksamerica contended that the policy was marine insurance because it was "issued to maritime companies, clearly cover[ed] their marine interests, and the underlying accident was on board a vessel in navigable waters," and accordingly sought to void coverage pursuant to *uberrimae fidei*. *Id.* at 310-11 (citation, quotations, and brackets omitted). Clean Water argued—and the district court agreed—that the policy was not a maritime contract because "the CGL section . . . [w]as a standard 'all risk policy' and . . . the maritime risks covered by the Policy were 'merely incidental' at best." *Id.* at 311 (citation omitted). The district court did not consider the SLL section in its analysis, presumably because Clean Water's claim arose under the CGL section. *Id.* at 310-11 (citation omitted).

On appeal, the Second Circuit reversed, holding that the policy was marine insurance because its principal objective was to establish marine insurance. With respect to the CGL section, the Court was mindful of developments in industry practice, recognizing that "[w]hile CGL insurance originally may not have been intended to serve as marine insurance, the far flung

activities of major corporate insureds has brought a number of maritime exposures within its scope," and "[i]ssuance of CGL-like insurance policies to maritime businesses seems to be a growing trend." *Id.* at 317-18 (citations and quotations omitted).  Clean Water's CGL section was illustrative.  Although it "exclude[d] certain traditional marine risks" covered under standard marine policies such as hull and protection and indemnity (P&I) insurance, it was tailored to address other "exposures particular to marine operations." *Id.* at 318-19 (citation omitted).

The pollution coverage was one aspect of the section that was "decidedly marine." *Id.* at 323.  "Pollution coverage is widely recognized as marine in nature," particularly since "some level of pollution coverage is often included in [traditional marine] P&I insurance policies." *Id.* at 321 (citations omitted).  As "[i]t became obvious to the petroleum and tanker trades . . . that extraordinary sources of financial protection would be necessary to meet the increasingly prohibitive costs of pollution clean-up and remediation activities," "[s]tandard CGL policies include[d] a pollution exclusion clause," but some policies offered a limited "buy back" provision for reinstatement of coverage at an additional cost. *Id.* at 321 (citations and quotations omitted).  Clean Water had taken advantage of such an option because its "business operations in oil and cargo transportation render[ed] pollution coverage potentially significant." *Id.* (citations omitted).  Other aspects of the CGL section were likewise marine "in the context of ship repair and maintenance businesses." *Id.* at 320.  The SLL section—relevant to an analysis of the contract as a whole—was also marine because it insured damage to vessels undergoing maintenance, a quintessential aspect of maritime commerce. *Id.* at 323.  The court thus concluded that "[t]he two sections of the Policy together operate seamlessly to provide coverage that is primarily marine in nature," and admiralty jurisdiction was therefore proper. *Id.* at 323-24.

In this case, it is undisputed that a principal component of Signal's business is vessel repair and maintenance.  Signal was primarily involved in such work in the beginning, and even in 2009, when its focus had shifted to new construction, vessel repair and maintenance continued to constitute some thirty to forty percent of its business.  It is also undisputed that the Drydock was designed for and substantially, if not predominantly, involved in such work.  In the months leading up to the sinking, it was used to drydock two drilling rigs for repairs.[12]  (Dkt. No. 229 ("Nicoletti Aff."), Ex. 16 at 233:9-25; Ex. 21 at 31:1-25.)  While Plaintiffs stress that the Drydock was also used to assemble one of Signal's new construction projects, the revenue and costs incurred in relation to that project were transferred to Signal's Orange, Texas facility, where the fabrication took place.  (Nicoletti Aff., Ex. 14 at 240:11–243:13, 405:24–406:25.)  Moreover, Signal's fabrication work appears to have been primarily, if not entirely, performed at its facilities in Orange, Texas and Pascagoula, Mississippi—not at the dockyard.  (*Id.* at 35:24–40:24, 406:14-25.)  Regardless, it is not necessary that Signal's Drydock operations have been *exclusively* related to vessel repair for the Drydock coverage to constitute marine insurance; indeed, such a quantitative approach would be inconsistent with the conceptual inquiry mandated by *Kirby*.  *See, e.g.*, *Catlin*, 946 F. Supp. 2d at 265-66 (finding "no indication [under *Kirby*] that a court's analysis should turn only on quantitative criteria like the amount of time a structure actually engaged in the repair of vessels").  What matters for purposes of the analysis is that the Drydock coverage was substantially related to pollution liability arising from vessel repair and maintenance operations, and therefore the nature of the business and interests insured was marine.

---

[12] Drilling rigs that are not permanently attached to the ocean floor have generally been recognized as vessels.  1 Schoenbaum § 3-6; *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 215-16 (5th Cir. 2013) (citations omitted).  Plaintiffs have not suggested otherwise, so the Court considers any opposition on this basis waived.  In any event, the Drydock was also involved in the repair of barges and tugs, which are clearly vessels.  (*See* Zacharow Decl., Ex. 74.)

Under *Folksamerica*, insurance covering marine pollution liabilities arising out of marine business operations is, naturally, "decidedly marine."  413 F.3d at 323.  The Second Circuit's analysis was echoed in *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, where the Ninth Circuit concluded that vessel pollution insurance is marine.  518 F.3d 645, 654-55 (9th Cir. 2008) ("That vessel pollution insurance covers new statutory liabilities, occasioned by modern environmental legislation, does not alter the fact that the risks of incurring that liability stem from the same vagaries of marine life that have shaped marine insurance law for centuries. . . . [Such] insurance [still] covers vessel owners' liabilities to third parties for marine incidents, namely pollution."); *see also M/G Transport Servs., Inc. v. Water Quality Ins. Syndicate*, 234 F.3d 974, 975-76 (6th Cir. 2000) (implicitly holding that "marine pollution liability" for a marine transporter of coal was marine insurance); Robert Force, Federal Judicial Center: Admiralty and Maritime Law 184-85, 187 (2004) (recognizing pollution insurance as a standard type of marine insurance); 2 Schoenbaum § 19-12 (noting that P&I insurance typically provides coverage for pollution).  The Pollution Policy provides coverage for liability under OPA, CERCLA, the FWCPA, and analogous state law arising out of any "accidental discharge or substantial threat of discharge into the navigable waters of the United States" from the Drydock.  (Pollution Policy at GAI2270.)  This is quintessentially marine pollution coverage.  *See, e.g.*, Robert T. Lemon, *Allocation of Marine Risks: An Overview of the Marine Insurance Package*, 81 Tul. L. Rev. 1467, 1486 (2007) (observing that vessel pollution liability policies generally provide coverage for liability under OPA, CERCLA, the FWCPA, and corresponding state law).[13]  The business, interests, and risks insured thus being maritime, the Drydock coverage fits neatly within the marine pollution insurance paradigm.

---

[13] Although not dispositive, it is also telling that the policy is self-titled "Ocean Marine" insurance.  (Pollution Policy at GAI2264.)  *See, e.g.*, *Catlin*, 946 F. Supp. 2d at 262.

Plaintiffs attempt to distinguish *Folksamerica* in several respects.  They note, for instance, that the Court could not have intended that *all* environmental pollution insurance—much of which covers purely landside pollution—is marine.  Even so, they tellingly omit any analysis of the Pollution Policy's terms, which extend coverage to statutory liability arising out of pollution discharges from Signal's marine business operations.  Granted, there will be close calls, but this is not one of them.  The Pollution Policy clearly insures maritime risks.

Plaintiffs also observe that marine pollution insurance cases (including *Folksamerica*) have historically involved coverage on vessels.  That may be true, but there is no reason to infer that only pollution insurance on vessels is sufficiently related to maritime commerce to fall within the admiralty jurisdiction.  On this view, jurisdiction would exist if the source of pollution had been one of the twenty-five vessels Signal used in its Drydock operations, but not if it was the Drydock itself.  Such a distinction is not only nonsensical, it fails to promote the protection of maritime commerce.  Whether the emission is from the Drydock or a subsidiary vessel, the source of pollution remains Signal's Drydock operations, and the impact upon and relation to maritime commerce is conceptually the same.

Finally, Plaintiffs read *Folksamerica* and other cases to require that maritime risks bear a direct relation to vessels.  That is often how the standard is formulated.  *See, e.g.*, *Kossick*, 365 U.S. at 736 ("transaction relates to ships and vessels, masters and mariners, as the agents of commerce"); *Folksamerica*, 413 F.3d at 320 ("risk[] peculiar to ship and sea") (quoting *Jeffcott*, 129 F.2d at 584).  But it is not always, and it begs the question of when a "direct" relation to a vessel arises.  Must the Drydock coverage have insured a vessel?  Or is it enough that it provided coverage for pollution arising out of the Drydock's operations, which were in turn intimately related to vessels?  *Folksamerica* itself suggests the answer, providing that coverage is maritime if it "relates directly 'to the navigation, business or commerce of the sea.'"  413 F.3d at 320

(quoting *DeLovio*, 2 Gall. at 444).  This broader formulation, first stated by Justice Story more than a century ago, was expounded upon in this Circuit: "If the subject matter of the contract relates to a ship in its use as such, *or* to commerce *or* to navigation on navigable water, *or* to transportation by sea *or* to maritime employment, it is fairly said to constitute a maritime contract."  *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 302 (2d Cir. 1987) (citation, quotations, and brackets omitted) (emphases added).  Any one of these may provide a basis for admiralty jurisdiction.

Admittedly, the various formulations of the standard have spawned unnecessary confusion.  But it seems beyond controversy that there are maritime subjects besides vessels.  *See, e.g.*, *Collins*, 16 F.3d at 36 ("There are few objects—perhaps none—*more* essentially related to maritime commerce than vessels.") (emphasis added).  Indeed, numerous courts have concluded that contracts related to non-vessels can be maritime if they nevertheless bear a sufficient connection to maritime commerce.  *See, e.g.*, *Catlin*, 946 F. Supp. 2d at 264-65 (holding that insurance on a non-vessel floating drydock was marine because the drydock was constructed and used to repair vessels); *St. Paul Fire & Marine Ins. Co. v. Bd. of Com'rs of Port of New Orleans*, 418 Fed. App'x 305, 307-08 (5th Cir. 2011) (concluding that bumbershoot policy broadly insuring the operations of the Port of New Orleans was marine because the "functioning and purpose of the Port show[ed] that the conceptual focus of the policy [was] maritime commerce"); *Commercial Union Ins. Co. v. Detyens Shipyard, Inc.*, 147 F. Supp. 2d 413, 418-19 (D.S.C. 2001) (holding that insurance on a non-vessel floating drydock was marine because the drydock was "used in maritime business or commerce to repair ships and barges" and therefore "play[ed] an integral role in . . . a crucial maritime activity"); *Royal Ins. Co.*, 738 F.2d at 1037-38 (considering whether insurance on non-vessels was marine because they might

nevertheless be "maritime objects").  Here, although the Drydock was not a vessel, its intimate relation to maritime commerce and vessels brings the policy within the admiralty jurisdiction.

Plaintiffs warn that this holding will lead to a parade of horribles, opening the jurisdictional door to insurance on graven dry docks (which are dug into land), marine railways (which draw the vessel out of the water), marine lifts used to load and unload vessels, and even beach houses.  As to the first three, the Court expresses no opinion.  It is apparent that *Kirby* and *Folksamerica* effect a sea change in the law of marine insurance, such that "the shore is now an artificial place to draw the line."  *Kirby*, 543 U.S. at 25.  The protection of maritime commerce is paramount, even if it imposes upon non-maritime interests.  *Folksamerica* recognized this principle in the insurance context, and this Court now follows its lead.  Plaintiffs' last hypothetical merely proves the folly of their slippery slope argument.  Of course "a policy covering a beach house against damage from the sea is not a maritime contract."  *La Reunion Francaise SA v. Barnes*, 247 F.3d 1022, 1025 (9th Cir. 2001).  Nor is one insuring its pollution liability arising from home heating oil leaking into the sea.  But this is not because there is a fundamental distinction between insurance on vessels and non-vessels; it is because the beach house bears no genuine relationship to maritime commerce and is thus in no way a maritime interest.  With these concepts in mind, there is no reason why courts cannot determine on a principled basis whether a contract is maritime or not, just as they have always done.

### iii.   The Fixed Structure Distinction

Some cases have drawn a "conceptual distinction between a contract relating to a particular vessel involved in a commercial operation as opposed to the overarching operation of a fixed structure that happens to involve boats."  *NHIC*, 581 F.3d at 431; *Royal Ins. Co.*, 738 F.2d at 1035.  Plaintiffs understand this fixed structure distinction to hold that the former contracts are

maritime while the latter are not, and argue that since the Drydock coverage relates solely to a fixed structure that happened to periodically involve vessels, it cannot be maritime.

In *Royal Insurance Co.*, the Ninth Circuit addressed whether insurance on a floating dock and breakwater was marine, and concluded that the objects insured were not maritime interests. 738 F.2d at 1036. The objects were like "traditional wharves and docks, but," the court reasoned, "[i]f there is no connection a specific vessel . . . contracts relating to wharves are generally not within admiralty jurisdiction." *Id.* at 1037-38 (citations omitted). The insurance covering only non-vessel fixed structures was therefore not marine. In *NHIC*, the Sixth Circuit considered insurance on another fixed structure—a marina—that specifically excluded coverage of vessels. 581 F.3d at 422-23. Citing *Royal Insurance Co.*, the court deemed significant the fact that the contract related solely to the marina and lacked any relation to a specific vessel. *Id.* at 430 ("*Royal Insurance* . . . suggests that contracts associated with fixed structure rather than a specific vessel generally are not maritime contracts.") (citing 738 F.2d at 1037).

At the outset, even if these cases did establish a bright-line rule, they are not controlling in this Circuit and this Court would decline to follow them. On the subject of admiralty jurisdiction, the Supreme Court has consistently eschewed unyielding rules in favor of a conceptual, purpose-based approach. *See, e.g.*, *Kirby*, 543 U.S. at 23, 26-27 (recognizing that "[o]ur cases do not draw clean lines between maritime and nonmaritime contracts" and abrogating the spatial "incidental" exception); *Exxon Corp.*, 500 U.S. at 611-12 (overturning *Minturn v. Maynard*, 58 U.S. 477 (1854), which established a *per se* rule against exercising admiralty jurisdiction over at least some agency contracts, as inconsistent with the conceptual approach); *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 268 (1972) (disclaiming reliance upon the strict locality test for admiralty torts and requiring that the tort "bear a significant relationship to traditional maritime activity"); *Dunham*, 78 U.S. at 16

(recognizing that the English rule extending admiralty jurisdiction over contracts solely "to contracts made upon the sea and to be executed therein (making *locality* the test) is entirely inadmissible, and that the true criterion is the nature and subject-matter of the contract"). *NHIC* and *Royal Insurance Co.* are, in any event, consistent with such an approach. Rather than holding that certain contracts are definitively maritime and others are not, they stand for the proposition that contracts related solely to fixed structures "generally" will not be maritime. *See, e.g.*, *NHIC*, 581 F.3d at 430 (citation omitted); *Royal Ins. Co.*, 738 F.2d at 1038 (citations omitted). Indeed, the very phrase "conceptual distinction" implies a flexible concept as opposed to a formalistic rule.[14] The Court therefore understands the fixed structure distinction to be just a useful proxy for measuring the relationship between a contract and maritime commerce.[15]

In the instant case, Plaintiffs' reliance upon the distinction is puzzling, since it appears to support rather than undermine jurisdiction. The Pollution Policy provides coverage not only to the non-vessel fixed structure Drydock, but also to Signal's fleet of twenty-five vessels and any vessel undergoing repairs on the Drydock. Thus, unlike the policies in *Royal Insurance Co.* and *NHIC*, the policy insures "particular vessel[s] involved in a commercial operation." *NHIC*, 581 F.3d at 431. This case is analogous to *Essex Insurance Co. v. Detroit Bulk Storage Co., Inc.*,

---

[14] *NHIC* relied upon *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625 (1887), and *Upper Steamboat v. Blake*, 2 App. D.C. 51 (D.C. Cir. 1893). But *Cope* simply stands for the proposition that a non-vessel floating drydock is not subject to salvage because it is not a vessel. 119 U.S. at 627-28. In contrast, *Blake* does distinguish between contracts related solely to "wharves, piers, docks [and] landing spaces," which objects might never see a vessel or relate to maritime commerce, and contracts related to such structures and "made exclusively for the benefit of the ship or vessel." 2 App. D.C. at 56-57. However, as in *NHIC* and *Royal Insurance Co.*, the ultimate issue was whether the contract related "to [maritime] commerce and navigation." *Id.* at 56. This Court therefore does not read *Blake* to be inconsistent with the conceptual approach mandated by *Kirby*. To the extent that it does establish a bright-line rule, the Court declines to follow it.

[15] The Court questions the utility of the distinction in the context of marine pollution insurance, since marine pollution bears a substantial relationship with maritime commerce and navigation regardless of whether the source of pollution is a fixed structure or vessel. For the sake of argument, however, it assumes the distinction is relevant.

which held that insurance covering a wharf owner was marine under *NHIC* because the policy "insure[d] against loss to ships and their cargo and equipment while docked at the wharf" and therefore "provide[d] insurance coverage specifically for objects of maritime commerce."  2012 WL 1893514, at *3 (E.D. Mich. May 23, 2012); *see also Port of New Orleans*, 418 Fed. App'x at 308 (holding that bumbershoot policy providing coverage to the Port was marine because, *inter alia*, the Port was charged with the statutory duty to "regulate the commerce and traffic of the port and harbor of New Orleans" and "owns and operates fourteen vessels to carry out its charge," which were "specifically covered in the bumbershoot policy").

Plaintiffs rely upon the policy's severability: since the Drydock coverage is severable from that of the vessels, it is an independent "contract" relating to a fixed structure alone.  On this logic, insurance on a non-vessel fixed structure can be marine only if it covers the fixed structure and other vessels and such coverage is non-severable.  The fixed structure cases do not address severability, but the Court sees no reason to read them through a formalistic lens that places critical importance upon whether the fixed structure and vessels were subject to separate premiums.  The purpose of the distinction is to illuminate whether a fixed structure is *itself* a maritime interest capable of supporting admiralty jurisdiction.  *See, e.g.*, *Royal Ins. Co.*, 738 F.2d at 1037 (relying upon the fixed structure distinction to determine whether the floating breakwater and dock were themselves "marine objects").  Since the Pollution Policy provides coverage to the Drydock and vessels necessary to Signal's maritime business operations, the fixed vessel distinction suggests that the Drydock and Drydock coverage bear a significant relation to vessels and maritime commerce.  To the extent that the distinction does hinge upon severability, however, the Court declines to follow it because it would be inconsistent with the protection of maritime commerce.  Whether Signal paid separate premiums on its Drydock and fleet is simply not relevant to the question whether the principal purpose of the Drydock coverage is maritime

commerce.  "[T]he demand for tidy rules can go too far, and when that demand divorces the jurisdictional inquiry from the purposes that support the exercise of jurisdiction, it has gone too far."  *Sisson v. Ruby*, 497 U.S. 358, 364 n.2 (1990).  Alternatively, because the doctrine is but one indicium of the contract's primary purpose, the Court finds that other indicia mandate a contrary conclusion.

### 5. The Dispute is Not Inherently Local

Having determined that the Pollution Policy is a maritime contract, the Court considers whether the dispute is nevertheless "inherently local" such that state law should apply.  *See, e.g.*, *Kirby*, 543 U.S. at 27 ("A maritime contract's interpretation may so implicate local interests so as to beckon interpretation by state law.") (citation omitted).  Plaintiffs emphasize the local aspects of the case, namely, that the dispute involves what was once an extension of land, where the question is whether an insurance policy must contribute to removal of a drydock from Texas coastal waters pursuant to state law.  Yet this argument misconstrues and needlessly complicates the inherently local inquiry.  Under *Wilburn Boat*, the rule is straightforward: federal law applies if there is an established admiralty rule, or if there is a need to fashion a new one; state law applies otherwise.  *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 314 (1955); *see also Ingersoll*, 829 F.2d at 305 ("Marine insurance contracts are governed by federal admiralty law when there is an established federal rule, and by state law when there is not.") (citing *id.* at 313-14).

In this Circuit and most others that have considered the issue, the doctrine of utmost good faith is firmly entrenched federal law.  *See, e.g.*, *AFG Marine Aviation & Transport v. Cassin*, 544 F.3d 255, 262-63 (3d Cir. 2009); *Inlet Fisheries*, 518 F.3d at 650-52; *HIH Mar. Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000); *Knight*, 804 F.2d at 13; *Am. Home Assur. Co. v. Masters' Ship Mgmt. S.A.*, 423 F. Supp. 2d 193, 221 (S.D.N.Y. 2006).  *But see Windsor Mount*

*Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 n.3 (1st Cir. 1995) (questioning whether the doctrine is entrenched law); *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 889 (5th Cir. 1991) (holding that it is not). *Uberrimae fidei* therefore governs the interpretation of the Pollution Policy.

Plaintiffs suggest that the Court can and should decline to apply the doctrine because the Drydock was a shore-side object that could have easily been inspected by Great American. The sole case they cite in support, however, concluded that the contract was not maritime; since there was no basis for applying maritime law, there was no exercise of discretion involved. *See In re Balfour Maclaine Intern. Ltd.*, 873 F. Supp. 862, 866 (S.D.N.Y. 1995). Regardless, it is not this Court's prerogative to "decide on the 'best' rule for efficient and fair administration of marine insurance markets. In fact, it was precisely to avoid this sort of federal judicial policy-making that the Supreme Court in *Wilburn Boat* cautioned against the creation of new maritime rules by the courts." *Inlet Fisheries*, 518 F.3d at 654. Thus, even if the Court could decline to apply *uberrimae fidei* for policy reasons, it would not. As Schoenbaum has explained, "[t]he rule of utmost good faith is grounded in *economic efficiency*. . . . [P]lac[ing] the onus on the party with the exclusive knowledge of circumstances affecting the risk to disclose so that the risks can be most precisely and cheaply evaluated . . . should lead to lower costs for insurers and, ultimately, lower and more precise premium costs for assureds." Thomas J. Schoenbaum, *The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law*, 29 J. Mar. L. Com. 1, 3 (1998) (citation omitted) (emphasis in original). Tampering with the parties' expectations on policy grounds risks doing more harm than good, and is not the role

of this Court.  Because *uberrimae fidei* is entrenched federal law in this Circuit, the only

remaining task is its application.[16]

### 6.    Application of *Uberrimae Fidei*

Great American is entitled to void the policy if it can show that Signal failed to disclose

material information—*i.e.*, information that would have affected its decision to insure at all or

even at a particular premium.  While materiality is ordinarily a question of fact for the jury,

summary judgment is appropriate where the evidence is beyond reasonable dispute.  *See, e.g.*,

*Inlet Fisheries*, 518 F.3d at 647 (affirming summary judgment to insurer); *Certain Underwriters*

*at Lloyd's v. Montford*, 52 F.3d 219, 223 (9th Cir. 1995) (same); *Knight*, 804 F.2d at 10, 14

(same); *Mut. Benefit Life Ins. Co. v. JMR Elec. Corp.*, 848 F.2d 30,  34 (2d Cir. 1988) (same);

*King v. Aetna Ins. Co.*, 54 F.2d 253, 255 (2d Cir. 1931) (reversing denial of summary judgment

to insurer).

As an initial matter, Plaintiffs cannot seriously contest that a reasonable insured would

know that the undisclosed information would have some bearing on an insurer's decision.  The

2002 Heger Report described the value of the Drydock as *below zero* and documented the need

---

[16] Even if the Pollution Policy were not a maritime contract, *uberrimae fidei* would apply
because the policy requires that it "shall be construed pursuant to, and the rights of the parties
hereto shall be governed and controlled by, the general maritime law of the United States," and
expressly incorporates *uberrimae fidei* in all but name, stating that "[a]ny concealment or
misrepresentation . . . of any material fact or circumstance relating to this insurance, or any claim
or incident hereunder, will void the policy completely . . . whether such concealment or
misrepresentation is deliberate, negligent, inadvertent, innocent, or otherwise."  (Pollution Policy
at GAI2270.).  In New York, there is a "strong public policy favoring individuals ordering and
deciding their own interests through contractual arrangements" and "[i]t is well settled that
courts will enforce a choice of law clause so long as the chosen law bears a reasonable
relationship to the parties or the transaction."  *Lupien v. Lupien*, 891 N.Y.S.2d 785, 785-86 (4th
Dept. 2009) (internal citations and quotation marks omitted).  It cannot be denied that admiralty
law bears a reasonable relationship to the parties or the transaction; regardless, the concealment
or misrepresentation clause provides a contractual basis for voiding the policy that is
independent of the choice-of-law clause and admiralty law.  The Court has considered Plaintiffs'
novel interpretive arguments with respect to the concealment or misrepresentation clause and
finds them unpersuasive.

for "extensive repairs" to make it operational. (2002 Heger Report at 7-8.) The March 2003 ABS Survey similarly found that the Drydock was rapidly deteriorating and warned that it could become "unserviceable" within five years, yet Signal was only performing temporary repairs to keep it operational in the short term. (Mar. 2003 ABS Survey at 3-5.) Signal itself recognized that the Drydock was not worth purchasing from the Port because it was expected to become inoperational within five years absent $22 million in repairs, and disposal costs "could run into the millions or even tens of millions of dollars." (Staff Study at 2-5.) The September 2003 ABS Survey went so far as to alert PANDIDC that Drydock operations should be stopped forthwith until "substantial repairs" were made, prompting PANDIDC to hold an emergency meeting regarding the Drydock's condition. (Sept. 2003 ABS Survey at 5-7.) If there were any doubt that the Drydock was, "[i]n the Port's own words . . . too much potential liability," (Staff Study at 4-5) Signal purchased the Drydock from the Port in 2005 for *$10* (and continued to bear the potentially multi-million burden of disposal). (CBOS.) Subsequent documentation leading up to the Drydock's demise continued to stress the need for serious repairs, the bulk of which Signal did not undertake before the Drydock sank during reconfiguration. Finally, Signal structured its decisionmaking around these observations, as evidenced by its notice of intent to renew the lease in which it rejected the twenty-five year renewal term and proposed a term ending, essentially, once the Drydock made its final voyage into the abyss.

There is therefore ample evidence to conclude, on the basis of the withheld surveys and reports alone, that Signal's non-disclosure was material. In addition, Great American has offered testimony from two of the three underwriters on Signal's account indicating that the documents in Signal's possession would have resulted in a different decision. Cindy Stringer, who underwrote the policy from 2005 through the 2009-10 year, testified that if she had seen the surveys and reports, she "definitely would have been concerned" and likely would have informed

Signal that she would not approve the policy until the completion of all recommended repairs. (Dkt. No. 289, Ex. B at 141:14-18, 142:19–143:3.)  Ms. Stringer also testified that if the insured had information that a vessel was "ready to collapse or something like that," it would be material information that should be brought to the attention of the insurer through the broker.  (*Id.* at 188:9-21.)  Reese Lever, who assisted Ms. Stringer with the Signal account by requesting renewal information for the 2009-10 year and became the underwriter on the account beginning in 2010-11, testified that if the interests insured had problems or were undergoing significant repairs, he would want to be made aware of those facts.  (Dkt. No. 289, Ex. A at 157:9-19, 174:8-14.)  He also testified that if a surveyor told the insured that all of the pontoons should be separately removed for repairs, it would be something an underwriter would want to know.  (*Id.* at 172:20–173:6.)

Great American has also provided affidavit evidence from Steve Weber, the underwriting officer of the Houston office, and Captain Ed Wilmot, Vice President of its Ocean Marine Division, both of whom were periodically involved with the Signal account.[17]  Mr. Weber attested that the omitted "information should have been provided to Great American and if it had been received, it would have resulted in a different underwriting decision."  (Zacharow Decl., Ex. 58 ¶ 21.)  He also stated that in his decades of experience, he had seen accounts where a particular vessel would be excluded if it "did not measure up" and the insurer would decline the entire account if the insured did not agree to exclude that vessel.  (*Id.* ¶ 22.)  Mr. Wilmot

---

[17] Although Ms. Stringer testified that only she and Mr. Lever were involved in the underwriting of the policy for the 2009-10 year, (Nicoletti Aff., Ex. 6 ("Stringer Tr.") 237:15-21), Mr. Lever testified that Mr. Weber was also involved in the underwriting process (Nicoletti Aff., Ex. 35 ("Nicoletti 35") at 150:19–151:19.)  This testimony is not inconsistent, as Ms. Stringer spoke of the 2009-10 policy alone, while Mr. Lever spoke of the policy without reference to a particular year.  To the extent that this creates an arguable issue of fact, however, the Court deems the remaining testimony and affidavit evidence, as well as its own analysis of what a reasonable insured would believe, sufficient to support summary judgment.

originally approved inclusion of the Drydock in the pollution coverage for the 2004-05 year, and attested that if he had known the information provided in the 2003 ABS Survey, he would not have done so.  (Zacharow Decl., Ex. 59 ¶¶ 1, 10, 19.)  Mr. Wilmot also spoke with Ms. Stringer in 2005 to advise regarding renewal, and attested that if he had known the information in any of the pre-2005 reports and surveys or the 2007 Heger Report, he would not have approved coverage.  (*Id.* ¶¶ 11, 20, 22.)  Finally, Mr. Wilmot described the removal of Pontoon H as "a classic material fact that should be disclosed to underwriters."  (*Id.* ¶ 25.)  This evidence is bolstered by emails among Willis, FFIC, and Trident in which Willis attempted to place hull insurance on the Drydock using the 2002 Heger Report but the underwriters declined coverage because of the report's description of the Drydock.  *See, e.g.*, *King*, 54 F.2d at 254 (finding similar interaction undermined insured's argument that it could not "have appreciated that [such information] would be equally material" to the current insurer).  The liability insurers now unabashedly join Signal to argue that the same information that was material to FFIC then is immaterial now.  This contention is not credible.  Numerous courts have held that materiality is established as a matter of law where an insured egregiously misrepresents the value or condition of the object insured.  *See, e.g.*, *Montford*, 52 F.3d at 222 (loss history, purchase price, and age of vessel was material as a matter of law); *Knight*, 804 F.2d at 13 (non-disclosure of fact of prior cancellation on grounds that objects insured were "grossly over-valued and inauthentic" was material as a matter of law) (citation omitted); *King*, 54 F.2d at 254-55 (insured's representation of value of vessel purchased for $2,500 as $40,000 was material as a matter of law); *Albany Insurance Co. v. Horak*, 1993 WL 269620, at *8 (E.D.N.Y. July 13, 1993) (granting summary judgment to insurer where insured misrepresented value and accident history).  Failure to disclose surveys and reports indicating the condition of the object insured has also been held to constitute violation of *uberrimae fidei*.  *See Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409

F.2d 974, 975, 982 (5th Cir. 1969) (non-disclosed information described vessel as "wholly unfit and in need of major repairs to make her reasonably fit").

There is thus substantial evidence to conclude not only that the omitted information was material in the objective sense, but also that it actually would have affected Great American's decision.  While it is true that testimony from underwriters is inescapably "self-serving," that fact does not preclude summary judgment where "the materiality of the misrepresentation is such that reasonable minds could reach only one conclusion," and Plaintiffs cannot rely upon "mere allegations or denials" to satisfy their burden.  *Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 959-60 (9th Cir. 1994) (citations and internal quotations omitted).  Such testimony is also "competent evidence of industry standards."  *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145, 1168 (N.D. Ala. 2005), *aff'd*, 518 F.3d 645.

In the face of this overwhelming evidence, Plaintiffs cite testimony purportedly reflecting that this was not the kind of information Great American would use to decide whether to underwrite a risk.  Ms. Stringer, for instance, testified that the fact that property and P&I insurance had been placed made her satisfied that acceptable reports had been produced or, alternatively, that the items insured were in acceptable condition.  (Nicoletti Aff., Ex. 6 ("Stringer Tr.") 229:9–230:14.)  She also testified that under Great American's underwriting guidelines, the relevant factors in setting the premium are generally the type of vessel, its weight, and the size of the fleet.  (Dkt. No. 275, Ex. 2 at 67:4–69:9.)  Plaintiffs further note that the insurance application did not inquire into the condition of any of the vessels, and cite testimony from Mr. Lever stating that the only information Great American deems necessary to its decision to underwrite a risk is set forth in the application itself.  (Dkt. No. 275, Ex. 1 ("Lever Tr.") at 53:15-22.)

This evidence is not probative because it assumes that the applicant is seeking insurance on an ordinary risk, not a decaying structure on its last leg of life. None of the cited testimony addresses the issue whether Great American considered the undisclosed information to be material, and the underwriters have specifically testified that it was. Moreover, *uberrimae fidei* requires the insured to affirmatively disclose any material information, regardless of whether it is specifically requested. The underwriters' testimony merely reflects their assumptions based upon the law. *Knight*, 804 F.2d at 14 ("[T]he assured is required to communicate the information to the insurer before the policy is issued, so that the insurer can decide for itself at that time whether to accept the risk. This obligation is not burdensome to the assured and it comports with the open disclosure required by the doctrine of *uberrimae fidei*.") As Ms. Stringer aptly put it, Great American's underwriters could not request information they had no reason to believe existed, and one would think that "it would be a matter of common sense that [Signal] would make [Great American] aware that there was some kind of condition affecting this dry dock." (Stringer Tr. at 222:21-23, 228:2-19.) Likewise, her testimony regarding the guidelines spoke to the "general[]" case, and she specifically qualified that "[e]very account is a different account" and "[y]ou have to underwrite each one individually." (*Id.* at 68:5-7.) For the same reasons, the fact that Great American did not request surveys or reports in the years leading up to the 2009-10 policy is also beside the point. (Nicoletti Aff., Ex. 2 at 206:10-16; Ex. 35 ("Nicoletti 35") 151:23–152:3; Ex. 42 at 207:8–208:13.) It was not reasonable for Signal to conclude that Great American did not consider information about a risk material if, through Signal's own actions, Great American was ignorant of that risk.[18]

---

[18] Plaintiffs perplexingly cite an exchange between counsel and Mr. Lever in which he testified that neither he nor Ms. Stringer was asked, prior to this lawsuit, whether they considered the omitted information material. The testimony does not address whether either of them actually

Plaintiffs also offer testimony from Mr. Lever indicating that if Signal had disclosed certain information to Great American, namely, the recommendations that the pontoons be separately removed and drydocked for inspection and repairs and that the decking be replaced, he would have underwritten the policy provided Signal promised to make such repairs.  (Lever Tr. at 172:20–175:21.)  Yet Mr. Lever did not have authority to decide whether to underwrite the 2009-10 policy; Ms. Stringer did, and she unambiguously testified that the omitted information would have made a difference.  Moreover, Mr. Lever was not asked what he would do if he had been given the various other surveys and reports indicating that the Drydock was at serious risk of sinking.  In any event, even if Mr. Lever's testimony could create a genuine issue of fact, he clearly indicated that the information would have been material to his decision.  Without it, he would have approved coverage without qualification; with it, he would have elicited a promise from Signal to make the recommended repairs.  Information is material if it would have affected the decision to insure at all, which includes information that is relevant to the "calculation of the insurance risk."  *HIH*, 211 F.3d at 1362.  That is, information is material if it would lead the insurer to issue the policy on any different terms.  *See* G. Gilmore & C. Black, *The Law of Admiralty* 62 (2d ed. 1975) (recognizing the importance of *uberrimae fidei* because "the underwriter often has no practicable means of checking on either the accuracy or sufficiency of the facts furnished him by the assured before the risk is accepted and the premium and *conditions* set") (emphasis added).  Because Mr. Lever would have only agreed to different terms if he had known the omitted information, his testimony supports, rather than undermines, the conclusion that such information was material.

---

considered this information material.  (Nicoletti 35 at 152:4-23.)  The Court does not view this as relevant.

Finally, Plaintiffs rely upon Great American's actions with respect to another drydock to argue that it would not have considered the omitted information relating to this Drydock material. When Signal sought coverage on a drydock acquired as part of the assets of Bender Shipbuilding, Great American requested additional information regarding the drydock's condition. Although the surveys recommended certain repairs, Great American insured the asset without reservation or confirmation that the repairs had been made. (Nicoletti 35 at 45:5-10, 77:19–80:22.)

This evidence presents a closer question, but it does not create a genuine issue of fact in light of the overwhelming evidence to the contrary. As an initial matter, the evidence cuts both ways. On the one hand, the fact that Great American did not charge a higher premium or even confirm that the requested repairs had been made suggests that it would not have charged a higher premium or excluded coverage if it had known the undisclosed information relating to the Drydock. On the other hand, the fact that Great American requested such information on the Bender Shipbuilding drydock indicates that it realistically could have affected its decision to insure or at a particular premium. Otherwise, why ask for it? More importantly, the evidence is only minimally relevant given the starkly different factual circumstances. The Drydock surveys and reports repeatedly, over a course of years, indicated the need for serious, prohibitively expensive repairs on a structure that was likely to sink in the near future, and ultimately did. The Bender Shipbuilding drydock survey was mild by comparison, observing that there was "old extensive pitting" in the hull and wing walls of the drydock and "heavy wastage" on the overhead longitudinal angles, and recommending that "[a]ll wasted and damaged structural members in way of the vessel's internal need to be addressed and repaired to make structurally sound." (Nicoletti 35 at 78:6–80:18.) Although Great American's actions with respect to that drydock demonstrate that not all conditions or recommendations will be material, they do not

reasonably suggest that Great American would have considered the extensive issues with the Drydock to be immaterial as well.

At bottom, this is not a case where an insurer is attempting to underwrite after the fact or exaggerate minor omissions.  The non-disclosures were egregious and go to the very heart of the value and severity of the risk.  Plaintiffs' contention that such information is immaterial simply does not hold water.  Because no reasonable juror could conclude that Signal did not violate its duty of utmost good faith, Great American's motion for summary judgment must be granted.[19]

**B.      The EPI Policy**

**1.      Motion for Reconsideration and Alteration**

MSI seeks reconsideration or alteration of the Court's March 25 Order, which held that the EPI Policy must contribute to removal and cleanup of the Drydock because coverage was triggered under the PPI Policy and the EPI Policy is written on a following basis.  MSI relies upon newly acquired testimony from Mr. Cunningham, Signal's Chief Financial Officer, as well as other extrinsic evidence purportedly overlooked by the Court, and contends that the Court can and should consider extrinsic evidence because it considered dictionary definitions to interpret the policies.  (Dkt. No. 256, Ex. 1 at 124:11–126:17.)  MSI is mistaken for two reasons.

First, the March 25 Order provides, in relevant part:

> MSI argues that [the] PPI Policy's coverage of "debris removal" does not include costs associated with the removal of the wrecked Drydock.  *Whether or not the wrecked Drydock constitutes "debris," however*, subsection (b) of the "Debris Removal and Cost of Clean Up" section *unambiguously* covers the cost of cleanup "at the 'location'" resulting from "physical loss, damage or destruction of the property" covered by the policy; the Drydock indisputably suffered such physical loss, thereby "mak[ing] necessary" cleanup at the location.

---

[19] Having determined that the policy is void *ab initio*, the Court denies as moot the parties' respective motions concerning whether the policy has been triggered.

2013 WL 1195277, at *7 (emphases added).  Thus, the Court held that the "physical loss" term of the PPI Policy "unambiguously" provides coverage for removal and cleanup of the Drydock, and this was an independent basis for coverage regardless of the meaning of the "debris" term. While the Court did go on to interpret the "debris" term using dictionary definitions and concluded that it provided an alternative basis for coverage, this dicta is not grounds for reconsideration or alteration of the holding.  *Id.*

Second, even if the "debris" dicta were necessary to the holding, under New York law dictionary definitions are not extrinsic evidence.  *See, e.g.*, *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (noting that it is "common practice" for New York courts "to refer to the dictionary to determine the plain and ordinary meaning of words of a contract," and "if the court finds that the contract is not ambiguous it should assign th[at] plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence") (citations and quotations omitted).  Since the Court determined that the plain meaning of the "debris" term was unambiguous, it was barred from considering extrinsic evidence such as the parties' subjective intent.  *See, e.g.*, *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 907 (2d Cir. 2010).  Accordingly, MSI's extrinsic evidence cannot provide a basis for reconsideration or alteration.  The Court has considered MSI's remaining arguments and finds them without merit.

## 2.    MSI's Rescission Claim

MSI also seeks to void the EPI Policy for fraud, concealment, and material misrepresentation pursuant to the following provision:

> This Coverage Part is void in any case of fraud by [the insured] as it related to this Coverage Part at any time.  It is also void if [the insured], at any time, intentionally conceal[s] or misrepresent[s] a material fact concerning: 1. This Coverage Part; 2. The Covered Property; . . . or 4. A claim under this Coverage Part.

(Dkt. No. 250, Ex. 18 ("EPI Policy") at WILLIS00792.)

i.        **Choice of Law**

Initially, the Court must determine what law governs the policy's interpretation.  "A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  Under New York's choice-of-law rules, "the first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co., (Stolarz)*, 81 N.Y.2d 219, 223 (1993).  MSI contends that Mississippi law governs, while Plaintiffs claim that there is no conflict, and otherwise Texas law governs.

In Mississippi, clauses such as the one in the EPI Policy are known as concealment clauses. *See, e.g.*, *Watkins v. Continental Ins. Co.*, 690 F.2d 449, 451 & n.2 (5th Cir. 1982).  To rescind a policy for breach of a concealment clause, an insurer must establish by a preponderance of the evidence that the insured's statements were "(1) false, (2) material and (3) knowingly and willfully made." *Hall v. State Farm Fire & Cas. Co.*, 937 F.2d 210, 209, 215 (5th Cir. 1991) (citing *Watkins*, 690 F.2d at 451).  A fact is material if it "enables the [insurer] to possess itself of all information as to other sources and means of knowledge of facts material to the insurer's rights." *Edmiston v. Schellenger*, 343 So. 2d 465, 466-67 (Miss. 1977) (citation and quotations omitted).  "Willfully" and "knowingly" are synonyms meaning that the statement was voluntarily and intentionally made. *See, e.g.*, *Moore v. State*, 676 So. 2d 244, 246 (Miss. 1996) (citations omitted).  If the statement was willfully and knowingly made, "the intent to deceive will be implied." *Edmiston*, 343 So. 2d at 466 (citation and quotations omitted).

Mississippi also recognizes a cause of action for material misrepresentation, under which "misstatements of material fact in an application for insurance provide grounds for declaring a policy issued in reliance thereon void ab initio." *Republic Fire & Cas. Ins. Co. v. Azlin*, 2012

WL 4482355, at *6 (N.D. Miss. Sept. 26, 2012) (citations and quotations omitted).  A material

misrepresentation claim is similar to a claim for violation of *uberrimae fidei*: to prevail, the

insurer must demonstrate that the application for insurance contains answers that are "false,

incomplete, or misleading," and that such answers were "material to the risk insured against or

contemplated by the policy."  *Carroll v. Metropolitan Ins. and Annuity Co.*, 166 F.3d 802, 805

(5th Cir. 1999) (citations omitted).  A misrepresentation is material if "it might have led a

prudent insure to decline the risk, accept the risk only for an increased premium, or otherwise

refuse to issue the exact policy requested by the applicant."  *Id.* at 805 (citation omitted).

"Whether the misrepresentation was intentional, negligent, or the result of mistake or oversight is

of no consequence."  *Id.* (citation omitted).  However, to prevail the insurer must "establish the

existence of a factual misrepresentation and its materiality *by clear and convincing evidence*."

*Id.* (citations omitted) (emphasis in original).  Additionally, a material misrepresentation claim

will fail if the insurer knew facts "that would cause a prudent insurer to start an inquiry, which, if

carried out with reasonable thoroughness, would reveal the truth."  *Id.* at 806 (citation and

quotations omitted).  Material misrepresentation is an independent legal claim, and may be

brought even if the insurance policy contains a concealment clause.  *See, e.g.*, *Azlin*, 2012 WL

4482355, at *6-10; *GuideOne Mut. Ins. Co. v. Rock*, 2009 WL 1854452, at *2-4 (N.D. Miss.

June 29, 2009).

     In Texas, to rescind a policy an insurer must demonstrate that it relied upon a

misrepresentation of material fact that was made by the insured with an intent to deceive.  *See,

e.g.*, *Mayes v. Mass. Mut. Life Ins. Co.*, 608 S.W.2d 612, 615-16 (Tex. 1980) (citations omitted).

Although "intent to deceive or defraud is not susceptible to direct proof [and] invariably must be

proven by circumstantial evidence," such evidence still "must transcend mere suspicion."  *IKON

Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. Ct. App. 2003) (citations and

quotations omitted).  Additionally, "[w]hen the language of an insurance policy is susceptible to more than one construction, the insurance policy should be construed in favor of the insured to avoid exclusion of coverage."  *Protective Life Ins. Co. v. Russell*, 119 S.W.3d 274, 281 (Tex. Ct. App. 2003) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987)).

There is, therefore, a conflict of laws.  Under Mississippi law, the concealment clause, rather than being ambiguous, has a settled legal meaning under which intent to deceive is not necessary to rescind the policy.  Mississippi also recognizes a claim for material misrepresentation, which is comparable to *uberrimae fidei*.  In contrast, under Texas law, MSI must prove intent to deceive and reliance, and any ambiguity will be construed in favor of coverage.  In light of this conflict, the Court must determine which state's law applies under New York choice-of-law principles.

In contract cases, New York applies the "center of gravity" or "grouping of contacts" analysis to determine which state has the most significant relationship with the parties and the dispute.  *Md. Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (citations omitted).  "In a general contract case, a court examines several factors including 1) the place of contracting; 2) the place of negotiation; 3) the place of performance; 4) the location of the subject matter; and 5) the contracting parties' places of business or domiciles."  *Narragansett Elec. Co. v. Am. Home Assur. Co.*, 921 F. Supp. 2d 166, 176 (S.D.N.Y. 2013) (citing *Zurich Ins. Co. v. Shearson Lehman Hutton*, 84 N.Y.2d 309, 317 (1994)).  "Beyond these general contract principles, . . . where liability insurance contracts are concerned, the applicable law is 'the local law of the state which the parties understood was to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties.'"  *Zurich*, 84 N.Y.2d at 318 (citing Restatement (Second) of Conflict of Laws § 193).  Critically, if the risks insured are spread throughout multiple states,

52

"the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk" and is the "controlling factor" in the analysis. *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 24, 27 (N.Y. App. Div. 2006), *aff'd*, 9 N.Y.3d 928 (2007); *see also In re Liquidation of Midland Ins. Co.*, 16 N.Y.3d 536, 544 (2011) (expressly adopting the *Foster Wheeler* rule). The insured is considered to be domiciled in the state where its principal place of business is located. *Id.* at 25.

The value of the assets insured under the EPI Policy is almost evenly split between Mississippi and Texas. Since the risk insured by the policy is spread across multiple states, the state of the insured's domicile is determinative. The policy lists the insured as Signal International, LLC, and lists its address as Mississippi. (EPI Policy at WILLIS00697; *see also id.* at WILLIS00713 (listing Signal International, LLC as the insured under the PPI Policy).) Thus, Mississippi law applies. It is not necessary to consider the remaining factors. *Foster Wheeler*, 36 A.D.3d at 27. Even if it were, they either weigh in favor of applying Mississippi law or are indeterminate: the policy was delivered in Mississippi (*id.* at WILLIS00697);[20] the place of negotiation was apparently New York and Virginia, where AmWins and MSI were located, respectively; the place of performance is Virginia and either Mississippi or Texas;[21] and

---

[20] Signal asserts that the policy was also delivered in Texas. This is supported by the policy's terms. (*See* EPI Policy at WILLIS00720.) However, in its opposition to MSI's Rule 56.1 Statement, Signal did not cite any evidence for its counterstatement, and has therefore arguably conceded that the policy was delivered in Mississippi alone. (Dkt. No. 277, at 61.) Local Civil Rule 56.1(c)-(d). Even assuming the contract was delivered to Texas too, the remaining contacts mandate application of Mississippi law.

[21] It is not clear from the record whether premiums were paid from Mississippi (by Signal International, LLC) or from Texas (by Signal International Texas, LLP).

the domiciles of the parties are Virginia and Mississippi.[22]  *Cf. Foster Wheeler*, 36 A.D.3d at 27

("In the case of a liability insurance policy covering risks in multiple states, the state of the

insured's principal place of business has a greater concern with issues of policy construction and

application bearing on the amount of available coverage than do the states where contracting,

negotiation, or payment of the premium happened to occur.").

Plaintiffs raise two objections to this conclusion.  First, they contend that the policy is

severable because it lists each property and its respective location, and the parties therefore

intended for the law of each state where the particular property is located to apply.  Put

differently, Plaintiffs argue that the "insured risk" for purposes of the conflicts analysis is the

Drydock—not all property under the policy—and since the Drydock is located entirely in Texas,

that state's law applies.  *Foster Wheeler* and its progeny preclude this argument.

In *Foster Wheeler*, the Appellate Division considered what law governed the

interpretation of excess liability insurance policies providing coverage for asbestos-related injury

claims arising throughout the nation.  36 A.D.3d at 18-19.  Because the rule that the principal

location of the risk controls cannot "be applied without modification in the event the insurance

policies in question cover risks that are spread throughout multiple states," the court crafted a

new rule under which the insured's domicile would serve as a proxy.  *Id.* at 22-24 (citations and

quotations omitted).  This rule was proper because it furthers the governmental interests

implicated when an insured makes a claim, including "(2) assuring that the state's domiciliaries

are fairly treated by their insurers; (3) assuring that insurance is available to the state's

domiciliaries from companies located both within and without the state; and (4) regulating the

conduct of insurance companies doing business within the state's borders."  *Id.* at 22 (citing

---

[22] Neither party discusses the place of contracting, which is where the last act necessary to form the contract was performed.  Presumably, it was either Virginia, where MSI was located, or Mississippi, where the insured was located.

*Fireman's Fund Ins. Co., Inc. v. Schuster Films, Inc.*, 811 F. Supp. 978, 984 (S.D.N.Y. 1993)).

The rule also promotes the choice-of-law goals of "certainty, predictability, and uniformity of

result and ease in the determination and application of the law to be applied."  Because "[t]he

state of the insured's domicile is a fact known to the parties at the time of contracting . . .

application of the law of that state is most likely to conform to their expectations."  Moreover,

because "the state of the insured's domicile can be ascertained in any subsequent litigation

without fact-intensive inquiry or unguided weighing of different contacts," the rule "minimizes

the likelihood that contemporaneous policies will be deemed governed by the laws of different

states" and "makes it more likely that consistent and uniform results will be reached in different

cases."  *Id.* at 23-24 (citations and quotations omitted).

　　　　The Second Circuit applied the *Foster Wheeler* rule to insurance claims arising out of

property damage in *Maryland Casualty Co.*  The issue before the court was what law governed

the construction of three insurance policies for pollution liability arising out of twenty-six waste

disposal sites spread across twelve states.  332 F.3d at 147-149.  The insurers took the position

that New York law should govern construction of all of the policies because nine of the twenty-

six sites were located in New York; the insured argued that the applicable law should depend

upon the location of each disposal site, since that was the "principal location of the insured risk"

with respect to those claims.  *Id.* at 149.  The court declined to apply different laws based upon

the location of each respective site, reasoning that the singular language of "principal location"

implied that only one state's law would apply to a policy, and that, "barring extraordinary

circumstances, only one state's law should govern an insurance agreement."  *Id.* at 152-53.

　　　　As in *Foster Wheeler* and *Maryland Casualty Co.*, the risks insured under the EPI Policy

are spread across multiple states.  Although the risks were not spread throughout the nation, or

even across twelve states, there is no reason that the conflicts analysis should vary depending

upon the number of states in which the insured risk is located.  *See, e.g.*, *Md. Cas. Co.*, 332 F.3d at 153 ("It is commonplace for courts applying New York choice-of-law rules to disregard (or at least discount) the location of the insured risk when the risk is located in *two or more* states.") (emphasis added) (citations omitted).  Nor should the analysis vary depending upon matters of circumstance, such as where the particular risk is located.  *See, e.g.*, *FC Bruckner Assocs., L.P. v. Fireman's Fund Ins. Co.*, 95 A.D.3d 556, 557 (N.Y. App. Div. 2012) ("That any number of Forest City subsidiaries, located in different states, could be insureds under this policy weighs against plaintiffs' argument that, because they are New York companies and the accident occurred in this state, New York law should be applied in this instance.").  Indeed, "[i]f [Plaintiffs'] position were accepted, the result would be a single policy governed by the laws of different states—precisely what *Foster Wheeler* sought to avoid."  *Wausau Business Ins. Co. v. Horizon Admin. Servs.*, 803 F. Supp. 2d 209, 215-16 (E.D.N.Y. 2011) (declining to apply the law of each named insured's domicile to the policies, relying upon *Foster Wheeler* and noting that it was aware of "no precedent for applying multiple states' laws to a single insurance policy"); *see also Narragansett*, 921 F. Supp. 2d at 177-78 (declining to adopt "a rule that where several affiliated corporations are named insureds, the law governing the corporate affiliate who happens to be a party to the litigation at hand is controlling," because it "may result in the laws of more than one state applying to the same insurance policy because two or more corporate affiliates with differing domiciles may become party to litigation either simultaneously or successively," and "[h]aving multiple states' laws apply to a single policy is inconsistent with the approach preferred by New York courts").  This conclusion is bolstered by the fact that this is essentially a dispute for allocation or indemnification among insurers.  The Drydock has already been removed, the site cleaned up, and the non-insurer actors paid: "the interest [of the state in which the Drydock is located] diminishes when the question is not whether someone will or can pay for

the cleanup but rather who will pay" in the end.  *Md. Cas. Co.*, 332 F.3d at 155 (citation and

quotations omitted).  In contrast, Mississippi continues to have an interest in the interpretation of

policies issued to insureds domiciled in the state.  *See, e.g.*, *Foster Wheeler*, 36 A.D.3d at 22.

The several cases cited by Plaintiffs are inapposite because they address severability in

different contexts.  *See Balfour*, 85 F.3d at 81 (admiralty jurisdiction); *Donley v. Glens Falls Ins.

Co.*, 184 N.Y. 107, 111 (1906) (effect of breach of warranty under severable portion of policy);

*Prudential Prop. & Cas. Ins. Co. v. Pearce*, 484 N.Y.S.2d 464, 466-67 (N.Y. Sup. Ct. 1985)

(effect of cancellation of severable portion of policy).  Moreover, the "question of divisibility or

severability rests upon the question of intention of the parties" with respect to the contract,

*Pearce*, 484 N.Y.S.2d at 466 (citations omitted), but New York's courts have already determined

that, for purposes of the conflicts analysis, the insured's domicile is the best indicator of which

law the parties intended would govern construction of the policy when the insured risk spans

multiple states.  *Foster Wheeler*, 36 A.D.3d at 22.  Finally, at least one court has concluded that

the existence of separate premiums, which would ordinarily permit severability, does not alter

the conflicts analysis.  *See Narragansett*, 921 F. Supp. 2d at 170-71, 177-79 (declining to

determine the governing law based upon the domicile of the named-insured litigant where each

insured had a separate premium, and instead considering the policy "as a whole" to determine the

principal insured and applying the law of the state where it was domiciled).

Plaintiffs' second objection is that even if the domicile of the insured controls, the actual

insured is Signal International Texas, LLP, whose principal place of business is located in Texas.

Yet Plaintiffs fail to cite any support in the record for this assertion, and the policy lists only

Signal International, LLC and refers to "the Insured" in the singular.  (*See, e.g.*, EPI Policy at

WILLIS00701.)  Signal International, LLP is therefore the insured under the policy.  *See

Narragansett*, 921 F. Supp. 2d at 178-79 (concluding that the relevant insured was the corporate

parent, EUA, where the policy listed only EUA's address, EUA was the first named insured on the policy page and the only insured listed on the declarations page, and the other named insureds were all subsidiaries or affiliates of EUA). Incidentally, even if Plaintiffs did offer evidence that Signal International Texas, LLP is *an* insured under the policy, numerous courts have refused to sever insurance policies as to different named insureds, and Signal International, LLP bears the most significant relationship to the policy. *See, e.g.*, *Wausau*, 803 F. Supp. 2d at 215-16.

### ii.     Application of Mississippi Law

MSI asserts claims to rescind the policy for material misrepresentation and, alternatively, breach of the concealment clause. Plaintiffs contend that MSI's material misrepresentation claim must fail because there was no "application" for insurance—only an exchange of emails in which AmWins provided MSI with certain information—and because neither AmWins or Signal provided MSI with any "answers" because MSI never asked any questions. *Carroll*, 166 F.3d at 805. That is, Plaintiffs understand the language in the case law of "applications" and "answers" to be elements of a material misrepresentation claim, which are only satisfied where there is a formal application with explicit questions and answers.

At the outset, the material misrepresentation rule is not just about insurance contracts. It is based upon the precept that "any contract induced by a misrepresentation or concealment could be avoided by a party," which is in turn "simply a general principle of contract law which the special nature of insurance contracts does not alter." *Pedersen v. Chrysler Life Ins. Co.*, 677 F. Supp. 472, 474 (N.D. Miss. 1988); *see also Fidelity Mut. Life Ins. Co. v. Miazza*, 46 So. 817, 819 (Miss. 1908) ("It is the universal rule that any contract induced by misrepresentation or concealment of material facts may be avoided by the party injuriously affected thereby."). Presumably, if the material misrepresentation rule is generally applicable to contracts, the inquiry

58

should be the same regardless of the type of contract at issue.  And since many contracts are based upon agreements rather than "applications," and the affirmative representations of the parties rather than express questions and "answers," it stands to reason that, absent some special justification, insurance contracts may be voided even if there is no formal application or question-and-answer exchange.  Unfortunately, neither the parties nor the Court have located any Mississippi cases directly addressing these issues.  However, in light of the rationale of the rule and existing case law, Plaintiffs' contentions must fail.

Turning first to "applications," it is implicit to the transaction of a contract for insurance that the insured requests or "applies" for insurance from the insured.  There is no reason, however, that this process must be formalized in writing.  If the misrepresentation rule is intended to protect insurers who rely upon information provided in the application process, it should protect them whether that information is communicated verbally or in writing.  In line with this reasoning, several Mississippi courts have permitted insurers to void policies even where the application process was verbal.  *See, e.g.*, *Dukes v. S.C. Ins. Co.*, 590 F. Supp. 1166, 1169 (S.D. Miss. 1984) (voiding insurance policy for material misrepresentation because the insureds "told the insurance agent" a falsity, with no indication that a written application existed); *Liverpool & London & Globe Ins. Co. v. Delaney*, 200 So. 440, 440-41 (Miss. 1941) (considering whether insurance policy was void under its terms because "the insured . . . concealed or misrepresented . . . any material fact or circumstance concerning th[e] insurance" where the policy was issued on a "verbal application").  While it is true that most cases addressing material misrepresentation claims in the insurance context involve written applications, this seems more a matter of circumstance than an element of the claim.  *See, e.g.*, *Rock*, 2009 WL 1854452, at *1 (homeowner's and automobile insurance); *Mass. Mut. Life Ins. Co. v. Nicholson*, 775 F. Supp. 954, 955-56 (N.D. Miss. 1991) (life insurance); *Nationwide Mut.*

*Fire Ins. Co. v. Dungan*, 634 F. Supp. 674, 675-76 (S.D. Miss. 1986) (homeowner's insurance). The fact that insurance companies generally use formal, written applications for certain types of insurance or insureds—for instance, homeowner's insurance issued to individuals—should not preclude them from using less formal means for other types of insurance or insureds—for instance, commercial insurance issued to sophisticated insurance brokers acting on behalf of corporate insureds. This is a case in point. Although MSI did not have a formal application requiring AmWins to enter information in response to set prompts, there was undoubtedly an application for insurance that was reflected in writing. AmWins provided information, via email, to MSI for the purpose of obtaining insurance for Signal's property. (*See* Dkt. No. 167, Ex. 11.) After reviewing this information, MSI responded with approval and a formal quote. (*See* Dkt. No. 167, Ex. 16.) It strains credulity to argue that this exchange was anything other than a written application for insurance.

The "answers" language is more significant, but it does not go as far as Plaintiffs would like. Through the "answers" requirement, material misrepresentation defines the scope of materiality in light of the insurer's own representations of what is important. Thus, an insurer:

> has no right to rescind the policy because there was information, not asked for on the application and not volunteered by the applicant, the knowledge of which would have caused the company to refuse to insure. If the company intends to rely exclusively on the application, it should ask questions tailored to elicit all the information that it needs.

*Mattox v. Western Fidelity Ins. Co.*, 694 F. Supp. 210, 216-17 (N.D. Miss. 1988) (citing *Delaney*). This limitation on materiality recognizes that an applicant for insurance should not be penalized when he "has answered fully and truthfully all the questions asked of him." *Azlin*, 2012 WL 4482355, at *7 (citations and quotations omitted). Many cases dealing with material misrepresentation in the insurance context therefore focus upon the prompts in the insurer's

application as evidence of what is material and what an insured would reasonably believe is important.  *See, e.g.*, *Mattox*, 694 F. Supp. at 214-15; *Dungan*, 634 F. Supp. at 682.

It does not follow, however, that an insurer must expressly ask questions in order to invoke the protections of the material misrepresentation rule.  If the format of insurance applications can vary depending upon the type of insurance, the nature of the insureds, and the relationship between the parties, there is no reason why the application process cannot also be tailored to the circumstances.  The application process for the EPI Policy is, again, a case in point.  The policy is not a homeowner's or fire insurance policy between an insurer and individual.  It is a "short fuse," multi-million dollar account between an insurer and a sophisticated insurance broker on behalf of a major corporation.  (Dkt. No. 167, Ex. 12 at TRIPM0049.)  There were no questions—and thus no "answers"—because AmWins proactively reached out to MSI to "review and advise quickly if you can authorize in these excess layers." (*Id.* at TRIPM0050.)  Implicit in AmWins's request was the understanding—through industry practice and course of dealing—that the attached information was precisely the sort of information that MSI and other insurers would consider material in deciding whether to approve the application and insure the risk.  Plaintiffs would have the material misrepresentation claim fail based upon the fact that MSI did not first reach out to AmWins requesting certain information, and consequently there no questions to which AmWins provided "answers" or requests for information to which AmWins responded.  Application of the rule ought not depend upon such matters of happenstance, nor should an insurer be penalized for relying upon the affirmative representations of an insurance broker.[23]  The proper inquiry, rather, is whether it was clear to both parties that the information provided was the type of information material to

---

[23] That Signal never directly communicated with MSI is irrelevant since AmWins was acting on its behalf.

the risk.  Plaintiffs cannot seriously dispute that this was the case.  AmWins's submission

included the 2009 Heller Report and the Statement of Values, the purpose of which was to

convey the value and condition of the property insured.  The only remaining question is whether

AmWins's representation was "false, incomplete, or misleading" and was "material to the risk

insured" because it "might have led a prudent insurer to decline the risk, accept the risk only for

an increased premium, or otherwise refuse to issue the exact policy requested by the applicant."

*Carroll*, 166 F.3d at 805.

 Summary judgment may be appropriate on a claim for material misrepresentation if the

insurer can point to clear and convincing evidence establishing the elements, but not if the

insured points to specific, probative facts that could reasonably support a conclusion to the

contrary.  *See, e.g.*, *Carroll*, 166 F.3d at 808; *Pederson*, 677 F. Supp. at 476.  The Fifth Circuit's

decision in *Carroll* is illustrative.  There, the insurer of a life insurance policy provided a

pathology report indicating that the deceased insured's tumor was of a certain size, and

testimony from its Vice President of Medical Services and the underwriter of the application that

if the company had known this information, it would have at least postponed issuance of the

policy until the insured proved that he was cured, and otherwise would have declined coverage.

166 F.3d at 806.  The insured's beneficiaries, however, presented testimony from the insured's

dermatologist that the tumor was smaller, and relied upon the Underwriting Guide, which stated

that an insured would not receive an increased premium based upon a tumor of that size.  *Id.* at

807.  The beneficiaries also presented testimony from the insurer's Vice President that the

insurer would not increase the premium based upon cancerous skin cells that were, as with the

insured, removed without complication.  *Id.*  Notably, the insured also had "numerous and

significantly more severe medical ailments," all of which the insurer had been aware, so it was

questionable whether one more ailment—of which the insured had been cured—would truly

have made a difference. *Id.* at 806. In light of these genuine issues of material fact, the Fifth

Circuit reversed the district court's grant of summary judgment to the insurer. *Id.* at 808.

In contrast to *Carroll*, the instant case is appropriate for resolution on summary

judgment. The 2009 Heller Report gave Signal's facilities the second best rating possible

(Above Average) and described the possibility of the Drydock sinking as an event with an

"*extremely low* probability and frequency based on previous industry experience." (2009 Heller

Report at 36-37) (emphasis added). The Statement of Values also listed the Drydock's value at

$13.6 million, despite a prior survey estimating its value as *negative* and multiple others

indicating that it was in need of serious and costly repairs. In light of the information which

Signal failed to provide MSI, the Court concludes that it is beyond genuine dispute, by clear and

convincing evidence, that the 2009 Property Submission was incomplete, misleading, and

arguably false. Because the standard is formulated in the disjunctive, it is enough that the

submission did not provide a complete picture of the value and condition of the Drydock.

The Court further finds as a matter of law—and by clear and convincing evidence—that

the undisclosed information was material in that it might have led a prudent insurer, at the very

least, to require a higher premium to cover the Drydock. This conclusion follows, in large part,

from the Court's analysis of the Pollution Policy. It is bolstered by the testimony of James

Morano, the policy's underwriter, indicating that the 2009 Heller Report was a "favorable

inspection with no recommendation" that gave a "rosy description of the drydock" in light of the

omitted surveys and reports, and although he "didn't see anything in there that would *preclude*

[him] from writing the excess policy," he would have wanted documents reflecting the

Drydock's poor condition. (Nicoletti Aff., Ex. 11 ("Morano Tr.") 32:17-20, 86:2–88:18, 131:3-7

(emphasis added).) Mr. Morano also attested that if the information had been provided in the

application, he would have either declined coverage entirely or conditioned approval of the

policy upon exclusion of the Drydock, and if such information had been provided after issuance

of the policy, MSI would have exercised its right of cancellation under the policy.  (Morano

Decl. ¶¶ 10, 12; EPI Policy at WILLIS00710.)  Finally, Joyce Johnson, Willis's Client Manager,

specifically testified that if the valuation of the Drydock had been different, it would have

affected the premium.  (Nicoletti Aff., Ex. 8 at 269:11-18.)

Plaintiffs' counterevidence is that Mr. Morano also testified that Signal's submission was

"a typical package that [he] would receive in deciding to write an excess insurance policy"; that

he had "all of the information [he] needed to decide to underwrite" the policy; and that he would

"normally" only request the most recent evaluation or appraisal and would request more

information if he felt that he needed it.  (Morano Tr. at 31:25–32:5, 45:14-15, 53:1-4.)  Plaintiffs

also point out that Mr. Morano did not inquire into the condition of any particular property or

visit any of Signal's yards, and that one of his "main interest[s]" in underwriting a policy is the

identity of the primary underwriter and he was comforted by the fact that that entity was

Westchester.  (Straus Decl., Ex. 4 at 20:18-19, 27:7-9, 42:3-7.)  These are essentially the same

arguments made against Great American, and they fail for the same reasons.  The testimony cited

by Plaintiffs is inapposite because it pertains to a different situation entirely, and merely reflects

MSI's assumptions based upon Signal's affirmative disclosure requirement under the law.

Plaintiffs also argue that the value and condition of the Drydock were not material because the

value was only one small part—$13.6 million—of a $211 million policy.  But this fact, standing

alone, does not constitute specific, probative evidence to counter Ms. Joyce's testimony that the

valuation of the Drydock would have affected the premium, or Mr. Morano's testimony that he

would have declined coverage or conditioned coverage upon exclusion of the Drydock.  Nor

does it contradict the Court's conclusion that, whatever MSI might have done, a prudent insurer

might have changed the terms of the policy had it known the omitted information.

Testimony from Mr. Morano and Cody Whittington that certain actions were not "fraud" is also irrelevant.  (Morano Tr. at 195:23–196:7; Nicoletti Aff., Ex. 12 at 367:13-19.)  As this case has revealed, the question of what constitutes "fraud" can vary immensely depending upon the applicable state law.  MSI's material misrepresentation claim—which does not require any evidence of intent or reliance—is not the same as fraud.  Nor is such testimony relevant to the question whether fraud was committed as a legal matter.  Finally, Mr. Morano's testimony regarding misrepresentation does not defeat summary judgment because it merely reflects that AmWins provided all of the information Signal had provided to it and that that appeared to be a complete submission.  (Morano Tr. at 45:5-13, 91:13-14.)  It was not.

In sum, Plaintiffs have failed to offer any probative evidence to refute the substantial evidence that the omitted information would have been material to a prudent insurer, and specifically would have affected MSI's decision.[24]  The Court therefore grants MSI's motion for summary judgment on its material misrepresentation claim.  The Court does not reach MSI's claim for breach of the concealment clause as it is not necessary to do so.[25]

---

[24] The Court notes that there does not appear to be a reliance requirement under the material misrepresentation claim.  However, assuming there is, reliance has been proven in this case.

[25] In light of the Court's holding that the EPI Policy is void *ab initio*, the motions for summary judgment as to business interruption and extra expenses are denied as moot.

**IV.    Conclusion**

For the foregoing reasons, it is hereby ORDERED that:

Plaintiffs and Signal's motion for partial summary judgment (Dkt. No. 226) is DENIED;

Signal's motion for partial summary judgment (*id.*) is DENIED;

Plaintiffs' motion for partial summary judgment (Dkt. No. 230) is DENIED;

Great American's cross-motion for summary judgment (Dkt. No. 242) is DENIED;

Great American's cross-motion for summary judgment (Dkt. No. 244) is GRANTED;

MSI's motion for summary judgment (Dkt. No. 249) is DENIED;

MSI's motion for reconsideration or alteration of judgment is DENIED (Dkt. No. 253);

and

MSI's cross-motion for summary judgment (Dkt. No. 257) is GRANTED.

The Clerk of Court is directed to terminate the motions at docket numbers 226, 230, 242, 244, 249, 253, and 257.

SO ORDERED.


Dated:  March 31, 2014
        New York, New York

_____
                    J. PAUL OETKEN
              United States District Judge